IN THE UNITED STATES DISTRICT COURT FOR THE ~~RECEIVED~~

MIDDLE DISTRICT OF ALABAMA

2006 FEB 16  A 11: 27

DAVID FREEMAN )
                   *Petitioner,* )
                   )
    v. )
                   )
                   ) Civil Action No. 2:06CV122-MHT-VPM
DONAL CAMPBELL, Commissioner, )
Alabama Department of Corrections, )
                   *Respondent.* )
                   )

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY[1]

1. (a)   Petitioner, David Freeman, was convicted and sentenced in the Circuit Court of Montgomery County, Alabama.

    (b)   Case No. CC-88-1412

2. (a)   Petitioner was convicted on June 25, 1996.

    (b)   Petitioner was sentenced on August 1, 1996.

3.   Petitioner was sentenced to death.

4.   Petitioner was convicted of six counts.

5.   Petitioner was convicted of six counts of capital murder: Ala. Code §13A-5-40(a)(10); Ala. Code § 13A-5-40(a)(4) (2 counts); Ala. Code § 13A-5-40(a)(2) (2 counts); and Ala. Code § 13A-5-40(a)(3).

6. (a)   Petitioner pled not guilty by reason of mental disease or defect to all charges.

    (b)   Not applicable.

---

[1] This petition substantially follows the form dictated by the model in the Appendix of Forms accompanying the Rules Governing Section 2254 Cases in the United States District Courts, as amended effective December 1, 2004. *See* Rule 2(d), Rules Governing Section 2254 Cases. Paragraphs 1 through 11 state the history of prior court proceedings; paragraphs 12(I) through 12 (IX) state the federal constitutional grounds upon which petitioner claims that the judgment and sentence imposed upon him are unlawful; and paragraphs 13 through 18 contain required technical information.

7.      Petitioner did not testify at trial or at any pre-trial or post-trial proceeding.

8.      Petitioner appealed from the judgment of conviction and sentence.

9.      (a)     Petitioner appealed directly to the Alabama Court of Criminal Appeals.

        (b)     Case number CR-95-2080.

(c)     The Alabama Court of Criminal Appeals affirmed petitioner's convictions.

(d)     The Alabama Court of Criminal Appeals' decision affirming the convictions and sentence was issued on April 30, 1999.

(e)     *Freeman v. State*, 776 So.2d 160 (Ala. Cr. App. 1999).

(f)     Petitioner raised the following grounds in his direct appeal to the Alabama Court of Criminal Appeals:

        I.      Whether the trial court's failure to instruct the jury that it could determine the voluntariness of Appellant Freeman's statement was improper and violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Alabama law.

        II.     Whether, because of a lack of evidence of a breaking and entering, there was insufficient evidence to sustain Appellant Freeman's convictions for burglary-murder and insufficient evidence for the finding of burglary as an aggravating circumstance.

        III.    Whether, because of a lack of evidence of an intent to steal before the killings, there was insufficient evidence to sustain Appellant Freeman's convictions for robbery-murder and insufficient evidence for the finding of robbery as an aggravating circumstance.

        IV.     Whether the jury charge regarding intent shifted the burden of persuasion to Appellant Freeman and violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Alabama law.

        V.      Whether Appellant Freeman's statements made after his arrest were admitted in violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 6 of the Alabama Constitution of 1901.

        VI.     Whether Appellant Freeman's statements made after his arrest were admitted

2

in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 6 of the Alabama Constitution of 1901.

VII.    Whether Appellant Freeman's statements made after his arrest were admitted in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, §§ 6 and 7 of the Alabama Constitution of 1901.

VIII.   Whether Appellant's multiple convictions and sentences for the same killing violate double jeopardy principles.

IX.     Whether the trial court erred in failing to conduct a competency hearing and allowing Appellant Freeman to proceed to trial even though he appeared not competent to stand trial in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights and Alabama law.

X.      Whether the trial court's instructions limiting consideration of mitigating evidence violated Appellant's rights to a constitutional sentencing hearing.

XI.     Whether the prosecution's misconduct and arguments during the guilt-innocence phase of the trial were improper and violated rights guaranteed to petitioner by the Fifth, Sixth, Eighth, and Fourteenth Amendments.

XII.    Whether the prosecution's misconduct and arguments at the penalty phase of the trial were improper and deprived appellant of a fundamentally fair hearing and due process.

XIII.   Whether Alabama's application of the "especially heinous, atrocious, and cruel" aggravating circumstance is unconstitutionally vague and as applied to Appellant's case violated due process and the prohibition of cruel and unusual punishment.

XIV.    Whether the trial court's instruction on insanity effectively and improperly deprived Appellant Freeman of a defense.

XV.     Whether the trial court's admission of testimony concerning Appellant Freeman's statements, extracted from Appellant Freeman while his judgment was impaired and without a valid waiver of his rights to remain silent and to have counsel present with him during interrogations, violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Alabama law.

3

XVI.   Whether the trial court's refusal to find the statutory circumstance of lack of capacity to conform conduct to the requirements of law deprived Appellant Freeman of a reliable sentencing determination as required by the Eighth and Fourteenth Amendments to the United States Constitution and Alabama law.

(g)    Petitioner sought further review by a higher state court.

    (1)    Petitioner sought further review in the Alabama Supreme Court.

    (2)    Alabama Supreme Court case number 1981565.

    (3)    The Alabama Supreme Court granted certiorari and affirmed petitioner's convictions and death sentence.

    (4)    The Alabama Supreme Court issued its decision affirming the convictions and sentence on May 26, 2000.

    (5)    *Ex parte David Freeman*, 776 So.2d 203 (Ala. 2000) (opinion on denial of rehearing).

    (6)    Before the Alabama Supreme Court, petitioner raised every issue he had previously raised before the Alabama Court of Criminal Appeals.

(h)    Petitioner filed a petition for writ of certiorari in the United States Supreme Court.

    (1)    United States Supreme Court case number 00-5948.

    (2)    The United States Supreme Court denied the petition for writ of certiorari.

    (3)    The United States Supreme Court's order denying the petition for writ of certiorari was entered on October 30, 2000.

    (4)    *Freeman v. Alabama*, 531 U.S. 966 (2000).

10.   Other than a direct appeal from the judgment of conviction and sentence, petitioner has previously filed one petition for post-conviction relief in the state courts of Alabama.

11.   (a)   (1)   Montgomery County Circuit Court.

        (2)   Case number CC 88-1412.60-EWR

        (3)   Petitioner filed his initial petition for post-conviction relief on September 28, 2001.

4

(4)     Petitioner sought post-conviction relief by filing a petition for post-conviction relief under Rule 32, Ala.R.Crim.P.

(5)     Petitioner raised the following grounds in his petition for post-conviction relief:

I.      Petitioner's right, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, not "to be twice put in jeopardy of life or limb" was violated when his trial was permitted to go forward after a previous proceeding ended in the declaration of a mistrial in the absence of manifest necessity.

II.     Petitioner was denied the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution as well as Alabama law.

        A.      Trial counsel failed to conduct meaningful, constitutionally permissible voir dire of the prospective jurors at petitioner's trial, failed to pose questions necessary to discover bias and predisposition on the part of prospective jurors, and failed to articulate meritorious challenges for cause based on information revealed by prospective jurors during voir dire.

        B.      Trial counsel failed to object to the introduction of the crime scene video on any ground.

        C.      Trial counsel failed to object to the crime scene technician's identification of various images at the crime scene.

        D.      Trial counsel failed to object to the testimony of the prosecution's purported forensic odontology expert concerning the alleged bite marks on petitioner's arm.

        E.      Despite having been informed of an alternative source of the bite marks, which were allegedly visible on petitioner's arm following his arrest, trial counsel failed to investigate and present reliable evidence in light of this information.

        F.      Trial counsel failed to submit autopsy data generated by the state's medical examiner to a qualified, independent pathologist for review.

        G.      Trial counsel failed to investigate, develop and present

5

evidence that petitioner suffers from neurological impairments.

H.    Trial counsel deposed Dr. Guy Renfro despite knowledge that his conclusions were harmful to petitioner's defense.

I.    Trial counsel failed to object to the testimony of Dr. Joel Dixon on the ground that admission of his hearsay account of the examinations performed by, and conclusions reached by three non-testifying doctors violated petitioner's right to cross-examine those doctors concerning their qualifications, methodology, and conclusions in contravention of the Confrontation Clause of the Sixth Amendment to the United States Constitution.

J.    Trial counsel failed to investigate, develop and present available evidence in mitigation of petitioner's punishment.

K.    Trial counsel failed to present available evidence regarding petitioner's background and his mental health history to the jury in a manner which would have allowed the jury to give this evidence mitigating effect during the sentencing phase.

L.    Trial counsel failed to investigate and introduce readily available evidence of petitioner's good behavior in and adaptability to prison.

M.    Trial counsel failed to investigate and present available evidence to impeach the testimony of prosecution witness Francis Boozer.

N.    Trial counsel failed to object to Alabama's requirement that the judge, rather than the jury, determine the existence of the facts necessary to the imposition of petitioner's death sentence.

O.    Trial counsel conceded during guilt-innocence phase closing argument that, in the event the jury returned a guilty verdict, no genuine question would remain as to the sentence petitioner would receive.

P.    Trial counsel failed to object to the admission of raw psychological testing data, including individual questions and

6

answers contained in testing instruments administered to petitioner.

Q.    Trial counsel failed to investigate, develop and present evidence establishing that petitioner is mentally retarded.

III.    Petitioner's right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Alabama law, and his right to be free from arbitrary and capricious imposition of the death penalty as guaranteed by the Eighth Amendment to the United States Constitution and Alabama law, were violated by the admission of graphic, unnecessarily cumulative images of the crime scene victims.

IV.    Petitioner's right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Alabama law was violated by the admission of unreliable forensic odontology testimony purporting to establish that bite marks allegedly found on Petitioner's arm were made by one of the victims.

V.    Petitioner's right to confront witnesses against him, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Alabama law, was violated by the admission of the hearsay testimony of Dr. Joel Dixon.

VI.    Petitioner's right, as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution and Alabama law, to be free from arbitrary, capricious imposition of the death penalty was violated as a result of the jury's and trial court's consideration of materially inaccurate information at the sentencing phase of petitioner's capital trial.

VII.    Petitioner's right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Alabama law was violated as a result of his representation at trial by lead counsel who labored under the debilitating, judgment-impairing effects of a psychological condition which resulted in the alteration of counsel's gender, and permanently disabled counsel from the practice of law.

VIII.    Petitioner's right the effective assistance of appellate counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Alabama law was violated as a result of

7

appellate counsel's failure to raise meritorious challenges to petitioner's convictions and death sentence based on facts appearing on the face of the record.

    A.    Appellate counsel did not raise a Double Jeopardy challenge to petitioner's conviction or sentence.

    B.    Appellate counsel did not challenge the admission into evidence of graphic, unnecessarily cumulative images of the crime scene and the victims.

    C.    Appellate counsel raised no challenge to the trial court's admission of, and reliance on, the testimony of Michael O'Brien concerning bite marks allegedly found on petitioner's arm.

    D.    Appellate counsel failed to challenge the admission into evidence of Dr. Dixon's hearsay testimony.

    E.    Appellate counsel failed to challenge the admission into evidence of the prior testimony witness Francis Boozer.

    F.    Appellate counsel failed to challenge that the trial court, not the jury, determined the existence of the aggravating factors rendering petitioner eligible for a sentence of death.

    G.    Appellate counsel failed to challenge the admission into evidence of raw psychological testing data.

IX.    Petitioner's right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Alabama law was violated as a result of his representation at trial by lead counsel who labored under an actual conflict of interest which adversely affected Petitioner's defense.

X.    Petitioner's right to trial by jury, and to have a jury determine all facts essential to the imposition of the punishment he received, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, was violated when the trial judge, rather than the jury, determined the facts necessary to increase Petitioner's sentence from life without parole to death.

XI.    Petitioner's right to be free from the imposition of excessive, cruel

and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution, was violated when he was sentenced to death despite the fact that he is mentally retarded.

XII.    Petitioner's right to demand the nature and cause of the accusation leveled against him, and to have a copy thereof, as guaranteed by Article I, § 6 of the Alabama Constitution (1901), and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, was violated when he was tried, convicted, and sentenced to death pursuant to an indictment which failed to allege the material elements necessary to the imposition of a death sentence under Alabama law. As a result of this deficiency, the trial court was without jurisdiction to sentence Petitioner to death.

(6)    Petitioner received an evidentiary hearing on his petition for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

(7)    The Montgomery County Circuit Court denied petitioner's application for post-conviction relief by adopting verbatim a proposed order submitted by counsel for respondent.

(8)    Judgment denying post-conviction relief was entered on June 25, 2003.

(b) & (c)    Petitioner has not filed any second or subsequent petitions for relief pursuant to Rule 32, Ala. R. Crim. P.

(d)    Petitioner appealed the denial of his application for post-conviction relief to the Alabama Court of Criminal Appeals, and sought review by the Alabama Supreme Court via a petition for writ of certiorari.

(e)    Not applicable.

12.    GROUNDS FOR FEDERAL HABEAS CORPUS RELIEF:

I.    PETITIONER'S RIGHT, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, NOT "TO BE TWICE PUT IN JEOPARDY OF LIFE OR LIMB" WAS VIOLATED WHEN HIS TRIAL WAS PERMITTED TO GO FORWARD AFTER A PREVIOUS PROCEEDING ENDED IN THE DECLARATION OF A MISTRIAL IN THE ABSENCE OF MANIFEST NECESSITY.

(a)    Supporting facts.

"A State may not put a defendant in jeopardy twice for the same offense." *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (citing *Benton v. Maryland*, 395 U.S. 784 (1969)). "Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's valued right to have his trial completed by a particular tribunal." *Id.* (internal quotation marks omitted). "Where . . . a mistrial has been declared, the defendant's valued right to have his trial completed by a particular tribunal is . . . implicated." *United States v. Dinitz*, 424 U.S. 600, 606 (1976) (internal quotation marks and additional citations omitted). "[T]he question whether under the Double Jeopardy Clause there can be a new trial after a mistrial has been declared without the defendant's request or consent depends on whether there is a manifest necessity for the (mistrial), or the ends of public justice would otherwise be defeated." *Id.* at 606-607 (internal quotation marks and additional citations omitted).

In this case, petitioner's re-trial originally commenced on January 22, 1996.[2] *See* Tr. C. 623.[3]

---

[2] Petitioner's initial convictions and sentence were overturned on direct appeal after the Alabama Court of Criminal Appeals concluded that the prosecution had violated the rule of *Batson v. Kentucky*, 476 U.S. 79 (1986), in selecting the jury for his first trial. *See Freeman v. State,* 651 So.2d 576, 581 (Ala.Crim.App.1994).

[3] This petition will utilize the following citation forms when referring to the state court record: "Tr.R." for the reporter's transcript of the trial proceedings; "Tr.C." for the clerk's record of the trial proceedings; "Rule 32 R." for the reporter's transcript of the state post-conviction relief proceedings;

10

At that proceeding, a jury was empaneled and sworn, and evidence was taken from approximately thirteen witnesses. *See id.*; Tr. C. 640-868. On January 31, 1996, following a brief delay in the proceedings occasioned by the temporary illness of petitioner's lead counsel, Allen Howell, the trial court *sua sponte* declared a mistrial. Tr. C. 862-863. The record does not contain, nor is petitioner aware of, any facts rising to the level of manifest necessity justifying the declaration of a mistrial. Petitioner did not request or expressly consent to the declaration of a mistrial; rather, when the trial court inquired as to petitioner's wishes, his second trial counsel, John Norris, related that petitioner "just wishes for the Court to give it time so Allen [Howell] can be one hundred percent." Tr. C. 862.

Prior to the subsequent trial which ended in the convictions and death sentence challenged in this petition, petitioner moved to dismiss the indictment against him on the ground that trying him after the declaration of a mistrial in the absence of manifest necessity violated the Double Jeopardy Clause. Tr. C. 635-636. This motion, a subsequent petition for a writ of mandamus submitted to the Alabama Supreme Court, and a pre-trial petition for a writ of habeas corpus filed in the United States District Court for the Middle District of Alabama were all denied without explanation. Tr. C. 634; 869; 870. Petitioner was thereafter retried, convicted, and sentenced to death in violation of the Double Jeopardy Clause.

    (b)     Petitioner did exhaust his state remedies with respect to this Ground.

    (c)     Direct appeal:

          (1)     Petitioner did not raise this issue on direct appeal.

          (2)     Petitioner did not raise this issue on direct appeal because it had previously been presented to the Alabama Supreme Court via a petition for writ of mandamus.

_____

and "Rule 32 C." for the clerk's record of the state post-conviction relief proceedings.

(d)   Post-Conviction Proceedings:

    (1)   Petitioner initially raised this issue through a post-conviction relief petition in the Montgomery County Circuit Court.

    (2)   Petitioner raised this issue in a Petition for Post-Conviction Relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. Respondent moved to dismiss on the ground that the issue had previously been raised and decided, and the circuit court dismissed the issue on January 23, 2001.

    (3)   Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

    (4)   Petitioner appealed the denial of his petition for post-conviction relief.

    (5)   Petitioner did not raise this issue in the appeal of the denial of his petition for post-conviction relief.

    (6)   Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

    (7)   Petitioner did not raise this issue in the appeal of the denial of his petition for post-conviction relief because the issue had already been exhausted during pre-trial proceedings.

(e)   Petitioner exhausted his remedies with respect to Ground I via a pre-trial petition for writ of mandamus submitted to and summarily denied by the Alabama Supreme Court.

II.    **PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN HE WAS INTERROGATED AFTER INVOKING HIS RIGHT TO SILENCE AND THE INCULPATORY STATEMENTS PRODUCED BY THAT INTERROGATION WERE ADMITTED AGAINST HIM AT HIS CAPITAL TRIAL.**

(a)    Supporting facts.

Petitioner was arrested in connection with the homicides of Sylvia and Mary Gordon on March 12, 1988. Tr.R. 568; 575. While police questioned him at various times before and after the arrest, he initially denied involvement and made no inculpatory statements. On March 14, 1988, Det. Gary Graves took petitioner to his office, handcuffed him to a chair, and began to interrogate him. Tr.R. 597-598. Graves testified at trial that he asked petitioner to give him a statement, and petitioner responded by stating "that he couldn't talk about it." Tr.R. 598. Rather than honoring petitioner's refusal to talk, Graves tried an alternate route: "But I asked him then, I said, well, if you can't talk about it, can you write it for me?" Tr.R. 598-599. According to Graves, petitioner agreed, and after initially providing a non-inculpatory written statement, petitioner went on to give a written statement admitting the homicides, and then gave an audiotaped statement confirming the written statement. Tr.R. 599; 607-613.

In the statements, petitioner allegedly admitted going to the Gordon residence, stabbing first Sylvia and then Mary Gordon, and disabling the household telephones before leaving in the Gordons' car. *See* Tr.R. 607-613; Tr.C. 3222-3230. The prosecution relied upon these statements in establishing petitioner's guilt, and in contending – contrary to the defense's position at trial – that petitioner had known what he was doing, and had done it intentionally. *See* Tr.R. 1170 (Deputy DA Harris: "What happened when Mary Gordon walked in? He told you what happened. I had no choice. He made the choice, and he murdered her as well"); Tr.R. 1205-1207 (utilizing content of

13

petitioner's statements to contend that petitioner acted intentionally and repeatedly lied in attempting to cover up his actions and minimize responsibility). The prosecution further relied upon the statements at the sentencing phase to contend that petitioner lacked remorse. *See* Tr. 1299 ("He shows you throughout his statements no remorse, none").

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that "[i]f the accused indicates [during custodial interrogation] that he wishes to remain silent, 'the interrogation must cease.'" *Edwards v. Arizona*, 451 U.S. 477, 482 (1081) (quoting *Miranda*, 384 U.S. at 474). In *Michigan v. Mosley*, 423 U.S. 96 (1975), the Court explained as follows:

> A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt "fully effective means . . . to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored . . ." The critical safeguard identified in the passage at issue is a person's "right to cut off questioning." . . . We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his "right to cut off questioning" was "scrupulously honored."

*Mosley*, 423 U.S. at 103-104 (internal citations omitted).

In this case, petitioner clearly and unambiguously invoked his right to silence when he responded to Det. Graves' questioning by saying he "couldn't talk about it." Indeed, petitioner could have meant nothing other than that he was unwilling or unable (or both) to discuss the matters Graves was asking about at that time. Rather than "scrupulously honor[ing]" petitioner's clear invocation of his "right to cut off questioning," however, Graves -- with petitioner still handcuffed to a chair -- attempted an end-run by suggesting that petitioner let down his guard and simply write what he had just declared his unwillingness to speak. This was precisely the sort of disregard for the rights guaranteed by the Fifth Amendment that *Miranda* and its progeny prohibit, and as *Mosley*

14

makes clear, Graves' failure to honor petitioner's invocation renders the statements made after that invocation inadmissible. Petitioner was therefore entitled to have his statements suppressed at trial, and failing that, to have his convictions and sentence – which, as described above, were infected by the erroneous admission of those statements – reversed on this ground on direct appeal.

    (b)    Petitioner exhausted his state remedies with respect to this Ground.

    (c)    Direct appeal:

        (1)    Petitioner raised this issue on direct appeal.

        (2)    Not applicable.

    (d)    Post-Conviction Proceedings:

        (1)    Petitioner did not raise this issue in state post-conviction relief proceedings.

        (2) - (7)    Not applicable.

    (e)    Not applicable.

**III.**    **PETITIONER'S RIGHT TO COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WAS VIOLATED AS A RESULT OF HIS REPRESENTATION AT TRIAL BY LEAD COUNSEL WHO LABORED UNDER A DEBILITATING, JUDGMENT-IMPAIRING PSYCHOLOGICAL CONDITION AND WHO LABORED UNDER AN ACTUAL CONFLICT OF INTEREST.**

(a)    Supporting facts.

Lead trial counsel, Allen Howell, now lives as a transgendered woman named Ally Howell. While the surgery to physically change Howell occurred after petitioner's 1996 trial, the psychological manifestations of Howell's gender confusion were present prior to and during petitioner's trial. Indeed, the lifelong psychological stress of Howell's confusion was at its height in 1994 and through the end of petitioner's trial. During that time, when no one other than Howell's

wife knew about his condition, Howell was dealing with other personal problems as well, including caring for his wife, who was suffering from a range of physical ailments, and his infant child.

Howell served as lead counsel during petitioner's trial. He alone was responsible for presenting evidence on behalf of the defense. And he was solely responsible for objecting to the admission of evidence offered by the prosecution. The nature of the charges against petitioner were especially difficult for Howell to confront. Due to the timing of Howell's psychological crisis, he was unable to deal with and work through his feelings about defending someone accused, as petitioner was, of a double rape/murder in a case involving allegations of inter-gender violence. Howell moved to be relieved from the case, citing personal and professional reasons in requesting an *in camera* hearing, but no hearing was ever held. Tr.C. 139; 137-138.[4]

Howell's psychological and personal problems interfered with his ability to focus on petitioner's case. The manner in which the case was investigated and tried by attorney Howell indicates that his attention was not properly focused on this case. Most troubling, Howell decided to rely solely on an insanity defense despite the fact that he lacked persuasive expert testimony to substantiate the claim. *See, e.g.*, Tr.R. 830 (Burkhart's testing did not indicate petitioner was "crazy"); Tr.R. 883 (of nineteen different reports by other examiners, none found petitioner had

---

[4]The trial court was on notice that Howell was not performing adequately. Due to concerns about Howell's health and ability to be ready for trial, the court appointed attorney Bill Abell three weeks prior to trial to ensure that the case could be tried. Rule 32 R. 85. Abell was appointed "backup" because there was some concern about Howell's behavior. Rule 32 R. 86. Although Abell had only been involved in the case for three weeks, he gave the opening statement in the guilt phase. Rule 32 R. 89. The determination that he was going to give the opening statement was made about ten minutes prior to the start of trial because Howell was not present and co-counsel, attorney Norris, was "nervous as a cat." *Id.* In his opening statement, Abell focused, among other things, on petitioner's lengthy mental health history, which he believed would be developed in the sentencing phase. Rule 32 R. 90. As the four-page sentencing transcript reveals, Abell's promise to the jury did not come to pass.

psychotic disorder or lacked capacity to appreciate criminality of conduct); Tr.R. 885 (Burkhart did not find petitioner lacked capacity to appreciate criminality of conduct); Tr.R. 896-898, 903 (Burkhart unable to estimate duration of psychotic episode or whether it lasted throughout perpetration of offenses). He decided to rely on an insanity defense despite the fact that he should have known he might have to overcome the testimony of Francis Boozer, a witness for the state at petitioner's first trial, who recalled petitioner telling her prior to the crime that he would have to get rid of Sylvia's mother and that he would rather see Sylvia dead than with someone else. *See* Ground VI, *infra*. Then, having chosen to pursue the defense of mental disease or defect at the time of the crime, Howell deposed Dr. Renfro with full knowledge that Renfro's conclusions refuted the defense theory. *See* Ground IV.C., *infra*. And then, in guilt-or-innocence phase closing argument, Howell told the jury that a finding of guilt would be equivalent to "writing the first line or two of David's death certificate," thereby all but conceding the sentencing phase. Howell had no strategic reason for any of these missteps. Tr.R 1189; *see also* Tr.R. 1195 (Howell during guilt-or-innocence phase closing: "Are we going to take another life?"). In fact, Howell recalls this statement to the jury as a reflection of the fact that she had concentrated her efforts on the guilt-or-innocence phase of the trial, rather than on the sentencing phase. Finally, having presented a guilt-or-innocence phase defense doomed from the very beginning, Howell presented virtually no evidence in the sentencing phase. *See* Tr.R. 1278-1283 (testimony of lone defense witness, who testified by telephone). This representation amounted to a complete abdication of the role of a competent and effective defense attorney – it entirely failed to subject the prosecution's case to meaningful adversarial testing. *United States v. Cronic*, 466 U.S. 648, 657-658 (1984) ("[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated"); *see also United States*

17

*ex rel. Williams v. Twomey*, 510 F.2d 634, 640 (7th Cir. 1975); *People v. Young*, 581 N.E.2d 371 (Ill. App. Ct. 1991); *cf. Bell v. Cone*, 535 U.S. 685 (2002).

In addition, due to the controversial and potentially embarrassing nature of Howell's psychological condition, counsel did not reveal to either his client or the trial court his condition, or the effect it had on his judgment and ability to effectively represent petitioner. *See* Rule 32 R. 103-104 (Howell never discussed with co-counsel his gender identity crisis and petitioner was not informed of a possible need to waive his right to conflict-free counsel); *see also* Rule 32 C. 472. By putting his personal interest in maintaining secrecy about his condition ahead of his obligation to reveal the impairments brought about by that condition, counsel deprived petitioner of his right to request that new counsel, free of such impairments, be appointed. *See Mickens v. Taylor*, 535 U.S. 162, 171 (2002) (once a conflict of interest has been shown to affect counsel's performance, prejudice is presumed). As a result, petitioner was forced to go forward at trial with lead counsel whose judgment was impaired to such an extent that counsel failed to function in the manner guaranteed by the Sixth Amendment.[5]

---

[5]In the state post-conviction relief proceedings, petitioner sought to prove his allegations relating to attorney Howell first by requesting the funds necessary to facilitate Ms. Howell's travel to Alabama (she now resides in upstate New York), and later by offering Ms. Howell's sworn affidavit. The Circuit Court summarily denied the request for travel funds, and later – after the conclusion of the evidentiary hearing – refused to admit the affidavit into evidence. Rule 32 C. 248; 415. The circuit court also summarily denied petitioner's earlier request for the resources necessary to retain the services of a psychologist with expertise in gender identity issues for the purpose of evaluating the effect of Howell's condition on his performance prior to and during trial. Rule 32 C. 200; Rule 32 Supp. C. 31. Had petitioner's request for funds been granted, he would have supplied an appropriate expert with all available, relevant information concerning counsel's condition and, if possible, arranged for one or more interviews of Howell by the expert. After completion of the proper assessments, petitioner believes the expert would have testified that, as a result of the psychological turmoil he was experiencing prior to and during petitioner's trial, Howell was unable to fulfill his obligations of diligence and zealousness toward petitioner.

18

(b)    Petitioner exhausted his state remedies with respect to this Ground.

(c)    Direct appeal:

    (1)    Petitioner did not raise this issue on direct appeal.

    (2)    Petitioner did not raise this issue on direct appeal because it requires information not contained within the trial record, and was therefore appropriately reserved for post-conviction proceedings.

(d)    Post-Conviction Proceedings:

    (1)    Petitioner raised this issue through a post-conviction petition in the Montgomery County Circuit Court.

    (2)    Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

    (3)    Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

    (4)    Petitioner appealed the denial of his petition for post-conviction relief.

    (5)    Petitioner raised this issue in the appeal of the denial of his petition for post-conviction relief.

    (6)    Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

    (7)    Not applicable.

(e)    Not applicable.

19

**IV.    INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.**

The Sixth Amendment guarantees all criminal defendants the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984); *see also (Terry) Williams v. Taylor*, 529 U.S. 362 (2000). To establish his entitlement to relief on a claim that counsel rendered ineffective assistance, a prisoner must demonstrate that (1) his attorney's representation "fell below an objective standard of reasonableness," and (2) he was prejudiced as a result thereof. *Strickland*, 466 U.S. at 687-688; *see also, e.g., Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*) ("An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense").

"To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 687). Under this standard, a reviewing court must "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' . . . which includes a context dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time[.]'" *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688). And when counsel's challenged conduct is purportedly attributable to "tactical judgment," that judgment and the "investigations supporting" it must themselves be objectively reasonable. *Wiggins*, 539 U.S. at 521.

"[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*, 123 S.Ct. at 2542 (quoting *Strickland*, 466 U.S. at 694). This standard requires a showing by less

than a preponderance of the evidence, and when assessing the existence of the requisite reasonable probability, it is both appropriate and necessary to consider the aggregate harm flowing from all of counsel's individual errors, rather than merely determining whether each individual error, standing alone, was prejudicial. *Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the *totality* of the evidence before the judge or jury") (emphasis added); (*Terry*) *Williams*, 529 U.S. at 397 (prejudice must be determined based on the "totality" of the evidence); *see also Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *Martin v. Cain*, 246 F.3d 471, 477 (5th Cir. 2001).

Because the impact of counsel's deficiencies must be considered cumulatively, as well as for ease of organization, petitioner's challenges to various aspects of trial counsel's performance, though presented individually, are all set forth herein as subdivisions of Ground IV (*i.e.*, Grounds IV.A through IV.F). Additional relevant legal principles governing the particular ineffective assistance of counsel allegations are stated throughout, as applicable.

In stating the factual bases of counsel's deficient performance and the attendant prejudice in this case, petitioner will, where appropriate, account for the fact that in state court he was prohibited from fully developing the factual bases of his ineffective assistance of counsel claims by the Alabama courts' denial of counsel's repeated requests for funds necessary to hire experts and investigators. The Montgomery Circuit Court also denied petitioner funding for travel expenses, preventing lead trial counsel, Ally Howell, who was primarily responsible for the defense, from testifying at the evidentiary hearing.[6] The circuit court further refused to admit a sworn affidavit

---

[6]*See* Rule 32 C. 171-178 (Motion for Funds Necessary for the Development and Presentation of the Factual Bases of Petitioner's Grounds for Relief (filed April 3, 2002) (requesting funds to retain a neuropsychologist, a forensic odontologist, a forensic pathologist, a mitigation specialist,

from Howell that summarized the points to which she would have testified. Rule 32 C. 415.

Therefore, in stating the factual basis for each ineffective assistance of counsel claim below, petitioner will also set forth, when pertinent, allegations and factual contentions that counsel believe would have been established in state court had petitioner been afforded funds to retain the expert and investigative services he repeatedly sought. Petitioner believes these allegations will have evidentiary support upon a reasonable opportunity for further fact development.

> **IV.A.** **PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY TRIAL COUNSEL'S FAILURE TO CONDUCT JUROR VOIR DIRE IN A MANNER THAT WOULD HAVE REVEALED BIASES OR PREDISPOSITIONS HARBORED BY THE JURORS, AND COUNSEL'S FAILURE TO ARTICULATE MERITORIOUS CHALLENGES FOR CAUSE.**

(a)    Supporting facts.

A criminal defendant is entitled to the effective assistance of counsel during jury selection. *See, e.g.*, *Strickland*, *supra*; *Gomez v. United States*, 490 U.S. 858, 873 (1989); *Irvin v. Dowd*, 366 U.S. 722 (1961). To render effective assistance in jury selection, counsel must conduct an "adequate *voir dire* to identify unqualified jurors" and seek their removal for cause. *Morgan v. Illinois*, 504

---

an investigator, a social worker, and a risk assessment expert)); Rule 32 C. 198-202 (Supplemental Motion for Funds Necessary for the Development and Presentation of the Factual Bases of Petitioner's Grounds for Relief (filed on May 7, 2002) (requesting funds to retain the services of a dermatologist, to contest the bite-mark evidence, and a psychologist with expertise in gender-identity issues, to study lead counsel Howell's psychological condition during trial)); Rule 32 C. 248-254 (Second Supplemental Motion for Funds Necessary for the Development and Presentation of the Factual Bases of Petitioner's Grounds for Relief (filed July 25, 2002) (requesting funds for travel expenses to secure the attendance of Howell, a resident of upstate New York, at the evidentiary hearing and for mental retardation testing by a neuropsychologist)). The circuit court heard oral argument on the first funding motion and the first supplemental funding motion and denied both on May 29, 2002. Rule 32 R. 42-58; Rule 32 Supp. C. 31. The circuit court summarily denied the second supplemental motion on August 5, 2002. Rule 32 C. 248.

U.S. 719, 729 (1992); *see also id.* at 728-729; *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984); *Smith v. Phillips*, 455 U.S. 209, 215-216 (1982); *State v. Chastain*, 947 P.2d 57, 65 (Mont. 1997) (trial counsel ineffective for failing to challenge unqualified juror; participation of juror was presumptively prejudicial); *State v. McKee*, 826 S.W.2d 26 (Mo.Ct.App. 1992) (counsel ineffective for failing to challenge two venirepersons who said it would bother them if defendant did not testify); *Knight v. State*, 839 S.W.2d 505, 511 (Tex. Ct. App. 1992) ("An examination of whether or not the result of the trial would have been different is mooted from the outset as appellant's right to a fair trial by an impartial adjudicator was stillborn. . . . The second prong of *Strickland* is automatically satisfied"); *Presley v. State*, 750 S.W.2d 602 (Mo. Ct. App.), *cert. denied*, 488 U.S. 975 (1988) (counsel ineffective for failing to challenge for cause a venireman who admitted bias against defendant; prejudice presumed). "[L]ack of adequate *voir dire* impairs the defendant's right to exercise peremptory challenges . . ." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). When counsel's deficient performance results in the seating of a biased juror, prejudice to the accused is automatic. *See*, *e.g.*, *Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

In this case, the *voir dire* record suggests that trial counsel both failed to pose necessary follow-up questions to the jurors they examined, and failed to raise available challenges for cause based on the information the jurors did reveal. As a result, there is a substantial likelihood that one or more of the jurors who decided petitioner's case were in fact unqualified. For example, trial counsel failed to follow up Juror Shirley Clements expression of uncertainty as to how she would be affected by pre-trial publicity, and failed to challenge her for cause using the answers she had given. Tr.R. 272 (Q: "Would the fact that you have seen [news coverage of case] affect your ability to serve on this jury?" A: "I really don't know. I am not sure. Since I don't know any details, don't

remember details or anything about it as of right now, until I was reminded of what was going on";

trial counsel made no effort to further develop juror's indications of possible bias, or to challenge

juror for cause). Counsel failed to ask further questions of Juror Denise Donald after she gave

answers indicating that her friends or relatives had been victims of crime. Tr.R. 319 (Q: "And you

indicated some members of your family or you knew somebody who was an abused child?" A: "A

close friend of mine told me her father had sexually abused her as a child"; trial counsel made no

effort to further develop juror's indications of possible bias, or to challenge juror for cause). And

counsel failed to ask Juror Walt Farmer further questions after he gave answers suggesting he

harbored a bias against the insanity defense, and failed to challenge him for cause based on the

answers he had given. Tr.R. 377-378 (when asked for "feelings" about insanity defense, juror

answered, "I am not in favor of it. Of course, it all depends. I would have to hear why it would be

considered insane"; when asked whether he could vote for insanity if evidence and law supported

it, juror answered, "Possibly"; when asked whether there was "something that would cause you not

to be able to vote for it," juror answered, "Probably not, maybe not"; trial counsel made no effort to

further develop juror's indications of possible bias, or to challenge juror for cause). In each of these

circumstances, the jurors answered questions in a manner that suggested bias and demanded further

inquiry by defense counsel.

Provided with necessary funds in state court, petitioner would have presented additional

testimony and evidence in support of this claim. *See (Michael) Williams v. Taylor*, 529 U.S. 420,

441 (2000) ("Even if [juror was] correct in her technical or literal interpretation of the question . .

., her silence . . . could suggest . . . an unwillingness to be forthcoming; this in turn could bear on the

veracity of her explanation for not disclosing [disqualifying information]"); *id.* at 442-443 (petitioner

cannot be faulted for the lack of factual development in state court where the court refused necessary funding requests). With the requested funding, petitioner would have utilized the services of an investigator to examine the circumstances relating to the constitution and selection of the jury, and the jury's consideration of the case, in order to determine the existence of any irregularities, improprieties or omissions bearing on petitioner's right to a fair trial before an impartial tribunal. Petitioner would have commissioned an investigation to determine, among other things, the truthfulness and completeness of the answers given by prospective jurors on *voir dire*, as well as an examination of the circumstances of the jury's consideration of the issues it was called upon to decide, and the scope of information relied upon by the jurors in reaching their verdicts. Had such an investigation been conducted, petitioner would have been able to present documentary and/or testimonial evidence that his Fifth, Sixth, Eighth and Fourteenth Amendment rights to a fair trial and a reliable sentencing proceeding were compromised as a result of juror bias, juror misconduct, or one or more other irregularities.

    (b)    Petitioner exhausted his state remedies with respect to this Ground.

    (c)    Direct appeal:

        (1)    Petitioner did not raise this issue on direct appeal.

        (2)    Petitioner did not raise this issue on direct appeal because it requires information not contained within the trial record, and was therefore appropriately reserved for post-conviction proceedings.

    (d)    Post-Conviction Proceedings:

        (1)    Petitioner raised this issue through a post-conviction petition in the Montgomery County Circuit Court.

        (2)    Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit

court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

(3)    Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

(4)    Petitioner appealed the denial of his petition for post-conviction relief.

(5)    Petitioner raised this issue in the appeal of the denial of his petition for post-conviction relief.

(6)    Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)    Not applicable.

(e)    Not applicable.

**IV.B.    PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY TRIAL COUNSEL'S FAILURE TO CHALLENGE THE PROSECUTION'S FORENSIC ODONTOLOGY EVIDENCE.**

(a)    Supporting facts.

As its first witness, the state called Michael O'Brien, a dentist under contract with the Department of Forensic Sciences in Alabama, who testified about the nature and source of bite marks found on petitioner's arm. O'Brien testified that petitioner had human bite marks on his arm, and claimed that these marks were recent, not more than one or two days old as of the time of the examination. Tr.R. 443. O'Brien went on to claim that there are three types of bite marks – ripping,

hicky, and marks made as a result of "offensive or defensive type of circumstance," and that the marks on petitioner's arm were the "offensive or defensive" type. Tr.R. 443-444. Based on molds he made of the victims' teeth, O'Brien claimed that the bite marks were made by Sylvia Gordon. Tr.R. 446-450.

Trial counsel did not object to O'Brien's testimony. As a result, the testimony was admitted in the absence of any demonstration that: (i) forensic odontology is sufficiently reliable to be admissible as scientific evidence against a capital defendant; (ii) the witness possessed the expertise necessary to determine the age of the alleged marks; (iii) the categories of bite marks described by the witness are grounded in empirical data or recognized within the scientific community; (iv) the alleged marks are susceptible to accurate categorization within the set of categories described by the witness; (v) the witness possessed the expertise necessary to properly conduct the comparisons upon which his testimony was based; and (vi) the comparisons allegedly performed by the witness yielded results reliable enough to warrant consideration by a capital jury.

Petitioner sought funds to obtain the services of a qualified forensic odontologist during state post-conviction proceedings, but the circuit court summarily denied his request. With the necessary funds, petitioner would have developed and presented expert testimony on several issues concerning the qualifications of Dr. O'Brien, his methods, and the admissibility, reliability, and probity of the testimony he gave at petitioner's capital trial. With the assistance of a qualified expert, petitioner could establish the following:

- Dr. O'Brien lacked the training and expertise necessary to render the set of opinions he presented at petitioner's trial;

- Whatever the merits of forensic odontology as a means of connecting bite marks to the teeth that made them, a forensic odontologist lacks

the training or expertise necessary to accurately resolve the entirely separate question of the age of a set of alleged bite marks appearing on human skin;

◆    The forensic odontological community does not limit the classification of bite marks to the three categories described at trial, but in fact recognizes that empirical support for such rigid classification does not exist;

◆    The alleged bite marks in this case do not bear sufficient indicia of character or context to permit accurate classification within a particular category.

*See generally*, American Board of Forensic Odontology, www.abfo.org, ID & Bitemark Guidelines.

In addition, had petitioner been afforded the resources to retain the services of a qualified dermatologist, he would have developed and presented expert testimony concerning skin damage and regeneration. Through this testimony, petitioner could establish that matters relating to skin, including trauma and healing characteristics, are within the province of dermatology, and that the assessment of variables such as the age of a wound requires particularized training not commonly undertaken by dentists. Additionally, while it is impossible for petitioner's counsel to predict the particulars without having had the benefit of a consultation with a qualified expert, a dermatologist could testify that Dr. O'Brien's estimate of the age of the alleged bite marks found on petitioner following his arrest was not reliable.

With the assistance of a qualified dermatologist, petitioner could also establish that the marks found on his arm actually pre-dated the crimes for which petitioner was tried and may, in fact, have been made by one of petitioner's relatives during an incident totally unrelated to the crimes for which petitioner was tried. Before trial, petitioner informed trial counsel that a relative had bitten him during an incident unrelated and prior to the offenses involving the Gordons. But counsel did

nothing to follow up on this information or to determine its potential value for use at trial.

One of counsel's most basic obligations under the Sixth Amendment is to conduct an adequate investigation, not only to identify evidence favorable to the defendant's case, but also to prepare to rebut harmful evidence the prosecution is expected to offer. *See, e.g., Rompilla v. Beard*, 125 S.Ct. 2456, 2465-2467 (2005); *Wiggins*, 539 U.S. at 522-524. Guideline 10.7 of the current ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases pertains to investigation and physical evidence:

> Counsel should make a prompt request to the relevant government agencies for any physical evidence or expert reports relevant to the offense or sentencing, as well as the underlying materials. With the *assistance of appropriate experts*, counsel should then *aggressively re-examine all of the government's forensic evidence*, and conduct appropriate analyses of all other available forensic evidence.

31 Hofstra L. Rev. 913, 1020 (2003) (emphasis added).[7]

In short, a thorough factual investigation into the prosecution's case is mandatory. Had trial counsel employed an independent forensic odontologist and/or dermatologist, they could have investigated the validity of the alternative source report and challenged the validity of the state's

---

[7]Guideline 11.4.1(D)(7) of the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, likewise provides:

> Counsel should secure the assistance of expert where it is necessary or appropriate for:  (A) preparation of the defense; (B) *adequate understanding of the prosecution's case*; C) *rebuttal of any portion of the prosecution case* at the guilt-innocence phase or the sentencing phase of the trial. . . .  Experts assisting in investigation and other preparation of the defense should be *independent* and their work product should be confidential to the extent allowed by law.  Counsel and support staff should use all available avenues including signed releases, subpoenas, and Freedom of Information Acts, to obtain all necessary information.

(emphasis added).

forensic odontology testimony. In the event the trial court nevertheless permitted the testimony, counsel would have been ready to challenge its reliability.

Lead trial counsel, Allen Howell, who made all the investigative and strategic decisions prior to and during trial, Rule 32 R. 103, had no strategic reason for failing to conduct this investigation. Having failed to conduct the investigation, counsel was in no position to make a reasonable determination as to the importance of the bite mark evidence to the case, much less to dispute its source or the prosecution's expert testimony, discussed above. *See Wiggins*, 539 U.S. at 527-528; *Ex parte State of Alabama (re Dubose v. State)*, 662 So.2d 1189, 1199 (Ala.Crim.App. 1994) (without expert assistance, defense counsel was unable to refute the prosecution's expert testimony).

But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different. Dr. O'Brien's testimony provided evidentiary support for both of the aggravating circumstances relied upon by the prosecution. The testimony heightened the likelihood that the jury, and later the trial judge, would find and rely upon the heinous, atrocious and cruel ("HAC") aggravating circumstance, *see* Tr. R. 1309-1310 (jury instruction on HAC aggravator); Tr. C. 1227 (Sentencing Order), by providing a basis from which the fact finders could conclude that at least one of the victims struggled against petitioner. This evidence of a struggle likewise supported a finding that petitioner had remained unlawfully in the victims' house after revocation of their consent, which in turn contributed to the determination that the homicides had been committed in connection with a burglary. *See Freeman v. State*, 776 So.2d 160, 193 (Ala.Crim.App. 1999).

(b)     Petitioner exhausted his state remedies with respect to this Ground.

(c)     Direct appeal:

(1)     Petitioner did not raise this issue on direct appeal.

(2)     Petitioner did not raise this issue on direct appeal because it requires information not contained within the trial record, and was therefore appropriately reserved for post-conviction proceedings.

(d)   Post-Conviction Proceedings:

(1)     Petitioner raised this issue through a post-conviction application in a state trial court.

(2)     Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

(3)     Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

(4)     Petitioner appealed the denial of his application for post-conviction relief.

(5)     Petitioner raised this issue in his appeal of the denial of post-conviction relief.

(6)     Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971.  That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem).  Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court.  That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)     Not applicable.

(e)   Not applicable.

**IV.C.** **PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS A RESULT OF TRIAL COUNSEL'S DECISION TO DEPOSE DR. GUY RENFRO.**

(a)    Supporting facts.

Dr. Guy Renfro, a clinical psychologist, was appointed by the Montgomery Circuit Court to evaluate petitioner's competency to stand trial and mental state at the time of the offense. Tr.C. 3463. In September of 1995, approximately nine months prior to trial, Renfro issued a forensic evaluation of petitioner, based on four meetings with petitioner, which Renfro provided to the court and both parties. *Id.* Therein, Renfro found petitioner competent to stand trial. Tr.C. 3471. Renfro attributed petitioner's mental state at the time of the offense to borderline personality disorder. *Id.* He concluded that at the time of the offense petitioner "was capable of discerning right from wrong and could appreciate the wrongfulness of acts such as that with which he is charged." Tr.C. 3472. Renfro determined that the information reviewed indicated this "rather strongly." Tr.C. 3473.

Despite the fact that Renfro's report indicated findings inconsistent with the defense theory that petitioner was not guilty by mental disease or defect, defense counsel chose to depose Renfro prior to trial. *See* Tr.C. 3464-3473; Tr.R. 993. In a videotaped deposition, Renfro reiterated what he had said in his report. He testified that he found no indication that petitioner would have had trouble conforming his behavior at the time of the offense, Tr.R. 3729, and no signs of delusional thinking or hallucinations, Tr.R. 3735. He further indicated that he had found no evidence that petitioner experienced a "brief reactive psychosis" at the time of the crime, Tr.R. 3761-3762, and no evidence of past psychosis in the documents he reviewed, Tr.R. 3762-3763. Renfro emphasized that petitioner likely experienced anger – but not uncontrollable anger – upon feeling rejected by

Sylvia Gordon, and acted on that anger. Tr.R. 39; 61; 3671; 3693; *see also* Tr.R. 3685.

After deposing Renfro, counsel realized, too late, that Renfro's testimony was harmful to petitioner's case and attempted unsuccessfully to prohibit the prosecution from introducing the deposition at trial. *See* Tr.R. 991. Over trial counsel's objection, the videotaped deposition of Dr. Renfro was played for the jury. Tr.R. 3633-3745. And the transcription of the deposition was admitted as a court exhibit for the jury to consider. Tr.R. 1005.

Defense counsel's handling of Dr. Renfro's findings demonstrates how aimless and incoherent the defense case was. Renfro's report and testimony directly contradicted the mental defect or disease defense that counsel had chosen to pursue. Renfro's report and testimony contradicted the defense expert Burkhart's determination that petitioner had a history of psychotic episodes and was likely experiencing brief reactive psychosis at the time of the crime. *See* Tr.R 769. In addition to undermining the insanity defense, counsel's error also negatively affected their credibility before the jury. It must have appeared to the jurors, viewing a deposition conducted by defense counsel in which testimony at odds with the insanity defense was elicited, that the prosecution was showing them something the defense had created but did not want the jury to see. In deposing an expert whose determinations directly contradicted the theory of defense, despite advance possession of the expert's report making clear that his findings were unfavorable, counsel's performance was deficient.

The impact of Renfro's videotaped deposition upon the jury was significant: it directly countered the testimony of the defense expert, Dr. Burkhart, and undercut the defense theory that petitioner was suffering from a mental disease or defect at the time of the crime. This directly impacted the jury's resolution of petitioner's guilt or innocence by supplying the jurors with an

unfavorable alternative to the testimony given by Dr. Burkhart.  It also indirectly affected the jury's consideration of the issues at both phases of the trial by raising fundamental questions about the competency and credibility of petitioner's defense counsel, which in turn would have tainted the jury's view of the mental health evidence they presented, and rendered the jurors less disposed to draw inferences favorable to petitioner. But for counsel's deficient performance in choosing to depose Renfro, there is a reasonable probability that the outcome of petitioner's trial would have been different. *Rompilla*, 125 S.Ct. at 2467; *Williams*, 529 U.S. at 396-399.

    (b)    Petitioner exhausted his state remedies with respect to this Ground.

    (c)    Direct appeal:

        (1)    Petitioner did not raise this issue on direct appeal.

        (2)    Petitioner did not raise this issue on direct appeal because it requires information not contained within the trial record, and was therefore appropriately reserved for post-conviction proceedings.

    (d)    Post-Conviction Proceedings:

        (1)    Petitioner raised this issue through a post-conviction petition in the Montgomery County Circuit Court.

        (2)    Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

        (3)    Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

        (4)    Petitioner appealed the denial of his petition for post-conviction relief.

(5)    Petitioner raised this issue in the appeal of the denial of his petition for post-conviction relief.

(6)    Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)    Not applicable.

(e)    Not applicable.

#### IV.D. PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP AND PRESENT EVIDENCE THAT PETITIONER SUFFERS FROM NEUROLOGICAL IMPAIRMENTS.

(a)    Supporting facts.

The records that were available to trial counsel reveal a number of factors that should have caused counsel to investigate the possibility that petitioner suffers from neurological impairments – *i.e.*, brain damage – with the assistance of a qualified neuropsychologist. Among those factors are the following:

- ✦    Petitioner is the biological son of a mentally retarded mother, and a mentally ill, possibly mentally retarded father. Petitioner's mother and his sister, Christine, were both described by state evaluators as "extremely retarded." Tr.C. 2286; *see also, e.g.*, Tr.C. 2284; 2513. Petitioner's father was also suspected of suffering from mental retardation, *see, e.g.*, Tr.C. 2308, in addition to well-documented mental illness, *see, e.g.*, *id.*; 2312.

- ✦    IQ testing performed on petitioner over the years reflects a pattern of significant, consistently large discrepancies between the verbal and performance scales, suggesting neurological dysfunction. *See, e.g.*, Tr.C. 2233(verb. 79; perf. 95); Tr.C. 2428 (verb. 81; perf. 101); Tr.C. 1345 (verb. 81; perf. 117).

35

◆    Petitioner has a history of inability to regulate his own body temperature, resulting in his wearing winter clothes in the summer and vice versa.

◆    Petitioner's development was noted as slow even as an infant, and at almost two years of age, he could say only two words, and often appeared not to understand what was being said to him. *See, e.g.*, Tr.C. 2169; 2623.

◆    As a child, petitioner was observed to be overly active, to suffer from memory problems and limited attention span, and to exhibit severe and frequent tantrums. *See, e.g.*, Tr.C. 2652-2660; 3079-3080.

◆    By his early teens, petitioner was described as emotionally disturbed, infantile, sullen, and unable to remember the dates of important holidays. *See, e.g.*, Tr.C. 2610-2611; 3079-3080.

◆    Petitioner was observed by boarding house staff digging in the mud with his hands, like a dog, running from the houseparents, and trying to escape under a fence. Tr.C. 2410.

This list of factors is not all-inclusive, nor does petitioner know with certainty that each and every one of the factors identified here would have been deemed by a qualified neuropsychologist to be a suggestion or manifestation of neurological impairment. Rather, these factors highlight that petitioner has exhibited an array of traits and behaviors that strongly suggest the possibility of brain damage and, in combination with the complete lack of nurturing he experienced early in life, strongly suggest the presence of one or more neurological impairments, underscoring the need for competent neuropsychological evaluation. *See, e.g.*, Martin H. Teicher, M.D., Ph.D., *Wounds That Time Won't Heal: The Neurobiology of Child Abuse*, 2 Dana Forum on Brain Science 50, 54 (Fall 2000) (describing links between childhood abuse and neglect and neurological impairments).

Despite awareness of a range of brain damage indicators, trial counsel never sought to have petitioner's neurological functioning examined. Dr. Burkhart, who performed various psychological tests on petitioner at defense counsel's request, did not administer tests designed to detect

36

neurological impairment. *See* Tr.R. 718-720.    Counsel's failure to examine petitioner's neuropsychological functioning fell outside the range of reasonably competent performance. *Wiggins*, 539 U.S. at 521-522; *see also, e.g.*, Commentary to ABA Guideline 4.1, 31 Hofstra L. Rev. at 956 ("Counsel must . . . obtain a thorough physical and neurological examination," which may include, *inter alia*, neuropsychological testing, appropriate brain scans, blood tests or genetic studies . . ."); *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997) (counsel ineffective in capital case for failing, *inter alia*, to develop and present evidence of neurological damage); *Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000) (same); *Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998) (same).[8]

With the resources necessary to retain a qualified neuropsychologist in state post-conviction proceedings, petitioner would have developed and presented evidence that he suffers from one or more neurological impairments that explain in substantial part his alleged actions at the time of the crimes for which he was convicted and sentenced to death. Counsel would have supplied the neuropsychologist with comprehensive records documenting petitioner's childhood, additional social history information generated by a mitigation investigator, and developmental and other findings rendered by a social worker. In addition to reviewing the records, the neuropsychologist would have administered an appropriate battery of tests under suitable conditions, reviewed the results of those tests, and cross-referenced those results with prior testing results and other background information.

---

[8] *Wiggins* and the Supreme Court's more recent decision in *Rompilla v. Beard*, 125 S.Ct. 2456 (2005), reinforce several relevant principles. Referring to the "standards for capital defense work articulated by the American Bar Association (ABA) – standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable,'" *Wiggins* underscores defense counsel's "'obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 524 (internal citations omitted); *see also Rompilla*, 125 S.Ct. at 2465-2466. Where counsel fail to do so, they lack the information necessary to make strategic judgments about the selection and presentation of evidence; decisions made under such conditions receive no deference. *Wiggins*, 539 U.S. at 527; *Rompilla*, 125 S.Ct. at 2467.

After considering these findings in the context of the results of a thorough social history investigation, and the findings of a qualified social worker, a neuropsychologist would likely have concluded, and testified, that petitioner has suffered from neurological impairments, including organic brain damage, since birth or early infancy, and that these impairments contributed to petitioner's mental retardation and/or adversely affected his ability to control aggression and cope properly with stressors. Taken together, this evidence would have supported the conclusion that petitioner was substantially less morally culpable for the crimes he allegedly committed than the jury was led to believe at trial. *See Glenn v. Tate*, 71 F.3d 1204, 1211 (6th Cir. 1995) ("[W]hile juries tend to distrust claims of insanity, they are more likely to react sympathetically when their attention is drawn to organic brain problems . . ."). Thus, but for trial counsel's failure to investigate and present evidence of neurological impairment – particularly when this omission is considered in the light of counsel's handling of the Renfro deposition, *see* Ground IV.C., *supra* – there is a reasonable probability that the outcome of petitioner's trial would have been different.

(b)    Petitioner exhausted his state remedies with respect to this Ground.

(c)    Direct appeal:

(1)    Petitioner did not raise this issue on direct appeal.

(2)    Petitioner did not raise this issue on direct appeal because it requires information not contained within the trial record, and was therefore appropriately reserved for post-conviction proceedings.

(d)    Post-Conviction Proceedings:

(1)    Petitioner raised this issue through a post-conviction petition in the Montgomery County Circuit Court.

(2)    Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit

court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

(3)    Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

(4)    Petitioner appealed the denial of his petition for post-conviction relief.

(5)    Petitioner raised this issue in the appeal of the denial of his petition for post-conviction relief.

(6)    Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)    Not applicable.

(e)    Not applicable.

**IV.E. PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE OF PETITIONER'S BACKGROUND AND MENTAL HEALTH PROBLEMS IN A MANNER THAT WOULD HAVE ALLOWED THE JURY TO GIVE IT MITIGATING EFFECT.**

(a)    Supporting facts.

As described in IV.D., *supra*, petitioner's background is extraordinary – even when compared to other individuals convicted of capital murder and sentenced to death – for the complete lack of nurturing and supportive family contact he endured from the earliest days of his life through the time of the offense. *See, e.g.,* Tr.R. 917-936. Although trial counsel recognized the tragic circumstances

39

of petitioner's youth, *see* Tr.R. 1179 ("What we have got is a throwaway child"); Tr.R. 1180-1188 (trial counsel describing petitioner's background in closing argument), counsel couched this information almost entirely in terms of its relationship to the mental disease or defect defense. *See* Tr.R. 704 (testimony of guilt-innocence phase witnesses Marvin Hartley, a youth services worker who worked with petitioner over a two-year period just a year before the crimes); Tr.R. 915-937 (testimony of Yvonne Copeland, who worked with petitioner as a social worker when petitioner was in foster care); *see generally* Tr.R. 710-913 (testimony of Dr. Barry Burkhart).

Focusing exclusively on an ill-conceived effort to establish that petitioner was not guilty by reason of mental disease or defect, *see*, *e.g.*, Tr.R. 417; 1190, counsel squandered the mitigating value of the information about petitioner's background. *See Tennard v. Dretke*, 542 U.S. 274, ___, 124 S.Ct. 2562, 2571-2572 (2004). This is unfortunate, because the evidence of petitioner's background that defense counsel possessed, even if insufficient to prove the insanity defense, was effective evidence in mitigation of a death sentence. *Wiggins*, 539 U.S. at 535 (citing *Penry, supra*) ("Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability").

The 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, which described the prevailing standard of practice for defense counsel at the time of petitioner's trial, set forth pages of obligations defense counsel must satisfy to be effective in investigating mitigation, including the collection of a comprehensive "family and social history." *Wiggins*, 539 U.S. at 524 (citing section 11.8.6). The value of a social history is that the jury will be provided with an explanation for how the defendant ended up in the situation he was in, which in turn helps to explain the defendant's behavior. *See Smith v. Mullin*, 379 F.3d 919, 938-

944 (10th Cir. 2004).

With the documentation of petitioner's life that was available to them at trial, and with the assistance of a mitigation investigator, a social worker and a neuropsychologist, trial counsel could have provided the jury with substantial evidence militating against a death sentence. *See* C. 402-404; 406-408. These experts could have identified and explained the adverse neurological and developmental effects wrought by the absence of nurturing petitioner experienced, and described the ways in which these effects manifested themselves in petitioner's behavior, particularly in times of stress.[9]

While counsel hinted at some of these notions at various points during the trial, their efforts were directed not at establishing the proposition that petitioner's background and limitations rendered him less morally culpable, but at furthering the guilt-or-innocence phase defense of not guilty by reason of mental disease or defect. *See, e.g., Penry*, 492 U.S. at 319 ("[E]vidence about the

---

[9]In addition to depriving petitioner of the affirmative benefits of a more sympathetic portrait of his character and more favorable findings on the existence of mitigating factors, counsel's omissions left the defense unable to counter the prosecution's use of petitioner's background against him. As the cross-examinations of Dr. Burkhart and Ms. Copeland illustrate, the district attorney made effective use of instances of misconduct and notations about undesirable character traits in petitioner's social history records. *See, e.g.*, Tr.R. 845-877 (Dr. Burkhart); Tr.R. 955-982 (Ms. Copeland). With the assistance of the appropriate experts, trial counsel could have effectively rebutted the prosecution's assertions by presenting lay and/or expert testimony explaining how petitioner's early life experiences shaped him into the young man he was at the time of the offense. A properly informed social worker and psychologist, for example, could have educated the jury on the developmental and psychological effects of the circumstances petitioner endured, such that the jury would have learned that it was those circumstances that dictated the contours of his character, not vice versa. *See* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, §§ 4.1, 10.4, 10.7, 10.15.1 (rev. ed. Feb. 2003) (available at http://www.abanet.org/deathpenalty/ guidelines.pdf). *See* Arlene Bowers Andrews, *Social Work Expert Testimony Regarding Mitigation in Capital Sentencing Proceedings*, 36 Social Work No. 5, 369, at 440 (1991) (describing role of social worker in preparation and presentation of mitigating evidence in capital sentencing proceedings).

defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse"); *Eddings*, 455 U.S. at 112; *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). By focusing their presentation of mental health evidence on a vain attempt to support that defense, trial counsel encouraged the jury to view the evidence of petitioner's tragic background and impairments in the wrong light, and discouraged the jurors from using that evidence to infer that, while petitioner may have been guilty of the offenses under the law, his moral culpability was not sufficient to warrant a death sentence.[10] *See, e.g., Williams*, 529 U.S. at 398 ("Mitigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case").

In sum, trial counsel's objectively unreasonable decision to rely strictly on an insanity defense that lacked evidentiary support diverted the jury's attention and the defense's resources away from the truly compelling mitigating case that could have been made. Had counsel investigated, developed and presented the available evidence in a manner enabling the jury to give it mitigating effect, the jury might well have been sufficiently moved by the mitigating evidence to recommend that petitioner's life be spared. But for counsel's failure, there exists a reasonable probability that the result of petitioner's sentencing proceeding would have been different. *See, e.g., Tennard, supra; Wiggins, supra; Williams, supra.*

(b)    Petitioner exhausted his state remedies with respect to this Ground.

(c)    Direct appeal:

---

[10]This point was not lost on the prosecution, which contended during sentencing phase closing arguments that the jurors' rejection of petitioner's insanity defense negated the mitigating factors relating to his mental state during the sentencing phase. *See* Tr.R. 1291-1292.

(1)     Petitioner did not raise this issue on direct appeal.

(2)     Petitioner did not raise this issue on direct appeal because it requires information not contained within the trial record, and was therefore appropriately reserved for post-conviction proceedings.

(d)     Post-Conviction Proceedings:

(1)     Petitioner raised this issue through a post-conviction petition in the Montgomery County Circuit Court.

(2)     Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

(3)     Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

(4)     Petitioner appealed the denial of his petition for post-conviction relief.

(5)     Petitioner raised this issue in the appeal of the denial of his petition for post-conviction relief.

(6)     Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)     Not applicable.

(e)     Not applicable.

43

**IV.F.  PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL
COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION BY TRIAL
COUNSEL'S FAILURE TO INTRODUCE EVIDENCE OF PETITIONER'S
ADAPTABILITY TO PRISON.**

(a)    Supporting facts.

As recognized in *Skipper v. South Carolina*, 476 U.S. 1 (1986), evidence of a capital

defendant's adaptability to prison is a relevant consideration at the penalty phase of a capital trial.

*Id.* at 4-5. Trial counsel had in their possession petitioner's institutional records, but failed to submit

them for review by a competent expert on institutional adaptability who could have utilized them in

reaching a determination as to petitioner's adaptability to confinement, and testified on that issue

before the jury.  If petitioner had been afforded the resources necessary to retain the services of a

qualified risk assessment expert – either a person with substantial professional experience in

corrections, or a mental health professional with experience in conducting risk assessments – during

the state post-conviction relief proceedings, he would have supplied that expert with petitioner's

prison records, and other information relevant to a determination of petitioner's prospects as a

manageable inmate. Based upon a review of the relevant information, including petitioner's conduct

in prison since the alleged offenses, the risk assessment expert likely would have testified that, had

petitioner been sentenced to life in prison, rather than death, the Alabama Department of Corrections

would have possessed the ability to manage him indefinitely with little or no risk to other inmates

or staff.

Trial counsel's failure to present any evidence from which the jury could infer that

petitioner's positive behavior in prison indicated that he would not pose a safety risk if sentenced

to life rather than death was deficient.  There was no strategic reason for failing to show the jury that

petitioner had adjusted to prison such that he would not pose a safety risk if sentenced to life. Had counsel provided the jury with such information, there is a reasonable probability – particularly when assessed in light of the other information counsel could have, but failed to, present – that the jury would have selected a sentence of life in prison, rather than death. *See, e.g., Tennard*, 124 S.Ct. at 2571 (quoting *Skipper v. South Carolina*, 476 U.S. 1, 7 (1986)) ("[E]vidence . . . of 'a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is . . . by its nature relevant to the sentencing determination'"); *Horton v. Zant*, 941 F.2d 1449, 1463 (11th Cir. 1991) (trial counsel ineffective, in part, for failure to present evidence of positive adjustment to prison).

   (b)    Petitioner exhausted his state remedies with respect to this Ground.

   (c)    Direct appeal:

        (1)    Petitioner did not raise this issue on direct appeal.

        (2)    Petitioner did not raise this issue on direct appeal because it requires information not contained within the trial record, and was therefore appropriately reserved for post-conviction proceedings.

   (d)    Post-Conviction Proceedings:

        (1)    Petitioner raised this issue through a post-conviction petition in the Montgomery County Circuit Court.

        (2)    Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

        (3)    Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

(4)    Petitioner appealed the denial of his petition for post-conviction relief.

(5)    Petitioner raised this issue in the appeal of the denial of his petition for post-conviction relief.

(6)    Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)    Not applicable.

(e)    Not applicable.

## V.    PETITIONER'S RIGHT TO A FAIR SENTENCING PROCEEDING AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WAS VIOLATED BY THE ADMISSION OF UNRELIABLE AND MATERIALLY INACCURATE EVIDENCE.

(a)    Supporting facts.

The factual basis for this ground is described in Ground IV.B., *supra*, which petitioner incorporates herein by reference. For the reasons described therein, the prosecution's evidence relating to the bite marks identified on petitioner was materially inaccurate. As such, the jury's consideration of this evidence violated the Eighth Amendment. *See Johnson v. Mississippi*, 486 U.S. 578, 590 (1988) (a capital jury's consideration of inaccurate information violates the Eighth Amendment and constitutes error which "extend[s] beyond the mere invalidation of an aggravating circumstance supported by evidence that was otherwise admissible," implicating instead the reliability concerns articulated in the Court's capital sentencing jurisprudence).

As discussed in Ground IV.B., with necessary resources, petitioner would present testimony establishing that the state's forensic odontologist did not follow accepted guidelines in rendering his

findings in this case, that he testified well beyond his expertise, and that indeed, it is impossible to determine the manner of, and timeframe during which, the marks were made.  The jury's consideration of such materially inaccurate information during the sentencing phase of petitioner's capital trial was inconsistent with the "special '"need for reliability in the determination that death is the appropriate punishment'" in any capital case." *Johnson*, 486 U.S. at 584 (quoting *Gardner v. Florida*, 430 U.S. 349, 363-364 (1977) (White, J., concurring) (additional citation omitted)). Because the inaccurate bite mark information "provided no legitimate support for the death sentence imposed," and because the jury's consideration of that information contributed to its selection of death rather than life in prison, petitioner's death sentence violates the Eighth Amendment. *Johnson*, 486 U.S. at 586 (quoting *Gardner*, 430 U.S. at 359).

     (b)     Petitioner exhausted his state remedies with respect to this Ground.

     (c)     Direct appeal:

          (1)     Petitioner did not raise this issue on direct appeal.

          (2)     Petitioner did not raise this issue on direct appeal because it requires information not contained within the trial record, and was therefore appropriately reserved for post-conviction proceedings.

     (d)     Post-Conviction Proceedings:

          (1)     Petitioner raised this issue through a post-conviction application in a state trial court.

          (2)     Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

          (3)     Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness

travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

(4)  Petitioner appealed the denial of his application for post-conviction relief.

(5)  Petitioner raised this issue in his appeal of the denial of post-conviction relief.

(6)  Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971.  That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem).  Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court.  That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)  Not applicable.

(e)  Not applicable.

VI.  **PETITIONER'S RIGHT THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WAS VIOLATED AS A RESULT OF APPELLATE COUNSEL'S FAILURE TO CHALLENGE THE ADMISSION INTO EVIDENCE OF THE PRIOR TRIAL TESTIMONY OF WITNESS FRANCIS BOOZER.**

(a)  Supporting facts.

The record on appeal reveals that the state was permitted, over the objection of defense counsel, to introduce the prior testimony of an allegedly unavailable witness, Francis Boozer, a former co-worker of petitioner's who had testified at petitioner's previous trial. Tr.C. 3812-3832 (State's Exh. 108). The prosecution represented that Boozer was unavailable because she was under a doctor's care and unable to travel from her Florida home. Tr.R. 618-619. To establish this point, the state presented the testimony of a prosecution investigator, Blake Trammer, who related that Boozer indicated to him that because of her emphysema and asthma she was under medical care and would remain so until she died. Tr.R. 619-620. Trammer further testified that Boozer lived in Brooksville, Florida, but Trammer did not know where in Florida that town was located. Most

48

importantly, Trammer admitted that he made no attempt to verify any of Boozer's representations. Tr.R. 621. He did not get a doctor's statement from Boozer; he did not even get the name of her doctor. Tr.R. 621. In response to defense counsel's objection to the admission of Boozer's prior testimony, the state replied that "anybody who lives out-of-state is unavailable." Tr.R. 621-622.

Over defense objection, Boozer's prior testimony, in which she recounted a conversation she had with petitioner prior to the Gordon murders, was read to the jury. According to Boozer, the conversation occurred in the break room at work, where Boozer encountered petitioner in a quiet state. She said to petitioner, "You seem sad tonight." Tr.C. 3815. Petiitioner, holding a picture of a "young lady," responded, "I am." *Id.* Boozer went on to recount that petitioner identified the young lady as "Sylvia" and as "his girlfriend." Tr.C. 3816. Petitioner reportedly told Boozer he loved Sylvia and wanted to marry her, but that her mother did not like him. *Id.* Boozer testified that petitioner went on to say that "if he could get rid of her mama, you know, that he felt like he and this young lady could have a relationship together." *Id.* Boozer further claimed that petitioner reacted as follows after she suggested that maybe the girl was too young to want to marry: "He said, well, I'm not going to give her up. He said, I'd rather see her dead than somebody else have her." Tr.C. 3817. Boozer explained that she had passed the conversation off as "puppy love romance" at the time, and had not told anyone else about it. *Id.*

As described *supra*, a prisoner challenging the effectiveness of his counsel must establish that his attorney's representation "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. The same standard applies to reviewing appellate counsel's performance. *Evitts v. Lucey*, 469 U.S. 387 (1985). To prove prejudice,

the petitioner must show that, but for counsel's errors, there is a reasonable probability he would have prevailed on appeal; it follows that it is not reasonable for appellate counsel to fail to raise on appeal a claim that has a reasonable probability of success. This was such a claim: there is a reasonable probability that a challenge to the admission of Boozer's testimony would have been victorious on appeal.

Alabama Rule of Evidence 804(1)(a) provides that "[u]navailability as a witness includes situations in which the declarant[:] is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance . . . by process or other reasonable means." The Alabama Supreme Court has held that "[w]hen the prosecution seeks to introduce, against a criminal defendant, the former testimony of a now unavailable witness, its burden in seeking the witness' presence is enhanced by the defendant's Sixth Amendment right to confront witnesses." *Scroggins v. State*, 727 So.2d 131, 133 (Ala. 1998). Accordingly, before a court may find a witness unavailable, the state must meet a "high standard" of proving that it exercised due diligence in attempting to locate the witness, especially in a capital case. *Scroggins*, 727 So.2d at 133.

It is difficult to imagine a less energetic or less diligent effort to locate a witness than that which occurred in this case. The state's investigator simply took Boozer at her word without any attempt to verify her representations. Furthermore, the prosecution's argument that an out-of-state witness is *per se* unavailable was wrong. Alabama has a statute specifically prescribing the procedure for securing an out-of-state witness' presence at a criminal trial. *See* Ala. Code §12-21-283; *see also Anderson v. State*, 362 So.2d 1296, 1302 (Ala.Crim.App. 1978) (in finding that state

did not exercise due diligence, Court notes that prosecution did not utilize the provisions of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings). Under Alabama law, therefore, Boozer's testimony should not have been admitted because the state did not meet its burden of demonstrating due diligence. Appellate counsel's failure to raise this issue on direct appeal constituted deficient performance.

There is a reasonable likelihood that petitioner would have prevailed on this claim on appeal. Under Alabama law, erroneously admitted evidence requires reversal on appeal when it "probably injuriously affected substantial rights." Rule 45, Ala.R.App.P.; *see also, e.g.*, *Brown v. State*, 807 So.2d 1, 10 (Ala.Cr.App. 1999). The admission of Boozer's prior trial testimony met this standard. Boozer's testimony, in suggesting that petitioner believed Sylvia would have been more available if he "got rid" of her mother, and that he would rather "see [Sylvia] dead than somebody else have her," suggested an element of premeditation and calculation that was incompatible with the defense theory of mental disease or defect. Perhaps most importantly, no other evidence put before the jury indicated that petitioner had entertained such thoughts before the day of the offenses. The prosecution recognized as much, contending as follows during closing argument: "The seed of his heinous, vicious killings [sic] was planted not just on March 11. No, it wasn't. It was planted several weeks and days beforehand. How do we know that? We know that from the statements he made to Francis Boozer whose testimony was read to you." Tr.R. 1157; *see also* Tr.R. 1169 (similar); Tr.R. 1176 (concluding guilt-or-innocence phase closing: "He couldn't have what he wanted. Nobody else would"). Thus, the Boozer testimony played a critical role not only in undermining defense counsel's contentions that petitioner lacked the capacity to conform his conduct to the requirements of the law, it also gave the jury reason to believe that petitioner had in fact planned the

offenses some time in advance. Because none of the other evidence went so far, it is reasonably probable that, had appellate counsel challenged the admission of the Boozer testimony on direct appeal, the state appellate courts would have concluded that the testimony "probably injuriously affected [petitioner's] substantial rights."

(b)    Petitioner exhausted his state remedies with respect to this Ground.

(c)    Direct appeal:

    (1)    Petitioner did not raise this issue on direct appeal.

    (2)    Petitioner did not raise this issue on direct appeal because he was represented in that proceeding by the attorney whose effectiveness is challenged herein.

(d)    Post-Conviction Proceedings:

    (1)    Petitioner raised this issue through a post-conviction application in a state trial court.

    (2)    Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

    (3)    Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

    (4)    Petitioner appealed the denial of his application for post-conviction relief.

    (5)    Petitioner raised this issue in his appeal of the denial of post-conviction relief.

    (6)    Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on

January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)    Not applicable.

(e)    Not applicable.

**VII.    THE PROSECUTION'S MISUSE OF VICTIM IMPACT EVIDENCE DURING ARGUMENTS AT BOTH PHASES OF THE TRIAL VIOLATED PETITIONER'S RIGHTS AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

(a)    Supporting facts.

During summation at both the guilt-innocence phase and sentencing phase of petitioner's trial, the prosecution focused on the characteristics and lost promise of the victims. During the guilt-innocence phase summation, the prosecutor stated:

> Sylvia Gordon, a 17 year old girl, senior in high school. She was in LAMP, She had a future. She had a promise. She had her whole life to live. She had just begun to live, no where close to reaching her potential . . .

> Mary Gordon wanted to do the best she could do. She did everything she could to provide for her children. She was alone. She had to be mother; she had to be father; she had to be everything; and she did a good job. She had Debbie who worked hard, manager of a TCBY, gone through college, graduated high school, went through C-PAC, made the honors program. Sylvia, as we said, in the honor program at LAMP. She did what she could. She worked so hard, as testimony has shown, she was tired all the time. All she wanted to do was rest, if she could get a chance.

Tr.R. 1155-1156.

> I am asking you, on behalf of Sylvia Gordon and Mary Gordon, to do justice for them.

Tr.R. 1165.

The prosecutor echoed those appeals for sympathy, looking more to the future, during the

sentencing phase closing:

> Mary Gordon will never know what it is like to hear the laughter of her grandchildren. She will never know what it is like to see her daughters get married. She will never know what it is like, as she worked hard her entire life being mother and father and providing and protecting for the welfare of her children, she will never know what it is like to finally rest and enjoy life. He took it all, period. He took it all . . .

> Sylvia Gordon, her whole future in front of her, on the academic path, she will never know what it is like to have gone to college. She will never know what it is like to meet the man you love and to get married. She will never know what it is like to hold her child to her breast. He took it all. Selfish.

Tr.R. 1287-1288.

With this background, the prosecution urged the jurors to evaluate the comparative value of the victims' lives:

> Ladies and Gentlemen, you are about to determine the value of the lives of the two people who are not here with us today. You are about to speak for the people in this community on what is right and what is just.

Tr.R. 1296.

The prosecutor went on to urge the jurors again to act for their community:

> Earlier you were asked if you ever felt, have you ever read the paper, have you ever talked to somebody and said, why don't they do something about this? Why isn't something changed? Why don't they make a difference? Folks, you twelve are they now. You are they. There is no one else to do this.

Tr.R 1300.

The prosecutor finished the sentencing phase summation by forcefully imploring the jurors that, if they did not sentence petitioner to death, they would owe the victims' surviving sister and

daughter, Debbie, an apology:

> The defendant would have you forget what happened March 11, 1988. The defendant would have you think, well, gee, he made a juvenile mistake, and so you ought to pardon him for this. You ought to say, well, we won't punish you so hard. What are you going to do? Debbie, I am sorry. I am sorry, Debbie, but your mother and your sister were butchered. He didn't have a big bad record so we didn't think the ultimate punishment in this was enough. It was the right thing to do. What are you going to say? Debbie, he might have had a mental problem some time and had a tough life. Even though he butchered your mother and your sister, we don't think the death penalty is right. Debbie, he might have been under duress or domination of somebody, I don't know who, but somebody out there might have made him do this, so it is okay. Debbie, the only person there that made him do anything was in total control was David Freeman himself.

Tr.R 1301-1302.

The prosecutor's argument in this case went beyond what the United States Supreme Court allowed as permissible victim impact evidence in *Payne v. Tennessee*, 501 U.S. 808 (1991). As petitioner argued in his direct appeal brief, "*Payne* did not open the door to all kinds of victim impact evidence." Brief of Appellant at 56, *Freeman v. State of Alabama*, No. CR-95-2080 (April 15, 1997). On the contrary, in upholding the admissibility of victim impact evidence for a carefully circumscribed purpose, the Court expressly rejected the notion that such evidence should be used to "permit[] a jury to find that defendants whose victims were assets to their community are more deserving of punishment than those whose victims are perceived to be less worthy." *Id.* at 823. The Court explained:

> As a general matter . . . victim impact evidence is not offered to encourage comparative judgments of this kind – for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead *each* victim's "uniqueness as an individual human being,"

> whatever the jury might think the loss to the community resulting
> from his death might be.

*Id. Payne* also left undisturbed the existing prohibition against a victim's family offering its opinion about the crime, the defendant, and the appropriate punishment. *Id.* at 2611 n.2 (citing *Booth v. Maryland*, 482 U.S. 496 (1987)).

In this case, the prosecution's arguments at both phases exhorted the jury to do precisely what the Eighth Amendment as construed in *Payne* and *Booth* forbids:  to sentence petitioner to death because his victims were worthy members of the community, and a surviving family member demanded a death sentence.  In so doing, the prosecutor introduced and advocated an element of arbitrariness that is incompatible with the Eighth Amendment mandate that a capital sentencing decision must be based upon "consideration of the character and record of the individual offender and the circumstances of the particular offense." *Lockett v. Ohio*, 438 U.S. 586 (1978).

The prosecutor's arguments likewise deprived petitioner of the right to a fundamentally fair trial under the Fourteenth Amendment by urging the jury to impose a sentence of death for reasons that are irrelevant or improper.  *See, e.g., Hance v. Zant*, 696 F.2d 951, 952 (11th Cir. 1983) (a "dramatic appeal to gut emotion has no place in the courtroom, especially in a case involving the penalty of death. a sentence imposed after such an appeal cannot be carried out"), *overruled on other grounds, Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985); *Darden v. Wainwright*, 477 U.S. 168, 181 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  "[I]t is most important that the sentencing phase of the trial not be influenced by passion, prejudice or any other arbitrary factor." *Hance*, 696 F.2d at 951. The remarks outlined above undermined the reliability of petitioner's sentence by appealing to jurors' fears and infusing passion and prejudice into the sentencing

56

deliberations. *See Miller v. Lockhart*, 65 F.3d 676 (8th Cir. 1995); *Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir. 1989).[11]

    (b)    Petitioner exhausted his state remedies with respect to this Ground.

    (c)    Direct appeal:

        (1)    Petitioner raised this issue on direct appeal.

        (2)    Not applicable.

    (d)    Post-Conviction Proceedings:

        (1)    Petitioner did not raise this issue in state post-conviction relief proceedings.

        (2) - (7)    Not applicable.

    (e)    Not applicable.

---

[11]In a capital case, there is also a risk that the prosecutor's guilt-innocence phase summation can inject extraneous factors – factors other than "the character and record of the individual offender and the circumstances of the particular offense," *Lockett*, 438 U.S. 586 – into the jury's sentencing consideration. Here, it is likely that the emotional appeal of the prosecutor's guilt-innocence phase closing argument stayed with the jurors such that it too, in combination with the impact of the sentencing phase closing argument, diverted the jurors from their primary responsibility. *See Darks v. Mullin*, 327 F.3d 1001, 1018-1019 (10th Cir. 2003) (recognizing that all errors – those occurring at guilt phase and those occurring at sentencing phase – "are relevant to sentence"); *Cargle v. Mullin*, 317 F.3d 1196, 1208 (10th Cir. 2003) (noting prejudice from guilt phase errors carried over into penalty phase).

**VIII.** **PETITIONER'S RIGHT TO TRIAL BY JURY, AND TO HAVE A JURY DETERMINE ALL FACTS ESSENTIAL TO THE IMPOSITION OF THE PUNISHMENT HE RECEIVED, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN THE TRIAL JUDGE, RATHER THAN THE JURY, DETERMINED THE FACTS NECESSARY TO INCREASE HIS SENTENCE FROM LIFE WITHOUT PAROLE TO DEATH.**

(a)     Supporting facts.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that, pursuant to the Sixth Amendment, "[a] defendant may not be 'expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" *Ring v. Arizona*, 536 U.S. 584, 602 (2002) (quoting *Apprendi*, 530 U.S. at 483). In this case, because the jury's sentencing phase verdict was not unanimous, *see* Tr.R. 1329, the trial judge, not the jury, determined the existence of two aggravating factors beyond a reasonable doubt. Tr.C. 1223-1231. The trial court, not the jury, went on to make the further factual determination that the aggravating circumstances it had found outweighed the mitigating circumstances. *See* Tr.R. 1223-1231. But for the factual findings rendered by the trial judge, petitioner could not have been sentenced to death under Alabama law. *See* Ala. Code § 13A-5-45(e) and (f); § 13A-5-46(e). The entry of these findings and the resulting imposition of the death penalty are contrary to the Sixth Amendment mandate established by *Apprendi* and *Ring*.

Under Alabama law, the sentence to be imposed upon a defendant convicted of capital murder cannot be elevated to death unless two factual issues are resolved against the defendant: first, the existence of an aggravating circumstance must be found beyond a reasonable doubt, Ala. Code § 13A-5-45(e) and (f); and second, the aggravating circumstance(s) must be found to outweigh the mitigating circumstance(s), Ala. Code § 13A-5-46(e). In *Ex Parte Waldrop*, 859 So.2d 1181 (Ala.

2002), the Alabama Supreme Court recognized that the first of these two eligibility facts is covered by *Ring*. *Waldrop*, 859 So.2d at 1187-1188. The Court rejected the contention that the second eligibility fact – that aggravating factors outweigh mitigating factors – is likewise subject to *Ring*'s mandate. *See Waldrop*, 859 So.2d at 1188-1190. That conclusion, however, cannot be sustained.

Contrary to the analysis in *Waldrop* – which relied on *Ford v. Strickland*, 696 F.2d 804 (11th Cir. 1983), a court of appeals decision nearly twenty years old at the time *Ring* was decided – courts of last resort in no fewer than four states have read *Apprendi* and *Ring* to require that the weighing of aggravating factors against mitigating factors is a factual determination going to death-eligibility, and is therefore the functional equivalent of an element under *Ring*. *State v. Whitfield*, 107 S.W.3d 253, 261-264 (Mo. 2003) (*en banc*) (part three of Missouri's capital sentencing process, in which jury must determine "whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances" is a factual question subject to the requirements of *Ring*); *State v. Ring,* 204 Ariz. 534, 65 P.3d 915, 943 (Ariz. 2003) (*Ring II*) (opinion on remand) (determination whether "mitigating factors are not sufficiently substantial to call for leniency" is a factual question subject to the requirements of *Ring*); *Woldt v. People,* 64 P.3d 256, 265 (Colo. 2003) (determination whether aggravators outweigh mitigators is one of three statutory "prerequisites to a finding . . . that a defendant was eligible for death"); *Johnson v. State,* 59 P.3d 450, 460 (Nev. 2002) (Nevada "statutory law requires two distinct findings to render a defendant death-eligible: 'the jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found'"). The weighing operation prescribed by Ala. Code §13A-5-46(e) is materially indistinguishable from the weighing

requirements found to be subject to *Ring* in *Whitfield*, *Ring II*, *Woldt*, and *Johnson*.

If anything, Alabama's weighing requirement operates even more clearly as an eligibility factor than its counterparts in other states since, under §13A-5-46(e), a jury is legally forbidden to recommend a death sentence if the outcome of the weighing determination favors the defendant. Thus, where aggravating factors do not outweigh mitigating factors, death is not an available sentence. This makes the weighing function a quintessential eligibility determination,[12] and the performance of that function in this case by the trial judge rather than the jury violated petitioner's Sixth Amendment rights.

    (b)    Petitioner exhausted his state remedies with respect to this Ground.

    (c)    Direct appeal:

        (1)    Petitioner did not raise this issue on direct appeal.

        (2)    Petitioner did not raise this issue on direct appeal because it was it foreclosed at the time his direct appeal was decided by the state appellate courts by the Supreme Court's previous decision in *Walton v. Arizona*, 497 U.S. 639 (1990).

    (d)    Post-Conviction Proceedings:

        (1)    Petitioner raised this issue through a post-conviction application in a state trial court.

        (2)    Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit court denied relief by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

---

[12]Indeed, Alabama's sentencing procedure might best be described as one involving a series of eligibility factors – guilt of capital murder; finding of aggravating factors; determination of weight – with no subsequent selection stage. That is, unlike many other jurisdictions, once the eligibility factors have been resolved against an Alabama capital defendant, a death sentence is automatic. *Compare* Ala. Code §13A-5-46(e) *with*, *e.g.*, V.A.M.S. 565.030.4 (Missouri).

(3)    Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the state court evidentiary hearing.

(4)    Petitioner appealed the denial of his application for post-conviction relief.

(5)    Petitioner raised this issue in his appeal of the denial of post-conviction relief.

(6)    Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)    Not applicable.

(e)    Not applicable.

## IX.    PETITIONER IS CATEGORICALLY INELIGIBLE FOR EXECUTION PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BECAUSE HE IS MENTALLY RETARDED.

(a)    Supporting facts.

Tests administered to petitioner in the late 1970's and early 1980's – before he reached the

age of eighteen – yielded IQ scores as low as 75, *see* Tr.C. 3073, which places petitioner within the

range of mental retardation. *See Atkins v. Virginia*, 536 U.S. 304, 309 n.5 (2002); *see Ex parte*

*Perkins*, 851 So.2d 453, 456 (Ala. 2002).[13] Available social history information about petitioner

_____

[13]While the Alabama Supreme Court declined in *Perkins* to adopt a particularized definition of mental retardation, the American Psychiatric Association's definition, as quoted in *Atkins*, provides as follows:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home

before age eighteen indicates that he has suffered from significant deficits in adaptive functioning; his development was noted as slow even as an infant; and at almost two years of age, he could say only two words and often appeared not to understand what was being said to him; by age seven, petitioner was observed to be overly active and suffering from memory problems and limited attention span; and by his early teens, petitioner was described as emotionally disturbed, infantile, sullen, and unable to remember important dates. *See* Ground IV.D., *supra* (discussing behavioral and intellectual deficits).  Additionally, at least one of his siblings suffered from mental retardation, his mother suffered from mental retardation, and his father may also have suffered from mental retardation, *see* Ground IV.D, *supra*.

During state post-conviction proceedings, petitioner requested but was denied funds with which to hire a qualified expert to conduct the analyses and testing necessary to determine whether petitioner is mentally retarded.  Had petitioner been afforded the necessary resources, he would have retained a neuropsychologist to conduct appropriate IQ testing, under suitable testing conditions, to accurately determine petitioner's Full Scale IQ score.  Additionally, the neuropsychologist would have reviewed the available social history materials, and the findings of a social worker and a mitigation investigator.  Before reaching an ultimate conclusion as to whether or not petitioner suffers from mental retardation, the neuropsychologist would also have assessed the accuracy and reliability of petitioner's previous IQ test scores by examining the types of tests petitioner took, and the conditions under which those tests were administered.  The neuropsychologist would have also

---

living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).
*Atkins,* 536 U.S. at 308 n. 3.

reviewed the current and past test scores to determine whether the older scores were skewed by the "Flynn Effect." *See, e.g.*, J.R. Flynn, IQ Gains Over Time, *in* Encyclopedia of Human Intelligence 617-623 (R.J. Sternberg ed., 1994).

In light of the foregoing, it is likely that proper testing and analysis would establish that petitioner meets the criteria for mental retardation, *i.e.*, that his IQ falls within the accepted range of mental retardation; that he has significant limitations in at least two adaptive skill areas, and that his deficiencies have existed since before he reached the age of eighteen. A finding that petitioner suffers from mental retardation would render him categorically ineligible for the death penalty. *See Atkins*, 536 U.S. at 321.

(b)    Petitioner exhausted his state remedies with respect to this Ground.

(c)    Direct appeal:

    (1)    Petitioner did not raise this issue on direct appeal.

    (2)    Petitioner did not raise this issue on direct appeal because it was foreclosed at that time by the Supreme Court's previous decision in *Penry v. Lynaugh,* 492 U.S. 302 (1989).

(d)    Post-Conviction Proceedings:

    (1)    Petitioner raised this issue through a post-conviction petition in the Montgomery County Circuit Court.

    (2)    Petitioner raised this issue in a petition for post-conviction relief submitted to the Montgomery County Circuit Court, CC 88-1412.60-EWR. The circuit court denied relief on the merits by adopting the proposed order submitted by counsel for respondent on June 23, 2003.

    (3)    Petitioner received an evidentiary hearing on his application for post-conviction relief at which evidence was presented. However, because he was summarily denied funding for investigative and expert assistance, and witness travel, essential to the development of the facts supporting his claims, petitioner lacked the resources necessary to fully prove his allegations at the

state court evidentiary hearing.

(4)    Petitioner appealed the denial of his petition for post-conviction relief.

(5)    Petitioner raised this issue in the appeal of the denial of his petition for post-conviction relief.

(6)    Petitioner appealed the denial of post-conviction relief to the Alabama Court of Criminal Appeals, case number CR-02-1971. That court affirmed the denial of relief on June 17, 2005, *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. 2005) (Mem). Petitioner thereafter filed a petition for writ of certiorari with the Alabama Supreme Court. That petition was denied on January 20, 2006, *Ex parte David Freeman*, 1041678 (Ala. Jan. 20, 2006).

(7)    Not applicable.

(e)    Not applicable.

13.    (a)    All grounds for relief raised in this petition have been presented to the Alabama Supreme Court.

(b)    There are no grounds in this petition that have not been presented in a state court.

14.    Petitioner has not previously filed any type of petition, application, or motion in a federal court regarding the convictions he challenges in this petition.

15.    At present, petitioner has no petitions or appeals concerning the judgment challenged here pending in any other court, state or federal. However, petitioner does intend to challenge certain aspects of the Alabama Court of Criminal Appeals' decision affirming the denial of post-conviction relief via a petition for a writ of certiorari to be submitted to the United States Supreme Court. Petitioner's time for filing that petition expires on or about April 20, 2006.

16.    The names and addresses of each attorney who previously represented petitioner are as follows:

(a)    At preliminary hearing:   Richard Shinbaum, Allen Howell, P.O. Box 201, Montgomery, AL 36101-0201.

(b)    At arraignment and plea: Allen Howell, P.O. Box 201, Montgomery, AL 36101-0201; John Norris, P.O. Box 1666, Montgomery, AL 36102-1666.

(c)    At trial: Allen Howell, William Abell, P.O. Box 201, Montgomery, AL 36101-0201;

John Norris, P.O. Box 1666, Montgomery, AL 36102-1666.

(d)     At sentencing: Allen Howell, William Abell, P.O. Box 201, Montgomery, AL 36101-0201; John Norris, P.O. Box 1666, Montgomery, AL 36102-1666.

(e)     On appeal: Thomas Goggans, P.O. Box 1307, Montgomery, AL 36101.

(f)     In state post-conviction proceedings: Keir M. Weyble, Robert Lominack, P.O. Box 11744, Columbia, SC 29211; Larry T. Menefee, 407 S. McDonough Street, Montgomery, AL 36104-4225.

(g)     On appeal from the adverse ruling in state post-conviction proceedings: Keir M. Weyble, P.O. Box 11744, Columbia, SC 29211; Larry T. Menefee, 407 S. McDonough Street, Montgomery, AL 36104-4225.

17.     Petitioner has no future sentences to serve after the completion of the sentence imposed by the judgment challenged in this petition.

18.     Timeliness of petition: Pursuant to 28 U.S.C. §2244(d)(1)(A), the limitations period began to run on October 30, 2000, the day after petitioner's conviction and sentence became final by the conclusion of direct review. The limitations period ran for 333 days, until the September 28, 2001 filing of the application for state post-conviction relief, at which time the limitations period was tolled pursuant to §2244(d)(2). The limitations period remained tolled pursuant to §2244(d)(2) until January 20, 2006, when the Alabama Supreme Court issued an order denying the petition for writ of certiorari seeking review of the Alabama Court of Criminal Appeals' affirmance of the Montgomery Count Circuit Court's denial of post-conviction relief. When the limitations period resumed running on January 20, 2006, thirty-two (32) days remained. Accounting for the thirty-two (32) days remaining at the time the state post-conviction relief proceedings concluded, petitioner's limitations period expires on February 21, 2006.

WHEREFORE, petitioner prays that the Court:

(a)    issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint;

(b)    conduct a hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in this petition;

(c)    permit him because of his indigence to proceed without payment of costs; and

(d)    grant such other relief as may be necessary and appropriate.

Respectfully submitted,

KEIR M. WEYBLE[14]
Blume & Weyble, LLC
P.O. Box 11744
Columbia, SC 29211
(803) 765-1044

By: _____
Counsel for Petitioner

February 15, 2006.

_____

[14]In his Motion for Appointment of Counsel (filed February 8, 2006), petitioner sought the appointment of Keir M. Weyble and Christopher Seeds to represent him in this action. By order dated February 13, 2006, the Court granted the request to appoint Mr. Weyble, but declined to appoint Mr. Seeds "at this time because he has not yet filed a motion for *pro hac vice* admission and because it is the policy of this court to appoint only one lawyer in a capital habeas case who resides outside this district and to require the appointment of local co-counsel from the Federal Defenders Office in the Middle District of Alabama." *Freeman v. Campbell*, 2:06CV122-MHT-VPM (Feb. 13, 2006) at 2 n.1.

As explained in the Motion for Appointment, Mr. Seeds is unable to apply for *pro hac vice* admission until he secures admission to the Bar of the Southern District of New York. This is expected to occur on February 28, 2006. Thereafter, Mr. Seeds will promptly submit a motion for *pro hac vice* admission to this Court, as well as a motion for reconsideration of the denial of his request for appointment in this case. Petitioner therefore respectfully requests that the Court defer any action on the appointment of co-counsel until such time as Mr. Seeds, who has already devoted significant time and effort to familiarizing himself with this case and preparing this petition, can establish his eligibility for admission *pro hac vice* and for appointment in this case.