IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA

DAVID FREEMAN                              )
                  *Petitioner*,    )
                            )
     v.                           )
                            )   Civil Action No. 2:06CV122-MHT-WC
RICHARD F. ALLEN, Commissioner,           )
Alabama Department of Corrections,        )
             *Respondent*.    )

**PETITIONER'S BRIEF ON THE MERITS AND IN OPPOSITION
TO RESPONDENT'S BRIEF ON PROCEDURAL DEFAULT**

Keir M. Weyble
 Blume Weyble & Norris, LLC
 P.O. Box 11744
 Columbia, SC 29211
 TEL: (803) 765-1044
 FAX: (803) 765-1143
 E-Mail: keir@blumelaw.com

Christopher Seeds
 P.O. Box 6725
 FDR Station
 New York, NY 10150
 TEL: (917) 837-6760
 E-Mail: chrisseeds@gmail.com

Robin C. Konrad
 Federal Defenders
 Middle District of Alabama
 201 Monroe Street , Suite 407
 Montgomery, AL 36104
 TEL: (334) 834-2099
 FAX: (334) 834-0353
 E-Mail: robin_konrad@fd.org

Counsel for David Freeman

# TABLE OF CONTENTS

**STATEMENT OF THE CASE**.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

I.    Procedural history. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

    A.    An insanity defense?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

    B.    A bare and misleading sentencing presentation. . . . . . . . . . . . . . . . . . . . . .  4

    C.    State post-conviction proceedings: *Pro bono* counsel and no litigation
        resources. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

II.   Fact development in the federal habeas proceedings. . . . . . . . . . . . . . . . . . . . . . .  6

**ANALYSIS OF CLAIMS FOR RELIEF UNDER 28 U.S.C. §§2254(d) AND (e)**. . . . . . . .  7

I.    The structure and function of 28 U.S.C. §2254(d). . . . . . . . . . . . . . . . . . . . . . . . .  7

II.   Evaluation of state court factual findings under AEDPA. . . . . . . . . . . . . . . . . . . .  13

**PETITIONER'S CLAIMS FOR HABEAS RELIEF**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

    **GROUND I – PETITIONER'S RIGHT, AS GUARANTEED BY THE FIFTH AND
    FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, NOT "TO BE
    TWICE PUT IN JEOPARDY OF LIFE OR LIMB" WAS VIOLATED WHEN HIS TRIAL WAS
    PERMITTED TO GO FORWARD AFTER A PREVIOUS PROCEEDING ENDED IN THE
    DECLARATION OF A MISTRIAL IN THE ABSENCE OF MANIFEST NECESSITY**. . . . . . . . .  20

I.    Relevant facts and procedural background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

II.   Ground I is not procedurally barred. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

    A.    Ground I is exhausted. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

    B.    Petitioner did not contravene state law by not seeking to relitigate a
        claim that the Alabama Supreme Court resolved against him during
        pre-trial litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

III.  Relevant legal principles. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

IV.   Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

GROUND II – PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN HE WAS INTERROGATED AFTER INVOKING HIS RIGHT TO SILENCE AND THE INCULPATORY STATEMENTS PRODUCED BY THAT INTERROGATION WERE ADMITTED AGAINST HIM AT HIS CAPITAL TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

I.    Relevant facts and procedural background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

II.   Relevant legal principles and discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    A.    The CCA's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

    B.    The CCA's decision involved an unreasonable application of clearly established federal law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

GROUND IV – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL. . . . . . . . . . . . . . . . . . . 50

I.    Relevant procedural background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

II.   Argument on fair presentation and procedural default. . . . . . . . . . . . . . . . . . . . . . . . 57

    A.    Fair presentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

    B.    Procedural default. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

        1.    The CCA's application of Rules 32.3 and 32.6(b) to petitioner's claims was not "independent" of federal law. . . . . . . . . . . . . 62

            a.    "Independence" of federal law. . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

            b.    As construed and applied by the CCA in this case, Rules 32.3 and 32.6(b) were not independent of federal law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

        2.    The CCA's application of Rules 32.3 and 32.6(b) to petitioner's claims does not constitute an "adequate" ground for withholding merits review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

            a.    Petitioner was misled and was not afforded meaningful notice or an opportunity to be heard. . . . . . . . . . . . 71

b.  The CCA's applications of Rule 32.3 and 32.6(b) in this case did nothing to further a legitimate state interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

c.  The CCA's applications of Rules 32.3 and 32.6(b) were exorbitant, manifestly unfair, and therefore inadequate to foreclose federal review.. . . . . . . . . . . . . . . . . . . 81

3.  Even if the CCA's applications of Rules 32.3 and 32.6(b) could qualify as adequate and independent, the circumstances and method of their application in this case constitute "cause" to overcome the resulting procedural bar.. . . . . . . . . . . . . . . . . . . . . . . . 86

III.  Petitioner's entitlement to consideration of additional facts supporting his ineffective assistance of counsel claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

A.  Exhaustion and factual supplementation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

B.  Petitioner's entitlement to fact development. . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

IV.  The merits of petitioner's allegations of ineffective assistance of trial counsel. . . . . . . 96

GROUND IV.B. – PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY TRIAL COUNSEL'S FAILURE TO CHALLENGE THE PROSECUTION'S FORENSIC ODONTOLOGY EVIDENCE. . . . . . . . . . . . . . . . . . . . . . . 97

A.  Procedural background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

B.  Relevant legal principles and discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

C.  Section 2254(d) does not apply to this Ground. . . . . . . . . . . . . . . . . . . . . . . . . . 104

D.  Petitioner is entitled to an evidentiary hearing on Ground IV.B.. . . . . . . . . . . . 105

GROUND IV.C. – PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, BY TRIAL COUNSEL'S DECISION TO DEPOSE DR. GUY RENFRO, A CLINICAL PSYCHOLOGIST WHO REFUTED FREEMAN'S MENTAL STATE DEFENSE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

A.  Relevant facts and procedural background. . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

1.    The deposition and trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

2.    The post-conviction proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

B.    Ineffective assistance of counsel. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

1.    Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

2.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

C.    Section 2254(d) does not bar relief on this Ground. . . . . . . . . . . . . . . . . . . . . 117

**GROUNDS IV. D.& E. – PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WAS VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE OF PETITIONER'S BACKGROUND AND MENTAL HEALTH PROBLEMS, INCLUDING NEUROLOGICAL IMPAIRMENTS, IN A MANNER THAT WOULD HAVE ALLOWED THE JURY TO GIVE THAT EVIDENCE MITIGATING EFFECT.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

B.    Procedural background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

C.    Mitigation information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

1.    Trial counsel's presentation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

2.    The facts a competent investigation would have revealed. . . . . . . . . . 124

3.    Expert assistance from a social worker. . . . . . . . . . . . . . . . . . . . . . . . 141

4.    Expert assistance from a neuropsychologist. . . . . . . . . . . . . . . . . . . . 146

D    Deficient performance. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 152

E.    Prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 156

F.    Section 2254(d) does not bar relief on this Ground. . . . . . . . . . . . . . . . . . . . . 160

G.    Petitioner is entitled to an evidentiary hearing on Grounds IV.D. and E.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

GROUND IV.F. – PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY TRIAL COUNSEL'S FAILURE TO INTRODUCE EVIDENCE OF PETITIONER'S ADAPTABILITY TO PRISON. ...................... 161

    A.     Procedural background. ......................................... 161

    B.     Relevant legal principles and discussion. ............................ 162

    C.     Section 2254(d) does not bar relief on this Ground. ..................... 167

    D.     Petitioner is entitled to an evidentiary hearing on Ground IV.F. ............ 167

GROUND V – PETITIONER'S RIGHT TO A FAIR SENTENCING PROCEEDING AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WAS VIOLATED BY THE ADMISSION OF UNRELIABLE AND MATERIALLY INACCURATE EVIDENCE. ...................................... 168

I.     Procedural background. ............................................... 168

II.    Ground V is not procedurally barred. ...................................... 168

III.   Relevant legal principles and discussion. .................................... 169

IV.   Petitioner is entitled to an evidentiary hearing on Ground V. ..................... 171

GROUND VI – APPELLATE COUNSEL'S FAILURE TO CHALLENGE THE ADMISSION OF THE PRIOR TRIAL TESTIMONY OF WITNESS FRANCIS BOOZER VIOLATED PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. ................................................... 172

I.     Relevant facts and procedural background. ................................. 172

    A.     Relying on the witness's word: the state's failure to procure medical evidence of the witness's illness and subpoena the witness. .............. 172

    B.     Francis Boozer's previous testimony. ................................ 173

    C.     The Alabama courts' disposition of the appellate ineffectiveness claim. .................................................. 174

II.    The Sixth Amendment violation. ........................................ 176

A.    Appellate counsel performed deficiently in failing to challenge the admission of Boozer's prior testimony because the State failed to prove that the witness was unavailable. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    176

    1.    The State failed to establish that Boozer was unable to be present due to an existing illness or infirmity. . . . . . . . . . . . . . . . . . . .    178

    2.    The State failed to establish that it was unable to procure Boozer's attendance by process or other reasonable means. . . . . . . . .    180

B.    There is a reasonable likelihood that petitioner would have prevailed on this claim on appeal, because the admission of Boozer's previous testimony was not harmless. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    183

III.    Section 2254(d) does not bar relief on this Ground. . . . . . . . . . . . . . . . . . . . . . . . . . . .    185

**GROUND VII – THE PROSECUTION'S VICTIM IMPACT ARGUMENTS VIOLATED PETITIONER'S RIGHTS AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.** . . . . . . . . . . . . . . . . . . . . . . .    186

I.    Relevant facts and procedural background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    186

A.    Victim trial testimony and argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    186

B.    The direct appeal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    191

II.    Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    193

A.    The argument that the jurors would determine the value of the victims' lives was improper under the Eighth Amendment. . . . . . . . . . . . . . . .    194

B.    The argument that jurors should impose a death sentence because it is what Deborah Gordon wanted violated the Eighth Amendment. . . . . . . . . .    196

C.    The prosecutor's argument encouraging the jurors to draw impermissible conclusions from the victim impact evidence also violated due process. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    200

D.    The improper and inflammatory victim-impact argument denied petitioner a fair and individualized sentencing proceeding. . . . . . . . . . . . . . . .    201

**GROUND VIII – PETITIONER'S RIGHT TO TRIAL BY JURY, AND TO HAVE A JURY DETERMINE ALL FACTS ESSENTIAL TO THE IMPOSITION OF THE PUNISHMENT HE RECEIVED, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN THE TRIAL JUDGE, RATHER THAN THE JURY, DETERMINED THE FACTS NECESSARY TO INCREASE HIS SENTENCE FROM LIFE WITHOUT PAROLE TO DEATH** . . . . . . . . . . . . . . . . . . . . . . . . . 203

I.    Relevant facts and procedural background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203

II.    Discussion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

    A.    Petitioner is entitled to the benefit of the rule announced in *Apprendi*, and that rule is sufficient to establish the Sixth Amendment violation requiring relief from his death sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

        1.    *Summerlin* is not dispositive of petitioner's case because his conviction was not final when *Apprendi* was decided. . . . . . . . . . . . . . 207

        2.    *Ring* did not announce a new rule relative to *Apprendi*. . . . . . . . . . . . 209

    B.    The CCA's conclusion that the weighing of aggravating and mitigating factors is not a determination which must be made by a jury beyond a reasonable doubt was both wrong and unreasonable under *Apprendi*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

**CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA

DAVID FREEMAN                      )
                 *Petitioner*,    )
                      )
    v.                   )
                      )   Civil Action No. 2:06CV122-MHT-WC
RICHARD F. ALLEN, Commissioner,  )
Alabama Department of Corrections,  )
               *Respondent*.  )

**PETITIONER'S BRIEF ON THE MERITS AND IN OPPOSITION
TO RESPONDENT'S BRIEF ON PROCEDURAL DEFAULT**

Petitioner, David Freeman (hereinafter "petitioner"), by and through undersigned counsel and pursuant to Magistrate Judge Wallace Capel's January 26, 2007 order, submits this brief to address the merits of his claims for habeas relief, and to address respondent's contentions that certain of his claims are procedurally barred from merits review and may not be the subject of an evidentiary hearing in this Court. Petitioner will begin with a brief overview of the factual and procedural background of the case, and a brief discussion of relevant statutory and decisional law governing the applicability and function of 28 U.S.C. §§ 2254(d) and (e). Petitioner will then turn to his individual grounds for relief and discuss, as necessary, respondent's procedural default arguments, exhaustion, the need for and availability of an evidentiary hearing, and the substantive merits of his allegations of constitutional error.

**STATEMENT OF THE CASE**

**I.     Procedural history.**

Petitioner was eighteen years old at the time of his March 12, 1988 arrest in connection with the March 11, 1988 homicides of Mary Gordon and her daughter, Sylvia Gordon. Vol. 40, R. 575.

1

He was charged with six counts of capital murder,[1] and local attorneys Richard Shinbaum and Allen Howell were appointed to defend him. The case originally went to trial in the Montgomery County Circuit Court in August 1989 before the Honorable Mark Montiel. Petitioner was convicted on all counts and the jury subsequently recommended a sentence of death by a vote of 11 to 1. Judge Montiel sentenced petitioner to death.

On direct appeal, the Alabama Court of Criminal Appeals (hereinafter "CCA") remanded the case for a hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). *Freeman v. State,* 651 So. 2d 573 (Ala. Crim. App. 1992). The remand hearing was conducted by the Honorable Eugene Reese, who concluded that the state had not exercised its peremptory challenges in a racially discriminatory manner. *Freeman v. State,* 651 So. 2d 576, 581 (Ala. Crim. App. 1994). On subsequent appeal, the CCA disagreed, reversed petitioner's convictions, and remanded for a new trial. *Id.* at 598.

Petitioner was retried in 1996, this time represented by Allen Howell, John Norris, and William Abell. Vol. 38, R. 6; 15. On the advice of counsel, petitioner pled not guilty by reason of mental disease or defect. Vol. 23, C. 1181. At trial, the state's case began with the testimony of Deborah Gordon Hosford, the sister of Sylvia Gordon and daughter of Mary Gordon, who discovered the homicides upon returning home, and the testimony of Dr. Michael O'Brien, a dentist by practice, who claimed to have identified an "exact[]" match between a bite mark found on petitioner's arm

---

[1]Petitioner was charged as follows: Count I – murder of two or more persons by one act or pursuant to one scheme or course of conduct; Count II – murder of Sylvia Gordon during a burglary in the first degree; Count III – murder of Mary Gordon during a burglary in the first degree; Count IV – murder of Sylvia Gordon during a robbery in the first degree; Count V – murder of Mary Gordon during a robbery in the first degree; Count VI – murder of Mary Gordon during a rape in the first degree. *See Freeman v. State,* 776 So. 2d 160, 168 (Ala. Crim. App. 1999).

following his arrest and a model of Sylvia Gordon's teeth.  The state offered the prior testimony of Francis Boozer regarding a conversation she claimed to have had with Petitioner regarding his relationship with Sylvia before the crimes.  Detectives and evidence technicians described the investigation of the crime scene, Petitioner's arrest, and statements he made to law enforcement under custodial interrogation.  And the medical examiner testified as to the cause and manner of death of Sylvia and Mary Gordon.

### A.    An insanity defense?

In defense, meant to support petitioner's plea of not guilty by reason of mental disease or defect, counsel offered the testimony of three witnesses.[2]  Two of those witnesses were youth services caseworkers, who had previously worked with petitioner.  Both discussed the failure of the state foster care system to properly care for petitioner, but neither provided any testimony bearing upon his mental state at the time of the crime.  The defense's third witness, clinical psychologist Dr. Barry Burkhart, was called to serve that purpose.  Burkhart testified that petitioner suffered from major depressive disorder and schizotypal personality disorder, suggested that on the day of the homicides petitioner was likely experiencing a brief reactive psychosis triggered by Sylvia Gordon's rejection of his romantic overtures, and opined that this may have rendered him unable to conform his conduct to the requirements of the law.  On cross-examination, however, Dr. Burkhart conceded, *inter alia*, that no test results or other experts supported his conclusions, and that even Burkhart himself was less than certain about the claims he had made. *See* Vol. 42, R. 824-885.  Trial counsel thus failed to support the insanity plea with any expert or lay testimony capable of meeting the

---

[2]Counsel also offered by stipulation the prior-trial testimony of Anita Hussey, who described time keeping and payment practices at the truck stop where petitioner and Boozer had been employed. Tab 37 at 10-23, Vol. 44.

relevant legal standard.  Petitioner was found guilty on all six counts. Tab R-24, Vol. 44, R.1266.

**B.    A bare and misleading sentencing presentation.**

At the sentencing phase, the state called no witnesses, choosing to rely upon the evidence presented at the guilt phase. Tab R-24, Vol. 44, R.1266. The defense offered six statutory mitigating circumstances, Tab R-27, but called only one witness to support them.  That witness, Alexander Moore, had been house father at one of petitioner's many institutional placements.  Vol. 44, R. 1279; 1314.  In his four transcript pages of testimony, which were delivered by telephone, defense counsel asked Moore what petitioner was like at the time Moore knew him and introduced two photographs of petitioner from that period.  Defense counsel then attempted, over repeated objections by the prosecution, to (improperly) elicit Moore's opinion on whether petitioner deserved a death sentence. When the objections were sustained, counsel asked Moore if there was anything else he would like to say.  To this, Moore replied: "To my way of thinking, [petitioner] was a good child like any other normal child that lived the lifestyle that he had to live.  I think he would be deserving of some leniency, if possible, if at all possible."  After closing arguments and jury instructions, *see* Vol. 44, R.1284-1322; 1325, the jury recommended a death sentence by a vote of 11 to 1. Tab R-34, Vol. 44, R. 1329. On August 1, 1996, the trial court sentenced petitioner to death. Tab R-36, Vol. 44,  R. 1335.

The state appellate courts affirmed, *Freeman v. State*, 776 So. 2d 160 (Ala. Crim. App. 1999); *Ex parte Freeman*, 776 So. 2d 203 (Ala. 2000), rejecting petitioner's claims that the admission of his statements to law enforcement violated *Miranda v. Arizona*, and that the state's improper victim impact arguments violated the Eighth and Fourteenth Amendments.  The judgment became final on October 30, 2000. *Freeman v. Alabama*, 531 U.S. 966 (2000).

4

### C.   State post-conviction proceedings: *Pro bono* counsel and no litigation resources.

Represented by *pro bono* counsel recruited from South Carolina, petitioner filed his initial petition for state post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, on September 28, 2001.  Tab R-48, Vol. 48. The petition was subsequently amended on four occasions. Tab R-50, Vol. 48; Tab R-52, Vol. 48; Tab R-54, Vol. 49; Tab R-57, Vol. 49.  The state answered the petitions, seeking dismissal on a variety of procedural grounds. Tab R-49, Vol. 48; Tab R-51, Vol. 48;  Tab R-53, Vol. 48; Tab R-55, Vol. 49; Tab R-58, Vol. 49.   Seeking to develop the factual bases of his claims, petitioner filed three written motions for funds for expert services necessary to the development and presentation of his claims.  *See* Vol. 48, C. 170-178; C. 198-200; Vol. 49, C. 201; Vol. 49, C. 248-254.   The circuit court summarily denied all of these funding requests.  Petitioner received an evidentiary hearing on his petition for post-conviction relief at which only three witnesses testified:  trial counsel William Abell, trial counsel John Norris, and appellate counsel Thomas Goggans.   Because petitioner was summarily denied funding for investigative and expert assistance, he lacked the resources necessary to fully develop and prove his allegations.  The court's denial of funds necessary for witness travel meant that lead trial counsel Allen (now Ally) Howell could not travel from her New York State residence to provide testimony at the Rule 32 hearing.  The court also refused to admit an affidavit from Howell addressing the matters she would have been questioned about had her appearance been possible.   The circuit court adopted the state's proposed order denying post-conviction relief on June 25, 2003.

The CCA affirmed the denial of post-conviction relief.  Although the state had not raised the point in its brief, and the circuit court had not relied upon it in the order it adopted, the CCA

concluded that a number of petitioner's claims, as presented to the circuit court, were barred for failure to satisfy the specificity requirement of Rule 32.6(b) of the Alabama Rules of Criminal Procedure. *Freeman v. State*, No. CR-02-1971 (Ala. Crim. App. June 17, 2005); Tab R-73. Petitioner's request for rehearing by the CCA, and a subsequent petition for writ of certiorari submitted to the Alabama Supreme Court, were denied. *Ex parte Freeman*, 1041678 (Ala. Jan. 20, 2006); Tab R-74.

## II.    Fact development in the federal habeas proceedings.

In these federal habeas proceedings, petitioner has gained access to the expert assistance he sought in state court. With access to a risk assessment expert, petitioner has obtained evidence that he is and was at the time of trial a fully manageable inmate, particularly well suited to adapt to prison life. With access to an expert in forensic odontology, petitioner has obtained evidence that the prosecution's bite mark witness substantially overreached in testifying that low quality imprints on petitioner's arm "compared exactly" to molds taken from Sylvia Gordon, and in making claims about the age of the bite marks when no conclusion to a reasonable degree of scientific certainty could have been drawn from the evidence. But most of all, petitioner has gained access to the investigative and expert assistance necessary to uncover and explain the tragic circumstances of his background that the jury should have heard at trial. Among other critical facts, the investigation revealed a history of trauma, repeated abandonment and neglect, and physical and sexual abuse – some of which was perpetrated by none other than trial counsel's lone penalty phase witness, Mr. Moore. With the assistance of a qualified social worker and neuropsychologist, petitioner has been able to assess the impact of his troubled background, and to identify the ways in which that background, and the psychological and neurological damage it caused, would have made for a powerful case in mitigation

6

at trial.

## ANALYSIS OF CLAIMS FOR RELIEF UNDER 28 U.S.C. §§2254(d) AND (e)

Respondent's past submissions indicate its intent to rely on 28 U.S.C. §§2254(d) and (e) in an effort to insulate the state courts' decisions denying relief from critical review by this Court. Because respondent's representations about these provisions suggest a method of analysis that misconceives their proper function, petitioner will set out a more accurate description of what they are and how they operate.

## I.     The structure and function of 28 U.S.C. §2254(d).

While it is not uncommon for litigants, and even courts, to use terms like "deference" and "standard of review" as shorthand when describing §2254(d), these terms are actually both incorrect and potentially harmful to a habeas petitioner's right to full substantive review of the constitutional issues he presents. This is so because such shorthand terms suggest that the substantive merits of a habeas petitioner's constitutional claims must be considered only through the distorting lens of "reasonableness" analysis.  While using §2254(d)(1) or (2) in this manner might promote a respondent's interest in minimizing the scrutiny with which a habeas petitioner's constitutional claims are examined by a federal habeas court, doing so would be consistent with neither the plain language of the statute, nor its application by the Supreme Court. Rather, as discussed below, §2254(d) not only permits but requires a more exacting inquiry into the constitutional merits of a petitioner's claims.

Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State

court proceedings unless the adjudication of the claim –

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Pursuant to the plain language of the statute's opening sentence, the threshold question is whether the particular claim under federal habeas review "was adjudicated on the merits in State court proceedings."  If, as is the case with respect to the ineffective assistance of counsel claims raised in petitioner's petition, the state court to which the claim was previously presented failed to resolve the merits, or failed to reach any component of the standard prescribed for the claim by federal law, then §2254(d) is inapplicable to the federal court's analysis of the claim or component. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] analysis"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (citing *Wiggins*) ("Because the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*") (internal citation omitted); *see also*, *e.g.*, *Weeks v. Angelone*, 176 F.3d 249, 258-260 (4th Cir. 1999) ("When a petitioner has properly presented a claim to the state court but the state court has not adjudicated the claim, . . . our review of questions of law and mixed questions of law and fact is *de novo*"); *Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005) ("When a state court is silent with respect to a habeas corpus petitioner's claim, that claim has not been "adjudicated on the merits' for purposes of §2254(d).  As a practical matter, a federal court cannot apply . . . §2254(d) in the absence

8

of any state court decision on the issue").

For claims or portions of claims that were adjudicated on the merits by a state court, the first step in correctly applying §2254(d) is to recognize that it is concerned with limiting a federal habeas court's authority to grant relief *once a federal constitutional violation has been found to exist*, not with attempting to influence the federal court's discharge of its Article III mandate to determine the existence *vel non* of constitutional error.[3] That §2254(d) speaks to the availability of a remedy, rather than to the method for ascertaining the existence of an error for which a remedy might be warranted, is clear for at least two reasons. First, the opening clause of the statute – "An application for a writ of habeas corpus . . . *shall not be granted*" (emphasis added) – is an express direction to withhold the writ unless certain conditions are met; it says nothing, however, that purports to modify the ways in which federal courts analyze or resolve the constitutional questions which are necessarily anterior to any consideration of a possible remedy.

Second, when Congress created the limitation on relief in §2254(d) as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), it made no changes to §2254(a), which confers federal habeas jurisdiction only for the circumscribed purpose of determining whether a habeas petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." Taken together, §§2254(a) and (d) thus form a framework in which federal courts remain both authorized and obligated to determine the existence of constitutional violations in the first instance, but may no longer remedy such violations by issuing the writ of habeas corpus unless they

---

[3]*See, e.g.,* (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (§2254(d) "places a new constraint on the power of a federal habeas court *to grant* a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court") (emphasis added); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("The requirements for habeas *relief* established by 28 U.S.C. §2254(d) are thus satisfied") (emphasis added).

further find one or more of the conditions enumerated in §2254(d)(1) or (2) to be satisfied. *See Gonzalez v. Crosby*, 545 U.S. 524, 532 n.4 (2005) (defining a "merits" decision in a habeas case as "a determination that there exist or do not exist grounds entitling a petitioner to habeas corpus relief under 28 U.S.C. §§2254(a) and (d)").

With this framework in view, the function of subdivisions (1) and (2) of §2254(d) is straightforward. Whereas the opening lines of §2254(d) establish the general proposition that habeas relief "shall not be granted . . . unless" certain conditions are met, subdivisions (1) and (2) enumerate in broad terms what those conditions are. Subdivision (1) authorizes a federal court to remedy a constitutional violation where the state court's "adjudication of the claim . . . resulted in a decision that was contrary to . . . clearly established Federal law," or "involved an unreasonable application of[] clearly established Federal law." And subdivision (2) further authorizes a grant of relief where the state court's "adjudication of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Considered collectively and in the context of the statute as a whole, the "contrary to," "unreasonable application of," and "unreasonable determination of the facts" clauses of subdivisions (1) and (2) establish three broad categories of defects, any one of which, if found to exist in a state court's decision rejecting a claim the federal court later determines to be meritorious, will permit the federal court to issue the writ. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*) (state court adjudication can survive §2254(d)(1) only where "neither the reasoning nor the result of the state court decision contradicts" Supreme Court precedents). Importantly, it is only the actual contents of the state court's decision, and not any *post hoc* reasoning that a respondent may offer as an

10

alternative means for justifying the outcome of the state court proceeding, that is relevant to the §2254(d) analysis. *See Wiggins*, 539 U.S. at 529-530 (justifications for state court's denial of relief offered by respondent in federal habeas proceedings but not relied upon in actual state court decision have "no bearing" on federal court's analysis under §2254(d)).[4]

By conditioning the availability of federal habeas relief not only on a finding that the petitioner's constitutional rights were violated, but on the further determination that the state court's failure to recognize or remedy the error was attributable to a material defect in its adjudication of the claim, §2254(d) effectively strikes a balance between insulating adequate state court decisions from federal interference and maintaining the availability of federal habeas relief where the state court's adjudication was demonstrably flawed. This requirement of state court error in failing to find an actual constitutional violation *plus* an identifiable analytical mistake to which that error is attributable is precisely what Justice O'Connor meant when she explained that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 411

---

[4]In *Wiggins*, the Supreme Court examined whether trial counsel had made an informed strategic decision not to investigate certain matters relating to the petitioner's background. The state court had denied relief on the mistaken belief that records counsel reviewed contained information about these matters, such that counsel possessed the information necessary to make an informed choice to investigate no further. After establishing that the records counsel possessed actually did not contain the information the state court believed them to contain, the Supreme Court went on to reject the respondent's effort to rely upon a theory for denying relief that had not been part of the state court's rationale. Noting that the respondent's theory had not been part of the reasoning set forth in the state court's decision, the Court declared that "[r]espondents' interpretation of [trial counsel's] postconviction testimony [as indicating the possibility that trial counsel obtained the same information from different source] therefore has no bearing on whether the Maryland Court of Appeals' decision reflected an objectively unreasonable application of *Strickland*." *Wiggins*, 539 U.S. at 529-530.

(2000).

That federal habeas review of claims previously adjudicated on the merits in state court involves the sort of two-tiered analysis described above – as opposed to a more superficial "reasonableness" examination suggested by terms like "deference" or "standard of review" – is confirmed by the Supreme Court's decisions granting relief in cases governed by §2254(d). For example, in *Williams*, *supra*, the Court engaged in a thorough, detailed examination of the constitutional merits of the petitioner's ineffective assistance of counsel claim, followed by an equally thorough examination of the ways in which the Virginia Supreme Court's adjudication of that claim was "contrary to" federal law (by applying the wrong constitutional rule to the petitioner's claim) and also "involved an unreasonable application of" federal law (by, *inter alia*, failing to consider all of the evidence relevant to the claim). *See Williams*, 529 U.S. at 390-398. Likewise, in both *Rompilla* and *Wiggins*, the Court first undertook its own detailed review of the merits of the petitioners' contentions that their trial counsel were ineffective for failing to adequately investigate, *see Rompilla*, 545 U.S. at 381-387; *Wiggins*, 539 U.S. at 519-527, and then performed a careful analysis of the ways in which the state courts' decisions rejecting the petitioners' claims were based on an "unreasonable determination of the facts," and involved an "unreasonable application of" federal law. *See Rompilla*, 545 U.S. at 389-390; *Wiggins*, 539 U.S. at 527-534. The Court took the same approach in *Miller-El v. Dretke*, 545 U.S. 231 (2005), again conducting a painstaking evaluation of the merits of the petitioner's claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), before further concluding that the state court's rejection of that claim was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding," such that

federal habeas relief was appropriate.[5]

In short, when considering petitioner's claims for relief, this Court must not merely determine whether it can be said at a glance that the state court's rejections of those claims it adjudicated on the merits were "contrary to" federal law, or somehow "unreasonable" in their treatment of the law or the facts. Rather, for all claims subject to §2254(d), the Court must determine for itself (a) whether petitioner's constitutional rights were violated, and if they were (b) whether the state court's failure to recognize and remedy those violations can be attributed to one or more defects within the categories enumerated in §2254(d)(1) or (2). Where these two questions are resolved in petitioner's favor, relief must be granted.

## II.    Evaluation of state court factual findings under AEDPA.

To the extent respondent's submissions imply that state court factual determinations are effectively beyond review by this Court, they are clearly incorrect. As the Supreme Court demonstrated in *Wiggins*, and more recently in *Miller-El*, a faithful application of §2254(d)(2) cannot be accomplished without looking beneath a state court's factual "findings" and assessing the reasonableness of the conclusions reached by the state court in light of the evidence that was before that court. *Miller-El*, 545 U.S. at 266; *Wiggins*, 539 U.S. at 528; *see also*, *e.g.*, *Guidry v. Dretke*, 397 F.3d 306, 328 (5th Cir. 2005) (granting relief in capital case where state court's decision was based on factual finding that ignored countervailing record evidence; under "§2254(d)(2), the district court

---

[5]To be sure, there are cases in which a petitioner's inability to satisfy §2254(d) may be so obvious – either because he relies upon a rule which has not been "clearly established . . . as determined by the Supreme Court," *see Penry v. Johnson*, 532 U.S. 782, 795 (2001), or because the relevant federal standard affords state courts such wide latitude that only an exceptionally poor decision by the state court could conceivably be sufficient to authorize relief, *see Andrade v. Lockyer*, 538 U.S. 63, 71-73 (2003) – that the reviewing court need not pause long over a particular claim. However, such is not the case with respect to any of petitioner's claims.

concluded properly that the state court's adjudication of the claim was based on an unreasonable determination of the facts"); *Yung v. Walker*, 296 F.3d 129, 136 (2nd Cir. 2002) ("the focus of §2254(d)(2)" is "on whether the [state] court's factual findings are supported by sufficient evidence"); *Beck v. Bowersox*, 257 F.3d 900, 901 (8th Cir. 2001) (§§2254(d)(2) and (e)(1) "require meaningful federal court review of the evidentiary record considered by the state courts"); *Childress v. Johnson*, 103 F.3d 1221, 1226 n.7 (5th Cir. 1997) ("While the measure of deference afforded state court factual findings is substantial, we note that it is not absolute. Section 2254(d)(2) authorizes issuance of the writ if the state court decision 'was based on an unreasonable determination of the facts in light of the evidence presented'").

Moreover, while §2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence," this presumption is likewise far from absolute. In fact, Congress clearly contemplated that habeas petitioners would challenge, and federal courts would consider, whether state court factual determinations are supported by the record when it enacted §2254(f) ("If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein . . ."). If an examination of the sufficiency of the evidentiary support for a state court's factual findings were off limits under §2254(d)(2) or §2254(e)(1), it would make no sense to provide, in an adjacent subdivision of the same statute, a mechanism for facilitating review of precisely that question. Furthermore, if federal courts are required by §2254(e)(1) to take state court factual determinations at face value, then *Wiggins* and *Miller-El* – both of which involved detailed examinations of the state court record and determinations by the Supreme Court that the

14

state court's findings were not supported – were decided incorrectly.

That both §§2254(d)(2) and (e)(1) provisions – housed in different subsections and prescribing different standards and approaches – speak to how a federal court is required to handle state court factual determinations creates a certain tension. On one hand, subsection (e)(1), speaking in apparently mandatory terms, says state court factual findings "shall be presumed to be correct" absent a showing to the contrary by "clear and convincing evidence." On the other hand, subsection (d)(2) commands federal courts to assess the reasonableness of state court factual determinations "in light of the evidence presented in the State court proceeding" – that is, to look *beneath* the state court's factual *conclusions* (the same conclusions subsection (e)(1) would presume correct) to determine whether those conclusions are reasonable in light of the evidence that was before the state court.

This begs the question: How can a federal court *presume* a state court's *conclusion* to be correct (§2254(e)(1)), while simultaneously looking *beneath* that conclusion to assess the reasonableness of the state court's work in *reaching* that conclusion to begin with (§2254(d)(2))? The solution to this inconsistency lies not in forcing two facially incompatible (or, at best, redundant) provisions together, but in recognizing the individual roles each was designed to play in the overall scheme of habeas review. Section 2254(e) is addressed to questions that arise in the context of fact-development in federal court, and it operates to presume state court factual findings correct unless the petitioner demonstrates the ability, both procedurally (§2254(e)(2)) and substantively (§2254(e)(1)), to rebut that presumption with evidence presented for the first time in federal court. By contrast, and as described above, §2254(d) operates to limit a federal court's ability to grant habeas relief once it has found a constitutional violation, and allows such relief only where the

<center>15</center>

federal court has identified a statutorily significant problem with the state court's treatment of the petitioner's claim. Within this framework, subsection (d)(2) directs the federal court to scrutinize what the state court did *with the evidence before it*, and permits a grant of habeas relief only where the state court's erroneous denial of relief "resulted" from an objectively "unreasonable determination of the facts . . . ." The structure and text of §§2254(d) and (e) indicate that (d)(2) and (e)(1) are thus mutually exclusive provisions that do not apply to the same factual matter, but instead– as their placement in different subdivisions of §2254 suggests – operate to address different situations and accomplish different tasks.[6] They are described below.

On its face, §2254(e) is crafted to serve two finite and closely related purposes: limiting the circumstances under which habeas petitioners are permitted to present evidence to a federal court in the first instance; and defining the standard of proof that must be met when a petitioner is permitted to present evidence and seeks to use that evidence to challenge a factual determination made by a state court. The first of these purposes was recognized in (*Michael*) *Williams v. Taylor*, 529 U.S. 420 (2000) (construing §2254(e)(2)). The second is plain from the language of §2254(e)(1), which provides, in relevant part, that "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Read together, subdivisions (1) and (2) of §2254(e) thus have a discrete function: to prescribe when an evidentiary hearing is permitted, what

---

[6]Perhaps because of the confusion inherent in trying to apply both §2254(d)(2) and (e)(1) to the same factual issue, remarkably little has been said about the relationship between these provisions during the nearly eleven years since AEDPA took effect. A handful of courts, however, have analyzed that relationship, and although their results contain relatively minor variations, they have generally settled on approaches consistent with the discussion presented here. *See generally Lambert v. Blackwell*, 387 F.3d 210, 235-237 (3d Cir. 2004); *Taylor v. Maddox*, 366 F.3d 992, 999-1008 (9th Cir. 2004); *Breighner v. Chesney*, 301 F.Supp.2d 354, 366 (M.D.Pa. 2004).

16

stature pre-existing state court factual findings will have at such a hearing, and what a petitioner must produce at the federal hearing in order to justify the setting aside of the state court's findings.[7]

Where there is no federal evidentiary hearing – either because the petitioner cannot meet the demanding requirements of §2254(e)(2) or because the factual record that emerged from the state court is complete with regard to the claim under consideration – §2254(e) is best read as having no role to play in the federal habeas court's analysis. Although the language of §2254(e)(1) is broad enough on its face to touch every instance of a federal court's consideration of a state court's factual determination, such a reading is neither consistent with the canon that a "statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant," *Market Co. v. Hoffman,* 101 U.S. 112, 115 (1879) (citation omitted) (quoted in *Duncan v. Walker*, 533 U.S. 167, 174 (2001)), nor necessary to the overarching AEDPA objective of maintaining respect for state court judgments.

Section 2254(e)(1) should not and need not be read to apply beyond the scenario in which a petitioner is permitted to present new evidence in federal court for the simple reason that

---

[7]The history of the habeas statute further supports this reading. In drafting AEDPA, Congress moved the presumption of correctness contained in former §2254(d) to §2254(e)(1), and placed it next to the newly drafted (e)(2). Under the former §2254(d)(8), the requirement that the petitioner rebut the presumption of correctness by convincing evidence applied only when there had been "an evidentiary hearing in the proceeding in the Federal court." Although this language does not appear in (e)(1), neither does language stating that the burden of rebutting the presumption by clear and convincing evidence applies in all cases regardless of whether a federal evidentiary hearing is held. It cannot be assumed that Congress intended to repudiate this history, and (e)(1)'s placement next to the evidentiary hearing standard in (e)(2) suggests that it did not. *See Lorillard v. Pons*, 434 U.S. 575, 581 (1978) (When "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the . . . incorporated law, at least insofar as it affects the new statute"); Yackle, *Federal Evidentiary Hearings under the New Habeas Corpus Statute*, 6 B.U. Pub. Int. L.J. 135, 139 (1996) ("[T]he omission of the former § 2254(d)'s reference to the petitioner's burden 'in' a federal hearing is easily explained. This new provision is considerably shorter than its predecessor and may only reaffirm prior law in a more concise way").

§2254(d)(2), by its plain language and position in the statutory scheme, is tailor-made, and better suited, to the task. Unlike §2254(e)(1) – which is situated in the same subdivision as the provision governing the availability of new fact development in federal court – §2254(d)(2) is part of AEDPA's mechanism for limiting a federal court's power to remedy a constitutional violation. As such, §2254(d)(2) is concerned not with whether evidence presented for the first time in federal court establishes a constitutional violation,[8] but with whether the state court's denial of relief on a claim the federal court has found meritorious under §2254(a) is attributable to the state court having unreasonably determined the facts from the evidence it had before it.

That it is best to read §2254(d)(2) as occupying the "field" where a federal habeas court adjudicates a constitutional claim using only the record that was before the state court is clear when one considers the alternative. If §2254(e)(1) were part of the equation, then the federal court would be required to apply two different standards – one a standard of proof (§2254(e)(1)'s "clear and convincing" requirement), and the other an assessment of past performance by another court (§2254(d)(2)'s "reasonableness" requirement) – to the same factual issue. This makes no sense as a practical matter, especially in view of the fact that §2254(e)(1) speaks to evidence that was not before the state courts, while §2254(d)(2) is expressly restricted to evidence that was before the state courts. Moreover, the confusion and excess work brought about by using both standards yields no appreciable benefit in the form of added protection for state court decisions. After all, as the

---

[8]As the Supreme Court recognized in *Holland v. Jackson*, 542 U.S. 649, 653 (2004) (*per curiam*), "[w]here new evidence is admitted, some Courts of Appeals have conducted *de novo* review on the theory that there is no relevant state-court determination to which one could defer." *Citing Monroe v. Angelone*, 323 F.3d 286, 297-299, and n. 19 (4th Cir. 2003); *see also  Rojem v. Gibson*, 245 F.3d 1130, 1140 (10th Cir. 2001); *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001); *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003).

Supreme Court explained in *Williams*, "Congress specifically used the word 'unreasonable,' and not a term like 'erroneous' or 'incorrect'" in §2254(d), such that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision [was] . . . erroneous[] or incorrect[]. Rather, that [decision] must also be unreasonable." *Williams*, 529 U.S. at 411.

In light of the confusion and unnecessary doubling of analyses that would be inherent in reading both §2254(e)(1) and (d)(2) to apply to the same factual issues, and in light of the cues to be taken from each provision's placement in different parts of the statutory scheme, they must be given "independent meaning." *Williams*, 529 U.S. at 404. Where a petitioner is permitted to present new evidence to a federal habeas court for the purpose of challenging an existing state court factual finding, §2254(e)(1) sets the bar the petitioner must surmount. But where the evidence before the federal habeas court is the same as the evidence that was before the state court, and the federal habeas court has concluded that a constitutional violation has been shown, habeas relief is permitted where the petitioner can further demonstrate that the state court's failure to find error is attributable to unreasonableness in its determination of a fact material to the resolution of the claim.

19

## PETITIONER'S CLAIMS FOR HABEAS RELIEF

In the sections that follow, petitioner will discuss the particulars of the grounds for relief that he intends to pursue before this Court.[9]  Because Grounds I and V involve discrete procedural bar arguments by respondent and do not require an evidentiary hearing, they, along with Grounds II, VII and VIII, which involve no alleged procedural bars and do not require an evidentiary hearing, will be discussed individually in the order that they appear in the Petition. Ground IV and its subdivisions, as well as Ground VI, involve a common set of issues relating to procedural default, fair presentation, exhaustion, and the need for an evidentiary hearing.  The issues common to these claims will be discussed together, and that discussion will be followed by further briefing specific to each individual subdivision within Grounds IV and VI.

> **GROUND I – PETITIONER'S RIGHT, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, NOT "TO BE TWICE PUT IN JEOPARDY OF LIFE OR LIMB" WAS VIOLATED WHEN HIS TRIAL WAS PERMITTED TO GO FORWARD AFTER A PREVIOUS PROCEEDING ENDED IN THE DECLARATION OF A MISTRIAL IN THE ABSENCE OF MANIFEST NECESSITY.**

## I.    Relevant facts and procedural background.

Petitioner's re-trial originally commenced on January 22, 1996.[10]  *See* Vol. 21, C. 623. Over the ensuing four day period, a jury was selected, empaneled and sworn, and evidence was taken from approximately thirteen witnesses. *See id.*; Vol. 21, C. 640-799; Vol. 22, C. 800-868.  Following the adjournment of proceedings on Thursday, January 25, 1996, the case was "continued . . . on a daily

---

[9] As their absence from this brief suggests, petitioner no longer intends to pursue Grounds III, IV.A., and IX set forth in his Petition.

[10] Petitioner's initial convictions and sentence were overturned on direct appeal after the CCA concluded that the prosecution had violated the rule of *Batson v. Kentucky*, 476 U.S. 79 (1986), in selecting the jury for his first trial.  *See Freeman v. State,* 651 So. 2d 576, 581 (Ala. Crim. App.1994).

basis" while trial counsel Allen Howell obtained medical care for an unspecified illness. Vol. 22, C. 859-860. After five days, including the intervening weekend, the proceedings reconvened on Wednesday, January 31, 1996. At that time, the trial judge began by instructing Mr. Howell to "state what [his] position [was] about continuing this trial[.]" Vol. 22, C. 860. Mr. Howell responded as follows:

> Judge, I don't feel a hundred percent today, and one of the reasons that I have been very guarded about all of this, I have been in the hospital three times before with this stuff. I'm trying to avoid a trip this time. I don't feel like I could give my best – do my best job today, and – but I am here, I am at your pleasure. I am still – some of the symptoms have improved, some haven't. And that's where I am, Judge.

Vol. 22, C. 860.

When asked whether he had anything to add, Mr. Howell's co-counsel, John Norris, advised the court that this was his "first capital case, so Allen [Howell] has got far more experience, and we need time so Allen could be one hundred percent to assist [Mr. Norris] and assist David [Freeman]." Vol. 22, C. 861. Mr. Norris further advised that he had spoken with petitioner about the circumstances, and that petitioner "wants Allen [Howell] to be one hundred percent, because he knows Allen [Howell] did a good job for him on the first trial of this matter, and he just wishes for the Court to give it time so Allen can be one hundred percent." Vol. 22, C. 862.

Immediately following Mr. Norris's recitation of petitioner's position, the trial court announced the following conclusions:

> Well, based upon my observations and comments that the lawyers – I think it's going to be difficult, if not impossible, for you to come [sic] complete this case, Mr. Howell, by tomorrow. So the Court reluctantly finds that its only position at this time would be to declare a mistrial . . . ¶ This Court reluctantly does this, because it's been set

21

> three times. We're halfway through the trial,  We've got witnesses
> from out of state, out of county, not the least of which [sic] is the
> defendant's right for a speedy trial, and the victim's right to have this
> case over and satisfied.  So, this Court very reluctantly declares a
> mistrial due to these circumstances, and will re-schedule this matter
> at the earliest convenience.

Vol. 22, C. 862-863. After eliciting the parties' positions with regard to scheduling the next trial to

begin on February 28, 1996, the court adjourned the proceedings.   Vol. 22, C. 863-867.

Three weeks later (one week before the trial was set to begin anew), on February 21, 1996,

petitioner, through his counsel, moved to dismiss the indictment on the ground that his retrial would

violate the Fifth and Fourteenth Amendment prohibition against double jeopardy. *See* Vol. 21, C.

635-636. One day later, petitioner filed a "Demand for Jury Trial" "on his Motion to Strike and plea

of previous jeopardy" pursuant to *Ex Parte Adams*, 669 So. 2d 128 (Ala. 1995).  The trial court

denied the motion to dismiss without explanation on the same day it was filed, and took no action

on the request for a jury trial. Vol. 21, C. 634. On February 23, 1996, trial counsel presented

petitioner's double jeopardy claim to the Supreme Court of Alabama via a petition for a writ of

mandamus or prohibition, to which he attached a copy of the 224 page record of the January 1996

trial proceedings. Vol. 21, C. 629-632.  The court issued an unexplained order denying relief the very

same day.  Vol. 22, C. 869.  Also on February 23, 1996, petitioner sought pre-trial habeas corpus

relief in the United States District Court for the District of Alabama.  Vol. 21, C. 622-627.  That

petition was denied without explanation on February 26, 2006.  Vol. 22, C. 870.  Having exhausted

his efforts to assert his rights under the Double Jeopardy Clause, petitioner was retried, convicted,

and sentenced to death in August 1996. Tab R-36, Vol. 44.

## II.    Ground I is not procedurally barred.

Respondent asserts two related theories for finding Ground I to be procedurally barred.  First, respondent contends that Ground I "is procedurally defaulted because it has not been exhausted in compliance with Title 28 U.S.C. §2254(b)(1)(A)." Respondent's Initial Brief on Procedural Default and Evidentiary Hearing Issues (hereinafter "Respondent's Initial Brief") at 3.  Second,  respondent argues that petitioner's failure to raise his double jeopardy claim on direct appeal following the conclusion of his re-trial "was a procedural default under state law, which bars federal habeas corpus review of this claim" because "Alabama law precludes collateral review of issues that could have been but were not raised on direct appeal.  Ala. R. Crim. P. 32.2(a)(5)."  *Id.* at 4.  As discussed below, neither of these theories is sufficient to support a finding of procedural default.

### A.    Ground I is exhausted.

Respondent's contention that Ground I is "procedurally defaulted because it has not been exhausted in compliance with Title 28 U.S.C. §2254(b)(1)(A)" is wrong. To satisfy §2254(b)'s exhaustion requirement, a prisoner must "give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see also Picard v. Connor*, 404 U.S. 270 (1971); *Ex parte Royall*, 117 U.S. 241 (1886).  "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in [the] appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365-366 (1995)). Importantly, a prisoner need only make such a fair presentation to the state courts once. *O'Sullivan*, 526 U.S. at 844 ("[W]e have not interpreted the exhaustion doctrine to require prisoners to file repetitive petitions"); *Brown v. Allen,* 344 U.S. 443, 447 (1953) (habeas petitioner is not

23

obligated "to ask the state for collateral relief, based on the same evidence and issues already decided by direct review").

While it is ordinarily the case that most constitutional claims appearing on the face of the trial record must be raised on direct appeal to avoid possible waiver and later susceptibility to procedural bar in federal habeas proceedings, this is true only because post-trial direct appeal usually represents the first opportunity to present such claims to a state appellate court. Where the nature of the claim and the state's rules of procedure permit, however, pre-trial presentation of a claim to an appellate court is no less capable of satisfying the exhaustion requirement than presentation of the claim in a traditional direct appeal. In either scenario, the prisoner succeeds in providing the "state courts an opportunity to act on [the] claim[]." *O'Sullivan*, *supra*.

Pre-trial claims of double jeopardy fall into the latter category. Unlike most trial errors, double jeopardy violations can be identified and litigated – and often are – before a trial even starts. When the pre-trial litigation of a double jeopardy claim includes presentation of the claim to the state's highest court, the exhaustion requirement set forth in §2254(b) is satisfied. *See*, *e.g.*, *Kurzawa v. Jordan*, 146 F.3d 435, 440 (7th Cir. 1998) (although conviction was not directly appealed, petitioner exhausted double jeopardy claim where state supreme court had already ruled that prosecution did not offend Double Jeopardy Clause); *Shute v. State of Texas*, 117 F.3d 233, 237 (5th Cir. 1997) (petitioner exhausted double jeopardy claim, and thus was not required to raise claim on direct appeal, where he sought a pre-trial state writ of habeas corpus and claim had twice gone before Texas Court of Criminal Appeals).

In this case, petitioner did all he was required to do to exhaust his double jeopardy claim. As described *supra*, he raised the claim in a pre-trial motion to the trial court, and he challenged the

denial of that motion via a petition for writ of mandamus in the Alabama Supreme Court. At no point during those proceedings was petitioner ever informed – expressly or implicitly – that his challenge should have been reserved for direct appeal. Nor, as discussed below, does the Alabama case law contain any indication that a double jeopardy claim fully litigated before trial must be re-litigated on direct appeal. Absent such a requirement, and in light of petitioner's fair presentation of his double jeopardy claim during the pre-trial proceedings, respondent's assertion that Ground I was not properly exhausted cannot be sustained.

### B. Petitioner did not contravene state law by not seeking to relitigate a claim that the Alabama Supreme Court resolved against him during pre-trial litigation.

It is well settled that only state rules that are "firmly established and regularly followed" are capable of giving rise to a procedural bar to federal habeas review. *James v. Kentucky*, 466 U.S. 341, 348 (1984); *see also Ford v. Georgia*, 498 U.S. 411, 424 (1991); *Henry v. Mississippi*, 379 U.S. 443, 448 n.3 (1965); *Hathorn v. Lovorn*, 457 U.S. 255, 262-63 (1982); *Barr v. City of Columbia*, 378 U.S. 146, 149 (1964); *Meadows v. Legursky*, 904 F.2d 903, 906 (4th Cir. 1990); *Wheat v. Thigpen*, 793 F.2d 621, 625 (5th Cir. 1986) (default rule can only bar relief where it is strictly followed and where it has been "clearly announced to defendant and counsel").

To prevail on its contention that this Court may not reach the merits of Ground I, respondent must direct this Court's attention to a "firmly established and regularly followed" Alabama rule mandating that an issue litigated through the Alabama Supreme Court in pre-trial proceedings must be re-litigated in a post-trial direct appeal. *See Insyxiengmay v. Morgan*, 403 F.3d 657, 666-67 (9th Cir. 2005) ("[T]he ultimate burden is on the State, not the petitioner, to show that a procedural state bar was clear, consistently applied, and well-established at the time the party contesting its use failed

25

to comply with the rule in question"); *Mitchell v. Mason*, 325 F.3d 732, 739 (6th Cir. 2003)  ("[I]t is the Warden's burden to demonstrate that the rule was *already* firmly established and regularly followed as of the time the state court invoked the rule") (emphasis by the court); *Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999) ("[T]he state bears the burden of proving the adequacy of a state procedural bar in order to preclude federal habeas review").  Absent such a rule, there can be no procedural default. *See, e.g., Ulster County Court v. Allen*, 442 U.S. 140, 150-51, 168 (1979) (lack of contemporaneous objection would not bar federal review where state law did not require one).  Because respondent has come forward with no such rule, this basis for barring merits review by this Court fails as a matter of law.

## III.    Relevant legal principles.

"A State may not put a defendant in jeopardy twice for the same offense." *Arizona v. Washington*, 434 U.S. 497, 503 (1978) (citing *Benton v. Maryland*, 395 U.S. 784 (1969)).  Jeopardy attaches as soon as a jury is sworn.  *Downum v. United States*, 372 U.S. 734 (1963); *see also Crist v. Bretz*, 437 U.S. 28, 35 (1978).  The protections granted by the Double Jeopardy Clause of the Fifth Amendment "embrace[] the defendant's valued right to have his trial completed by a particular tribunal." *Id.* (internal quotation marks omitted). "Where . . . a mistrial has been declared," this " valued right . . . is . . . implicated." *United States v. Dinitz*, 424 U.S. 600, 606 (1976) (internal quotation marks and additional citations omitted).

Double jeopardy implications are not restricted to circumstances in which the "mistrial declaration . . . unfairly aids the prosecution or harasses the defense."  *Jorn*, 400 U.S. 470, 483 (1971) (internal citations omitted); *see also Downum*, 372 U.S. at 736 (the "extreme" case does not "mark the limit" of the double jeopardy "guarantee").  On the contrary, to remain faithful to the

nature of the right, a trial judge "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *Jorn*, 400 U.S. at 486. For this reason, "[t]he determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury first impaneled is itself a weighty one." *Illinois v. Somerville*, 410 U.S. 458, 471 (1973); *see also United States v. Perez*, 9 Wheat. 579, 580 (1824) (the "power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes").

"[T]he question whether under the Double Jeopardy Clause there can be a new trial after a mistrial has been declared without the defendant's request or consent depends on whether there is a manifest necessity for the (mistrial), or the ends of public justice would otherwise be defeated." *Dinitz*, 424 U.S. at 606-607 (internal quotation marks and additional citations omitted); *see also Jorn*, 400 U.S. at 481 (retrial permitted after mistrial only when, "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated"). In giving meaning to the term "manifest necessity," the Supreme Court has "assume[d] that there are degrees of necessity," and made clear that it "require[s] a 'high degree' before concluding that a mistrial is appropriate." *Washington*, 434 U.S. at 506 (quoting *Winsor v. The Queen*, L.R. 1 Q.B. 390, 394 (1866)).

Determining the existence *vel non* of manifest necessity warranting declaration of a mistrial requires careful examination of the particular facts and circumstances of each case. *Washington*, 434 U.S. at 506. Two considerations are of particular significance. First, whether alternatives to a

mistrial exist. *See*, *e.g.*, *Jorn*, 400 U.S. at 487; *Love v. Morton*, 112 F.3d 131, 137 (3rd Cir. 1997) (death of trial judge's mother-in-law did not warrant mistrial where alternate judge was available to preside over ongoing trial); *Harris v. Young*, 607 F.2d 1081, 1085 (4th Cir. 1979) ("In determining whether the trial judge exercised sound discretion in declaring a mistrial, [the court] must consider if there were less drastic alternatives to ending the trial[ and if there were] they should have been employed in order to protect the defendant's interest in promptly ending the trial"); *Dunkerley v. Hogan*, 579 F.2d 141, 147 (2d Cir. 1978) (re-trial barred where trial judge *sua sponte* declared mistrial due to defendant's hospitalization during third day of trial; seven to ten day continuance was feasible alternative to which prosecution did not object).   And second, whether the trial court afforded the defendant an opportunity to explain his position on the question of mistrial before actually declaring a mistrial. *See*, *e.g.*, *Washington*, 434 U.S. at 515-516; *United States v. Dixon*, 913 F.2d 1305, 1313 (8th Cir. 1990) (manifest necessity lacking where judge granted mistrial without affording defense counsel an opportunity to be heard, thereby indicating inadequate consideration for defendant's double jeopardy rights); *Brady v. Samaha*, 667 F.2d 224, 229-230 (1st Cir. 1981) (trial judge failed to exercise sound discretion in granting mistrial without consulting defendant's standby counsel, acted precipitately following rapid sequence of events culminating in declaration of mistrial, and failed to consider alternatives to mistrial, such as severance or curative instructions).

**IV.    Discussion.**

As discussed *supra*, petitioner recognizes that because the double jeopardy claim asserted here was adjudicated on the merits during the state court proceedings, he must demonstrate both a constitutional violation satisfying §2254(a), and one or more defects in the state court's decision sufficient to authorize relief under §2254(d).  The trial court's handling of the double jeopardy issues

28

satisfies both of these requirements.[11]

The record of the late January 1996 proceedings in this case bears the essential hallmarks of a mistrial declared in the absence of manifest necessity. As described *supra* at 20-21, the trial had been under way for four days before Mr. Howell's unspecified illness necessitated continuances "on a daily basis" from Friday, January 26 through Tuesday, January 30.[12] Thus, there is no question but that jeopardy had attached. *See Downum*, *supra*. When court reconvened on Wednesday, January 31, Mr. Howell was present. Though purportedly not "a hundred percent," Mr. Howell gave no indication that he was unable to go forward that day, or that his condition was such that he expected to be unavailable in the coming days. On the contrary, Mr. Howell summed up his report to the judge by stating, "I am here, I am at your pleasure. I am still – some of the symptoms have improved, some haven't. And that's where I am, Judge." Nothing in these remarks could reasonably have been understood as a statement that Mr. Howell could not, or would not, have gone forward

---

[11]Because the Alabama Supreme Court's rejection of petitioner's request for pre-trial mandamus relief contains no discussion or explanation, the trial court's declaration of a mistrial and subsequent denial of petitioner's motion to dismiss the indictment represent that last reasoned state court decision on the double jeopardy issue. It is that decision that must be examined under §2254(d). *See, e.g.*, *Ylst v. Nunnemaker*, 501 U.S. 797, 803-804 (1991); *Joseph v. Coyle*, 469 F.3d 441, 450 (6th Cir. 2006) (quoting *Payne v. Bell,* 418 F.3d 644, 660 (6th Cir. 2005)) ("[T]he decision we review [under §2254(d)] is that of 'the last state court to issue a reasoned opinion on the issue'"); *Schultz v. Page*, 313 F.3d 1010, 1015 (7th Cir. 2002) ("[A] federal court reviewing a habeas petition should examine the decision of the last state court to rule on the merits of the issue"); *Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002) ("This court . . . must look to the last reasoned decision of the state court as the basis of the state court's judgment"); *Barrientes v. Johnson,* 221 F.3d 741, 779 (5th Cir. 2000) ("When the last state adjudication of the claim is silent or ambiguous, the federal court should look through to the last clear state decision on the matter") (internal quotation marks omitted)

[12]The record of the June 1996 retrial indicates that the proceedings did not continue through the weekend. *See* Vol. 42, R. 914; Vol. 43, R. 1004. Assuming the earlier proceeding followed the same work schedule, only three court days had been lost as a result of Mr. Howell's illness at the time the mistrial was declared.

either that day, or soon thereafter.

The discussion amongst the judge and counsel that followed Mr. Howell's report is likewise notable for what it lacked. While Mr. Norris indicated that the defense "need[ed] time so Allen [Howell] could be one hundred percent," his remarks stopped well short of expressly or implicitly requesting (or consenting to) a mistrial. In fact, read most reasonably in the context of a proceeding which took place after five (or, more likely, three) days of "daily" continuances, Mr. Norris appeared to have simply been requesting another continuance sufficient to permit Mr. Howell to return to form. Most strikingly, although Mr. Howell was present and available to be questioned, and although Mr. Norris had merely requested "time" to facilitate an appropriate contribution by Mr. Howell, the trial judge made no inquiry into how long Mr. Howell might have needed, or the parties' positions on the propriety or desirability of a mistrial rather than a further (and possibly quite brief) continuance.

Rather than taking the modest steps necessary to gather information capable of supporting a reasoned determination of manifest necessity, the trial judge simply declared a mistrial. In the remarks that followed, the judge gave no indication that he had considered a continuance as a less extreme alternative, or that he had given any thought to petitioner's rights under the Double Jeopardy Clause. Instead, the judge indicated that his chief, and perhaps only, motivation for declaring a mistrial was the likelihood that Mr. Howell would be unable to "complete this case . . . by tomorrow." Nowhere, however, did the judge explain how or why completing the trial by Thursday, January 31, could have been of such overriding importance. The remainder of the judge's explanatory remarks focused not on why a mistrial was manifestly necessary, but on his reasons for being reluctant to end the proceeding, *e.g.*, "because it's been set three times," "We're halfway

30

through," " We've got witnesses from out of state, out of county," "the defendant's right for a speedy trial," "the victim's right to have this case over and satisfied." These, of course, contribute nothing to a proper finding of manifest necessity.

The trial judge's declaration of a mistrial in the manner discussed above was not only inconsistent with the Double Jeopardy Clause for purposes of petitioner's burden under §2254(a), it was also contrary to, and involved an unreasonable application of, clearly established federal law within the meaning of §2254(d)(1) in at least two ways. First, as discussed above, the Supreme Court's decisions clearly establish that retrial following the declaration of a mistrial is permitted only where, "taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Jorn*, 400 U.S. at 481; *see also*, *e.g.*, *Dinitz*, 424 U.S. at 606-607. Here, the trial judge's remarks strongly indicate that he did not concern himself with the constitutionally prescribed manifest necessity rule, and instead proceeded under some unspecified, but necessarily less demanding, rule for declaring a mistrial. In so doing, the trial court produced a decision that was "contrary to" federal law. *See*, *e.g.*, (*Terry*) *Williams*, 529 U.S. at 405 ("A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases").

Moreover, even if the trial court were credited with some awareness of the rules laid down in the Supreme Court's double jeopardy precedents, the court's failure to even loosely follow the mandate of manifest necessity, or to elicit the parties' positions on the propriety of a mistrial before declaring one, constitutes an unreasonable application of clearly established federal law. *See*, *e.g.*, (*Terry*) *Williams*, 529 U.S. at 397-398; *Johnson v. Karnes*, 198 F.3d 589, 596 (6th Cir. 1999) ("The care taken by the state trial judge here falls well below that exercised in the aforementioned

31

[manifest necessity decisions]"; "the state court's declaration of a mistrial constituted unreasonable application of the manifest necessity standard enunciated by the Supreme Court"); *see also*, *e.g.*, *Huss v. Graves*, 252 F.3d 952, 956 (8th Cir. 2001) (trial court's declaration of mistrial was contrary to federal law because, *inter alia*, court "failed even to ask [petitioner]'s counsel for her opinion on whether [petitioner] wanted a mistrial").

Second, the trial court's failure to consider another continuance as an alternative to declaring a mistrial was likewise contrary to clearly established federal law.  Indeed, the Supreme Court's description of the events requiring relief in *Jorn* could be applied without modification to this case:

> It is apparent from the record that no consideration was given to the possibility of a trial continuance; indeed, the trial judge acted so abruptly in discharging the jury that, had the prosecutor been disposed to suggest a continuance, or the defendant to object to the discharge of the jury, there would have been no opportunity to do so. When one examines the circumstances surrounding the discharge of this jury, it seems abundantly apparent that the trial judge made no effort to exercise a sound discretion to assure that, taking all the circumstances into account, there was a manifest necessity for the *sua sponte* declaration of this mistrial. Therefore, we must conclude that in the circumstances of this case, appellee's reprosecution would violate the double jeopardy provision of the Fifth Amendment."

*Jorn*, 400 U.S. at 487 (citing *United States v. Perez*, 9 Wheat. at 580).  By mishandling the proceedings in petitioner's case in a manner materially indistinguishable from the approach condemned more than two decades earlier in *Jorn*, the trial court acted contrary to clearly established federal law.  *See Williams*, 529 U.S. at 406 ("A state-court decision will . . . be contrary to . . . clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent"); *Huss*, 252 F.3d at 956 (declaration of mistrial was contrary to federal law because, *inter alia*, trial

32

judge "failed to consider potential alternatives to a mistrial").

In sum, petitioner has satisfied both §2254(a) by demonstrating that his retrial following the trial court's impermissible declaration of a mistrial violated the Double Jeopardy Clause, and §2254(d) by showing that the state court's rejection of his double jeopardy claim was contrary to, and involved an unreasonable application of, clearly established federal law. He is therefore entitled to a writ of habeas corpus.

> **GROUND II – PETITIONER'S RIGHTS AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN HE WAS INTERROGATED AFTER INVOKING HIS RIGHT TO SILENCE AND THE INCULPATORY STATEMENTS PRODUCED BY THAT INTERROGATION WERE ADMITTED AGAINST HIM AT HIS CAPITAL TRIAL.**

## I.    Relevant facts and procedural background.

At trial, the factual circumstances surrounding law enforcement's acquisition of petitioner's statements were described in the testimony of the interrogating officer, Gary Graves:

> Q:    Now, the next day, Monday, March 14, did you go to the jail that day?
> A:    Yes, ma'am, I did.
>
> Q:    What was your purpose in going there?
> A:    Dr. Lauridson asked me to go to the jail to accompany him and Detective Knox to take photographs of David Freeman. He had bite marks on his arms. They wanted to take one-to-one ratio photographs to match them to the teeth of Sylvia and Mary Gordon.
>
> Q:    And did y'all do that, go and take some pictures?
> A:    Yes, ma'am, we did.
>
> Q:    When that was completed, what did you do?
> A:    I had David Freeman. I read him his rights from the rights form and asked him if he wanted to talk to me about this case.
>
> Q:    Did you do that while you were at the jail?
> A:    Yes, ma'am, I did.

33

Q:    You said you used a rights form to do that.  I am going to show you what is marked State's Exhibit 8 and ask you if you recognize that?

A:    Yes, ma'am.  This is the rights form that I filled out and I signed, along with David Freeman.

* * *

Q:    What else did you fill out on there?

A:    I filled out the time that I did these rights was at 8:10 in the morning.  The charges were capital murder.  Then I read him [his *Miranda*] rights.

* * *

Q:    Did you or anyone in your presence threaten him in any way to sign the form or make a statement?

A:    No, ma'am.

Q:    Did you or anyone in your presence offer him any reward or hope of reward at anything at all to get him to sign that or make a statement?

A:    No, ma'am.

Q:    Did he appear to know what he was doing?

A:    Yes, ma'am.

Q:    Was he responsive to your questions?

A:    Yes, ma'am.

[Introducing exhibit into evidence]

Q:    After you read him State's 8 and you said that he signed it, what did you do?

A:    I believe Dr. Lauridson at that time took the pictures of the bite marks on David Freeman, which took a little while.  Then I transported David Freeman back to my office, which was at the Police Department in the Homicide unit.

Q:    And once you got to the Homicide unit, what did you do?

A:    I took David in my office, uncuffed his hands.  I put on of the cuffs – left one of the cuffs on his hands and cuffed it to the chair, which is a practice that we always use.  Then I started talking to David, at which time *I started mentioning about the capital murder case that we were investigating and asked him if he could tell me what actually happened*.

Q:    Let me ask you this.  Did he appear to be uncomfortable in any way?

A:    He was nervous.

34

Q:    Is that unusual?

A:    No, ma'am.

Q:    Have you dealt with other suspects in your many years as a detective?

A:    Yes, ma'am, anytime you bring anybody into the Police Department and you are a detective, everybody is nervous.  That's just common nature.

Q:    It's normal to be nervous?

A:    Sure.

Q:    Now, you said that you asked him to give you a statement?

A:    Yes, ma'am.

Q:    What happened then?

A:    *David then told me that he couldn't talk about it.  But, I asked him then, I said, well, if you can't talk about it, can you write it for me?  He said he would, he would do that.*

Vol. 40, R. 593-599. (emphases added).  In response to officer Graves' request for a written statement, petitioner initially wrote a version denying responsibility for the homicides.  Graves then continued to question  petitioner, challenging him on the veracity of the written statement he had prepared.  According to Graves, petitioner "stuttered a couple minutes" and then, following Graves' directive to write "another statement stating actually what really happened," petitioner wrote a confession.  Vol. 40, R. 604.  Graves then conducted a further oral interrogation in which petitioner gave a series of inculpatory answers.  The audiotape of this interrogation was transcribed.  Both the written and oral confessions were admitted at trial. Vol. 34, C. 3222-3223; Vol. 22, C. 897-902.

At trial, the state relied heavily upon  petitioner's confession to bolster its otherwise largely circumstantial case. *See* Vol. 40,  R. 413 ("And the defendant confesses to the crime, eventually."); Vol. 40, R. 427 ("[O]nly later when he realizes the police had such evidence, that he began to reveal some of the truth.").  This was particularly true during closing argument.  *See* Vol. 44, R. 1205 ("He is confronted.  David, you are not telling us the whole truth.  You are right.  And he goes back into

further detail. And just look through here at the specifics about what he did. But then he gets to the

hard part, and all of a sudden he has to blank out. Isn't that convenient? Then he wakes up and says

he has no other choice, so I stabbed her mother").

On direct appeal in the Alabama courts, petitioner presented the same issue that is now

before this Court. *See Freeman v. State*, 776 So. 2d 160, 173 (Ala. Crim. App. 1999) ("Freeman

contends that his post-arrest statements to police were improperly admitted at trial because, he says,

the police continued to question him about the murders after he asserted his right to remain silent").[13]

After reviewing the record, the CCA found that petitioner was taken into custody on March 12,

1988, during which time he was advised of his *Miranda* rights. *Id.* "Freeman acknowledged that

he understood those rights, that he signed a waiver to that effect, and that he agreed to talk to the

police." *Id.* at 174. In that statement, he "denied any knowledge of, or participation in, the murders

of Mary Gordon and Sylvia Gordon." *Id.*

That court also found that on March 14, 1988, petitioner was questioned by Detective Gary

Graves after again hearing and waiving his *Miranda* rights. *Id.* According to the court, "[Graves]

then asked Freeman what happened on the day of the murders." *Id.*[14] Graves then testified that

"Freeman told him 'he couldn't talk about it.'" *Id.* (quoting Vol. 40, R. 598). The court summarized

its interpretation of what occurred after petitioner asserted that he could not talk about it:

---

[13]The Alabama Supreme Court also reviewed this claim, but its opinion summarily affirmed
the decision of the CCA without separate discussion. *Ex Parte Freeman*, 776 So. 2d at 204
("Freeman raises the same issues in his certiorari petition that he raised before the Court of Criminal
Appeals. The opinion of the Court of Criminal Appeals provides a thorough treatment of the facts
of this case, and it correctly disposes of each issue raised by Freeman in his petition.").

[14]The trial transcript reveals Graves' precise testimony: "I started mentioning about the
capital murder case that we were investigating and asked him if he could tell me what actually
happened." Vol. 40, R. 598.

> In an effort to clarify Freeman's comment, Graves then said to Freeman, "If you can't talk about it, can you write it for me?" Graves testified that Freeman said that he would, and he then proceeded to handwrite two statements denying any involvement in the murders in the first statement, but admitting in the second statement to killing both Mary Gordon and Sylvia Gordon.

*Id.* (internal citation omitted).

The CCA acknowledged that "[i]ncluded in the right to remain silent is a right to cut off questioning.  When a defendant invokes his right to remain silent, that request must be "'scrupulously honored.'" *Id.* at 174 (quoting *Slaton*, 680 So. 2d at 886, which cites *Miranda*, 384 U.S. at 474, and *Michigan v. Mosley*, 423 U.S. 96 (1975)).  But relying on state court precedent the court added that, "[w]hen a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of clarifying the equivocal request." *Freeman*, 776 So. 2d at 175 (citing *Beard v. State*, 612 So. 2d 1335, 1341 (Ala. Crim. App. 1992) (citations omitted)); *see also id.* at 174-175 (quoting *Slaton v. State*, 680 So. 2d 879, 886-87 (Ala. Crim. App. 1995) (holding that "Oh God, I don't feel like going through all this" was not unequivocal assertion of right to remain silent)).  Applying this understanding of the governing law, the CCA concluded as follows:

> Here, Freeman's response to Graves's question was not an unequivocal invocation of his right to remain silent.  The response, instead, appears to be Freeman's [*sic*] simply saying that he did not like talking about the brutal murders. Freeman was, however, more than willing to handwrite a statement about the murders. . . . Freeman's response to police was not an assertion of his right to remain silent, but instead indicated Freeman's desire to conduct the interview the way he wanted it conducted.

*Freeman*, 776 So. 2d at 175.

## II.    Relevant legal principles and discussion.

The Fifth Amendment to the United States Constitution protects one from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This fundamental, constitutionally-protected right has been clearly established by the United States Supreme Court for decades. *See generally Quinn v. United States*, 349 U.S. 155, 161 (1955) (noting that "[t]he privilege against self-incrimination is a right that was hardearned by our forefathers"); *Emspak v. United States*, 349 U.S. 190 (1955) ("[N]o ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination. All that is necessary is an objection stated in language that a committee may reasonably be expected to understand as an attempt to invoke the privilege."); *Malloy v. Hogan*, 378 U.S. 1 (1964) (holding that Fifth Amendment's privilege against self-incrimination is applicable to the States through the Fourteenth Amendment); *Miranda v. Arizona*, 384 U.S. 436, 457 (1966) (establishing "adequate safeguards to protect precious Fifth Amendment rights"); *Kastigar v. United States*, 406 U.S. 441, 444 (1972) (the privilege against compulsory self-incrimination "reflects a complex of our fundamental values and aspirations, and marks an important advance in the development of our liberty") (footnotes omitted); *Dickerson v. United States*, 530 U.S. 428, 434-35 (2000) (reiterating that *Miranda* created a constitutional rule based on "an increased concern about confessions obtained by coercion," yet the constitutional principle of one's right to remain silent had been recognized for centuries).

When conducting a custodial interrogation, law enforcement must first inform the subject that he has, *inter alia*, "a right to remain silent." *Miranda*, 384 U.S. at 444. An individual's right to remain silent may be waived if done so voluntarily, knowingly, and intelligently. *Id.* If, however, a suspect waives his rights and answers questions, such waiver "does not deprive him of the right

38

to refrain from answering any further inquiries." *Id.* at 445. Indeed, "[i]f the individual indicates *in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* at 473-74 (emphasis added). In *Miranda*, the Supreme Court reasoned that when an individual expresses the desire to remain silent, "he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, *subtle or otherwise*." *Id.* at 474 (emphasis added).[15]

The Court again emphasized that an accused's "'right to cut off questioning'" functions as a "critical safeguard" in *Michigan v. Mosley*. 423 U.S. 96, 103 (1975) (quoting *Miranda*, 384 U.S. at 474). There, the Court endeavored to balance a suspect's privilege against self-incrimination with law enforcement's need for interrogation, holding that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored." *Id.* at 104 (quotation omitted). Since *Mosley*, the Court has not altered the rules governing the right to cut off questioning. The test remains whether that right was "scrupulously honored."

"[F]ederal habeas courts must make as the starting point of their analysis the state courts' determinations of fact, including that aspect of a 'mixed question' that rests on a finding of fact." *(Terry) Williams*, 529 U.S. at 386. There is no "requirement that federal courts actually defer to a

---

[15]"[T]he protection of the privilege reaches an accused's communications, *whatever form they might take*, and the compulsion of responses which are also communications, for example, compliance with a subpoena to produce one's papers." *Schmerber v. State of California*, 384 U.S. 757, 763-64 (1966) (emphasis added). *See also Pennsylvania v. Muniz*, 496 U.S. 582, 588 (1990) (holding that "the privilege [against self-incrimination] 'protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature'"); *United States v. Wade*, 388 U.S. 218, 222 (1967) (privilege prevents compelled disclosure of "any knowledge [subject] might have," but does not extend to demand for speech to be utilized only for voice identification).

state-court application of federal law that is, in the independent judgment of the federal court, in error." *Id.* at 387. In this case, this Court should grant petitioner's petition for writ of habeas corpus because the CCA's decision was not merely wrong on the constitutional merits, but it was also "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), and it involved an "unreasonable application of clearly established Federal law," 28 U.S.C. § 2254(d)(1).

> **A.    The CCA's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.**

A habeas petitioner is entitled to relief where he can show that the state court decision rejecting his meritorious constitutional claim was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). *Miller-El*, 545 U.S. at 266; *Wiggins*, 539 U.S. at 528; *see also*, *e.g.*, *Yung v. Walker*, 296 F.3d 129, 136 (2d Cir. 2002) ("the focus of §2254(d)(2)" is "on whether the [state] court's factual findings are supported by sufficient evidence"); *Beck v. Bowersox*, 257 F.3d 900, 901 (8th Cir. 2001) (§§2254(d)(2) and (e)(1) "require meaningful federal court review of the evidentiary record considered by the state courts"); *Childress v. Johnson*, 103 F.3d 1221, 1226 n.7 (5th Cir. 1997) ("While the measure of deference afforded state court factual findings is substantial, we note that it is not absolute. Section 2254(d)(2) authorizes issuance of the writ if the state court decision 'was based on an unreasonable determination of the facts in light of the evidence presented'"). In this case, the CCA's rejection of petitioner's challenge to the admission of his inculpatory statement was based on an unreasonable mischaracterization of the petitioner's invocation of his right to silence, and on an unreasonable failure to consider the entire record before the court.

In denying relief on direct appeal, the state court drew two conclusions critical to its determination that petitioner's right to silence was not violated. First, the court found that Officer Graves' request that petitioner write a statement was made "[i]n an effort to clarify Freeman's comment." Second, and relatedly, the court manufactured circumstantial support for the officer's continued questioning by surmising that petitioner simply "did not like talking about the brutal murders." Neither of these conclusions is reasonable based on the evidence that was before the state court.

Read in context, Officer Graves' request that petitioner write about the offenses after declaring that he could not talk about them is susceptible to only two reasonable interpretations. First, it shows beyond dispute that Graves understood petitioner's declaration as an invocation of his right to silence. Had this meaning been lost on Graves, he would simply have continued to press for an oral statement. Second, the fact that Graves took petitioner's declaration as an invocation of his rights also means that, contrary to the conclusion drawn by the state court, his ensuing request that petitioner write his story was not an attempt at "clarif[ication]" – indeed, none was needed – but was instead a naked effort to circumvent the invocation of the right to silence petitioner had just made.

Once these unavoidable inferences from the record are acknowledged, it becomes equally clear that the state court's observation that petitioner "did not like talking about the brutal murders" was merely a *post hoc* effort to justify Officer Graves' end-run around *Miranda*. Whether or not petitioner "like[d] talking about" the homicides should have been irrelevant to Graves upon hearing what petitioner said and understanding it as an invocation of the right to silence. At that stage of an interrogation, the law makes clear that the interrogator is not free to simply devise an alternate

41

method of extracting information from the subject.  Instead, the interrogator's only lawful course of action is to stop.  The state court avoided these legal conclusions by drawing factual inferences that the record cannot reasonably support.  In so doing, the state court infected its decision with a defect serious enough to authorize a grant of habeas relief under § 2254(d)(2).

The state court's second unreasonable factual conclusion was that petitioner was "more than willing to handwrite a statement about the murders," and that he was "responsive to all [of the officers'] questions."  *Freeman*, 776 So. 2d at 175.  In his trial testimony, Graves stated that after petitioner told him that he could not talk about the crime, Graves suggested that he write about it.  Petitioner's first written statement did not admit to committing the crime.  Vol. 41, R. 604.  In fact, Graves testified that after he read the first statement,"I talked to [ Freeman] a little bit more, and then I asked him, I said, this isn't actually the truth that actually happened?"  *Id.*  According to Graves, petitioner "stuttered a couple minutes."  Only after Graves told him to write "another statement stating actually what really happened" did petitioner provide a written confession.  *Id.*

Based on Graves' testimony, the state court's conclusion that  petitioner was "more than willing to handwrite a statement about the murders" and that he was "responsive to all [of the officers'] questions" is unreasonable.  Petitioner provided two statements (one handwritten) that did *not* confess to the crime before providing the final written statement that was used against him at trial.[16]  Neither of his initial statements was responsive.  In viewing these circumstances together, when  petitioner's affirmative statement to officer Graves telling him that he could not talk about the

---

[16] As noted earlier, petitioner also provided answers to an oral interrogation *after* he had said that he did not want to talk about the incident and after Graves had him provide a written confession. This, too, was introduced against him at trial.  Because the oral statement was provided after the inadmissible written statement, the oral statement was equally inadmissible.

incident, the state court unreasonably concluded that petitioner was responsive. Indeed, he was initially unresponsive to the *only* question to which the officers wanted an answer. Based on these facts, it was unreasonable for the state court to conclude that petitioner was "more than willing" to write a statement detailing the homicide.

The state court also mischaracterized the record by adopting the state's argument that "Freeman's response to the police was not an assertion of his right to remain silent, but instead indicated [his] desire to conduct the interview the way he wanted it conducted." *Freeman*, 776 So. 2d at 175. Like the other conclusions made by the court, there is nothing in the record to logically support this determination. Graves – *not Freeman* – suggested that petitioner write a statement. The court's conclusion is inconsistent with Officer Graves' testimony.

In addition, the CCA's conclusion ignored petitioner's mental limitations. The record before the Alabama courts included documentation of petitioner's low intelligence quotient scores, placement in special education classes, mental health problems, and sixth-grade education. For the court to conclude that petitioner was "indicat[ing his] desire to conduct the interview the way he wanted" despite these cognitive limitations was also unreasonable.

In sum, when Graves continued interrogating after petitioner stated that "he couldn't talk about [the crime]," Graves failed to honor petitioner's constitutional right to remain silent. Based on the record, the factual determinations upon which the CCA's decision turned were unreasonable. *See, e.g., Miller-El*, 545 U.S. at 240, 266 (noting the "standard [under 28 U.S.C. §2254(d)(2)] is demanding but not insatiable," and holding that state court reached "unreasonable as well as erroneous" conclusion based on juror strikes); *Guidry v. Dretke*, 397 F.3d 306, 328 (5th Cir. 2005) (granting relief in capital case where state court's denial of relief was based on factual finding that

43

ignored countervailing record evidence); *Taylor v. Maddox*, 366 F.3d 992, 1016 (9th Cir. 2004) (noting that "[f]ailure to consider key aspects of the record is a defect in the fact-finding process" and granting relief on *Miranda* claim); *Johnson v. Champion*, 288 F.3d 1215, 1229 (10th Cir. 2002) (finding that court's determination of facts was unreasonable where it "infer[red] that [defendant] intended to abandon his appeal, based merely on the fact that he did not personally contact the courts regarding the status of his appeal during a seven-month period" despite defendant's testimony to the contrary). These defects in the state court's decision authorize issuance of the writ pursuant to §2254(d)(2).

> **B.    The CCA's decision involved an unreasonable application of clearly established federal law.**

Under 28 U.S.C. § 2254(d)(1), a federal court shall not issue a writ of habeas corpus on a claim that was "adjudicated on the merits in state court proceedings" unless the state court conclusion "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See Williams*, 529 U.S. at 405-08 (construing § 2254(d)(1)'s "contrary to" and "unreasonable application of" clauses).

"[T]he determination whether or not a rule is clearly established at the time a state court renders its final judgment of conviction is a question as to which the 'federal courts must make an independent evaluation.'" *Williams*, 529 U.S. at 382 (citing *Wright v. West*, 505 U.S. 277, 305 (1992)). In 1966, the Supreme Court recognized the constitutionally protected right to remain silent and held that "any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474. In 1975, the Court added

that "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Mosley*, 423 U.S. at 104. This law was clearly established when petitioner was arrested and questioned in 1988.

A decision by a state court is an "unreasonable application of [Supreme Court] precedent if the state court identifies the correct governing legal rule from th[e] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams*, 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 410; *see also Wiggins*, 539 U.S. at 520 ("[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts' of petitioner's case.") (quoting *Williams*, 529 U.S. at 413); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) ("Notably, an 'unreasonable application' is an 'objectively unreasonable' application") (citing *Williams*, 529 U.S. at 412).

In this case, the CCA articulated the correct federal law, but unreasonably applied that law by assuming facts unsupported by the record and permitting those factual errors to drive its legal analysis. *See Wiggins*, 539 U.S. at 528 (finding that state court "based its conclusion, in part, on a clear factual error" and "[t]his partial reliance on an erroneous factual finding . . . highlights the unreasonableness of the state court's decision"); *see also Williams*, 529 U.S. at 397 (finding that Virginia Supreme Court's analysis was unreasonable application of clearly established law because

45

its decision "turned on its erroneous view that a 'mere' difference in outcome is not sufficient to establish constitutionally ineffective assistance of counsel" under *Strickland v. Washington*).

The right to cut off questioning is the "critical safeguard" that allows an accused to control the timing and duration of questioning, *as well as the subject matter discussed*.  *Mosley*, 423 U.S. at 104.  "The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting." *Id.*  Indeed, the Supreme Court has created a compromise between an accused's right to silence and law enforcement's need to interrogate by holding that the right to cut off questioning must be scrupulously honored.  *Id.*  To determine whether an officer scrupulously honored that right "requires a case by case analysis." *Jackson v. Dugger*, 837 F.2d 1469, 1472 (11th Cir. 1988).

In *Mosley*, law enforcement interrogated a person who was suspected of several robberies. When the suspect, Richard Mosley, informed an officer that he did not want to answer questions related to the robberies, the officer immediately ceased questioning.  *Mosley*, 423 U.S. at 97.  Shortly thereafter on the same day, another officer read Mosley his rights as required by *Miranda*, which Mosley waived, and questioned Mosley about a different crime.   The Supreme Court found that the officers scrupulously honored the defendant's right to remain silent because immediately after Mosley expressed that he did not want to discuss anything related to the robberies, all questioning related to *that subject* ceased and never resumed.  *Id.* at 104-05.

In the instant case, on March 12, 1988, petitioner was arrested, waived his *Miranda* rights, and provided an oral statement denying involvement in the crime all on the same day.  Vol. 40, R. 579-580.  After his arrest,  petitioner remained in custody at the local jail; on the morning of March 14, 1988, he was again read his *Miranda* rights, which he again waived.  Vol. 40, R. 593-594.  He

was transported from the jail to Graves' office, where he was handcuffed to a chair.   Vol. 40, R. 597-598.  At that point, Graves asked  petitioner about the crime, and petitioner responded that "he couldn't talk about it." Vol. 40, R. 598. Graves did not cease questioning related to the homicides, as the officers did in *Mosley*.  Instead, Graves asked  petitioner to *write* a confession to the homicides, Vol. 40, R. 599, and when  petitioner did not provide the written statement that Officer Graves wanted, he continued the interrogation.  Vol. 41, R. 604.  By Graves' testimony,  petitioner "stuttered a couple of minutes," *id.*, and only after further interrogation wrote an inculpatory statement, *id.*

An accused asserting the right to silence "need not speak with the discrimination of an Oxford don."  *Davis v. United States*, 512 U.S. 452, 459 (1994) (quotation omitted).  Petitioner's clear statement that he could not talk about the crime was sufficient for any law enforcement officer to know he was invoking his right to remain silent.  Graves understood it as such, as evidenced by his immediate suggestion that the interrogation continue in writing.  Graves' failure to respect petitioner's exercise of his right to remain silent did not counteract, but rather amplified "the coercive pressures of the custodial setting." *Mosley*, 423 U.S. at 104.  Graves failed to scrupulously honor  petitioner's right to cut off questioning.  His actions violated petitioner's constitutional right to silence.

The state court decision finding that petitioner's rights were not violated was an unreasonable application of clearly established federal law.  Quoting state law, the CCA set forth that "[w]hen a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of clarifying the equivocal request." *Freeman*, 776 So. 2d at 175 (internal quotations omitted; citation omitted).  As discussed *supra*, however, Graves required no

"clarification" from petitioner; Graves' own testimony reflects that he knew what petitioner had said and understood its legal ramifications. The CCA's effort to justify Graves' subsequent interrogation as an innocuous attempt to "clarify[] the equivocal request" was unreasonable because it applied *Davis*' "clear and unequivocal" standard outside the context of a right to counsel invocation,[17] and because it left the real constitutional question – whether petitioner's right to silence was "scrupulously honored" – unanswered.

Petitioner stated that he could not talk about the murder and Graves just as clearly got the message. Petitioner's statement was sufficient to prevent further interrogation. *See, e.g., United States v. Muhammad*, 2006 WL 3084441, at **3 (11th Cir. Oct. 31, 2006) (finding that defendant's

---

[17]In the right to *counsel* context, the Supreme Court has held that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect *clearly requests an attorney*." *Davis v. United States*, 512 U.S. 452, 461 (1994) (emphasis added). While the rule announced in *Davis* specifically addressed a suspect's right to counsel, the Eleventh Circuit has since interpreted *Davis* to include a suspect's right to remain silent. *See Coleman v. Singletary*, 30 F.3d 1420 (11th Cir.1994) ("A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent"). The Supreme Court, however, has not extended *Davis* to cover invocations of the right to silence and has, since *Mosley*, continued to distinguish between invoking that right and invoking the right to counsel. *See, e.g.*, *Solem v. Stumes*, 465 U.S. 638, 648 (1984) (noting that "*Mosley* did distinguish the right to counsel from the right to silence"); *Smith v. Illinois*, 469 U.S. 91, 95 n.2 (1984) (citing *Mosley* as establishing "rule requiring termination of questioning upon accused's invocation of his right to silence prevents police from 'persisting in repeated efforts to wear down [the accused's] resistance and make him change his mind'") (alteration in original); *Edwards v. Arizona*, 451 U.S. 477, 491 n.1 (1981) (Powell, J., concurring) ("In *Michigan v. Mosley,* of course, the question was whether a suspect who had invoked his right to remain silent later could change his mind and speak to police."); *United States v. Mandujano*, 425 U.S. 564, 580-81 (1978) ("a person in police custody has, of course, an absolute right to decline to answer any question, incriminating or innocuous").

In this case, the CCA's opinion treats the clarity and firmness of petitioner's invocation as a material and disputed issue. *See Freeman*, 776 So. 2d at 174. As described above, pursuant to the clearly established Supreme Court precedent to which §2254(d)(1) obligated the CCA to adhere, this issue was not material. Moreover, as described below, even it were material, Officer Graves' testimony conclusively establishes that what he heard clearly and unequivocally constituted an invocation of the right to silence.

"unequivocal statement during the interrogation that 'he did not want to talk to [Inspector Willis] anymore' was a clear invocation of his constitutionally protected right to cut off questioning and to remain silent") (alteration in original); *Kordenbrock v. Scroggy*, 919 F.2d 1091, 1094 (6th Cir. 1990) (holding that suspect who said "I can't say nothing" and "right now I can't talk" invoked his right to remain silent and thus his rights were violated when interrogation continued). The statement should have been excluded.

This error was not harmless under either *Chapman v. California*, 386 U.S. 18 (1967), or *Brecht v. Abrahamson*, 507 U.S. 619 (1993).[18] "A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. . . . [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (quotation omitted). In this case, the statements admitted in violation of the Fifth Amendment necessarily affected the jury because they constituted the most direct and powerful evidence of

---

[18]Because the state court failed to find error in the admission of petitioner's statements, those issues should be evaluated only under *Chapman*, which assigns the burden of establishing harmlessness beyond a reasonable doubt to the state. *See Chapman*, 386 U.S. 18, 24(1967); *Orndorff v. Lockhart*, 998 F.2d at 1426, 1430 (8th Cir. 1992); *Horsley v. Alabama*, 45 F.3d 1486, 1498 n.3 (11th Cir. 1995) (Thatchett, J., dissenting) ("the *Chapman* harmless error standard should apply when a federal habeas corpus court is the first to conduct a harmless error analysis"); *see also Fry v. Pliler*, 127 S.Ct. 763 (2006) (order granting certiorari to address the following question: "If constitutional error in a state trial is not recognized by the judiciary until the case ends up in federal court under 28 U.S.C. § 2254, is the prejudicial impact of the error assessed under the standard set forth in *Chapman v. California*, 386 U.S. 18 (1967), or that enunciated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993)? Does it matter which harmless error standard is employed? And, if the *Brecht* standard applies, does the petitioner or the State bear the burden of persuasion on the question of prejudice?").

petitioner's culpability for the homicides. They also had a broader impact by providing the prosecution with a basis from which to argue that petitioner possessed the mental ability to manufacture and tell lies calculated to minimize the appearance of aggravation, which, the prosecution asserted, was inconsistent with the mental state defense that counsel elected to pursue at trial. *See* Vol. 40, R. 413; 427; Vol. 44, R. 1205.

Because the state courts failed to recognize and remedy this error by excluding petitioner's statement, and because the admission of that statement substantially bolstered the prosecution's circumstantial case, petitioner has satisfied §2254(a). Additionally, because the CCA's rejection of this claim on direct appeal suffered from the unreasonable defects described above, petitioner has also satisfied §2254(d). Petitioner is therefore entitled to habeas relief in the form of a new guilt-innocence trial or new sentencing proceeding.

### GROUND IV – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

Respondent's procedural default and exhaustion arguments with regard to each of the subdivisions of Ground IV rely upon on a common ground, *i.e.*, petitioner's alleged non-compliance with Alabama Rules of Criminal Procedure 32.3 and 32.6(b). In the sections that follow, petitioner will set forth the factual and procedural background necessary to a proper evaluation of respondent's defenses, the relevant law of fair presentation and procedural default, and the ways in which the state court's applications of Rules 32.3 and 32.6(b) foreclose their use as a procedural bar to federal habeas review and/or give rise to "cause" necessary to overcome a procedural bar. Petitioner will then explain why the additional facts supporting his ineffective assistance of counsel claims described in this brief are eligible for consideration by this Court. Finally, petitioner will discuss the individual merits of his claims.

I.    **Relevant procedural background.**

Petitioner's convictions and sentence were affirmed on direct appeal, *Freeman v. State*, 776 So. 2d 160 (Ala. Crim. App. 1999); *Ex parte Freeman*, 776 So. 2d 203 (Ala. 2000), and the judgment became final when the Supreme Court of the United States denied certiorari on October 30, 2000. *Freeman v. Alabama*, 531 U.S. 966 (2000). At that time, the one year statute of limitations for seeking federal habeas relief prescribed in 28 U.S.C. §2244(d)(1) began to run.

Nine months later, in late July of 2001, a representative of the Equal Justice Initiative of Alabama succeeded in recruiting volunteer, *pro bono* counsel to assist petitioner in seeking state post-conviction relief.[19]  Through August and September of 2001, petitioner's new counsel obtained and reviewed the record, conducted the investigation that time and their limited budget would permit, and, on September 28, 2001, filed an initial Petition for Relief from Conviction and Sentence Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure. Tab R-48, Vol. 48. That petition contained, *inter alia*, the challenges to trial counsel's effectiveness that are alleged in Grounds IV.B. and C. of the Petition submitted to this Court. *See* Tab R-48, Vol. 48 (Grounds II.D & E, II.H).  On November 9, 2001, petitioner filed a first amended petition with the state court which included, *inter alia*, the ineffective assistance of counsel claims alleged in Grounds IV.D. and E. of the Petition submitted to this Court.  *See* Tab R-50, Vol. 48 (Grounds II.G, J & K).  Additionally, on January 18, 2002, petitioner filed a second amended petition with the state court which contained, *inter alia*, the

---

[19]*Pro bono* volunteer counsel are necessary in Alabama capital cases because Alabama continues to stand nearly alone in its refusal to provide for the appointment and reasonable compensation of attorneys for indigent, death-sentenced prisoners in state post-conviction proceedings. *See Barbour v. Haley*, 471 F.3d 1222 (11th Cir. 2006) (denying relief on a class-action complaint brought by Alabama death row inmates seeking counsel for post-conviction litigation).

ineffective assistance of counsel claim alleged in Ground IV.F. of the Petition submitted to this Court.  *See* Tab R-52, Vol. 48 (Ground II.L).

In response to petitioner's initial and first amended Rule 32 petitions, the state submitted answers and accompanying motions for dismissal of various claims for failure to satisfy the specificity requirement of Rule 32.6.  *See* Vol. 48, C. 34-38; 105-108.  Petitioner responded to the state's first request for dismissal under Rule 32.6 on November 9, 2001, with a Motion for a More Definite Statement of Non-Compliance with Rule 32.6(b) of the Alabama Rules of Criminal Procedure, and Notice of Intent to Amend Petition Following Investigation and Discovery.  *See* Vol. 48, C. 63-68. In that submission, petitioner explained that the state's invocations of Rule 32.6 were entirely conclusory, as they failed to identify precisely the alleged defects in petitioner's pleading or provide any guidance to petitioner in seeking to correct any defects that actually existed. Vol. 48, C. 63-65.  Petitioner's motion also gave notice to the circuit court and the state that petitioner's efforts to identify and plead the facts relating to his claims were ongoing, that the development of facts depended upon access to funds necessary to secure investigative and expert assistance, and that once petitioner had acquired and utilized these essential tools, he would amend his pleadings accordingly.  The state never responded to petitioner's motion.

On January 23, 2002, the circuit court conducted a telephonic hearing on the state's motion for dismissal.  Vol. 51, R. 2-34.  During that hearing, the state made no effort to argue or otherwise seek a ruling on the portions of its motion for partial dismissal asserting noncompliance with Rule 32.6's specificity requirement.  *See* Vol. 51, R. 2-19.  Later the same day, the circuit court entered an order dismissing Grounds I and V of the Rule 32 petition "as precluded," and denying the remainder of the state's requests for dismissal – including all of its assertions that petitioner's claims

52

had not been pled with sufficient specificity. Vol. 48, C. 165. Petitioner understood this ruling as a rejection of the state's contentions under Rule 32.6, and relied upon that understanding as the litigation proceeded. During the ensuing ten months, petitioner filed two further amendments to his Rule 32 petition. The state's answer to the second of these amended petitions included the same assertions of Rule 32.6, directed at the same claims, that it had unsuccessfully made nearly a year earlier. Vol. 49, C. 355-378. The circuit court, which had already rejected the state's arguments in its January 23, 2002 order, entered no further rulings concerning Rule 32.6.

As promised in his November 9, 2001 Motion for More Definite Statement, petitioner sought discovery and funds for investigative and expert assistance in the circuit court. In April and May of 2002, petitioner submitted two motions seeking funds to secure investigative and expert services necessary to the factual development of his claims, and supported those requests with cross-references to the relevant claims in the petition and additional information about petitioner's need for the services.[20] Vol. 48, C. 170-178; C. 198-200; Vol. 49, C. 201. The circuit court held a telephonic hearing on petitioner's funding requests on May 29, 2002. Vol. 51, R. 35-63. During that hearing, the state opposed petitioner's request for funds on three main grounds: (1) state law did not provide for funds for expenses associated with capital post-conviction litigation, Vol. 51, R. 38; (2) petitioner had not made an adequate showing of need, Vol. 51, R. 39; and (3) the state legislature had appropriated only $38,600 to cover expenses in all capital Rule 32 proceedings for the entire year, $25,000 of which had already been spent, such that the funds petitioner sought simply were not available, Vol. 51, R. 39. While the circuit court indicated that it did not require any additional

---

[20]As part of its order dated January 23, 2002, the circuit court summarily denied petitioner's request for leave to proceed *ex parte* with his funding requests.

factual explanation from petitioner in order to rule on the funding requests,[21] petitioner nevertheless went on to provide the court and counsel for the state with a detailed explanation of his need for the various services he was seeking, and the reasons those services were essential to the development of the facts.  *See* Vol. 51, R. 42-58.  Later the same day, the circuit court entered an order summarily denying petitioner's requests for funds, and effectively foreclosing his ability to fully develop, plead, and prove the factual bases of his claims.[22]  Vol. 52, R. 31.

Having been denied access – at the state's consistent behest – to all of the resources necessary to develop and prove his claims, petitioner approached the June 4, 2003 evidentiary hearing in the circuit court with little available evidence to present.  In addition to the handful of witnesses he called, petitioner also supplemented the allegations in his petition at the hearing by filing a detailed written Proffer of Facts and Evidence in Support of the Grounds for Relief Set Forth in His Rule 32 Petition.  *See* Tab R-59, R. 122, Vol. 51.  The state raised no objection to this proffer, nor did it request that the circuit court revisit its denial of the state's earlier requests for partial dismissal under Rule 32.6.

On June 25, 2003, the circuit court denied relief by adopting the state's proposed order without modification. Tab R-72, Vol. 55.  Although the state had ample opportunity to propose, and have the circuit court adopt, findings that petitioner's allegations were insufficient to satisfy Rule

---

[21]*See* Vol. 51, R. 42 ("I don't need any more on that issue . . . I don't have any additional information I need about that").

[22]Petitioner submitted a third request for funds on July 25, 2002. Vol. 49, C. 248-254. Although the state expressly declined to oppose the portion of that request which sought funds necessary to facilitate the appearance of lead trial counsel to testify at the evidentiary hearing, the request was summarily denied in its entirety by the circuit court.  *See* Vol. 49, C. 261-268; Vol. 49, C. 248.

32.6, it did not do so.  Instead, the order denying relief purported to resolve all of the ineffective assistance of counsel claims now pending in the federal habeas corpus petition – claims the state now says were not sufficiently pled in state court – on their merits. *See* Tab R-72 at 16-23, Vol. 55.

The state's abandonment of its earlier, unsuccessful contention that petitioner's allegations were insufficiently specific continued on appeal.  Its brief to the CCA did not challenge the circuit court's January 29, 2002 denial of its requests for partial dismissal under Rule 32.6, nor did the state otherwise indicate that petitioner's contentions were insufficient to satisfy that rule.  *See* Tab R-61, Vol. 53.  It was thus not until the CCA issued its decision affirming the denial of Rule 32 relief – nearly three and a half years after the circuit court denied the state's Rule 32.6 dismissal motion, and nearly two years after proceedings before the circuit court ended – that an Alabama state court first invoked Rules 32.3 and 32.6(b) to declare petitioner's allegations before the circuit court insufficient.  *See* Tab R-73.  By that time, of course, the opportunity that was available to petitioner during the circuit court proceedings to cure any defects that may have existed in his pleadings had long since come to an end.

Of the grounds for relief presented in the Petition submitted to this Court, seven were rejected by the CCA as failing, in whole or part, to satisfy the Rule 32.6(b) specificity requirement.[23]  In applying that requirement to petitioner's submissions, the CCA assessed petitioner's pleadings against the constitutional standard for demonstrating entitlement to relief – usually the *Strickland*

---

[23]Those grounds are:  Ground III (presented as Grounds VII and IX in the Rule 32 proceedings); Ground IV.B (presented as Grounds II.D and II.E in the Rule 32 proceedings); Ground IV.C (presented as Ground II.H in the Rule 32 proceedings); Ground IV.D (presented as Ground II.G in the Rule 32 proceedings); Ground IV.E (presented as Ground II.K in the Rule 32 proceedings); Ground IV.F (presented as Ground II.L in the Rule 32 proceedings); and Ground VI (presented as Ground VIII.E in the Rule 32 proceedings).

*v. Washington*, 466 U.S. 668 (1984), standard for ineffective assistance of counsel – and deemed them insufficiently specific wherever the allegations, in the CCA's view, fell short of making a factually comprehensive showing of a constitutional violation. *See, e.g.*, Tab R-73 at 18, Vol. 55 (petitioner "failed to plead specific facts tending to indicate that he was prejudiced by counsel's performance . . .");Tab R-73 at 25, Vol. 55 (petitioner failed to "plead[] any specific facts that would tend to indicate that [prison adaptability] evidence . . . would have altered the balance of aggravating and mitigating circumstances").

When making its assessments of petitioner's circuit court pleadings, the CCA at times appeared to require a full narrative of all that transpired at trial, *see* Tab R-73 at 18, Vol. 55 (petitioner "did not allege anywhere in his petition what evidence was presented at trial by the state and the defense, and he did not state anywhere in his petition what aggravating and mitigating circumstances were presented to the jury at the penalty phase of the trial or what circumstances were found by the trial court to exist"), and held petitioner to a standard of pleading he could not possibly have met without the resources he had properly requested but been summarily denied, *see, e.g.*,Tab R-73 at 23, Vol. 55 (petitioner "did not allege what type of neurological impairments he suffered from; the severity of his alleged impairments; or how the alleged impairments would have been relevant to his trial"). As will be discussed in greater detail *infra*, these and other features of the CCA's applications of Rules 32.3 and 32.6 are important to determining whether the specificity requirement derived therefrom is capable of serving as the basis for a procedural bar to federal habeas review at all, and if so, whether petitioner can demonstrate "cause" sufficient to overcome any such bar.

After learning of the CCA's decision, petitioner sought rehearing contending that the court's

*ex mero motu* invocation of Rules 32.3 and 32.6 to reject many of his claims without notice or an opportunity to be heard violated due process and state waiver law. *See* Tab R-63, Vol. 53. Petitioner also asserted that because he had been led by the circuit court to believe that his pleadings had been sufficient, the proper course in the wake of the CCA's determination to the contrary was to remand the case to afford petitioner an opportunity to amend his pleadings pursuant to Rule 32.7(b). *See* Tab R-63 at 15, Vol. 53. The CCA rejected petitioner's request for rehearing without elaboration, and the Alabama Supreme Court denied petitioner's subsequent request for a writ of certiorari. Tab R-73, Vol. 55; Tab R-74, Vol. 55.

## II.    Argument on fair presentation and procedural default.

Stated simply, respondent's interpretation of the state court proceedings described above appears to be as follows:  Notwithstanding the circuit court's ruling to the contrary, petitioner's allegations before that court were not sufficient to satisfy Alabama's specificity requirement, and the CCA' *ex mero motu* ruling to that effect both justifies a finding that petitioner's ineffective assistance of counsel claims were not fairly presented to the state courts, and constitutes an adequate and independent basis for denying relief.  As will be discussed below, this is wrong for several reasons.

First, the relevant sections of petitioner's brief to the CCA set out both the legal and factual bases of petitioner's claims in a manner that satisfies the "fair presentation" requirement, and neither respondent nor the state courts have said otherwise.  Second, while the CCA (and now respondent) invoke Rules 32.3 and 32.6(b) to sanction petitioner for the purported defects in his allegations to the state circuit court, those rules – at least as applied in this case – are neither independent of federal law nor adequate to warrant withholding merits review in federal habeas. Third, even absent the

57

independence and adequacy deficiencies in the state court's applications of Rule 32.3 and 32.6(b), the fact that petitioner was first misled by the circuit court into believing his allegations were sufficient, and then denied an opportunity to correct any defects once the CCA took it upon itself to identify them, constitutes "cause" for any procedural bar that might otherwise have applied.

Once respondent's fair presentation and procedural bar theories are resolved and set to one side, the only remaining question is whether petitioner's additional facts relating to his ineffective assistance of counsel claims should be considered by this Court. As will also be discussed below, those facts do warrant consideration because they do not fundamentally alter the nature of the claims presented to the state courts. Alternatively, to the extent this Court could perceive any such fundamental alteration, petitioner's additional facts are eligible for consideration because their omission from the state court pleadings was not the result of a "fail[ure] to develop" that could properly be attributed to petitioner within the meaning of 28 U.S.C. §2254(e)(2).

### A.    Fair presentation.

Before examining the procedural default issues, it is important to recognize the distinction between the fair presentation requirement and the procedural default doctrine, and how that distinction contributes to properly defining the matters to be resolved in this case. Respondent asserts that a number of petitioner's claims are barred "because they were not fairly presented to the state courts and have not been exhausted." Respondent's Initial Brief at 12 (addressing petitioner's Ground IV.C); *see also id.* at 10 (Ground IV.B), 14 (Ground IV.D), 16 (Ground IV.E), 19 (Ground IV.F), and 21 (Ground VI). This confuses non-exhaustion and procedural default in a way that, if not corrected, could unnecessarily complicate the procedural issues this Court must resolve.

For an assertion that a claim has "not been exhausted" to be accurate, it must also be true that a state court remedy remains available for the petitioner to pursue. *See, e.g.*, *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) ("We do not disagree with Justice Stevens' general description of the law of exhaustion and procedural default"); *id.* at 853 (Stevens, J., dissenting) ("[T]he exhaustion inquiry focuses entirely on the availability of state procedures at the time when the federal court is asked to entertain a habeas petition"); *Coleman v. Thompson*, 501 U.S. 722, 732 (1991) ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him"); *Engle v. Isaac*, 456 U.S. 107, 125-126, n.28 (1982) ("[T]he problem of waiver is separate from the question whether a state prisoner has exhausted state remedies"). In this case, it is uncontested that no state court corrective procedures remain available to petitioner with respect to any of the claims alleged in the Petition submitted to this Court. As a result, all of those claims are, by definition, exhausted.

An "exhausted" claim, of course, is not necessarily a "fairly presented" claim. Recognizing this truism, the Supreme Court's decisions provide for the enforcement of the exhaustion requirement through the doctrine of procedural default. Where a prisoner has been given an opportunity to exhaust his claim in state court proceedings, but fails to take advantage of that opportunity in the manner prescribed by the state court's rules, that failure may or may not give rise to a procedural bar to subsequent review of the claim in federal habeas proceedings. As will be discussed in more detail below, whether such a bar actually arises depends upon whether the state court actually rejected the claim on a procedural ground, and upon whether the particular procedural ground invoked by the state court was both independent of federal law and adequate to justify foreclosure of federal review under the circumstances of the individual case. *See generally*

*O'Sullivan*, 526 U.S. at 853-854 (Stevens, J., dissenting) (describing procedural default doctrine as mechanism for enforcing exhaustion requirement); *Coleman*, 501 U.S. at 735 ("In habeas, if the decision of the last state court to which the petitioner presented his federal claims . . . did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition").

The issue characterized by respondent as one of "fair presentation" is thus actually a question of procedural default. As to the CCA's applications of Rules 32.3 and 32.6 in this case, the contours of that question are shaped by two main features of the state court appellate proceedings: (1) the absence of any indication that the substance of petitioner's legal or factual allegations of federal constitutional error submitted to the Alabama appellate courts were themselves insufficient to have fairly presented the substance of his federal claims; and (2) the CCA's reliance on petitioner's alleged non-compliance with Rules 32.3 and 32.6 before the state circuit court as the exclusive basis for its own refusal to consider the entirety of the legal and factual allegations contained in his appellate briefs. *See* Tab R-73 at 15, Vol. 55.

When examined within the established framework for procedural default analysis (which will be discussed in greater detail below), these features of the state court proceedings lead to one question, the answer to which will determine whether the claims rejected by the CCA for non-compliance with Rules 32.3 and 32.6 are actually barred from merits review in this Court: Do Rules 32.3 and 32.6, as applied in this case, qualify as an independent and adequate state law ground for the CCA's denial of relief? If the answer is yes, then petitioner is not entitled to merits review absent a showing of cause and prejudice; if the answer is no, then the sole state law ground on which the CCA based its rejection of petitioner's claims is incapable of serving as a procedural bar, and merits

review in this Court is required.  As set forth below, the answer to both the independence and adequacy components of this question are a resounding "No."

**B.    Procedural default.**

The procedural default rules that apply in federal habeas derive directly from the "adequate and independent state ground" doctrine developed by the Supreme Court for use in determining its jurisdiction over federal constitutional issues arising in direct appeals of state court judgments. *See Wainwright v. Sykes*, 433 U.S. 72, 81, 87 (1977); *see also*, *e.g.*, *Coleman*, 501 U.S. at 729 ("This Court will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment"); *Harris v. Reed*, 489 U.S. 255, 262 (1989) ("*Wainwright v. Sykes* made clear that the adequate and independent state ground doctrine applies on federal habeas").

Under this doctrine, a state court judgment which actually rests on a state law ground that is both "adequate" in the sense that it is clearly established and consistently and regularly applied to serve a legitimate state interest, *see*, *e.g.*, *Ford v. Georgia*, 498 U.S. 411, 421-425 (1991) *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *Lee v. Kemna*, 534 U.S. 362, 366-367 (2002), and "independent" in the sense that its application does not involve consideration of a federal question, *see*, *e.g.*, *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985), must be left undisturbed by a federal habeas court absent a showing of either "cause and prejudice" or a "fundamental miscarriage of justice," *Murray v. Carrier*, 477 U.S. 478, 485 (1986).  However, "[t]he mere existence of a basis for a state procedural bar does not deprive" a federal habeas court of authority to address the merits of a constitutional claim; rather, for such a deprivation to occur, "the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*,

61

472 U.S. 320, 327 (1985) (citing *Ulster County Court v. Allen,* 442 U.S. 140, 152-154 (1979)); *see also Harris*, 489 U.S. at 262 ("a federal claimant's procedural default precludes federal habeas review, like direct review, only if the last state court rendering a judgment in the case rests its judgment on the procedural default").

Finally, as noted above, even where a state court does expressly rely upon a state procedural rule to reject a federal constitutional claim, such reliance is incapable of barring federal habeas review if the state court rule with which the petitioner failed to comply is not "consistently or regularly applied" by the state courts. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *see also*, *e.g.*, *Hathorn v. Lovorn,* 457 U.S. 255, 262-263 (1982) (quoting *Barr v. City of Columbia,* 378 U.S. 146, 149 (1964)) ("[A] state procedural ground is not 'adequate' unless the procedural rule is 'strictly or regularly followed'"); *Martin v. Maxey*, 98 F.3d 844, 848 (5th Cir. 1996) (quoting *Amos v. Scott,* 61 F.3d 333, 339 (5th Cir. 1995)) ("[I]n order to be 'adequate,' a procedural bar rule must be 'strictly or regularly' applied by the state to the 'vast majority of similar claims'").

As discussed below, the CCA's determinations that several of petitioner's claims were not pleaded with sufficient specificity before the state circuit court cannot bar this Court from reaching the merits of those claims.

    1.    **The CCA's application of Rules 32.3 and 32.6(b) to petitioner's claims was not "independent" of federal law.**

        a.    **"Independence" of federal law.**

"[F]ederal courts on habeas corpus review . . .will presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence

of any possible state law ground is not clear from the face of the opinion.'" *Coleman*, 501 U.S. at 734-735 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-1041 (1983)); *see also id.* ("[I]f the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims, and did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition"); *Enterprise Irrigation District v. Farmers Mutual Canal Co.*, 243 U.S. 157, 164 (1917) ("But where the non-Federal ground is so interwoven with the other as not to be an independent matter, or is not of sufficient breadth to sustain the judgment without any decision of the other, our jurisdiction is plain").

A state law rule is sufficiently "interwoven" with federal law to disqualify it from serving as the basis for a procedural bar to merits review in habeas if the resolution of the state procedural law question requires application of a federal constitutional rule. *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985) ("[W]hen resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law . . ."); *Card v. Duggar*, 911 F.2d 1494, 1516 (11th Cir. 1990) (recognizing applicability of *Ake* in habeas; "[T]he procedural rule relied on by the state court must serve as an independent state law ground for denying relief, and may not be intertwined with an interpretation of federal law" (citing *Ake*, 470 U.S. at 75)); *see also*, *e.g.*, *Smith v. Stewart*, 241 F.3d 1191, 1196 (9th Cir. 2001) ("[F]ederal habeas review is not barred when a state makes the application of its default rule depend on consideration of federal law"). Such was the case in *Ake*, where the Supreme Court concluded that an Oklahoma state court's finding of waiver was not independent of federal law because the state law waiver rule did not apply to "fundamental trial error," which included federal constitutional error. *Ake*, 470 U.S.

at 74. "Before applying the waiver doctrine to a constitutional question," the Court found, "the state court must rule, either explicitly or implicitly, on the merits of the constitutional question." *Id.* at 75. The Court went on to conclude that "the additional holding of the state court – that the constitutional challenge presented here was waived – depends on the court's federal-law ruling and consequently does not present an independent state ground for the decision rendered." *Id.*

As *Ake* illustrates, content-sensitive pleading or preservation requirements are particularly likely to lack the independence from federal law necessary to make suitable bases for procedural bars to federal habeas review. In *Stokes v. Anderson*, 123 F.3d 858 (5th Cir. 1997), for example, the Fifth Circuit held that MISS. CODE ANN. §99-39-27(5) could not be an independent state ground for decision because it allowed Mississippi state courts to deny post-conviction relief only if it did not appear "from the face of the application, motion, exhibits, and the prior record that…[the petitioner's claims] present a substantial showing of the denial of a state or federal right." *Stokes*, 123 F.3d at 860 (quoting §99-39-27(5)); *id.* ("[§99-39-27(5)] cannot operate as a *procedural* bar to review because it requires some evaluation, however cursory, of the merits of a petitioner's claim. Similarly, §99-39-27(5) cannot be an *independent* state ground because it is not separate from the merits of Stokes' claim . . . that he is being held in custody in violation of the Constitution or federal law").

The Second Circuit applied the same principles and reached the same conclusion in *Green v. Travis*, 414 F.3d 288 (2005). There, the New York state appellate court had held that the habeas petitioner's *Batson* claim had not been preserved for appellate review, and was therefore procedurally barred, because his counsel had failed to formulate his objection with sufficient specificity at trial. Recognizing that the state court's application of New York's preservation rule

64

"turned on the interpretation of federal constitutional jurisprudence," the Second Circuit concluded

that the state court's ruling had not been independent of federal law, and could not, therefore,

foreclose federal habeas review of the *Batson* claim. *Green*, 414 F.3d at 295-296. "The question

of whether an objection is sufficiently specific to constitute a *prima facie* case under *Batson*," the

Second Circuit explained, "merges the preservation issue with the adequacy of a *prima facie* case

under *Batson*. Thus, if the Appellate Division held . . . that Green's *Batson* claim was unpreserved

because it did not satisfy the test for a *prima facie Batson* claim, the state's procedural default rule

is interwoven with federal constitutional law." *Id.*

> **b.    As construed and applied by the CCA in this case,
> Rules 32.3 and 32.6(b) were not independent of
> federal law.**

Before beginning its discussion of petitioner's ineffective assistance of counsel claims, the

CCA described Rules 32.3 and 32.6(b) as they would be applied in this case, in relevant part, as

follows:

> The burden of pleading under Rule 32.3 and Rule 32.6(b) is a heavy
> one. Conclusions unsupported by specific facts will not satisfy the
> requirements in Rule 32.3 and Rule 32.6(b). If, assuming every
> factual allegation in a Rule 32 petition to be true, a court cannot
> determine whether the petitioner is entitled to relief, the petitioner has
> not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b).
> *See Bracknell v. State*, 883 So. 2d 724 (Ala. Crim. App. 2003).
> Moreover, to sufficiently plead an allegation of ineffective assistance
> of counsel, a Rule 32 petitioner must not only "identify the [specific]
> acts or omissions of counsel that are alleged not to have been the
> result of reasonable professional judgment," *Strickland v.
> Washington*, 466 U.S. 668, 690 (1984), but must also plead specific
> facts indicating that he or she was prejudiced by the acts or
> omissions, *i.e.*, facts indicating "that there is a reasonable probability
> that, but for counsel's unprofessional errors, the result of the
> proceeding would have been different." *Id*. at 694. A bare allegation

65

> that prejudice occurred without specific facts indicating how the
> petitioner was prejudiced is not sufficient.

Tab R-73 at 14, Vol. 55.

A standard of pleading more self-evidently interwoven with federal law would be difficult

to imagine. By its own description, the CCA applies Rules 32.3 and 32.6(b) through express

reference to the federal constitutional standard applicable to the claim under review, in this case, the

Sixth Amendment standard for proving ineffective assistance of counsel prescribed by *Strickland*

*v. Washington*. Indeed, as the state court explained, the question of a Rule 32 petitioner's

satisfaction of Rules 32.3 and 32.6(b) turns squarely on whether his allegations, if proven, would

entitle him to relief on his federal claim. Tab R-73 at 14, Vol. 55. ("If, assuming every factual

allegation in a Rule 32 petition to be true, a court cannot determine whether the petitioner is entitled

to relief, the petitioner has not satisfied the burden of pleading under Rule 32.3 and Rule 32.6(b)");

*see also*, *e.g.*, *Boyd v. State*, 913 So. 2d 1113, 1125 (Ala. Crim. App. 2003) ("After *facts* are pleaded,

which, if true, entitle the petitioner to relief, the petitioner is then entitled to an opportunity, as

provided in Rule 32.9, Ala. R.Crim. P., to present evidence proving those *alleged facts*") (emphasis

by the court); *Bracknell v. State,* 883 So. 2d 724, 727 (Ala. Crim. App. 2003) (quoting *Moore v.*

*State*, 502 So. 2d 819, 820 (Ala. 1986)) ("An evidentiary hearing on a [Rule 32] petition is required

only if the petition is 'meritorious on its face'"). In answering that question, of course, the CCA has

no choice but to examine the merits of the petitioner's allegations and rule, either explicitly or

implicitly, on whether they meet the *Strickland* standard. This operation is materially identical to

the approaches taken by the state courts in *Ake*, *Stokes* and *Green* described above, none of which

exhibited the independence from federal law necessary to form the basis of a procedural bar to federal habeas review.[24]

That the CCA's actual application of Rules 32.3 and 32.6 in this case involved an assessment of petitioner's allegations against the *Strickland* standard is also clear from the court's discussion of his individual claims. For example, the CCA's discussion of claim II.D. of the Rule 32 Petition (Ground IV.B. of the Petition submitted to this Court) indicates that although the state court was satisfied with petitioner's allegations of deficient performance, his allegations of prejudice were insufficient because "they do not tend to indicate that the testimony of the forensic odontologist was improperly admitted or that it prejudiced Freeman . . . Thus, Freeman failed to satisfy his burden of pleading with respect to these allegations of ineffective assistance of . . . counsel." Tab R-73 at 18, Vol. 55; *see also id.* ("Freeman did not even identify who or what the alternative source of the bite marks was"). Similarly, the CCA's rejection of claims II.G. and II.K. of the Rule 32 Petition (Grounds IV.D. and IV.E. of the Petition submitted to this Court) made express reference to the two prongs of the *Strickland* standard, stating, respectively, that "Freeman failed to allege in his petition any facts tending to indicate that his counsel's performance was deficient or that he was prejudiced by counsel's performance," Tab R-73 at 23, Vol. 55, and that "Freeman alleged no facts tending to indicate that he was prejudiced by counsel's preparation for and conducting [sic] of the penalty phase

---

[24]The CCA's use of Rule 32.3 and 32.6 bears a much closer resemblance to a merits summary judgment inquiry than it does to the sorts of adequate and independent state law grounds for decision typically relied upon to find procedural bars in collateral review cases. *See, e.g., Massaro v. United States*, 538 U.S. 500, 504 (2003) (claims apparent from the face of the trial record but not raised on direct appeal are ordinarily barred from review in collateral proceedings); *Coleman*, 501 U.S. at 727, 757 (upholding procedural default arising out of petitioner's failure to timely file notice of appeal); *Sykes*, 433 U.S. at 87 (failure to comply with contemporaneous objection rule can give rise to procedural bar).

67

of his trial."[25]  Tab R-73 at 25, Vol. 55; *cf. Strickland*, 466 U.S. at 687 ("First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense").  Similar language can be found in the CCA's discussions of claims II.H. and L, VII and IX of the Rule 32 Petition (Grounds IV.C., IV.F. and III, respectively, of the Petition submitted to this Court).  *See* Tab R-73 at 24-25, 27, Vol. 55.

In short, while the CCA rejected petitioner's ineffective assistance of counsel claims due to purportedly procedural defects in the ways in which those claims had been pled before the circuit court, the inquiry utilized to identify the alleged defects, and the nature of the alleged defects themselves, depended upon consideration of the constitutional rule laid down in *Strickland*.  As a result, the CCA's applications of Rules 32.3 and 32.6 to petitioner's claims lack the independence from federal law necessary to bar merits review in this Court.

> **2.    The CCA's application of Rules 32.3 and 32.6(b) to petitioner's claims does not constitute an "adequate" ground for withholding merits review.**

While "firmly established and regularly followed" state procedural rules are ordinarily sufficient to prevent federal habeas review of a claim, *James v. Kentucky*, 466 U.S. 341, 348 (1984), "[t[here are . . . exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee v. Kemna*, 534 U.S. 362, 376 (2002).  In fact, "[i]t is a dominant theme of the Supreme Court case law . . . that a federal habeas petitioner shall not be denied federal review of a federal constitutional claim on the basis of an asserted state procedural ground that is manifestly unfair in its treatment of that claim." *Spencer*

---

[25]As discussed *infra*, the CCA's readiness to fault a petitioner for failing to allege facts unavailable to him without the assistance of investigative and expert services that the state refuses to provide contributes to the inadequacy of Rules 32.3 and 32.6 as applied in this case.

v. *Kemp*, 781 F.2d 1458, 1470 (11th Cir. 1986). A federal court's inquiry into the adequacy of a state procedural bar "'is itself a federal question.'" *Lee*, 534 U.S. at 375 (quoting *Douglas v. Alabama,* 380 U.S. 415, 422 (1965)). When resolving this federal question, the federal court must concern itself not with whether the state rule at issue "is facially valid," but with whether "its application in [the] particular case does not satisfy constitutional requirements of due process of law" or the other criteria of adequacy. *Spencer*, 781 F.2d at 1470 (citing *Reece v. Georgia,* 350 U.S. 85 (1955)).

The exorbitance or manifest unfairness which renders a particular application of a state rule inadequate to bar federal review can have a range of sources. In *Lee*, the Court found the application of state rules requiring a written motion for a continuance inadequate to prevent habeas review of the petitioner's due process challenge to the trial court's denial of his oral continuance motion. After emphasizing that this basis for denying a continuance had been raised for the first time on the state appellate court's own motion some two and one-half years after the trial, *Lee*, 534 U.S. at 380, the Court found "[t]hree considerations [which], in combination, [placed Lee's] case within the small category of cases in which asserted state grounds are inadequate to block adjudication of a federal claim." *Id.* at 381. First, the rationale relied upon by the trial judge for denying Lee's continuance motion – that the judge was simply unavailable to be present for trial the next day – "could not have been countered by a perfect motion for continuance." *Id.* Second, "no published [state court] decision direct[ed] flawless compliance with [the relevant procedural rules] in the unique circumstances [Lee's] case present[ed]." *Id.* at 382. And, "[t]hird and most important, given the realities of trial, Lee substantially complied with [the state's] key Rule." *Id.* (internal quotation marks and citation omitted).

69

In addition to the principles relied upon in *Lee*, there are other characteristics of a rule's application which are known to render the rule inadequate to prevent federal review. For example, a rule will be inadequate when its application in a particular set of circumstances upsets a petitioner's legitimate reliance on prior rulings. *See*, *e.g.*, *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 458 (1958) ("Novelty in procedural requirements cannot be permitted to thwart review in this court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights"); *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964) (citing *Wright v. Georgia*, 373 U.S. 284, 291 (1963), *NAACP v. Alabama, supra*, and *Barr v. City of Columbia*, 378 U.S. 146 (1964)) ("The basic due process concept involved is the same as that which the Court has often applied in holding that an unforeseeable and unsupported state-court decision on a question of state procedure does not constitute an adequate ground to preclude this Court's review of a federal question"); *id.* at 354 (quoting Amsterdam, Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U.PA.L.REV. 67, 74, n. 34 (1960)) ("The standards of state decisional consistency applicable in judging the adequacy of a state ground" look to whether "'a federal right turns upon . . . the appearance to the individual of the status of state law as of that moment . . .'"); *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990) (quoting *NAACP v. Alabama, supra*) (A state "procedural bar . . . must not be applied in an arbitrary or unprecedented fashion, such that it thwarts federal court review of those who, 'in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights'").

Such disturbances of reliance interests are further exacerbated, and the adequacy of the state court's rule application further diminished, where they are accompanied by a failure to afford the petitioner an opportunity to take action necessary to bring himself into compliance with the newly

modified requirements imposed by the court.  *See*, *e.g.*, *Bouie*, 378 U.S. at 355 (quoting *Brinkerhoff-Faris Trust & Sav. Co. v. Hill,* 281 U.S. 673, 678 (1930)) ("When a state court overrules a consistent line of procedural decisions with the retroactive effect of denying a litigant a hearing in a pending case, it thereby deprives him of due process of law 'in its primary sense of an opportunity to be heard and to defend [his] substantive right'"); *Spencer*, 781 F.2d at 1470 (application of state procedural rule to petitioner was unfair because it "afford[ed] him no opportunity to attempt to comply with the new provision before suffering the deprivation it imposed.  [footnote omitted]  We cannot find such an interpretation of Georgia procedural law to be an independent and adequate state ground sufficient to preclude federal court consideration of the merits of Spencer's claim").

As discussed below, the CCA's applications of Rules 32.3 and 32.6, and the circumstances surrounding those applications, provide multiple grounds from which to conclude that those rules are not adequate to bar federal review of petitioner's claims.

### a.  Petitioner was misled and was not afforded meaningful notice or an opportunity to be heard.

As discussed above, when assessing the adequacy of a state court's determination that a prisoner's noncompliance with a state procedural rule resulted in a default, a federal court must examine the prisoner's conduct in the context as it appeared to the petitioner at the time of the alleged default. *Bouie*, 378 U.S. at 354-355.  In this case, factors in existence during the pendency of petitioner's Rule 32 Petition before the state circuit court led petitioner to believe that his pleadings satisfied the pleading requirements imposed by state law.

As described *supra*, the question of petitioner's compliance with Rule 32.6's specificity requirement did not go unmentioned in the proceedings before the state circuit court.  On the

71

contrary, the issue was squarely placed before the circuit court in the form of the state's motion to dismiss. The state's failure to pursue that motion, and the circuit court's denial of the motion in its January 23, 2002 order, conveyed one unambiguous message: petitioner's pleadings were not insufficient to satisfy the rule. That message was never contradicted by the circuit court throughout the approximately fifteen additional months that the Rule 32 Petition remained pending before that court, nor was it contradicted in the order denying Rule 32 relief, which was written entirely by counsel for the state but contained no reference to any Rule 32.6 defect.

Petitioner's reliance upon the unambiguous message sent by the conduct of the circuit court was reinforced by Rule 32.7(d). That rule, entitled "Summary Disposition," instructed the circuit court as follows: "If the court determines that the petition is not sufficiently specific, . . . the court may either dismiss the petition or grant leave to file an amended petition. Otherwise, the court shall direct that the proceedings continue and set a date for hearing." According to its plain language, Rule 32.7(d) afforded the circuit judge a finite set of options: if the petition was "not sufficiently specific," the judge was obligated to either dismiss it, or notify petitioner of the deficiency and permit him to amend; "[o]therwise," *i.e.*, if the petition was *not* insufficiently specific, the judge was required to "direct that the proceedings continue and set a date for hearing." In this case, the judge did not dismiss the petition as insufficiently specific and did not notify petitioner that his allegations were in need of amendment. Rather, the judge followed the course prescribed by the rule for cases lacking a specificity deficiency: he "direct[e]d that the proceedings continue and set a date for hearing." Furthermore, apart from its initial motion to dismiss, which was denied, and its subsequent repetition of the same motion, which the circuit court did not address, the state made no effort to

72

persuade the circuit court that a Rule 32.6 deficiency existed, or that a hearing should not be set pursuant to Rule 32.7(d).[26]

Petitioner's reliance upon the circuit court's message was further justified by the nature of the Rule 32.6 specificity requirement and the other case-related information that was within the knowledge of the circuit judge. Unlike most true procedural bar rules, which impose clear, categorical requirements such as when or where to file a particular claim,[27] Alabama's Rule 32.6 specificity requirement does not lend itself to simple, straightforward application. Instead, its satisfaction *vel non* must be subjectively determined by the presiding circuit judge. When that judge indicates that he has enough information to serve the interests underlying the specificity requirement – regardless of the sources of that information[28] – there is no reason for a petitioner to question that judgment.

Here, the Rule 32 judge was far from unfamiliar with the factual background against which petitioner's allegations were made. As counsel for respondent noted during argument on petitioner's funding requests, the Rule 32 judge had personal knowledge of the trial proceedings because he

---

[26]*Cf. Allen v. State*, 825 So. 2d 264, 270-271 (Ala. Crim. App. 2001) (request set forth in motion submitted to Rule 32 court not preserved for appellate review where lower court did not rule on motion and movant did not object to lower court's inaction).

[27]*See* examples cited *supra* at n. 24.

[28]Alabama circuit judges are permitted to rely upon their own personal recollections about a case when deciding whether an evidentiary hearing is necessary in a Rule 32 proceeding. *See, e.g., Ex parte Hill*, 591 So. 2d 462, 463 (Ala.1991) ("[A] judge who presided over the trial or other proceeding and observed the conduct of the attorneys at the trial or other proceeding need not hold a hearing on the effectiveness of those attorneys based upon conduct that he observed"); *Sheats v. State*, 556 So. 2d 1094, 1095 (Ala. Crim. App. 1989) ("If the circuit judge has personal knowledge of the actual facts underlying the allegations in the petition, he may deny the petition without further proceedings so long as he states the reasons for the denial in a written order").

presided over them.  *See* Vol. 51, R. 40 ("Judge, you remember this case"); *see also* Tab R-72 at 11,

Vol. 55 ("Further, the Court personally addressed and observed Freeman on numerous occasions").

Additionally, petitioner supplied the circuit court with particularized factual allegations both in

support of his funding requests, *see* Vol. 51, R. 35-63, and in the written proffer of facts filed at the

Rule 32 evidentiary hearing.  The extent to which the circuit judge relied upon these additional

sources of specific information relating to petitioner's claims can, of course, never be precisely

known.  What is clear, however, is that the presiding circuit judge came to the Rule 32 proceedings

with personal knowledge of the case, he was supplied with additional information both in the Rule

32 Petition and its amendments, and in petitioner's other written and oral submissions,[29] and he flatly

rejected the proposition that petitioner's allegations were insufficiently specific in the January 23,

2002 order.  Thus, at all times during which petitioner could have corrected any defects that may

have existed in the pleadings before the circuit court, that court indicated both expressly and

impliedly that there were no defects.

Given the circumstances, petitioner approached the appeal of the denial of Rule 32 relief to

the CCA with no expectation that the specificity of his pleadings before the circuit court would be

an issue.  After all, the rules assigned resolution of the question of petitioner's compliance with the

specificity requirement to the circuit judge, and that judge not only failed to note any deficiencies,

but proceeded to reach the merits of all of his ineffective assistance of counsel claims.  *Cf. Harper

v. State*, 676 So. 2d 949, 950 (Ala. Crim. App. 1995) ("[I]f the court finds that a particular allegation

fails to meet the requirements of specificity of Rule 32.6(b), we encourage the court to so note with

---

[29]As discussed *infra*, these facts also demonstrate that petitioner, at the very least, substantially complied with the requirements of Rule 32.6.

particularity in its written findings"). Petitioner's belief that the specificity requirement would have no part in the appeal was further reinforced when the state submitted its brief to CCA without making a single allegation that petitioner's pleadings before the circuit court failed to comply with Rules 32.3 and 32.6. *See generally* Tab R-61, Vol. 53.

In light of what had gone before, the CCA's *ex mero motu* invocation of Rules 32.3 and 32.6 as the central ground for rejecting petitioner's claims was arbitrary, unfair, and therefore inadequate, in at least two ways. First, the CCA substituted its own judgment for that of the court charged under the rules with making the specificity determination at the time when the opportunity to cure deficiencies remained available. *See*, *e.g.*, *Bouie*, 378 U.S. at 355; *Spencer*, 781 F.2d at 1470; *Forgy v. Norris*, 64 F.3d 399, 401-02 (8th Cir. 1995) ("unexpectable state procedural bars are not adequate to foreclose federal review of constitutional claims"); *Osborn v. Shillinger*, 861 F.2d 612, 618 (10th Cir.1988) ("[I]f a petitioner could not reasonably have been aware that a procedural rule would prevent the court from addressing the merits of his claim, his violation of that rule cannot bar federal review"); *cf. McNair v. Campbell*, 416 F.3d 1291, 1300 n.4 (11th Cir. 2005) ("We cannot conclude that such belated presentation of the issue to the appellate court – at a time when the State could no longer respond, after the issues for appellate review had been joined, and after the decision of the appellate court – constituted a diligent pursuit of the issue on appeal or a reasonable attempt to pursue the claim in state court"); *Barkell v. Crouse*, 468 F.3d 684, 694 (10th Cir. 2006) (quoting 28 U.S.C. §2254(e)(2)) ("[I]f Mr. Barkell complied with what reasonably appeared to be the established state-law requirements, he cannot be said to have 'failed to develop the factual basis of [his] claim,' even if his reasonable interpretation of state law turned out to be wrong . . ."). And while the violation of fundamental fairness was complete when the CCA *sua sponte* invoked and applied the

specificity requirement, it was substantially exacerbated when that court subsequently denied petitioner's request for a remand necessary to afford him an opportunity to amend his circuit court pleadings. *See* Tab R-63, Vol. 53; Tab R-73, Vol. 55.

Second, but no less important to this Court's adequacy determination, the CCA's invocation and application of the specificity requirement was accomplished only through the suspension *sub silentio* of established state procedural rules. State law had long mandated that a Rule 32 petitioner has a due process right to "the notice he needs to attempt to formulate arguments and present evidence to 'disprove [the] existence of [a procedural bar] by a preponderance of the evidence.'" *Ex parte Rice*, 565 So. 2d 606, 608 (Ala. 1990) (quoting Temp. Rule 20.3, Ala.R.Crim.P.). Before the CCA's decision on appeal, the only "notice" petitioner received concerning Rule 32.6's application to his case was the circuit court's denial of the state's motion to dismiss for lack of specificity. State law also provided that matters – such as procedural defenses available to the state – not raised and argued in an appellate brief were deemed waived. Rule 28(a)(10) & (b), Ala.R.App.P.; *Brownlee v. State*, 666 So. 2d 91, 93 (Ala. Crim. App. 1995) ("We will not review issues not listed and argued in brief"); Ala.R.Crim.P. 32.3 ("The state shall have the burden of pleading any ground of preclusion . . ."). The CCA's arbitrary departure from these settled rules was inconsistent with due process, and renders the application of Rules 32.3 and 32.6 facilitated thereby inadequate to serve as the basis for a procedural bar to federal habeas review. *See, e.g.*, *Bouie*, *supra*; *Card*, *supra*.

> **b.    The CCA's applications of Rule 32.3 and 32.6(b) in this case did nothing to further a legitimate state interest.**

A state court's application of a state procedural rule cannot be adequate to foreclose federal review unless that application is necessary to further a legitimate state interest. *James v. Kentucky*,

466 U.S. 341, 349 (1984). Where no legitimate state interest exists, or where the objective underlying the procedural rule is substantially served notwithstanding a prisoner's technical non-compliance with the letter of a rule, a state court's reliance on that non-compliance to reject a claim for relief will not bar merits review in federal habeas corpus. *Lee v. Kemna*, 534 U.S. at 385 (rejecting state's procedural bar theory because the state court rule's "essential requirements . . . were substantially met in this case"); *Osborne v. Ohio*, 495 U.S. 103, 124 (1990) (merits review was appropriate notwithstanding trial counsel's failure to comply with contemporaneous objection requirement since, "under the circumstances, nothing would be gained by requiring [counsel] to object a second time . . ."); *James*, 466 U.S. at 349 (quoting *Staub v. City of Baxley*, 355 U.S. 313, 320 (1958)) ("To insist on a particular label for [counsel's request] would 'force resort to an arid ritual of meaningless form,' and would further no perceivable state interest"); *Reynolds v. Berry*, 146 F.3d 345, 347 (6th Cir. 1998) (adequacy of a state rule "is determined by examining the state's legitimate interests in the procedural rule in light of the federal interest in considering federal claims").

To properly assess the adequacy of a state court's finding that its rules were violated as a basis for withholding federal review, it is thus necessary both to gauge the value the state actually attaches to the interest ostensibly served by the rule, and to examine whether, as a practical matter, that interest was sufficiently served under the circumstances of the particular case. Here, the answers to both of these inquiries further establish that the CCA's application of Rules 32.3 and 32.6 in this case was inadequate to serve as a procedural bar.

On their face, Rules 32.3 and 32.6 appear to be designed to promote the pleading of claims at a level of detail sufficient to permit a circuit judge to determine whether or not the prisoner's

allegations, if proven, would entitle him to relief. *See*, *e.g.*, *Boyd*, *supra*; *Bracknell*, *supra*. Viewed in isolation, these rules could be seen as an articulation of a state court interest in receiving the facts giving rise to meritorious claims of constitutional error, and remedying such errors, in furtherance of the obligation to uphold the Constitution. Viewed in the context of the state court proceedings in this case, however, any suggestion that the state courts harbored a genuine interest in hearing and resolving constitutional claims quickly evaporates. As summarized *supra*, the state court rules afforded petitioner, who was and remains indigent, no right to appointed, funded counsel in his Rule 32 proceeding. Additionally, despite petitioner's pleas for investigative and expert assistance necessary to uncover and develop the facts to prove his constitutional claims, the circuit court denied every funding request petitioner submitted without explanation.[30] After holding *sua sponte* that petitioner had not supplied the circuit court with enough facts about his constitutional claims, the CCA upheld the circuit court's denials of the very funding that was necessary to have developed those facts.[31] And finally, when confronted with the due process implications of its *ex mero motu* invocation of the specificity requirement and the resulting need for a remand and an opportunity to amend the circuit court pleadings, the CCA simply denied rehearing.

By all indications the state courts' interest in this case was not to do what was necessary – even minimally so – to determine whether constitutional error occurred at petitioner's capital trial.

---

[30]It bears repeating that these denials were preceded by the state's assertions both that Rule 32 petitioners simply have no right to funds for fact development, regardless of their centrality to the petitioners' ability to develop the evidence of constitutional error, and that the budget for all such requests across the state of Alabama for the year 2002 was a mere $38,600, $25,000 of which had been spent on other cases by the time petitioner's requests were submitted. Vol. 51, R. 38-39.

[31]The relationship between these funding denials and the alleged deficiencies in petitioner's pleadings relied upon by the CCA is discussed in greater detail *infra*.

Instead, the courts' primary objective was to move his case through and out of the state court system as inexpensively and expeditiously as possible. While the state courts were free to harbor that interest and serve it as they did in petitioner's case, this Court is under no obligation to deem it legitimate or adequate as a basis for a procedural bar. *See Lee*, *supra*; *Osborne*, *supra*; *James*, *supra*; *see also (Michael) Williams v. Taylor*, 529 U.S. 420, 433 (2000) ("We do not suggest the State has an obligation to pay for investigation of as yet undeveloped claims; but if the prisoner has made a reasonable effort to discover the claims to commence or continue state proceedings, § 2254(e)(2) will not bar him from developing them in federal court").

Even accepting Rules 32.3 and 32.6 at face value and ignoring their use by the CCA as a tool for dismissing the undeveloped claims of an indigent prisoner, the information supplied to and known by the circuit judge in this case substantially met the objectives of the rules, such that nothing was gained by the CCA's applications of Rules 32.3.and 32.6. As described *supra*, petitioner not only stated his claims in his Rule 32 petitions, he also supplemented the facts relating to those claims through his written and oral submissions in support of his funding requests, and the written proffer of facts submitted at the Rule 32 evidentiary hearing. Furthermore, the Rule 32 judge in petitioner's case also served as the trial judge, and established state law contemplated that he would call upon his "personal knowledge of the actual facts underlying the allegations in the petition . . . ." *Sheats*, 556 So. 2d at 1095. There is ample reason to believe that the judge did so in this case. *See* Vol. 51, R. 40 (counsel for respondent: "Judge, you remember this case"); Tab R-72 at 11, Vol. 55 ("Further, the Court personally addressed and observed Freeman on numerous occasions"). Taken together, the sources of information to which the circuit judge had ready access were more than sufficient to

supply him with the relevant facts and theories that were available at the time.[32]  *See Lee*, 534 U.S. at 383 (interests served by state rule requiring written continuance motion "were either covered by the oral continuance motion or otherwise conspicuously apparent on the record"); *Osborne*, 495 U.S. at 124 ("Given this sequence of events, . . . we are convinced that Osborne's attorney pressed the issue of the State's failure of proof . . . before the trial court and, under the circumstances, nothing would be gained by requiring Osborne's lawyer to object a second time . . .").

That the Rule 32 court believed it had what it needed to decide petitioner's case – and therefore that the interests underlying Rules 32.3 and 32.6 were substantially met – is further underscored by the fact that it denied the state's motion for dismissal under Rule 32.6, and it adopted an order disposing of the case that is conspicuously devoid of any reference to a Rule 32.6 deficiency.  The Supreme Court's reasoning in *Lee* is instructive:

> The asserted procedural oversights in Lee's case . . . were first raised more than two and a half years after Lee's trial.  The two Rules, Missouri maintains, "work together to enhance the reliability of a *trial court's* determination of whether to delay a scheduled criminal trial due to the absence of a witness." Brief for Respondent 29 (footnote omitted) (emphasis added). Nevertheless, neither the prosecutor nor the trial judge so much as mentioned the Rules as a reason for denying Lee's continuance motion. [footnote omitted]  If either prosecutor or judge considered supplementation of Lee's motion necessary, they likely would have alerted the defense at the appropriate time, and Lee would have had an opportunity to perfect his plea to hold the case over until the next day.  Rule 24.10, we note, after listing the components of a continuance motion, contemplates subsequent perfection:  "If the court shall be of the opinion that the affidavit is insufficient it shall permit it to be amended."

---

[32]As discussed *infra*, many of the deficiencies in petitioner's pleadings relied upon by the CCA were attributable not to petitioner's failure to supply the circuit court with information he possessed, but to petitioner's inability to acquire necessary information without access to the investigative and expert services the circuit court denied.

*Lee*, 534 U.S. at 380.[33]

Like the "asserted procedural oversights" in *Lee*, the purported specificity defects in petitioner's submissions to the circuit court were first raised on appeal, *ex mero motu*, "more than two and a half years after" the circuit court's denial of the state's motion for partial dismissal. Like the prosecutor and the judge in *Lee*, neither counsel for respondent nor the circuit court "so much as mentioned [Rule 32.6] as a reason for denying" the petition, even though the order containing that denial was written by the former and adopted verbatim by the latter. And as in *Lee*, "[i]f either [counsel for respondent] or [the circuit] judge considered supplementation of [the petition] necessary, they likely would have alerted the [petitioner] at the appropriate time, and [he] would have had an opportunity to perfect his [petition]" as contemplated by Rule 32.7(d). Faced with these circumstances, the Supreme Court concluded in *Lee* that the state appellate court's rejection of the habeas petitioner's claim on procedural grounds was not adequate to foreclose federal habeas review. *Lee*, 534 U.S. at 387. Because there is no principled basis upon which to distinguish the relevant circumstances of this case from those before the Court in *Lee*, this Court should likewise conclude that the CCA's applications of Rules 32.3 and 32.6 are inadequate to prevent merits review of petitioner's ineffective assistance of counsel claims.

> **c.    The CCA's applications of Rules 32.3 and 32.6(b) were exorbitant, manifestly unfair, and therefore inadequate to foreclose federal review.**

---

[33]*See also id.* ("The Missouri Court of Appeals, it seems, raised Rule 24.09's writing requirements . . . on its own motion"); *id.* 380 n.11 ("The belated assertion of these Rules also explains why Lee did not contend in his state postconviction motion that counsel was constitutionally ineffective for failing meticulously to comply with Rules 24.09 and 24.10. That postconviction motion had been made and denied in the trial court before the Rules' entry into the case when Lee proceeded on appeal").

81

"[E]xorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Lee*, 534 U.S. at 376; *see also*, *e.g.*, *Spencer*, 781 F.2d at 1470 ("[A] federal habeas petitioner shall not be denied federal review of a federal constitutional claim on the basis of an asserted state procedural ground that is manifestly unfair in its treatment of that claim"). The CCA's applications of Rules 32.3 and 32.6 in this case exhibit precisely the sort of exorbitance and manifest unfairness that renders a state rule inadequate.

The CCA's opinion reveals that its disapproval of petitioner's circuit court pleadings was often based not on his failure to plead what was known to or available to him, but on his failure to plead what he had already made clear could not be pled without access to the resources the circuit court refused to provide. For example:

- ✦ The CCA rejected Grounds VII and IX of the Rule 32 Petition (Ground III of the Petition submitted to this Court) because petitioner did not plead "any specific facts indicating that counsel suffered from an actual conflict of interest that adversely affected her performance." Tab R-73 at 27, Vol. 55. However, as petitioner had already explained to the circuit court in his funding requests and his proffer, determining the "specific facts" establishing counsel's conflict and the adverse effects on her performance required the services of an expert in the psychology of gender identity issues. *See* Vol. 48, C. 200; Vol. 51, R. 54-58; Vol. 50, C. 438. Petitioner's requests for access to those services were denied.

- ✦ The CCA rejected Ground II.E. of the Rule 32 Petition (Ground IV.B. of the Petition submitted to this Court) because petitioner "did not even identify who or what the alternative source of the bite marks was."[34] Tab R-73 at 18,

---

[34]The CCA rejected Ground II.D. of the Rule 32 Petition, which also went to the prosecution's forensic odontology evidence, because petitioner did not include what would effectively have been a comprehensive summary of the entire trial as part of the allegations supporting his claim. *See* Tab R-73 at 18, Vol. 55 ("Freeman alleged virtually no facts in his petition regarding the circumstances of the crimes, he did not allege anywhere in his petition what evidence was presented at trial by the state and the defense, and he did not state anywhere in his petition what aggravating and  circumstances were presented to the jury at the penalty phase of the trial or what circumstances were found by the trial court to exist"). This was not only exorbitant, but also

Vol. 55. As petitioner explained to the circuit court, however, he had no means of accurately identifying the alternate source of the bite marks without access to the services of an investigator to locate the individual in question, and a forensic odontologist to compare that person's dentition to the marks examined by Dr. O'Brien prior to trial. Vol. 48, C. 171-174; Vol. 51, R. 46, 48; Vol. 50, C. 427-430. The funds necessary to secure those services were denied and, as a direct result, petitioner lacked the means to ascertain the facts the CCA faulted him for failing to plead.

◆    The CCA rejected Ground II.G. of the Rule 32 Petition (Ground IV.D. of the Petition submitted to this Court) because petitioner "did not allege what type of neurological impairments he suffered from; the severity of his alleged impairments; or how the alleged impairments would have been relevant to his trial. Likewise, Freeman made only a conclusory allegation that the result his trial probably would have been different, without pleading any facts whatsoever that would tend to indicate that he was prejudiced." Tab R-73 at 23, Vol. 55. This reasoning is patently exorbitant and unfair. As they explained to the state courts repeatedly, petitioner's Rule 32 counsel were not social workers or neuropsychologists, nor were they equipped to conduct the extensive social history investigation that the case demanded from their modest offices two states away. *See* Vol. 48, C. 175-176; Vol. 51, R. 42-44; 49-53; Vol. 50, C. 431-433; 435-437. Without the requisite investigation, and without access to qualified experts, counsel had no means of ascertaining or pleading either the "type" or "severity" of the neurological impairments from which petitioner suffered or the ways in which those "impairments would have been relevant to his trial."

◆    The CCA rejected Ground II.K. of the Rule 32 Petition (Ground IV.E. of the Petition submitted to this Court) because petitioner "did not allege in his petition what 'available evidence' there was about his background or mental health history that his counsel did not present or what 'manner' he believes his counsel should have presented the unidentified evidence. Likewise, other than the conclusory allegation that but for counsel's . . ., Freeman alleged no facts tending to indicate that he was prejudiced . . . ." Tab R-73 at 25, Vol. 55. This reasoning is also exorbitant and unfair. Here again, the state courts were well aware of petitioner's inability to perform the investigation and identify the precise contours of his claim without the investigative and expert services he requested but was denied. *See* Vol. 48, C. 175-176; Vol. 51, R. 42-44; 49-53; Vol. 50, C. 431-433; 435-437.

---

unnecessary since the circuit judge had presided over the trial and was well acquainted with the evidence presented by the parties and the findings reached at that proceeding; indeed, the circuit judge issued the very order containing those findings. *See* Tab R-66, Vol. 55.

✦ The CCA rejected Ground II.L. of the Rule 32 Petition (Ground IV.F. of the Petition submitted to this Court) because petitioner did not allege "what his behavior was in prison or how he adapted to prison life" and "made only a conclusory allegation of prejudice without pleading any specific facts that would tend to indicate that evidence of his alleged 'good behavior in and adaptability to prison' would have altered the balance of aggravating and mitigating circumstances." Tab R-73 at 25, Vol. 55. As petitioner explained to the circuit court, however, his ability to specifically identify the relevant facts, distill their meaning, and present them as support for his claim depended on access to a qualified expert on risk assessment and adaptability. Vol. 48, C. 176-177; Vol. 51, R. 54; Vol. 50, C. 431-433; 437-438. As with all of his other funding requests, his effort to obtain the funds necessary to retain such an expert was rejected without explanation by the circuit court, and that rejection was upheld by the CCA.

As these examples show, the CCA's applications of Rules 32.3 and 32.6 to petitioner's ineffective assistance of counsel claims – applications undertaken without notice to petitioner or an opportunity to be heard – were neither reasonable nor fair. By endorsing and presiding over a collateral review system which refuses to provide fact development resources to those without the means to acquire them on their own, the CCA ensures that claims requiring additional facts will go undeveloped before the state circuit courts. By coupling this funding policy with an extraordinarily demanding pleading specificity requirement that frequently cannot be met absent the resources that the funding policy makes unavailable, the CCA's applications of Rules 32.3 and 32.6 place prisoners like petitioner in an impossible situation. *See NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 297 (1964) (state procedural rule could not bar federal review where state court had never applied it with the "pointless severity shown here").

It is well established that a state procedural rule is not adequate to bar federal review where the prisoner was not afforded a meaningful opportunity to comply with the rule. *See*, *e.g.*, *Ford v. Georgia*, 498 U.S. at 423-424; *Spencer*, 781 F.2d at 1470 (it is unfair to subject petitioner to

retroactive application of state rule because doing so "afford[s] him no opportunity to attempt to comply with the new provision before suffering the deprivation it imposed"). While most of the decisions applying this principle in habeas cases involve unforeseen or otherwise retroactive applications of state rules, the unfairness these decisions recognize is generated not by the simple timing of a rule's application, but by the absence of a reasonable opportunity for compliance occasioned by that timing. The CCA's decision in petitioner's case accomplished precisely the same deprivation by simultaneously upholding the circuit court's refusal to supply the resources necessary for fact development, and then purporting to bar consideration of petitioner's claims because the facts were insufficiently developed. While Rules 32.3 and 32.6 may be capable of serving legitimate and adequate purposes in many cases, their application to achieve this end in this case was exorbitant and manifestly unfair. For this additional reason, the CCA's rejection of petitioner's claims under those rules cannot serve as an adequate basis for withholding merits review in federal habeas proceedings.

3.    **Even if the CCA's applications of Rules 32.3 and 32.6(b) could qualify as adequate and independent, the circumstances and method of their application in this case constitute "cause" to overcome the resulting procedural bar.**[35]

A procedural default arising out of noncompliance with a state's procedural rules bars federal habeas review unless "the habeas petitioner can show 'cause' for the default and 'prejudice attributable thereto.'" *Harris v. Reed*, 489 U.S. 255, 262 (1989). "Because of the broad range of potential reasons for an attorney's failure to comply with a procedural rule, and the virtually limitless array of contexts in which a procedural default can occur, th[e] [Supreme] Court has not given the term 'cause' precise content." *Reed v. Ross*, 468 U.S. 1, 13 (1984). The Court has explained, however, that "cause" generally involves something "external to the petitioner, something that cannot fairly be attributed to him," such that its "'existence . . . must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (*quoting Murray v. Carrier,* 477 U.S. 478, 488 (1986)); *see also Amadeo v. Zant,* 486 U.S. 214, 222 (1988). This external factor may consist, *inter alia*, of a demonstration that "'some interference by officials' . . . made compliance impracticable." *Coleman*, 501 U.S. at 753 (*quoting Carrier,* 477 U.S. at 488).

---

[35]Because the standard for showing "prejudice" necessary to overcome a procedural default of an ineffective assistance of counsel claim is functionally identical to the "prejudice" prong of the *Strickland v. Washington*, 466 U.S. 668 (1984), standard for proving such a claim on its merits, petitioner relies upon his discussion of the merits of his claims, *infra*, for the prejudice portion of his "cause and prejudice" showing. *See, e.g.*, *Crawford v. Head*, 311 F.3d 1288, 1327 (11th Cir. 2002) (noting that "in practice the [reasonable probability of a different result and prejudice] inquiries are the same"); *Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir. 2006) (citing *Prou v. United States,* 199 F.3d 37, 49 (1st Cir. 1999)) ("*Strickler v. Greene,* 527 U.S. 263 (1999), requires a finding that if a habeas petitioner can meet the prejudice standard needed to establish ineffective assistance under *Strickland,* then the prejudice standard under the 'cause and prejudice' showing to excuse a procedural default is also met").

Such interference may take the form of official representations upon which the petitioner justifiably relies. *Strickler v. Greene*, 527 U.S. 263, 288-289 (1999) (finding "cause" for procedurally defaulted *Brady v. Maryland* claim where petitioner justifiably relied on state actors' representations that all favorable material had been disclosed).

In this case, the proceedings before the state circuit court implicate the interference and reliance considerations the Supreme Court has recognized in an unusually stark way. As discussed in detail *supra*, the circuit court's denial of the state's dismissal motion, consistent refusal to revisit the issue, and willingness to hold an evidentiary hearing prevented petitioner from complying with the view of Rules 32.3 and 32.6(b) later taken by the CCA by leading petitioner to believe he was already in compliance. Petitioner was not unaware of the rules; he was simply told by the circuit court that he was not violating them. Petitioner's reliance on this assurance from the official entity vested with the authority to make precisely that judgment fits within the Supreme Court's "objective factor external to the defense" framework at least as easily as did the petitioner's reliance on the state's representations in *Strickler*.[36] *See Roberts v. Sutton*, 217 F.3d 1337, 1340-1341 (11th Cir. 2000) (petitioner's reliance on assurance from clerk of court that record had been transmitted to state appellate court constituted "cause" for default arising from failure to actually supply record to appellate court). As a result, even if the CCA's application of Rules 32.3 and 32.6(b) could be found

---

[36]This is especially so given that, as described *supra*, the circuit court was aware – both from the judge's personal knowledge and from petitioner's other submissions during the litigation – of considerably more facts relevant to petitioner's claims than were expressly set out within the four corners of his Rule 32 petition. The difference in detail between petitioner's Rule 32 petitions submitted to the circuit court and his briefs submitted to the state appellate courts reflects this fact. The circuit judge had personal knowledge of the trial proceedings and record, and had been supplied with additional information about petitioner's claims through funding requests and a written proffer. In preparing his appellate briefs, petitioner simply combined the information that had been put before the circuit court into a single brief.

87

to be both independent and adequate, petitioner can nevertheless overcome the resulting procedural bar to merits review by this Court.

### III.  Petitioner's entitlement to consideration of additional facts supporting his ineffective assistance of counsel claims.

In his discussion of the merits of his ineffective assistance counsel claims, *infra*, petitioner relies on both the facts that were before the state courts, and additional facts obtained through investigative and expert assistance which became available only after his state court proceedings concluded.  While there is no requirement that the facts alleged to support a federal habeas claim match those presented to the state court in support of the claim item for item, respondent's submissions thus far make clear that it intends to contest the eligibility of petitioner's additional facts for presentation at an evidentiary hearing and consideration by this Court.  Petitioner will therefore identify the law governing factual supplementation and evidentiary hearings in federal habeas, and discuss the reasons why he is entitled to present and rely upon his additional facts in this proceeding.

#### A.    Exhaustion and factual supplementation.

A federal habeas petitioner's presentation of "supplemental evidence" which does not "fundamentally alter the legal claim already considered by the state courts" does not offend the exhaustion requirement.  *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *see also id.* at 257-258 (citing *Picard v. Connor*, 404 U.S. 270, 278 (1971)) ("We have never held that presentation of additional facts to the district court, pursuant to that court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts").

In this case, petitioner offers additional evidence on three areas:  the reliability of the prosecution's bite mark evidence (Grounds IV.B. and V.), the mitigating evidence that could have

been developed and presented by trial counsel (Ground IV.D & E), and the evidence of adaptability

to confinement that could have been developed and presented by trial counsel (Ground IV.F.).  As

will be clear from the discussion of the merits of these claims *infra*, none of petitioner's additional

evidence "fundamentally alter[s] the legal claim[s] already considered by the state courts." *Vasquez*,

*supra*; *see also Holland v. Jackson*, 542 U.S. 649, 653 (2004) (*per curiam*) (discussing circumstance

where evidence presented for the first time in federal court "does not support a new claim but merely

buttresses a previously rejected one"). On the contrary, with respect to each of these claims,

petitioner relied upon the same legal theory and types of facts in state court as he relies upon before

this Court.[37] To the extent there is any question about petitioner's entitlement to present and rely

_____

[37] At least one federal court of appeals has held that where a habeas petitioner's supplemental evidence falls within *Vasquez*'s parameters, his entitlement to consideration of that evidence is established and consideration of §2254(e)(2) is unnecessary.  *See Morris v. Dretke*, 413 F.3d 484, 498-499 (5th Cir. 2005).  In *Morris*, the Fifth Circuit found that, "[i]n cases where the legal question is whether the new evidence a petitioner puts forth for the first time on federal habeas on a particular claim already asserted on state habeas is exhausted under §2254(b), subparts (d) and (e) of §2254 concerning 'factual development' are not implicated."  The court went on to explain that such cases

> present[] the question whether the new evidence, not previously presented to the state courts but presented for the first time to the federal court, has met the exhaustion requirement of §2254(b)(1)(A). We do not in this case ask the question whether the petitioner has "failed to develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2).  Here, Morris, having met the §2254(b)(1)(A) exhaustion requirement on the . . . evidence presented for the first time on federal habeas, need not additionally overcome the obstacles of §2254(e)(2). Thus, because there is, and can be, no lingering concern about "factual development" in Morris's case, under Rule 8(a) of the Rules Governing Section 2254 Cases in the United States District Courts, the federal court here retains full discretion to grant Morris an evidentiary hearing.

*Id.* at 499 (internal citations omitted).  While Freeman regards this approach as sensible and faithful to the relevant statutory and decisional law, he proceeds with the §2254(e)(2) discussion below because, even if this Court chooses to apply that provision here, he is nevertheless entitled to present and rely upon his supplemental evidence.

upon his additional evidence, resolution of that question is controlled by 28 U.S.C. §2254(e)(2). *See Holland*, 542 U.S. at 652-653 (§2254(e)(2) covers presentation of new facts whether or not those facts are presented at evidentiary hearing).

**B.    Petitioner's entitlement to fact development.**

The availability of a federal evidentiary hearing is governed in the first instance by §2254(e)(2), which provides, in relevant part, that "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant" meets one of two exceptions not implicated by this case. Once a petitioner's case is determined to fall outside of §2254(e)(2), his request for an evidentiary hearing should be evaluated against the standard established in *Townsend v. Sain*, 372 U.S. 293, 312 (1963). *See Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002); *see also*, *e.g.*, *Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005); *Matheney v. Anderson*, 253 F.3d 1025 (7th Cir. 2001); *Fisher v. Lee*, 215 F.3d 438, 454 (4th Cir. 2000). Under *Townsend*, "where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew." 372 U.S. at 312. As will be set forth immediately below, and *infra* in the discussion of the merits of petitioner's ineffective assistance of counsel claims, this case falls outside of §2254(e)(2) because it is not petitioner's fault that the additional facts he presents to this Court were not developed or presented to the state courts. And as further described *infra*, the facts petitioner alleges, if proven, would entitle him to relief.

The applicability *vel non* of §2254(e)(2)'s restriction on the availability of a federal evidentiary hearing turns on whether or not the petitioner "failed to develop" the facts supporting

his claim in state court.  In (*Michael*) *Williams v. Taylor*, 529 U.S. 420  (2000), the Supreme Court unanimously held that, "[u]nder the opening clause of §2254(e)(2), a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*, 529 U.S. at 432. "Diligence for purposes of the opening clause," the Court explained, "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court;  it does not depend . . . upon whether those efforts could have been successful." *Id.* at 435.

Applying this understanding of §2254(e)(2)'s "failed to develop" clause, the Supreme Court rejected the Fourth Circuit's determination that Williams had not exhibited sufficient diligence when pursuing the factual basis of his juror misconduct claim during state habeas proceedings.  In state court, Williams' counsel, acting on "suspicions" that "'irregularities, improprieties and omissions exist[ed] with respect to the empaneling [sic] of the jury,'" moved for "funding for an investigator 'to examine all circumstances relating to the empanelment of the jury and the jury's consideration of the case.'" *Williams*, 529 U.S. at 442 .  At the state's urging, the Virginia Supreme Court denied Williams' request for funds.  *Id.*  This denial of funds, the Supreme Court determined, "depriv[ed] [Williams] of a further opportunity to investigate." *Id.*  "We do not suggest that the State has an obligation to pay for investigation of as yet undeveloped claims," the Court explained, "but if the prisoner has made a reasonable effort to discover the claims to commence or continue state proceedings, §2254(e)(2) will not bar him from developing them in federal court."[38] *Id.* at 443.

_____

[38]In reaching these conclusions, the Court was unmoved by the Fourth Circuit's determination that "state habeas counsel was not diligent because petitioner's investigator on federal habeas discovered the relationships [underlying Williams' claims] upon interviewing two jurors . . .," and then confirmed one of those relationships through public records. *Id.*  The Court gave no indication that state habeas counsel could be faulted for not locating and interviewing the jurors himself, and

Petitioner's conduct with respect to the claims now alleged as Grounds IV.B., D., E. and F. during the Rule 32 proceedings in this case easily meets the threshold for reasonable diligence established by *Williams*. As described in detail *supra*, petitioner's Rule 32 counsel were recruited to represent him *pro bono* because the State of Alabama is unwilling to supply the prisoners it intends to execute with a reasonably compensated attorney for even one round of post-conviction review. Unlike some of the other attorneys who have agreed to donate their time and expertise to assist in filling the capital representation void fostered by Alabama's policies, petitioner's volunteer lawyers were not associated with a large law firm capable of funding the retention of investigators and experts itself, or of dispatching attorneys or other staff to locate and interview far flung witnesses. On the contrary, petitioner's counsel were two members of a four- (later three-) attorney firm located in Columbia, South Carolina – approximately 370 driving miles from Montgomery, Alabama, where the offenses occurred, and 490 miles from Atmore, Alabama, where petitioner is incarcerated.

Through review of the record and the limited investigation their budget would permit, Rule 32 counsel were able to identify the issues they believed required additional development. They could not, however, cause that development to occur on their own. As relevant here, the claims alleged as Grounds IV.B., D., E., and F, and Ground V. all required consultation with and substantial assistance from experts in forensic odontology, psychology, social work and human development, and adaptability to incarceration. Moreover, Grounds IV.D. and E. required a comprehensive

---

dismissed the notion that the record as it stood during the state court proceedings contained a basis for the investigation that later yielded the facts underlying Williams' claims. *Id.*

investigation of petitioner's background, including locating and interviewing dozens of witnesses scattered across Alabama and as far away as Wisconsin.

Recognizing that investigative and expert assistance was essential to the development of the factual bases of petitioner's claims, Rule 32 counsel sought the funds necessary to secure that assistance from the state court. In April, 2002, counsel made a formal, written request for funds to hire a forensic odontologist, a neuropsychologist, a social worker, a mitigation investigator, and a risk assessment expert.[39] Vol. 48, C. 170-178. The state opposed all of these requests, and did so primarily on the ground that funds to assist indigent, death-sentenced prisoners in retaining such services were simply unavailable under state law. Vol. 51, R-38. During the May, 2002 hearing on petitioner's funding motions, counsel provided the circuit court with additional explanation of their need for the funds they had requested, including the facts that they lived and worked many travel hours away from the areas where investigation was necessary, that funding for such extraordinary travel would have to come directly from counsel's own pockets, and that counsel themselves were not experts in, *inter alia*, odontology, psychology, social work, or adaptability to incarceration. Vol. 51, R. 47-53. The circuit court summarily denied every one of petitioner's requests for funds. As in *Williams*, this "depriv[ed] petitioner of a further opportunity to investigate." 529 U.S. at 442.

That petitioner's ability to develop the facts supporting his claims depended upon access to qualified investigative and expert assistance is confirmed by the evidence such assistance has yielded during these federal proceedings. With regard to Grounds IV.B., IV.F., and V., the raw material

---

[39]Unlike in cases such as *Hall v. Head*, 310 F.3d 683 (11th Cir. 2002), *Crawford v. Head*, 311 F.3d 1288 (11th Cir. 2002), and *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005), petitioner lodged his requests for fact development resources with the circuit court well in advance of the evidentiary hearing. Indeed, petitioner's three written funding motions were filed in April, May and July, 2002, and the evidentiary hearing was held in June 2003.

underlying petitioner's challenges to the prosecution's bite mark evidence and to counsel's failure to present evidence of adaptability to incarceration were present in the state court record. What was neither present nor accessible during the state court proceedings, however, was the expert review and analysis essential to converting that raw material into actionable evidence of a constitutional violation. The expert assistance to which petitioner gained access in these federal proceedings – and only that assistance – facilitated the development of the additional evidence described below in the discussions of Ground IV.B., IV.F., and V.

Access to investigative and expert assistance was equally critical to the development of the additional evidence supporting Grounds IV.D. and E. While Rule 32 counsel did have the institutional records admitted at trial, expert evaluation and investigative assistance made available since the state court proceedings concluded have revealed that those records tell only a fraction of the story. When the previously available records were reviewed by experienced experts in psychology and social work, those experts identified features and patterns that were not reasonably evident to the untrained eyes of petitioner's Rule 32 counsel. Through further consultation with these experts, habeas counsel were able for the first time both to identify key factors and themes that form the basis of the mitigation case trial counsel should have presented, and to formulate an investigation plan designed to develop that evidence.

The investigation that ensued from counsel's consultation with the experts was likewise made possible only through access to resources that were unavailable in the state courts. Whereas Rule 32 counsel operated on a shoestring budget from an office hundreds of miles away, habeas counsel were able to utilize the services of a trained and experienced mitigation investigator and social worker based in Alabama, and were equipped with investigative tools, local knowledge and

proximity to witnesses and other sources of information that Rule 32 counsel did not possess. Moreover, even with these advantages, the investigation necessary to develop the relevant facts has thus far consumed more than 500 hours, and involved dozens of witness interviews in a nearly equal number of locations in and out of Alabama, some of which required tracking subjects through address changes and/or repeated efforts to locate and actually speak with persons of interest.

Rule 32 counsel simply could not have undertaken these tasks without benefit of the expert assistance that has guided the recent investigation, without the experience, knowledge and tools available to petitioner's current investigative team, and without a base of operations in or much nearer to Alabama. To hold that these circumstances gave rise to a "fail[ure] to develop" the facts within the meaning of §2254(e)(2) would be to effectively replace the "reasonable effort" standard set by *Williams*, 529 U.S. at 443, with something much closer to an "extraordinary measures" requirement. Such a shift would not only be devoid of support in the statutory language and relevant case law, it would also be particularly ironic and unfair in a case, like this one, from Alabama – a state which continues to stand alone in refusing both meaningful appointment of counsel and basic litigation resources. Holding a habeas petitioner to the sort of extraordinary burden that would be required in order to find a "fail[ure] to develop" in this case would reward the state for maintaining a system rigged to facilitate procedural denials of constitutional claims by unreasonably demanding more from volunteer counsel than they can or should be asked to give. While §2254(e)(2), like *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8 (1992), upon which it is based, does seek to "channel[] the resolution of claims into the" state courts, neither the statute nor its decisional forebear suggest that an indigent prisoner should be penalized when the state refuses even the minimal tools necessary to fact development. *See Williams*, 529 U.S. at 437 ("[C]omity is not served by saying a prisoner 'has

95

failed to develop the factual basis of a claim' where he was unable to develop his claim in state court despite diligent effort").

IV.    **The merits of petitioner's allegations of ineffective assistance of trial counsel.**

In the sections that follow, petitioner will discuss the merits of his ineffective assistance of counsel claims. The discussion of each claim will also include a summary of its procedural history, its eligibility for fact development in, and merits review by, this Court, and its status with respect to §2254(d)'s limitation on the availability of habeas relief.

Before examining the claims in detail, it is important to note two points that apply to the claims as a group. First, the Sixth Amendment violations they allege are subject to the two-part standard established in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), under which "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citing *Strickland*). Counsel's performance falls below *Strickland*'s "objective standard of reasonableness" if it is outside the "wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690. "[T]o establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694).

Second, when assessing counsel's conduct, and more particularly the impact of that conduct on the reliability of the trial verdicts, counsel's deficiencies must be considered cumulatively, not item-by-item. *See*, *e.g.*, *Strickland*, 466 U.S. at 695 ("In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or

jury"); *Williams*, 529 U.S. at 397 (when assessing prejudice, reviewing court must consider "the totality of the mitigation evidence – both that adduced at trial, and the evidence adduced in the [post-conviction] proceedings"); *Martin v. Grosshans*, 424 F.3d 588, 590-592 (7th Cir. 2005) ("even if [trial counsel's] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense"); *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) (granting relief on basis of cumulative impact of multiple errors by counsel); *Lindstadt v. Keane*, 239 F.3d 191, 205 (2nd Cir. 2001) (granting relief where petitioner was prejudiced by "cumulative effect of four errors" committed by trial counsel).[40]

### GROUND IV.B. – PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY TRIAL COUNSEL'S FAILURE TO CHALLENGE THE PROSECUTION'S FORENSIC ODONTOLOGY EVIDENCE.

### A.     Procedural background.

Before the state courts, petitioner contended that trial counsel were ineffective for failing to develop and present available challenges to the prosecution's forensic odontology evidence. *See* Tab R-57, Vol. 49 (Ground II-D); Tab R-60 at 23-27, Vol. 53; Tab R-64 at 36-49, Vol. 54. Petitioner

---

[40]That prejudice must be assessed cumulatively, rather than item-by-item, is further reinforced by *Kyles v. Whitley*, 514 U.S. 419 (1995), in which the Supreme Court held that proper application of the *Strickland* "reasonable probability" prejudice standard requires an assessment of the cumulative effect of errors with the potential to impact the outcome. *Kyles*, 514 U.S. at 436 ("suppressed evidence [must be] considered collectively, not item by item"); *see also Strickler v. Greene*, 527 U.S. 263, 289-290 (1999). While *Kyles* and *Strickler* both involved application of the *Brady v. Maryland*, 373 U.S. 83 (1963), rule mandating disclosure of favorable, material evidence to the accused, the standard used to measure "materiality" in the *Brady* context is identical to the standard used to measure "prejudice" in the *Strickland* context. In fact, this standard was imported into the *Brady* doctrine directly from *Strickland* in *United States v. Bagley*, 473 U.S. 667, 682 (1985). Therefore, the Court's statements about "materiality" in the *Brady* context apply equally to "prejudice" in the *Strickland* context. *See, e.g.*, *Martin v. Cain*, 246 F.3d 471, 477 (5th Cir. 2001) (internal citation omitted) ("*Brady*'s 'materiality standard 'is identical to' the prejudice standard [petitioner] had to satisfy to prevail on his ineffective assistance claim").

also sought funds necessary to secure the services of an expert in forensic odontology capable of reviewing the evidence and reaching conclusions about the reliability and accuracy of the state's expert's testimony. Vol. 48, C. 171-172; C. 199-200; *see also* Vol. 49, C. 399-400; Vol. 50, C. 401. The circuit court summarily denied petitioner's request for expert assistance, and subsequently denied relief on the ground that petitioner had not proven the merits of his claim.  Vol. 50, C. 466. On appeal, petitioner challenged the circuit court's denial of relief on the merits, and its refusal to authorize necessary expert assistance. Tab R-60 at 23-27, Vol. 53.  The CCA found the deficient-performance portion of petitioner's claim to have been sufficiently pled, but did not purport to adjudicate that issue. Tab R-73 at 17-18, Vol. 55. Instead, the court went on to find that the allegations of prejudice contained in the Rule 32 petition submitted to the circuit court were insufficiently specific,[41] and rejected the claim on procedural grounds.  Tab R-73, Vol. 55.  For the reasons discussed *supra* at 61-88,  the CCA's specificity ruling with regard to the prejudice portion

---

[41]The CCA's ruling with regard to the prejudice component of this claim illustrates the inadequacy of the specificity requirement as a basis for precluding federal review. As the CCA acknowledged, petitioner *did* allege that the prosecution's testimony was "prejudicial because it 'provided a basis' for the jury to find that Freeman was guilty of burglary and to find the presence of the heinous, atrocious, or cruel aggravating circumstance." Tab R-73, Vol. 55. This should have been sufficient.  The CCA, however, demanded far more, faulting petitoner for failing to include a summary of the entire trial record as part of the allegations supporting his claim.  *See* Tab R-73, Vol. 55 ("Freeman alleged virtually no facts in his petition regarding the circumstances of the crimes, he did not allege anywhere in his petition what evidence was presented at trial by the state and the defense, and he did not state anywhere in his petition what aggravating and  circumstances were presented to the jury at the penalty phase of the trial or what circumstances were found by the trial court to exist").  The trial record was familiar to the Rule 32 judge, who also presided over the trial. That same record was also before, and available to, the appellate court. The CCA's announcement and application of such a demanding pleading standard to reject Ground IV.B. cannot bar merits review by this Court. *See*, *e.g.*, *NAACP v. Alabama ex rel. Flowers*, 377 U.S. at 297 (state procedural rule cannot bar federal review when it is applied with"pointless severity"); *Ford v. Georgia*, 498 U.S. at 424-425 (procedural requirement announced after prisoner's opportunity to comply had ended could not serve as procedural bar to federal review).

of this claim lacks both the independence from federal law and adequacy necessary to serve as a valid procedural bar this Court's review.

### B.    Relevant legal principles and discussion.

Under the Sixth Amendment, trial counsel has an obligation to conduct an investigation, which includes identifying evidence favorable to the defendant's case and preparing to rebut the State's evidence. *See Rompilla*, 545 U.S. at 386 n.5 ("Counsel's obligation to rebut aggravating evidence extended beyond arguing it ought to be kept out"); *Wiggins*, 539 U.S. at 524 ("The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor'"); ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(D)(7) (1989) (instructing that counsel should secure expert assistance where necessary for "*rebuttal of any portion of the prosecution's case* at the guilt/innocence phase or the sentencing phase of the trial") (emphasis added).  By failing to raise available challenges to the state's forensic odontology evidence, which the jury received as uncontested proof that petitioner had bite marks on his arm from one of the victims, trial counsel's performance fell below prevailing professional norms, and prejudiced the defense.

At trial, the state's expert, Dr. O'Brien, testified to the following: that he saw petitioner on March 12, 1988, Vol. 20, R. 442; that petitioner had human bite marks on his arm that were no more than one or two days old, Vol. 20, R. 443; that the bite marks were identifiable as being of a type ordinarily made in offensive or defensive circumstances, Vol. 20, R. 445; and that he compared the bite marks on petitioner's arm to models made from petitioner and the two victims, and the marks "compared exactly to the models of Sylvia Gordon," Vol. 20, R. 449.  As to his qualifications, Dr.

O'Brien testified that he received his dental degree in 1983, Vol. 20, R. 436; that he completed forensic pathology training at the Armed Forces Institute of Pathology, Vol. 20, R. 437; that he had been in private practice as a dentist for ten years, Vol. 20, R. 437-438; that he was a member of the American Society of Forensic Odontology, Vol. 20, R. 439; and that he had written several articles on bite marks, Vol. 20, R. 440.  Trial counsel did not object to any aspect of Dr. O'Brien's testimony, and presented no evidence to rebut any of his claims.  The few questions counsel posed during cross-examination were limited to establishing that petitioner was cooperative on the day the bite marks were photographed.  Vol. 20, R. 451.

In the current proceedings, petitioner obtained the assistance of an expert in forensic odontology that he sought in the state courts.  The expert with whom counsel have now consulted has been a dentist for 30 years, was trained in forensic dentistry at the Armed Forces Institute of Pathology in 1982, and has been certified by the American Board of Forensic Odontology since 1987.  This expert and others like him were available and should have been consulted by petitioner's trial counsel.

Had trial counsel consulted with a qualified expert, they would have been able to establish that Dr. O'Brien substantially overreached in the claims he made for the prosecution.  First, whereas Dr. O'Brien assured jurors that the marks on petitioner's arm "compared exactly" to the models of Sylvia Gordon's teeth, a qualified expert would have acknowledged that those marks could not have been said to match Sylvia Gordon's teeth to a "reasonable degree of scientific certainty."  The marks contained too little evidence from which to reach a conclusion about who made them.[42]  A defense

_____

[42]As explained by a qualified expert, the bite marks left on petitioner's arm only displayed three tooth marks — two upper teeth and one lower tooth.  With so few marks, a specific individual cannot be identified from this evidence.

expert would have further explained that the marks photographed on petitioner's arm were poorly suited for use in a comparison with dental molds, and that because of their low quality, the marks would be useful only to *exclude* possible sources, not to *identify* a particular individual as the source of a mark. In fact, a qualified expert would not have been able to exclude *any* of the three models created – petitioner, Sylvia or Mary Gordon – based on a comparison between the models and the marks.[43]

Second, a qualified expert would have rebutted Dr. O'Brien's testimony regarding the age of the marks. While a forensic odontologist can visually inspect wounds, it is impossible to precisely conclude when they were made without analyzing the histology of the skin. Even indulging the dubious assumption that Dr. O'Brien was qualified to perform such an analysis, it would have been impossible because petitioner is alive. Thus, Dr. O'Brien's claims about the age of the marks he examined were, at best, speculative.

Third, a qualified expert would have debunked Dr. O'Brien's assertions that the locations and configurations of the marks indicated that they were made in offensive or defensive circumstances. Vol. 20, R. 445. In fact, there was no way for Dr. O'Brien or anyone else to know for certain whether the marks were offensive or defensive. A defense expert could also have clarified that exceptions exist to the general assumptions about bite mark sourcing, and that if a

---

[43] Although based on the evidence, it was theoretically possible to include petitioner as a source of the bite mark, based on the location and orientation of the marks an expert would almost certainly have conceded that it would have been improbable for petitioner to have created the marks using his own teeth.

101

possible alternate source were identified, it would be reasonable to conclude that the marks could have been made by that alternate source.[44]

Finally, a qualified expert would have exposed the weakness of Dr. O'Brien's credentials. His membership in the American Society of Forensic Odontology does not require actual qualifications; the organization accepts anyone interested in forensic odontology. His membership in the American Academy of Forensic Science requires only that he is a dentist, has completed one formal course, and is involved with an associated agency. Notably, Dr. O'Brien was *not* a member of the American Board of Forensic Odontology, which, unlike the affiliations he touted at trial, requires actual case experience in dental and bite-mark analysis, and also requires that its members pass a two-day board examination and continually recertify. In contrast to Dr. O'Brien, the expert retained for these proceedings has served on the board of directors of the ABFO and has been a diplomate since 1987.

Trial counsel's failure to consult with or present testimony from a qualified forensic odontologist was constitutionally deficient. Trial counsel had been associated with the case for approximately eight years by the time Dr. O'Brien testified in the re-trial, and was on notice that the prosecution possessed and intended to use forensic odontology evidence. As described above, this knowledge obligated counsel to investigate and make reasonable efforts to rebut the state's case. Like trial counsel in *Rompilla*, who argued residual doubt while failing to challenge aggravating evidence related to a prior offense, 545 U.S. at 386, petitioner's counsel did nothing to prepare a

---

[44] Petitioner's past submissions to the state courts and this Court have noted the existence of a possible alternate source for the bite marks photographed on his arm. Unfortunately, investigation made possible by access to resources the state courts refused to provide has revealed that the alternate source's dentition has deteriorated to such a degree that the comparison necessary to establish him as a person who could have made the marks on petitioner's arm is now impossible.

challenge to the bite-mark evidence, which had an easily foreseeable impact on jury issues such as whether the offenses were heinous, atrocious or cruel.  "Without making efforts to learn the details and rebut the relevance of the [state's evidence], a convincing argument . . . was certainly beyond any hope."  *Id.*

Counsel's failure to prepare or raise any challenge to the prosecution's vulnerable bite-mark evidence was prejudicial.  With the help of a qualified expert, counsel could have thrown into question the qualifications of Dr. O'Brien as an expert witness and the admissibility of his testimony.  Even if the trial court nevertheless permitted the prosecution to call Dr. O'Brien and elicit his opinions, defense counsel would have been armed and ready to challenge him through both cross-examination and the testimony of their own, genuinely qualified expert.

Had counsel attacked the bite mark evidence as they could have, there is a reasonable probability that the result of the trial would have been different.  The state argued in its opening that petitioner had "bite marks that Sylvia left on him as she was fighting for her life . . . ." Vol. 23, R. 1164.  It ostensibly proved this assertion through Dr. O'Brien's unchallenged testimony.  At the sentencing phase, the state relied on its guilt-innocence phase evidence to support the aggravating factors that the homicides were committed in connection with a burglary, rape, or robbery, and argued to the jury that there is "another aggravating circumstance that also just screams out from the evidence that you have heard, that these killings were especially heinous, atrocious, and cruel." Vol. 24, R. 1273-1274.  The primal image of a young girl biting her attacker as she was "fighting for her life" necessarily played a meaningful role in the jury's determination whether aggravating factors existed and whether their weight justified a sentence of death.  Effectively challenging the prosecution's bite mark evidence would, at the very least, have neutralized its impact and, in so

doing, would have deprived the state of the primal image upon which it capitalized. Counsel's failure to make this challenge – particularly when viewed, as it must be, in light of counsel's other deficiencies[45] – undermines confidence in petitioner's sentences and requires that the writ be granted.

## C.    Section 2254(d) does not apply to this Ground.

Section 2254(d)'s limitation on habeas relief does not apply to this ineffective assistance of counsel claim. While the CCA expressly found that the deficient performance portion of the claim was not procedurally defective, it did not go on to discuss or resolve the merits of that issue. Instead, as courts considering ineffective assistance of counsel claims often do,[46] the CCA simply pressed on to the question of prejudice, and found that the relevant allegations in the Rule 32 petition were insufficiently specific to satisfy the requirements of Rules 32.3 and 32.6(b). Because the court did not adjudicate the merits, section 2254(d) is, by its own terms, inapplicable. *See* §2254(d) ("An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . ."); *Wiggins*, 539 U.S. at 534 ("our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the *Strickland* analysis"); *Rompilla*, 545 U.S. at 390 (citing *Wiggins*) ("Because the state courts found the representation

---

[45]*Wiggins*, 539 U.S. at 534 ("In assessing prejudice, [the court should] reweigh the evidence in aggravation against the totality of available mitigating evidence"); *Williams*, 529 U.S. at 397 (*Strickland* prejudice analysis requires evaluation of "the totality of the omitted evidence"); *Strickland*, 466 U.S. at 695 ("a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury").

[46]*See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed").

adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*") (internal citation omitted). As a result, this Court is free to grant the writ on the basis of petitioner's satisfaction of §2254(a).

**D.     Petitioner is entitled to an evidentiary hearing on Ground IV.B.**

The rules governing the availability of federal evidentiary hearings, and petitioner's efforts to secure the expert assistance necessary to the proper development and presentation of this claim, are discussed in detail *supra* at 88-96. This Court has already determined that petitioner was diligent in his efforts to develop the evidence supporting this claim. *See Freeman v. Allen*, 2:06cv-122-MHT-VPM, Order (Oct. 19, 2006) (finding that petitioner used diligence in seeking expert assistance to review the forensic evidence such that discovery of that evidence was not precluded by §2254(e)(2)). This finding, and the facts and state court procedural history on which it was based, establish that §2254(e)(2)'s restrictions on the availability of federal evidentiary hearings do not apply. Additionally, because the facts petitioner has alleged, if proven, would require a grant of relief from his death sentence, he is entitled to an evidentiary hearing before this Court.

**GROUND IV.C. – PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL, IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, BY TRIAL COUNSEL'S DECISION TO DEPOSE DR. GUY RENFRO, A CLINICAL PSYCHOLOGIST WHO REFUTED FREEMAN'S MENTAL STATE DEFENSE.**

**A.     Relevant facts and procedural background.**

**1.     The deposition and trial.**

Dr. Guy Renfro, a clinical psychologist, was appointed by the Montgomery Circuit Court to evaluate petitioner's competency to stand trial and his mental state at the time of the offense. Vol. 35, C. 3464. In early September of 1995, approximately nine months prior to trial, Dr. Renfro issued

a forensic evaluation of petitioner based on his four meetings with petitioner between July and September of 1995.  *See* Vol. 35, C. 3464.  Renfro provided his evaluation to the trial court and to both parties.

Therein, Renfro found petitioner competent to stand trial.  Vol. 35, C. 3471.  He diagnosed petitioner as suffering from Borderline Personality Disorder and attributed petitioner's mental state at the time of the offense to this disorder.  Vol. 35, C. 3468-3471.  He also concluded that at the time of the charged offenses petitioner "was capable of discerning right from wrong and could appreciate the wrongfulness of acts such as that with which he is charged."  Vol. 35, C. 3472.  Renfro determined that the information he reviewed indicated this "rather strongly."  Vol. 35, C. 3473.

Despite the fact that Renfro's report concluded that petitioner was not suffering from a mental disease or defect at the time of the crimes, *see* Vol. 35, C. 3471,[47] defense counsel chose to depose Renfro prior to trial.  In a pretrial conference on October 12, 1995, Howell reported that the defense did not intend to depose any of the State's witnesses, including Dr. Renfro:  "Dr. Renfro. We have both gotten the report.  I don't see any need to depose him, because he is accessible to talk to by phone, and I have talked to him by phone."  Vol. 52, R. 32.  However, upon learning that Dr. Renfro would be on vacation out of state at the time scheduled for trial, defense counsel affirmatively asked "alternatively for a continuance or for the deposition."  Vol. 42, R. 993.

In a videotaped deposition, Renfro reiterated the findings in his report.  *See* Vol. 36, C. 3633 *et seq*.  He reiterated his diagnosis that petitioner suffered from Borderline Personality Disorder. Vol. 36, C. 3648.  He reiterated his opinion that petitioner was competent to stand trial.  Vol. 36, C.

---

[47] Shortly after receiving and reading Dr. Renfro's report, lead defense counsel, Allen Howell sent a copy to co-counsel John Norris.  In the accompanying cover letter, Howell stated simply: "Enclosed is a copy of Dr. Renfro's report.  It does not look good for us."

3729. He reiterated his "conclusion that while [petitioner] was very angry and very emotional" there was no indication that petitioner did not understand that his conduct would be wrong or criminal or that he would have had trouble conforming his behavior.  Vol. 36, C. 3730; *see* Vol. 36, C. 3741-3744; 3755 (finding no indication that petitioner "suffered from a mental disorder or illness that would have prevented him from appreciating or that lacked substantial capacity to appreciate the criminality of this conduct to the requirements of the law").  Renfro also reiterated that there was no evidence petitioner suffered from delusional thinking or hallucination or experienced a "brief reactive psychosis" at the time of the crime.  Vol. 36, C. 3735; C. 3761.  Renfro emphasized that petitioner likely experienced anger, but not uncontrollable anger, upon feeling rejected by Sylvia Gordon, and acted on that anger.  Vol. 36, C. 3671-3672; 3693.  At the end of the deposition, the State moved to introduce Dr. Renfro's report and the defense objected, arguing "it's improper to admit his report since he has yet to deny any part of it that I'm aware of, and it's not needed to impeach him."  Vol. 36, C. 3772.

After deposing Renfro, counsel realized, too late, that Renfro's testimony was harmful to petitioner's case and attempted unsuccessfully to prohibit the prosecution from introducing the deposition at trial.  *See* Vol. 42, R. 991-98.  The defense filed a motion in limine asking the court to rule on the defense objections to the State's deposition cross-examination of Dr. Renfro.  As the motion pointed out, defense counsel's "objections [we]re mostly, if not all, objections to the form of the question, and ha[d] to do with the State's failure to lay a proper predicate for questions from Dr. Renfro."  Vol. 24, C. 1207-1208.  At trial, defense counsel, choosing not to offer the deposition, reiterated their objections to the State's cross-examination and attempted to explain their position:

> Of course, we had his report at that time [of the deposition], but we weren't exactly sure what he was going to say. After finding out what he was going to say and getting Your Honor's ruling earlier this week [denying the in limine motion] . . . it was our unanimous agreement to do what I have just said, which was not to offer his deposition. And if the State chooses to offer it, that's fine, but we withdraw our questions, and we renew all our objections we just stated to the State's questions.

Vol. 42, R.994. The trial court overruled defense counsel's objections and admitted the deposition of Renfro (who was, as anticipated, unavailable during the trial) in its entirety. Vol. 42, R. 998. Defense counsel objected that "requiring the defendant to examine a witness that he chooses not to examine would violate his due process rights and state and federal constitutions. And we do not consent to playing, and object to playing –." At that point defense counsel was cut off by the jury entering the courtroom. Vol. 42, R. 998. The videotaped deposition was then played for the jury as part of the State's rebuttal case. Vol. 42, R. 1000.

## 2.    The post-conviction proceedings.

In his Rule 32 proceedings, petitioner claimed that trial counsel were ineffective for deposing Dr. Renfro despite having known that Renfro's conclusions were harmful to the defense.[48] Denying the claim, the circuit court held that "[t]he record clearly indicates that trial counsel did not, and indeed, could not know what Renfro's exact testimony would be until he was deposed." Tab R-72 at 19, Vol. 55. "Moreover," the court stated, "Freeman fails to cite in his petition or argue at his

---

[48] Petitioner's Rule 32 petition alleged:

> Trial counsel deposed Dr. Guy Renfro despite knowledge that his conclusions were harmful to petitioner's defense. As a result of trial counsel's decision to take Dr. Renfro's deposition, the prosecution was supplied with useful evidence against petitioner, which it subsequently introduced at petitioner's trial. But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different.

Vol. 19, C. 298-299.

evidentiary hearing what specific testimony in Renfro's deposition caused him to be prejudiced." *Id.* at 19-20. Therefore, the Rule 32 court held, petitioner "failed to meet his burden of proving" that trial counsel's taking of Renfro's deposition met the *Strickland* standard for deficient performance or prejudice. *Id.* at 20.

On appeal, the CCA did not address the merits of the claim, but held:

> Freeman failed to even identify in his petition who Dr. Guy Renfro was, and, as the circuit court correctly found in its order, failed to plead any facts regarding what conclusions Dr. Renfro had that were harmful to Freeman or what evidence Dr. Renfro developed that was used by the State. Clearly then, Freeman failed to satisfy his burden of pleading with respect to this allegation of ineffective assistance of trial counsel, and it was properly denied by the circuit court.

Tab R-73 at 24, Vol. 55. As discussed *supra*, the CCA's ruling lacks both the independence from federal law and the adequacy necessary to serve as a valid procedural bar to review by this Court. Petitioner is therefore entitled to merits review.

**B.    Ineffective assistance of counsel.**

**1.    Deficient performance.**

To establish ineffective assistance of counsel, a defendant must first demonstrate that his attorney's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. Objective review of counsel's performance must measure "reasonableness under prevailing professional norms," and must take into account "counsel's perspective at the time." *Id.* at 688. 689. According to the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (2003), which the United States Supreme Court recognizes as the prevailing professional norms for counsel in capital cases, *see Wiggins*, 539 U.S. at 524, it is defense counsel's duty to formulate a coherent defense theory, and accordingly qualification standards for attorneys

109

should insure that appointed capital defense counsel "have demonstrated[] . . . skill in the investigation, preparation, and presentation of evidence bearing upon mental status." Guidelines 5.1, 10.10.1 (reprinted in 31 Hofstra L. Rev. 913 (2003).[49]  In assessing the reasonableness of counsel's performance:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness.

*Strickland*, 466 U.S. at 690-91.

Trial counsel's sole theory of defense was that as a result of mental disease or defect petitioner lacked the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.  In the opening statement, defense counsel Abell argued that the murder of Sylvia and Mary Gordon was a tragedy for which "my client, David Freeman, is not responsible."  Counsel argued that petitioner was not legally responsible for his action because "[w]hat David Freeman was suffering from was a borderline personality disorder."  Vol. 40, R. 417. Counsel then turned the blame on the State of Alabama and its failed foster care – and particularly, failed psychiatric care – of petitioner.  Vol. 40, R. 418-422.  Counsel asked the jury to "put the responsibility where it belongs," on the State.  Vol. 40, R. 422.  "[B]ecause of this mental defect," Abell urged, petitioner "was unable to conform his conduct, and was, therefore, not responsible for this act."  Vol. 40, R. 423.

---

[49] The new ABA Guidelines are substantively the same as those promulgated in 1989, which were in effect at the time of petitioner's 1996 trial.  *See Rompilla*, 125 S. Ct. at 2465-66.

The crux of the defense was the testimony of clinical psychologist and professor of psychology at Auburn University, Barry Burkhart. Vol. 41, R. 711 *et seq.*[50] Dr. Burkhart was formerly a supervisor of the Psychological Assessment Program at the Diagnostic and Evaluation Center at the Lee County Development Center, a long-term treatment and detention facility for adolescents, where he examined petitioner as a teenager. Vol. 41, R. 714-15; R. 718. Based on four more recent meetings with petitioner, a test battery, records of previous evaluations, police reports regarding the charged offenses and petitioner's statement to law enforcement, and his own clinical judgment, Vol. 41, R. 721; R726, Burkhart diagnosed petitioner as suffering from major depressive disorder and schizotypal personality disorder. Vol. 41, R. 732; 734-735. Burkhart agreed that petitioner could also suffer from borderline personality disorder. Vol. 41, R. 738. But he concluded that on the day of Sylvia and Mary Gordon's death, "it is very likely that [David] was experiencing a brief reactive psychosis, and that the stress of being abandoned, of being rejected, caused him to be unable to conform his conduct to the requirements of the law." Vol. 41, R. 769. Burkhart was

---

[50]The defense called two witnesses in addition to Dr. Burkhart, each of whom had interacted with petitioner as a social case worker while petitioner was growing up in foster care. Marvin Hartley, formerly a caseworker with the Alabama Department of Youth Services (Vol. 41, R. 704-705), testified that David was a loner, occasionally angry (he punched a hole in a wall and got into one or two fights), who craved attention and was "starving for love." Vol. 41, R. 706. "At the time," Hartley said, "the Department of Youth Services was not equipped to meet those needs." *Id.* Yvonne Copeland, a social worker formerly assigned to foster care with the Talladega County Department of Human Resources, Vol. 42, R. 915-916, 931, explained that David's father, who suffered from and was hospitalized for mental illness, and his mother, who was mentally retarded, could not care for David. See Vol. 42, R. 940-944. She recounted petitioner's history of frequently changing foster care placements in private homes and group homes, long-term residential treatment facilities, Vol. 42, R. 920-931, 964, and the difficulty with finding a home that could cope with David's behavioral needs, Vol. 42, R. 934, 937-983. The defense also read into the record the prior testimony of Anita Hussey, Vol. R710, which was unrelated to his mental incapacity defense.

111

thus the only witness presented by defense counsel who came anywhere close to supporting the mental state defense.[51]

Deposing Dr. Renfro, whose report concluded that at the time of the charged offenses petitioner "was capable of discerning right from wrong and could appreciate the wrongfulness of acts such as that with which he is charged," Vol. 35, C. 3472, directly contradicted defense counsel's opening statement, Dr. Burkhart's testimony, and the mental state defense that counsel had chosen to pursue. It contradicted Dr. Burkhart's determination that petitioner had a history of psychotic episodes and was likely experiencing brief reactive psychosis at the time of the crimes. *See* Vol. 41, R. 769 (Burkhart testimony).

It is deficient performance for defense counsel to elicit evidence that disproves their own case. *See Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000). In *Combs*, a defendant raised an intoxication defense to charges of capital murder, arguing that he was too intoxicated from alcohol and drugs to form the requisite intent to kill. 205 F.3d at 273. Combs's defense counsel called several witnesses who had seen the defendant taking drugs and alcohol before the crime. *Id*. And the defense called a clinical psychologist "to establish that [the defendant] could not act purposely and intentionally because of his diminished capacity." *Id*. at 288. The expert did testify that the defendant was intoxicated. On cross-examination, however, the expert also testified – directly contrary to the defense theory – that the defendant (though intoxicated) acted intentionally in committing the murders. *Id*. ("Q. So he may have been under the influence or your opinion based on what you were told he was under the influence but at the same time he was acting intentionally and purposely when he acted as he did on July 15th, is that correct? A. I certainly believe that he

---

[51]As discussed *infra*, however, Burkhart's testimony was equivocal at best, and was comprehensively undermined by the prosecution on cross-examination.

was, yes"). In the post-conviction hearing, Combs's trial counsel noted that the expert's testimony regarding intent "surprised" him. *Id*. at 288.

The Sixth Circuit found trial counsel's decision to call the expert witness objectively unreasonable. The court suggested that defense counsel should have known of the doctor's opinion before calling him to testify. *Id*. at 288. Expressing some disbelief that Combs's counsel were not aware of the expert's "opinion on this ultimate issue," the court held that "[r]egardless of whether Combs's counsel should have known or instead actually knew [the expert's] opinion regarding Combs's intent . . . counsel's decision to put him on the stand was objectively unreasonable." *Id*. The court explained:

> [Defense counsel] testified that the defense presented [the expert witness] in order to establish that Combs could not have been acting purposefully. [The expert's] testimony directly contradicted the sole defense theory that Combs lacked the requisite intent to commit murder. Although defense counsel presented substantial testimonial evidence that Combs was in fact intoxicated at the time of the shootings, this testimony was rendered worthless when the defense's own expert testified that Combs's intoxication did not legally excuse his crime. Furthermore, not only did [the expert's] testimony destroy any hope of a successful intoxication defense, but it also helped the prosecution to establish one of the elements of its case in chief. Quite simply, this testimony was completely devastating to the defense, and counsel's decision to present it was objectively unreasonable.

*Id*. The same is true here. The videotape of Renfro's deposition was devastating to petitioner's defense, directly contradicting the sole defense theory on the "ultimate issue" in the guilt-innocence trial – whether petitioner lacked the requisite intent to commit murder.

Before deposing Renfro, Howell had received Renfro's report and had read it. Indeed, his initial reaction to Renfro's report was that it was harmful to the defense, as he stated in a cover letter with which he sent the report to co-counsel, and as reflected in his initial determination not to depose

Renfro. Howell thus must have known that Renfro's conclusion that petitioner suffered from no mental disease or defect at the time of the crime ran directly contrary to the chosen defense.

At trial, Howell attempted to explain why he had deposed Renfro: "Of course, we had his report at that time [when we ordered the deposition], but we weren't exactly sure what he was going to say." Vol. 42, R. 994. Howell also suggested that the defense decided not to offer Renfro's deposition after the court denied the defense's challenges to the form of some of the state's deposition questions. But neither of these explanations is objectively reasonable.[52] Adjustment to the form of several of the state's questions during the deposition would hardly have remedied the fact that Renfro's conclusions directly undercut the insanity defense. Thus, the court's denial of the in limine motion ought not to have had any impact on the determination of whether to offer the deposition as evidence. Moreover, by the time of trial, the damage was already done: Howell could not have reasonably believed that he could keep Renfro's deposition from the jury by simply deciding not to present it at trial. Howell's determination to depose Dr. Renfro was as good as calling him to the stand.

The other attempted explanation offered by Howell, that "we weren't exactly sure what [Renfro] was going to say," is also objectively unreasonable, and, based on the record, hard to accept as true. Renfro's report stated his conclusions straightforwardly. And Renfro's deposition testimony simply mirrored the report – as Howell appreciated when, at the conclusion of the deposition, he objected to admitting Renfro's report as an exhibit because "he has yet to deny any part of it that I'm aware of." Vol. 36, C. 3772. But "[r]egardless of whether [defense] counsel should have known or

---

[52]Howell's final effort to exclude the deposition was to argue that "requiring the defendant to examine a witness that he chooses not to examine would violate his due process rights and state and federal constitutions," Vol. 42, R. 998. But Howell himself chose to examine the witness.

instead actually knew [the expert's] opinion regarding [] intent . . . counsel's decision to put him on the stand was objectively unreasonable." *Combs*, 205 F.3d at 288. Calling a witness to testify, in deposition or in court, because counsel does not know what the witness is going to say "violates the cardinal rule of examination-if defense counsel did not know what [the witness] would say, he should not have asked." *Chatmon v. United States*, 801 A.2d 92, 109 (D.C. 2002); *cf. Leka v. Portuondo*, 257 F.3d 89, 103 (2d Cir. 2001) (recognizing, in context of suppressed-evidence claim, that "to call a witness cold . . . would be suicidal"). Counsel's decision to depose Renfro simply because he did not know "exactly" what Renfro was going to say was unreasonably risky where the witness had already offered a report reaching a conclusion directly contrary to what the defense sought to prove.[53] A defendant charged with a crime, and particularly a capital offense, ought to expect that his lawyer's questions will not help the State prove its case. Counsel's performance fell below an objective standard of reasonableness.

## 2.    Prejudice.

To show prejudice under *Strickland*, one must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 446 U.S. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." Id. at 694; *see Smith v. Mullin*, 379 F.3d 919, 929 (10th Cir. 2004) (a "reasonable probability is "less

---

[53] f Howell's motivation for conducting the deposition was merely to establish that borderline personality disorder could explain why petitioner reacted impulsively and with anger when Sylvia rejected him, *see* Vol. 36, C. 3671-3672 (On direct: "Q. Could, in your opinion, a profound change in affect and/or behavior in response to an announced rejection by a person that the patient perceives to be a lover or a very close person cause the patient to react in an instinctive and uncontrollable way? A. I'm not sure I would go with instinctive and uncontrollable, but they certainly would lead to a change in behavior, a change in thinking, a change in the way they're showing their emotions. But I'm not sure I would go so far as to say uncontrollable"), he could have established the same with Dr. Burkhart. *See* Vol. 41, R. 738.

that a preponderance of the evidence"). In assessing prejudice, defense counsel's cumulative performance is considered with the totality of the evidence. *Strickland*, 446 U.S. at 695.

In *Combs*, the Sixth Circuit found prejudice established under *Strickland*, even though defense counsel presented "significant evidence" in support of its intoxication defense, because counsel made the "most devastating" error of presenting expert witness testimony that the defendant "although intoxicated, nevertheless acted with purpose and intent" – expert witness testimony that directly contradicted the defense. *Id*. at 289-90; *see Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("[A] single, serious error may support a claim of ineffective assistance of counsel"); *see also Rompilla*, 545 U.S. at 383. This "provided the State with its most powerful evidence," without which its case would have been "much weaker." *Combs*, 205 F.3d at 290.

That is so here. While the State offered in rebuttal additional mental state testimony from Dr. Dixon, a clinical and forensic psychologist (who summarized the results of psychiatric examinations conducted of petitioner in 1989 at Taylor Hardin Secure Medical Facility, each of which concluded that petitioner was not suffering from a mental disease or defect at the time of the crime, *see* Vol. 43, R. 1010 *et seq*.; R. 1062-1070), the impact of Renfro's videotaped deposition on the jury was unique. It must have appeared to jurors, viewing a deposition conducted by defense counsel in which counsel and the prosecution elicited testimony directly at odds with petitioner's mental state defense, that there was indeed no legitimate mental state defense. Jurors viewing the deposition presented by the prosecution must have realized that the defense had expected Renfro to support its position, thus giving greater credence to the state expert conclusions recounted in Dixon's testimony and less to Burkhart's. Further, the video deposition tainted the jury's view of the competency and credibility of petitioner's counsel, which in turn tainted the jury's view, at both the

116

guilt-innocence and sentencing phases, of the testimony of Burkhart. This rendered the jury less disposed to draw inferences in favor of the defense at either phase of the trial. Counsel's misguided decision to depose Renfro must be assessed in conjunction with counsel's other missteps. But for counsel's deficient performance, there is a reasonable probability that the outcome of petitioner's trial would have been different.

### C.        Section 2254(d) does not bar relief on this Ground.

The last state court to address this claim purported to resolve it on procedural grounds. Tab R-73 at 24, Vol. 55. This, by definition, precludes application of §2254(d). *See* §2254(d) ("An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . ."); *Davis v. Crosby*, 341 F.3d 1310, 1313 (11th Cir. 2003) (*per curiam*) ("As the Florida courts failed to resolve the merits of Davis's claim, the present controversy falls outside of §2254(d)(1)'s requirement that we defer to state court decisions . . .") (footnote omitted); *Lenz v. Washington*, 444 F.3d 295, 302 (4th Cir. 2006) ("Because there is no state court judgment on the merits, we review *de novo*"); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (§2254(d)'s limitation on relief inapplicable where, although state trial court resolved merits, state appellate court erroneously relied on state procedural default rule to deny relief). Because the CCA failed to adjudicate the merits, and because that court's purported procedural basis for rejecting the claim cannot serve as a valid procedural bar to federal review, *see supra* at 61-88, petitioner is entitled to merits review, and to habeas relief upon satisfaction of §2254(a).

GROUNDS IV. D. & E. – PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WAS VIOLATED BY TRIAL COUNSEL'S FAILURE TO INVESTIGATE, DEVELOP, AND PRESENT EVIDENCE OF PETITIONER'S BACKGROUND AND MENTAL HEALTH PROBLEMS, INCLUDING NEUROLOGICAL IMPAIRMENTS, IN A MANNER THAT WOULD HAVE ALLOWED THE JURY TO GIVE THAT EVIDENCE MITIGATING EFFECT[54]

### A.    Introduction.

In this section of his brief, petitioner will first set forth the procedural background of his claims and demonstrate why merits review by this Court is proper and necessary. He will then summarize the factual information presented by counsel at trial, and contrast that limited view of his background with the more extensive information developed in these proceedings. Finally, petitioner will explain how trial counsel's performance fell below prevailing professional norms, and how this substandard performance resulted in prejudice requiring habeas relief from his death sentences.

### B.    Procedural background.

Petitioner presented the claims addressed here to the Alabama state courts during his Rule 32 proceedings. *See* Tab R-57, Vol. 49; Tab R-60 at 39-45, Vol. 53; Tab R-64. As noted above, although Freeman was granted an evidentiary hearing on his Rule 32 petition, the circuit court summarily denied all funds necessary to investigate, prepare or present the facts supporting his claims, leaving petitioner unable to do more than submit a written proffer about what he could have done with adequate resources. Vol. 49, C. 396-400; Vol. 50, C. 401-411 (describing, *inter alia*, work that needed to be performed by a neuropsychologist, a mitigation investigator, and a social worker). In an order written by counsel for respondent, the circuit court denied this claim on the merits, finding that petitioner "failed to meet his burden of proving trial counsel's alleged failure to

---

[54]Because they rely upon a common core of facts and legal principles, the merits of Grounds IV.D. and IV.E. are discussed together.

investigate and present mitigating evidence was the result of deficient performance or caused him to be prejudiced as required by *Strickland*."  Vol. 50, C. 466; *see also* Tab R-72 at 21, Vol. 55.

Petitioner appealed the trial court's denial of relief to the CCA, raising arguments functionally identical to those that would later be included in the petition submitted to this Court. *See* Tab R-60 at 39, Vol. 53.  ("The circuit court erred in denying relief on the petitioner's claims that trial counsel were ineffective for failing to investigate, develop and present evidence of petitioner's background and mental health problems in a manner that would have allowed the jury to give it mitigating effect").  Directing his appellate arguments to the stated basis of the circuit court's ruling, petitioner asserted that "[t]he absence of an evidentiary presentation on these points . . . is attributable solely to the circuit court's summary rejection of petitioner's requests for necessary expert and investigative assistance." Tab R-60 at 39, Vol. 53  (citing Vol. 48, C. 170-178; C. 198-200; Vol. 49, C. 201-202; Vol. 48, C. 31; Vol. 48, C. 248).  Additionally, although he was limited in what he could in good faith present without having the benefit of investigative and expert assistance, petitioner nevertheless provided the state appellate court with a description of how those services would have contributed to his showing:

> While the circuit court denied petitioner the funds necessary to establish the particulars of what the defense case could have been in the hands of effective counsel, it is clear that with the documentation of petitioner's life that was available to them at trial, and with the assistance of a mitigation investigator, a social worker and a neuropsychologist, trial counsel could have provided the jury with substantial evidence mitigating against a death sentence. ¶ Among other things, these experts could have identified and explained the adverse neurological and developmental effects wrought by the absence of nurturing petitioner experienced, and described ways in which these effects manifested themselves in petitioner's behavior.

Tab R-60 at 43, Vol. 53.

119

Petitioner further contended that counsel's omissions not only deprived him of a "more sympathetic portrait of his character and more favorable findings on the existence of mitigating factors," but "left the defense unable to counter the prosecution's use of his background against him." Tab R-60 at 44, Vol. 53. As petitioner explained to the state court, "[w]ith the assistance of appropriate experts, trial counsel could have effectively rebutted the prosecution's assertions by presenting lay and/or expert testimony explaining how [petitioner's] early life experiences shaped him into the young man he was at the time of the offense." Tab R-60 at 44, Vol. 53; *see also* Tab R-60 at 41, Vol. 53 (noting that trial counsel focused exclusively and in vain "on the ill-conceived effort to establish that petitioner was not guilty by reason of mental disease or defect").

As discussed *supra*, the CCA rejected this claim via a *sua sponte* determination that petitioner should not have been granted a hearing because "none of his allegations were pleaded with sufficient specificity to satisfy the requirements in Rule 32.2 and Rule 32.6(b)." Tab R-73 at 15, Vol. 55. The state appellate court faulted petitioner for not alleging detailed information about his background and mental health, *see* Tab R-73 at 24-25, Vol. 55, and for failing to "allege what type of neurological impairments he suffered from; the severity of his alleged impairments; or how the alleged impairments would have been relevant to his trial." Tab R-73 at 23, Vol. 55; *see also* Tab R-73 at 25, Vol. 55 ("Freeman alleged no facts tending to indicate that he was prejudiced by counsel's preparation for and conducting of the penalty phase of his trial"). Of course, as petitioner had made clear throughout the Rule 32 proceedings, the information demanded by the CCA was precisely the information that was not reasonably available to him without the resources he repeatedly sought but was summarily denied. The CCA neither acknowledged nor addressed this paradox.

Respondent's Initial Brief takes two positions regarding the alleged procedural default of petitioner's challenges to trial counsel's mishandling of their mitigation responsibilities. First, respondent argues that petitioner's claim "is procedurally defaulted from this court's review because it was dismissed under an independent and adequate state rule." Tab R-61 at 15, Vol. 53 (citing the CCA's invocation of Rules 32.3 and 32.6(b)). Second, respondent contends that petitioner's claim is procedurally defaulted because he did not afford the state courts a full and fair opportunity to decide it. Tab R-61 at 16, Vol. 53. In support, respondent explains that the current claim presented to this Court "spans four pages and contains specific allegations regarding [his] background and mental health" (including allegations that trial "counsel should have hired a mitigation investigator, social worker, and neuropsychologist") for which there was "no parallel in the Rule 32 petition." *Id.* Respondent also suggests, that petitioner has presented a claim in his federal petition that rests on "a different legal theory or new factual claim with respect to an issue raised in state court." *Id.* at 17. None of these are correct.

Petitioner has not fundamentally altered his legal claim in the petition submitted to this Court. *See Vasquez, supra*. In fact, the language of the claim in federal court is nearly identical to the language of the claim presented on appeal in the state post-conviction proceedings. Tab R-60 at 39, Vol. 53 ("[T]rial counsel were ineffective for failing to investigate, develop and present evidence of petitioner's background and mental health problems in a manner that would have allowed the jury to give it mitigating effect."); *see also* Tab R-60 at 32, Vol. 53 ("[T]rial counsel were ineffective for failing to investigate, develop and present evidence that petitioner suffers from neurological impairments"). Nor do the additional facts set forth below, which were not reasonably available to Freeman in state court, fundamentally alter the claim. Rather, as noted *supra*, these facts

121

were developed – and could only have been developed – using expert and investigative services that the state courts refused to provide. And, contrary to respondent's allegations, petitioner did in fact seek expert and investigative assistance not only in his Rule 32 petition, but throughout the Rule 32 proceedings. *See* Vol. 49, C. 316 (Fourth Amended Petition asks the court to "provide petitioner, who is indigent, with funds sufficient to secure expert and investigative assistance necessary for the development and presentation of evidence in support of his allegations"); Vol. 49, C. 63-67 (Petitioner's Motion for a More Definite Statement, which indicates he will be able to plead more facts once funds are granted); Vol. 48, C. 174-176 (Motion for funds for a social worker, a mitigation specialist, and a neuropsychologist); Vol. 51, R. 42-44, 49-53 (petitioner's oral argument on motion for funds for a social worker, a mitigation specialist, and a neuropsychologist). Additionally, as previously explained, petitioner, as an indigent petitioner with out-of-state *pro bono* counsel, had no way to investigate or hire the professionals necessary to develop the facts.

As established *supra* at 61-96, respondent's procedural bar theory cannot be sustained, its fair presentation theory is simply wrong, and §2254(e)(2) imposes no barrier to consideration of petitioner's supplementary evidence because he is not at fault for the lack of factual development in the state courts. This Court may properly determine whether counsel's performance resulted in ineffective assistance of counsel. Had trial counsel performed a competent pre-trial investigation, they would have been able to present a more accurate and far more mitigating account of petitioner's background. With such information, and experts to interpret and describe it, counsel could have discovered that the records they moved into evidence *en masse* were, by turns, inaccurate, inadequate, and incomplete. As detailed below, the investigation conducted for these proceedings

122

has revealed the background that should have been presented at petitioner's trial. Trial counsel's failure to develop and present this information was both deficient and prejudicial.

### C.    Mitigation information.

#### 1.    Trial counsel's presentation.

Petitioner's trial attorneys conducted only a limited investigation into his background. This investigation yielded a single sentencing phase witness, Alexander Moore, whose four pages of testimony were delivered by telephone, and functioned only to lay the foundation for the admission of a few photographs, and to inform the jury that petitioner was "normal. *See* Vol. 44, R. 1279-1283. As noted below, Moore actually had a far more critical and damaging influence on petitioner's development than his trial testimony suggested.

While counsel also relied on their guilt/innocence phase evidence at the penalty phase, the weaknesses in that evidence were never overcome. The testimony of counsel's flagship witness, Dr. Burkhart, was painstakingly exposed by the prosecution as poorly informed, unsubstantiated, and incapable of adequately explaining certain facially damaging features of petitioner's background as reflected in social services records.[55] *See generally* Vol. 42, R. 884-903. Talladega County DPS social worker Yvonne Price Copeland, who also testified for the defense, was similarly uninformed. Although petitioner, then a child, had been part of her assigned case load, she worked approximately four hours away from the facility where he was housed, and had only minimal contact with him. *See* Vol. 42, R. 916, 929. Counsel's other witness, Alabama Department of Youth Services (DYS) counselor Marvin Hartley, likewise did little to further petitioner's cause during his three pages of

---

[55]Petitioner's current experts have indicated that they could not have reached their conclusions without having been informed of facts not contained in the records that Dr. Burkhart reviewed.

testimony. *See* Vol. 41, R. 704-707 (relating that young David Freeman was withdrawn, susceptible to outbursts when he did not get his way, and craved love and attention, and that DYS was not equipped to meet his needs).

Such was the case for a life sentence provided to the jury by trial counsel. As described below, there was far more to the story.

## 2.    The facts a competent investigation would have revealed.[56]

A child has no power to choose the family into which he is born. On July 10, 1969, in Talladega, Alabama, David Freeman was born into a family with a history of mental illness, mental retardation, sexual abuse, incest, and poverty. His mother, Blondie Williams Freeman, was thirty-eight years old at the time of his birth, mentally retarded, and notorious for her promiscuity, conspicuously poor hygiene, and complete lack of basic parenting ability. His father, Edward Freeman, was fifty-three years at the time of his birth, mentally ill and lacking the education and skills to provide for his family or himself. Young David's stint with his two biological forebears was the first of at least *thirty* different placements through which he would pass as a child.

David's father, Edward, was the third of five children. When Edward was around eight years old, a nervous breakdown by his mother led the state to remove her five children and place them in five separate homes. While Edward was regarded as a nice young boy, something occurred during his military service that seemed to change him forever.[57] Edward was eventually diagnosed with

---

[56] The information set forth in this section has been developed through witness interviews conducted by a trained investigator and planned with the assistance of experts who had reviewed the record and interviewed petitioner. Citations to the existing court record refer to documents that corroborate, contradict or otherwise relate to facts revealed by this investigation.

[57] He would say odd things, such as, "If I went into a field and laid down, how long do you think I would lay there until something came and ate me?" At that time, military trauma was often untreated and frequently had a large impact on the veteran and his family.

schizophrenia, and his relationship with young David was thereafter characterized by a series of brief reunions and abandonments.

To those who knew or had made the acquaintance of David's mother, Blondie, she was remarkable, and memorable, for her low intellectual functioning, filth and odor.[58] Blondie was also known to be comfortable in household conditions that others regarded as unbearable. Her house lacked indoor plumbing, and the air was fetid and swarming with flies. The walls had holes and were so caked with grime that they looked as if they had been painted black. The floor was as dirty as the ground outside. Instead of glasses, the inhabitants used tins cans. In short, it was "an unfit place for anyone to stay because of [Blondie's] poor housekeeping habits." Vol. 29, C. 2289.

Before David was born, Blondie already had at least five living children, four fathered by Edward. Four other children were stillborn, and another died later. David was thus the fifth surviving child born to Blondie and Edward. The oldest, Linda, was born in October of 1961; Edward Jr. ("Eddie") was born two years later, in December 1963; Michael ("Mike") was born in 1966; and Sarah in 1967. Blondie's other living child, Christina, was born in 1951, the product of an incestuous union between Blondie and her brother. Christina, like her mother, was mentally retarded.

Blondie's inability to care for herself was matched by her inability to care for her children.[59] Edward tried to make up for his wife's deficits, but was incapable of doing any better. For example, although Sarah was allergic to milk, Edward continued to give it to her, which made her sick. After

---

[58]*See* Vol. 29, C. 2289 (David's mother described as having a "very limited" mental capacity); Vol. 28, C. 2167 (described as mentally retarded); Vol. 35, C. 3572 (same); Vol. 29, C. 2289 ("Her person is filthy").

[59]For example, when Linda had the measles, Blondie allowed her to run around in the rain. *See also* Vol. 29, C. 2290 (reporting that she was not "able to care for the children").

years of witnessing his wife's incompetence with their children, and prior to David's birth, Edward

finally realized that Blondie was simply unfit.  The Alabama Department of Pensions and Security

("DPS") became involved in assisting with care for the children.[60]  When Sarah was an infant,

Brenda Patricia Elliott ("Pat"), Edward's daughter from another woman, took in Linda, Eddie, Mike,

and Sarah for a while.  Pat recognized that neither Blondie nor Edward were able to care for their

own.

 While Pat was helping with the four children, she suspected that Edward was molesting the

oldest daughter, Linda.  Pat learned that Edward would tell his children to go outside and play, but

he would keep Linda inside and lie in bed with her.  Edward would tell the other children that he and

Linda were watching television, but this did not make sense because Edward would not let the other

children watch television.[61]  Pat informed social workers about her suspicions and expressed her

discomfort in bringing the children to see Edward.  The social workers told Pat that Edward had legal

visitation rights.  Since Pat was obligated to allow Edward legal visitation, she determined that the

best course of action would be to allow the state to place the other children for adoption so Edward

would not be permitted to see them.  Pat adopted Sarah, but Mike, Eddie, and Linda were sent

elsewhere.

 From the minute young David was born, he was surrounded by chaos and instability.[62]  A

social worker who visited the home when David was four months old described the house as "quite

---

[60]Edward filed a petition with the state indicating that his wife could not feed and clean the children. Vol. 29, C. 2294. When DPS became involved with the Freeman family, DPS records note that the Blondie and her family had been known to the agency since August 1935.  Vol. 29, C. 2273.

[61]Pat knew from her own mother that when Edward had tried to molest her as a child.

[62] One week before David was born, Edward was released from jail after being held for five weeks on a charge of "decoying a child."  Tr. C. 2290-2291.  According to Edward, the arrest occurred because he had gone to Pat's house and tried to retrieve his children.  Tr. C. 2292.

filthy. The floors definitely needed cleaning. When [David] dropped his pacifier, Mrs. Freeman simply picked it up and stuck it back in his mouth." Vol. 29, C. 2295. When David was six months old, his father went to DPS to discuss plans for removing David from the home because his mother could not take care of him. He realized that "he and his wife can't care for *any* of the children as they should." Vol. 29, C. 2298 (emphasis added). Edward explained that his wife "just doesn't have the ability to care for him. She doesn't keep him dry or clean. She loves him but just doesn't know how to keep house or bring up children." *Id.* The following month, before David had been removed, Edward returned to DPS and explained that his wife had left home with Christina, her mentally retarded daughter, and David. *Id.* Within a short time, DPS obtained an order to remove him from his mother's care.

On March 16, 1970, several DPS workers went to the home where Blondie and David were staying. Tr. C. 2299. When Blondie realized that the workers were there to take David away, she started "screaming and cursing" and told the workers that they "could not get her baby." *Id.* The workers left and returned with two police officers. Vol. 32, C. 3000. They had "quite a time in getting the baby because she was so belligerent." *Id.* David was "calm until his mother screamed and hollered in his ears and upset him." *Id.* In the end, the workers succeeded in taking baby David from his mother. He was eight months old, and he never saw his mother again.

David was placed temporarily with Pat and then with his paternal aunt. At the time he was taken from Blondie, David was "so dirty that he had a vile odor. He had sores in his head and his body showed evidence that he had not been near a tub of water in quite a long time." *Id.* When his aunt bathed him, he screamed the entire time because he was not accustomed to the water. The

Freeman children were all so dirty that their aunt had a policy of requiring them to hose off before they set foot in her house.

David's aunt was elderly and unable to provide long-term care for him, and he was sent to a boarding home after two months. David, then ten months old, was joined at the boarding home by a new younger brother, Jimmy Terry, for whom Blondie and Edward had also been unable to provide basic care. The brothers spent ten months in one boarding home, followed by two years in foster care with another family. At the age of three years and six months, David briefly returned to live with Edward and his new wife. Edward, however, was too ill to care for the children, and after three months David and Jimmy Terry were sent to another boarding home. One month later, shortly after he turned four, David was sent to another foster family, the Stephens – his sixth placement in the just over three years since he had been taken from his mother.

The Stephens kept David approximately one year, during which he received "a lot of attention" and experienced "the period of his greatest accomplishment." Vol. 28, C. 2169; Vol. 29, C. 2333. Mrs. Stephens recalls that when David first arrived, he was dressed in a girl's coat and shoes, and he had long hair. She said David was a good child. Mrs. Stephens had a biological son who was approximately thirteen years older than David. Her son remembers David spending Halloween at their house. Mrs. Stephens had bought David a mask with a rubber band to wear as a costume; David was so excited that he kept putting it on and taking it off. When Mrs. Stephens told David to put up the mask so he did not break it, he reacted by breaking out in tears, as though he had been scolded for doing something terrible.

The placement with the Stephens ended when David, five years old, was transferred to the custody of Edna and Thomas Smith, who claimed they wanted to adopt him. Edna Smith was

128

David's older step-sister. She and her husband lived in Ft. Leonard Wood, Missouri. Mr. Smith was a twenty-year military man, who had attained the rank of staff sergeant. Vol. 29, C. 2337. Mrs. Smith was a housewife, a part-time jewelry saleswoman, and a self-described "international policewoman." Vol. 35, C. 3504. The Smiths took in David, younger brother Jimmy Terry, and older sister Linda.

From the age of five until he was almost age eight, David lived with the Smiths, where he suffered physical, emotional, and sexual abuse. Both adults beat the children. Mrs. Smith used a belt or a switch to beat them when they did not listen, and Mr. Smith beat them in the face with his fist. Mr. Smith was known to hit hard enough to knock the children, including David, literally off their feet. The children often had bruises on their faces from the beatings. Mr. Smith accompanied the physical abuse with threats, telling the children that he would make their lives worse than they already were.

Mr. Smith, who drank regularly, was rageful and unpredictable. One day he would allow the children to do something; the next day, he would beat them for the same behavior. He argued with and degraded his wife, calling her a "stupid bitch," complaining about the food she cooked. Sometimes he was so upset that he threw plates into the sink. The Smiths could be heard screaming at each other in their bedroom; the screaming would cease after a loud bang.

In addition to beating them, the Smiths punished the children by starving them. When this occurred, David sometimes slipped downstairs to sneak food for himself and his brother. On one occasion, he managed to return with a can of raw biscuits, which he ate uncooked. On another occasion, Mr. Smith caught the children taking food out of the neighbor's refrigerator and beat them. Afterward, Mr. Smith ordered them to remain in their room until the next day. Neither adult checked

129

on them or fed them. The children were allowed out of their room only to use the bathroom. Thirsty, David resorted to drinking from the toilet like a dog.

During his time with the Smiths, even David's young siblings noticed that he acted different from other children. In one instance, when David was seven or eight, a snake crawled up his pant leg while he was playing on a pile of logs. Whereas most children would call for someone to help them, David "freaked out," screaming. On another occasion, David could not be persuaded that he was incapable of flying on his "Evil Knievel" bicycle. He rode the bicycle down a ramp, off a hill, and crashed. Insisting to Jimmy Terry that he must have done something wrong, David tried once more, and crashed again. David then became upset with Jimmy Terry because he thought his brother was hiding the correct instructions. David was convinced he could fly because "they" told him that he could.

David had trouble sleeping and had nightmares during this time. Having a bad dream, he would scream, cry, and gasp for breath, as he called out for his brother or Mrs. Smith. Upon waking, he would continue to cry and shake. David told Jimmy Terry that something was going to get him. David did not always remember having the nightmares until two or three days after they occurred.

As a result of his unusual behavior, at age seven David was referred to Rolla Regional Center for the Developmentally Disabled. Vol. 35, C. 3503. Mrs. Smith reported that David was "throwing tantrums, getting on the floor, crawling around," talking "like a baby," lying, and stealing. Vol. 35, C. 3503. David's stealing and lying generally related to food, as he would "steal food both at school and at home, saying he did not have enough to eat." Vol. 35, C. 3507. When confronted, he would lie about taking the food. Vol. 35, C. 3508. Mrs. Smith also reported that David had both nightly and daily urine accidents. *Id.* David's school added an allegation of neglect because David "wore

the same pair of pants two days in a row, the first having been soiled." Tr. C. 3506. At school, older children "knock[ed] [David] around." Vol. 35, C. 3509. David was not a fighter, and he "responded to aggression from others by withdrawing [and] crying." *Id.* The Rolla Regional Center did not diagnose him.

Back at the Smiths', the children typically played outside everyday until dark. When David was around six or seven, Mr. Smith started calling him into the house without the other children. At that same time, Jimmy Terry noticed David clinging to his bottom in pain after coming out of the house. Jimmy Terry was upset because he thought David was receiving ice cream from Mr. Smith. Being a curious child, Jimmy Terry decided to peek in the window one day, thinking he would find David enjoying some ice cream. Instead, he saw David performing oral sex on Mr. Smith. After a while, Mr. Smith began calling Jimmy Terry into the house and forcing him to perform oral sex. This only happened to Jimmy Terry for approximately two weeks until he finally told Mrs. Smith. As soon as she was told, Mrs. Smith took the children in the middle of the night and brought them back to Alabama. Thus ended David's seventh placement in as many years.

In Alabama, the state shuffled David around to several places for approximately a year. In October 1977, when David was eight, he was examined by Dr. Kline with the Cheaha Mental Health Center. Dr. Kline, the first person to diagnose David, determined that he had "Adjustment Reaction." Vol. 36, C. 3607. Dr. Kline further indicated that David "has found that stubbornness and exaggerated behavior gets him what he wants." *Id.* The evaluation did not include any history about the physical, sexual, or emotional abuse that he suffered at the Smith home.

After several different placements, David finally ended up at St. Mary's Home when he was nine years old. St. Mary's was a Catholic residential home for children located in Mobile, Alabama.

131

Sister Mary Lawrence was the administrator. Alexander Moore (later the only defense witness at the penalty phase of David's capital trial) was the main caretaker for the boys. Mr. Moore had no formal education, and had come to St. Mary's after a series of short stays at various Catholic organizations in positions interacting with young boys throughout the country. At St. Mary's, he functioned as a "house dad." He was in charge of making sure the boys were fed, clothed, and behaved. Instead of acting as a provider and protector, however, Mr. Moore was sexually abusing the boys, including David.

While under the "care" of Mr. Moore, David complained to another St. Mary's worker, Ms. Packer, that he was experiencing pain in his bottom. When Ms. Packer examined him, she noticed that his buttocks were red, and that he was bleeding from his rectum. Ms. Packer took him to the doctor, who told her that David had been sexually abused. Like many children who have been abused, David denied it when confronted. Ms. Packer nevertheless reported the abuse to the administration at St. Mary's. To her knowledge, nothing was done to protect David.[63]

Ms. Packer's knowledge of Mr. Moore's sexually abusive conduct was not confined to her experience with David.[64] Ms. Packer had seen boys climb onto Mr. Moore's lap and rub on his genitalia, and she had seen Mr. Moore become aroused by this behavior. When Mr. Moore tried to discipline the boys, they would respond by saying things such as, "I'm going to tell Sister Mary Lawrence that you came to my bed last night." Ms. Packer reported her concerns about Mr. Moore's behavior to Sister Mary Lawrence, who in turn confronted Mr. Moore about the accusation. Mr.

---

[63]In addition to going to the doctor for a bloody rectum, David exhibited other signs that he had been sexually abused while at St. Mary's Home. David not only had enuresis, but he also had trouble controlling his bladder during the day. Jimmy Terry further recalls that David defecated in the stairwell at St. Mary's Home.

[64]According to Ms. Packer, it was also known that some of the boys in the home were sexually abusing others.

Moore denied it, and Sister Mary Lawrence took his word and failed to report Ms. Packer's concerns to any other person, including DPS or the social workers.

David visited Jimmy Terry, who had been adopted by the Vances while David was still at St. Mary's, on several occasions. David wanted to leave with Jimmy Terry because he was scared. According to Jimmy Terry, most people did not understand David. David did a lot of normal things so he seemed normal. But even his younger brother knew that David was not like other children. As a young boy, David would panic and become completely disoriented by situations that would not have affected most children so severely, particularly when the situation related to his parents. For example, when David and Jimmy Terry learned that one of their foster parents, Mr. Jeffcoat, had passed away, David seemed fine all day, but later began crying, shaking, and telling his brother that their father died. When Jimmy Terry tried to explain that it was not their real father who had died, David did not believe it and persisted in sobbing uncontrollably and gasping for breath. In another instance, David saw a woman at church and became convinced that she was his real mother. He was very upset and could not be dissuaded from his belief that this random woman was, in fact, his real mother. Vol. 30 C. 2492

While he was at St. Mary's, Ms. Packer recalls that David, if accepted, could behave. David went for weekend visits to foster homes, and often came back bruised. Many people did not know how to handle David and did not want to have him at their house. Ms. Packer took David home with her on several weekends when he had nowhere else to stay.

During his four years at St. Mary's, David struggled in school and went from Catholic schools to public schools. He was very slow and often required extended repetition of concepts or information before he could acquire a basic understanding. One of David's special education

133

teachers recalled that David did not have any friends and was not popular. He was embarrassed because he did not have any family, he was not loved, and he knew it. As a result, David lacked the ability to be close to other people, even though he desired it.[65] The teacher occasionally brought David to her home during the weekend. Although her son was around David's age, he could not relate to David because David was too immature.

One of the social workers who saw David during his years at St. Mary's described him as the single child most abused by the system. According to this social worker, David had been mishandled from the beginning, which left his emotional growth stunted, and put him "on the receiving end of the bullying" when he was placed with older children. Vol. 31, C. 2610. The social worker attempted to help David assemble his life story, but this was nearly impossible because David could not remember anything about his past and had no family pictures. The staff at St. Mary's was not educated or trained in handling children such as David, and he received no therapy there. The good intentions of some members of the staff were not enough for David, whose depression, sexual abuse, and trauma left him handicapped, impulsive, explosive, memory impaired, and struggling with poor concentration and a possible eating disorder.

When David was ten years old, Mrs. Stephens' son learned that he was living in Mobile at St. Mary's. He remembered David from when David lived with his family for nearly a year at age four. He would visit David in Mobile, and David would come to the Stephens' house for visits. One time while David was visiting Mr. Stephens, David took some money to buy cigarettes. Mr. Stephens decided to give David the option of smoking a cigarette or getting a spanking; David chose the latter. When Mr. Stephens went into the bedroom to spank him, David went completely out of

---

[65]The teacher added that David took pride in being clean.

134

control.  He was screaming, yelling, flipping around the bed, and crying hysterically.  David told Mr. Stephens that he hated him and that he wanted Mr. Stephens to take him back to St. Mary's.  Mr. Stephens let David settle down and fall asleep.  Later that evening, when Mr. Stephens came back to David's bedroom to tuck him into bed, Mr. Stephens mentioned the incident and told David that he was sorry that David hated him.  David asked Mr. Stephens what he was talking about, as he did not remember saying that or anything else about the incident.

Despite David's problems, Mr. Stephens wanted to adopt him.  When he broached this possibility with a DPS social worker, he was told that it was not a good idea and was instructed to slowly cut off contact with David.  Believing that DPS knew what was best for David, Mr. Stephens eventually did cut off contact and, in doing so, added to the series of abandonments that largely defined David's youth.

David endured the abuse at St. Mary's Home until he was thirteen, when he was once again transferred.  David was ostensibly expelled from St. Mary's because he allegedly threatened Ms. Packer with a knife when she confronted him about taking food from the kitchen.  As Ms. Packer recalls, however, David picked up a butter knife, but never brandished it as though he was planning to attack her, and never caused her to fear for her safety.  In fact, Ms. Packer thought this event was not even significant enough to report.  The boys who witnessed it, however, told Mr. Moore.  Ms. Packer was never questioned by the group home administrator or anyone from DPS about this incident.  Shortly thereafter, David was discharged from St. Mary's.

After leaving St. Mary's, David once again found himself shuffled from placement to placement.  He was sent first to Lee County Youth Development Center in Opelika, Alabama, for a few months, then to Coosa Valley Regional Attention Home in Anniston, Alabama, for a few

months.  When he was almost fourteen years old, David was "permanently" placed in the Gateway School in Birmingham, Alabama.  The Gateway school was an open residential treatment facility in a campus setting.  Within his first six months at Gateway, David was "pushed down the stairs by another resident."  Vol. 35, C. 3583.

During his stay at Gateway, David saw social worker David Kilmer. According to Mr. Kilmer, David was very immature. When he played with boys his own age, David played more like an eight- or nine-year-old, not a fourteen- or fifteen-year-old.  David also had problems beyond the normal scope of Mr. Kilmer's patients, and did not fit into a single category.  Techniques that worked with other children did not work for David.  For example, David had episodes in which he disconnected more than any other child.  Neither Mr. Kilmer nor anyone else was able to reach him when he was having an episode.  Mr. Kilmer stated that David had issues that were very difficult, if not impossible, to detect.  Like other staff members in David's prior placements, Mr. Kilmer was not a skilled therapist for a troubled youth in desperate need of psychiatric care for trauma and depression.  Instead, the profound neglect that began early in David's life continued through his multiple placements, impacting his development and behavior.

When David was almost fifteen, he attempted suicide and was transferred from Gateway to Children's Hospital of Alabama.[66]  He spent a week or so there before he was returned to Gateway, where he remained for another year until his commitment, at age fifteen, to the Adolescent

---

[66]In May 1984, when David was fourteen years and ten months, he threatened to jump off a building at Gateway.  For two weeks prior to this incident, he had been taking Tofranil, an antidepressant medication.  Vol. 36, C. 3619.  He remained on Tofranil for only three months. Vol. 33, C. 3047.  Even though he was prescribed an antidepressant to "moderate pessimism and irritability," *id.*, and despite noting that "his results are not inconsistent with major depressive episodes," he was diagnosed with "adjustment disorder with disturbance of emotion and conduct." Vol. 35, C. 3527.  This doctor noted when diagnosing David that he had "been generally well, without serious illness or trauma." Vol. 36, C. 3619.

Adjustment Center at the Alabama Department of Mental Health in Eufala, Alabama. He remained

there for one year, and then was placed in the Dothan (Alabama) Diversion Center.  From the time

he was sixteen until he turned eighteen, after being charged with criminal mischief and burglary,[67]

David was committed to the Department of Youth Services Diagnostic and Examination Center and

spent time in Bell Road Group Home, Mount Meigs, Roebuck Children's Home, and a work release

program.

      While David was in the Bell Road Group Home, and just before his seventeenth birthday,

he was allowed to spend the Fourth of July weekend with Mr. Dailey, a volunteer at the group home,

and Mr. Dailey's family.  Over the weekend, David met a girl named Dawn, who was also a foster

child at Mr. Dailey's house.  Dawn had just turned eighteen and was starting her senior year of high

school in the fall.  Upon meeting, Dawn and David liked each other and started seeing each other

whenever they got the chance.  They dated during Dawn's entire senior year of high school, and

although they were only able to see each other during group home outings, they managed to find time

to be alone, and had sex when possible.

      David told Dawn that he loved her; at the time, Dawn loved David as well.  He was very

attentive to her needs.  They shared intimacies, and, because of their similar backgrounds with foster

care, they could relate with one another.  They depended on one another and needed each other.

Dawn was physically and emotionally attracted to David.  She could see in him the loneliness and

abandonment that she felt.  She knew that David wanted to feel loved.  He would ask her questions,

---

[67] "On August 15, 1985, David along with a female resident eloped from [Eufala Adolescent Center]." Vol. 32, C. 2957.  While they were gone, "it began to rain, and [David] reported they were attempting to seek shelter."  Vol. 35, C. 3434.  They broke into a trailer, Vol. 32, C. 2957, and David was convicted of Burglary 3rd degree and Criminal Mischief 3rd degree, Vol. 35, C. 3434.

such as, "What's wrong with me?" "Why doesn't my family want me?" or "Why doesn't my family love me?"

When Dawn would meet up with David, the boys in the group home would tease David about having a girlfriend. Despite the comments from the boys, David did not get violent, and he was not violent toward Dawn either. He complained to Dawn about things at the group home, but never gave details of the events. Dawn would try to keep David's hopes up by telling him there was light at the end of the tunnel. David, however, seemed very sad and hopeless. Dawn wanted to go to college, but David never talked about what he was going to do with his future. After they dated for almost a year, Dawn found out she was pregnant with David's child. She ran away to Louisiana, where she had a miscarriage and began dating someone else who was controlling and abusive. Dawn wrote David a letter telling him that she had met someone else and was not going to return to Alabama.

On August 3, 1987, not quite a month after David turned eighteen, he too ran away. David set out to find the only family members he knew. He stayed with his half-sister Pat Elliott and her husband for a few weeks, but was kicked out because he stayed out too late one night. He then traveled around the state, trying to find someplace to live. He visited a former school teacher in Mobile and told her he was trying to find his mother, whom he had not seen in more than seventeen years.[68] He also went to see his brother Michael, who temporarily helped him with a place to stay. David also showed up on Dawn's doorstep in Louisiana. When she answered the door, her new boyfriend was standing behind her threatening her with a wrench. Fearing that David's life was at risk, Dawn lied to David and told him everything was fine. David told her he had hitchhiked to Louisiana because he wanted to make sure she was okay, and then he hit the road again. After a few

---

[68]He also confided in the teacher that Mr. Moore sexually abused him years earlier.

more months, David found himself in Montgomery, Alabama. He sought assistance from the state, but no help was provided. Eventually, in early 1988, he found refuge in the trailer of a man he met on the side of the road.

In February 1988, only a few months after he was released from the state's guardianship, David met Sylvia Gordon and the two became friends. Before long, David began mistaking Sylvia's gestures of kindness as signs of an opportunity for the kind of attachment he had long desired but never been able to acquire or maintain. At some point shortly before March 11, 1988, David gave Sylvia a handwritten letter declaring his love for her and his fear of losing her "like all [his] other girlfriends." Vol. 35, C. 3402-3404. Sylvia wrote him a response, and gave it to him on the afternoon of March 11. Her letter reflected a decidedly different view of the circumstances: "David, why are you doing this to yourself? I told you I like you—that's it. I don't need or want the pressure you're putting on me. I don't want to hurt you, but this won't work. . . . The reason I'm not seeing anyone else is that no one else seems interested. Don't trust me. . . ." Vol. 35, C. 3404. Still fresh from months on the road searching in vain for a family to connect with, and primed by literally a lifetime of promising placements followed by unceremonious rejections, this frank rebuff by Sylvia was more than David was equipped to handle.

David was arrested on March 12, 1988, and has been in the custody of the state – this time as an offender – since that day. His siblings have fared only moderately better. His oldest sister Linda has been married numerous times and has not been in touch with anyone in the family for months; her children have been taken away from her and one was killed. She runs around with truck drivers, and her current whereabouts are unknown. David's oldest brother Eddie is serving a life sentence for sexually abusing his sister Sarah's daughter. His other brothers Michael and Jimmy

Terry are making ends meet, although Jimmy Terry struggles with depression and poor relationships with others. His sister Sarah, who was raised by the Elliotts, is living with her boyfriend; some of her children have been removed from her care and placed in alternate homes. His father has passed away. David is still searching for his mother. Despite numerous efforts by his legal team, David's mother has not been found.

Before turning to a discussion of what the facts detailed above mean, it is important to pause and emphasize that much of this information was not explicitly set forth in the records admitted into evidence at trial. Instead, this information was gathered only after a trained social worker and psychologist reviewed the documents and saw strong indications of possible sexual abuse, and a skilled mitigation specialist conducted the interviews necessary to uncover this information. With these investigative and expert resources – none of which were available during the state post-conviction proceedings – petitioner's legal team was able to locate witnesses across Alabama, as well as in Louisiana, Wisconsin, Illinois, and Missouri. This was a considerable undertaking made even more daunting by the passage of time; more information and witnesses would likely have been uncovered had trial counsel conducted this investigation over ten years ago. Some witnesses had to be interviewed on several occasions before divulging the shameful details held in their memories. Moreover, like many adult males who have suffered childhood sexual abuse, petitioner has repressed the memories of his abuse, and was therefore incapable of directing post-conviction counsel toward that information. In short, experts with experience in social work, trauma, neuropsychology, and mitigation investigation were essential to the identification and collection of the factual information described above. As detailed below, these experts are equally critical to understanding what

140

petitioner's uniquely troubled background did to him, and how it would have impacted a jury called upon to decide his fate.

### 3.     Expert assistance from a social worker.

To assist in developing and understanding the facts, petitioner's legal team retained the director of a center specializing in trauma and abuse.  This expert holds a masters degree in Social Work and Social Research, and a post-doctoral degree in sociology.  She has worked with patients who have experienced trauma and abuse for over thirty years. This expert performed a thorough review of the records, conducted interviews, and examined additional information gathered during the investigation.  This expert determined that petitioner's entire life has been marked by rejection, trauma, abuse, and mistreatment.  From the records alone, one may opine that he was simply a "bad kid."  The expert's training and experience, however, revealed that the records relied upon by trial counsel were often inaccurate, inadequate, and contained false diagnoses.  Many of the individuals who interacted with David were not qualified to provide proper care and treatment, and consequently failed to identify (or perhaps to even look for) the cause of what was labeled early on as a "conduct" problem: the sexual abuse and trauma that young David suffered.

The trauma began no later than the day eight month old David was literally torn from his mother's arms.  As an infant, David had begun to attach to his mother and abruptly severing such an attachment can be devastating.  In David's case, the devastation was only exacerbated by the fact that he never saw his mother again, and was left to spend a childhood (and now an adulthood) ruminating about why his mother had given him up and never come to see him. This trauma was further compounded as David, still a small child trying, like any small child, to acquire basic social skills and find his place among those around him, was shuffled from one home or institution to the

141

next. When he needed security and nurturing most, the only certainty in his small world was that no one cared enough for him to give him a permanent family and a stable home.

According to the expert, all of the behaviors that the untrained personnel who dealt with David as a child attributed to conditions such as conduct or adjustment disorder – the same behaviors the prosecution would later rely upon without serious contradiction to portray him as a bad kid worthy of a death sentence – were actually clear, well-recognized symptoms of sexual, physical and emotional abuse. It is thus no coincidence that none of these symptoms were present until after he was sent to live with the Smiths in Missouri.[69] Indeed, his instances of acting out and stealing, as well as his bladder control problems, are best explained not by speculation that he was simply born bad, but by the fact that he was being forced to fellate and submit to anal intercourse from Mr. Smith, he was being beaten by the Smiths, and he was subjected to food and water deprivation as a form of punishment. Once again, David, still a young boy, could find no shelter or protection, this time because the person to whom he should have been able to look for such basic childhood comforts was instead beating him unpredictably and forcing him to perform sex acts.

That the state actors charged with looking after David's best interests were woefully uninformed is manifest in his October 1977 adjustment reaction diagnosis, Vol. 36, C. 3607, and in the "adjustment reaction with behavior problems" diagnosis rendered a few months later by Dr.

---

[69]Shortly before David was transferred to St. Mary's group home, a DPS summary indicated that "[a]fter spending three years with these relatives [in Missouri,] he was returned to foster care and *has been exhibiting behavior problems since*. David has had a most unsettled life. . . . David appears to have been happier . . . where structured limits were placed upon him." Vol. 35, C. 3543 (emphasis added). David exhibited "disruptive behavior," Vol. 35, C. 3544, and "craved love and physical contact yet does not know how to respond to it when it is present," Vol. 35, C. 3540. The results of his psychological report "would not indicate the presence of a personality disorder. However, these [*sic*] is evidence of some undesirable and potentially problematic personality characteristics." *Id.* These reports, written within months of leaving the Smiths, are replete with signs that a trained expert would have recognized as warranting further inquiry.

Kline, Vol. 21, C. 2625.  While these conclusions were reached by personnel operating under the impression that "David has no reported history of trauma," Vol. 35 C. 3539, the truth, as revealed by the more recent investigation, was obviously quite different.  A child who is unruly, steals, and commits similarly undesirable acts for no discernable reason may warrant the kinds of labels that were attached to David during this period.  When a child who is fresh from a household dominated by physical abuse and sexual assault acts that way, however, informed experts have no trouble concluding that the child's behavior is a predictable reaction to the trauma he has experienced.

Whereas missing the signs of trauma and sexual abuse David was exhibiting after his return from Missouri was a troubling mistake, sending him on to St. Mary's was like trying to douse a fire with gasoline.  After arriving there at just over nine years of age, fresh from an extended period of physical and sexual abuse in Missouri, David spent the next four years under the authority of Mr. Moore, being used again as an object of sexual gratification for a man tasked with nurturing him and overseeing his development.   As the expert explains, children who find themselves in these circumstances often begin to believe that they are at fault, and begin to expect this type of treatment from people who are supposed to protect him.  When – as in David's case – necessary treatment, therapy, and medication are not provided, poor self-image, depression, and conduct problems inexorably follow. *See* Vol. 35, C. 3559 (Lee County Youth Development Center evaluation conducted at age thirteen years, five months: "he felt depressed and like crying almost daily").

The circumstances of David's departure from St. Mary's again added fuel to the fire.  Already misunderstood, and having been repeatedly failed by the adults responsible for protecting him, David again found himself on the receiving end of an arbitrary decision made by uninformed authorities that would have lasting consequences.  While he was ostensibly removed from St. Mary's for acting

143

aggressively toward a worker, contemporaneous records acknowledge that "it seems as if DPS was not as involved with David as they would have preferred that they had been [during that time]," and that the DPS social worker assigned to the case "had a different opinion of what happened at St. Mary's . . ." Vol. 35, C. 3419. Moreover, as described *supra*, Ms. Packer, who was the person David allegedly threatened, has made clear that the incident to which his discharge from St. Mary's was officially attributed was not serious at all. The net result, however, was that David was uprooted yet again, the trauma and sexual abuse he was experiencing remained unaccounted for, and he was sent down the institutional line, this time with a record suggesting a tendency for violence based on dubious facts and suspect judgments.

His next stop – Gateway – brought no relief. Within six months of his arrival, David was "pushed down the stairs by another resident." Vol. 35, C. 3583. Had this been an isolated incident, it might have carried no significance. But it was not. In addition to the physical and sexual abuse he had endured, records indicate that David had also been a target for other children as early as age six or seven, *see* Vol. 35, C. 3509, and had been "on the receiving end of the bullying" while at St. Mary's, Vol. 31, C. 2610. According to the expert, the years of bullying by peers, particularly when added to the sexual and physical abuse, caused David to see himself as a person whom the rest of the world repeatedly knocked down. With no access to treatment, he internalized his suffering, and it turned to panic, terror, and anxiety which David could not overcome, understand, or explain. Importantly, as intuitive as these conclusions are now, they could only be drawn with information that neither his state custodians nor trial counsel gathered.

David was almost fifteen years old before he was finally prescribed an antidepressant medication. Vol. 36 C. 3619. Though prescribed the antidepressant to "moderate pessimism and

irritability," *id.*, and despite a notation that "his results are not inconsistent with major depressive episodes," David again was misdiagnosed with "adjustment disorder with disturbance of emotion and conduct." Vol. 35, C. 3527. This is no surprise, however, given that the diagnosing doctor was operating under the impression that David had "been generally well, without serious illness or trauma." Vol. 36, C. 3619.

The misdiagnoses continued. At age fifteen years, two months, David was diagnosed with "conduct disorder, socialized, aggressive." The doctor noted a history of "oppositional behavior, stealing, bedwetting, physical and verbal abuse, immaturity, temper tantrums, and running away." Vol. 35, C. 3412. Instead of exploring possible reasons for these symptoms, David was once again labeled as suffering from a personality disorder. Another evaluation fourteen months later brought more of the same: "Conduct disorder, atypical." Vol. 35, C. 3407. While this evaluator did note that David "expresses strong need for attachment and a steady person upon which to rely," and that "David's needs reflect those of a rejected child[;] David is somewhat depressed and anxious," the evaluator did nothing to uncover the roots of the problem or to provide meaningful help.

Given this long history of uninformed and inaccurate diagnoses, it was all but a foregone conclusion that the state-sponsored evaluation of David after the offenses underlying this case would yield what it did: "Adjustment disorder with Depression." Vol. 28, C. 2139. And while another state-appointed expert arrived at a diagnosis of Borderline Personality Disorder prior to the 1996 trial, Vol. 30, C. 2469, this conclusion too was reached *without the critical evidence of the trauma and abuse that pervaded David's formative years*. As a result, the diagnoses were inaccurate, incomplete, and simplistic. In reality, the unrecognized and untreated trauma had long since prevented him from developing the problem solving and coping skills essential to healthy survival.

145

While David's reaction when faced with what he perceived as yet another arbitrary rejection in March, 1988 was excruciatingly tragic, its direct connection to what he had consistently experienced, literally throughout his entire life, cannot be denied.

Had trial counsel taken the modest step of engaging an expert with a background in social work and childhood trauma, they could have uncovered the true story of David's past and explained it to the jury. As the expert now retained for these proceedings has concluded, David's untreated abuse left him vulnerable to panic and dissociative episodes, particularly under circumstances involving rejection or abandonment. While the record trial counsel gathered contained hints of this, the real story lay in the physical and sexual abuse that an adequate investigation would have uncovered.

### 4.    Expert assistance from a neuropsychologist.

In addition to the social worker discussed above, petitioner has also consulted with an experienced neuropsychologist, who oversees the mental health services in two juvenile detention facilities. He has evaluated over 2000 children and over 2500 adults, and has worked for eleven years with a juvenile justice facility, and for fifteen years with an adult correctional facility. After reviewing David's prior evaluations and learning of the social history acquired through recent investigation, this expert agrees that David has been misdiagnosed throughout his life. Characterizing David's background as one of the worst he has ever seen, this expert believes that David has long suffered from chronic post-traumatic stress disorder ("PSTD") with dissociative episodes.

According to the expert, an accurate assessment of David's neuropsychological condition requires consideration of multiple factors. He has neurological deficits, particularly with respect to

memory, planning and organizing, but he also has problems with attachment and rejection owing to his unstable childhood. More than that, however, David suffered severe trauma when he was a child. For example, when he was anally raped and forced to perform fellatio as a seven-year-old, David experienced an "event that is outside the range of usual human experience and that would be markedly distressing to almost anyone." American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 146 (3d Ed. Revision 1987) ("DSM-III-R").[70] An experience of this magnitude – had it been discovered and considered at the time – would have supported a diagnosis of post-traumatic stress disorder (PTSD). As it happened, of course, past evaluators never found the root of David's problems, and instead settled for the expediency of labeling him a bad child who would not adjust appropriately to his surroundings.

As defined in the DSM-III-R, PTSD, requires: (A) a person to experience a traumatic event "outside the range of usual human experience"; (B) that "[t]he traumatic event is persistently reexperienced"; (C) "[p]ersistent avoidance of stimuli associated with the trauma or numbing of general responsiveness"; (D) "[p]ersistent symptoms of increased arousal"; and (E) "[d]uration of the disturbance (symptoms in B, C, and D) of at least one month." DSM-III-R at 146-48. As explained below, the expert concludes that David meets these criteria now, and met them at the time of the offense.

The available evidence establishes that David meets criterion A. As has been described, he was anally raped and forced to perform fellatio as a young boy, which is accepted within the professional community as "an event that is outside the range of usual human experience." *Id.* at

---

[70]While this version of the DSM was in use prior to David's initial trial, the DSM-III, published in 1980, also contained this diagnosis. Thus, the psychologists who diagnosed David as a child could have looked beyond the symptoms to properly diagnose him.

146.  David also suffered a series of other traumas, including being starved and physically assaulted as a very small boy, and being revictimized while he was raped during his stay at St. Mary's.

The evidence also shows that David meets criterion B in that he has been prone to "sudden acting or feeling as if the traumatic event were recurring (includes a sense of reliving the experience, illusions, hallucinations, and dissociative (flashback) episodes, even those that occur upon awakening or when intoxicated)." *Id.* at 146-47.  With David, this characteristic was exemplified in the episode described by Mr. Stephens, during which David reacted to relatively ordinary punishment with terror, hysteria and vitriol, then had no recollection of what had occurred once the episode was over.  One of David's former social workers, Mr. Kilmer, similarly reported that David had been observed to disconnect from reality more than any other child, and that when this occurred, he was simply unreachable.

David also easily satisfies criterion C's requirement of at least three signs of "persistent avoidance of stimuli associated with the trauma," including:

- ✦ "efforts to avoid thoughts or feelings associated with the trauma,"

- ✦ "efforts to avoid activities or situations that arouse recollections of the trauma,"

- ✦ "markedly diminished interest in significant activities (in young children, loss of recently acquired developmental skills such as toilet training or language skills),"

- ✦ "inability to recall an important aspect of the trauma,"

- ✦ "feeling of detachment or estrangement from others,"

- ✦ "restricted range of affect, *e.g.*, unable to have loving feelings," and

148

✦    "sense of foreshortened future."

*Id.* at 147.  David's history is replete with information meeting these descriptions.  When first seen while in Missouri, David responded to aggression from others by withdrawing and crying.  Vol. 35, C. 3509.  "David would never volunteer any information regarding his family and would respond to direct questioning by avoiding eye contact or ignoring questions he did not wish to answer."  Vol. 36, C. 3603.  He frequently had tantrums and would crawl around on the floor at school, and he had nightly and daily urine accidents and talked like a baby.  Vol. 35, C. 3541.  All of this information was presented during David's evaluation at the Rolla Center at age seven, and is indicative of several signs of "persistent avoidance of stimuli associated with the trauma."

These signs continued after David moved back to Alabama and experienced additional trauma. His records indicate that he felt estranged from others, could not have loving feelings, and continued to avoid discussion of his past. *See, e.g.,* Vol. 35, C. 3545 ("He has an impaired ability to really trust and form a close relationship"); Vol. 36, C. 3609 (at age nine: "He manifests a great deal of insecurity, yet is quite desirous of receiving adult affection"); Vol. 36, C. 3611 (at age thirteen: "He basically refused to talk about his past, and when questions were [di]rected in this area he became quiet and would not respond"); Vol. 35, C. 3558 (at age thirteen: "His poor relationship with his peers was apparent throughout the four years [at St. Mary's]"); Vol. 33, C. 3138 (at age thirteen: "He has a demonstrated tendency to minimize or avoid feelings regarding familial relationships"); Vol. 33, C. 3147-3148 (at age fourteen: social worker thinks David needs to spend more time in male groups for role-modeling purposes but David's efforts to do so have been half-hearted "due perhaps to a fear of being victimized by some of the older boys"); Vol. 28, C. 2170 (at

149

age twelve: "David will shy away from competitive interactions with his peers").[71]  Additionally,

David's first (and only) real girlfriend, Dawn, also described David's outlook on the future as

hopeless.

David also exhibited signs meeting criterion D's requirement of "persistent symptoms of

increased arousal (not present before the trauma)."  The DSM-III-R lists six symptoms, indicating

that a person must have at least two; David meets at least three, including:

1.    Difficulty falling or staying asleep;

2.    Irritability or outbursts of anger;

3.    Difficulty concentrating.

DSM-III-R at 147-48.  The records indicate that David had signs of all three of these. *See* Vol. 29,

C. 2367 (While at St. Mary's, in late 1979, David was reported as "not sleeping at night and was

keeping the other children awake"); Vol. 35, C. 3560 (noting that thirteen year old David had "been

observed sitting awake on his bed in the middle of the night on many occasions"); Vol. 35, C. 3503

(Missouri reports discussing fighting and tantrums); Tr. C. 3558 (noting temper tantrums); Vol. 33,

C. 3139 (same); Vol. 33, C. 3144 (same); Vol. 36, C. 3611 (psychological evaluation noting that he

has difficulties in "complex thinking" and "with developing ideas"); Vol. 25, C. 1573 (school

progress report indicating "David tends to do well for short periods of time and shows no consistency

in maintaining appropriate behavior").

Finally, the last criterion for PTSD is that the symptoms described in sections B, C, and D,

last for "at least one month."  DSM-III-R at 148.  As described above, David's symptoms began no

---

[71] These are only examples, and by no means constitute an exhaustive catalogue of the
instances in which David exhibited these traits.

later than age seven and progressed for years as he went untreated. Thus, he easily satisfies this final requirement.

The neuropsychologist also explains that David has consistently exhibited particularly poor memory, and that this is likely associated with PTSD and David's need to repress difficult memories. When he was first evaluated at Rolla Regional Center in Missouri, Mrs. Smith indicated that his memory was a problem area. Vol. 35, C. 3503. Later, at Gateway, progress reports indicated that David "appears to forget easily, even when the information is crucial to him (dates of upcoming visits, family members, etc.)." Vol. 33, C. 3157; *see also* Vol. 33, C. 3161 ("David is still apparently forgetting a great deal of information that should be pertinent to him"); Vol. 35, C. 3583 (David "demonstrated a problem with 'forgetting' very important details that affect his life on a daily basis"). From early in his life, David learned to repress memories so he would not have to relive the trauma over and over again. Once he started repressing certain memories, he could not choose to limit which pieces of information he remembered. David's memory continues to be very poor at present, as evidenced not only by neuropsychological test results but also by his heavy reliance upon written "logs," which effectively serve as an external surrogate for his low functioning memory. Without his logs, he is unable to recall basic information, or to carry on any but the simplest conversation.

In addition to finding PTSD, the neuropsychologist also notes that David has shown signs of disassociation. In his confession, for example, David reported having blacked out during portions of the incident. Vol. 34, C. 3222. David also reported to his evaluators that he felt as though he was floating above the scene. While the prosecution was eager to dismiss these accounts as self-serving efforts to minimize culpability, the occurrences David described are well known to those with

151

expertise in PTSD, and could well have been triggered when he was overcome by the feelings of rejection and abandonment that had been accumulating.

In sum, as described above, the neuropsychologist retained for these proceedings was provided with the documents contained in the record as well as the additional information gathered through a competent mitigation investigation. That information yielded a set of opinions both more accurate and more mitigating than the uninformed conclusions contained in the social services records or in the testimony presented at trial. Had trial counsel discharged their obligation to investigate and prepare, they could have presented the same information to the jury, and in so doing dramatically increased the likelihood that petitioner's life would have been spared.

### D.    Deficient performance.

Since 2000, the Supreme Court has granted habeas corpus relief in three capital cases after finding trial counsel ineffective for failing to adequately investigate and present mitigating evidence. *Rompilla v. Beard*, *supra*; *Wiggins v. Smith*, *supra*; *Williams v. Taylor*, *supra*. These decisions underscore capital trial counsel's constitutional "'obligation to conduct a thorough investigation of the defendant's background.'" *Wiggins*, 539 U.S. at 522 (internal citations omitted); *id.* at 534 ("'[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse'") (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)); *id.* at 525 (finding counsel's failure to investigate was unreasonable based on social services records and noting that "[h]ad counsel investigated further, they might well have discovered the sexual abuse later revealed during state post-conviction proceedings"); *Rompilla*, 545 U.S. at 387 n.7 ("Our decision in *Wiggins* made

152

precisely the same point in citing the earlier 1989 ABA Guidelines. 539 U.S. at 524 ('The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor'" (quoting 1989 ABA Guideline 11.4.1.C) (emphasis in original))").[72]

Where counsel fail in this obligation, they necessarily lack the information required to make strategic judgments concerning the selection and presentation of penalty phase evidence; as a result, deferential treatment of decisions made under such conditions is inappropriate. *Wiggins*, 539 U.S. at 526-527. Indeed, *Wiggins* pointedly condemned "*post-hoc* rationalization of counsel's conduct" by reviewing courts, and established that it is reversible error to "merely assume" that an adequate investigation was performed. *Id.* Rather, a reviewing court must "conduct an assessment of whether [counsel's] decision . . . actually demonstrated reasonable professional judgment." *Id.* In doing so, the reviewing court must "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background *was itself reasonable.*" *Wiggins*, 539 U.S. at 527 (emphasis by Court) (internal citations omitted).

"In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'" *Rompilla*, 545 U.S.

---

[72]*See also*, *e.g.*, American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 11.4.1(A) (rev. ed. Feb. 2003) (available at http://www.abanet.org/deathpenalty/guidelines.pdf) ("Counsel should conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial. Both investigations should begin immediately upon counsel's entry into the case and should be pursued expeditiously"); *Goodwin v. Balkcom*, 684 F.2d 794, 805 (11th Cir. 1982) ("At the heart of effective representation is the independent duty to investigate and prepare").

153

at 381 (citations omitted); *see also Wiggins*, 539 U.S. at 533 (finding that "'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation'") (citations omitted). "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527.

In *Wiggins*, trial counsel reviewed social services records, and hired a psychologist to assist in evaluating their client, then made a purportedly strategic decision not to investigate his background any further, and to instead focus on a theory of residual doubt. *Id.* at 523-524, 518. In post-conviction proceedings, Wiggins contended that his counsel had been ineffective for failing to pursue a more thorough investigation. To support this claim, Wiggins presented the testimony of a social worker who described "the severe physical and sexual abuse [Wiggins] suffered at the hands of his mother and while in the care of a series of foster parents," as gleaned from "state social services, medical, and school records, as well as interviews with [Wiggins] and numerous family members . . ." *Id.* at 516. Emphasizing that the limited records trial counsel had seen contained indications that important additional information was available, the Supreme Court found that "[t]he scope of [trial counsel's] investigation was . . . unreasonable in light of what counsel actually [knew]." *Id.* at 525. "[A]ny reasonably competent attorney," the Court added, "would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background . . . Had counsel investigated further, they might well have discovered the sexual abuse later revealed during state postconviction proceedings." *Id.*

154

Trial counsel's conduct in this case is not materially distinguishable from *Wiggins*. Here, counsel had access to a large volume of social services records, and to the expert assistance necessary to pursue an investigation based on the clues those records contained. Rather than pursuing the investigation, or enlisting the assistance of trained professionals to do it for them, however, counsel elected to proceed with an insanity defense that even their own psychologist could not support, and to rely on a single witness – who, unbeknownst to counsel, had sexually abused their client – at the sentencing phase. Vol. 44, R. 1279-1283.

There was no valid strategic rationale for counsel's failure to investigate and prepare. First, while counsel's decision to present what little background information they had developed in the form of an insanity defense was technically "strategic," it was not the sort of strategic decision that *Strickland* insulates from scrutiny, because it was made in the absence of a reasonable investigation. *See*, *e.g.*, *Wiggins*, 539 U.S. at 527 (citing *Strickland*, 466 U.S. at 691) ("*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy"); *Williams*, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2d ed.1980)) (trial counsel's performance was deficient because they "did not fulfill their obligation to conduct a thorough investigation of the defendant's background"); *Rolan v. Vaughn*, 445 F.3d 671, 681-82 (3rd Cir. 2006) ("*Strickland* and its progeny make clear that counsel's strategic choices will not be second-guessed by *post-hoc* determinations that a different trial strategy would have fared better. However, there is a prerequisite to this rule's application. Only choices made after a reasonable investigation of the factual scenario are entitled to a presumption of validity").

155

Second, counsel could not have decided to forego the use of mitigating evidence of the abuse petitioner suffered because they included a reference to that abuse in the opening statement. *See* Vol. 40, R. 419. As in *Wiggins*, the fact that counsel failed to deliver on this promise had nothing to do with legitimate trial strategy, and everything to do with counsel having failed to perform the investigation necessary to make their case. *See Wiggins*, 529 U.S. at 526 ("The record of the actual sentencing proceedings underscores the unreasonableness of counsel's conduct by suggesting that their failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment"); *id.* ("What is more, during the sentencing proceeding itself, counsel did not focus exclusively on Wiggins' direct responsibility for the murder. After introducing that issue in her opening statement, [counsel] entreated the jury to consider not just what Wiggins 'is found to have done,' but also 'who [he] is.' Though she told the jury it would 'hear that Kevin Wiggins has had a difficult life,' counsel never followed up on that suggestion with details of Wiggins' history") (internal citations omitted).

In short, measured against the well-settled obligations imposed by the Sixth Amendment and explained in *Strickland*, *Williams*, *Wiggins*, and *Rompilla*, trial counsel's preparations were glaringly deficient. They were in possession of information which would have caused competent counsel to investigate further, and they had access to the professional assistance necessary to conduct that investigation and extract mitigating evidence from the information it produced. Rather than doing so, however, counsel remained in the dark and invested what little evidentiary capital they had in a hopelessly thin insanity theory. By even the most conservative reading of the Supreme Court's ineffective assistance of counsel jurisprudence, this was paradigmatically deficient performance.

**E.    Prejudice.**

In determining the prejudice caused by trial counsel's deficient performance, this Court must "reweigh the evidence in aggravation against the totality of available mitigating evidence. *Wiggins*, 539 U.S. at 534. This "totality of the evidence" review examines "both [the evidence] adduced at trial, and the evidence adduced in the habeas proceeding." *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000); *see Wiggins*, 539 U.S. at 536. In this case, failure to fully investigate Freeman's background left counsel unprepared to present an affirmative case for life and unprepared to rebut the key features of the state's case for death.

The epitome of counsel's failure is the misleading testimony of the lone witness counsel presented during the sentencing proceedings, Deacon Alexander Moore. Moore's four pages of testimony, provided by phone, informed the jury without further elaboration that Freeman was a "normal child like any other child that lived the lifestyle that he had to live." Vol. 44, R. 1282. It served as the basis for the introduction of two photos taken of Moore and Freeman when Moore served as Freeman's headstart counselor. And Moore's testimony conveyed his personal opinion (the type of evidence deemed irrelevant by the United States Supreme Court in *Booth* and *Payne*) on whether Freeman deserved the death penalty – a half-hearted plea for mercy: "I think [Freeman] would be deserving of some leniency, if possible, if at all possible." Vol. 44, R. 1282.

Counsel surely offered Moore's testimony to humanize their client, but the cruel irony is that, unknown to the jury, the witness called to do so had, himself, dehumanized Freeman. If counsel had fully investigated, they could have informed the jury that the child who Moore called a "normal child" suffered from trauma due to sexual abuse *by Moore*. They could have shown the jury the photos of Freeman and Moore, not as an example of Freeman with a mentor, but for what they were: portraits of sexual abuse. Counsel could have shown the jury that, far from being a "normal child,"

157

David Freeman was a child who had not only been routinely neglected, but also repeatedly sexually abused.

Counsel's failure to uncover and present evidence of sexual abuse and other damaging aspects of Freeman's background severely hindered their ability to rebut the state's aggravation case, much of which was established during the cross-examination of defense witness Dr. Burkhart at the guilt-innocence trial. Vol. 42, R. 843-77. With the evidence and expert interpretation produced during the proceedings before this Court, counsel could have shown that Freeman was not the ill-tempered, petulant, and "selfish" killer the prosecution sought to portray. *See* Vol. 44, R. 1286-1288 (arguing Freeman's "whole life led up to this act…. [h]e didn't get his way, he loses his temper"). With this evidence, trial counsel could have effectively countered the prosecution's claims with details of Freeman's tragic background, beginning with his birth to deeply damaged parents and continuing through a shuffle of over thirty placements. Counsel could have explained the continual misdiagnoses of Freeman's mental and emotional impairments by linking Freeman's acting out with the physical and sexual abuse, to which it corresponded, at the hands of grown men who were supposed to have been nurturing him.

What the jury did receive from trial counsel was not explained. Records documenting Freeman's institutional history were provided to the jury bare, without an accompanying chronology, without the testimony of a social worker to tie the information into an understandable series of causes and effects. The jury received the records without any packaging by trial counsel; counsel did not even mention the records in summation.

Trial counsel's presentation may also have confused the jury about mitigation. At sentencing, counsel's only witness pled for mercy. The other witnesses providing information about Freeman's

158

past testified at the guilt-innocence in the context of a "mental disease and defect" defense. When the jury rejected the guilt-innocence defense, it may also have discounted the probative value of the defense's guilt-innocence witnesses to the decision to be made at the sentencing phase. The jurors were instructed to consider the evidence in making their sentencing determination, but trial counsel offered no clear explanation, Tab R-31 at R. 1294, Vol. 44 ("The extreme mental or emotional disturbance and the inability to conform his conduct to the requirements of the law, mitigating factors, aren't the same here. They don't mean the same thing as they did back here. Back here, that's out, because what that is is something you have already rejected"), or persuasive explanation, Tab R-31 at R. 1295, Vol. 44 ("[I]t was just that he had a lot going on inside of him that made all of this occur"), of why that testimony, once rejected, could now be deemed reliable. This is particularly true of Burkhart's testimony: though the relevance of his testimony to the "mental disease or defect" defense was shattered by the prosecution on cross-examination, its relevance as a reason to spare Freeman's life nevertheless remained. Had counsel discharged their obligation to investigate and prepare the evidence described *supra*, their presentation at trial would likely have been radically different. Instead of relying on Dr. Burkhart to make a case for insanity that his own testimony did not support (and Dr. Renfro's refuted), counsel would likely have reached the conclusion that relying on the insanity defense was an unreasonable strategy, both because it could not win and because relying on it diminished the mitigating potential of evidence about Freeman's background.

There is a reasonable probability that further investigation, leading in turn to a presentation of evidence more focused on mitigation and less on an insanity defense, would have made a difference at the sentencing phase in this case. It cannot be questioned that Freeman has the kind

159

of "troubled history" the Supreme Court has declared "relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535 (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)). Indeed, Freeman's social history is tragic, showing a pitiful, unrequited search for the basic human comforts of love and acceptance.

Where trial counsel forgoes investigation, preparation, and use of such information, the reliability of the sentencing determination is inevitably rendered suspect. Where, as in this case, counsel's omissions are compounded by an ill-conceived insanity defense, which diverts the jury's attention from the value of the defendant's background as mitigation and drains the defense of credibility, confidence in the outcome is undermined. Because Freeman has satisfied §2254(a) by showing that trial counsel was ineffective under the Sixth Amendment, and because the CCA's refusal to reach the merits renders §2254(d)'s limitations on relief inapplicable, this Court should grant the writ.

### F.    Section 2254(d) does not bar relief on this Ground.

The last state court to address these claims purported to resolve them on procedural grounds. Tab R-73 at 23-25, Vol. 55. This, by definition, precludes application of §2254(d). *See* §2254(d) ("An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . ."); *Davis v. Crosby*, 341 F.3d 1310, 1313 (11th Cir. 2003) (*per curiam*) ("As the Florida courts failed to resolve the merits of Davis's claim, the present controversy falls outside of §2254(d)(1)'s requirement that we defer to state court decisions . . .") (footnote omitted); *Lenz v. Washington*, 444 F.3d 295, 302 (4th Cir. 2006) ("Because there is no state court judgment on the merits, we review *de novo*"); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (§2254(d)'s limitation on relief

160

inapplicable where, although state trial court resolved merits, state appellate court erroneously relied on state procedural default rule to deny relief). Because the CCA failed to adjudicate the merits, and because that court's purported procedural basis for rejecting the claim cannot serve as a valid procedural bar to federal review, *see supra* at 61-88, petitioner is entitled to merits review, and to habeas relief upon satisfaction of §2254(a).

### G. Petitioner is entitled to an evidentiary hearing on Grounds IV.D. and E.

The rules governing the availability of federal evidentiary hearings, and petitioner's efforts to secure the expert assistance necessary to the proper development and presentation of this claim, are discussed in detail *supra* at 88-96. Because petitioner sought and was summarily denied the funds necessary to obtain the investigative and expert services that were essential to the development of the facts described earlier in the discussion of these claims, he cannot be faulted for his inability to present those facts the state courts. As a result, §2254(e)(2)'s restrictions do not apply. Additionally, because the facts petitioner has alleged, if proven, would require a grant of relief from his death sentence, he has established his entitlement to an evidentiary hearing before this Court.

### GROUND IV.F. – PETITIONER WAS DENIED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY TRIAL COUNSEL'S FAILURE TO INTRODUCE EVIDENCE OF PETITIONER'S ADAPTABILITY TO PRISON.

### A. Procedural background.

Before the state courts, petitioner contended that trial counsel were ineffective for failing to develop and present available evidence that petitioner had behaved well while incarcerated prior to his 1996 trial. *See* Tab R-57, Vol. 49; Tab R-60, Vol. 53. Petitioner also explained to the state courts that, to prove his claim, he required access to a risk assessment expert capable of reviewing

petitioner's prison records, reaching conclusions about his prospects for maintaining his status as a peaceful, manageable prisoner, and providing those conclusions to the court. *See* Vol. 48, C. 176-177; Vol. 50, C. 437-438; Tab R-60 at 47, Vol. 53 . The circuit court summarily denied petitioner's request for expert assistance, and subsequently denied relief on the ground that petitioner had not proven the merits of his claim. Tab R-72, Vol. 55. On appeal, petitioner challenged the circuit court's denial of relief on the merits, and its refusal to authorize necessary expert assistance. Tab R-60 at 45-47, Vol. 53. As with petitioner's other ineffective assistance claims, the CCA rejected petitioner's contentions on the ground that his allegations before the circuit court had been insufficiently specific. Tab R-73 at 25, Vol. 55. For the reasons discussed *supra*, the CCA's ruling lacks both the independence from federal law and the adequacy necessary to serve as a valid procedural bar to review by this Court.

**B.    Relevant legal principles and discussion.**

"Representation of a criminal defendant entails certain basic duties," including "the overarching duty to advocate the defendant's cause," and the "duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688; *see also id.* at 690 ("the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case"). This obligation includes a duty to prepare evidence which is favorable to the defendant's case and prepare to rebut harmful evidence about which counsel knows or should know. *Rompilla*, 545 U.S. at 385-390; *Wiggins*, 539 U.S. at 522-524. In assessing an allegation that counsel's performance was deficient, a reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690; *see also Wiggins*,

162

539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688) (reviewing court must "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' . . . which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time'").

By the time of petitioner's re-trial in 1996, it had been a decade since the Supreme Court had established that the advocacy of a capital defendant's cause could, pursuant to the Eighth and Fourteenth Amendments, include the presentation of evidence that the defendant would adapt well to confinement if sentenced to life in prison. *Skipper v. South Carolina*, 476 U.S. 1 (1986). In *Skipper*, the Court acknowledged that "[c]onsideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing: 'any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.'" *Skipper*, 476 U.S. at 5 (quoting *Jurek v. Texas*, 428 U.S. 262, 275 (1976)); *see also id.* at 7 ("a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination"). The Court further noted that "[t]he relevance of evidence of probable future conduct in prison as a factor in aggravation or mitigation . . . is underscored" where the prosecution's arguments suggest a death sentence is necessary "in part because [the defendant] could not be trusted to behave if he were simply returned to prison." *Id.* at 5 n.1.

Petitioner had been incarcerated in the county jail and as a death row inmate at Holman Prison for more than eight years by the time of his 1996 retrial. Trial counsel had copies of petitioner's prison records from that period, but made no attempt to utilize them to establish that

petitioner had been a well-behaved, manageable inmate who could be expected to adapt well if sentenced to life in prison without parole. Counsel had no strategic reason for this omission, nor could such a reason be imagined in light of *Skipper*'s holding and the dearth of other mitigating evidence counsel elected to develop and present. While the prosecution's penalty phase closing argument was relatively brief, it did include an unambiguous reference to petitioner's future dangerousness. The district attorney argued: "My question to you is who needs protection? Who needs protection now? Is it David Freeman, or is it the innocents? . . . [T]his duty you have to make [sic] is important, this duty you have to do." Vol. 24, R. 1297. As discussed below, counsel could have rebutted the prosecution's argument that the jurors had a "duty" to "protect[]" "the innocents." Their failure to do so was both deficient and prejudicial.

In these federal habeas proceedings, petitioner gained access to the risk assessment expert services he sought in state court. The expert with whom petitioner has now consulted has over 33 years of experience in correctional administration, at levels ranging from counseling inmates at a single state facility to directing and administering entire state- and territory-wide departments of corrections, from serving as a consultant to the governments of several nations and territories to teaching courses in corrections at the university and technical college levels. This expert is versed in matters such as facility operations and management, assessment, classification and management of prisoners, and assessment and management of prison security. He has been qualified as an expert witness in more than a dozen state and federal jurisdictions.

Through counsel, petitioner supplied the expert with information that was or could have been available to trial counsel prior to the 1996 re-trial, including petitioner's prison records, information about the offenses with which he was charged, and information about petitioner's background. After

reviewing and considering this information, the expert has concluded that the facts available in 1996 indicated that petitioner was a fully manageable inmate. The expert noted that petitioner had no history of gang affiliation, subversive activities, hostage-taking, or other behaviors ordinarily associated with prisoners who are difficult to manage.[73] In fact, based on his knowledge and experience and the available documentation, the expert believes that petitioner's background indicates that he is particularly well-suited for adaptation to prison life. Unlike prisoners who have substantial experience living even modestly successful lives outside the prison setting, petitioner has spent the majority of his life in institutional settings and has been conditioned to the structure such settings provide from an early age. In short, an institutional setting, like prison, is effectively "home" to individuals with petitioner's background, and they are much less likely to be destructive, subversive or otherwise rebellious than prisoners with backgrounds less similar to the conditions that prevail within prison walls.

Given that (a) trial counsel had petitioner's prison records, (b) qualified expert assistance like that utilized by petitioner in these proceedings was available in 1996, and (c) *Skipper* gave petitioner an unqualified right to present evidence of his adaptability to confinement both as a basis for a sentence less than death and as rebuttal to the prosecution's future dangerousness argument, counsel's failure to prepare and present such evidence was constitutionally deficient. There were no strategic considerations that could have warranted foregoing such evidence, nor would the

---

[73]On the contrary, petitioner's prison records from this period indicate that as of May 1990 he had "been assigned to Holman for over six (6) months without any reports of negative behavior," that he "is no problem and does display the proper attitude," and that despite "some psychological concerns, . . . he'll be able to interact in a group setting without problems." Records from subsequent years likewise show that petitioner was judged to have made "good" or "positive" "adjustment," and contain nothing to suggest that he was dangerous or posed a management problem.

preparation necessary to present the testimony of a risk assessment expert have been particularly onerous. Under these circumstances, counsel had an obligation to prepare and present the readily available evidence that a sentence of death was not necessary in order to "protect[]" "the innocents," and that, if sentenced to life in prison, petitioner could be expected to peacefully live out his days behind bars.

Counsel's deficient failure to prepare and present adaptability evidence was prejudicial in several ways. As noted above, it deprived the jurors of important insight – insight decidedly favorable to petitioner – into the likely consequences of their sentence selection decision, and it allowed the prosecution's future dangerousness argument – an argument quite plainly calculated to encourage an unfavorable adaptability forecast – to go unrebutted.[74] Furthermore, the available adaptability evidence was not cumulative to anything else counsel had presented, and would have been an important and effective supplement to the evidence of petitioner's background and psychological condition described in detail above. Taken together – as it must be for a proper *Strickland* prejudice analysis – the combination of petitioner's deeply troubled history and adaptability to institutional life would have both reduced his moral culpability in the eyes of the jurors and established him as a uniquely suitable candidate for punishment via permanent incarceration rather than execution. *See*, *e.g.*, *Strickland*, 466 U.S. at 695 ("In making this

---

[74]The fact that petitioner's favorable incarceration record was amassed after his initial conviction and sentencing underscores its force as a factor that could have swayed jurors toward a sentence less than death. *See Jenkins v. State*, ___So. 2d___, 2004 WL 362360 (Ala. Crim. App. Feb. 27, 2004), *aff'd in part, rev'd in part sub nom.*, *Ex parte Jenkins*, 2005 WL 796809 (Ala. April 8, 2005) ("A defendant facing trial on capital charges is more likely to be well-behaved in prison than an individual who has already been convicted of a capital offense and has no incentive to cooperate with his jailers").

[prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury").

### C.    Section 2254(d) does not bar relief on this Ground.

The last state court to address this claim purported to resolve it on procedural grounds.  Tab R-73 at 25, Vol. 55.  This, by definition, precludes application of §2254(d).  *See* §2254(d) ("An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . ."); *Davis v. Crosby*, 341 F.3d 1310, 1313 (11th Cir. 2003) (*per curiam*) ("As the Florida courts failed to resolve the merits of Davis's claim, the present controversy falls outside of §2254(d)(1)'s requirement that we defer to state court decisions . . .") (footnote omitted); *Lenz v. Washington*, 444 F.3d 295, 302 (4th Cir. 2006) ("Because there is no state court judgment on the merits, we review *de novo*"); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (§2254(d)'s limitation on relief inapplicable where, although state trial court resolved merits, state appellate court erroneously relied on state procedural default rule to deny relief).  Because the CCA failed to adjudicate the merits, and because that court's purported procedural basis for rejecting the claim cannot serve as a valid procedural bar to federal review, *see supra* at 61-88, petitioner is entitled to merits review, and to habeas relief upon satisfaction of §2254(a).

### D.    Petitioner is entitled to an evidentiary hearing on Ground IV.F.

The rules governing the availability of federal evidentiary hearings, and petitioner's efforts to secure the expert assistance necessary to the proper development and presentation of this claim, are discussed in detail *supra* at 88-96.  In short, because petitioner sought and was summarily denied the funds necessary to retain a qualified expert during the state court proceedings, he cannot be

167

faulted for his inability to present the facts discussed herein to the state courts. As a result, §2254(e)(2)'s restrictions do not apply. Additionally, because the facts petitioner has alleged, if proven, would require a grant of relief from his death sentence, he has established his entitlement to an evidentiary hearing before this Court.

### GROUND V – PETITIONER'S RIGHT TO A FAIR SENTENCING PROCEEDING AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WAS VIOLATED BY THE ADMISSION OF UNRELIABLE AND MATERIALLY INACCURATE EVIDENCE.

## I.      Procedural background.

Petitioner presented this claim in his state court Rule 32 proceedings. *See* Tab R-57, Vol. 49; Tab R-60 at 51-55, Vol. 53; Tab R-64 at 66-71. Petitioner also sought funds for expert assistance to present evidence and prove this claim, but his request was denied. Vol. 48, C. 171-172; C. 199-200. Although petitioner was denied funding for expert assistance, on the day of the evidentiary hearing, he submitted a proffer of facts that could have been presented if he had received funds to hire a forensic odontologist to review the state's evidence. Vol. 49, C. 399-400; Vol. 50, C-401. The trial court dismissed this claim, relying on Alabama Rules of Criminal Procedure 32.2(a)(3) & (a)(5), finding that it could have been but was not raised at trial or on appeal. Vol. 50, C. 453-454. The CCA affirmed for the same reason. Tab R-73 at 28, Vol. 55.

## II.     Ground V is not procedurally barred.

Respondent argues that this claim is procedurally barred from this Court's review because it could have been but was not raised at trial or on appeal. *See* Ala. R. Crim. P. 32.2(a)(3) & (a)(5). This is wrong. The crux of petitioner's claim is that the bite mark evidence the jury heard, which was the same evidence contained in the record at trial and on direct appeal, was materially

inaccurate, *as demonstrated by the evidence he sought to present in the Rule 32 proceedings*. While petitioner might have argued on direct appeal that portions of the trial evidence were inaccurate, he had no means of supplementing the record with the evidence necessary to prove such a contention until collateral review.[75] Thus, as both the United States Supreme Court and the Alabama Court of Criminal Appeals have found in analogous contexts, petitioner's instant claim was best suited for review in collateral proceedings. *See, e.g.*, *Massaro v. United States*, 538 U.S. 500 (2003) (because record is often inadequate to facilitate appropriate review, ineffective assistance of counsel claims need not be raised on direct appeal); *Robitaille v. State*, 2005 WL 3118795, at *21 (Ala. Crim. App. 2005) ("The difficulty of reviewing claims of ineffective assistance of counsel on direct appeal, when those issues have not been developed on the record, was addressed by the United States Supreme Court in *Massaro*"); *State v. Freeman*, 605 So. 2d 1258, 1259 (Ala. Crim. App. 1992) (juror misconduct claim "was not procedurally barred under Rule 32.2(a)(4) and (5), A.R.Crim.P., because the fact that the juror had been a policeman was not known at the time of trial or at the time of direct appeal").

## III.    Relevant legal principles and discussion.

"The fundamental respect for humanity underlying the Eighth Amendment prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case." *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988).  In *Johnson*, the Supreme Court held that a death sentence imposed after the "jury was allowed to consider evidence that has been revealed to be materially inaccurate" was incompatible

---

[75]As discussed, *supra*, in connection with Ground IV.B., the state court collateral review proceedings did not provide a meaningful opportunity for fact development because all of petitioner's requests for the resources necessary to such development were denied.

with this heightened need for reliability. *Johnson*, 486 U.S. at 590. In so holding, the Court also indicated that the error resulting from a capital sentencing jury's consideration of materially inaccurate information is qualitatively more pernicious than an error that merely invalidates an aggravating factor supported by evidence that was nevertheless otherwise admissible. *Id.*; *see Tuggle v. Netherland*, 516 U.S. 10, 14 (1995) (reiterating *Johnson*'s holding "that *Zant* [*v. Stephens*, 462 U.S. 862 (1983)] does not apply to support a death sentence imposed by a jury that was allowed to consider materially inaccurate evidence").

In this case, as described *supra* at 99-104, and incorporated here by reference, the jury heard and was permitted to consider materially inaccurate evidence. The testimony of the state's forensic odontologist witness, Dr. O'Brien, was presented to the jury despite his insufficient qualifications and his conclusions that contradict the standard practice in forensic odontology. Dr. O'Brien told the jury that the bite marks on petitioner's arms were caused by one of the victims, Sylvia Gordon. Vol. 40, R. 450. His statement that the marks "compared *exactly*" with Sylvia's teeth was wrong not only because the marks did not compare exactly with Sylvia's teeth, but also because it assumes that an exact match can occur. Forensic odontologists recognize that comparing bite marks is *not* an exact science, and that an expert's opinion should not be couched in such misleadingly concrete terms. There is simply no way to tell with the absolute certainty that O'Brien claimed to have whether a bite mark is made by a certain individual.

The qualified expert with whom petitioner's legal team has consulted during these proceedings indicates that the bite marks were, at best, "weak" specimens for comparison with dental impressions of the victims' teeth. On a scale of 1 to 10, with 10 being the best evidence possible, the expert indicates that the marks on petitioner's arm may be a 3. With this poor quality evidence,

170

a qualified forensic odontologist expert would not have been able to exclude either victim *or* petitioner based on a comparison of the bite marks with the impressions. In sum, Dr. O'Brien was not qualified to make the damaging conclusion that he made, and no qualified forensic odontologist would have made the claim isolating Sylvia Gordon as the source that the jury heard and considered at trial. *See supra* at 99-105.

Because the inaccurate bite mark testimony "provided no legitimate support for the death sentence imposed," and because, as discussed more fully *supra* in connection with Ground IV.B., the jury's consideration of that information contributed to its selection of death rather than life in prison, petitioner's death sentence violates the Eighth Amendment. *Johnson*, 486 U.S. at 586 (quoting *Gardner*, 430 U.S. at 359). The impact of this testimony, particularly when considered in conjunction with the other errors at the sentencing phase, was not harmless under either *Brecht*, *supra*, or *Chapman*, *supra*. *See Hill v. Lockhart*, 28 F.3d 832, 839 (8th Cir. 1994) (finding of Strickland prejudice obviates need for separate harmlessness analysis); *see also* footnote 18, *supra*. Additionally, because the state courts failed to reach the merits of this claim, §2254(d)'s limitation on relief does not apply, and petitioner is entitled to relief based on his satisfaction of §2254(a).

## IV.    Petitioner is entitled to an evidentiary hearing on Ground V.

The rules governing the availability of federal evidentiary hearings, and petitioner's efforts to secure the expert assistance necessary to the proper development and presentation of this claim, are discussed in detail *supra* at 88-96. Because petitioner sought and was summarily denied the funds necessary to obtain the investigative and expert services that were essential to the development of the facts described earlier in the discussion of this claims, he cannot be faulted for his inability to present those facts the state courts. As a result, §2254(e)(2)'s restrictions do not apply.

Additionally, because the facts petitioner has alleged, if proven, would require a grant of relief from his death sentence, he has established his entitlement to an evidentiary hearing before this Court.

> **GROUND VI – APPELLATE COUNSEL'S FAILURE TO CHALLENGE THE ADMISSION OF THE PRIOR TRIAL TESTIMONY OF WITNESS FRANCIS BOOZER VIOLATED PETITIONER'S RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

Under *Strickland v. Washington,* 466 U.S. 688 (1984), petitioner must establish that his attorney's representation "fell below an objective standard of reasonableness," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. *See Wiggins*, *supra*; *Williams*, *supra*. The same standards apply to review of appellate counsel's performance. *Evitts v. Lucey*, 469 U.S. 387 (1985). To prove that deficient performance of appellate counsel was prejudicial, petitioner must show that, but for counsel's errors, there is a reasonable probability that the claim not raised would have prevailed on appeal:  it is not reasonable for appellate counsel to fail to raise a claim that has a reasonable probability of winning.  This was such a claim.

I.    **Relevant facts and procedural background.**

   A.    **Relying on the witness's word:  the state's failure to procure medical evidence of the witness's illness and subpoena the witness.**

At petitioner's retrial, the state was permitted to introduce, over the objection of defense counsel, the prior testimony of an allegedly unavailable witness, Francis Boozer,  a former coworker of petitioner's who had testified at his previous trial. Vol. 37, C. 3812-3832; Vol. 41, R. 621-622. The prosecution stated that Boozer was unavailable because she was suffering from emphysema, under a doctor's care, and unable to travel from her Florida home.  Vol. 41, R. 618-620.  In support,

the state presented the testimony of Blake Trammer, an investigator with the District Attorney's Office in Montgomery, who had been asked to locate Boozer prior to trial. He testified that he spoke with Boozer by phone from her home in Florida. Vol. 41, R. 620.[76] Boozer told him she was living in Florida under a doctor's care. *Id.* Trammer testified that minutes after their first conversation ended Boozer called him back, emphasizing that she was suffering from emphysema and asthma and was using a ventilator to help her breathe. Vol. 41, R. 620-621. She indicated that she would remain in this condition until she died. Vol. 41, R. 620.

Trammer did not get a doctor's statement from Boozer concerning her condition. *See* Vol. 41, R. 621. He did not get the name of her doctor. *See id.* As Trammer said, he just "took her word for it she couldn't travel." *Id.* When asked, "Did you do any independent attempt to verify what she was telling you?," Trammer responded, "No, sir, I did not." Vol. 41, R.621. The district attorney did not issue any process to procure Boozer's presence in court. *See* Vol. 41, R. 1.

Following Trammer's testimony, defense counsel objected to the reading of Boozer's prior testimony to the jury on the ground that the state, which relied solely on Trammer to establish Boozer's unavailability, had provided only hearsay and no reliable evidence that Boozer was, in fact, unavailable. Vol. 41, R. 21. The State countered that "anybody who lives out-of-state is unavailable." Vol. 41, R. 621-622. Overruling the defense objection, the trial court allowed the jury to hear Boozer's testimony from petitioner's first trial. Vol. 41, R. 622.

## B. Francis Boozer's previous testimony.

---

[76]Trammer attested that Boozer lived in Brooksville, Florida. But he did not know where in Florida Brooksville was located. Vol. 41, R. 620 ("I cannot give you any direction on that.").

At petitioner's first trial, Francis Boozer recounted a conversation she claimed to have had with petitioner prior to the Gordon homicides. The conversation occurred in the break room of a Union 76 Truck Stop, where Boozer and petitioner were working together on the night shift. Vol. 37, C. 3813-3815.[77]   Boozer described petitioner as someone who was generally friendly, quiet, cooperative, of even temperament, and who did his job. Vol. 37, C. 3823.

Boozer claimed that on a night prior to March 11, 1988, she encountered petitioner in a quiet state. Vol. 37, C. 3815; 3824. She said to him, "[Y]ou seem sad tonight." Vol. 37, C. 3815. Petitioner said, "I am," and showed Boozer a picture of a young woman, who he identified as Sylvia, "his girlfriend." Vol. 37, C. 3815-3816. Petitioner told Boozer that he loved Sylvia and wanted to marry her, but that her mother did not seem to like him, and therefore Sylvia would not marry him. Vol. 37, R. 3816. Boozer testified that petitioner "went on to say that if he could get rid of her mama, you know, that he felt like he and this young lady could have a relationship together." *Id.* Boozer suggested that maybe the girl was too young to want to marry. According to Boozer, petitioner then said, "I'm not going to give her up. . . . I'd rather see her dead than somebody else have her." Vol. 37, R. 3817. Boozer testified that petitioner also said that "if [Sylvia's] mother was dead and if he was rid of her, that he would have a chance." *Id.* At the time, Boozer passed petitioner's concerns off as "puppy love romance that young people have." She also told no one else about it.  Vol. 37, C. 3817; 3822.

### C.    The Alabama courts' disposition of the appellate ineffectiveness claim.

Appellate counsel did not pursue trial counsel's objection to the admission of Boozer's prior testimony on appeal. In the Rule 32 petition, petitioner argued this failure constituted ineffective

---

[77] The citations in this paragraph are to State's Trial Exhibit No.108.

assistance of counsel. "Had counsel raised and argued this error," petitioner asserted, "there is a reasonable probability that the result of petitioner's direct appeal would have been different." Vol. 19, C. 308. Petitioner's appellate counsel, Thomas Goggans, was asked at the Rule 32 hearing whether there was a strategic reason for not challenging the introduction of Boozer's prior testimony. Goggans testified, "Not that I recall." Vol. 48, C. 108.

The circuit court denied the claim on the merits:

> In Ground VIII.(E), Freeman contends that appellate counsel was ineffective for failing to raise on appeal that the Court erred admitting the prior testimony of Boozer. Freeman failed to proffer in his petition or at his evidentiary hearing what argument or legal authority appellate counsel could have presented on appeal that would have caused the appellate court to reverse his convictions or sentence. The Court finds that Freeman has failed to meet his burden of proving appellate counsel's performance was deficient or caused him to be prejudiced as required by Strickland. Rule 32.3, ARCrP. Therefore, this claim is hereby denied.

Tab R-72 at 31, Vol. 55.

The CCA, however, rejected the claim on the ground that the allegations set forth in the petition submitted to the circuit court were not sufficiently specific to show a facially meritorious constitutional claim.

> Freeman failed to allege in his petition what the substance of Francis Boozer's testimony was; why he believed the testimony was inadmissible; or how the testimony prejudiced him. Therefore, Freeman failed to satisfy his burden of pleading with respect to this allegation of ineffective assistance of counsel, and it was properly denied by the circuit court.

Tab R-73 at 27, Vol. 55. As discussed *supra*, the CCA's ruling lacks both the independence from federal law and the adequacy necessary to serve as a valid procedural bar to review by this Court. Petitioner is therefore entitled to merits review.

II.    **The Sixth Amendment violation.**

A.    **Appellate counsel performed deficiently in failing to challenge the admission of Boozer's prior testimony because the State failed to prove that the witness was unavailable.**

The right of confrontation and cross-examination is an essential and fundamental requirement of a fair trial. *Barber v. Page*, 390 U.S. 719, 721 (1968); *Pointer v. Texas*, 380 U.S. 400, 405 (1965). "The primary object of the [Confrontation Clause of the Sixth Amendment] . . . was to prevent depositions or *ex parte* affidavits . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242-243 (1895).

Both the Confrontation Clause of the Sixth Amendment and the Alabama Rules of Evidence provide a necessity exception when a witness is unavailable and prior testimony by the witness was given in previous judicial proceedings against the same defendant and was subject to cross-examination. Ala.R.Evid. 804(b)(1) (eff. Jan. 1, 1996);[78] *Ohio v. Roberts*, 448 U.S. 56 (1980); *see*

--------

[78]Rule 804(b)(1) provides:

The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(1)    *Former Testimony.* Testimony of a witness, in a former trial or action, given (A) under oath, (B) before a tribunal or officer having by law the authority to take testimony and legally requiring an opportunity for cross-examination, (C) under circumstances affording the party against whom the witness was offered an opportunity to test his or her credibility by cross-examination, and (D) in litigation in which the issues and parties were substantially the same as in

176

*also Scroggins v. State*, 727 So. 2d 131, 133 (Ala. 1998) ("When the prosecution seeks to introduce,

against a criminal defendant, the former testimony of a now unavailable witness, its burden in

seeking the witness' presence is enhanced by the defendant's Sixth Amendment right to confront

witnesses").  "Unavailability as a witness" under Alabama Rule of Evidence 804 (which mirrors the

Federal Evidence Rule), includes two situations pertinent here:

> (4)  [The declarant] is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

> (5)  [The declarant] is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subsection (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means.

Ala.R.Evid. 804(a).[79]

The burden of proving unavailability of a witness rests with the proponent of the hearsay.

*Scroggins*, 727 So. 2d at 133; *see United States v. Acosta*, 769 F.2d 721, 723 (11th Cir. 1985)

(interpreting Federal Rule of Evidence 804).  To meet that burden, the State must show that "it

exercised due diligence in seeking the presence of the witness at trial to no avail."  *Scroggins*, 727

So. 2d at 134.  "A witness is not 'unavailable' for purposes of . . . the exception to the confrontation

requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence

_____

the present cause.

[79]Rule 804(a) also defines a witness as "unavailable" where the witness:

> (1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or (2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or (3) now possesses a lack of memory of the subject matter of the declarant's statement . . . .

177

at trial." *Roberts*, 448 U.S. at 74-77 (quoting *Barber*, 390 U.S. at 724-25). While this determination lies in the discretion of the trial court, the State's diligence is subject to particular scrutiny in capital cases. *Scroggins*, 727 So. 2d at 134. Before offering a witness' prior statement in lieu of live testimony in a capital case, the State must meet a "high standard" of proving that it exercised due diligence in its attempt to locate and procure the witness. *Id*. at 133 (citing *Johnson v. State*, 623 So. 2d 444 (Ala. Crim. App. 1993)).

Ultimately, the diligence and good faith of the State's effort is a case-by-case determination. *See Roberts*, 448 U.S. at 74-77. In *Roberts*, the United States Supreme Court recognized that the "law does not require the doing of a futile act. . . . But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation." *Id*. Ultimately, the "length to which the prosecution must go to produce a witness . . . is a question of reasonableness." *California v. Green*, 399 U.S. 149, 189 n.22 (1970). The State's effort here failed to meet this burden in two ways: first, the State presented no medical evidence concerning Boozer's condition, but rather relied solely on the witness's work; second, the State failed to use available process to procure the witness's presence at trial, arguing that she was unavailable simply because she was out of state.

### 1.    The State failed to establish that Boozer was unable to be present due to an existing illness or infirmity.

Alabama caselaw has not directly addressed "unavailability" due to medical illness under Rule 804. The Eleventh Circuit, however, has considered the issue in the context of FRE 804, of which Alabama's rule is a mirror-image. *See United States v. Acosta*, 769 F.2d 721 (11th Cir. 1985). In *Acosta*, the defense sought to admit pre-trial suppression hearing testimony of the defendant's

178

wife (an alibi witness), whom the defense argued was unavailable because "[s]he's got a baby and

when the baby was born, it had an operation and the baby is not well . . . ." 769 F.2d at 722.  After

the trial court refused to admit the hearsay under FRE 804(a), the Eleventh Circuit affirmed, holding

counsel's statement was insufficient without corroborating medical testimony:

> [The defendant] offered no evidence that he had requested the witness
> to testify or that she had refused to do so.  *Nor was there medical
> testimony* as to the nature or severity of the child's illness or that the
> child's health would be jeopardized by the mother's absence.
> Moreover, there was no pre-trial motion for a continuance in order to
> produce the witness at a later date.  *The sole support for Acosta's
> claim was his counsel's uncorroborated statement that Mrs. Acosta
> was unavailable due to her child's illness. . . .  [T]his statement, in
> and of itself, was not sufficient to satisfy the proponent's burden of
> demonstrating that the witness was unavailable.*

*Id.* (emphasis added; citation omitted); *see Weisman v. Alleco, Inc.*, 925 F.2d 77, 79 (4th Cir. 1991)

(refusing admission of testimony under 804 because party "fail[ed] to produce any competent

medical evidence of the reasons and necessity for [witness's] hospitalization and resultant

unavailability") (citing *Acosta*).  By contrast, in *Parrott v. Wilson*, 707 F.2d 1262, 1268 (11th Cir.

1983), the Eleventh Circuit held that a witness's deposition was properly admitted where the parties

had deposed the witness's doctor who attested thoroughly to the witness's mentally ill condition and

poor prospects for near term improvement.  The court suggested that "[s]ituations involving out-of-

state or ill declarants . . . may require a greater degree of detail in the findings of fact."  *State v.

Triplett*, 340 S.E.2d 736, 740 (N.C. 1986) (citing *Parrott*).

The situation here is akin to *Acosta*.  The State presented only Trammer's testimony,

uncorroborated by medical evidence, that Boozer was too ill to testify.  To satisfy the reasonableness

179

criteria, however, the State needed to make an effort, at the very least, to exhaust all leads.[80]  As in *Acosta*, the investigator's report is an assertion without proof, and the proffer lacked corroborating medical evidence.  More generally, the State's effort was not reasonable because the State failed to exhaust available sources of information.  Due diligence required the State, at a minimum, to ascertain the name, address, and phone number of Boozer's physician and attempt to contact the doctor treating Boozer to obtain "medical evidence" of her inability to attend the trial.  There is no evidence, however, that the State made any effort to obtain medical verification on Boozer's condition.  If parties could establish unavailability due to illness simply by taking witnesses at their word, witnesses could avoid testifying by feigning illness, and parties could avoid potentially damaging cross-examination simply by proffering hearsay obtained in an out-of-court conversation with the witness.  The Confrontation Clause and Rule 804 stand to prohibit such tactics.

2.    **The State failed to establish that it was unable to procure Boozer's attendance by process or other reasonable means.**

In the absence of medical evidence corroborating that Boozer's illness prevented her from attending the trial, the state bore the burden to prove that it made a thorough, good-faith effort to procure her attendance.  At trial, the state argued that its burden was satisfied automatically by the

---

[80]*See Roberts,* 448 U.S. 56 (five unsuccessful attempts to serve subpoena and failure to pursue vague leads from witness's mother about whereabouts of witness out of state constituted a good faith effort); *see also, e.g., Johnson v. State*, 623 So. 2d 444 (Ala. Crim. App. 1993) (finding of unavailability where the state presented the testimony of multiple witnesses, including the missing witness's mother, girlfriend, a city jailer (the witness had recently escaped from jail) and an investigator who could not find the witness); *Nolen v. State*, 469 So. 2d 1326 (Ala. Crim. App. 1985) (finding that, "although state may have done more," due diligence established sufficient to admit prior testimony where investigators presented uncontroverted testimony that they had called last known place of employment of witnesses and sent letters to their last known address); *Matkins v. State*, 521 So. 2d 1040, 1041-42 (Ala. Crim. App. 1988) (same, regarding attempt to reach witness at last known phone number"); *Pilley v. State*, 930 So. 2d 550, 561 (2005) (same, where last known address was out of state).

fact that Boozer was out of the state, in Florida: the prosecutor asserted, "anybody who lives out-of-state is unavailable." Vol. 41, R. 621-622. While that may have been true in 1890, *see Pruitt v. State*, 9 So. 406 (1890), it was not true at the time of petitioner's trial, and it is not true now. *See Barber v. Page*, 390 U.S. at 724 n.4; *Anderson v. State*, 362 So. 2d 1296, 1301 (Ala. Crim. App. 1978).

> For witnesses not in prison, the Uniform Act To Secure the Attendance of Witnesses from Without a State in Criminal Proceedings provides a means by which prosecuting authorities from one State can obtain an order from a court in the State where the witness is found directing the witness to appear in court in the first State to testify. The State seeking his apparance must pay the witness a specified sum as a travel allowance and compensation for his time. As of 1967 the Uniform Act was in force in 45 States, the District of Columbia, the Canal Zone, Puerto Rico, and the Virgin Islands.

*Barber*, 390 U.S. at 724 n.4 (citation omitted). In *Barber*, the Supreme Court held that a witness was not unavailable where the party seeking to admit prior testimony failed to use available means, including the Uniform Act, to secure the witness's presence at trial: "The right of confrontation may not be dispensed with so lightly." *Id*. at 725.

Alabama adopted the Uniform Act, prescribing procedure for securing the presence of an out-of-state witness at a criminal trial, in Alabama Code section 12-21-283. *See Anderson v. State*, 362 So. 2d 1296, 1302 (Ala. Crim. App. 1978). And the CCA has since found that the State failed to exercise due diligence by failing to utilize the provisions of section 12-21-280 to procure the presence of a witness incarcerated out-of-state:

> Because the prosecution did not utilize the provisions of the Uniform Act to Secure the Attendance of Witnesses from Without a State in Criminal Proceedings or a writ of habeas corpus ad testificandum or by any other means show that the witness was unavailable to testify, we cannot characterize the state's efforts to produce the witness as

> having been made with due diligence or in good faith. The mere fact that a witness is incarcerated in another state does not constitute legal "unavailability" for purposes of the introduction of former testimony. Since the witness was not "unavailable" for purposes of the confrontation requirement, this case must be reversed and remanded.

*Id*. at 1302.[81]  In *Scroggins*, the Alabama Supreme Court reversed and remanded for a new trial where the only evidence supporting the witness's unavailability was the word of the district attorney's investigator:

> Morgan Knight, an investigator with the Jefferson County district attorney's office, was the only witness to testify as to Williams's unavailability.  Knight's testimony reflects that he conducted his search for Williams primarily by telephone.  He did not know whether Williams had been served with a subpoena by the Jefferson County sheriff's office.  He stated that he put a "hold" on Williams, but that although the juvenile authorities arrested him and placed him in the juvenile facility, he was released before Scroggins's trial.  No writ of attachment was ever issued for Williams.  We therefore conclude that the State failed to carry its burden to show that Billy Joe Williams was "unavailable," so that his testimony given at the preliminary hearing would have been admissible into evidence at Scroggins's trial.

*Id*. at 134; *see also Flowers v. State*, 799 So. 2d 966, 974 (2000) (merely ascertaining that witness is out of state in California does not establish due diligence).

---

[81] In *Anderson*, the CCA cited the following language from the Eastern District of Michigan with approval:

> *Barber v. Page* discredited the old concept that a mere showing by the prosecution that a witness was in another state would constitute 'unavailability' so as to justify the use of a transcript at a defendant's trial. Since *Barber v. Page*, the prosecution must do more than just show the witness is out of the jurisdiction of the state where the defendant is being tried. Where the prosecution knows the specific location of a witness who is out of the state, the prosecution must subpoena the out-of-state witness under the 'Uniform Act to Secure the Attendance of a Witness from Without a State' if such a statute is available.

362 So. 2d 1302 (quoting *Eastham v. Johnson*, 338 F. Supp. 1278, 1281 (E.D.Mich.1972)).

Here, Trammer's testimony shows that after talking with Boozer, the State abandoned all effort to bring her to court, despite knowing her location. There is no set rule for what supports diligence in each case. But the State must exhaust all reasonable avenues.[82] The question is whether the State's determination to stop investigating the witness's availability based upon a conversation with the witness was reasonable. *See California v. Green*, 399 U.S. at 189 n.22. The testimony of the State's investigator, Trammer, shows that the State simply took Boozer at her word, without any attempt to verify her representations or procure her presence. In light of the Alabama court decisions on unavailability, there is a reasonable probability that, had appellate counsel challenged the admissibility of Boozer's testimony, the CCA or the Alabama Supreme Court would have found error. Appellate counsel's failure to raise this issue on direct appeal therefore constituted deficient performance.

**B.    There is a reasonable likelihood that petitioner would have prevailed on this claim on appeal, because the admission of Boozer's previous testimony was not harmless.**

In *Flowers v. State*, the Alabama Court of Criminal Appeals found the State failed to establish necessity for the use of prior testimony, but nevertheless upheld the defendant's conviction after finding the witness's testimony harmless. *Flowers* 799 So. 2d at 982 (Ala. Crim. App. 2000)

---

[82]For example, in neither *Nolen* nor *Matkins* did the state issue subpoenas for the witnesses, and the court found that failure not fatal to their diligence because under the facts "such an effort would have been a useless gesture as the State had no address at which to serve any subpoena." *Matkins*, 521 So. 2d at 1041; *accord Nolen*, 469 So. 2d at 1328-29. Yet in Matkins, the court did find that where the investigator acknowledged that he had not "made any extraordinary attempts to locate" the witness, and had simply "asked about him in the local community," the predicate was not met. *Matkins*, 521 So. 2d at 1042 ("The mere fact that, after diligent search, [the witness] was not found at her usual place of residence, or in the county, shows no more than a present disappearance, consistent with the hypothesis that it was merely temporary and that she was elsewhere in the state . . . ."). But where a State has located a witness, the Confrontation Clause requires more.

(opinion on return to remand); *see Chapman v. California*, 386 U.S. 18 (1967). In that capital case, the court found the testimony cumulative to other evidence in the record. *Id*. at 982-83.

The same cannot be said of Boozer's testimony here. Boozer's testimony evinced premeditation existing days before the murders. While other evidence may have supported an inference that petitioner did some foreplanning (such as the fact that he carried a knife with him to the Gordons'), Boozer's testimony presented a *statement* by petitioner, and one that likely would have appeared to jurors, in hindsight, as contemplation of the murder of Sylvia and Mary Gordon. It provided strong evidence of motive. And it significantly undercut the defense argument that "all the evidence, I believe if you take it and put it together, will show that it was just a series of random acts that weren't connected, that weren't planned, which would make it not appropriate under those capital statutes." Vol. 43, R. 1191.

This was not lost on the first prosecutor to argue in the State's guilt-phase summation:

> The seed of this heinous, vicious killing was not planted just on March 11. No, it wasn't. It was planted several weeks and days beforehand. How do we know that? We know that from the statements he made to Frances Boozer whose testimony was read to you. When he said, when this defendant said, I would rather see her, Sylvia, dead that anyone have her. . . . The case is about the choice this man made.

Vol. 43, R. 1157. Or on the second:

> How do we know that David Freeman intended this course of conduct, that he intended to do what happened here, to murder these two women? It is like Mr. McNeill has already explained to you, he had a prior conversation with Francis Boozer and told you that if he couldn't have Sylvia, nobody would.

Vol. 43, R. 1169. And at the sentencing phase, the intent evinced in Boozer's testimony weighed strongly in favor of a death sentence. At both phases, the State's message was that "[t]his case is

about motive . . . . [i]t is about choice," Vol. 44, R. 1212, and "he made a choice," Vol. 44, R. 1303.

That motive and choice was developed most starkly by Boozer's testimony, and admission of the

testimony could not have been deemed harmless on direct appeal. *Chapman*, 386 U.S. 18; *Flowers*,

799 So. 2d at 982-83. Had appellate counsel challenged the erroneous admission of Boozer's

testimony, there is a reasonable probability that it would have been victorious. As a result, petitioner

is entitled to a new guilt-innocence trial or, in the alternative, to a new sentencing proceeding.

**III      Section 2254(d) does not bar relief on this Ground.**

The last state court to address this claim purported to resolve it on procedural grounds. Tab

R-73 at 24, Vol. 55. This, by definition, precludes application of §2254(d). *See* §2254(d) ("An

application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was

adjudicated on the merits in State court proceedings unless the adjudication of the claim . . ."); *Davis*

*v. Crosby*, 341 F.3d 1310, 1313 (11th Cir. 2003) (*per curiam*) ("As the Florida courts failed to

resolve the merits of Davis's claim, the present controversy falls outside of §2254(d)(1)'s

requirement that we defer to state court decisions . . .") (footnote omitted); *Lenz v. Washington*, 444

F.3d 295, 302 (4th Cir. 2006) ("Because there is no state court judgment on the merits, we review

*de novo*"); *Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir. 1997) (§2254(d)'s limitation on relief

inapplicable where, although state trial court resolved merits, state appellate court erroneously relied

on state procedural default rule to deny relief). Because the CCA failed to adjudicate the merits, and

because that court's purported procedural basis for rejecting the claim cannot serve as a valid

procedural bar to federal review, *see supra* at 61-88, petitioner is entitled to merits review, and to

habeas relief upon satisfaction of §2254(a).

185

**GROUND VII – THE PROSECUTION'S VICTIM IMPACT ARGUMENTS VIOLATED PETITIONER'S RIGHTS AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The prosecution's summations exhorted the jury to do precisely what the Eighth Amendment, as construed by the United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808 (1991), and *Booth v. Maryland*, 482 U.S. 496 (1987), forbids: to impose a death sentence because the victims were hardworking, praiseworthy members of the community, and because a surviving family member demanded it. The prosecutor's argument also told the jurors that their sentencing decision should factor in a determination of the victims' value to the community. These arguments injected prejudice incompatible with the Eighth Amendment mandate that a capital sentencing decision must be based upon "consideration of the character and record of the individual offender and the circumstances of the particular offense," *Lockett v. Ohio*, 438 U.S. 586 (1978), and inflamed the jury deliberations, rendering the trial fundamentally unfair under the Due Process Clause of the Fourteenth Amendment.

## I.    Relevant facts and procedural background.

### A.    Victim trial testimony and argument.

As the second witness at the guilt-innocence trial, the State called Deborah Gordon Hosford, the sister of Sylvia Gordon and the daughter of Mary Gordon. Ms. Hosford lived with Sylvia and Mary, and on the morning of March 12, 1988, arriving home at 1:15 a.m., she discovered them murdered. Before discussing those events, the prosecutor asked Ms. Hosford about her sister's background:

> Q.    *What about your sister*?  Tell us a little bit about Sylvia.
> Back in March of '88 was she in school?

186

A.    Yes.  She was at Lanier High School.  She was in the LAMP program doing very, very well.   She was on the literary magazine.

Q.    Was she active in any student groups?

A.    She was a member of SADD, Students Against Drunk Drivers.  Pretty much everything was focused around school.  She considered herself a LAMP nerd, just because she was really focused on getting a good education and getting everything taken care of.

Q.    What were her plans that summer?

A.    . . . . I know she was going to be graduating in a couple of months.  When we had talked about it previously, she was talking about going to college.  She hadn't decided on any particular one at that point.

Vol. 40, R. 458-459 (emphasis added).  And the prosecutor asked Ms. Hosford about her mother's background:

Q.    *And your mama*, you told us her name was Mary Gordon.  How old was she?

A.    She was forty-two years old.

Q.    I don't know if I asked you Sylvia's age.

A.    She was seventeen.

Q.    Did your mother work?

A.    Yes, she did.   At that time she was working at DYNA-lift.  She was doing something clerical there. . . .

187

Vol. 40, R. 458-459 (emphasis added).[83]  After Deborah Hosford testified about finding her sister

and mother dead in her home, the prosecutor revisited the subject of Sylvia's character:

> Q.    What kind of person was your sister in terms of her relationships with other people?
>
> A.    I feel she was a very, very caring person.  She didn't want to hurt anybody's feelings.  I feel that's pretty much the way my mother was, and she instilled that in us.  Neither one of us wanted to hurt anybody's feelings.  We tried to let people off easy if we could and not offend them in any way.  That's just the way she was.  She didn't want to offend anybody.  She didn't want to hurt their feelings, but she couldn't – I guess you have to stand up for yourself at some point, and you have to stand up for yourself regardless, even if it does hurt somebody else's feelings, but I know she never tried to hurt anybody's feelings.

Vol. 40, R. 466.

---

[83] The prosecutor also asked Deborah Hosford about her own background:

> Q.    What about your education?  Where did you go to high school?
>
> A.    I went to Carver high school.  I was in C-Pac in drama out there . . . . .
>
> Q.    Were you putting yourself through school?
>
> A.    Pretty much.  I had a Pell grant and a scholarship at Huntington.  Other than that, I was having to pay for everything else myself.

Vol. 40, R. 458.  And the prosecutor asked Deborah Hosford whether there were pets in the house she shared with Sylvia and Mary:

> Q.    Did you have any pets there at the house with you on Rosebud?
>
> A.    We had six dogs and thirteen cats all living in the house with us.  I was real bad about if I found a stray, I would bring it home.
>
> Q.    Were any of those animals kittens or puppies?
>
> A.    Yeah.  I think at that time we had about four or five newborn puppies.

Vol. 40, R. 457.

188

In summation, the prosecution recalled Ms. Hosford's description of her mother and sister, reinforcing the tragedy of the crime:

> Sylvia Gordon, a 17 year old girl, senior in high school. She was in LAMP, she had a future. She had a promise. She had her whole life to live. She had just begun to live, no where close to reaching her potential.
>
> Mary Gordon wanted to do the best she could do. She did everything she could to provide for her children. She was alone. She had to be mother; she had to be father; she had to be everything, and she did a good job. She had Debbie who worked hard, manager of a TCBY, gone through college, graduated high school, went through C-Pac, made the honors program. Sylvia, as we said, in the honor's program at LAMP. She did what she could. She worked so hard, as the testimony has shown, she was tired all the time. All she wanted to do was rest, if she could get a chance. . . .

Vol. 43, R. 1155-1156. "[O]n behalf of Sylvia Gordon and Mary Gordon," the prosecutor asked the jury, "do justice for them." Vol. 43, R 1155. In support, the prosecutor invoked the impact of the deaths of Sylvia and Mary Gordon on Deborah Hosford: "Ladies and gentlemen, this is a horrific case, and I don't think it can be as horrific for any of us as it was for Debbie Gordon when she stepped in that night and saw her sister lying dead and stabbed to death and her mother lying stabbed to death." Vol. 43, R. 1176.

At the sentencing phase, the State, relying solely on evidence from the guilt-innocence trial, again focused on Sylvia and Mary's lost promise, echoing its previous appeal:

> Mary Gordon will never know what it is like to hear the laughter of her grandchildren. She will never know what it is like to see her daughters get married. She will never know what it is like, as she worked hard her entire life being mother and father and providing and protecting for the welfare of her children, she will never know what it is like to finally rest and enjoy life. He took it all, period. He took it all.

189

> Sylvia Gordon, her whole future in front of her, on the academic path, she will never know what it is like to have gone to college. She will never know what it is like to make a career. She will never know what it is like to meet the man you love and to get married. She will never know what it is like to bear children. She will never know what it is like to hold her child to her breast. He took it all. Selfish.

Vol. 44, R. 1287-1288. In rebuttal summation, the prosecutor told the jurors that their verdict would reflect the relative worth of the victims' lives: "Ladies and gentlemen, you are about to determine the value of the lives of two people who are not with us today. You are about to speak for the people in this community on what is right and what is just." Vol. 44, R. 1296. This, the prosecutor told the jury, was their duty: "None of us here take pleasure in that. We have a duty to do." Vol. 44, R. 1296; *see infra* at 184-185. The prosecutor closed with a forceful argument, imploring that if the jurors did not sentence petitioner to death, they would owe Debbie – Sylvia's sister and Mary's daughter – an apology:

> The defendant would have you forget what happened March 11, 1988. The defendant would have you think, well, gee, he made a juvenile mistake, and so you ought to pardon him for this. You ought to say, well, we won't punish you so hard. What are you going to do? Debbie, I am sorry. I am sorry, Debbie, but your mother and your sister were butchered. He didn't have a big bad record, so we didn't think the ultimate punishment in this case was enough. It was the right thing to do. What are you going to say? Debbie, he might have had a mental problem sometime and had a tough life. Even though he butchered your mother and your sister, we don't think the death penalty is right. Debbie, he might have been under duress or domination of somebody, I don't know who, but somebody out there might have made him do this, so it is okay. Debbie, the only person there that made him do anything was in total control, was David Freeman himself. . . . And lastly, I guess he wants you to say to Debbie, Debbie, he was only eighteen. I am sorry. Only eighteen. We are going to forget what he did.

190

R1301-02. [4][8]

### B.    The direct appeal.

Appellate counsel challenged the prosecutor's guilt-innocence phase summation under the

Fifth, Sixth, Eighth, and Fourteenth Amendments.    Counsel objected to the prosecution's

introduction of facts and argument about the victims' background and character as irrelevant to the

issue of guilt and innocence and calculated to create sympathy for the victims. Tab R-38 at 48-49,

Vol. 45.    Counsel argued that it was improper for the prosecution to urge that the jury convict

petitioner to fulfill a duty as the conscience of the community.  *Id*. at 50.  The combined effect of

---

[84] In addition to arguing that jurors should impose a death sentence for Ms. Hosford, the prosecution argued that jurors had a duty to impose a death sentence for the community.   The prosecutor introduced this notion during the rebuttal closing at the guilt-innocence trial (Vol. 44, R. 1211), and maintained an emphasis on "this duty that you have to do" at the sentencing phase, arguing that jurors must impose a death sentence to hold up their end of a team effort between law enforcement, scientists, lawyers, and the Court:

> It is too late for Sylvia and Mary.  But this duty that you have to make is important, this duty that you have to do.  The police officers have done theirs in collecting the evidence and taking the statements.  The scientists have done theirs in analyzing the evidence and reporting to you.  The lawyers on both sides have done their duties.  The Judge is doing his.  And you have fulfilled part of yours.

Vol. 44, R. 1297-1298.

> You have a duty that is greater than life itself.  Just as a police officer has a duty, and every time he or she goes out, they lay their lives down for you and me, for total strangers, a duty greater than life.  Your duty today is just as important.  It is important no just to David Freeman, but to the people who value life.  Earlier you were asked if you ever felt, have you ever read the paper, have you ever talked to somebody and said, why don't they do something about this?  Why isn't something changed?  Why don't they make a difference?  Folks, you twelve are they now.  You are they.  There is no one else to do this.

Vol. 44, R. 1299-1300.

these comments, counsel argued, deprived petitioner of a fair trial under the Fifth, Sixth, and Fourteenth Amendments. *Id*. And counsel pointed out that the prosecutor's arguments injected extraneous and arbitrary factors into the sentencing proceeding, in violation of the Eighth Amendment. *Id*. at 50-51.

With regard to the penalty phase closing argument, appellate counsel urged that "[t]he prosecutors' arguments relating to the victims were particularly egregious." *Id*. at 56. "[S]tatements to the jury that what is recommended would declare the value of the victims' lives were wholly incorrect." *Id*. at 56; *see id*. at 57. Also incorrect were the prosecutor's arguments urging the jury to choose the death penalty because Deborah Hosford would desire it. *Id*. at 56 ("*Payne* did not open the door to all kinds of victim evidence.") (citing *Robison v. Maynard*, 829 F.2d 1501 (10th Cir. 1991)). [5][8]

The CCA found the prosecutor's reliance, during the guilt-innocence phase summation, on information about the character and background of the victims to be a legitimate commentary on trial evidence (the testimony of Deborah Hosford). *Freeman v. State*, 776 So. 2d at 185. The court also held that, even if the evidence was irrelevant and the argument improper, the error was harmless. *Id*. The court approved of the prosecutor's argument that the jurors were obligated to "do their duty" and "do justice" for Sylvia and Mary Gordon at both phases, as "general appeals for law enforcement and justice . . . not sympathy." *See id*. at 186-87. And the court found the penalty-phase argument concerning the character and lost future promise of Sylvia and Mary Gordon proper victim impact

---

[85] Noting the Eleventh Circuit's pledge to carefully scrutinize penalty-phase summations calculated to inflame the jury's passions or to direct attention to arbitrary factors, appellate counsel also challenged the prosecutor's persistent call for the jury to do the "duty that you have to do" by imposing a death sentence. *See* Tab R-38 at 51-55, Vol. 45. Counsel based this argument on due process precedent and on the Eighth Amendment (citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Lockett v. Ohio*, 438 U.S. 586 (1978)). *Id*.

argument under *Payne v. Tennessee*, 501 U.S. 808 (1991). *Freeman*, 776 So. 2d at 184-85. Finally, the court held that the prosecutor's argument that "if [the jury] did not vote to impose the death penalty, the jury would owe Debrorah Gordon Hosford . . . an apology" was also proper because:

> The prosecutor's argument . . . did not suggest to the jury that it should vote for the death penalty based simply on sympathy for the victims or the victims' family. The prosecutor was simply arguing to the jury that the mitigating circumstances argued by Freeman, even if proven, were outweighed by the aggravating circumstances. The prosecutor urged the jury to follow the law in making its sentencing recommendation. It did not urge the jury to base its recommendation on sympathy for the victims' family.

*Freeman,* 776 So. 2d. at 189.[86] The CCA did not address petitioner's claims that the prosecutor's argument improperly asked the jury to assess the value of the victim's lives and that it improperly relied on what the victims' relatives – specifically, Deborah Hosford – would desire. *See id*.

## II.    Argument.

The prosecutor's argument in this case went beyond what the United States Supreme Court allows as permissible victim impact evidence. *Payne v. Tennessee*, 501 U.S. 808 (1991). As petitioner argued on direct appeal, "*Payne* did not open the door to all kinds of victim impact evidence." Tab R-38 at 56, Vol. 45. In *Payne*, the Court did not alter the standing Eighth Amendment prohibition on evidence and argument concerning family members' opinions and characterizations of the crimes and the defendant. 501 U.S. at 825; *see Booth*, 482 U.S. 496; *South*

---

[86]The court also dismissed petitioner's cumulative error argument on the ground that "[w]here no single instance of alleged prosecutorial misconduct constitutes reversible error, the cumulative effect of these instances cannot be considered to be any greater." *Freeman*, 776 So. 2d. at 186-87. The court also held that the prosecutor's argument that petitioner "believed in the death penalty" was a legitimate inference drawn from the evidence and responsive to defense counsel's argument. *Id*. at 188. The court further held that the prosecutor's reference to petitioner's juvenile record was a proper comment that evidence already before the jury and argued by defense counsel was entitled to little weight. *Id*. at 189.

*Carolina v. Gathers*, 490 U.S. 805 (1989). In fact, the Court expressly disapproved, under the Eighth Amendment, of prosecutorial argument that asks jurors to factor in the victim's value to the community. *Payne*, 501 U.S. at 823. *Payne* only held that "a State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed," *id*. at 827, with the caveat that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief," *id*. at 825 (citation omitted).

Appellate counsel challenge the prosecution's penalty phase summation as a violation of both due process argument, and the Eighth Amendment prohibitions left intact by *Payne*. The CCA's opinion, however, does not acknowledge or address the Eighth Amendment challenges. *See Freeman*, 776 So. 2d. at 187-188. Accordingly, this Court's authority to grant relief on the Eighth Amendment claims is unconstrained by §2254(d). *See Wiggins*, 539 U.S. at 534; *Rompilla*, 545 U.S. at 390 (2005); *Espy v. Massac*, 443 F.3d 1362, 1365 (11th Cir. 2006) (When a state court fails to address an issue raised by the defendant, §2254(d) does not apply). Additionally, as discussed below, while the CCA did reach the due process issue, its decision was both wrong on the constitutional question, and defective within the meaning of §2254(d)(1).

A.  **The argument that the jurors would determine the value of the victims' lives was improper under the Eighth Amendment.**

In upholding the admissibility of evidence and argument about the victim and the impact of the murder on the victims' relatives, the Supreme Court expressly rejected the notion that such evidence and argument could be used to "permit[] a jury to find that defendants whose victims were

194

assets to their community are more deserving of punishment than those whose victims are perceived

to be less worthy." *Payne*, 501 U.S. at 823.  The court explained:

> As a general matter . . . victim impact evidence is not offered to
> encourage comparative judgments of this kind – for instance, that the
> killer of a hardworking, devoted parent deserves the death penalty,
> but that the murderer of a reprobate does not.  It is designed to show
> instead each victim's "uniqueness as an individual human being,"
> whatever the jury might think the loss to the community resulting
> from his death might be.

*Id*.  In this case, the prosecutor's penalty phase arguments describing Sylvia and Mary Gordon

exceeded a description of the character and impact of the lives lost.[87]  The prosecutor told the jurors

that their verdict would reflect the value, the relative worth, of the victims' lives to the community:

---

[87]The prosecutor's guilt-innocence summation argument describing Sylvia and Mary Gordon was improper and was based upon victim-impact testimony that was improperly elicited during the guilt-innocence trial.  Alabama caselaw establishes that character and background testimony about a victim is irrelevant to the determination of guilt or innocence.  *See, e.g., Gissendanner v. State*, __ So. 2d __, 2006 WL 510505, at *8-9 (Ala. Crim. App. 2006) (finding testimony that victim had no children irrelevant to murder prosecution); *Ex parte Rieber*, 663 So. 2d 999, 1005-06 (Ala. 1995) (finding testimony about victim's children's ages and custody status irrelevant and inadmissible to determination of guilt:  "the only issue before the jury during the guilt phase of the trial was whether [the appellant] had robbed and killed [the victim]").  In *Rieber*, the Alabama court "caution[ed] prosecutors that the introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law."  *Id*. at 1005-06.  Under *Rieber* and like cases, the testimony elicited from Deborah Gordon Hosford concerning the background and character of her sister and mother was irrelevant, inadmissible, and highly prejudicial.  The CCA ignored Alabama law in holding that the prosecutor's guilt-innocence phase arguments on the character and background of Sylvia and Mary Gordon were a proper inference from the evidence.  *See Freeman v. State*, 776 So. 2d at 185.

The guilt-innocence victim impact evidence and argument, whether or not harmless in the guilt-innocence trial, contributed to the Eighth and Fourteenth Amendment violations in the sentencing proceeding.  *See Darks v. Mullin*, 327 F.3d 1001, 1018-19 (10th Cir. 2003) (recognizing that all errors – those occurring at guilt-innocence phase and those occurring at sentencing phase – "are relevant to sentence"); *Cargle v. Mullin*, 317 F.3d 1196, 1208 (10th Cir. 2003) (noting prejudice from guilt-innocence phase errors carried over into penalty phase).

> Ladies and gentlemen, you are about to determine the value of the lives of two people who are not with us today.  You are about to speak for the people in this community on what is right and what is just.

Tab R-32, Vol. 44, R. 1296.  Further, the prosecutor told the jurors that it was their duty to make that value determination:  "None of us here take pleasure in that.  We have a duty to do."  Tab R-32, Vol. 44, R. 1296.

This exhortation to make a value judgment in determining whether to impose a death sentence followed the prosecutor's description of the background and character of Sylvia and Mary Gordon.  Mary Gordon, the prosecutor said, was a hardworking, single mother, a parent who devoted her life to her daughters.  She did not want to work, but would, she anticipated, until she died.  Sylvia was equally an asset to the community, an exceptionally hard-working student looking to the future.  *Payne* prohibits victim impact evidence and argument "offered to encourage comparative judgments," and specifically condemns argument "that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not."  501 U.S. at 823.  That is precisely what the prosecution argued here.  The argument was, unquestionably, improper under clearly established federal law.

> **B.    The argument that jurors should impose a death sentence because it is what Deborah Gordon wanted violated the Eighth Amendment.**

*Booth v. Maryland* involved the murder of an elderly couple, found by their son two days after the murder.  At the sentencing trial, the prosecution offered a victim impact statement, based on interviews with the son and with the victims' daughter, son-in-law, and granddaughter.  As the Supreme Court described, the victim impact statement "provided the jury with two types of

196

information. First, it described the personal characteristics of the victims and the emotional impact

of the crimes on the family. Second, it set forth the family members' opinions and characterizations

of the crimes and the defendant." *Booth*, 482 U.S. at 502.  With regard to the "second type,"

concerning family members' opinions and characterizations of the crimes and the defendant, the

Court held:

> One can understand the grief and anger of the family caused by the
> brutal murders in this case, and there is no doubt that jurors generally
> are aware of these feelings. But the formal presentation of this
> information by the State can serve no other purpose than to inflame
> the jury and divert it from deciding the case on the relevant evidence
> concerning the crime and the defendant. As we have noted, any
> decision to impose the death sentence must be, and appear to be,
> based on reason rather than caprice or emotion. The admission of
> these emotionally charged opinions as to what conclusions the jury
> should draw from the evidence clearly is inconsistent with the
> reasoned decisionmaking we require in capital cases.

*Id*. at 508-09 (citation and quotation omitted).

   The family members' characterization of the defendant and the crime in *Booth* included the

son's statement that "he doesn't think anyone should be able to do something like that and get away

with it," *id*. at 508, and the daughter's statement that she could not forgive the person that murdered

her parents and that "such a person could 'never be rehabilitated,'" *id*. at 500.  The Court placed in

the same category the conclusion of the probation official who produced the victim impact statement

that "the murder of Mr. and Mrs. Bronstein is still such a shocking, painful, and devastating memory

to them that it permeates every aspect of their daily lives. It is doubtful that they will ever be able

to fully recover from this tragedy and not be haunted by the memory of the brutal manner in which

their loved ones were murdered and taken from them." *Id*.; *see also id*. at 509 n.11.  The Court

concluded that admission of these victim impact statements violated the Eighth Amendment. *Id*. at

197

509; *see Gathers*, 490 U.S. 805 (extending *Booth* ruling, in full, to apply to prosecutorial argument as well as evidence).

In *Payne*, the Supreme Court overruled *Booth*'s prohibition on the "first type" of victim impact statement describing the personal characteristics of the victims and the emotional impact of the crimes on the family: a majority of the Court held that a "State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." 501 U.S. at 825. But the Court left undisturbed *Booth*'s prohibition against the "second type" of victim impact evidence and argument, concerning a victim's family offering its opinion about the crime, the defendant, and the appropriate sentence. *Id.* at 830 n.2; *see id.* at 833 (O'Connor, J. concurring).[88] "Thus, the *Booth* prohibition against evidence of family members' opinions and characterizations of the crime, the defendant, and the appropriate sentence remains good law." *United States v. Brown*, 441 F.3d 1330, 1351 (11th Cir. 2006); *see Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir. 2005) ("[T]he *Payne* Court did not alter *Booth*'s holding that admitting evidence of the victims' opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment; rather *Payne* only

---

[88]Note 2 of the *Payne* majority opinion states:

> Our holding today is limited to the holdings of *Booth v. Maryland,* 482 U.S. 496 (1987), and *South Carolina v. Gathers,* 490 U.S. 805 (1989), that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing. *Booth* also held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment. No evidence of the latter sort was presented at the trial in this case.

501 U.S. at 830 n.2.

allows evidence of the victim's personal characteristics and the harm inflicted upon the victim's family and community."). [9][8]

In this case, Deborah Gordon, like the victim's son in *Booth*, discovered her family murdered. As in *Booth*, "there is no doubt" jurors were "generally aware" of the grief and anger she had experienced following the murders, particularly in light of her testimony during the guilt-innocence trial. In *Booth*, the prosecutor admitted evidence showing that the surviving son did not "think anyone should be able to do something like that and get away with it." 482 U.S. at 508. The prosecutor's argument that the jurors would owe Deborah Gordon an apology if they did not impose a death sentence made the analogous point here: "Debbie" wanted and expected the jury to sentence petitioner to death. As in *Booth*, "the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Id*.

In denying relief, the CCA did not mention the Eighth Amendment prohibition on opinion evidence and argument. Rather, the CCA addressed only the "first type" of victim impact statement, concerning the emotional impact of the crime on Deborah Hosford. Doing so, it offered the creative explanation that the "prosecutor was simply arguing to the jury that the mitigating circumstances argued by petitioner, even if proven, were outweighed by the aggravating circumstances. The prosecutor . . . did not urge the jury to base its recommendation on sympathy for the victims'

[89]In *Brown*, the Eleventh Circuit considered whether the prosecution violated *Brady v. Maryland* by suppressing evidence that the victim's kin opposed the death penalty. The court held that based on *Booth* and *Payne*, finding opinions of victim's family on whether or not to impose the death penalty was not relevant. 441 F.3d at 1352. In the case cited by petitioner's appellate counsel, *Robison v. Maynard*, 829 F.2d 1501 (10th Cir. 1991), overruled on other grounds, *Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001), the Tenth Circuit applied the same logic, refusing to grant a victim's family member's testimony that she did not favor a death sentence.

family." *Freeman*, 776 So. 2d. at 189. Deborah Gordon's loss was a legitimate consideration under *Payne*, one that could weigh as an aggravating factor against mitigating factors such as petitioner's age, his lack of a prior record, and his mental impairment.

But that is not all the prosecutor's argument asked the jurors to do. The prosecutor was asking the jurors: If you justify a life verdict by relying on, for example, the defendant's age as a mitigating factor, or his lack of prior record, or his mental impairment, will you be able to explain that to the surviving victim? The prosecutor asked jurors to weigh the mitigating evidence against Deborah Gordon's wants, not merely against the aggravating factors and other evidence in the case. This argument crossed the line drawn by the Supreme Court in *Booth* and *Gathers* and left undisturbed by *Payne*, and so doing violated the Eighth Amendment.

> ### C. The prosecutor's argument encouraging the jurors to draw impermissible conclusions from the victim impact evidence also violated due process.

The prosecutor's sentencing phase summation also violated the due process clause of the Fourteenth Amendment. While the introduction of some victim impact evidence may be relevant, this is only true so long as it is not so "unduly prejudicial that it render the trial fundamentally unfair" under Fourteenth Amendment due process principles. *Payne*, 501 U.S. at 825. For the reasons discussed above, the prosecutor's argument, alone and in combination with the exhortations that the jury had a duty to impose a death sentence, *see* Vol. 44, R.1297-1300, also rendered the sentencing proceeding fundamentally unfair. The CCA's failure to recognize this due process violation – owing substantially to its preoccupation with "sympathy," *see Freeman*, 776 So. 2d at 188-189 – involved an unreasonable application of clearly established due process principles. *See e.g.*, *Romano v. Oklahoma*, 512 U.S. 1, 12-13 (1994); *Darden v, Wainwright*, 477 U.S. 168, 181 (1986); *Roper v.*

*Weaver*, 127 S.Ct. 763 (2006) (order granting certiorari to consider the following question presented: "Since this Court has neither held a prosecutor's penalty phase closing argument to violate due process, nor articulated, in response to a penalty phase claim, what the standard of error and prejudice would be, does a court of appeals exceed its authority under 28 U.S.C. §2254(d)(1) by overturning a capital sentence on the ground that the prosecutor's penalty phase closing argument was "unfairly inflammatory?").

### D.    The improper and inflammatory victim-impact argument denied petitioner a fair and individualized sentencing proceeding.

The objectionable victim impact evidence could not have been harmless under either *Chapman v. California*, 386 U.S. 18 (1967), or *Brecht v. Abrahamson*, 507 U.S. 619 (1993).[90] Victim impact testimony or prosecutorial argument based on victim characteristics and the sense of loss experienced by surviving victims is by its nature emotional. *See Booth*, 482 U.S. at 508-09. And the prosecutor's position as representative of the State makes it more likely that misconduct will sway the jury and prejudice proceedings: "Consequently, improper suggestions, insinuations . . . are apt to carry much weight against the accused when they should properly carry none." *Berger v. United States*, 295 U.S. 78, 89 (1935); *see Strickler v. Greene*, 527 U.S. 263, 281 (1999).

_____

[90]Because the state court failed to reach or resolve the Eighth Amendment challenges raised on direct appeal, those issues should be evaluated only under *Chapman*, which assigns the burden of establishing harmlessness beyond a reasonable doubt to the state. *See Chapman*, 386 U.S. at 24; *Orndorff v. Lockhart*, 998 F.2d at 1426, 1430 (8th Cir. 1992); *Horsley v. Alabama*, 45 F.3d 1486, 1498 n.3 (11th Cir. 1995) (Thatchett, J., dissenting) ("the *Chapman* harmless error standard should apply when a federal habeas corpus court is the first to conduct a harmless error analysis"); *see also Fry v. Pliler*, 127 S.Ct. 763 (2006) (order granting certiorari to address the following question: "If constitutional error in a state trial is not recognized by the judiciary until the case ends up in federal court under 28 U.S.C. § 2254, is the prejudicial impact of the error assessed under the standard set forth in *Chapman v. California*, 386 U.S. 18 (1967), or that enunciated in *Brecht v. Abrahamson*, 507 U.S. 619 (1993)?  Does it matter which harmless error standard is employed?  And, if the *Brecht* standard applies, does the petitioner or the State bear the burden of persuasion on the question of prejudice?").

The prosecutor's argument here did not present a mere statement of a victim's wish, but rather the striking image of a personal affront, the notion that if a juror was inclined to find that petitioner's age, or his lack of criminal record, or his mental impairment, or any other mitigating factor or combination thereof warranted a life verdict, the juror must consider how it could explain that verdict to "Debbie": "What are you going to say? Debbie, he might have had a mental problem sometime and had a tough life. . . . Debbie, he was only eighteen. I am sorry. . . . We are going to forget what he did." Vol. 44, R. 1301-1302. The prosecutor asked jurors to weigh the evidence against Deborah Gordon's wish for a death sentence, not just against the aggravating factors and other evidence in the case.

In the context of the entire proceedings, the prosecutor's emotional appeal was not harmless. The argument came near the end of the penalty-phase summation. It was not responsive to defense counsel's argument, which made only perfunctory mention of the mitigating factors and asked why resolve two tragic deaths with a third. There was no curative instruction. And the court's instructions that the prosecutor's arguments were not evidence, and that the jury must consider only the evidence and weigh the aggravating factors against the mitigating, likely had little curative effect: Deborah Hosford's testimony was in evidence. The way in which she found her family was horrifying. The jury could not easily have disregarded Deborah Gordon's loss or her opinion about the appropriate sentence.

In sum, petitioner has satisfied §2254(a) by demonstrating that the introduction of the prosecution's victim impact arguments violated the due process clause and the Eighth and Fourteenth Amendments. Petitioner has also satisfied §2254(d)(1) by showing that the state court's rejection

of the due process claim was contrary to clearly established federal law.  He is therefore entitled to

a writ of habeas corpus and a new sentencing proceeding.

> **GROUND VIII – PETITIONER'S RIGHT TO TRIAL BY JURY, AND TO HAVE A JURY DETERMINE ALL FACTS ESSENTIAL TO THE IMPOSITION OF THE PUNISHMENT HE RECEIVED, AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, WAS VIOLATED WHEN THE TRIAL JUDGE, RATHER THAN THE JURY, DETERMINED THE FACTS NECESSARY TO INCREASE HIS SENTENCE FROM LIFE WITHOUT PAROLE TO DEATH.**

## I.    Relevant facts and procedural history.

At petitioner's 1996 retrial,  the jury recommended a death sentence by a vote of 11 to 1. Tab

R-34, Vol. 44, R. 1329.  Pursuant to Alabama law, the trial judge was permitted to accept or decline

the jury's recommendation, based on the judge's own factual determinations as to the existence and

relative weight of aggravating and mitigating factors.  *See* Ala. Code §§13A-5-46 and 47.  In this

case, after the jury delivered its non-unanimous recommendation,  the trial court found the existence

of two aggravating factors, weighed those aggravating factors against the mitigating factors, and

determined that petitioner's sentence would be death.  Vol. 44, R. 1329-1330; Vol. 24, C. 1223-

1231. Petitioner thereafter appealed directly to the CCA, which affirmed his convictions and

sentence. *Freeman v. State*, 776 So. 2d 160 (Ala. Crim. App. 1999); *Ex parte Freeman*, 776 So. 2d

203 (Ala. 2000).  The case became final on October 30, 2000, when the Supreme Court denied

certiorari.  *Freeman v. Alabama*, 531 U.S. 966 (2000).

In his amended Rule 32 petition, petitioner raised two claims based on *Apprendi v. New*

*Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002).

Ground X of the amended petition alleged:

> Petitioner's right to trial by jury, and to have a jury determine all facts
> essential to the imposition of the punishment he received, as

203

guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, was violated when the trial judge, rather than the jury, determined the facts necessary to increase Petitioner's sentence from life without parole to death.

Ground XII of the petition alleged a related argument:

Petitioner's right to demand the nature and cause of the accusation leveled against him, and to have a copy thereof, as guaranteed by Article I, § 6 of the Alabama Constitution (1901), and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, was violated when he was tried, convicted, and sentenced to death pursuant to an indictment which failed to allege the material elements necessary to the imposition of a death sentence under Alabama law. As a result of this deficiency, the trial court was without jurisdiction to sentence Petitioner to death.

Vol. 19, C. 339-342.  The circuit court summarily dismissed both of these claims as "precluded" on the ground that they "could have been but w[ere] not raised at trial or on direct appeal." Vol. 20, C. 455-457.  On appeal, the CCA disagreed with the circuit court's procedural disposition of Grounds X and XII, recognizing that the claims could not have been raised at trial or on direct appeal because the Supreme Court had not yet decided *Apprendi* at the time the state court ruled on petitioner's direct appeal.

The CCA nevertheless denied relief on two grounds.  First, relying on *Schriro v. Summerlin*, 542 U.S. 348 (2004), the court held that *Ring v. Arizona* "does not apply retroactively to cases on collateral review," and observed that petitioner's conviction had become final "some two years before the United States Supreme Court issued its opinion in *Ring*." Tab R-73 at 28, Vol. 55.  In so holding, the court did not address the material difference between petitioner's status as someone whose conviction was not final when *Apprendi* was decided, and other prisoners, like the petitioner in *Summerlin*, whose convictions were final before *Apprendi*.  As described *infra*, this difference is

204

significant, for while *Apprendi* announced a new rule relative to the Sixth Amendment decisions that came before it, *Ring* did not announce a new rule relative to *Apprendi*.

The state court's second basis for denying relief was that "even if *Ring* were applicable to petitioner's case, all of petitioner's arguments regarding *Ring* were decided adversely to him by the Alabama Supreme Court in *Ex parte Waldrop*, 859 So. 2d 1181 (Ala. 2002)." Tab R-73 at 28, Vol. 55; *see also Waldrop*, 859 So. 2d at 1189 ("the weighing process is not a factual determination"). This holding, however, flies in the face of authority from at least four other states, each of which has held – in opinions issued after the Alabama Supreme Court's decision in *Waldrop* – that the determination of whether aggravating factors outweigh mitigating factors is a factual question subject to the requirements of *Apprendi* and *Ring*. *State v. Ring*, 65 P.3d 915, 943 (Ariz. 2003) (*Ring II*); *Woldt v. People*, 64 P.3d 256, 265 (Colo. 2003); *State v. Whitfield*, 107 S.W.3d 253, 261-64 (Mo. 2003); *Johnson v. State*, 59 P.3d 450, 460 (Nev. 2002).

Petitioner subsequently sought discretionary review of the CCA's decision in the Alabama Supreme Court, but his petition for writ of certiorari was denied.

## II. Discussion.

### A. Petitioner is entitled to the benefit of the rule announced in *Apprendi*, and that rule is sufficient to establish the Sixth Amendment violation requiring relief from his death sentence.

In *Apprendi*, the Supreme Court announced that if a state increases a defendant's authorized punishment contingent on a finding of fact, that fact must be found by a jury unanimously and beyond a reasonable doubt. 530 U.S. at 482-483. This rule, the Court held, applies to capital and non-capital defendants alike. *Id*. at 497. And yet, due to an erroneous understanding of Arizona's capital sentencing law, the Court left in place precedent approving of judge sentencing in Arizona.

205

*See id.* at 496-497 (discussing *Walton v. Arizona*, 497 U.S. 639 (1990)); *see also Ring v. Arizona*, 536 U.S. 584, 602-603 (2002) (acknowledging *Apprendi*'s misapprehension of Arizona's capital sentencing scheme). The impossible coexistence of *Walton* and *Apprendi* was resolved two years later in *Ring*, where the Court overruled *Walton* and reiterated that *Apprendi* applies equally to capital and non-capital cases. *Id.* at 589, 603.

This case implicates the relationship of *Apprendi* and *Ring* for purposes of retroactivity analysis under *Teague v. Lane*, 489 U.S. 288 (1989), and, contrary to the CCA's (and respondent's) apparent assumption, presents a question left unanswered by *Schriro v. Summerlin*, 542 U.S. 348 (2004). *Summerlin* held that *Ring* announced a new rule with respect to an Arizona prisoner whose direct appeal was final years before *Apprendi* was decided. Emphasizing that *Ring* was an outgrowth of *Apprendi*, the Court held that *Ring*, like *Apprendi*, did not meet *Teague*'s exceptions. *Summerlin*, 542 U.S. at 358. Consequently, Summerlin, although sentenced to death by a judge, could not benefit from *Apprendi* and *Ring* because his case was final on direct appeal before those decisions were announced.

Alabama, like Arizona, utilized judicial fact-finding in capital sentencing prior to *Apprendi* and *Ring*. *Compare* Ala. Code §13A-5-47 *with* Ariz.Rev.Stat. Ann. § 13-1105(C) (1989). Prior to petitioner's case, the CCA had considered a number of cases involving prisoners in the same posture as *Summerlin* – prisoners whose direct appeals were fully adjudicated before this Court's decisions in both *Apprendi* and *Ring*. *See, e.g.*, *Brooks v. State*, 929 So. 2d 491(Ala. Crim. App. 2005) (conviction final in 1997); *Barbour v. State*, 903So. 2d 858 (Ala. 2004) (conviction final in 1996); *McWilliams v. State*, 897 So. 2d 437 (Ala. Crim. App. 2004) (conviction final in 1996); *Boyd v.*

*State*, 913 So. 2d 1113 ((Ala. Crim. App. 2003)  (conviction final in 1998).[91]  In each case, the Alabama court declined to apply *Ring* retroactively.

The question in this case is different, and it has not been addressed by either the Supreme Court or the Alabama appellate courts.[92]  Petitioner's direct appeal was final on October 30, 2000, which was *after* the June 26, 2000 decision in *Apprendi*, yet *before* the Court acknowledged in *Ring* that, under an accurate reading of Arizona's capital sentencing scheme, *Walton* could not survive *Apprendi*. As discussed below, the CCA was wrong to rely upon *Summerlin* to conclude that petitioner was not entitled to the benefit of the *Apprendi / Ring* rule given that the judgment in his case did not become final until after *Apprendi* was decided.

### 1.    *Summerlin* is not dispositive of petitioner's case because his conviction was not final when *Apprendi* was decided.

The *Teague* doctrine imposes strict limits on who may benefit from new rules of law.  Under *Teague*, a prisoner is entitled to the benefit of any new rule announced before his conviction becomes "final" on direct appeal.  489 U.S. at 310.  A case is deemed "final" on direct appeal "'where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari had elapsed before [the Supreme Court's] decision' [announcing the new rule in question]."  *Id*. at 295 (quoting *Allen v. Hardy*, 478 U.S. 255, 258 n.1 (1986) (*per curiam*) (citation omitted)).

---

[91]In one additional case of which petitioner is aware, *Wilson v. State*, 911 So. 2d 40 (Ala. Crim. App. 2005), the CCA applied its belief that *Ring* did not apply retroactively to a petitioner whose conviction had not become final until after *Apprendi* was decided. However, there, just as in this case, the state court simply cited *Summerlin*, and neither acknowledged nor discussed the relationship between *Apprendi* and *Ring*.

[92]Although petitioner raised the arguments set forth below to the state courts, the CCA did not address them, and the Alabama Supreme Court declined to review the case.

In *Summerlin*, an Arizona death-sentenced petitioner whose case was in federal habeas proceedings – and whose direct appeal was final years before *Apprendi* and *Ring* were decided – sought the benefit of *Ring* and argued that it applied retroactively. The Supreme Court held that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review," and found that neither of *Teague*'s exceptions applied. *Summerlin*, 542 U.S. at 358. While the CCA relied on *Summerlin* in holding that petitioner was not entitled to retroactive application of *Ring*, it failed to acknowledge or account for the fact that petitioner is in a materially different posture than Summerlin.

Specifically, unlike Summerlin, petitioner is entitled to the benefit of *Apprendi*. The Supreme Court denied certiorari on petitioner's direct appeal on October 30, 2000, over four months after the June 26, 2000 announcement of the decision in *Apprendi*.[93] Therefore, *Teague* does not bar application of the rule of *Apprendi* – that if a state increases a defendant's authorized punishment contingent on a finding of fact, that fact must be found by a jury beyond a reasonable doubt – to this case. In contrast, Summerlin's direct appeal was final long before *Apprendi*, such that the Supreme Court had no occasion in his case to determine whether a capital defendant whose direct appeal was final *after* this Court issued *Apprendi*, but *before* it applied *Apprendi*'s holding with respect to the Arizona capital statute in *Ring*, is entitled to the benefit of the Sixth Amendment rule announced in *Apprendi*.

---

[93]At the time *Apprendi* was decided, petitioner's convictions and sentence had been affirmed on direct appeal by the Alabama Supreme Court, and rehearing had been denied, *see Ex parte David Freeman*, 776 So. 2d 203 (Ala. 2000) (opinion on denial of rehearing), but certiorari had not yet been denied by this Court, *see Freeman v. Alabama*, 531 U.S. 966 (2000) (denying certiorari on October 30, 2000).

Thus, the issue in this case is not whether the *Teague* exceptions apply, as in *Summerlin*, but rather whether, under these circumstances, petitioner's claim is subject to *Teague* at all. The answer depends on whether *Ring* announced a new rule relative to *Apprendi*. As described below, it did not, and petitioner is therefore entitled to the benefit of the Sixth Amendment rule that it was the jury, not the trial judge, which was required to determine every fact necessary to expose him to a sentence of death.

### 2.    *Ring* did not announce a new rule relative to *Apprendi*.

*Apprendi* stated explicitly that capital defendants are no less entitled than non-capital defendants to have any fact that increases the penalty for a crime beyond the prescribed statutory maximum proved to a jury beyond a reasonable doubt. "The person who is charged with actions that expose him to the death penalty," the Court explained, "has an absolute entitlement to jury trial on all the elements of the charge." *Apprendi*, 530 U.S. at 497 (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 257, n. 2 (1998) (Scalia, J., dissenting) (emphasis deleted)). Two years later, the Court reiterated precisely the same thing in *Ring*: "Capital defendants, no less than non-capital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. *Ring* thus echoed *Apprendi*'s determination that capital and non-capital defendants alike were entitled to have juries determine all facts authorizing a sentence increase. *Ring* did not, however, establish the entitlement; that had already been done.[94]

---

[94]This, coupled with the fact that petitioner's judgment was not final before *Apprendi* was decided, answers respondent's attempt to manufacture a discrepancy between the arguments petitioner has submitted to the state courts and this Court. *See* Respondent's Initial Brief at 23 n.11.

While *Apprendi* expressly stated that its rule applied to capital cases, it also generated

uncertainty over how its holding could coexist with *Walton v. Arizona*'s holding that "'the Sixth

Amendment does not require that the specific findings authorizing the imposition of the sentence of

death be made by the jury.'"  *Walton v. Arizona*, 497 U.S. 639, 648 (1990) (quoting *Hildwin* v.

*Florida*, 490 U.S. 638, 640-641 (1989) (*per curiam*)).  This tension was evident in the closing

paragraphs of the majority opinion, which acknowledged a conflict between *Apprendi* and *Walton*,

but concluded that the Arizona capital sentencing provisions did not conflict with *Apprendi*:

> This Court has previously considered and rejected the argument that
> the principles guiding our decision today render invalid state capital
> sentencing schemes requiring judges, after a jury verdict holding a
> defendant guilty of a capital crime, to find specific aggravating
> factors before imposing a sentence of death. *Walton* v. *Arizona,* 497
> U.S. 639, 647-649 (1990); *id.*, at 709-714 (Stevens, J., dissenting).
> For reasons we have explained, the capital cases are not controlling:
>
> > Neither the cases cited, nor any other case, permits a
> > judge to determine the existence of a factor which
> > makes a crime a capital offense. What the cited cases
> > hold is that, once a jury has found the defendant guilty
> > of all the elements of an offense which carries as its
> > maximum penalty the sentence of death, it may be left
> > to the judge to decide whether that maximum penalty,
> > rather than a lesser one, ought to be imposed. The
> > person who is charged with actions that expose him to
> > the death penalty has an absolute entitlement to jury
> > trial on all the elements of the charge.  *Almendarez-
> > Torres*, 523 U.S., at 257, n. 2 (Scalia, J., dissenting)
> > (emphasis deleted).

530 U.S. at 496-497.  Justice O'Connor disagreed, emphasizing that the majority was relying on an

erroneous understanding of Arizona law:

> The distinction of *Walton* offered by the Court today is baffling, to
> say the least. The key to that distinction is the Court's claim that, in
> Arizona, the jury makes all of the findings necessary to expose the

> defendant to a death sentence. As explained above, that claim is demonstrably untrue. A defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty.

*Id*. at 538 (O'Connor, J., dissenting) (internal citations omitted); *see also Jones v. United States*, 526 U.S. 227, 272 (1999) (Kennedy, J., dissenting); *Walton*, 497 U.S. at 709-711 (Stevens, J., dissenting).

Later, in *Ring*, the Court acknowledged Arizona's own determination that Justice O'Connor's interpretation of the Arizona capital statute was correct, and that the *Apprendi* majority's reading of that statute had indeed been wrong. "Recognizing that the Arizona court's construction of the State's own law is authoritative," the Court was "persuaded that *Walton*, in relevant part, cannot survive the reasoning of *Apprendi*." *Ring*, 536 U.S. at 603 (citation omitted). Overruling *Walton*, the Court reached the only conclusion *Apprendi* would permit: "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury.'" *Id*. at 609 (quoting *Apprendi*, 530 U.S. at 494, n. 19)); *see also Sattazahn v. Pennsylvania*, 537 U.S. 101, 111-112 (2003) (Scalia, J., joined by Rehnquist, C.J., and Thomas, J.).

That the holding in *Ring* is merely a reflection of the Court's clearer understanding of Arizona's capital sentencing law, and not an announcement of a new rule relative to *Apprendi*, is buttressed by the Court's characterization of *Ring* in *Summerlin*. Rejecting the Ninth Circuit's reasoning that *Ring* "reposition[ed] Arizona's aggravating factors as elements of the separate offense of capital murder and reshap[ed] the structure of Arizona murder law," *Summerlin v. Stewart*, 341

211

F.3d 1082, 1105 (2003) (*en banc*), the Court stated that "the range of conduct punished by death in Arizona was the same before *Ring* as after . . . Even if our understanding of state law changed, however, the actual content of state law did not." *Summerlin*, 542 U.S. at 355 n.5 (citing *State v. Ring*, 25 P.3d 1139, 1151 (2001)); *see also*, *e.g.*, *Cannon v. Mullin*, 297 F. 3d 989, 994 (10th Cir. 2002) (*Ring* is "simply an extension of *Apprendi* to the death penalty context."), *cert. and stay of execution denied,* 536 U.S. 974 (2002); *In re Johnson,* 334 F. 3d 403 (5th Cir. 2003) ("Since the rule in *Ring* is essentially an application of *Apprendi*, logical consistency suggests that the rule announced in *Ring* is not retroactively available").

In light of the Court's expressed intent in *Apprendi* to include capital cases within the reach of the rule it announced, and the Court's characterization of *Ring* as an opinion emanating from a clearer understanding of Arizona's capital sentencing law, *Ring* did not announce a new rule relative to *Apprendi*. Therefore, *Summerlin*'s holding that "*Ring* announced a new procedural rule that does not apply retroactively to cases already final on direct review," must be read to apply only to prisoners – like the habeas petitioner in *Summerlin* – whose cases were final before *Apprendi* was decided. It follows that, because petitioner's case was not final at the time *Apprendi* was decided, he is entitled to the benefit of the Sixth Amendment rule announced in that decision.[95]

---

[95]It is unclear whether a state court's rejection of a claim on the ground that the claim seeks the benefit of a new rule not available on collateral review constitutes an adjudication on the merits for purposes of triggering the application of §2254(d). The Supreme Court's description of *Teague* analysis as a "threshold matter" that "should be addressed before considering the merits of the claim" strongly suggests that it does not. *Lambrix v. Singletary*, 520 U.S. 518, 524 (1997). Even if this Court were to subject the CCA's retroactivity ruling to §2254(d), however, the magnitude of the state court's error in failing to recognize the nature of the respective holdings in *Apprendi* and *Ring*, or to acknowledge that petitioner was plainly entitled to the benefit of the rule in *Apprendi*, would render the CCA's decision contrary to and/or an unreasonable application of clearly established federal law.

**B.**    **The CCA's conclusion that the weighing of aggravating and mitigating factors is not a determination which must be made by a jury beyond a reasonable doubt was both wrong and unreasonable under *Apprendi*.**

The CCA's second ground for rejecting petitioner's Sixth Amendment claim was that the claim was foreclosed by *Ex Parte Waldrop*, 859 So. 2d 1181, 1189 (Ala. 2002), in which the Alabama Supreme Court held that "the weighing process is not a factual determination." *See* Tab R-73 at 28, Vol. 55. This holding cannot be squared with the language of the relevant Alabama statute, or with the Sixth Amendment principle established in *Apprendi* and applied in *Ring*.

"[A]ll facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt." *Ring*, 536 U.S. at 610 (Scalia, J., concurring).  Under Alabama law, the sentence to be imposed upon a defendant convicted of capital murder cannot be elevated to death unless two factual issues are resolved against him:  first, one or more statutory aggravating circumstances must be found beyond a reasonable doubt, Ala. Code §13A-5-45(e) and (f); and second, the aggravating circumstance(s) must be found to outweigh the mitigating circumstance(s), Ala. Code §13A-5-46(e).  It is the second of these determinations – made by the judge at petitioner's trial after the jury failed to return a unanimous verdict – that the CCA, relying on *Waldrop*, *supra*, refused to subject to the Sixth Amendment rule of *Apprendi* and *Ring* in this case.

The relevant portion of Alabama's sentencing scheme provides as follows:

> After deliberation, the jury shall return an advisory verdict as follows:
>
> (1)    If the jury determines that no aggravating circumstances as defined in Section 13A-5- 49 exist, it shall return an advisory

213

               verdict recommending to the trial court that the penalty be life imprisonment without parole;

(2)    If the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist but do not outweigh the mitigating circumstances, it shall return an advisory verdict recommending to the trial court that the penalty be life imprisonment without parole;

(3)    If the jury determines that one or more aggravating circumstances as defined in Section 13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death.

Ala. Code §13A-5-46(e). By its plain language, this statute dictates that, absent a determination that aggravating circumstances outweigh mitigating circumstances, a sentence of death is not a legally permissible punishment. In other words, if the weighing determination is not resolved in favor of the state, the defendant is legally ineligible for death. By any sensible measure, this must mean that the relative weight of aggravating and mitigating circumstances is a factual determination necessary to expose an Alabama defendant to a sentence of death.

In *Waldrop*, which the CCA treated as dispositive of petitioner's Sixth Amendment claim, the Alabama Supreme Court did not expressly address the language of §13A-5-46(e). Instead, the court rested its analysis on *Ford v. Strickland*, 696 F.2d 804 (11th Cir. 1983), a decision nearly twenty years old at the time *Ring* was decided, which embraced the now-repudiated view that "'aggravating and mitigating circumstances are not facts or elements of the crime. . .'" *Waldrop*, 859 So. 2d at 1189-1190 (quoting *Ford*, 696 F.2d at 818)). On its face, this was an unreasonable application of *Apprendi*, which made clear that its Sixth Amendment rule applied to the factual determinations necessary to expose a defendant to a death sentence.

214

That this is so is further underscored by the weight of authority from at least four other state courts of last resort that have read *Apprendi* and *Ring* to require that the weighing of aggravating factors against mitigating factors is a factual determination going to death-eligibility and therefore the functional equivalent of an element under *Ring*:[96]

◆  *State v. Whitfield*, 107 S.W.3d 253, 261-264 (Mo. 2003) (*en banc*) (part three of Missouri's capital sentencing procedure, in which jury must determine "whether one or more mitigating circumstances exist which outweigh the aggravating circumstance or circumstances," is a factual question subject to the requirements of *Ring*);

◆  *State v. Ring*, 204 Ariz. 534, 65 P.3d 915, 943 (Ariz. 2003) (*Ring II*) (opinion on remand) (determination whether "mitigating factors are not sufficiently substantial to call for leniency" is a factual question subject to the requirements of *Ring*);

◆  *Woldt v. People*, 64 P.3d 256, 265 (Colo. 2003) (determination whether aggravators outweigh mitigators is one of three statutory "prerequisites to a finding . . . that a defendant was eligible for death");

◆  *Johnson v. State*, 59 P.3d 450, 460 (Nev. 2002) (Nevada "statutory law requires two distinct findings to render a defendant death-eligible: 'the jury or the panel of judges may impose a sentence of death only if it finds at least one aggravating circumstance and further finds that there are no mitigating circumstances sufficient to outweigh the aggravating circumstance or circumstances found'").

The weighing operation prescribed by Ala. Code §13A-5-46(e) is materially indistinguishable from the weighing requirements found to be subject to *Apprendi* and *Ring* in *Whitfield*, *Ring II*, *Woldt*, and *Johnson*. If anything, Alabama's weighing requirement operates even more clearly as an eligibility factor than its counterparts in other states since, under §13A-5-46(e), a jury is legally forbidden to recommend a death sentence if the outcome of the weighing determination does not

---

[96]*Cf. Carey v. Musladin*, 127 S.Ct. 649, 654 (2006) (looking to state courts' treatment of disputed constitutional issue in course of resolving whether relevant legal principle was treated as "clearly established").

affirmatively favor the prosecution. Thus, where aggravating factors do not outweigh mitigating factors, death is not an available sentence.  This makes the weighing process a quintessential eligibility determination.  Indeed, Alabama's sentencing procedure might best be described as one involving a series of eligibility factors – guilt of capital murder; finding of aggravating factors; determination of weight – with no subsequent selection stage.  That is, unlike many other jurisdictions, once the eligibility factors have been resolved against an Alabama capital defendant, death is automatic. *Compare* Ala. Code §13A-5-46(e) *with*, *e.g.*, V.A.M.S. 565.030.4 (Missouri).

In sum, when read properly in the light of *Apprendi* and *Ring*, Alabama's capital sentencing scheme requires a factual determination that aggravating circumstances outweigh mitigating circumstances in order to make death a legally permissible sentence.  Because the judge, not the jury, made that determination in this case, and because the CCA unreasonably failed to remedy the resulting Sixth Amendment violation, petitioner is entitled to a writ of habeas corpus.

## CONCLUSION

WHEREFORE, for these reasons, petitioner prays that the Court:

(a)    issue an order to have him brought before it, to the end that he may be discharged from the unconstitutional confinement and restraint;

(b)    conduct a hearing at an appropriately scheduled time where proof may be offered and argument advanced concerning the allegations set forth in this brief; and

(c)    grant such other relief as may be necessary and appropriate.

<div style="margin-left:40%">

Respectfully Submitted,

**s/Keir M. Weyble**
**KEIR M. WEYBLE**
Blume Weyble & Norris, LLC
P.O. Box 11744
Columbia, SC 29211
TEL:   (803) 765-1044
FAX:   (803) 765-1143
E-Mail: keir@blumelaw.com

**s/Christopher Seeds**
**CHRISTOPHER SEEDS**
P.O. Box 6725
FDR Station
New York, NY 10150
TEL:   (917) 837-6760
E-Mail: chrisseeds@gmail.com

**s/Robin C. Konrad**
**ROBIN C. KONRAD**
Federal Defenders
Middle District of Alabama
201 Monroe Street , Suite 407
Montgomery, AL 36104
TEL:   (334) 834-2099
FAX:   (334) 834-0353
E-Mail: robin_konrad@fd.org

Counsel for David Freeman

</div>

April 16, 2007

217

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2007, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Michael Nunnelly, Esq.
Attn: Capital Litigation Division
Office of the Attorney General
Alabama State House
11 South Union Street
Montgomery, Alabama 36130

**s/Robin C. Konrad**
**ROBIN C. KONRAD**
Federal Defenders
Middle District of Alabama
201 Monroe Street , Suite 407
Montgomery, AL 36104
TEL:   (334) 834-2099

Counsel for David Freeman