IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DAVID FREEMAN, | ) | |
| AIS No. 0000Z506, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06-CV-122-WKW |
| | ) | [WO] |
| JEFFERSON S. DUNN, | ) | |
| Commissioner, Alabama Department | ) | |
| of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner David Freeman filed this federal habeas corpus action pursuant to

28 U.S.C. § 2254 challenging his June 1996 Montgomery County conviction for

capital murder and sentence of death. For the reasons set forth below, Petitioner is

not entitled to either habeas corpus relief or a Certificate of Appealability.[1]

## I. BACKGROUND

### A. The Offense and Aftermath

In the early morning hours of March 12, 1988, Deborah Gordon returned to

her home in Montgomery, Alabama to find the porch light off and the front door

---

[1] The undersigned took assignment of this case on July 19, 2016. Doc. # 101.

ajar.[2]  When she entered the house, it appeared to have been ransacked.[3]  Deborah discovered her seventeen-year-old sister Sylvia's lifeless body lying beneath a blanket on Sylvia's bed.[4]  When Deborah pulled the blanket off Sylvia, she saw stab wounds on Sylvia's chest.[5]  Fearful, Deborah backed out of Sylvia's room and decided to leave.[6]  After searching for her car keys, she began to do so.[7]  As she exited the house, Deborah saw her mother Mary's bare legs through the doorway to her mother's bedroom.[8]  She saw no signs of life in either her mother or sister.[9]  Deborah drove to a nearby store and called police.[10]

---

[2] Testimony of Deborah Gordon Hosford, 40 SCR R-470.  All references to the voluminous state court record in this cause will indicate the volume in the state court record (designated "SCR") followed by the page number.  The page numbers in those portions of the state court record containing verbatim transcriptions of the proceedings in Petitioner's three state-court capital murder trials are preceded by the letter "R" and will be so designated herein for the sake of consistency.

[3] Testimony of Deborah Gordon Hosford, 40 SCR R-471.

[4] *Id.*, 40 SCR R-458, R-471.

[5] *Id.*, 40 SCR R-471, R-481.

[6] *Id.*, 40 SCR R-472, R-481-82.

[7] *Id.*, 40 SCR R-472-73, R-481-82.

[8] *Id.*, 40 SCR R-473.

[9] *Id.*, 40 SCR R-483.

[10] *Id.*, 40 SCR R-473.

The medical examiner determined after autopsy that (1) Mary Gordon (age 42),[11] whose body was clad only in her shirt and bra (both of which had been cut), sustained eleven major stab wounds, (2) several of Mary's stab wounds were post-mortem, (3) more than one of her stab wounds would have been fatal independently, (4) Mary died of multiple stab wounds to her abdomen and chest, (5) she also sustained numerous smaller cuts, scratches, and abrasions, and (6) Mary may have survived as long as five-to-ten minutes and been conscious for up to three minutes after her first wound.[12] A forensic pathologist testified via stipulation that vaginal

---

[11] *Id.*, 40 SCR R-459.

[12] Testimony of Dr. James Lauridson, 41 SCR R-648-65. Dr. Lauridson was called to the crime scene at 29 Rosebud Court the night of the murders to examine the bodies prior to their removal and transport for autopsy. *Id.*, 41 SCR R-615. He testified (1) there was a great deal of blood in multiple rooms of the house, (2) Mary Gordon's body was only partially clothed, (3) Mary's body displayed a number of visible wounds, and (4) her legs were spread. *Id.*, 41 SCR R-646. He performed autopsies on both bodies on March 12, 1988. *Id.*, 41 SCR R-647. Dr. Lauridson testified that (1) Mary Gordon's autopsy revealed a bloodstain smeared on the inner aspect of her thigh, (2) Mary wore an electrical device with an ace bandage on her left wrist from a prior surgery to treat carpel tunnel syndrome, (3) he was unable to determine the order of her multiple wounds, (4) Mary suffered (a) a pre-mortem stab wound to the left breast which nicked a rib and caused damage to her lung, (b) a pre-mortem stab wound to the left chest which caused damage to her heart, (c) a long incised wound across her right breast, (d) a pre-mortem stab wound to the right upper quadrant of the abdomen which caused injury to her liver, (e) a post-mortem stab wound to the left front abdomen which struck her stomach, (f) a post-mortem stab wound to her right thigh, (g) a post-mortem stab wound to the anterior upper left thigh, (h) a deep pre-mortem stab wound to the right flank which struck her aorta and kidney, (i) an incised pre-mortem wound to the left back near the shoulder blade, (j) a pre-mortem stab wound to the lower left back which hit the lung, and (k) a pre-mortem stab wound to her left shoulder, (5) there was no specific sole cause of death, (6) Mary also had scratches and small cuts on the front of her abdomen, small cuts on her right front knee, and cuts and abrasions on her left upper back, (7) there was no evidence of any underlying disease in Mary, (8) Mary may have lived five-to-ten minutes after her first wound and may have lost consciousness after approximately three minutes, and (9) Mary died of multiple stab wounds to her abdomen and chest. *Id.*, 41 SCR R-0649-65. Dr. Lauridson's autopsy and crime scene reports on Mary Gordon appear at 34 SCR 3356-63.

swabs taken from Mary Gordon during autopsy contained semen consistent with that of Petitioner.[13]

The medical examiner determined after autopsy that (1) Sylvia Gordon (who was clad only in her socks, bra and tee shirt with her bra and tee shirt pulled up over her head and behind her neck) had twenty-one major injuries plus a number of smaller cuts and scratches, (2) there were a number of very small tears in the lining of Sylvia's vagina, (3) he could not determine whether those vaginal tears were pre- or post-mortem, (4) all but one of Sylvia's wounds were pre-mortem, (5) Sylvia's neck showed bruising as well as tearing of the skin consistent with pressure having been applied to the front of her neck, (6) her vocal cords hemorrhaged, (7) Sylvia died as a result of blood loss, (8) the cause of Sylvia's death was multiple stab wounds, none of which would have been fatal independently, and (9) Sylvia could have survived for up to ten minutes and been conscious for as long as eight minutes after the assault upon her commenced.[14]

---

[13] Stipulation of Phyllis Rollan, 41 SCR R-624. During Petitioner's third capital murder trial, the parties stipulated to the admission of concise summaries of the testimony of most of the forensic experts who had testified extensively during Petitioner's first two capital murder trials. The prosecutor read each of the stipulations in open court in front of the jury. A detailed lab report prepared by Phyllis Rollan addressing her findings regarding bloodstains found at the crime scene and body fluids recovered during the autopsies of Mary and Sylvia Gordon appears at 34 SCR 3344-55.

[14] Testimony of Dr. James Lauridson, 41 SCR R-667-82. Dr. Lauridson testified Sylvia Gordon was found in her bedroom lying on her bed on her back with her arm over her face and a blanket partially over her. *Id.*, 41 SCR R-646. He also testified that Sylvia suffered (1) a large incised wound to the back of her head, (2) an incised horizontal wound under her chin, (3) a stab wound to the left breast that went down and to the left, (4) a stab wound to the right breast that

Deborah Gordon reported to police that, when she left her home the previous afternoon, her sister was sitting with Petitioner in the living room, Sylvia had been seeing Petitioner, and Sylvia had informed Deborah earlier that day she planned to breakup with Petitioner.[15]  Deborah also reported that her mother's Silver Pontiac Sunbird was missing.[16]  Every telephone inside the Gordon home had either been pulled from the wall or had its wires cut.[17]

Mary Gordon's missing Pontiac Sunbird was located in downtown Montgomery a short distance from an apartment occupied by Petitioner and his roommate.[18]  More specifically, an officer testified Mary Gordon's missing Pontiac Sunbird was located at seven a.m. on March 12, 1988 on Scott Street between South

---

went backward and leftward, (5) a stab wound to the left breast that went upward and forward, (6) a stab wound to the upper abdomen that went backward and downward and injured her intestines, (7) an incised wound to her right abdomen, (8) an incised wound to her left chest, (9) a post-mortem incised horizontal wound to her right upper arm, (10) an upward stab wound to her right lower arm, (11) an upward stab wound to her right upper arm, (12) an incised wound to her lower left arm, (13) an incised wound to her left hand, (14) an incised wound to her right hip, (15) a downward slash wound to her right mid-back, (16) a downward stab wound to her left upper chest, (17) a downward stab wound to her backside, (18) a forward stab wound to her right buttocks, (19) an upward and leftward wound to her right thigh, (20) a pair of incised wounds to the front of her right knee, and (21) an incised wound to her left knee.  *Id.*, 41 SCR R-673-79.  Dr. Lauridson's autopsy and crime scene reports regarding Sylvia Gordon appear at 34 SCR 3330-39.

[15] Testimony of Deborah Gordon Hosford, 40 SCR R-461-68, R-475-75.

[16] *Id.*, 40 SCR R-470, R-476.

[17] Testimony of Thomas G. Knox, 40 SCR R-500, R-505-08, R-513.

[18] Stipulation of W.R. Morris, 40 SCR R-533.

Court and South Perry Streets.[19]  A fingerprint examiner testified via stipulation that

a latent fingerprint lifted from the top of the vehicle above the driver's side door

matched Petitioner.[20]  Inside the vehicle, police discovered a butcher knife on the

rear floorboard, which knife a tool-mark examiner testified via stipulation was

consistent with the cuts observed in the ribs of both victims and their clothing.[21]

Hours later, police arrived at an apartment in Montgomery where they found

Petitioner wearing a bandage over one hand.[22]  After Petitioner's roommate gave

---

[19] *Id.*

[20] Stipulation of T.R. Shanks, 40 SCR R-564-65.  The retired officer who located and lifted the fingerprint from the top of Mary Gordon's vehicle on March 12, 1998 testified to that fact. Testimony of Phil Holland, 40 SCR R-556.  Another witness testified via stipulation that he collected Petitioner's fingerprints for comparison purposes.  Stipulation of Rayfield Parks, Sr.  40 SCR R-563.

[21] Stipulation of Lonnie R. Harden, 41 SCR R-635-38.  Knife-cut and tool-mark examination reports prepared by Mr. Hardin appear at 34 SCR 3341-42, 3365-67.
A former police officer testified that he processed Mary Gordon's vehicle after it was taken to impound and he discovered and collected a butcher knife, identified in a photograph admitted at trial as State Exhibit 31, on the rear floorboard of Mary Gordon's vehicle.  Testimony of Phil Holland, 40 SCR R-555-56.  The same officer also testified regarding the collection of Petitioner's bloody clothing from the apartment where Petitioner was arrested, including a jacket found in the same closet as Petitioner's other bloodstained clothing which contained an empty sheath for a knife in the lining.  Id., 40 SCR R-547-48.

[22] Testimony of Terry Jett, 40 SCR R-570-72.  More specifically, Detective Jett testified that (1) on the morning of March 12, 1988, a second canvass of the area around the Gordon home led police to an apartment at 443 S. Court Street in Montgomery, (2) Petitioner answered the apartment door when officers knocked, (3) Henry Peak claimed to be the "owner" of the apartment, (4) Peak executed a written consent to search the apartment, (5) Petitioner had a bandaged hand when he opened the door and explained he had cut his hand on a chair, (6) Jett observed bloody clothing inside the apartment, (7) Petitioner was arrested and *Mirandized* at the apartment, taken to police headquarters, and *Mirandized* again, and (8) Petitioner gave a voluntary, audio-recorded statement which was admitted into evidence as State Exhibit 5A.  *Id.*, 40 SCR R-570-85.

consent to a search of the apartment, police discovered several items of Petitioner's clothing in a closet containing what appeared to be bloodstains.[23] Police arrested Petitioner.[24] A former Montgomery police officer testified he collected the Petitioner's blue jeans, briefs, jacket (containing a knife sheath in the lining), and shoes from the apartment where Petitioner was arrested and took photographs of Petitioner's bandaged hand and the butcher knife recovered from the rear floorboard of Mary Gordon's vehicle.[25] Forensic tests of the blood found on Petitioner's clothing, including his underwear, showed it matched that of the victims.[26] Hairs found inside the front pocket of Petitioner's jeans matched the head hair of Sylvia Gordon.[27]

Both a partial bloody shoe print found on the blouse of Mary Gordon and a separate partial bloody shoe print found at the crime scene were consistent with one of Petitioner's shoes.[28] Sylvia Gordon's blood was present in multiple locations

---

[23] Testimony of Terry Jett, 40 SCR R-574, R-576.

[24] *Id.*, 40 SCR R.575, R-577.

[25] Testimony of Phil Holland, 40 SCR R-537-42, R-544-61.

[26] Stipulation of Phyllis Rollan, 41 SCR R-632-33.

[27] Stipulation of Craig Bailey, 41 SCR R-639.

[28] *Id.*, 41 SCR R-639-40.

throughout the Gordon home.[29]   The clothing of both victims had been cut extensively.[30]   Forensic testing on a blue and white checkered cloth found at the crime scene showed it contained blood consistent with the victims and semen consistent with Petitioner.[31]

Petitioner was arrested on March 12, 1988.[32]   The same day, Petitioner gave police an audiotape recorded statement in which he denied any knowledge of the Gordon murders.[33]

Two days later, Petitioner consented to have bite marks on his arms photographed and thereafter gave police a handwritten written statement in which he again denied any knowledge of the Gordon murders.[34]   Later the same day,

_____

[29] Stipulation of Phyllis Rollan, 41 SCR R-627-29.

[30] *Id.*, 41 SCR R-625-26, R-629.

[31] *Id.*, 41 SCR R-630-31.

[32] Testimony of Terry Jett, 40 SCR R-575, R-577.

[33] Testimony of Terry Jett, 40 SCR R-575, R-577, R-580-82.  A transcript of the Petitioner's audiotaped statement given to police on March 12, 1988 (admitted into evidence as State Exhibit 5A) appears among the records from both Petitioner's first and third capital murder trials at 22 SCR 903-12 and 34 SCR 3205-14, respectively.   In that statement, Petitioner denied any knowledge of the murders of Mary or Sylvia Gordon.

[34] Testimony of Gary Graves, 40 SCR R-593-614.  More specifically, former Detective Graves testified that (1) he went with the medical examiner to the jail to photograph bite marks on Petitioner's arms, (2) Petitioner voluntarily signed a rights form, (3) the medical examiner photographed Petitioner's bite marks, (4) when Graves questioned Petitioner about the Gordon murders, Petitioner responded that he could not talk about it, (5) when the detective asked whether Petitioner would "write it for me," the Petitioner agreed to do so, and (6) Petitioner then wrote out a statement which was marked at trial as State Exhibit 9.  *Id.*, 40 SCR R-597-600, 41 SCR R-602-04.  A copy of Petitioner's first handwritten statement given March 14, 1988 appears at 34 SCR 3218-20.  In that handwritten statement, Petitioner once again denied any knowledge of the Gordon

however, Petitioner furnished police with another handwritten statement in which he stated that (1) during his conversation with Sylvia he "sort of blanked out," (2) when he "came to" her mother was coming in the door, (3) he saw a knife in his hand and he felt he had no choice so he stabbed her mother, (4) he wrapped a bandage around a cut on his hand, (5) when he exited the bathroom he "saw both of them trying to get to the phone," (6) he ran over and got all of the phones off the walls, and (7) he got the keys to the silver car and left.[35]  The same date, Petitioner gave police an audiotape recorded statement in which he admitted he stabbed Mary Gordon once in the back and took her car but denied assaulting Sylvia Gordon and denied sexually assaulting either victim.[36]

---

murders.  Petitioner next began an abbreviated handwritten statement which was marked as State Exhibit 10 and appears at 34 SCR 3221.  Testimony of Gary Graves, 41 SCR R-604.

[35] 34 SCR 3222-23.  Petitioner's final handwritten statement given to police on March 14, 1988 was admitted into evidence at Petitioner's third capital murder trial as State Exhibit 11 and appears in its entirety at 34 SCR 3222-24.  Petitioner concluded his final handwritten statement on March 14, 1988 as follows: "then I said under my breath 'my god don't tell me I did it, case [sic] I loved her.  I wouldn't hurt her for nothing.'  Then I looked down at my hand and said 'I did do it.'  So I said I got to cover myself so I made up all kinds of lies."  34 SCR 3224.

[36] The audiotape-recorded statement Petitioner gave to police on March 14, 1988 was admitted into evidence as State Exhibit 12 and played in open court.  Testimony of Gary Graves, 41 SCR R-611-12.  A verbatim transcription of Petitioner's question-and-answer format statement given March 14, 1988 was admitted into evidence as State Exhibit 13A [41 SCR R-612] and appears at 34 SCR 3225-30 and 22 SCR 897-902.  In his audiotape recorded statement given March 14, 1988, Petitioner stated that (1) he "got dizzy for a little while" as he conversed with Sylvia Gordon, (2) "the next thing I knew Sylvia was laying on the couch bleeding, um, I had a knife in my hand, my hand was cut, her mother was coming in the door," (3) he "looked around at Sylvia and I stabbed Mrs. Gordon in the back," (4) "she headed for her room and I forced my way in," (5) "I fell again, well, I fell, and then when I came to she was laying [sic] beside me, well not beside beside [sic] me, close, close to me," (6) "she was whizzing, so I got up, I went and got the

## B. Indictment

In June 1988, a Montgomery County grand jury indicted Petitioner on six counts of capital murder.[37]

## C. First Trial

Jury selection in Petitioner's first capital murder trial commenced on August 14, 1989.[38]  The guilt-innocence phase of trial began the next day.[39]  On August 19, 1989, the jury returned its verdict, finding Petitioner guilty on all six counts.[40]  The

---

car keys," (7) after he went to the bathroom to clean his hand, he came out and Sylvia was at the kitchen door, (8) he took all the phones out of the walls sockets, (9) "something happened, um, um, I can't quite get it, but I think I know I went out to the car and put my bike in the trunk," and (10) after getting some water he left the house and drove around for a few hours.  34 SCR 3225.

[37] 34 SCR 3327-29.  More specifically, the grand jury alleged Petitioner (1) intentionally fatally stabbed Mary Gordon pursuant to the same scheme or course of conduct in which he intentionally caused the death of another person, (2) intentionally fatally stabbed Sylvia Gordon while unlawfully entering or remaining in the dwelling of Sylvia Gordon with the intent to commit the crimes of murder, rape, robbery, or theft of property and while armed with a deadly weapon, (3) intentionally fatally stabbing Mary Gordon while unlawfully entering or remaining in the dwelling of Sylvia Gordon with the intent to commit the crimes of murder, rape, robbery, or theft of property and while armed with a deadly weapon, (4) intentionally fatally stabbing Sylvia Gordon while in the course of committing the theft of a Pontiac Sunbird while armed with a deadly weapon or causing serious physical injury to Sylvia or Mary Gordon, (5) intentionally fatally stabbing Mary Gordon while in the course of committing the theft of a Pontiac Sunbird while armed with a deadly weapon or causing serious physical injury to Sylvia or Mary Gordon, and (6) intentionally fatally stabbing Mary Gordon while in the course of engaging in sexual intercourse with Mary Gordon by forcible compulsion.  Additional copies of Petitioner's indictment appear at (1) 13 SCR 10-12, which pages appear immediately after several unnumbered pages near the end of that volume of state court records and (2) 18 SCR 7-9.

[38] The verbatim transcription of the proceedings during jury selection in Petitioner's first trial appears at 4 SCR R-613 through 5 SCR R-860.

[39] The verbatim transcription of proceedings during the guilt-innocence phase of Petitioner's first capital murder trial appears at 5 SCR R-61 through 13 SCR R-2001.

[40] 13 SCR R-2001-02.

sentencing phase of Petitioner's first capital murder trial took place on August 21, 1989.[41] At the conclusion of that portion of Petitioner's first capital murder trial, the jury recommended by a vote of eleven-to-one that Petitioner receive the death penalty.[42] On October 5, 1989, the state trial court heard arguments from both parties regarding sentencing.[43] On October 18, 1989, the trial judge imposed the sentence of death.[44]

## D.  First Direct Appeal

Petitioner appealed his conviction and sentence.  In an opinion issued May 6, 1994, the Alabama Court of Criminal Appeals reversed Petitioner's conviction, based upon a *Batson* violation, and remanded for a new trial.  *Freeman v. State*, 651 So. 2d 576 (Ala. Crim. App. 1994), *cert. denied* (Ala. 1994).

## E.  Second Trial - Mistrial

The guilt-innocence phase of Petitioner's second capital murder trial commenced on January 25, 1996.[45]  On January 31, 1996, the state trial court held a

---

[41] The verbatim transcription of the proceeding from Petitioner's first sentencing hearing appears at 13 SCR R-1-122.

[42] 13 SCR R-116.

[43] 13 SCR R-2016-45.

[44] 13 SCR R-2046-56.

[45] The verbatim transcription of the testimony and other evidence admitted during Petitioner's abbreviated second capital murder trial appears at 17 SCR 4-215.

hearing during which (1) Petitioner's lead trial counsel explained he was not physically able to continue with Petitioner's trial due to illness and offered no indication when he might be able to continue the trial, (2) Petitioner's co-counsel advised the trial court that his wife, a nurse, believed lead counsel should be hospitalized and expressed a strong preference that the trial not continue without the presence of Petitioner's lead counsel, (3) the prosecution agreed that lead defense counsel appeared unable to continue with the trial and expressed a desire that Petitioner receive effective representation, and (4) the trial court reluctantly declared a mistrial, noting the trial had already been continued for almost a week, and reset the case for February 26, 1996.[46]    Neither party objected to the trial court's declaration of a mistrial or urged reconsideration of that ruling.

## F.  State Mandamus Proceedings

On February 21, 1989, Petitioner filed a motion to dismiss the indictment against him, arguing that (1) jeopardy attached at the commencement of his second capital murder trial, (2) the state trial court erroneously ordered a mistrial without finding on the record "any reasons of manifest necessity that would warrant

---

[46] 17 SCR 216-24; 19 SCR 365-73.  The precise nature of the illness that incapacitated Petitioner's lead counsel in January 1996 is not clear from the exchanges between counsel and the trial court at the hearing on January 31, 1996.  The state court record does, however, include a formal motion for continuance filed in November 1995 in which Petitioner's lead trial counsel revealed that he had been hospitalized on November 21, 1995 for treatment of "multiple deep vein thromboses (blood clots in veins leading to the heart and lungs)."  18 SCR 127-28.

declaring a mistrial" as opposed to a continuance, and (3) under such circumstances, Petitioner's retrial would violate Double Jeopardy principles.[47]  The state trial court denied Petitioner's motion to dismiss the indictment on Double Jeopardy grounds.[48]

On February 22, 1996, Petitioner filed a petition for writ of mandamus with the Alabama Court of Criminal Appeals urging the same Double Jeopardy argument and seeking an order directing the trial court to dismiss the indictment against him.[49] The same date the Alabama Court of Criminal Appeals denied Petitioner's petition for writ of mandamus.[50]  Petitioner thereafter filed a motion for stay and for writ of mandamus in the Alabama Supreme Court, which denied both motions in an order issued February 23, 1996.[51]

## G.  First Federal Habeas Corpus Proceeding

On February 23, 1996, Petitioner filed an original federal habeas corpus action in this court, which was docketed as cause no. 2:96-cv-323-ID-VPM, urging the same Double Jeopardy claim he raised in the state courts and seeking an emergency writ of habeas corpus and removal of Petitioner's state criminal proceeding to this

---

[47] 18 SCR 144-46; 19 SCR 384-85, 387-88.

[48] 19 SCR 375, 383.

[49] 19 SCR 378-82.

[50] 19 SCR 376.

[51] 19 SCR 377; 22 SCR 869.

court.  In an Order issued February 26, 1996, this court denied both Petitioner's

motion for removal and emergency federal habeas corpus petition.[52]

## H.  Third Trial

Jury selection in Petitioner's third capital murder trial commenced on June 17,

1996.[53]  The guilt-innocence phase of trial commenced June 18, 1996.

### 1.  The Prosecution's Case

In addition to the evidence summarized in section I.A. above, petitioner's jury

also heard testimony during the guilt-innocence phase of Petitioner's June 1996

capital murder trial from forensic dentist Dr. Michael O'Brien that (1) he was board

certified by both the National Dental Board of Examiners and Alabama Board of

Dental Examiners, (2) he had trained in forensic pathology at the Armed Forces

Institute of Pathology and trained in forensic dentistry at both the University of

Texas Health Sciences Center in San Antonio and Northwestern University in

Chicago, (3) he had studied and written articles on bite mark identification, (4) he

went to the Montgomery County Jail to meet with Petitioner and examine bite marks

on Petitioner's arms which appeared to be both human and fresh, (5) the location

and configuration of petitioner's bite marks were consistent with either offensive or

---

[52] 22 SCR 870.

[53] Jury selection in Petitioner's third capital murder trial commenced June 17, 1996 and concluded the following day.  The verbatim transcription of those proceedings appears at 38 SCR R-81-200 through 39 SCR R-201-388.

defensive wounds, as opposed to tearing or passionate bite marks, (6) he took a dental impression or mold of Petitioner's teeth, (7) he later went to the morgue where he took dental impressions of the teeth of both Mary Gordon and Sylvia Gordon, (8) the bite marks on Petitioner's arms did not appear similar to the teeth molds from Petitioner or Mary Gordon, (9) the bite marks on Petitioner's arms compared identically to the mold of Sylvia Gordon's teeth, (10) throughout their encounter, Petitioner appeared very relaxed and cooperative, and (11) he identified photographs of the bite marks on Petitioner's arms which photographs had been admitted into evidence.[54]

The prosecution also requested, and the trial court permitted, to have the testimony of Petitioner's former co-worker Frances Boozer, given during Petitioner's first trial, read in open court.[55] Mrs. Boozer testified during Petitioner's first capital murder trial that (1) she worked with Petitioner at the Union truck stop in Montgomery in March, 1988, (2) a few days before the murders of Mary and Sylvia Gordon, she had a conversation with Petitioner, (3) Petitioner told her he was having problems with his girlfriend, Sylvia, (4) more specifically, Petitioner told her he loved Sylvia and wanted to marry her but Sylvia was a mama's baby and her

---

[54] Testimony of Michael O'Brien, 40 SCR R-435-53.

[55] 41 SCR R-622.

mama didn't seem to like him, (5) because of her mother, Sylvia would not marry him, (6) Petitioner also told her that if he could get rid of her mama, he felt he and Sylvia could have a relationship together, (7) when she learned Sylvia was still in school, she suggested Petitioner find a young lady who was more mature, (8) Petitioner repeated that he loved Sylvia and wanted to marry her, (9) when she suggested that Sylvia might not be ready to give up her freedom, Petitioner sad "well I'm not going to give her up" and "I'd rather see her dead than somebody else have her," (10) Petitioner said that Sylvia's mother "told her exactly what to do and she followed everything mommy said," and (11) Petitioner told her that if Sylvia's mother was dead and if he was rid of her, that he would have a chance.[56]

## 2. The Defense's Evidence

After the prosecution rested at the guilt-innocence phase of trial, Petitioner's trial counsel called a mental health expert, specifically clinical psychologist Dr. Barry Burkhart, who opined that, on the date of his capital offenses (a) Petitioner was suffering from major depressive disorder, Schizotypal Personality Disorder, and Borderline Personality Disorder, (b) Petitioner's condition was characterized by a markedly unstable self-image and violent reaction to perceived abandonment, and (c) when Petitioner perceived that Sylvia was rejecting his romantic overture,

---

[56] Testimony of Frances Diane Boozer, 11 SCR R-1692-1712.

Petitioner suffered intense dissociative symptoms, including inappropriate intense anger, which culminated in a brief reactive psychosis in which Petitioner lost touch with reality and was unable to conform his behavior to the requirements of the law.[57] Dr. Burkhart was the defense's primary witness during Petitioner's third trial offered in support of Petitioner's plea of "not guilty by reason of mental disease or defect." More specifically, Dr. Burkhart testified on direct examination that (1) he was certified in clinical psychology and had served as supervisor of the Lee County Development Center's psychological assessment center, (2) he evaluated Petitioner four times for a total of approximately twelve hours in 1989 and administered many tests, (3) he also reviewed a wealth of records relating to Petitioner's medical and mental health history, Petitioner's written and typed statements to police, (4) Petitioner's mental health records showed that he was diagnosed as depressed and angry from an early age and included recommendations for placement in a long-term treatment facility and psychotherapy, (5) Petitioner reported abuse in the home in Missouri in which Petitioner was placed along with his sister, (6) he diagnosed Petitioner with Schizotypal Personality Disorder, a condition characterized by a pervasive pattern of social discomfort and disability, an inability to get along with others, an inability to make any attachment to people, and brief paranoid psychotic

---

[57] Dr. Burkhart's testimony begins at 41 SCR R-710 and continues to 42 SCR R-913.

episodes, (7) Petitioner had been diagnosed by Dr. Guy Renfro and other mental health professionals as displaying Borderline Personality disorder, a condition very similar to Dr. Burkhart's diagnosed Schizotypal Personality disorder, (8) Borderline Personality Disorder ("BPD") is characterized by instability in interpersonal relationships, self-image, affect, feelings, and marked impulsivity in early childhood or early adulthood, (9) persons with BPD often engage in frantic efforts to avoid real or imagined abandonment, (10) persons with BPD often go through a cycle in their interpersonal relationships in which they initially idealize the object of their affection then, when the relationship fails or deteriorates, they demonize the person they once idealized, (11) persons displaying BPD also have markedly unstable self-images, *i.e.*, their self-image alternates between grandiose and extremely negative, (12) persons displaying BPD also show impulsivity, potentially self-damaging behaviors, including recurrent suicidal behavior and gestures, and an inability to self-regulate their emotions, (13) BPD can be co-morbid with depressive problems, (14) persons displaying BPD also show affective instability due to marked reactivity of mood and intense episodic dysphoria, (15) persons displaying BPD often have feelings of boredom and emptiness and display inappropriate intense anger, (16) persons with BPD can display transient stress-related paranoid ideation or severe dissociative symptoms, which can lead to delusional thinking and a loss of cognitive control, *i.e*, "blanking out," (17) Petitioner meets seven of the nine criteria for BPD

and only five are required for a diagnosis, (18) children require consistent attachment to a parent, (19) children exposed to chronic neglect or abuse are impaired socially, cognitively, and psychologically, (20) children denied normal personal relationships have a high probability of having psychological disorders and emotional dis-control, (21) the extreme stress Petitioner experienced when Sylvia Gordon rejected his romantic overture could have caused Petitioner to experience a psychotic disorder or reactive psychosis in which Petitioner lost touch with reality, and (22) he believed it was "very likely" that, at the time of his capital offenses, Petitioner suffered a brief reactive psychosis while under the stress of being abandoned or rejected.[58]

On cross-examination, Dr. Burkhart admitted that (1) Petitioner's was the first case in which Dr. Burkhart testified in an adult criminal case about a defendant's competency, (2) Petitioner's answers to two different MMPI tests Dr. Burkhart administered showed possibly invalid results, (3) there is disagreement within the mental health profession regarding the efficacy of the Rorschach test he administered to Petitioner, (4) during his clinical interview, Petitioner refused to discuss his condition at the time of his offenses, (5) none of the tests he administered showed that Petitioner was psychotic on March 11, 1988, (6) he disagrees with both (a) Dr. Mohabbat's diagnosis of adjustment disorder with mixed emotions and (b)

_____

[58] Testimony of Dr. Barry Burkhart, 41 SCR R-710-69; 42 SCR R-903-10.

19

Dr. Grayson's finding of an absence of major depressive disorder in Petitioner and diagnosis of adjustment disorder with disturbance of emotions and conduct, (7) he disagrees with a December, 1984 diagnosis of Antisocial Personality Disorder, in part because such a diagnosis is inappropriate for a patient under the age of eighteen, (8) Petitioner's records are full of incidents in which Petitioner was violent, reactive, and refused to follow orders, (9) Petitioner has a pattern of being aggressive toward female staffers at his youth facilities, (10) Petitioner's records from a Missouri youth facility show he was violent at age seven, (11) a psychological evaluation performed in March 1977 showed Petitioner's intelligence as average, (12) Petitioner's records show he was hard to manage at both school and home, (13) by age eight, a Dr. R.J. Kline reported Petitioner had constantly caused problems for boarding home parents and Petitioner was referred to the Department of Pensions and Securities because of his behavioral problems, (14) a September 1978 report by Dr. Kline stated that Petitioner will possibly become antisocial in later life and diagnosed Petitioner with adjustment disorder, (15) a January 1979 report by Dr. Dennis Breiter states Petitioner has a low tolerance for frustration, (16) a psychological evaluation report done when Petitioner was thirteen years and two months old states, in part, that Petitioner (a) refused to talk about his past, (b) had been removed from a foster home because he had been aggressive toward a young child, (c) was angry with persons in authority, (d) had low impulse control, and (e) denied having experienced any sexual

contact, (17) a December 1983 psychological evaluation by Dr. Garry Grayson found no symptoms of major depressive episodes, (18) a May 1984 psychological evaluation by Dr. Dale Wisely found no major depression and diagnosed Petitioner with adjustment disorder with mixed disturbance, (19) a September 1984 psychological evaluation performed when Petitioner was fifteen diagnosed Petitioner with conduct disorder, (2) a psychological evaluation in December 1984 by Dr. F. Lopez reported Petitioner displayed antisocial attitudes, (21) a November 1985 psychological evaluation by Dr. Thomas Boyle performed when Petitioner was sixteen years and four months diagnosed Petitioner with conduct disorder, (22) a January 1989 Lunacy Commission Report prepared by Dr. Joe Dixon summarized the findings of the three physicians who evaluated Petitioner, *i.e.*, Dr. Mohabbat (Adjustment Reaction with anger and depression), Dr. Bryant (Adjustment Disorder with depressed mood), and Dr. Nagi (Antisocial Personality Disorder), (23) Dr. Guy Renfro diagnosed Petitioner with Borderline Personality Disorder, (24) none of the other mental health experts who evaluated Petitioner following Petitioner's arrest diagnosed Petitioner with a psychotic disorder, (25) no one believes Petitioner lacked the substantial capacity to appreciate the criminality of his conduct, (26) only Dr. Burkhart believes Petitioner lacked substantial capacity to conform his conduct to the law, (27) Dr. Burkhart believes Schizotypal Personality Disorder is the correct diagnosis for Petitioner, (28) he believed Petitioner suffered from a mental disease

or defect at the time of his offense which prevented Petitioner from conforming his conduct to the requirements of the law, *i.e.*, a brief reactive psychosis, but (29) he was unable to determine precisely when that brief psychotic episode began or ended.[59]

The defense also called a pair of social workers who testified regarding the disruptive nature of Petitioner's childhood after the State of Alabama removed Petitioner from his birth mother approximately ten months after his birth. More specifically, a man who worked at the Bell Road Group Home in 1986-87 when Petitioner resided there, testified that Petitioner (1) was a loner and appeared isolated and withdrawn, (2) had occasional outbursts, (3) once punched a hole in the wall, (4) was involved in one or two fights, and (5) had a child-like craving for love and attention.[60]

A state adoption program specialist who had worked in Talladega County as Petitioner's case-worker for several years testified that (1) she handled Petitioner's case while he was in foster care, (2) Petitioner never had a relationship with his biological mother, (3) she believed Petitioner's mother was mentally retarded based upon his mother's behavior and appearance, (4) Petitioner's father was a disabled veteran who suffered from a painful facial tic, nerves, and depression, (5)

---

[59] Testimony of Dr. Barry Burkhart, 41 SCR R-769-800; 42 SCR R-801-903.

[60] Testimony of Marvin W. Hartley, 41 SCR R-704-09.

Petitioner's childhood was characterized by a number of frequent, erratic moves, (6) Petitioner was placed with a relative of his step-mother in Missouri from 1974-77 with an eye toward adoption, (7) Petitioner was returned to Alabama in 1977, where he was placed in a foster home and then in Symmetry House in Opelika after Petitioner was aggressive toward another child, (8) Petitioner was placed in St. Mary's Home in Mobile from 1978-83 but was removed from that facility after he assaulted a house parent, (9) Petitioner was placed in Coosa Valley, a crisis facility for delinquent children, for four months in 1983 and then sent to Gateway in Birmingham, (10) Petitioner twice ran away from the Gateway facility, (11) on one occasion while at Gateway, Petitioner climbed on the roof and refused to come down, (12) on another occasion, Petitioner grabbed a butcher knife and cut himself, (13) a social summary (State Exhibit 6A) prepared by Doris Reeder, who took over for her as Petitioner's caseworker, accurately reflects Petitioner's delayed social development and multiple unsuccessful placements, (14) Petitioner did not communicate verbally and was the most difficult child she ever dealt with, and (15) Petitioner's numerous placements were unsuccessful due to Petitioner's aggressive behavior.[61]

---

[61] Testimony of Yvonne Price Copeland, 42 SCR R-915-37.

On cross-examination, the same former caseworker testified that (1) Petitioner's brother Michael did well in school, (2) at age ten months, Petitioner was placed in foster care, (3) Petitioner went to a second foster home and then to live with relatives in Missouri from 1974-77, (4) the family in Missouri returned Petitioner and his other siblings to Alabama after allegations of abuse were made in Missouri, (5) an investigation by military authorities in 1976 concluded "no real abuse had in likelihood occurred," (6) prior to his return, Petitioner was evaluated at age seven in Missouri and found to be normal with low frustration tolerance, (7) Petitioner was removed from a foster family in Alabama after six months and sent to Symmetry House, (8) at age nine, Petitioner was removed from Symmetry House due to behavioral problems, (9) Petitioner then went to St. Mary's Home in Mobile, another residential treatment facility, from 1978-82, (10) Petitioner was removed from St. Mary's and sent to Gateway after Petitioner struck a childcare worker, (11) Dr. Burkhart evaluated Petitioner at age thirteen and recommended further long term residential placement, (12) Petitioner then went to Coosa Valley Attention Facility in Anniston (not a long term facility) and then to Gateway in Birmingham (which was a long term facility), (13) while at Gateway, Petitioner displayed tantrum-like behavior, picked on younger children, often presented himself as the victim when he was the instigator, engaged in self-hurt behaviors, was manipulative and attention-seeking, but not depressed, (14) Petitioner was then sent to the Eufaula Adolescent

Adjustment Center, a more structured facility, in August, 1984 around age fifteen, where Petitioner received both group and individual therapy, (15) in August, 1985, Petitioner escaped or "eloped" from the Eufaula facility with a girl and committed a burglary for which Petitioner was placed in a diversion program in Dothan, (16) a report in April 1986 states Petitioner had displayed excellent conduct and educational progress, (17) individual counseling was included in Petitioner's treatment plan, (18) in September 1986 a report indicates Petitioner was uncooperative during his weekly therapy sessions, (19) Petitioner began acting out at age four and the reason he was moved around so frequently was his own behavior, and (20) all efforts to modify Petitioner's behavior failed.[62]

The defense also obtained the admission of testimony from one of the witnesses called during Petitioner's original capital murder trial to attempt to rebut the testimony of Frances Diane Boozer.[63]  More specifically, the defense requested (and the trial court permitted) that the testimony of Anita Hussey given during Petitioner's first trial be read into evidence.  Ms. Hussey testified during Petitioner's first trial that (1) she was the office manager from the Union 76 Station in Montgomery, (2) she could verify the accuracy of the time cards filled out by Petitioner and Frances Diane Boozer, (3) both Petitioner and Ms. Boozer worked

---

[62] Testimony of Yvonne Price Copeland, 42 SCR R-937-82.

[63] 41 SCR R-709-10.

March 2 through March 6, 1988 but not at the same time, (4) Petitioner and Ms. Boozer worked overlapping shifts on March 9, 1988 for about four hours, (5) Petitioner worked a shift on March 10, 1988 but it was unclear when Ms. Boozer worked that date, (6) she sent Petitioner home on March 11, 1988 when she found him asleep on the job, and (7) Ms. Boozer frequently arrived early for her shift.[64]

### 3. Prosecution's Rebuttal Evidence

After the defense rested at the guilt-innocence phase of trial, the prosecution (1) played the videotaped deposition of Dr. Guy J. Renfro, who expressed opinions contrary to those of Petitioner's mental health expert Dr. Burkhart,[65] and (2) presented the testimony of a forensic psychologist, Dr. Joe W. Dixon, who expressed his own findings and opinions as well as summarized the findings of the three psychiatrists who evaluated Petitioner as part of the Lunacy Commission's determination of Petitioner's competence to stand trial and the possible presence of a mental disease or defect at the time of the offense.

More specifically, in his videotaped deposition, on direct examination by Petitioner's counsel, Dr. Renfro testified that (1) he was a clinical psychologist, (2) he interviewed Petitioner for seven and a half hours over four separate meetings in

---

[64] Testimony of Anita Hussey, 11 SCR R-1714-27.

[65] A verbatim transcription of Dr. Renfro's videotaped deposition appears at 36 SCR 3633-3788.

the Summer and Fall of 1995, (3) he reviewed many of Petitioner's test results, including IQ and MMPI tests, (4) his conclusion was that Petitioner displayed Borderline Personality Disorder ("BPD"), which is a pattern of behavior that a person has represented for a long time and continues to maintain, (5) he did not consider BPD a mental disorder, (6) long-term treatment for BPD is available through relearning of things that were not learned or changes to maladaptive behavior, (7) the criteria for BPD are a pervasive pattern of instability of mood, interpersonal relationships, and self-image beginning by early adulthood and present in a variety of contexts with at least five of the following eight characteristics: (a) a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of over-idealization and devaluation, (b) impulsiveness in at least two areas that are potentially self-damaging, *e.g.*, spending, sex, substance abuse, shoplifting, reckless driving, and binge eating, (c) affective instability, *i.e.*, marked shifts from base line mood to depression, irritability or anxiety usually lasting a few hours and only rarely more than a few days, (d) inappropriate intense anger or lack of control of anger, frequent displays of temper, constant anger, recurrent fights, (e) recurrent suicidal threats, gestures, or behavior or self-mutilating behavior, (f) marked and persistent identity disturbance manifested by uncertainty about at least two of the following: self-image, sexual orientation, long term goals or career choice, type of friends desired, preferred

values, (g) chronic feelings of emptiness or boredom, and (h) frantic efforts to avoid real or imagined abandonment, (8) Petitioner's history establishes the vast majority of the foregoing criteria, (9) Petitioner's frequent movements exacerbated his problems with Petitioner developing a pattern of acting out to test the resolve or commitment of his caregivers - to see if they would abandon him once his behavior escalated, (10) Petitioner's loss of his mother at an early age affected his ability to bond with others, (11) records show Dr. Burkhart observed Petitioner's rapid mood changes from calm to agitated several times, (12) records showed Petitioner became angry or behaved aggressively when he perceived abandonment, including by Sylvia Gordon, (13) for persons with BPD, the perception of impending separation or rejection or loss of external structure can lead to profound changes in self-image, affect, cognition, or behavior, (14) Sylvia Gordon's note to Petitioner (State Exhibit 52), in which she explained that she did not want a romantic relationship with him, could cause Petitioner to perceive an impending separation or rejection, (15) while fear of abandonment can lead to inappropriate anger, he could not say such anger would be uncontrollable, (16) persons with BPD quickly go from idealizing potential caregivers or lovers to devaluing them, *i.e.*, feeling the other person does not care enough, (17) feelings of love at first sight very quickly are followed by dramatic shifts in their views of others, (18) Petitioner lacked a well-developed sense of where he was going in his life and has a fragile self-image, (19) Petitioner's frequent

removals from homes set the tone for Petitioner's feelings of abandonment and rejection, (20) Petitioner was reluctant to talk about his family of origin, (21) Petitioner's impulsiveness, moodiness, episodic depression, and extreme reactivity to interpersonal stress are all well-documented throughout his records, (22) while some persons with BPD may experience psychotic-like symptoms during periods of extreme stress, at the time of his offense, Petitioner experienced rage and anger but nothing that was uncontrollable, (23) as early as age eight, at Symmetry House, Petitioner was unwilling to be accepting or conforming in his relationship with adults, (24) Petitioner did get individual treatment at Eufaula Adolescent Adjustment Center, (25) a personality disorder is defined as a pattern of behavior (learned behavior) that leads to a person consistently getting into trouble or having trouble functioning in society that does not respond to treatment, (26) people have the capacity to change aspects of their behavior but after a certain age and certain point in life, it is very difficult to change, (27) Petitioner's test results consistently show a lot of anger, difficulty getting along with people, and difficulty following rules, (28) persons with BPD tend to be guarded and distrustful, (29) Petitioner needs to feel in control of situations and may feel rejected if people disagree with him, which may

lead him to become angry, and (3) some researchers believe that a psychological event can trigger amnesia as a form of dissociative disorder.[66]

On cross-examination by the prosecution, Dr. Renfro testified that (1) in his opinion Petitioner was competent to stand trial and was displaying the characteristics of BPD at the time of his offense, (2) Petitioner is very sensitive to possible rejection and likely to react with intense anger and impulsive behavior, (3) nonetheless, Petitioner understood his behavior was wrong and criminal, (4) there was no indication Petitioner was unable to conform his behavior to legal standards or that Petitioner had a mental disorder that prevented him from conforming his behavior, (5) he found no evidence of delusional thinking in Petitioner, (6) Petitioner has a tendency not to be totally candid or open, *i.e.*, Petitioner would say he did not recall something but later make references indicating he did recall those events, (7) during his capital offenses, Petitioner engaged in a lot of goal-oriented behavior indicating an appreciation of the criminal nature of his conduct and a desire to avoid apprehension, (8) Petitioner's crime scene conduct was inconsistent with a person who lacked the substantial capacity to appreciate criminality of his conduct or to conform his conduct, (9) he diagnosed Petitioner with (a) BPD on Axis II (lifelong patterns of behavior) but (b) nothing on Axis I (major mental disorders) or Axis III

---

[66] Deposition testimony of Dr. Guy J. Renfro, 36 SCT 3638-3722, 3773-83.

(contributing health or medical problems), (c) Axis IV (psychosocial stress factors) issues, including the fact Petitioner had a capital murder charge pending against him, and (d) Axis V (global assessment of functioning) showed mild to moderate impairment in occupational functioning and social functioning, (10) BPD is not a mental disease or mental illness, (11) despite BPD, Petitioner was aware of what was going on around him during his offenses and able to make conscious decisions and behave in a certain way, (12) in his opinion, there was no indication Petitioner suffered from a mental disorder or illness that prevented Petitioner from possessing the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, (13) *Petitioner told him that he recalled stabbing both Sylvia and Mary Gordon each once,* (14) *Petitioner indicated that he knew what he had done was wrong and discussed disposing of a knife*, (15) Petitioner's admissions that he cut the phone lines suggested he was trying to prevent people from using the phones to call out, (16) Petitioner was able to go to work after the offenses and make it back home, indicating he was capable of goal-oriented behavior, (17) he found no evidence Petitioner was suffering from a brief reactive psychosis at the time of the offenses, (18) the Rorschach and MMPI tests administered to Petitioner by Dr. Burkhart and others had little value in the context of determining Petitioner's mental state at the time of his offenses, (19) Petitioner has never generated a usable MMPI test result, (20) he found nothing in Petitioner's

records indicating Petitioner had ever been diagnosed with a psychosis, and (21) he did not believe Petitioner experienced amnesia during or after the offenses but, rather, only claimed to have done so.[67]

Dr. Dixon testified that (1) he is a forensic psychologist, (2) forensic psychology is different from clinical psychology in that the possibility of secondary gain requires a diagnosing psychologist to be alert to the possibility the patient is presenting bogus or incorrect information, (3) psychologists have to be trained to be forensic psychologists, (4) he evaluated Petitioner in December 1988 to determine whether Petitioner was competent to be evaluated by the Lunacy Commission, (5) he found Petitioner (a) displayed a calm, lucid, rational demeanor, (b) was generally uncooperative, (c) did not appear to be mentally retarded, (d) displayed a flat affect but was emotionally stable and steady, (e) displayed depression that was a "fairly normal range of reaction" for someone who had been indicted for a double murder, and (f) displayed no active thought disorder, (6) Petitioner said he loved his girlfriend and was at work at the time of her murder, (7) three Lunacy Commission psychiatrists (Dr. Bryant, Dr. Nagi, and Dr. Mohabbat) independently evaluated Petitioner, (8) each of those doctors found no evidence of mental illness or mental impairment which prevented Petitioner from standing trial, (9) all three Lunacy

---

[67] Deposition Testimony of Dr. Guy J. Renfro, 36 SCR 3722-73, 3783-86.

Commission doctors found no evidence suggesting grounds existed for a mental state defense to the offenses charged, (10) Petitioner told all three Lunacy Commission doctors he had no role in the murders of the Gordons, (11) none of the Lunacy Commission psychiatrists found any evidence that Petitioner lacked substantial capacity to conform his conduct to the law as a result of a mental disease or defect, (12) the Lunacy Commission doctors who evaluated Petitioner did not have access to all of Petitioner's childhood records or a social history of Petitioner dated January 5, 1989, (13) a diagnosis of Adjustment Disorder (*i.e.*, the diagnoses made by Dr. Bryant and Dr. Mohabbat) is inapplicable to depression that lasts more than six months but Petitioner's prolonged depression could have been a reaction to being in jail or the hospital, (14) at age fifteen, Petitioner was diagnosed by a Dr. Lopez with conduct disorder, the precursor to an adult diagnosis of Antisocial Personality Disorder, (15) Petitioner's siblings were unable to furnish information on Petitioner or his offenses, and (16) the MMPI test requires a cooperative, self-disciplined test subject, who needs to be motivated to perform.[68]

---

[68] Testimony of Dr. Joe W. Dixon, 43 SCR R-1010-1114.

### 4. The Verdict

On June 25, 1996, the jury returned its verdict, unanimously finding Petitioner guilty of all six counts of capital murder in the indictment.[69]

### 5. Punishment Phase

The punishment phase of Petitioner's capital murder trial commenced the same date. The prosecution presented no additional evidence.[70] The defense presented a single new witness, a Catholic Deacon who worked at St. Mary's House in Mobile when Petitioner was a resident there and testified Petitioner was a good child deserving of leniency.[71] Later the same day, the jury returned its verdict at the punishment phase of Petitioner's capital murder trial and recommended, by a vote of eleven-to-one, that a sentence of death be imposed.[72] On August 1, 1996, the parties re-submitted all of the evidence from Petitioner's previous sentencing

---

[69] 44 SCR 1266-68. Petitioner's jury retired to deliberate at 1:15 pm and returned its verdict at 2:20 pm the same date. The completed verdict form from the guilt-innocence phase of Petitioner's June 1996 capital murder trial appears at 23 SCR 1104-06.

[70] 44 SCR R-1271-77.

[71] Testimony of Alexander Moore, 44 SCR R-1278-83.

[72] 44 SCR R-1329-30. Petitioner's jury began its punishment phase deliberations at 4:05 pm, took a break between 5:45 pm and 6:30 pm, and returned its verdict at 8:00 pm. 44 SCR R-1326, R-1329. The verdict form from the punishment phase of Petitioner's June 1996 capital murder trial appears at 23 SCR 1103.

hearing, and the trial judge imposed the sentence of death recommended by Petitioner's jury.[73]

## I. Second Direct Appeal

Petitioner appealed his conviction and sentence.[74]  In an opinion issued April 30, 1999, the Alabama Court of Criminal Appeals affirmed Petitioner's conviction and sentence.  *Freeman v. State*, 776 So. 2d 160 (Ala. Crim. App. 1999), *cert. denied*, 776 So. 2d 203 (Ala. 2000).  The Alabama Supreme Court denied certiorari on

---

[73] 44 SCR 1332-39.

[74] Attorney Thomas M. Goggans filed Petitioner's appellant's brief on April 15, 1997 and asserted sixteen arguments, to wit, (1) the trial court erred in failing to instruct the jury that it could determine the voluntariness of Petitioner's statement to police, (2) there was insufficient evidence to establish Petitioner committed murder in the course of a burglary, both as to the issue of guilt and the existence of an aggravating factor at sentencing, (3) there was insufficient evidence to establish Petitioner committed murder in the course of a robbery, both as to the issue of guilt and the existence of an aggravating factor at sentencing, (4) the jury charge improperly shifted the burden to the defense with regard to the issue of the Petitioner's intent, (5-7) the trial court erroneously admitted three different post-arrest statements made after Petitioner invoked his right to counsel, (8) Petitioner's multiple counts of capital murder arising from one killing violate Double Jeopardy principles, (9) the trial court erred in failing to conduct a hearing to determine Petitioner's competence to stand trial, (10) the trial court's jury instructions improperly limited the jury's ability to consider mitigating evidence, (11) the prosecution improperly commented during the guilt-innocence phase of trial on the victims' character and asked the jury to serve as "the conscience of the community," (12) the prosecution improperly commented at the punishment phase of trial on the victims' inability to lead their lives, asked the jury to serve as "the conscience of the community," referred to Petitioner's juvenile criminal record, and stated that Petitioner believed in the death penalty, (13) the statutory aggravating factor of "especially heinous, atrocious, and cruel" is unconstitutionally vague, (14) the trial court's instructions on insanity effectively deprived Petitioner of that defense, (15) Petitioner's *Miranda* rights were violated when he was questioned despite Petitioner's major depression and Schizotypal personality disorder, and (16) the trial court erred when it failed to determine at sentencing that Petitioner lacked the capacity to conform his conduct to the requirements of the law. 45 SCR 26-68 (Tab 39).  Attorney Goggans filed a supplemental brief on July 2, 1997, arguing the trial court's jury instruction on "breaking and entering" were contrary to Alabama state law.  45 SCR 1-6.

March 10, 2000.  *In re David Freeman*, 776 So. 2d 203 (Ala. 2000).  The United

States Supreme Court denied certiorari October 30, 2000.  *Freeman v. Alabama*, 531

U. S. 966 (2000).

## J.  Rule 32 Proceedings

On October 24, 2001, Petitioner filed his initial petition for relief from

judgment pursuant to Rule 32.[75]  In an Order issued January 23, 2002, the state trial

---

[75] 48 SCR 8-17.  Through attorneys Keir M. Weyble and Larry T. Menefee, Petitioner thereafter filed four amended petitions for Rule 32 relief.  His first amended petition, filed November 9, 2001, appears at 48 SCR 72-87.  His second amended petition, filed January 18, 2002, appears at 48 SCR 145-64.  His third amended petition, filed July 25, 2002, appears at 49 SCR 218-39.  His fourth and final amended petition, filed July 17, 2002, appears at 49 SCR 293-318.  As grounds for relief in his fourth amended petition, Petitioner argued (1) his June 1996 retrial following the January 1996 mistrial violated Double Jeopardy principles, (2) his trial counsel rendered ineffective assistance by (a) failing to conduct meaningful voir dire, (b) failing to object to the admission of graphic and cumulative photographic and videotape evidence showing the crime scene and the victims, (c) failing to object to the testimony and narration of the crime scene video by the evidence technician, (d) failing to object to the admission of the forensic odontologist's testimony as unreliable and unfounded scientifically, (e) failing to present evidence showing an alternative source for the bite marks on Petitioner's arms, (f) failing to submit autopsy data to an independent pathologist for evaluation, (g) failing to present evidence showing Petitioner suffered from unspecified neurological impairments, (h) deposing Dr. Guy Renfro, (i) failing to object on hearsay grounds to the testimony of Dr. Joel Dixon summarizing the findings of other mental health professionals who actually examined Petitioner, (j) failing to present unidentified mitigating evidence, (k) failing to present unidentified evidence of Petitioner's background and mental health history in a manner that would have allowed the jury to give mitigating effect to such evidence, (l) failing to present evidence of Petitioner's good behavior in prison, (m) failing to impeach the testimony of prosecution witness Frances Boozer, (n) failing to raise challenges to the Alabama capital sentencing statute based upon the Supreme Court's holdings in *Ring v. Arizona* and *Apprendi v. New Jersey*, (o) conceding during closing argument at the guilt-innocence phase of trial that a guilty verdict determined the appropriate sentence, (p) failing to object to the admission of raw psychological testing data, and (q) failing to investigate and present evidence showing Petitioner is mentally retarded, (3) the admission of graphic and cumulative photographic and videotaped evidence violated Petitioner's right to a fair trial, (4) the admission of unreliable and unscientific testimony by a forensic odontologist regarding bite marks violated Petitioner's right to a fair trial, (5) the admission of the hearsay testimony of Dr. Joel Dixon violated Petitioner's rights under the Confrontation Clause, (6) Petitioner's rights under the Eighth Amendment were violated by virtue of (a) the admission of unreliable and unscientific

court summarily dismissed Petitioner's Double Jeopardy and Confrontation Clause claims based on Petitioner's failure to raise those claims at trial and on direct appeal.[76] On June 4, 2003, the state trial court held an evidentiary hearing and heard from three witnesses called by Petitioner: Petitioner's former trial co-counsel, *i.e.*, attorneys William Abell and John David Norris, and Petitioner's former state appellate counsel, *i.e.,* attorney Thomas M. Goggans.[77]

---

expert testimony regarding bite marks on Petitioner's arms, (b) the trial court's failure to find Petitioner suffered from a mental disease or defect, (c) the admission of testimony describing the nature of the Petitioner's assaults upon the victims and the possible duration of their suffering, and (d) the admission of raw psychological testing data, (7) Petitioner's right to counsel was violated when his lead trial counsel suffered from a debilitating psychological condition throughout trial, (8) his appellate counsel rendered ineffective assistance by failing to present arguments on direct appeal that (a) Petitioner's Double Jeopardy rights were violated, (b) the admission of graphic and cumulative photographic and crime scene video violated Petitioner's right to a fair trial, (c) the admission of the forensic odontologist's unreliable and unscientific expert testimony rendered Petitioner's trial unfair, (d) Petitioner's Confrontation Clause rights were violated by the admission of hearsay testimony by Dr. Joel Dixon, (e) Petitioner's right to a fair trial was violated by the admission of prior testimony by prosecution witness Frances boozer in the absence of a showing that she was unavailable, (f) Petitioner's constitutional rights under *Ring* and *Apprendi* were violated by the failure of the jury to make findings unanimously and beyond a reasonable doubt at the punishment phase of trial, and (g) Petitioner s right to a fair trial was violated by the admission of raw psychological testing data. (9) Petitioner's lead trial counsel suffered from an actual conflict of interest arising from a debilitating psychological condition which said counsel suffered throughout trial which said counsel failed to reveal to Petitioner, (10) Petitioner's rights under the holdings in *Ring* and *Apprendi* were violated, (11) Petitioner is mentally retarded and, under *Atkins v. Virginia*, constitutionally ineligible for the death penalty, and (12) Petitioner's indictment was constitutionally deficient under *Ring* and *Apprendi* and under Alabama law.

[76] 48 SCR 165. The first and fifth claims in Petitioner's second amended Rule 32 petition, dismissed by the state trial court in January 2002, were identical to the first and fifth claims contained in Petitioner's fourth amended petition summarized above in note 75.

[77] Attorney Abell testified that (1) he was appointed as Petitioner's third trial counsel about three weeks before Petitioner's trial, (2) attorney Allen Howell was Petitioner's lead counsel and attorney John Norris was second chair, (3) the trial court appointed Abell to assist because attorney Howell had been ill, (4) Abell gave the opening statement at the guilt-innocence phase of trial because Howell was unavailable and Norris was nervous, (5) his opening statement focused on the fact Petitioner had been a ward of the state most of his life, (6) the evidence of Petitioner's guilt

In an Order issued June 25, 2003, the state trial court made its findings of fact, conclusions of law, and denied Petitioner's petition for state habeas corpus relief under Rule 32.[78] Petitioner appealed the trial court's denial of his Rule 32 petition.[79] On June 17, 2005, the Alabama Court of Criminal Appeals issued a memorandum

---

was "overwhelming," (7) shortly before trial, the Petitioner's plea was changed from not guilty to "not guilty by reason of mental disease or defect," (8) Abell agreed with this strategy because it was designed to reduce the amount of harmful evidence available to the prosecution, (9) the defense team's experts had been hired by the time Abell joined the defense, and (10) Abell did not participate in the sentencing phase of Petitioner's trial. Testimony of William Abell, 51 SCR R-82 - R-94.

Attorney Norris testified that (1) attorney Howell was lead counsel, (2) attorney Abell was appointed after attorney Howell's illness led to the declaration of a mistrial, and (3) this was Norris' first capital murder trial and he deferred to Howell on all strategic and tactical decisions. Testimony of John David Norris, 51 SCR R-94 - R-105.

Attorney Goggans testified that (1) other than the applicable standard of appellate review, he had no strategic reasons for omitting any particular claims from Petitioner's appellate brief and (2) the applicable standard of appellate review may render some points argued strongly at trial inappropriate for assertion on appeal. Testimony of Thomas M. Goggans, 51 SCR R-106 - R-115.

Petitioner also attempted to introduce an affidavit from his former lead trial counsel, attorney Allen Howell, but the trial court sustained the State's objection to admission and consideration of the Howell affidavit and ordered that document sealed. 51 SCR R-115-23.

[78] The state trial court's "Final Order" dated June 25, 2003 appears at both 50 SCR 446-78 and 55 SCR (Tab R-72). The state trial court found Petitioner failed to assert arguments at trial or on direct appeal similar to Petitioner's first, third, fourth, fifth, sixth, tenth, eleventh, and twelfth claims in Petitioner's fourth amended Rule 32 petition and dismissed each of those claims for that reason. 50 SCR 452-57. The trial court concluded Petitioner failed to present any evidence supporting his ineffective assistance by trial and appellate counsel claims, conflict of interest claims, and denied all those claims (*i.e.*, claims two, seven, eight, and nine) on the merits. 50 SCR 459-78. In the course of rejecting Petitioner's ineffective assistance claims premised upon *Ring* and *Apprendi*, the state trial court noted the Supreme Court of Alabama rejected Petitioner's interpretation of the holdings in those and related United States Supreme Court opinions, citing *Ex parte Waldrop*, 859 So. 2d 1181 (Ala. 2002), *cert. denied*, 540 U.S. 968 (2003). 50 SCR 468-69.

[79] Attorneys Robert Lominack, Keir M. Weyble, and Larry T. Menefee filed a Brief of Appellant on March 3, 2004 in the Alabama Court of Criminal Appeals appealing the trial court's denial of Petitioner's fourth amended Rule 32 petition. 53 SCR (Tab R-60).

affirming the trial court's denial of Rule 32 relief.[80]  Petitioner filed a petition for writ of certiorari in the Alabama Supreme Court.[81]  In an Order issued January 20, 2006, the Alabama Supreme Court denied Petitioner's petition for writ of certiorari.[82]  Petitioner filed a petition for writ of certiorari in the United States Supreme Court.[83]  The United States Supreme Court denied Petitioner's request for certiorari on June 26, 2006.  *Freeman v. Alabama*, 548 U. S. 910 (2006).

## K.  Proceedings in this Court

On February 16, 2006, Petitioner filed his original federal habeas corpus petition, asserting nine grounds for relief (Doc. # 5).[84]  On March 19, 2007,

---

[80] The Alabama Court of Criminal Appeals' Memorandum dated June 17, 2005 affirming the trial court's denial of Petitioner's fourth amended Rule 32 petition appears both at Exhibit 1 attached to 54 SCR (Tab R-64) and at 55 SCR (Tab R-73) [henceforth "Ala. Crim. App. Memo. 55 SCR (Tab R-73)"].  The Alabama Court of Criminal Appeals concluded all of Petitioner's assertions of ineffective assistance by either Petitioner's trial counsel or appellate counsel were unsupported by any specific facts sufficient to warrant an evidentiary hearing, much less satisfy the dual prongs of the analysis set forth in *Strickland v. Washington*.  Ala. Crim. App. Memo. 55 SCR (Tab R-73), at pp. 14-27, 38.

[81] Attorneys Keir M. Weyble and Larry Menefee filed Petitioner's petition for writ of certiorari in the Alabama Supreme Court on September 26, 2005, challenging the denial of Petitioner's fourth amended Rule 32 petition.  54 SCR (Tab R-64).

[82] 55 SCR (Tab R-74).

[83] Attorneys Keir M. Weyble and Christopher Seeds filed a petition for writ of certiorari in the United States Supreme Court on April 18, 2006 challenging the denial of Petitioner's fourth amended Rule 32 petition.  54 SCR (Tab R-65).

[84] As grounds for relief, Petitioner argues that (1) his right to be free of Double Jeopardy was violated after he was retried following the state trial court's mistrial declaration in January 1996 in the absence of manifest necessity, (2) his right to freedom from compulsory self-incrimination was violated when his statements made March 14, 1988 were admitted into evidence because Petitioner invoked his right to counsel prior to making those statements, (3) his lead trial counsel suffered from a debilitating psychological condition (*i.e.*, gender confusion) during trial

Respondent filed his initial brief on procedural default and evidentiary issues (Doc. # 63). On April 16, 2007, Petitioner filed his 218-page "brief" in support of his federal habeas corpus petition (Doc. # 64).[85] On July 19, 2007, Respondent filed his brief on the merits (Doc. # 80).[86] On September 4, 2007, Petitioner filed his reply

---

which created an actual conflict of interest because said counsel did not advice Petitioner of this fact, (4) his trial counsel rendered ineffective assistance by (a) failing to question and challenge for cause three identified members of the jury venire, (b) failing to object to the testimony of forensic odontologist Michael O'Brien on the grounds that he was unqualified to render an opinion and his testimony was unreliable and not scientific in nature, (c) choosing to depose Dr. Guy Renfro, who testified that Petitioner knew right from wrong and contradicted the testimony of Petitioner's mental health expert Dr. Burkhart, (d) failing to investigate, develop, and present evidence showing Petitioner suffers from neurological impairments, *i.e.*, hyperactivity as a child, memory problems, and emotional disturbance, (e) failing to investigate, develop, and present mitigating evidence showing that Petitioner has mental health problems, and (f) failing to present unidentified prison records and the testimony of an unidentified risk assessment expert showing Petitioner had a record of good behavior in prison and is unlikely to be violent in an institutional setting, (5) his right to a fair trial was violated by the admission of unreliable and inaccurate testimony concerning the bite marks on his arms, (6) his appellate counsel rendered ineffective assistance by failing to challenge the admission of the prior testimony of prosecution witness Frances Boozer on state law grounds because there was an inadequate showing that Mrs. Boozer was unavailable to testify in person in 1996, (7) the prosecutor misused victim impact evidence during argument at both phases of trial by asking the jury at the guilt-innocence phase of trial to "do justice" for both victims and by encouraging the jury at the punishment phase of trial to be the conscience of the community and by contrasting the victims' worth as human beings with that of the Petitioner, (8) because the jury's verdict at the punishment phase of trial was less than unanimous, Petitioner's death sentence violates the principles announced by the Supreme Court in *Ring v. Arizona* and *Apprendi v New Jersey*, and (9) because Petitioner's IQ has been measured as low at 75, Petitioner is mentally retarded and ineligible for the death penalty under the United States Supreme Court's holding in *Atkins v. Virginia*.

[85] Despite its great length, Petitioner's "brief" in support of his federal habeas corpus petition did not furnish any record citations, authorities, or argument supporting Petitioner's final claim for federal habeas relief, *i.e.*, Petitioner's claim that he is mentally retarded and, therefore, ineligible to receive the death penalty under the Supreme Court's holding in *Atkins v. Virginia*.

[86] For unknown reasons, Respondent's brief on the merits does not address Petitioner's *Atkins* claim.

brief (Doc. # 83).  On July 19, 2016, this case was reassigned to the undersigned's docket (Doc. # 101).

## II. AEDPA STANDARD OF REVIEW

The state appellate courts rejected most of Petitioner's claims in this federal habeas corpus proceeding on the merits, either on direct appeal or during Petitioner's Rule 32 proceeding.  Because petitioner filed his federal habeas corpus action after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court's review of petitioner's claims for federal habeas corpus relief which were disposed of on the merits by the state courts is governed by the AEDPA.  *Penry v. Johnson*, 532 U. S. 782, 792 (2001).  Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in this cause in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Brown v. Payton*, 544 U. S. 133, 141 (2005); *Williams v. Taylor*, 529 U. S. 362, 404-05 (2000); 28 U.S.C. § 2254(d).

The Supreme Court has concluded the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d) (1) have independent meanings. *Bell v. Cone*, 535 U. S. 685, 694 (2002). Under the "contrary to" clause, a federal habeas court may grant relief if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or (2) the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U. S. at 141; *Mitchell v. Esparza*, 540 U. S. 12, 15-16 (2003) ("A state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'"). A state court's failure to cite governing Supreme Court authority does not, *per se*, establish the state court's decision is "contrary to" clearly established federal law: "the state court need not even be aware of our precedents, 'so long as neither the reasoning nor the result of the state-court decisions contradicts them.'" *Mitchell v. Esparza*, 540 U. S. at 16.

Under the "unreasonable application" clause, a federal habeas court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown v. Payton*, 544 U. S. at 141; *Wiggins v. Smith*, 539 U. S. 510, 520 (2003). A federal court making the "unreasonable application" inquiry

should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *McDaniel v. Brown*, 558 U. S. 120, 132-33 (2010) ("A federal habeas court can only set aside a state-court decision as 'an unreasonable application of . . . clearly established Federal law,' § 2254(d) (1), if the state court's application of that law is 'objectively unreasonable.'"); *Wiggins v. Smith*, 539 U. S. at 520-21. The focus of this inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable; an "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U. S. 465, 473 (2007) ("The question under the AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable - a substantially higher threshold."); *Wiggins v. Smith*, 539 U. S. at 520; *Price v. Vincent*, 538 U. S. 634, 641 (2003) ("it is the habeas applicant's burden to show that the state court applied that case to the facts of his case in an objectively unreasonable manner").

As the Supreme Court has explained:

Under the Antiterrorism and Effective Death Penalty Act, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."

*Bobby v. Dixon*, 565 U .S. 23, 24 (2011) (quoting *Harrington v. Richter,* 562 U. S. 86, 103 (2011)).

Legal principles are "clearly established" for purposes of AEDPA review when the holdings, as opposed to the dicta, of Supreme Court decisions as of the time of the relevant state-court decision establish those principles. *Yarborough v. Alvarado*, 541 U. S. 652, 660-61 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); *Lockyer v. Andrade*, 538 U. S. 63, 71-72 (2003). Under the AEDPA, what constitutes "clearly established federal law" is determined through review of the decisions of the United States Supreme Court, not the precedent of the federal Circuit Courts. *See Lopez v. Smith*, 135 S. Ct. 1, 2 (2014) (holding the AEDPA prohibits the federal courts of appeals from relying on their own precedent to conclude a particular constitutional principle is "clearly established").

The AEDPA also significantly restricts the scope of federal habeas review of state court fact-findings. 28 U.S.C. § 2254(d)(2) provides federal habeas relief may not be granted on any claim that was adjudicated on the merits in the state courts unless the state court's adjudication of the claim resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Wood v. Allen*, 558 U. S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."); *Williams v. Taylor*, 529 U. S. at 410 ("[A]n *unreasonable* application of federal law is different from an

*incorrect* application of federal law."). Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), on habeas review, this does not suffice to supersede the trial court's factual determination. *Wood v. Allen*, 558 U. S. at 301; *Rice v. Collins*, 546 U. S. 333, 341-42 (2006).

In addition, § 2254(e)(1) provides a petitioner challenging state court factual findings must establish by clear and convincing evidence that the state court's findings were erroneous. *Schriro v. Landrigan*, 550 U. S. at 473-74 ("AEDPA also requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'"); *Rice v. Collins*, 546 U. S. at 338-39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'"); *Miller-El v. Dretke,* 545 U. S. 231, 240 (2005) ("[W]e presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'"); 28 U.S.C. §2254(e)(1). It remains unclear at this juncture whether § 2254(e)(1) applies in every case presenting a challenge to a state court's factual findings under § 2254(d)(2). *See Wood v. Allen*, 558 U. S. at 300 (choosing not to resolve the issue of § 2254(e)(1)'s possible application to all challenges to a state

court's factual findings); *Rice v. Collins*, 546 U. S. at 339 (likewise refusing to resolve the Circuit split regarding the application of § 2254(e)(1)).

However, the deference to which state-court factual findings are entitled under the AEDPA does not imply an abandonment or abdication of federal judicial review. *See Miller-El v. Dretke*, 545 U. S. at 240 (the standard is "demanding but not insatiable"); *Miller-El v. Cockrell*, 537 U. S. 322, 340 (2003) ("Even in the context of federal habeas, deference does not imply abandonment or abdication of judicial review. Deference does not by definition preclude relief.").

## III. *ATKINS* CLAIM

### A. The Claim

In his ninth claim for federal habeas relief, Petitioner argues he is ineligible for the death penalty under the Supreme Court's holding in *Atkins v. Virginia*, 536 U. S. 304 (2002), because he is mentally retarded (Doc. # 5, at pp. 61-65).

### B. State Court Disposition

Petitioner presented a highly conclusory version of the same argument as his eleventh ground for relief in his fourth amended Rule 32 petition.[87]  In its Final Order addressing Petitioner's fourth amended Rule 32 petition, the state trial court held the

---

[87] 49 SCR 310-11.

claim was precluded from review because it had not been raised at trial or on appeal[88]

but nonetheless went on to address the merits, finding and concluding as follows:

> Moreover, the record from trial establishes beyond any doubt that Freeman is not mentally retarded. The record contains the results of numerous IQ tests given from ages eight through fourteen years. Freeman's IQ scores include: 87 at age eight; 86 at age nine; 85 at age ten; 89 at age thirteen; and 89 at age fourteen. The record also contains many handwritten letters from Freeman to various individuals that not only establish his literacy, but also clearly show a significant degree of intellectual functioning. Further, the Court personally addressed and observed Freeman on numerous occasions. Based on the record and the Court's personal knowledge of Freeman, even if this claim were properly before the Court, it would be without merit. Therefore, this claim is hereby denied.[89]

Petitioner appealed the state trial court's dismissal and rejection on the merits

of his *Atkins* claim.[90] The Alabama Court of Criminal Appeals affirmed, concluding

the record "affirmatively refutes Freeman's allegation that he is mentally

---

[88] 50 SCR 455.

[89] 50 SCR 455-56 (record citations and legal authorities omitted). In the course of denying Petitioner's related claim that his trial counsel rendered ineffective assistance by failing to investigate Petitioner's IQ and present evidence showing Petitioner was mentally retarded, the state trial court again concluded "the record establishes beyond any doubt that Freeman is not mentally retarded." 50 SCR 471.

[90] 53 SCR (Tab R-60), at pp. 74-77. In his appellant's brief, Petitioner argued, in part, as follows:

> Petitioner's background and social history indicate that he suffers from both subaverage intellectual functioning and significant limitations in multiple adaptive skill areas, including communication, health and safety, and functional academics. These deficits have been present since before his eighteenth birthday, and they were present at the time of the offenses for which he was convicted and sentenced to death.

53 SCR (Tab R-60), at p. 76. Petitioner did not identify any evidence in the record supporting these conclusions.

retarded."[91]  Petitioner sought certiorari review from the Alabama Supreme Court, presenting the same conclusory assertions of mental retardation he included in his appellate brief before the Alabama Court of Criminal Appeals, once again without any record citations.[92]  The Alabama Supreme Court denied Petitioner's certiorari petition.[93]

## C.  Clearly Established Federal Law

In *Atkins v. Virginia*, 536 U. S. 304 (2002), the United States Supreme Court concluded the execution of mentally retarded persons failed to fulfill either of the two justifications for capital punishment, *i.e.*, retribution and deterrence, and held the Eighth Amendment forbids the execution of mentally retarded persons.  *Atkins v. Virginia*, 536 U. S. at 318-21.  The Supreme Court cited two clinical definitions of "mental retardation" with approval[94] but, ultimately, left to the States "the task of

---

[91] 55 SCR (Tab R-73), at pp. 29-30.  Additional copies of the Alabama Court of Criminal Appeals' Memorandum issued June 17, 2005 appear at 54 SCR (as Exhibit 1 in Tab R-64) & (as Appendix II in Tab R-65).  That state appellate court concluded the state trial court erroneously dismissed Petitioner's *Atkins* claim as procedurally defaulted but agreed the record before the court, including records of extensive IQ testing throughout Petitioner's childhood showing full-scale scores ranging between 85 and 97, established that Petitioner does not suffer from subaverage intellectual functioning.  55 SCR (Tab R-73), at pp. 29-30.

[92] 54 SCR (Tab R-64), at pp. 90-92.

[93] 55 SCR (Tab R-74).

[94] In a footnote in *Atkins*, the Supreme Court identified two clinical definitions of "mentally retarded" as follows:

The American Association on Mental retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning.  It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the

developing appropriate ways to enforce the constitutional restriction upon their execution of sentences."[95]  *Id.*, 536 U. S. at 317.

Nonetheless, the Supreme Court recognizes that "an IQ between 70 and 75 or lower" is "typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition."  *Brumfield v. Cain,* 135 S. Ct. 2269, 2278 (2015) (quoting *Atkins v. Virginia*, 536 U. S. at 309 n.5).  Thus, an IQ score of 75 is "squarely in the range of potential intellectual disability."  *Brumfield v. Cain*, 135 S. Ct. at 2278.

---

following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work.  Mental retardation manifests before age 18."  Mental Retardation, definition, Classification, and Systems of Supports 5 (9th ed. 1992).

    The American Psychiatric Association's definition is similar.  "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B).  The onset must occur before age 18 years (Criterion C).  Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."  Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed. 2000).  "Mild mental retardation is typically used to describe people with an IQ of 50-55 to approximately 70.  *Id.*, at 42-43.

*Atkins v. Virginia*, 536 U.S. at 309 n.3.

[95] In *Bobby v. Bies*, 556 U. S. 825 (2009), the Supreme Court pointed out that *Atkins* did not provide definitive procedural or substantive guides for determining when a person who claims intellectual disability will be so impaired as to fall within *Atkins'* compass.  *Bobby v. Bies*, 556 U.S. at 831.

With regard to the first prong of the *Atkins* analysis, *i.e.*, establishing significantly subaverage intellectual functioning, the Supreme Court has held that, because of the imprecision inherent in IQ testing,[96] a court must consider the

---

[96] In *Hall v. Florida*, 134 S. Ct. 1986 (2014), the Supreme Court explained in some detail the nature of the imprecision inherent in IQ testing as follows:

> The professionals who design, administer, and interpret IQ tests have agreed, for years now, that IQ test scores should be read not as a single fixed number but as a range. See D. Wechsler, The measurement of Adult Intelligence 133 (3d ed. 1944) (reporting the range of error on an early IQ test). Each IQ test has a "standard error of measurement," *ibid.*, often referred to by the abbreviation "SEM." A test's SEM is a statistical fact, a reflection of the inherent imprecision of the test itself. See R. Furr & V. Bacharach, Psychometrics 118 (2d ed. 2014) (identifying the SEM as "one of the most important concepts in measurement theory"). An individual's IQ test score on any given exam may fluctuate for a variety of reasons. These include the test taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing. See American Association on Intellectual and Developmental Disabilities, R. Schalock et al., User's Guide To Accompany the 11th Edition of Intellectual Disability: Definition, Classification, and Systems of Supports 22 (2012) (hereinafter AAIDD Manual), A. Kaufman, IQ testing 101, pp. 138-39 (2009).
>
> The SEM reflects the reality that an individual's intellectual functioning cannot be reduced to a single numerical score. For the purposes of most IQ tests, the SEM means that an individual's score is best understood as a range of scores on either side of the recorded score. The SEM allows clinicians to calculate a range within which one may say an individual's true IQ score lies. See APA Brief 23 ("SEM is a unit of measurement: 1 SEM equates to a confidence of 68% that the measured score falls within a given score range, while 2 SEM provides a 95% confidence that the measured score is within a broader range"). A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence. See DSM-5, at 37 ("Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points) . . . . This involves a score of 65-75 (70 +/- 5); APA Brief 23 ("For example, the average SEM for the WAIS-IV is 2.16 IQ test points and the average SEM for the Standford-Binet 5 is 2.30 IQ test points (test manuals report SEMs by different age groupings; these scores are similar, but not identical, often due to sampling error"). Even when a person has taken multiple tests, each separate score must be assessed using the SEM, and the analysis of multiple IQ scores jointly is a complicated endeavor. See Schneider, Principles of Assessment

standard error of measurement ("SEM") when assessing intellectual disability. *See*

*Hall v. Florida*, 134 S. Ct. 1986, 2000 (2014):

> The legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework. *Atkins* itself points to the diagnostic criteria employed by psychiatric professionals. And the professional community's teachings are of particular help in this case, where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession.
>
> By failing to take into account the SEM and setting a strict cutoff at 70, Florida "goes against the unanimous professional consensus." APA Brief 15. Neither Florida nor its *amici* point to a single medical professional who supports this cutoff. The DSM–5 repudiates it: "IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real-life situations and mastery of practical tasks." DSM–5, at 37. This statement well captures the Court's independent assessment that an individual with an IQ test score "between 70 and 75 or lower," *Atkins, supra,* at 309, n. 5, 122 S.Ct. 2242, may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning.

In *Moore v. Texas*, 137 S. Ct. 1039, 1048-53 (2017), the Supreme Court

further restricted States' ability to circumscribe the legal definition of "intellectual

disability," holding (1) a State's determination under *Atkins* must be guided by

---

of Aptitude and Achievement, in The Oxford Handbook of Child Psychological Assessment 286, 289-291, 318 (D. Sakolfske, C. Reynolds, V. Schwean, eds. 2013). In addition, because the test itself may be flawed, or administered in a consistently flawed manner, multiple examinations may result in repeated similar scores, so that even a consistent score is not conclusive evidence of intellectual functioning.
*Hall v. Florida*, 134 S. Ct. at 1995-96.

current medical standards[97] and (2) States are not free to adopt criteria unsupported by medical science to evaluate a defendant's alleged subaverage intellectual functioning or deficits in adaptive skills.[98] *See Moore v. Texas*, 137 S. Ct. at 1050-

---

[97] In *Moore*, the Supreme Court emphasized its holding in *Hall* implicitly required that states employ current medical diagnostic standards in making findings of significantly subaverage intellectual functioning and significant deficits in adaptive skills:

> In *Hall v. Florida*, we held that a State cannot refuse to entertain other evidence of intellectual disability when a defendant has an IQ score above 70. Although *Atkins* and *Hall* left to the States "the task of developing appropriate ways to enforce" the restriction on executing the intellectually disabled, States' discretion, we cautioned, is not "unfettered." Even if "the views of medical experts" do not "dictate" a court's intellectual-disability determination, we clarified, the determination must be "informed by the medical community's diagnostic framework." We relied on the most recent (and still current) versions of the leading diagnostic manuals - the DSM-5 and AAIDD-11. Florida, we concluded, had violated the Eighth Amendment by "disregarding established medical practice." We further noted that Florida had parted ways with practice and trends in other States. *Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does our precedent license disregard of current medical standards.

*Moore v. Texas*, 137 S. Ct. at 1048-49 (citations omitted).
"The medical community's current standards supply one constraint on States' leeway in the area. Reflecting improved understanding over time, see DSM-5, at 7, AAIDD-11, at xiv-xv, current manuals offer 'the best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Id.*, 137 S. Ct. at 1053.

[98] For instance, the Supreme Court pointed out the Texas appellate court focused on Moore's perceived adaptive strengths in certain areas when the current clinical approach called for identification of deficits in adaptive skills. *Moore v. Texas*, 137 S. Ct. at 1050. The Texas appellate court also pointed out Moore's improved behavior in prison; whereas the Supreme Court noted clinicians caution against reliance on adaptive strengths developed in a controlled setting. *Id.* The Texas appellate court attempted to explain away Moore's poor academic performance by pointing to traumatic childhood abuse and suffering; the Supreme Court pointed out the medical community employed such traumatic experiences as "risk factors" sufficient to explore the prospect of intellectual disability. *Id.*, at 1051. The Texas appellate court required Moore to show that his adaptive deficits were unrelated to his "personality disorder"; the Supreme Court pointed out mental health professionals have long recognized that intellectual disability may be co-morbid with a wide variety of personality disorders, attention-deficit disorder, depression, and even bi-polar disorder. *Id.* The Supreme Court also rejected the Texas appellate court's reliance upon lay perceptions of Moore's intellectual functioning as "lay stereotypes." *Id.*, at 1051-52. Prior to its opinion in *Moore*, the Supreme Court recognized the diagnostic criteria for intellectual disability

53 (holding a Texas appellate court erred in applying a set of non-clinical criteria known as the *Briseno* factors in evaluating a defendant's claim of intellectual disability because (1) some of the *Briseno* factors had implicitly been rejected by the medical community (in part because they were based on outdated stereotypes) and (2) all the *Briseno* factors were little more than lay perceptions of intellectual disability untethered to any clinical medical standard).

## D. AEDPA Review

Whether Petitioner is intellectually disabled is a question of fact.[99]  *Ledford v. Warden, GDCP*, 818 F.3d 600, 632 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 1432 (2017); *Conner v. GDCP Warden*, 784 F.3d 752, 766 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1246 (2016).  Thus, the state habeas court's determination on the merits that Petitioner is not intellectually disabled is a finding of fact entitled to deference

---

are not exclusive, *i.e.*, individuals with intellectual disability also tend to have a number of other mental health disorders, including personality disorders.  *Brunfield v. Cain*, 135 S. Ct. at 2280.

[99] While Petitioner's pleadings in both the state habeas court and this court employ the terms "mental retardation" and "mentally retarded," following the Supreme Court and Eleventh Circuit's leads, this opinion uses the terms "intellectual disability" and "intellectually disabled" to describe the identical phenomenon  *See Hall v. Florida*, 134 S. Ct. at 1990 ("This change in terminology is approved and used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders, one of the basic texts used by psychiatrists and other experts, the manual is often referred to by its initials 'DSM,' followed by its edition numbers, *e.g.*, 'DSM-5.'"); *Burgess v. Commn'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1310 n.1 (11th Cir. 2013) ("[W]e recognize that increasingly professionals in this field, such as the American Association on Intellectual and Developmental Disabilities (formerly the American Association on Mental Retardation), are replacing the term 'mental retardation' with 'intellectual disability' or 'intellectual developmental disability.'").

under the AEDPA.  *Ledford v. Warden, GDCP*, 818 F.3d at 632; *Fults v. GDCP Warden*, 764 F.3d 1311, 1319 (11th Cir. 2014), *cert. denied*, 136 S. Ct. 56 (2015).

The purpose of the AEDPA is to ensure that federal habeas relief functions to guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.  *Greene v. Fisher*, 565 U. S. 34, 43 (2011) (quoting *Harrington v. Richter*, 562 U. S. 86, 102-03 (2011)); *Hill v. Humphrey*, 662 F.3d 1336, 1347 (11th Cir. 2011) (*en banc*), *cert. denied*, 566 U.S. 1041 (2012).  A state prisoner seeking a writ of habeas corpus from a federal court must show that the state court's ruling on the claim presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.  *Bobby v. Dixon*, 565 U. S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. at 101); *Hill v. Humphrey*, 662 F.3d at 1346.  The AEDPA's § 2254(d)(1)'s standard is difficult to meet and a highly deferential standard for evaluating state court rulings, which demands that state-court decisions be given the benefit of the doubt, and one for which the petitioner carries the burden of proof.  *Cullen v. Pinholster*, 563 U. S. 170, 181 (2011); *Hill v. Humphrey*, 662 F.3d at 1346.

It is significant for the purpose of this court's AEDPA analysis of the state habeas court's denial of Petitioner's *Atkins* that both the state habeas court's June 25, 2003 "Final Order" denying Petitioner's Rule 32 petition and the Texas Court of

Criminal Appeals' Memorandum issued June 17, 2005 affirming the trial court's denial of Petitioner's Rule 32 petition were issued prior to the dates the Supreme Court issued its opinions in *Hall v. Florida, Brumfield v. Cain,* and *Moore v. Texas*, discussed above. Except insofar as they merely reiterated or applied the holding in *Atkins*, those subsequent opinions were not "clearly established" as of the date the state courts rejected Petitioner's *Atkins* claim on the merits.

The Eleventh Circuit has consistently held that the legal standard applied by Alabama courts for evaluating intellectual disability within the context of *Atkins* requires a criminal defendant to show (1) significant subaverage intellectual functioning (defined as an IQ of 70 or below), (2) significant or substantial deficits in adaptive behavior, and (3) that these problems manifested themselves during the developmental period (*i.e.*, before the age of 18). *See, e.g.*, *Burgess v. Commn'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1321 (11th Cir. 2013); *Thomas v. Allen*, 607 F.3d 749, 752 (11th Cir. 2010); *Powell v. Allen*, 602 F.3d 1263, 1272 (11th Cir. 2010), *cert. denied*, 562 U. S. 1183 (2011); *Holladay v. Allen*, 555 F.3d 1346, 1353 (11th Cir. 2009); *Wood v. Allen*, 542 F.3d 1281, 1286 (11th Cir. 2008), *aff'd*, 558 U. S. 290 (2010). Alabama courts also require a showing that the problems existed at the time of the capital offense and at the time of sentencing. *See Burgess v. Commn'r, Ala. Dep't of Corr.*, 723 F.3d at 1321 n.13 (holding the Alabama Supreme Court requires that a defendant asserting an *Atkins* claim exhibit significantly

subaverage intellectual functioning abilities and significant deficits in adaptive behavior during three periods: before the age of eighteen, on the date of the capital offense, and currently); *Thomas v. Allen*, 607 F.3d at 752-53 (holding the same); *Powell v. Allen*, 602 F.3d at 1272 ("it is implicit in that definition that the IQ and deficits in adaptive functioning exist not only prior to the age of eighteen but also at the time of the crime and currently"); *Holladay v. Allen*, 555 F.3d at 1353 ("it is 'implicit' that the problems also existed at the time of the crime" (quoting *Smith v. Alabama*, 213 So. 3d 239, 248 (Ala. 2007)).

Petitioner was a ward of the State of Alabama beginning within months of his birth (in July 1969) when Talladega County officials removed him from the home of his biological mother. He remained a ward of the State until shortly before he committed his capital offenses (in March 1988 at age 18 years 8 months). Throughout that period, Petitioner received routine psychological evaluations that included intelligence testing, all of which found Petitioner's IQ was at least a full standard deviation above the upper end of the range for a finding of intellectual disability, *i.e.*, a score of seventy.[100] More specifically, Petitioner was tested initially

---

[100] "The mean IQ test score is 100. The concept of standard deviation describes how scores are dispersed in a population. Standard deviation is distinct from standard error of measurement, a concept which describes the reliability of a test . . . ." *Hall v. Florida*, 134 S. Ct. at 1994. "The standard deviation on an IQ test is approximately 15 points, and so two standard deviations is approximately 30 points. Thus a test taker who performs 'two or more standard deviations from the mean' will score approximately 30 points below the mean on an IQ test, *i.e.*, a score of approximately 70 points." *Id.*

in March 1977 and had full-scale scores of 89 on the WISC-R and 96 on the Stanford Binet IQ tests.[101]   Petitioner's full-scale score on the WISC-R in January 1978 was 87.[102]   Petitioner's full-scale score on the WISC-R in January 1979 was 86.[103] Petitioner's full-scale score on the WISC-R in May 1980 was 85.[104]   Petitioner's full-scale score on the WISC-R in September-October 1982 was 89.[105]   The report from a psychological evaluation performed in December 1982 by Petitioner's mental health expert at trial, Dr. Barry Burkhart, states that (1) Petitioner's verbal score was

---

[101] Multiple copies of the reports relating to Petitioner's March, 1977 IQ testing by Wanda McPherson, M.A., clinical psychologist, are included in the record as part of more extensive reports supervised by Dr. John A. Saunders, M.D.; these reports appear at 31 SCR 2661-66, 32 SCR 2963-68, 35 SCR 3512-16, 35 SCR 3520-24, 35 SCR 3532-36, and 36 SCR 3602-05. Discussion of Petitioner's IQ testing by Ms. McPherson (verbal score of 81 and performance score of 101 on the WISC-R) appears at 31 SCR 2664, 32 SCR 2965, 35 SCR 3514, 3522, 3534, and 36 SCR 3603.

[102] Multiple copies of the psychological evaluation of Petitioner prepared in January 1978 by Dr. R.J. Kline, Ph.D., which included administration of the WISC-R (verbal score 74 and performance score of 104), appear in the record at 30 SCR 2478-79, 31 SCR 2625-26, 32 SCR 2909, 2969, 33 SCR 3193-94, and 35 SCR 3539-40.

[103] Multiple copies of the psychological evaluation of Petitioner prepared in January 1979 by Dr. Dennis E. Breiter, Ph.D., which included results of the WISC-R (verbal score 74, performance score 104), appear in the record at 28 SCR 2162-63, 30 SCR 2431-32, 35 SCR 3546-47, and 36 SCR 3608-09.  A report by social worker Jean Love dated June 1, 1979 also reflects Dr. Breiter's findings regarding Petitioner's level of intellectual functioning.  31 SCR 2601-02.

[104] Multiple copies of the report prepared in May 1980 by Doyle James, Ed.D., and Wanda Faye Trimble, M.S., reflecting Petitioner's WISC-R testing (verbal score 74, performance score 95) appear at 29 SCR 2233-35 and 33 SCR 3057-59.  A barely legible copy of the same report appears in the record at 26 SCR 1773-75.

[105] Multiple copies of the psychological evaluation prepared by Dr. Dennis E. Breiter in the Fall of 1982 (September 28 and October 12, 1982) discussing WISC-R testing (verbal score 81, performance score 101) appear in the record at 28 SCR 2164-66, 30 SCR 2428-30, 32 SCR 2977-79, 35 SCR 3548-49, and 36 SCR 3610-12.

81 and performance score was 101 (but does not specify a "full-scale" score) and (2) Petitioner's intelligence is "low average."[106]  Petitioner's full-scale score on the WISC-R in May 1984 was 97.[107]  A psychological evaluation performed in November 1985 reported Petitioner's full-scale score of 86.[108]  Thus, save for Petitioner's May 1984 full-scale score of 97, all of his full-scale IQ scores fell within a range of 85 to 89.

Out of an abundance of caution, this court will focus primarily upon Petitioner's lowest IQ test score achieved during his developmental period, *i.e.*, the full-scale score of 85 he achieved in May 1980.  Petitioner's lowest IQ test score in the record (85) is significantly higher than the upper end of the mild intellectual

---

[106] Multiple copies of the psychological evaluation prepared by Dr. Burkhart in December 1982 appear in the record at 30 SCR 2491-94, 31 SCR 2627-30, and 35 SCR 3558-61.  The verbal and performance component scores set forth in Dr. Burkhart's December 1982 report (verbal score 81, performance score 101) are identical to those contained in Dr. Breiter's report just months before, in which Dr. Breiter calculated Petitioner's full-scale score as 89.  *See* note 105.

[107] Multiple reports on the psychological evaluation performed on Petitioner in May 1984 by Dr. Dale W. Wisely, Ph.D., (verbal score 81, performance score 117) appear in the record at 24 SCR 1345, 32 SCR 2980-82, 34 SCR 3321, 35 SCR 3409-11, 3526-28, 3589-91, and 36 SCR 3618.  A September 1984 report by Dr. F. Lopez, M.D., reports the same full-scale score found by Dr. Wisely in May of that year; Dr. Lopez's report appears at 34 SCR 3321, 35 SCR 3412, and 35 SCR 3595.

[108] Multiple copies of a November 1985 psychological evaluation prepared by Dr. Thomas L. Boyle, Ph.D., and William Mea, M.A., (verbal score 78, performance 100) appear in the record at 33 SCR 3195-97, 34 SCR 3322-24, and 35 SCR 3405-07.  A separate report by school psychologist Cheryl E. Bogiv later the same month reports the same full-scale score and component scores reported by Dr. Boyle.  30 SCR 2455-57.  A vocational report prepared by Eleanor D. Sanders on November 14, 1985 likewise reports the same full-scale and component scores as Dr. Boyle.  30 SCR 2458-59.

disability range, *i.e.*, 75.   As explained above, applying the SEM applicable to Petitioner's full-scale IQ test scores, there is a 95% certainty Petitioner's actual IQ falls within the range of 80 to 90 (85 plus or minus five points).   *See Ledford v. Warden, GDCP*, 818 F.3d at 640 ("The standard error of measurement accounts for a margin of error both below and above the IQ test-taker's score.").[109]   The lower end of this range for Petitioner's lowest recorded IQ test score is a full five points higher than the upper end of the range recognized as intellectually disabled, *i.e.*, a score of 75.   Thus, even considering the SEM, the low end of the applicable range for Petitioner's lowest recorded full-scale IQ test score does not overlap with the upper end of the IQ range for a finding of mild intellectual disability.[110]

---

[109] The Eleventh Circuit recognizes that consideration of the statistical error of measurement "is not a one-way ratchet."   *Ledford v. Warden, GDCP*, 818 F.3d at 640 (quoting *Mays v. Stephens*, 757 F.3d 211, 216 n.17 (5th Cir. 2014), *cert. denied*, 135 S. Ct. 951 (2015)).   "Further, the standard error of measurement is a bi-directional concept that does not carry with it a presumption that an individual's IQ falls to the bottom of his IQ range."   *Ledford v. Warden. GDCP*, 818 F.3d at 641.   "While *Hall* requires lower courts at least to consider the standard error of measurement when evaluating intellectual functioning, it does not, as Ledford contends, require lower courts to find that an IQ score of 75 or below necessarily satisfies the significantly subaverage intellectual functioning prong.   In fact, the Supreme Court steers us way from such rigid assertions by emphasizing that an IQ score represents a 'range, not a fixed number.'"   *Id.*, 818 F.3d at 641 (quoting *Hall v. Florida*, 134 S. Ct. at 1999).

[110] Some courts have also applied the so-called "Flynn effect" to determinations of intellectual functioning within the context of *Atkins* determinations.   *See Ledford v. Warden. GDCP*, 818 F.3d at 635-40 (discussing the history of the Flynn effect (including the wide range of opinions among federal courts about its legal efficacy) and holding (1) a district court is not required to apply a Flynn effect reduction to an individual's IQ score in a death penalty case, (2) a district court should consider all of the expert medical testimony, including evidence about the Flynn effect, and make its own fact findings, and (3) a district court's application or rejection of the Flynn effect constitutes a fact finding subject to review only for clear error).

"The Flynn Effect, named after intelligence expert James Flynn, is a 'generally recognized phenomenon' in which the average IQ scores produced by any given IQ test tend to rise over time,

often by approximately three points per ten years from the date the IQ test is initially standardized." *Black v. Carpenter*, 866 F.3d 734, 738 n.1 (6th Cir. 2017). "The Flynn Effect 'is a phenomenon positing that, over time, standardized IQ test scores tend to increase with the age of the test without a corresponding increase in actual intelligence in the general population. Those who follow the Flynn effect adjust for it by deducting from the IQ score a specified amount for each year since the test was normalized.'" *In re Cathey*, 857 F.3d 221, 227 (5th Cir. 2017). "[P]roponents of the Flynn Effect argue IQ scores must be adjusted downward by 0.3 points for each year that has passed since the test was normed to arrive at a proper measure of the test taker's IQ." *Smith v. Duckworth*, 824 F.3d 1233, 1244 (10th Cir. 2016), *cert. denied sub nom. Smith v. Royal*, 137 S. Ct. 1333 (2017). "When correcting for the Flynn Effect, 'the standard practice is to deduct 0.3 IQ points per year (3 points per decade) to cover the period between the year the test was normed and the year in which the subject took the test.'" *Smith v. Ryan*, 813 F.3d 1175, 1185 (9th Cir. 2016). "James Flynn, the eponym of the 'Flynn Effect' theory, estimated that IQ scores increase at 0.3 points per year." *McManus v. Neal*. 779 F.3d 634, 653 n.6 (7th Cir. 2015) (citation omitted).

> "An evaluator may also consider the 'Flynn effect,' a method that recognizes the fact that IQ test scores have been increasing over time. The Flynn effect acknowledges that as an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects. Therefore, the IQ test score must be recalibrated to keep all test subjects on a level playing field."

*Burgess v. Comm'r. Ala. Dep't of Corr.*, 723 F.3d at 1321 n.16 (quoting *Thomas v. Allen*, 607 F.3d at 753).

In *Ledford*, the Eleventh Circuit discussed at length the lack of consensus within the mental health community over application of the Flynn effect (which addresses the impact of standardized test scores on a population) to individual IQ test scores. *See Ledford v. Warden, GDCP*, 818 F.3d at 638 ("there is 'no uniform consensus regarding the application of the Flynn effect in determining a capital offender's intellectual functioning.'"). "[T]he DSM-V does little more than acknowledge the possibility that the Flynn effect is a 'factor' that 'may' impact an individual's IQ score." *Id.* "While the DSM-V states that the Flynn effect 'may' affect intelligence scores, it does not provide any guidance as to how a clinician should actually apply the Flynn effect, let alone mandate any 0.3 point-per-year reduction for IQ scores obtained from tests with outdated norms." *Id.*

The state habeas court did not expressly apply the Flynn effect in the course of rejecting Petitioner's *Atkins* claim on the merits, perhaps because Petitioner alleged no specific facts, cited no authority, and presented no evidence concerning the Flynn effect to the state habeas court. The only reference to the Flynn effect contained in Petitioner's Rule 32 pleadings is a conclusory assertion that a neuropsychologist should have been appointed by the court to calculate the potential impact of the Flynn effect on Petitioner's IQ test scores - which assertion appears in Petitioner's Proffer of Facts and Evidence in Support of the Grounds for Relief Set Forth in His Rule 32 Petition found at 50 SCR 405. Alabama courts are not required to employ the Flynn effect when calculating a criminal defendant's IQ score. *See Reeves v. State*, 226 So. 3d 711, 739 (Ala. Crim. App. 2016) (holding trial court did not err in rejecting the Flynn effect and failing to deduct points from the defendant's IQ score to account for that phenomenon), *cert. denied*, 138 S. Ct. 22 (2017); *Smith v. State*, 112 So. 3d 1108, 1131 (Ala. Crim. App. 2012) ("a trial court need not accept the Flynn effect as binding"), *cert. denied*, 112 So. 3d 1152 (Ala. 2012). The Alabama Court of

Furthermore, the voluminous record before the state habeas court reveals that myriad mental health professionals evaluated Petitioner throughout his developmental period. The reports of those who evaluated Petitioner during that

Criminal Appeals first addressed the Flynn effect in 2009. *Reeves v. State*, 226 So. 3d at 737 n.13. As was the case in his state habeas proceeding, at no point in his pleadings in this court has Petitioner alleged any specific facts showing in any intelligible manner how the Flynn effect might apply to any of his IQ test scores. Accordingly, this court need not address the potential application of the Flynn effect to any of Petitioner's Wechsler Intelligence Scale for Children - Revised ("WISC-R") IQ test scores.

Moreover, contrary to Petitioner's assertion in his state habeas pleadings, it is unnecessary to appoint a mental health expert to calculate the potential impact of the Flynn effect on an IQ test score. Even when the Flynn effect is applied to Petitioner's lowest WISC-R score, *i.e.*, his May 1980 score of 85, the Flynn effect still does not bring Petitioner's IQ score range within the upper end of the range for intellectual disability. The WISC was last re-normed in 1972. *Walker v. True*, 399 F.3d 315, 322 (4th Cir. 2005). Applying the Flynn effect's 0.3 point-per-year reduction decreases Petitioner's May 1980 score by only 2.4 points (*i.e.*, eight years times 0.3 points-per-year). Giving Petitioner the benefit of the doubt, and ignoring the arithmetical rules of rounding, at best, Petitioner's lowest full-scale score is entitled to a reduction of only three points to 82. This reduces his corresponding SEM IQ score range to 77 to 87. This Flynn-effect-reduced IQ score range does not overlap with the upper range of the SEM for a true intellectually disabled individual, *i.e.,* a score of 75. Thus, even if all of the statistical adjustments possible under the holding in *Hall* (mandating consideration of the SEM for standardized IQ test scores) and the Flynn effect (0.3 points-per-year reduction since the standardized test instrument was last re-normed) are applied to Petitioner's lowest recorded WISC-R score, that score range does not qualify Petitioner for a diagnosis of intellectual disability.

Application of the Flynn effect to Petitioner's other full-scale IQ test scores offers Petitioner no benefit. For instance, when Petitioner's March 1977 full-scale score of 89 is reduced by the Flynn effect (*i.e.*, five years times 0.3 points-per-year), Petitioner's score is reduced only 1.5 points (or two full points using generally accepted rounding rules) and his SEM range of scores is reduced only to 82-92. When Petitioner's January 1979 full-scale score of 86 is reduced by the Flynn effect (*i.e.*, seven years times 0.3 points-per-year), his score is reduced only 2.1 points and his SEM range of scores is reduced only to 79-89. When Petitioner's September-October 1983 full-scale score of 89 is reduced by the Flynn effect (*i.e.*, eleven years times 0.3 points-per-year), his score is reduced only 3.3 points and his SEM range of scores is reduced only to 81-91. When Petitioner's May 1984 full-scale score of 97 is reduced by the Flynn effect (*i.e.*, twelve years times 0.3 points per year), his score is reduced 3.6 points (or four full points using generally accepted rounding rules) and his SEM range is reduced only to 88-98. Likewise, even when Petitioner's November 1985 full-scale score of 86 is reduced by the Flynn effect (*i.e.*, thirteen years times 0.3 points-per-year), his score is reduced 3.9 points and his SEM range of scores is reduced to 76-86. Thus, application of the Flynn effect to Petitioner's IQ test scores does not bring Petitioner's SEM range within the range of the intellectually disabled.

period, including clinical psychologists, school psychologists, and others, belie any suggestion that Petitioner was intellectually disabled or even borderline intellectually disabled.[111] On the contrary, those evaluating Petitioner consistently concluded he was performing in either the "average" or "low average" range of intellectual functioning.[112] Likewise, none of the mental health professionals who

---

[111] For instance, a report dated May 24, 1984 prepared by Dr. Garry Grayson states "[c]ognitive function is without gross impairment and suggests below average intelligence." 24 SCR 1331. Each of the psychological evaluations performed by mental health professionals during Petitioner's developmental period discussed above likewise reflected findings that Petitioner was not intellectually disabled. *See* notes 99-106.

A report by a social worker at Gateway dated March 21, 1983 when Petitioner was thirteen years old states Petitioner "had a low average IQ in the 89 range." 26 SCR 1731. The same report states that Petitioner's mother "is said to be mentally retarded." 26 SCR 1730. This court has undertaken a painstakingly exhaustive review of the entire record in this case, including numerous reports or "social history" documents prepared by social workers and child-care caseworkers, which declare that Petitioner's mother, an older sister, and possibly his father were "mentally retarded." *See, e.g.*, 28 SCR 2167-69; 28 SCR 2199-2200; 29 SCR 2201-03; 29 SCR 2210-13; 29 SCR 2220-21; 29 SCR 2223-24; 29 SCR 2226-27; 29 SCR 2271-72. In addition, the record before the state habeas court included an extensive set of unsigned typewritten pages purporting to reflect the history of Petitioner's biological family prior to his birth and the efforts of Talladega County officials to find a permanent placement for Petitioner after his birth. 29 SCR 2273-2387. These documents, apparently prepared by social workers and child-care caseworkers, include no assertions that either of Petitioner's parents or Petitioner's older sister were ever diagnosed as intellectually disabled by qualified mental health professionals. Instead, the assertions of intellectual disability contained in Petitioner's family history documents appear to be premised upon the same type of lay observations and lay stereotypes rejected by the Supreme Court in its recent opinion in *Moore v. Texas* as legitimate bases for a finding of intellectual disability.

Medical notes prepared by Dr. Dale W. Wisely when Petitioner was fourteen years old report that Petitioner scored 81 on the verbal portion of a WISC-R IQ test (described by Dr. Wisely as "low average"), 117 on the performance portion (described by Dr. Wisely as "high average") and a full scale of 97 (described by Dr. Wisely as "average"). 24 SCR 1345. Dr. Wisely also reported (1) the large difference between Petitioner's verbal and nonverbal scores could be the product of his speech problems or his chaotic upbringing and inconsistent schooling and (2) Petitioner's Bender-Gestalt showed Petitioner to be "developmentally immature but neuropsychologically benign." *Id.*

[112] For instance, a psychological evaluation performed in January 1978 by Dr. R.J. Kline reported Petitioner achieved a full-scale IQ score of 87. 30 SCR 2478-79; 31 SCR 2625-26; 32 SCR 2909; 32 SCR 2969; 33 SCR 3193-94; 35 SCR 3539-40. A psychological evaluation

evaluated Petitioner following his arrest expressed any opinions suggesting

Petitioner was intellectually disabled.[113]

performed in January 1979 by Dr. Dennis Breiter, Ph.D., reported Petitioner achieved a full-scale IQ of 86 at age 9 years, six months. 28 SCR 2162-63; 30 SCR 2431-32; 31 SCR 2602; 32 SCR 2899; 35 SCR 3546; 36 SCR 3608. Another psychological evaluation done by Dr. Breiter in September and October 1982, when Petitioner was thirteen years and three months, reported Petitioner achieved a full-scale score of 89. 28 SCR 2164; 30 SCR 2428-30; 32 SCR 2977-79; 35 SCR 3548-49; 36 SCR 3610.

[113] For example, Petitioner's own mental health expert, Dr. Barry Burkhart testified during Petitioner's first capital murder trial that Petitioner's IQ was in the eighties and Petitioner was not intellectually disabled. Testimony of Dr. Barry Burkhart, 10 SCR R-1427-28. Dr. Joe W. Dixon testified during Petitioner's first capital murder trial that (1) his own interviews with Petitioner led him to believe Petitioner's intelligence was in the low average range, *i.e.*, between 80 and 90, (2) Dr. Mohabbat, a psychiatrist who evaluated Petitioner as part of the Lunacy Commission's evaluation, concluded Petitioner was not intellectually disabled, and (3) Dr. Bryant, another psychiatrist who evaluated Petitioner for the Lunacy Commission, found Petitioner possessed no psychological abnormality. Testimony of Dr. Joe W. Dixon, 10 SCR R-1479-80, R-1489-90. Dr. Kamal Nagi testified during Petitioner's first capital murder trial that he believed Petitioner was not mentally ill but, rather possessed an anti-social personality. Testimony of Dr. Kamal Nagi, 11 SCR R-1602-86.

Extensive progress notes from Petitioner's stay at the Taylor Hardin medical facility during his competency evaluation between December 14, 1988 and January 11, 1989 reflect Petitioner's situationally depressed mood and complaints of pain following a dental extraction but reveal nothing suggesting Petitioner was displaying below average intellectual functioning. 27 SCR 1823-1999; 28 SCR 2000-59. Each of the three psychiatrists who evaluated Petitioner's competence to stand trial for the Lunacy Commission (*i.e.*, Dr. M. Omar Mohabbat, M.D., Dr. Kamal A. Nagi, M.D., and Dr. Bernard E. Bryant, M.D.) prepared a detailed written report included in the record. Multiple copies of those reports appear at 28 SCR 2060-74, 28 SCR 2103-05, 2118-20, 2125-41. In addition, Dr. Joe W. Dixon prepared a report concerning his evaluation of Petitioner in which he stated "I would judge his intelligence to be in the low average range with fair insight and judgment." 28 SCR 2106-08. Nothing in any of these four mental health professionals' reports suggest Petitioner was then exhibiting significantly below average intellectual functioning. In fact, Dr. Nagi expressly stated: "Mr. Freeman is not suffering from symptoms of mental illness, mental retardation or other psychiatric disorders at this time nor at the time of the alleged offense." 28 SCR 2068. Dr. Bryant reported Petitioner's "intellect appeared to be a little below normal but not that much and his insight and judgment appeared to be fair." 28 SCR 2071. Additional notes, raw test data, and other documentation supporting these four mental health professionals' conclusions appear in the record. 28 SCR 2085-2102, 2121-24, 2142-61, 2173-87. A social history prepared by a social worker during Petitioner's evaluation by the Lunacy Commission reported that Petitioner denied (1) any history of physical or sexual abuse during his stay at various placement facilities and (2) any history of a mental disorder. 28 SCR 2075-78, 2121-24. Petitioner's family members were unable to furnish the social worker assisting the

As explained above, there is a 95% chance that Petitioner's actual IQ score lies within the range of 80 to 90.  Even giving due consideration to the statistical error of measurement (which recognizes an upper limit of 75 for mild intellectually disabled diagnosis), Petitioner's IQ test scores in the record establish Petitioner consistently functioned throughout his childhood at an intellectual level above the upper end of the range for a finding of intellectual disability.  During his Rule 32 proceeding, Petitioner alleged no facts showing Petitioner ever tested lower than 85 on any standardized IQ test instrument during his developmental years.  Likewise, during his Rule 32 proceeding, Petitioner alleged no specific facts showing that he had ever displayed deficits in adaptive skills that fell significantly or substantially below the norm for such skills.

### E.  Conclusion

Having independently reviewed the extensive documentation concerning Petitioner's developmental years that was before the state habeas court, this court concludes the state habeas court's denial on the merits of Petitioner's *Atkins* claim was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the

---

Lunacy Commission psychiatrists with any substantive information regarding Petitioner's background or developmental history.  28 SCR 2080-83.

facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding. Petitioner's ninth claim does not warrant federal habeas corpus relief.

## IV. *APPRENDI - RING* CLAIM

### A. The Claim

In his eighth claim for federal habeas relief, Petitioner argues that his right to trial by jury under the Sixth Amendment and his Eighth Amendment rights were violated because the jury's verdict at the punishment phase of his trial was not determinative of his final sentence, in violation of the Supreme Court's holdings in *Apprendi v. New Jersey*, 530 U. S. 466 (2000), and *Ring v. Arizona*, 536 U. S. 584 (2002), (Doc. # 5, at 58-61; Doc. # 64, 203-16).

### B. State Court Disposition

Petitioner asserted an abbreviated version of the same basic claim as his tenth ground for relief in his fourth amended Rule 32 petition.[114] In its Final Order denying Petitioner's fourth amended Rule 32 petition, the state habeas trial court (1) held Petitioner's *Ring* claim was precluded from state habeas review because it was not raised at trial or on direct appeal[115] and (2) rejected the legal argument underlying this claim on the merits, concluding the argument asserted by Petitioner was

---

[114] 49 SCR 310, 338.

[115] 50 SCR 454-55; 55 SCR 454-55. An additional copy of the trial court's Final Order issued June 25, 2003 appears in 54 SCR (Tab R-65).

foreclosed by the Alabama Supreme Court's holding in *Ex parte Waldrop*, 859 So. 2d 1181 (Ala. 2002), *cert. denied*, 540 U. S. 968 (2003).[116]  The Alabama Court of Criminal Appeals affirmed, holding *Ring* was not retroactive to cases such as Petitioner's and also recognizing, as had the state habeas trial court, that Petitioner's *Ring* arguments were foreclosed by the Alabama Supreme Court's holding in *Waldrop*.[117]  The Alabama Supreme Court denied Petitioner's certiorari petition.[118]

## C.  Clearly Established Federal Law

This court discussed at length the Supreme Court's holdings in *Ring, Apprendi*, and *Hurst v. Florida*, 136 S. Ct. 616 (2016), in *Dallas v. Dunn*, No. 2:02cv777, 2017 WL 3015690, *19-31 (M.D. Ala. July 14, 2017).  In *Dallas*, this court explained that a true consensus on an overarching analytical approach to Eighth Amendment claims did not fully appear until the Supreme Court's opinion in *Tuilaepa v. California*, 512 U. S. 967 (1994), in which eight Justices agreed the Eighth Amendment addresses two different, but related, aspects of capital sentencing: the eligibility decision and the selection decision.  *Tuilaepa*, 512 U. S. at 971.  In *Tuilaepa*, the Supreme Court's analysis of those two aspects of capital

---

[116] 50 SCR 468-69; 55 SCR 468-69.  *See also* 54 SCR (Tab R-65).

[117] 55 SCR (Tab R-72), at pp. 28-29.  Additional copies of the Alabama Court of Criminal Appeals' Memorandum issued June 17, 2005 appear in 54 SCR (Tab R-64 & R-65).

[118] 55 SCR (Tab R-74).

sentencing provided the first comprehensive system for analyzing Eighth Amendment claims a clear majority of the Supreme Court had ever offered:

> To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or both). As we have explained, the aggravating circumstance must meet two requirements. First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder. Second, the aggravating circumstance may not be unconstitutionally vague.

> \* \* \*

> We have imposed a separate requirement for the selection decision, where the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence. "What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." That requirement is met when the jury can consider relevant mitigating evidence of the character and record of the defendant and the circumstances of the crime.

*Tuilaepa*, 512 U. S. at 971-73 (citations omitted).

The Supreme Court held that States may adopt capital sentencing procedures which rely upon the jury, in its sound judgment, to exercise wide discretion. *Tuilaepa*, 512 U. S. at 974. The Supreme Court also concluded, at the *selection* stage, states are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly-defined

factors, such as "the circumstances of the crime," "the defendant's prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment." *Tuilaepa*, 512 U. S. at 978.

In *Loving v. United States*, 517 U. S. 748 (1996), the Supreme Court described the first part of the *Tuilaepa* analysis, *i.e.,* the eligibility decision, as follows:

> The Eighth Amendment requires, among other things, that "a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" Some schemes accomplish that narrowing by requiring that the sentencer find at least one aggravating circumstance. The narrowing may also be achieved, however, in the definition of the capital offense, in which circumstance the requirement that the sentencer "find the existence of the aggravating circumstance in addition is no part of the constitutionally required narrowing process."

*Loving*, 517 U. S. at 755 (citations omitted).

The Supreme Court subsequently elaborated on the distinction between the narrowing function or "eligibility decision" and the "selection phase" of a capital sentencing proceeding in *Buchanan v. Angelone*, 522 U. S. 269 (1998):

> Petitioner initially recognizes, as he must, that our cases have distinguished between two different aspects of the capital sentencing process, the eligibility phase and the selection phase. *Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 2634, 129 L.Ed.2d 750 (1994). In the eligibility phase, the jury narrows the class of defendants eligible for the death penalty, often through consideration of aggravating circumstances. *Ibid.* In the selection phase, the jury determines whether to impose a death sentence on an eligible defendant. *Id.,* at 972, 114 S.Ct., at 2634-2635. Petitioner concedes that it is only the selection phase that is at stake in his case. He argues, however, that our decisions indicate that the jury at the selection phase

must both have discretion to make an individualized determination and have that discretion limited and channeled. *See*, *e.g., Gregg v. Georgia,* 428 U.S. 153, 206-207, 96 S.Ct. 2909, 2940-2941, 49 L.Ed.2d 859 (1976). He further argues that the Eighth Amendment therefore requires the court to instruct the jury on its obligation and authority to consider mitigating evidence, and on particular mitigating factors deemed relevant by the State.

No such rule has ever been adopted by this Court. While petitioner appropriately recognizes the distinction between the eligibility and selection phases, he fails to distinguish the differing constitutional treatment we have accorded those two aspects of capital sentencing. It is in regard to the eligibility phase that we have stressed the need for channeling and limiting the jury's discretion to ensure that the death penalty is a proportionate punishment and therefore not arbitrary or capricious in its imposition. In contrast, in the selection phase, we have emphasized the need for a broad inquiry into all relevant mitigating evidence to allow an individualized determination. *Tuilaepa, supra,* at 971-973, 114 S.Ct., at 2634-2636; *Romano v. Oklahoma,* 512 U.S. 1, 6-7, 114 S.Ct. 2004, 2008-2009, 129 L.Ed.2d 1 (1994); *McCleskey v. Kemp,* 481 U.S. 279, 304-306, 107 S.Ct. 1756, 1773-1775, 95 L.Ed.2d 262 (1987); *Stephens, supra,* at 878-879, 103 S.Ct., at 2743-2744.

In the selection phase, our cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence. *Penry v. Lynaugh,* 492 U.S. 302, 317-318, 109 S.Ct. 2934, 2946-2947, 106 L.Ed.2d 256 (1989); *Eddings v. Oklahoma,* 455 U.S. 104, 113-114, 102 S.Ct. 869, 876-877, 71 L.Ed.2d 1 (1982); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978). However, the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence. *Johnson v. Texas,* 509 U.S. 350, 362, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993); *Penry, supra,* at 326, 109 S.Ct., at 2951; *Franklin v. Lynaugh,* 487 U.S. 164, 181, 108 S.Ct. 2320, 2331, 101 L.Ed.2d 155 (1988). Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence. Thus, in *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), we held that the standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood

that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.,* at 380, 110 S.Ct., at 1198; see also *Johnson, supra,* at 367-368, 113 S.Ct., at 2669.

But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible. *See Tuilaepa, supra,* at 978-979, 114 S.Ct., at 2638-2639 (noting that at the selection phase, the state is not confined to submitting specific propositional questions to the jury and may indeed allow the jury unbridled discretion); *Stephens*, *supra*, at 875, 103 S.Ct., at 2741-2742 (rejecting the argument that a scheme permitting the jury to exercise "unbridled discretion" in determining whether to impose the death penalty after it has found the defendant eligible is unconstitutional, and noting that accepting that argument would require the Court to overrule *Gregg, supra*).

*Buchanan v. Angelone*, 522 U. S. at 275-277.

## D. AEDPA Review

Petitioner's eighth claim for federal habeas relief relies upon the Supreme Court's opinions in *Apprendi v. New Jersey*, 530 U. S. 466 (2000), and *Ring v. Arizona*, 536 U. S. 584 (2002) 136 S. Ct. 616 (2016). Petitioner's arguments in support of his eighth claim misconstrue the holdings in *Ring* and *Apprendi*, as well as fail to anticipate the Supreme Court's subsequent opinions in *Blakely v. Washington*, 542 U. S. 296, (2004), and *Hurst v. Florida*, 136 S. Ct. 616 (2016).

In *Apprendi v. New Jersey*, the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent

underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent. *Apprendi*, 530 U. S. at 497. The Supreme Court's opinion in *Apprendi* emphasized it was merely extending to the state courts the same principles discussed in Justice Stevens's and Justice Scalia's concurring opinions in *Jones v. United States*, 526 U. S. 227, 252-53 (1999): other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi*, 530 U. S. at 490. Put more simply, the Supreme Court held in *Apprendi* (1) it was unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal is exposed and (2) all such findings must be established beyond a reasonable doubt. *Id.*, 530 U. S. at 490.

Two years later, in *Ring v. Arizona*, the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence in a case in which the jury had declined to find the defendant guilty of premeditated murder during the guilt-innocence phase of a capital trial (instead finding the defendant guilty only of felony murder) but a trial judge subsequently concluded the defendant should be sentenced to death based upon *factual* determinations that (1) the offense was committed in expectation of receiving something of pecuniary value (*i.e.,* the fatal shooting of an armored van guard during a robbery) and (2) the foregoing

aggravating factor outweighed the lone mitigating factor favoring a life sentence (*i.e.*, the defendant's minimal criminal record).[119] *Ring v. Arizona*, 536 U. S. at 609. The Supreme Court emphasized, as it had in *Apprendi*, the dispositive question "is not one of form, but of effect": "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt." *Id.*, 536 U. S. at 602. "A defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.*, 536 U. S. at 602 (quoting *Apprendi*, 530 U. S. at 483). Because Ring

---

[119] The Arizona trial judge instructed Ring's jury on alternative theories of premeditated murder and felony murder. *Ring v. Arizona*, 536 U. S. at 591. The jury deadlocked on premeditated murder but convicted Ring of felony murder occurring in the course of armed robbery. *Id.* The trial court also instructed Ring's jury in accordance with Arizona law that (1) a person commits first-degree murder if, acting either alone or with one or more other persons, the person commits or attempts to commit one of several enumerated felonies including robbery and, in the course of and furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person and (2) a conviction for felony murder did not require a specific mental state other than what is required for the commission of the enumerated felonies. *Id.* (*citing* Ariz.Rev.Stat.Ann. § 13-1105(A) and (B) (West 2001)). At the guilt-innocence phase of Ring's trial, there was no evidence presented showing Ring participated in the planning of the robbery or expected the killing of the armored car guard. *Id.*, 536 U. S. at 592-93. Between the guilt-innocence phase of trial and Ring's sentencing hearing, however, one of his accomplices entered into a plea agreement and agreed to testify at Ring's sentencing hearing. *Id.*, 536 U. S. at 593. At the sentencing hearing, the accomplice identified Ring as the primary planner of the robbery and the person who actually shot the guard. *Id.*

The Arizona trial judge found a second aggravating factor applied in Ring's case, *i.e.,* Ring's comments after the fatal shooting in which he chastised his co-conspirators for their failure to praise Ring's marksmanship rendered his offense "especially heinous, cruel, or depraved." The Arizona Supreme Court later held there was insufficient evidence to support the trial judge's finding of depravity but nonetheless re-weighed the remaining aggravating factor against the lone mitigating factor and affirmed Ring's death sentence. *Ring v. Arizona*, 536 U. S. at 595-96.

would not have been subject to the death penalty under Arizona law based solely upon the jury's verdict (and but for the trial judge's factual determination as to the existence of an aggravating factor), the Supreme Court declared Ring's death sentence violated the right to trial by jury protected by the Sixth Amendment. *Id.*, 536 U. S. at 609.

In *Blakely v. Washington*, 542 U. S. 296, (2004), the Supreme Court struck down as a violation of the Sixth Amendment's right to jury trial a judge-imposed sentence of imprisonment that exceeded by more than three years the state statutory maximum of 53 months. *Blakely v. Washington*, 542 U. S. at 303-04. In so ruling, the Supreme Court relied upon its prior holding in *Apprendi,* 530 U. S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). In *Blakely*, the Supreme Court also relied upon its prior opinion in *Ring v. Arizona*, *supra*, for the principle "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely v. Washington*, 542 U. S. at 303.

In *Hurst v. Florida*, the Supreme Court struck down as a violation of the principles announced in *Apprendi* and *Ring* a death sentence imposed by a Florida judge after the jury at the guilt-innocence phase of Hurst's trial convicted him of

first-degree murder but failed to specify which of the two theories of murder submitted (*i.e.,* premeditated murder or felony murder for an unlawful killing during a robbery) it believed. *Hurst*, 136 S. Ct. at 619-20. The Florida felony murder statute at the time of Hurst's trial, as was true for Arizona's felony murder statute at the time of Ring's trial, did not require a jury finding of the specific intent to kill.[120] Consistent with Florida's hybrid capital sentencing scheme, the sentencing court held an evidentiary hearing before the jury, and the jury recommended a sentence of death. After the Florida Supreme Court vacated Hurst's first sentence, the sentencing judge conducted a new evidentiary hearing, instructing the jury it could recommend a death sentence if it found at least one aggravating circumstance beyond a reasonable doubt, *i.e.*, either the murder was especially heinous, atrocious, or cruel, or the murder was committed while Hurst was committing a robbery. At the conclusion of the second sentencing hearing, the jury recommended death by a vote of 7 to 5. In her sentencing order, the trial judge relied upon her independent determination that the evidence established statutory aggravating factors of (1) the capital felony was especially heinous, atrocious, or cruel and (2) the capital felony

---

[120] Florida law provided at the time of Hurst's murder trial that first degree murder consisted of the unlawful killing of a human being (1) when perpetuated from a premeditated design to effect the death of the person killed or any human being, (2) when committed by a person engaged in the perpetuation of, or in the attempt to perpetuate any of nineteen listed felonies (including robbery and kidnaping), or (3) which resulted from the unlawful distribution of any controlled substance identified in the statute, when such drug is proven to be the proximate cause of the death of the user. Fla. Stat. § 782.04(1) (2010).

was committed while the defendant was engaged, or was an accomplice, in the commission or an attempt to commit, or flight after committing or attempting to commit any robbery, *i.e.*, Fla. Stat. § 921.141(6)(d) & (h) (2010). The Supreme Court held the Sixth Amendment and Due Process Clause jointly require that each element of a crime be proved to a jury beyond a reasonable doubt. *Hurst*, 136 S. Ct. at 621. The Supreme Court described its prior holding in *Apprendi* as follows: "any fact that 'exposes the defendant to a greater punishment *than that authorized by the jury's guilty verdict'* is an 'element' that must be submitted to a jury." *Id.* (*emphasis added*). The Supreme Court concluded Hurst's death sentence was invalid because the sentencing judge, not a jury, found the aggravating circumstance necessary for the imposition of the death penalty under Florida law. *Id.*, at 624.

Alabama's capital sentencing scheme is very similar to the hybrid system that produced Hurst's death penalty. As explained in detail in Section I.H. above, Petitioner's most recent capital sentencing proceeding followed the same pattern as Hurst's: first, the trial judge instructed an advisory jury it could only consider specific aggravating circumstances it determined beyond a reasonable doubt existed in Petitioner's case; second, the jury recommended a sentence of death; and finally, the trial judge issued a written sentencing order containing factual findings, weighing aggravating factors he concluded had been established beyond a reasonable doubt against mitigating circumstances, and imposing a sentence of

death.  There the similarities between Petitioner's trial and those in *Hurst* and *Ring* end, however.

What distinguishes Petitioner's trial from the constitutionally defective capital murder trials in *Hurst* and *Ring*, and what distinguishes the holding in *Apprendi* from the circumstances of Petitioner's case, is the fact Petitioner's capital sentencing *jury* made all the factual determinations at the guilt-innocence phase of Petitioner's trial (*unanimously* and *beyond a reasonable doubt*) necessary to render Petitioner eligible for the death penalty under Alabama law (*i.e.*, finding Petitioner (1) intentionally murdered Mary Gordon and Sylvia Gordon and (2) did so in the course of committing burglary, robbery, and sexual assault).  As the Supreme Court explained in *Hurst*, its holding in *Apprendi* was that "any fact that 'exposes the defendant to a greater punishment than that authorized by the jury's guilty verdict' is an 'element' of the offense that must be submitted to a jury." *Hurst*, 136 S. Ct. at 621.  The jury's factual findings at the guilt-innocence phase of Petitioner's capital murder trial rendered Petitioner *eligible* for the death penalty within the meaning of the Supreme Court's Eighth Amendment jurisprudence.  *See Tuilaepa v. California*, 512 U. S. at 971-72 ("To render a defendant eligible for the death penalty in a homicide case, we have indicated that the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase.").  Petitioner's jury made guilt-innocence phase factual findings,

unanimously and beyond a reasonable doubt, that he (1) intentionally killed Sylvia Gordon in the course of the same scheme or course of conduct in which he intentionally killed Mary Gordon, (2) intentionally killed Sylvia Gordon in the course of committing the burglary of the dwelling of Mary and Sylvia Gordon, (3) intentionally killed Mary Gordon in the course of committing the burglary of the dwelling of Sylvia Gordon, (4) intentionally killed Sylvia Gordon in the course of committing the robbery of Sylvia or Mary Gordon, (5) intentionally killed Mary Gordon in the course of committing the robbery of Mary Gordon, and (6) intentionally killed Mary Gordon in the course of committing the rape of Mary Gordon.[121]  These factual findings were all that were necessary under applicable Alabama law and the Eighth Amendment to render Petitioner *eligible* to receive a sentence of death.

The Supreme Court's Sixth and Eighth Amendment jurisprudence requires that all factual determinations necessary to render a defendant *eligible* for a sentence of death must be made unanimously and beyond a reasonable doubt by a jury.  The juries in *Ring* and *Hurst* rendered ambiguous guilty verdicts on charges of first-degree murder.  Those charges were premised or potentially premised upon felony murder theories that did not require the prosecution to establish beyond a reasonable

---

[121] 44 SCR R-1266-68.

doubt that the defendant acted with the specific intent to kill. Likewise, the ambiguous guilty verdicts in *Ring* and *Hurst* did not establish that the juries in those cases had concluded unanimously and beyond a reasonable doubt the existence of an aggravating circumstance that both (1) did not apply to every defendant convicted of murder and (2) was not unconstitutionally vague.[122] *See Tuilaepa*, 512 U. S. at 972 (the aggravating circumstance must apply only to a subclass of defendants convicted of murder and may not be unconstitutionally vague). In stark contrast, Petitioner's guilty verdict on the capital murder counts against him necessarily included factual findings (unanimously and beyond a reasonable doubt) that Petitioner intentionally killed Mary and Sylvia Gordon in the course of (1) the same scheme or course of conduct and (2) a burglary, robbery, and rape. Petitioner's guilty verdict did not suffer from any of the ambiguities present in *Ring* or *Hurst*. For this reason, Petitioner's death penalty does not suffer from the same

---

[122] Ring's jury was instructed on the dual theories of premeditated murder and felony murder; it deadlocked on premeditated murder but convicted on felony murder after receiving instructions permitting it to convict on that charge without making a finding of a specific mental state beyond that necessary to convict for robbery. *Ring*, 536 U. S. at 591-92. Hurst's jury convicted him of first-degree murder without specifying which of the two alternative theories (*i.e.,* premeditated murder or felony murder for an unlawful killing during a robbery) it had concluded the evidence established beyond a reasonable doubt. *Hurst*, 136 S. Ct. at 619-20. Thus, both of these guilty verdicts were highly ambiguous. In contrast, Petitioner's jury was instructed it was required to find unanimously and beyond a reasonable doubt that (1) Petitioner *intentionally* killed Mary or Sylvia Gordon before it could return guilty verdicts to counts two through six of the indictment and (2) Petitioner *intentionally* killed both Mary and Sylvia Gordon before it could return a guilty verdict as to the first count of the indictment. *See* 42 SCR R-1234-39, R-1241-43, R-1245-47, R-1255-57.

constitutional defect that took place during the trials of *Ring* and *Hurst*. Likewise, the Petitioner's death sentence does not violate the constitutional rule announced in *Apprendi*. Petitioner's trial conformed in all respects to the Sixth and Eighth Amendment requirements applicable to the *eligibility* determination of the capital sentencing process in a capital sentencing proceeding.

The Supreme Court has distinguished the constitutional requirements of the *eligibility* decision, *i.e.*, the narrowing function, and the *selection* decision, *i.e.*, the individualized assessment of mitigating circumstances, holding the latter requires only that the sentencing jury be given broad range to consider all relevant mitigating evidence but leaving to the States wide discretion on how to channel the sentencing jury's balancing of mitigating and aggravating factors. *See Kansas v. Marsh*, 549 U. S. 158, 174-75 (2007) (holding, in connection with the *selection* phase of a capital sentencing proceeding, the Constitution mandates only that (1) the defendant has a right to present the sentencing authority with information relevant to the sentencing decision and (2) the sentencing authority is obligated to consider that information in determining the appropriate sentence); *Tuilaepa*, 512 U. S. at 978 (holding, at the *selection* stage, States are not confined to submitting to the jury specific propositional questions but, rather, may direct the jury to consider a wide range of broadly defined factors, such as "the circumstances of the crime," "the defendant's

prior criminal record" and "all facts and circumstances presented in extenuation, mitigation, and aggravation of punishment").

At the *selection* phase of a capital trial, the Supreme Court has left to the States the decision whether to channel a sentencing jury's weighing of mitigating evidence or grant the jury unfettered discretion to consider all relevant mitigating evidence and weigh that evidence in any manner the jury deems reasonable. *See Kansas v. Marsh*, 549 U. S. at 174 ("So long as a state system satisfies these requirements, our precedents establish that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed."). Likewise, the Supreme Court has not yet imposed a particular burden of proof requirement with regard to a capital sentencing jury's consideration of mitigating evidence when such consideration occurs exclusively within the selection process:

> In sum, "discretion to evaluate and weigh the circumstances relevant to the particular defendant and the crime he committed" is not impermissible in the capital sentencing process. "Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment." Indeed, the sentencer may be given "unbridled discretion in determining whether the death penalty should be imposed after it has been found that the defendant is a member of the class made eligible for that penalty."

*Tuilaepa v. California*, 512 U. S. at 979-80 (citations omitted).

"[T]here is no constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Johnson v. Texas*, 509 U. S. 350, 362 (1993) (quoting *Boyde v. California*, 494 U. S. at 377). "We have never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required." *Kansas v. Marsh*, 549 U. S. at 175 (quoting *Franklin v. Lynaugh*, 487 U. S. at 179).

The Supreme Court has never categorically mandated *jury* resolution of all factors at the *selection* phase of a capital sentencing process. On the contrary, the Supreme Court's jurisprudence addressing the *selection* aspect of capital sentencing has focused on requiring consideration of all mitigating evidence, as well as the circumstances of the capital offense. *See Tuilaepa v. California*, 512 U. S. at 972 ("What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." (quoting *Zant v. Stephens*, 462 U. S. 862, 879 (1983)). "The selection decision, on the other hand, requires individualized sentencing and must be expansive enough to accommodate relevant mitigating evidence so as to assure an assessment of the defendant's culpability." *Tuilaepa v. California*, 512 U. S. at 973.

Petitioner received exactly the type of individualized assessment of his culpability in the context of all the mitigating evidence presented during trial when (1) the jury considered all relevant mitigating evidence presented during either phase of trial, (2) the jury made its sentencing recommendation (after weighing only those aggravating circumstances it determined had been established beyond a reasonable doubt against all the mitigating circumstances), and (3) the trial judge issued his findings and conclusions in his sentencing order (which findings were dictated, in part, by the jury's unanimous findings beyond a reasonable doubt that the Petitioner's capital offenses (1) included multiple murders committed in the same scheme or course of conduct and (2) occurred in the course of a burglary, robbery, and rape).[123]

---

[123] At the time of Petitioner's capital murder trial, Alabama law provided, and still provides, as follows:

> At the sentencing hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.
>
> Ala. Code § 13A-5-45(e).

The state trial court's sentencing order, containing findings of fact and conclusions of law, appears at 55 SCR (Tab R-66) 1223-31. Judge Reese found the state had proven beyond a reasonable doubt three aggravating circumstances, *i.e.,* that (1) *as found by the jury*, the Petitioner's capital offense was committed while Petitioner was engaged in or was an accomplice in the commission or attempted commission, or during flight after committing or attempting to commit burglary, robbery, and rape and (2) Petitioner's capital offenses were especially heinous, atrocious, or cruel compared to other capital offenses. 55 SCR 1227. Judge Reese made the following findings with regard to Alabama's statutory mitigating circumstances: (1) Petitioner had no significant history of prior criminal activity; (2) Petitioner's capital offense was committed while the Petitioner was under the influence of extreme mental or emotional disturbance; (3) neither victim was a participant in Petitioner's conduct or consented to it; (4) Petitioner was not an accomplice in the capital offense of an another person and his participation was not relatively minor; (5) Petitioner

The jury made determinations at the guilt-innocence phase of trial that (1) Petitioner's intentional capital offenses took place in the course of a burglary, robbery, and rape and (2) Petitioner intentionally killed one person in the course of the same scheme or course of conduct in which he intentionally killed a second person. The jury made those determinations unanimously and beyond a reasonable doubt. Those determinations rendered Petitioner eligible to receive the death penalty under both Alabama law and the Supreme Court's Eighth and Sixth Amendment jurisprudence. The state trial court was constitutionally obligated to consider the circumstances of Petitioner's offense when it made the selection determination at the punishment phase of Petitioner's capital murder trial. It did so.

After the jury unanimously found Petitioner guilty beyond a reasonable doubt of all six counts of capital murder in the indictment, Petitioner received from both

---

did not act under extreme duress or under the substantial domination of another person; (6) Petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was not substantially impaired; and (7) Petitioner was eighteen years old at the time of the crime. 55 SCR 1229. In addition, the trial judge found (1) Petitioner's emotional disturbance at the time of his offense was due to a difficult family history and his transfer to a number of different placements and (2) Petitioner's antisocial personality were mitigating circumstances. 55 SCR 1230.

The state trial judge's findings of fact at sentencing were based in part on consideration of the evidence in the trial record showing (1) Petitioner sexually assaulted Mary Gordon after stabbing her at least once and forcing his way into her bedroom, (2) Sylvia Gordon died of blood loss from multiple stab wounds, none of which were independently fatal, (3) Mary Gordon died as a result of multiple stab wounds, some of which were independently sufficient to have caused her death, (4) some of Mary Gordon's stab wounds were post-mortem, (5) Petitioner confessed to having ripped or cut every phone in the house from the wall to prevent his victims from calling for help, (6) Sylvia Gordon's genitals showed signs of trauma which could have been either pre- or post-mortem in nature, and (7) Petitioner confessed that he drove away from the crime scene in Mary Gordon's vehicle.

the advisory jury and the trial court individualized consideration of the circumstances of his offense and the mitigating aspects of his character and background. This is all the Eighth and Sixth Amendments required in connection with the selection decision.

## E.  Conclusion

The state habeas court's rejection on the merits of Petitioner's *Ring/Apprendi* claim during the course of Petitioner's Rule 32 proceeding was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding. Petitioner's eighth claim does not warrant federal habeas corpus relief.

## V.  PROSECUTORIAL JURY ARGUMENT

## A.  The Claim

In his seventh claim for federal habeas corpus relief, Petitioner argues the prosecution employed improper jury argument at both phases of his June 1996 capital murder trial (Doc. # 5, at pp. 52-57; Doc. # 64, at pp. 186-203).

## B.  State Court Disposition

Petitioner included challenges to the prosecutors' guilt-innocence phase and sentencing phase jury arguments as his eleventh and twelfth claims in his appellant's

brief.[124]  The Alabama Court of Criminal Appeals rejected those arguments on the merits, finding Petitioner failed to object to any of the allegedly improper prosecutorial comments and concluding none of the identified statements rendered either phase of Petitioner's capital trial fundamentally unfair.  *See Freeman v. State*, 776 So. 2d at 183-89 (holding all of the prosecutorial arguments identified by Petitioner were either proper summations of the evidence, reasonable inferences drawn from the evidence, proper arguments that the aggravating circumstances outweighed the mitigating circumstances, or general appeals for justice and law enforcement).  The Alabama Supreme Court subsequently denied certiorari review, as did the United States Supreme Court.

## C.  Clearly Established Federal Law

In reviewing the propriety of prosecutorial closing argument, the relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Darden v. Wainwright*, 477 U. S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U. S. 637, 642 (1974)).  The Supreme Court recognizes that States have "a legitimate interest in counteracting mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to

---

[124] 45 SCR 47-57.

society and in particular to his family." *Payne v. Tennessee*, 501 U. S. 808, 825 (1991). The State may properly conclude that, "for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." *Id.*

## D. AEDPA Review

### 1. The Proper Scope of Prosecutorial Jury Argument

To find prosecutorial misconduct warranting a new trial, the Eleventh Circuit applies a two-pronged test: (1) the remarks must be improper and (2) the remarks must prejudicially affect the substantial rights of the defendant. *Conner v. GDCP Warden*, 784 F.3d 752, 769 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1246 (2017). To satisfy the second prong, the prosecutor's improper comments must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (quoting *Darden v. Wainwright*, 477 U. S. at 181). In determining whether prosecutorial arguments are sufficiently egregious to result in the denial of due process, the Eleventh Circuit considers the statements in the context of the entire proceeding, including factors such as (1) whether the remarks were isolated, ambiguous, or unintentional; (2) whether there was a contemporaneous objection by defense counsel; (3) the trial court's instructions; and (4) the weight of aggravating and mitigating factors. *Conner v. GDCP Warden*, 784 F.3d at 769 (quoting *Land v. Allen*, 573 F.3d 1211, 1219-20 (11th Cir. 2009), *cert. denied*, 559 U. S. 1072 (2010)).

The same standard applies to allegedly improper prosecutorial arguments at the sentencing phase of a capital murder trial. *See Price v. Allen*, 679 F.3d 1315, 1326 (11th Cir. 2012) (holding a federal habeas corpus petitioner "must show that 'there has been a violation of due process,' which 'occurs if, but only if, the improper argument rendered the sentencing stage trial fundamentally unfair.'" (quoting *Romina v. Head*, 253 F.3d 1349, 1366 (11th Cir. 2001), *cert. denied*, 535 U. S. 1011 (2002)), *cert. denied*, 568 U. S. 1212 (2013). "An improper prosecutorial argument has rendered a capital sentencing proceeding fundamentally unfair if there is a reasonable probability that the argument changed the outcome, which is to say that absent the argument the defendant would not have received a death sentence." *Price v. Allen*, 679 F.3d at 1326 (quoting *Romina v. Head*, 253 F.3d at 1366).

Federal courts recognize as proper four areas for prosecutorial jury argument: (1) summation of the evidence; (2) reasonable inferences drawn from the evidence; (3) replies or answers to opposing counsel's argument; and (4) pleas for law enforcement and justice.[125]

---

[125] *See, e.g., Norris v. Davis*, 826 F.3d 821, 832 n.10 (5th Cir. 2016) (recognizing these four areas as permissible subjects for jury argument under Texas law), *cert. denied*, 137 S. Ct. 1203 (Feb. 27, 2017); *United States v. Rios-Morales*, 878 F.3d 978, 987 (10th Cir. 2017) (holding prosecutor's assertion during closing argument that the defendant was the moving force behind a drug conspiracy an accurate summation of the trial evidence); *United States v. Oscar*, 877 F.3d 1270, 1283-84 (11th Cir. 2017) (holding prosecutor's accusation that a defense witness had testified falsely was an inference supported by the evidence at trial where other evidence contradicted portions of the witness' testimony and the witness' testimony was inconsistent); *United States v. Kiekow*, 872 F.3d 236, 254-55 (5th Cir. 2017) (holding prosecutor's comments regarding the credibility of prosecution witnesses were an appropriate rebuttal to defense counsel's

argument that the prosecution witnesses had lied, where prosecution merely questioned existence of a motive for the witnesses to testify falsely and did not refer to any evidence not in the record), *cert. filed* Jan. 31, 2018 (no. 17-7619); *United States v. Hodge*, 870 F.3d 184, 203 (3rd Cir. 2017) (holding (1) "It is fundamental that counsel presenting a summation is free to repeat the evidence and even 'argue reasonable inferences from the evidence,' as long as counsel refrains from misstating the evidence" and (2) prosecutor's reiteration of a witness' trial testimony during closing argument did not constitute a basis for reversal); *United States v. Melton*, 870 F.3d 830, 841 (8th Cir. 2017) (quoting *United States v. Robinson*, 110 F.3d 1320, 1327 (8th Cir.), *cert. denied*, 522 U. S. 975 (1997): "So long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they, no less than defense counsel, are free to use colorful and forceful language in their arguments to the jury" and holding prosecutor's comments suggesting a defendant testified falsely at trial because they were based on the evidence and highlighted the reasons why the prosecutor believed the defendant's testimony was not credible); *United States v. Walker-Couvertier*, 860 F.3d 1, 12 (1st Cir. 2017) ( holding prosecutor's argument in drug conspiracy trial that defendant obtained a second weapon after another weapon had been seized was a reasonable inference from the evidence), *cert. filed* Feb. 6, 2018 (no. 17-7674); *United States v. Klemis*, 859 F.3d 436, 443 (7th Cir. 2017) (holding (1) prosecutor's comments on the deleterious effects of heroin abuse encapsulated reasonable and commonsense inferences that arose from uncontroverted evidence, particularly a physician's testimony regarding how heroin affects the body and (2) a prosecutor may properly comment on a witness's credibility if the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion); *United States v. Ponzo*, 853 F.3d 558, 583 (1st Cir. 2017) (holding prosecutor's statements suggesting defendant would advance within a racketeering conspiracy if a particular person were killed a reasonable inference from the testimony in evidence), *cert. filed* Oct. 27, 2017 (no. 17-624); *United States v. Jackson*, 849 F.3d 540, 554 (3rd Cir. 2017) ("the role of the 'prosecutor is to argue in summation' what inferences to draw from the evidence"); *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 852 (6th Cir. 2017) (holding (1) prosecutors must be given leeway to argue reasonable inferences from the evidence and (2) a prosecutor has no less right to discuss a jury's duty to impose the death penalty if legally warranted than defense counsel has the right to discuss a jury's duty to acquit (or give a life sentence) if legally warranted); *United States v. Flournoy*, 842 F.3d 524, 528 (7th Cir. 2016) (holding it was appropriate for prosecutor to respond to defense counsel's argument about the government's failure to call a witness by pointing out the defendant had the power to subpoena witnesses); *United States v. Miller*, 799 F.3d 1097, 1106-07 (D.C. Cir. 2015) (holding the prosecutor's closing arguments about a witness's testimony amounted to proper summary of that testimony and the prosecutor's references to the defendant as a "con man" or "con artist" were permissibly tied to specific conduct charged in the indictment charging conspiracy to defraud), *cert. denied*, 137 S. Ct. 47 (2016); *United States v. Alcantrara-Castillo*, 788 F.3d 1186, 1195 (9th Cir. 2015) (prosecutor's argument that the testimony of a particular prosecution witness was "consistent, believable, and logical," a proper instance of the prosecutor drawing an inference from the evidence rather than offering an impermissible personal opinion on the witness' credibility); *United States v. Vazquez-Larrauri*, 778 F.3d 276, 283-84 (1st Cir. 2015) (while it is improper for the prosecutor to personally vouch for the credibility of a witness or to assert a personal belief in the defendant's guilt, it is permissible for the prosecution to offer specific reasons why a witness ought to be accepted as truthful by the jury - such as fact cooperating witness's testimony put him and his family in danger or witness's plea bargain

Alabama law likewise recognizes as appropriate these same four areas of prosecutorial jury argument.[126]

---

agreement required witness to testify truthfully); *United States v. Johnson*, 767 F.3d 815, 824-25 (9th Cir. 2014) (prosecution may not comment on the defendant's failure to testify but may properly call attention to the defendant's failure to present exculpatory evidence -- such as expert testimony rebutting prosecution's DNA evidence), *cert. denied*, 136 S. Ct. 688 (2015); *United States v. Woods*, 764 F.3d 1342, 1247 (10th Cir. 2014) (holding it was proper for prosecutor to argue the fact prosecution witnesses had pleaded guilty to conspiring to distribute methamphetamine rendered their trial testimony more credible in meth conspiracy trial), *cert. denied*, 135 S. Ct. 1866 (2015); *United States v. Garcia*, 758 F.3d 714, 724 (6th Cir.) (prosecutor's argument that prosecution witness accused by defense of testifying falsely would have spun a more persuasive yarn had the witness decided to lie was proper responsive jury argument and not an improper personal comment on witness's credibility), *cert. denied*, 135 S. Ct. 498 (2014); *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014) (prosecutor's jury argument which quoted trial testimony of victim (identifying the defendant as the assailant) and then asserted the defendant "did it" not an improper assertion of prosecutor's personal opinion as to defendant's guilt); *United States v. Adkins*, 743 F.3d 176, 187 (7th Cir.) (prosecutor may comment on veracity of a witness if that comment is immediately preceded by the prosecutor's argument that corroborating evidence showed the witness's testimony to be truthful), *cert. denied*, 134 S. Ct. 2864 (2014); *United States v. Poole*, 735 F.3d 269, 277 (5th Cir. 2013) (as long as a prosecutor's characterization of the testifying defendant "as a liar" is reasonably seen as drawing conclusions from, and is actually supported by, the evidence, the prosecutor does not commit error); *United States v. Runyon*, 707 F.3d 475, 513-14 (4th Cir. 2013) (prosecutor's opening and closing jury arguments contrasting the criminal justice system's treatment of criminal defendant with the defendant's treatment of his murder victim was proper; the prosecutor's argument that the jury should not grant the defendant mercy because the defendant showed no mercy to his victim or the victim's family was proper; "It is, of course, perfectly permissible for the prosecution to urge the jury not to show a capital defendant mercy."; and prosecutor's argument suggesting kidnaping, robbery, and murder victim suffered "mental torture" while being held at gunpoint by the defendant prior to victim's death a proper inference from the evidence presented), *cert. denied*, 135 S. Ct. 46 (2014); *Bryant v. Caldwell*, 484 F.2d 65, 66 (5th Cir. 1973) (prosecutor's reference to the defendant's character and his appeal to the jury to convict for the sake of the safety of the community were well within the permissible scope of jury argument for a Georgia prosecutor), *cert. denied*, 415 U.S. 981 (1984).

[126] *See Henderson v. State*, ___ So. 3d ___, ___, 2017 WL 543134, *34 (Ala. Crim. App. Feb. 10, 2017) (there is no impropriety in a prosecutor appealing to the jury for justice and to properly perform its duty - such comments are nothing more than proper pleas for justice), *cert. filed* Jan. 25, 2018 (no. 17-7546); *Bohannon v. State*, 222 So. 3d 457, 500-05 (Ala. Crim. App. 2015) (holding (1) "The test of a prosecutor's legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument." (2) the prosecutor may present his impressions from the evidence, argue every legitimate inference from the evidence, and "examine, collate, sift, and treat the evidence in his own way," (3) the prosecutor may urge

## 2. The Prosecution's Guilt-Innocence Phase Jury Arguments

Petitioner did not object to any of the guilt-innocence phase evidence about the Petitioner's victims presented by the prosecution through the testimony of Deborah Gordon Hosford (*i.e.*, her testimony concerning Sylvia Gordon's efforts to obtain her high school diploma and Mary Gordon's efforts to hold down a job and be a single mother to her two daughters).[127]   Likewise, Petitioner did not object to

---

the jury to use common sense in determining the defendant's guilt, (4) the prosecutor is entitled to argue forcefully for the defendant's conviction, and (5) the prosecutor may reply in kind to the argument of defense counsel), *aff'd*, *Ex parte Bohannon*, 222 So. 3d 525 (Ala. 2016), *cert. denied*, 137 S. Ct. 831 (2017); *Bohannon v. State*, 222 So. 3d at 520-22 (holding prosecutor may properly (1) argue to the jury that a death sentence is appropriate and (2) respond in rebuttal to the arguments of defense counsel); *Shanklin v. State*, 187 So. 3d 734, 793 (Ala. Crim. App. 2014) (prosecutor properly argued that, based upon other evidence presented at trial, a witness was incorrect in some of the details of her trial testimony but correct about other details - such argument was a reasonable inference from the totality of the evidence presented), *cert. denied*, (Ala. Aug. 28, 2015), *cert. denied*, 136 S. Ct. 1467 (2016); *Brown v. State*, 74 So. 3d 984, 1017 (Ala Crim. App. 2010) ("While it is never proper for the prosecutor to express his personal opinion as to the guilt of the accused during closing argument, reversible error does not occur when the argument complained of constitutes mere expression of opinion concerning inferences, deductions and conclusions drawn from the evidence." (quoting *Allen v. State*, 659 So. 2d 135, 139 Ala. Crim. App. 1994)), *aff'd*, 74 So. 3d 1039 (Ala. 2011), *cert. denied*, 565 U. S. 1111 (2012); *Gobble v. State*, 104 So. 3d 920, 970 (Ala. Crim. App. 2010) (prosecutor's opening statement that defendant did not want her child back and that the child's injuries occurred one of two ways - through abuse or an automobile accident - were supported by evidence showing the defendant relinquished her parental rights and a medical expert opined at trial the child's injuries could have been caused either in an automobile accident or from child abuse), *cert. denied*, (Ala. Sept. 14, 2012), *cert. denied*, 569 U. S. 927 (2013); *Minor v. State*, 914 So. 2d 372, 421 (Ala. Crim. App. 2004) (holding pleas for justice appropriate), *cert. denied*, 914 So. 2d 372 (Ala. 2004), *cert. denied*, 548 U. S. 925 (2006).

[127] Petitioner offered no objection when the prosecution elicited testimony from Deborah Gordon Hosford during the guilt-innocence phase of trial establishing that (1) Sylvia Gordon was seventeen years old at the time of her death, (2) Sylvia was focused on her education, a member of Students Against Drunk Driving, the literary magazine, and the LAMP program, and nearing her graduation, (3) Mary Gordon was forty-two years old and a single mother who worked a clerical job and had undergone surgery on both her wrists, (4) Mary Gordon worked long hours and was often exhausted, (5) Mary's wrist surgery had not fully relieved her pain and she wore an electrical device a lot, and (6) both Sylvia and Mary were otherwise in good health in March 1988. Testimony of Deborah Gordon Hosford, 40 SCR R-456-60.

Likewise, Petitioner offered no objection when the prosecutor asked Deborah Gordon Hosford about the nature of Sylvia's relationship with Petitioner:

Q.   Who is David Freeman?

A.   The defendant.  He was seeing my sister at that time.

Q.   How did you know him?

A.   I had met him a couple times, actually more than a couple of times.  I wasn't at the house very much, so I don't know how often he would be there, but pretty much whenever I was at home, he was there.

Q.   Do you know where he was living?

A.   My sister had told me he was living down the street in a trailer.

Q.   Where was he working, if you know?

A.   At that point I don't think I knew.  I had heard he had gotten a job, but I didn't know where he was working.

Q.   You mentioned a bicycle.  Did you ever see him with a bicycle?

A.   Yes.  Every time he came over, it would be in the front yard.

Q.   What about a car?  Did he have one?

A.   No, he did not.

Q.   Did y'all have a car that was for sale at the time?

A.   Yes, we did.  That was a Plymouth Horizon, I believe.  That was actually the car that I totalled [sic] not two days before this happened.

Q.   How did you have it for sale?  Where was it?

A.   It was sitting in the front yard with a for sale sign on it.

Q.   Do you know if he inquired about that?

A.   From what I heard, that's how he met my sister.

Q.   How long had you known him?

A.   Probably only a couple of months.  Like I said, I met him a few times, but I hadn't talked to him.  I don't think it was for very long.  I just knew it was long enough that my mother had gotten aggravated with him being there as often as he was.

Q.   What kind of person was your mother in terms of having people over at your house?

A.   She was fine most of the time with it, except when we would have a guy over too often, she would get aggravated and say she didn't want to have him over quite so much.  She liked to be able to do whatever she needed to do without having to look over her shoulder constantly if some stranger or somebody else was in the house with us.  She liked it to be just us pretty much.  She liked her privacy.

Q.   You said that David was seeing your sister.  Were they dating?

A.   You might be able to call it that.  As far as I know, they never went anywhere.  My sister didn't have her license yet at that time, and I know with a bicycle, you can't really go anywhere on that, but I know he was over at the house quite often to see her.

Q.   Did you ever know them to go to a movie?

A.   Not as far as I know.

Q.   Go out to eat?

91

any of the prosecutor's closing argument at the guilt-innocence phase of trial summarizing the testimony of this witness.[128] As the state appellate court noted, the

A.    Not as far as I know.

Q.    Go to a ballgame or do anything social like that?

A.    As far as I know, the only social thing they ever did was him at our house.

Q.    You said when you saw David there, your sister, Sylvia, said something to you. What did she say?

A.    I asked her what he was doing here, because my understanding was she had already broken up with him. She said, don't worry; I am getting rid of him today.

Q.    What kind of person was your sister in terms of her relationships with other people?

A.    I feel she was a very, very caring person. She didn't want to hurt anybody's feelings. I feel that's pretty much the way my mother was, and she instilled that in us. Neither one of us wanted to hurt anybody's feelings. We tried to let people off easy if we could and not offend them in any way. That's just the way she was. She didn't want to offend anybody. She didn't want to hurt their feelings, but she couldn't -- I guess you have to stand up for yourself at some point, and you have to stand up for yourself regardless, even if it does hurt somebody else's feelings, but I know she never tried to hurt anybody's feelings.

40 SCR R-462-66. Petitioner did not object to any of the foregoing testimony.

[128] Petitioner complains in his federal habeas corpus petition about the following comments made by the prosecutor in closing argument at the guilt-innocence phase:

On March 11, 1988 this defendant brutally stabbed the life out of a family when he took that knife and he butchered Mary Gordon and Sylvia Gordon simply because he could not have what he wanted, as he had done his whole life. He couldn't have what he wanted. But this time he decided to kill them.

Sylvia Gordon, seventeen-year-old girl, senior in high school. She was in LAMP. She had a future. She had promise. She had her whole life to live. She had just begun to live, nowhere close to reaching her potential.

Mary Gordon wanted to do the best she could do. She did everything she could to provide for her children. She was alone. She had to be mother; she had to be father; she had to be everything, and she did a good job. She had Debbie who worked hard, manager of a TCBY, gone through college, graduated from high school, went through C-Pac, made honors program. Sylvia, as we said, in the honor's program at LAMP. She did what she could. She worked so hard, as the testimony has shown, she was tired all the time. All she wanted to do was rest, if she could get a chance. And on a Friday when the weekends come she comes home, home -- think about this folks -- her home, the place where she is the most comfortable, where she can relax, she can unwind. And what she walks into is the

trial court repeatedly instructed the jury that the comments and argument of the lawyers were not evidence to be considered by the jury in reaching its verdict or in recommending a sentence. *Freeman v. State*, 776 So. 2d at 184. Having independently reviewed the entire record from Petitioner's June 1996 capital murder trial, this court agrees with the state appellate court: the prosecutor's closing arguments in question merely summarized the testimony of Mrs. Hosford already before the jury or drew reasonable inferences from that same testimony. The evidence of Petitioner's guilt was overwhelming.[129] The prosecution's comments addressing the victims' character made during closing argument at the guilt-innocence phase of Petitioner's latest capital murder trial did not render Petitioner's trial fundamentally unfair. *See United States v. Hernandez*, 864 F.3d 1292, 1305 (11th Cir. 2017) ("to be reversible error, prosecutorial misconduct must raise a

---

worst nightmare that any parent can see, her own child helpless, dying, bleeding at the hands of this man. And why? Because he couldn't get what he wanted. 43 SCR R-1155-57. Petitioner made no objection to any of the foregoing argument. Nor does Petitioner argue there was anything factually inaccurate in the prosecutor's argument.

In federal court, the failure of defense counsel to object to any of the prosecution's allegedly prejudicial closing arguments generally means a complaint of improper prosecutorial argument must satisfy the plain error standard. *See, e.g., United States v. Taohim*, 817 F.3d 1215, 1224 (11th Cir. 2013) (when defense counsel fails to object to allegedly improper prosecutorial argument, the plain error standard requires the defendant to show (1) an error occurred; (2) the error was plain; (3) it affected the defendant's substantial rights; and (4) it seriously affected the fairness of the judicial proceeding).

[129] Even Petitioner's co-counsel during his June 1996 capital murder trial acknowledged this fact in his testimony at Petitioner's Rule 32 evidentiary hearing. Testimony of William Abell, 51 SCR R-92. Attorney Abell explained he fully agreed with the decision by Petitioner's lead trial counsel to withdraw Petitioner's not guilty plea and substitute a plea of not guilty by reason of mental disease or defect. *Id.*, 51 SCR R-93.

reasonable probability that, but for the prejudicial remarks, the outcome at trial would have been different."), *cert. denied*, 2018 WL 491628 (Jan. 22, 2018).

This court also agrees with the state appellate court's analysis of the prosecutor's request during guilt-innocence phase closing argument that the jury "do justice" for Petitioner's victims.[130]  There is nothing improper in a prosecutor's

---

[130] Contrary to Petitioner's arguments in his briefs in state court and his pleadings in this court, the prosecutor never employed the phrase "conscience of the community" during closing argument at the guilt-innocence phase of Petitioner's June 1996 trial.  On the contrary, when viewed in proper context, the only passage from the prosecution's guilt-innocence phase argument identified by Petitioner as one in which Petitioner argues the prosecution allegedly appealed to the jury to ignore its duty to render a verdict based on the evidence did precisely the opposite:

> These killings were cruel, vicious, depraved, but intentional.  Common sense tells you that, ladies and gentlemen.  This case is only about selfishness.  That's it.
>
> A family died in their home where they should be the most comfortable surrounded by all the memorabilia of their lives.  When you looked at the video, you couldn't help but notice Sylvia's room, the bed in which she died, all her stuffed toys and posters that you would expect in a teenage girl's room.  That's where she died, where she should have been the safest.  That is where in unbelievable pain and agony she died at the hand of this man, because he couldn't get his way.
>
> There are very few times in all our lives when we can really do something, we can do justice.  *I am asking you, on behalf of Sylvia Gordon and Mary Gordon, to do justice for them.*  This case is about selfishness.

43 SCR R-1164-66 (emphasis added).  Petitioner made no objection to the foregoing argument. The state appellate court accurately characterized the foregoing arguments as a call for justice, not sympathy.  *Freeman v. State*, 776 So. 2d at 186.

In his brief in support of his federal habeas corpus petition (Doc. # 64, at p. 189), *for the first time,* Petitioner also complains about the following language used by the prosecutor near the conclusion of closing argument at the guilt-innocence phase of trial:

> Ladies and gentlemen, this is a horrific case, and I don't think it can be as horrific for any of us as it was for Debbie Gordon when she stepped in that night and saw her sister lying dead and stabbed to death and her mother lying stabbed to death.
>
> And Mr. Mitchell is right, this case comes down to intent and what somebody did, and that somebody is sitting right over there whose name is David Freeman.  He couldn't have what he wanted.  Nobody else would.  Thank you.

42 SCR R-1176.  Petitioner did not object to the foregoing argument.

While Petitioner's appellant's brief did assert complaints about the prosecution's guilt-innocence phase closing argument it included no complaint about the foregoing passage.  45 SCR

appeal to the jury to do justice and properly perform its duty. *See United States v. Bailey*, 123 F.3d 1381, 1401 (11th Cir. 1997) (prosecutor's request that jury perform its civic duty was not prejudicial to defendant); *United States v. Smith*, 918 F.2d 1551, 1562-63 (11th Cir. 1990) (a prosecutor's appeals to the jury to act as "the conscience of the community" are not impermissible when they are not intended to inflame); *United States v. Kopituk*, 890 F.2d 1289, 1342-43 (11th Cir. 1982) (appeals to the jury to act as the conscience of the community, unless designed to inflame the jury, are not *per se* impermissible), *cert. denied*, 463 U. S. 1209 (1983). Viewed in context, the prosecutor's request that the jury "do justice" for Petitioner's victims did not inflame the jury or render the guilt-innocence phase of Petitioner's June 1996 murder trial fundamentally unfair.

There is no reasonable probability the outcome of the guilt-innocence phase of Petitioner's June 1996 capital murder trial would have been different but for any or all of the prosecution's jury arguments challenged by Petitioner in this court.

_____

(Tab R-38), at pp. 47-51. Thus, this aspect of Petitioner's seventh claim for federal habeas relief is unexhausted. This court need not decide whether the unexhausted status of this portion of claim seven is procedurally defaulted because, under the AEDPA, this court has the authority to deny an unexhausted claim on the merits. *Rhines v. Weber*, 544 U. S. 269, 277 (2005) (quoting 28 U.S.C. § 2254(b)(2) "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). This court independently concludes after *de novo* review of the entire record from Petitioner's June 1996 capital murder trial that the concluding paragraphs of the prosecution's guilt-innocence phase closing argument did not render that portion of Petitioner's trial fundamentally unfair. Petitioner did not object to the argument in question, which represented reasonable inferences drawn from the testimony of Deborah Gordon Hosford, admitted without objection during the guilt-innocence phase of trial.

### 3. The Prosecution's Punishment Phase Jury Arguments

In his federal habeas corpus petition and brief in support, Petitioner challenges the propriety of virtually the entirety of the prosecution's sentencing phase closing argument.[131]    After the prosecution made its initial punishment-phase closing

---

[131] More specifically, Petitioner complains about the following portion of the prosecution's initial punishment phase closing jury argument:

Ladies and gentlemen, if you will remember last week when you were being selected to sit on this jury, the Judge asked you a series of questions. And he made a note that capital punishment is not designed for every and all cases. It is not designed for every and all murders. It is there, and it is on the books for the special types that have been set out by the legislature as the conscience of the community would feel warrant the death penalty.

By your verdict that you have already rendered, you have found this murder is eligible for the death penalty, and we have proven beyond a reasonable doubt the existence of that aggravating circumstance I have already told you, that the killing took place during a robbery, took place during a rape, and took place during a burglary. That we have proven to you.

Ladies and gentlemen, we have proven something else to you, the other aggravating circumstance that we are relying on, that this killing is especially heinous, atrocious, and cruel.

What do those words mean? Heinous, extremely wicked or shockingly evil. Atrocious, outrageously wicked and vile. Cruel, designed to inflict high degree of pain with the utter indifference to or even the enjoyment of the suffering of others.

There cannot be a better description of what happened to Mary Gordon and what happened to Sylvia Gordon on May [sic] 11 of 1988 as heinous, atrocious, and cruel. Twenty-two stab wounds, not one fatal. You have heard the testimony from Dr. Lauridson that Sylvia Gordon lived up to ten minutes. You can look at the photographs that have been presented to you. The blood trails as she crawled on the floor trying to escape, a seventeen-year-old girl with her whole future in front of her, and her life ends because of this man's selfishness. The only reason, no other excuse, no more excuses.

Do you remember from all these psychological records that you have heard, and one of the ones that was presented to you was something from DYS, and this defendant was warned, hey buddy, you are going to keep up, and you are going to get into the adult system? No more excuses. Today excuse time is over. It is over with.

Mary Gordon, how cruel, how cruel of an act to leave and to attack your own child. He left her daughter there helpless, bleeding. Think what her last thoughts had to have been on this earth as she comes into that door, and not a thing she can do to save her child, nothing. He didn't give her the chance. He didn't

argument, Petitioner's trial counsel argued the jury should recommend a life sentence, pointing out that (1) Petitioner never used or threatened anyone with a butcher knife, (2) Petitioner's only prior brushes with the law involved a juvenile offense and such offenses are usually sealed and forgotten, (3) Petitioner's juvenile burglary conviction involved him and a girl who had run away from a group home breaking into a building because they needed a place to stay, which did not warrant electrocution, (4) at the time of his offense, Petitioner suffered from an extreme mental or extreme emotional disturbance and lacked the ability to conform his conduct to the law, (5) even if Petitioner's extreme mental or emotional disturbance

---

give Sylvia the chance. You cross David Freeman, you end up dead, period. You are a witness to his act, you end up dead, period. And then to rape her and to smear the blood of her daughter on her while being raped. How heinous, how atrocious, how cruel.

Mary Gordon will never know what it is like to hear the laughter of her grandchildren. She will never know what it is like to see her daughters get married. She will never know what it is like, as she worked hard her entire life being mother and father and providing and protecting for the welfare of her children, she will never know what it is like to finally rest and enjoy life. He took it all, period. He took it all.

Sylvia Gordon, her whole future in front of her, on the academic path, she will never know what it is like to have gone to college. She will never know what it is like to make a career. She will never know what it like to meet the man you love and to get married. She will never know what it is like to bear children. She will never know what it is like to hold her child to her breast. He took it all. Selfish.

This defendant, ladies and gentlemen, believes in the death penalty. You cross him, you are dead. His whole life led up to this act. You have seen it in the records, his whole life. He didn't get his way, he loses his temper.

You just heard it from the father, the deacon, who just testified by phone. He was good. He was quiet until confronted when he had to do something. He is not in control any more. That's all he wants. What satisfies him? Wicked, evil, heinous, atrocious, control.

44 SCR 1285-89.

did not justify a finding of not guilty by reason of mental disease or defect, it was relevant and germane to the question of punishment, (6) even if the evidence did not reach the level to hold Petitioner not responsible for his actions, the same evidence warranted not putting him to death, (7) Petitioner was only eighteen at the time of his offense, (8) Petitioner was acting under extreme pressure, akin to duress, (9) taking a third life would not correct the tragedy of the two lives already taken, and (10) a sentence of life without parole would ensure Petitioner would never see daylight again without somebody in a uniform being around him, and was an adequate punishment.[132]  At that point, the prosecution delivered the final portion of its closing punishment phase argument, a substantial portion of which was clearly a response to the arguments made by Petitioner's trial counsel.[133]

---

[132] 44 SCR R-1293-96.

[133] Petitioner complains about myriad aspects of the concluding portion of the prosecution's closing punishment phase jury argument, which in its entirety was as follows:

> Ladies and gentlemen, you are about to determine the value of the lives of two people who are not here with us today.  You are about to speak for the people in this community on what is right and what is just.  None of us here take pleasure in that.  We have a duty to do.  You know, you didn't even choose to be here.  You were summoned.  You responded.  You had a duty.
>
> We are here for one reason, David Freeman.  And because of him, you had a hard decision to make.  And I pray that you will not make it lightly.
>
> I know you will be just and fair, that you will consider all of the evidence, all the factors, all the circumstances, and the law.  But our system is set up where if you harm one of the innocent people, you harm one of us innocent people, you harm us all.  And this is what David Freeman has done, and that's why you have this important decision to make.
>
> My question to you is who needs protection?  Who needs protection now?  Is it David Freeman, or is it the innocents?  It is too late for Sylvia and Mary.  But this duty that you have to make is important, this duty you have to do.

The police officers have done theirs in collecting the evidence and taking the statements.  The scientists have done theirs in analyzing the evidence and reporting to you.  The lawyers on both sides have done their duties.  The Judge is doing his.  And you have fulfilled part of yours.  Life is precious.  If only David Freeman believed that, you wouldn't have to make this decision.

The relationship between a parent and child like Mary and Sylvia is very special.  It should be respected.  It should be given honor, but he didn't.  He wiped it out, because he thought if he could not have her, no one else would.

A lot has been said in this last week about who David Freeman is.  It could be said Debbie lost her mother and sister because of a man who never had a family.  It could be said she lost her mother and sister because he was a man who never had a chance, but those pictures belie that.  The pictures that were introduced just this afternoon that you looked at just a few minutes ago, what do they show you?  A kid with other kids who was given the same chances, but rejected them, not once, not twice, but multiple times, multiple times.  The truth is, he started lying and cheating and stealing and even assaulting, as soon as he had the ability to do it when he couldn't control.  The truth is, he is not just quiet and withdrawn.  He shows you throughout his statements no remorse, none.  The truth is, he is not just barely functioning.  He did fairly well.  The truth is, he wasn't out of control.  In fact, his so-called love letter to Sylvia, do you know what that was?  It wasn't a love letter.  You know what a love letter is.  It was a warning.  It was a demand.  I'll have you.  I won't lose you.  That's who you are dealing with; his lust, his desire.

You have a duty that is greater than life itself.  Just as a police officer has a duty, and every time he or she goes out, they lay their lives down for you and me, for total strangers, a duty greater than life.  Your duty today is just as important.  It is important not just to David Freeman, but to the people who value life.

Earlier you were asked if you ever felt, have you ever read the paper, have you ever talked to somebody and said, why don't they do something about this?  Why isn't something changed?  Why don't they make a difference?  Folks, you twelve are they now.  You are they.  There is no one else to do this.

You know, the law passed by the legislature, it guides us all.  Let it guide you today.  Don't make your decision based on prejudice, bias, sympathy for or against the defendant, Mary Gordon, Sylvia Gordon, or Debbie Hosford.  Go by the law.  Go by what is right.

The defendant would have you forget what happened March 11, 1988.  The defendant would have you think, well, gee, he made a juvenile mistake, and so you ought to pardon him for this.  You ought to say, well, we won't punish you so hard.  What are you going to do?  Debbie, I am sorry.  I am sorry, Debbie, but your mother and your sister were butchered.  He didn't have a big bad record, so we didn't think the ultimate punishment in this case was enough.  It was the right thing to do.  What are you going to say?  Debbie, he might have had a mental problem sometime and had a tough life.  Even though he butchered your mother and your sister, we don't think the death penalty is right.  Debbie, he might have been under duress or domination of somebody, I don't know who, but somebody out there might have

Petitioner complained on direct appeal, and complains in this court, that the prosecution's punishment-phase closing argument improperly suggested to jurors that they should act as "the conscience of the community" and impose the death penalty; that they should speak for the people of the community and do what was "right and just"; and that they could make a difference by punishment Petitioner for his crimes by recommending the death penalty. The state appellate court concluded the prosecution's remarks in question "were general appeals for law enforcement and justice and appeals to the jury to discharge its duties in such a manner as to punish Freeman for the commission of his crimes and to deter others from

---

made him do this, so it is okay. Debbie, the only person there that made him do anything was in total control, was David Freeman himself.

And then they argue to you something about disregarding the law. The Judge is going to read you the law. Listen. It is the same words. You have already found it. Substantial capacity, ability to conform, under some kind of duress. It is the same thing. And he wants you to pretend like it is different. No, that is another lie.

And, lastly, I guess he wants you to say to Debbie, Debbie, he was only eighteen. I am sorry. Only eighteen. We are going to forget what he did. We are going to forget what he did. Now he is a grown man.

What would it take for you to come back with a death penalty in this case? If he had been nineteen? If he had stabbed Sylvia twenty-three times, instead of twenty-two? If he had raped both of them? If he had killed not two but three people? What would it take? What more do we in this country need to say that the death penalty was appropriate?

You have an appropriate case. You have a duty to do justice. And when you vote, look inside and do justice. And none of us in this courtroom can fault you if you are true to your duty. I ask you, I ask you to do justice in this case.

I ask you to go back to March 11, 1988, imagine you are there and you are watching him do this. We know one person in this courtroom who believes in the death penalty, who executes at knife point [sic], forgetting cries out, forgetting being afraid, forgetting caring that life is precious. He made a choice. Follow the law.

44 SCR R-1296-1303.

committing similar offenses." *Freeman v. State*, 776 So. 2d at 187. Having independently reviewed the entirety of the record from Petitioner's June 1996 capital murder trial, this court agrees. Appeals for justice and law enforcement are an appropriate subject for prosecutorial jury argument. *See United States v. Bailey*, 123 F.3d at 1401 (prosecutor's request that jury perform its civic duty was not prejudicial to defendant); *United States v. Smith*, 918 F.2d at 1562-63 (a prosecutor's appeals to the jury to act as "the conscience of the community" are not impermissible when they are not intended to inflame.); *United States v. Kopituk*, 890 F.2d at 1342-43 (appeals to the jury to act as the conscience of the community, unless designed to inflame the jury, are not impermissible *per se*). A jury's consideration of the appropriateness of retribution is also proper. *Spivey v. Hand*, 207 F.3d 1263, 1276 (11th Cir.), *cert. denied*, 531 U. S. 1053 (2000).

Petitioner complained on direct appeal, and complains in this court, that the prosecution made improper comments about the character and value of the victims' lives and improperly invited the jury to weigh the value of the lives of Mary and Sylvia Gordon against the Petitioner's life. The state appellate court concluded the comments in question were "proper comments about the characteristics of the victims and the consequences of Freeman's cutting short their lives." *Freeman v. State*, 776 So. 2d at 187. The state appellate court implicitly rejected the Petitioner's reliance upon the Supreme Court's opinions in *Payne v. Tennessee*, 501 U. S. 808

(1991), and *Booth v. Maryland*, 482 U. S. 496 (1987). *Id.* (holding the prosecution may properly present and argue evidence relating to the victims and impact of the victims' death on the victims' family because this type of evidence related to the harm done by the defendant and consequently was a valid consideration in determining the punishment to be imposed). This court agrees.

Viewed in proper context, the prosecution's punishment-phase closing arguments did not invite the jury to weigh the value of the victims' lives against the Petitioner's life. Petitioner did not object to the admission of the testimony of Deborah Gordon Hosford describing the personal qualities of her late mother and late sister. Petitioner likewise did not object at the commencement of the punishment-phase of trial when the prosecution re-offered all of the testimony and exhibits it had introduced during the guilt-innocence phase of trial; in fact, Petitioner's counsel did likewise.[134] The testimony of Mrs. Hosford was properly the subject of summation and a basis for drawing reasonable inferences by the prosecution in its punishment-phase closing jury argument. There was nothing improper about the prosecution's comments about the personal qualities of Mary and Sylvia Gordon or the impact their deaths had upon their family and society as a whole. *See Payne v. Tennessee*, 501 U. S. at 825 (holding States have a legitimate

---

[134] 44 SCR R-1276-77.

interest in counteracting mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.").

The state appellate court concluded the prosecution's comment that Petitioner "believed in the death penalty" was a proper inference drawn from the evidence. *Freeman v. State*, 776 So. 2d at 187-88.  This court agrees.

The state appellate court concluded the prosecutor's comments allegedly suggesting that, if the jury returned a recommendation in favor of a life sentence, the jury would owe Deborah Gordon Hosford an apology was an argument that the mitigating factors argued by Petitioner's trial counsel, even if proven, did not outweigh the aggravating circumstances.  *Freeman v. State*, 776 So. 2d at 188-89. This court agrees.  The prosecution's argument, viewed in proper context, did not advise the jury it should vote to recommend a death sentence based on sympathy or a sense of duty the jury owed to Deborah Hosford.  This court also concludes the argument in question, when viewed in proper context, was a legitimate response to the punishment-phase closing argument of Petitioner's trial counsel.

Improper prosecutorial argument renders a capital sentencing proceeding fundamentally unfair only if there is a reasonable probability that the argument changed the outcome, which is to say that absent the argument the defendant would

not have received a death sentence. *Price v. Allen*, 679 F.3d at 1326; *Romina v. Head*, 253 F.3d at 1366. This analysis must be undertaken in view of the entire record from Petitioner's third capital murder trial.

The prosecution's evidence before the jury at the punishment phase of trial was overwhelming. At the guilt-innocence phase of Petitioner's June 1996 capital murder trial, the jury found unanimously, beyond a reasonable doubt that (1) Petitioner intentionally killed Mary and Sylvia Gordon by stabbing each of them in the course of the same criminal episode and (2) Petitioner committed those murders in the course of committing the felonies of burglary, robbery, and rape. Viewed in the light most favorable to the jury's verdict, the evidence before the jury at the punishment phase of trial also established that Petitioner (1) stabbed or cut Mary Gordon more than ten times, several of which were inflicted post-mortem, (2) sexually assaulted Mary Gordon after he delivered at least one stab wound to her back, (3) stabbed or cut Sylvia Gordon more than twenty times, (4) posed Sylvia in a lurid manner on her bed with a blanket over her with her blouse and bra pulled up and over her neck, (5) ripped from the wall or cut the wires of every phone in the house for the express purpose of preventing his victims from calling for help, (6) took the keys to Mary Gordon's vehicle and drove away from the crime scene with his bicycle in the trunk of his car, (7) drove past and parked away from his apartment to avoid being seen by his roommate, (8) cleaned himself up and went to work, (9)

upon his arrest, denied any knowledge of the murders of Sylvia and Mary Gordon,

(10) days later confessed that he "blanked out" while talking with Sylvia Gordon

and awoke later to find a knife in his hand, (11) confessed he felt he had "no choice"

but to stab Mary Gordon, (12) confessed Mary Gordon attempted to flee after he

stabbed her but he pursued her into her bedroom, (13) months later denied during

his interviews with all three Lunacy Commission physicians that he had any role in

the Gordon murders, and (14) years later admitted to Dr. Renfro that he stabbed each

victim at least once.[135] Finally, it is not an exaggeration to say that, once the medical

---

[135] *See* Discussions of the testimony and other evidence in Sections I.A. and I.H. above.

The trial judge expressly found Petitioner's antisocial personality disorder to be a *mitigating* factor. *See* Sentencing Order of August 15, 1996, 55 SCR (Tab R-62), at p. 1230. This is significant because persons displaying this personality disorder are often incapable of experiencing empathy for their victims. The DSM-5 describes antisocial personality disorder as "a pervasive pattern of disregard for, and violation of, the rights of others that begins in childhood or early adolescence and continues into adulthood." *DSM-5*, at p. 659. Deceit and manipulation are central features of antisocial personality disorder. *Id.*

The DSM-5 defines antisocial personality disorder through the following diagnostic criteria:

    A.  A pervasive pattern of disregard for and violation of the rights of others, occurring since age 15 years, as indicated by three (or more) of the following:

        1.  Failure to conform to social norms with respect to lawful behaviors, as indicated by repeatedly performing acts that are grounds for arrest.

        2.  Deceitfulness, as indicated by repeatedly lying, use of aliases, or conning others for personal profit or pleasure.

        3.  Impulsivity or failure to plan ahead.

        4.  Irritability and aggressiveness, as indicated by repeated physical fights or assaults.

        5.  Reckless disregard for safety to self or others.

        6.  Consistent irresponsibility, as indicated by repeated failure to sustain consistent work behavior or honor financial obligations.

        7.  Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another.

    B.  The individual is at least age 18 years.

    C.  There is evidence of conduct disorder with onset before age 15 years.

examiner, Dr. Lauridson, completed his testimony, the aggravating factor that the Petitioner's capital offense was "especially heinous, atrocious, or cruel" was established virtually as a matter of law. The level of savagery inflicted on the bodies of both victims was extraordinary, even when viewed in the context of other capital offenses.

The evidence properly before Petitioner's jury at the sentencing phase of trial included Deborah Gordon Hosford's testimony relating the personal characteristics of Sylvia and Mary Gordon, which testimony was admitted *without objection* at the guilt-innocence phase of trial. The trial court repeatedly instructed the jury during punishment-phase closing arguments that the remarks of counsel did not constitute evidence or the law.[136] This court concludes there is no reasonable probability that, but for any of the prosecution's punishment-phase jury arguments, the outcome of the Petitioner's punishment phase would have been different. All of the prosecution's punishment-phase jury arguments about which Petitioner now complains were either proper summations of the evidence, reasonable inferences

---

D The occurrence of antisocial behavior is not exclusively during the course of schizophrenia or bipolar disorder.

*DSM-5*, at p. 659.

Given the trial court's factual finding that Petitioner's Antisocial Personality Disorder was a *mitigating* factor, Judge Reese did not hold Petitioner's inability to express remorse or contrition for his capital offenses against him when he determined to accept the jury's recommendation and impose a sentence of death upon Petitioner.

[136] 44 SCR R-1289-90.

drawn from the evidence, responses to the punishment-phase closing arguments of Petitioner's trial counsel, or proper appeals for justice and law enforcement. Proper arguments, regardless of their impact on the outcome of the case, do not render a trial unfair. *Spivey v. Hand*, 207 F.3d at 1276. None of the prosecution's punishment-phase closing arguments rendered Petitioner's trial fundamentally unfair.

## E.  Conclusion

The state appellate court's rejection on the merits of Petitioner's challenges to the prosecution's closing jury arguments at both phases of Petitioner's June 1996 capital murder trial was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's trial and state appellate proceedings. Petitioner's seventh claim does not warrant federal habeas corpus relief.

## VI. ERRONEOUS ADMISSION OF BITE-MARK TESTIMONY

## A.  The Claim

In his fifth claim for federal habeas relief, Petitioner argues the trial court's admission of "materially inaccurate" bite mark testimony by Dr. Michael O'Brien rendered the punishment phase of Petitioner's trial constitutionally defective under

the Supreme Court's holding in *Johnson v. Mississippi*, 486 U. S. 578 (1981) (Doc. # 5, at pp. 26-31, 46-48; Doc. # 64, at pp. 97-105, 168-72).

## B. State Court Disposition

As explained in Section I.H.1. above, forensic dentist Dr. Michael O'Brien testified *without objection* at the guilt-innocence phase of Petitioner's June 1996 capital murder trial that bite marks he observed (which were also photographed) on Petitioner's arms shortly after arrest matched the teeth marks obtained from a post-mortem dental impression Dr. O'Brien obtained of Sylvia Gordon's teeth. Petitioner now argues the testimony of Dr. O'Brien was "materially inaccurate," and thereby tainted the punishment phase of his capital murder trial.

Petitioner presented an abbreviated version of the same argument as part of several different grounds for state habeas relief in his fourth amended Rule 32 petition.[137] Petitioner presented no specific facts, no medical or legal authorities, and no evidence supporting this claim during the evidentiary hearing in Petitioner's Rule 32 proceeding. The state trial court held the claim had not been properly raised on direct appeal and, therefore, was precluded from review.[138] In the course of

---

[137] 49 SCR 296-97, 302-04, 306-07. Significantly, Petitioner included no reference to *Johnson v. Mississippi* in his fourth amended Rule 32 Petition. Petitioner did not include a citation to *Johnson v. Mississippi* or any argument intelligibly related to that opinion in any of his pleadings in his Rule 32 proceeding until he filed his appellate brief with the Alabama Court of Criminal Appeals in March, 2004. 53 SCR (Tab R-60), at pp, 52, 54-55.

[138] 50 SCR 453-54 (dismissing Petitioner's fourth and sixth claims for state habeas relief).

denying relief on Petitioner's related ineffective assistance complaint about the failure of his trial counsel to object to the admission of Dr. O'Brien's testimony, the state trial court held (1) the Alabama Supreme Court recognized the admissibility of forensic odontology expert testimony generally in *Ex parte Dolvin*, 391 So. 2d 677, 680 (Ala. 1980), (2) the Alabama Court of Criminal Appeals held in *Handley v. State*, 515 So. 2d 121, 131 (Ala. Crim. App. 1987) (holding bite mark expert testimony admissible where forensic odontology expert was fully qualified and jury had before it photographic overlays of the plaster models of bite marks and the defendant's teeth), that testimony from a dental witness regarding bite mark comparison is admissible so long as the proper predicate for the admission of expert testimony is laid, (3) Dr. O'Brien testified to his extensive qualifications as an expert in forensic odontology and bite mark analysis and was properly accepted as such, and (4) therefore, any objection Petitioner's trial counsel might have made to the admission of Dr. O'Brien's bite mark testimony would have been without merit.[139] The Alabama Court of Criminal Appeals affirmed the state trial court's denial of Petitioner's Rule 32 petition, holding in part that (1) under Alabama law, bite mark identification testimony does not require a scientific predicate for admission, (2) Dr. O'Brien was fully qualified as an expert to express an opinion on bite mark

---

[139]  50 SCR 462.

identification, and (3) even if Petitioner's trial counsel had timely objected and obtained the exclusion of Dr. O'Brien's testimony, Petitioner was not prejudiced because the evidence of Petitioner's guilt was overwhelming and bite mark evidence did not play a crucial component in the proof supporting the "heinous, atrocious, or cruel" aggravating circumstance.[140]

Because (1) the state trial court and state appellate court both dismissed Petitioner's complaint about the admission of Dr. O'Brien's trial testimony at the punishment phase of his trial based upon procedural grounds and (2) Petitioner failed to fairly present his *Johnson v. Mississippi* argument to the state habeas court, this court's consideration of this claim is necessarily *de novo*. *See Porter v. McCollum*, 558 U. S. 30, 39 (2009) (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U. S. 510, 534 (2003) (holding the same). This court is authorized to deny a claim for federal habeas relief when the claim is subject

---

[140] Alabama Court of Criminal Appeals Memorandum issued June 17, 2005, 50 SCR (Tab R-64), at pp. 16-21; 55 SCR (Tab R-73), at pp. 16-21.

to rejection under *de novo* review, regardless of whether AEDPA deference applies. *See Berghuis v. Thompkins*, 560 U. S. 370, 390 (2010) (holding federal courts can deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to habeas relief if his claim is rejected on *de novo* review); *Conner v. GDCP Warden*, 784 F.3d 752, 767 & n.16 (11th Cir. 2015) ("[B]ecause we conclude that Mr. Conner would not be entitled to habeas relief under *de novo* review, we affirm the District Court's denial of relief under that standard without resolving whether AEDPA deference applies."), *cert. denied*, 136 S. Ct. 1246 (2016); *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1291 (11th Cir.) ("The Supreme Court has made clear that we are entitled to affirm the denial of habeas relief in this manner: 'a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.'"), *cert. denied*, 568 U. S. 905 (2012).

## C.  Federal Habeas Review of the Admission of Evidence

State rule-makers "have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *Nevada v. Jackson*, 569 U. S. 505, 509 (2013).  Federal habeas corpus relief does not lie for errors of state law, including the allegedly erroneous admission of evidence under state evidentiary rules.  *Estelle v. McGuire*, 502 U. S. 62, 67 (1991).  It is not the province of a federal

111

habeas court to reexamine state-court determinations on state-law questions. *Id.*, 502 U. S. at 67-68.

Federal courts possess only limited authority to consider state evidentiary rulings in a habeas proceeding by a state prisoner; in such case, inquiry is limited to determining whether the evidentiary ruling was so prejudicial as to deny fundamental fairness to the criminal trial, thus violating due process principles. *United States v. Hun*, 368 F.3d 1359, 1363 n.3 (11th Cir. 2004) (quoting *Phillips v. Wainwright*, 624 F.2d 585, 588 (5th Cir. 1980))[141]; *Mills v. Singletary*, 161 F.3d 1273, 1289 (11th Cir. 1998), *cert. denied*, 528 U. S. 1082 (2000); *Sims v. Singletary*, 155 F.3d 1297, 1312 (11th Cir. 1998), *cert. denied*, 527 U. S. 1025 (1999). A denial of fundamental fairness occurs whenever the improper evidence is material in the sense of a crucial, critical, highly significant factor. *Mills v. Singletary*, 161 F.3d at 1289; *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir.), *cert. denied*, 525 U. S. 963 (1998). The erroneous admission of evidence is likely to be harmless under the standard of *Brecht v. Abrahamson*, 507 U. S. 619, 623 (1993), where there is significant corroborating evidence, or where other evidence of guilt is overwhelming. *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1114 (11th Cir. 2012), *cert. denied*, 568 U. S. 1237 (2013).

---

[141] Decisions of the Fifth Circuit handed down prior to September 30, 1981, are binding in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.3d 1206, 1207 (11th Cir. 1981) (en banc).

## D. *De Novo* Review

Petitioner argues the testimony of Dr. O'Brien concerning the bite marks on Petitioner's arms was critical to the jury's finding on the "heinous, atrocious, or cruel" aggravating factor. Having reviewed the entire record from Petitioner's June 1996 capital murder trial, this court respectfully disagrees.[142] The crime scene photographs and video, as well as Dr. Lauridson's testimony concerning the results

---

[142] Petitioner also argues that the bite-mark testimony supported the jury's finding that Petitioner's capital offense was committed during the course of a burglary and this somehow prejudiced him during the *punishment* phase of trial. This argument is nonsensical. The fact that Sylvia Gordon managed to fight back while she was being butchered (it is undisputed she suffered over twenty stab wounds or cuts, including many to her chest) added very little to the evidence showing Petitioner attacked both Sylvia and her mother while inside their home. The jury could reasonably have inferred from the crime scene evidence (including Sylvia's bloodstains found in many rooms of the house) and Petitioner's admission that he cut or pulled from the walls all the phones in the home that, once he commenced his assaults upon Sylvia and Mary Gordon, Petitioner remained inside the Gordon home against the wishes of both Sylvia and her mother. Dr. O'Brien's testimony added very little to the evidence before the jury establishing that Mary and Sylvia Gordon implicitly withdrew their permission for Petitioner to remain inside their home once he began his vicious assaults upon them.

    Moreover, by the time Petitioner's capital murder trial reached the *punishment phase*, the jury had already found unanimously and beyond a reasonable doubt that Petitioner committed an intentional murder in the course of a burglary. Thus, the aggravating factor of an intentional murder committed during a burglary had already been established during the guilt-innocence phase of Petitioner's trial. Therefore, the jury's consideration of Dr. O'Brien's testimony during the punishment phase of trial could not have prejudiced Petitioner in connection with this aggravating factor. At the punishment phase of trial, both the jury and trial judge were both required by Alabama law to consider this aggravating factor as having been established when recommending and imposing sentence. At the time of Petitioner's capital murder trial, Alabama law provided, and still provides, as follows:

> At the sentencing hearing the state shall have the burden of proving beyond a reasonable doubt the existence of any aggravating circumstances. Provided, however, any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.

*Ala. Code* § 13A-5-45(e).

of his autopsies of the victims' bodies, established the "heinous, atrocious, or cruel" nature of the Petitioner's offenses without any assistance from Dr. O'Brien. Dr. O'Brien's testimony only demonstrated that Sylvia Gordon had attempted to fight back during petitioner's assault upon her; it added very little to Dr. Lauridson's graphic testimony detailing the horrific scope and nature of the physical injuries inflicted upon Sylvia and Mary Gordon, some of which were post-mortem.[143] Nor did Dr. O'Brien's bite-mark testimony add anything to the overwhelming forensic evidence establishing Petitioner sexually assaulted Mary Gordon. Dr. O'Brien's odontology testimony also added nothing to the overwhelming evidence establishing that Petitioner committed his double homicide while in the course of committing a robbery. Thus, Dr. O'Brien's bite-mark testimony was not a "critical, crucial, or highly significant" factor at the punishment phase of Petitioner's trial. In fact, the prosecution failed to make any mention of Dr. O'Brien's testimony or the bite marks on Petitioner's arms during closing jury argument at the punishment phase of

---

[143] Dr. O'Brien identified bite marks on the Petitioner's body as matching the dental mold he obtained from the body of Sylvia Gordon. Testimony of Dr. Michael O'Brien, 40 SCR R-435-53. He did not testify regarding any bite marks on the victims. Thus, his bite-mark testimony did not establish the Petitioner had bitten either of his victims. As the state habeas court noted, Dr. O'Brien's testimony was more relevant to the issues before the jury at the guilt-innocence phase of trial (i.e., it helped establish Petitioner's presence at the scene of the crime at or near the time of the offenses) than to the issues before the jury at the punishment phase of trial. At Petitioner's June 1996 trial, the other evidence, including Petitioner's statements to police and the remaining extensive forensic evidence, established Petitioner's presence at the Gordon home on the date of the offenses to a certainty. Dr. O'Brien's dental identification testimony added nothing of substance to the overwhelming evidence presented by the prosecution that was relevant to the issues before the jury during the punishment phase of trial.

Petitioner's June 1996 capital murder trial.[144]  The admission of Dr. O'Brien's bite-mark testimony did not render the punishment phase of Petitioner's trial fundamentally unfair.

Moreover, as explained above, in the course of Petitioner's Rule 32 proceeding, both the state trial court and state appellate court concluded, as a matter of Alabama evidentiary law, that Dr. O'Brien's trial testimony was admissible.  State court rulings on matters such as the admissibility of evidence under state evidentiary rules and state case law bind a federal court in habeas corpus proceedings.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Loggins v. Thomas*, 654 F.3d 1204, 1228 (11th Cir. 2011) ("Alabama law is what the Alabama courts hold that it is."); *Hendrix v. Sec'y, Fla. Dep't of Corr.*, 527 F.3d 1149, 1153 (11th Cir.) (state court ruling on issue of recusal under Florida state law bound federal habeas court), *cert. denied*, 555 U. S. 1004 (2008).  Thus, insofar as Petitioner's fifth claim herein is premised upon assertions that the trial court erroneously applied applicable state law when it admitted *without objection* Dr.

---

[144] The prosecution's punishment-phase closing jury argument appears at 44 SCR R-1284-93, R-1296-1303.  The initial portion of the prosecution's punishment-phase closing argument did address the "heinous, atrocious, or cruel" aggravating circumstance but included no reference or allusion to Dr. O'Brien's testimony or Petitioner's bite marks.

O'Brien's testimony, that argument is conclusively refuted by the state trial court and state appellate court's findings to the contrary. It also furnishes no basis for federal habeas corpus relief. *Estelle v. McGuire*, 502 U. S. at 67-68.

Finally, Petitioner's reliance on the Supreme Court's holding in *Johnson v. Mississippi* is misplaced. In *Johnson*, a state court sentenced Johnson to death in 1982 citing his 1963 New York felony conviction for assault with intent to commit rape as one of three aggravating factors supporting the sentence.[145] The prosecution presented no evidence about the conduct underlying the prior conviction but relied instead on a single authenticated copy of a document indicating the conviction. *Johnson v. Mississippi*, 486 U. S. at 586 ("[T]he jury was not presented with any evidence describing that conduct − the document submitted to the jury proved only the facts of conviction and confinement, nothing more."). The prosecution repeatedly referred to that evidence in the sentencing hearing. *Id.*, 486 U. S. at 581 (quoting the prosecutor at trial as saying "I say that because of having been convicted of second degree assault with intent to commit first degree rape and capital murder that Samuel Johnson should die"). "Thus, the death sentence [in *Johnson*] relied on the mere fact of conviction." *Spivey v. Head*, 207 F.3d 1263, 1281 (11th Cir.), *cert.*

---

[145] More specifically, the *Johnson* jury found the following aggravating circumstances: (1) the defendant was previously convicted of a felony involving the use or threat of violence to the person of another; (2) the defendant committed capital murder for the purpose of avoiding arrest or effecting an escape from custody; and (3) the capital murder was especially heinous, atrocious, and cruel. *Johnson v. Mississippi*, 486 U.S. at 581 n.1.

*denied*, 531 U. S. 1053 (2000).  After his Mississippi conviction and sentence, Johnson's attorneys successfully prosecuted a post-conviction proceeding in New York in which they argued Johnson had been denied his right to appeal; in the course of his subsequent appeal, the New York appellate court reversed Johnson's conviction.  *Johnson v. Mississippi*, 486 U. S. at 582.  The Mississippi Supreme Court denied Johnson post-conviction relief.  The United States Supreme Court reversed, holding that allowing the death sentence to stand although based in part on a reversed conviction violated the Eighth Amendment.  *Id.*, 486 U. S. at 586 ("The prosecution repeatedly urged the jury to give it [Johnson's prior conviction] weight in connection with its assigned task of balancing aggravating and mitigating circumstances 'one against the other.'").

As explained above, in contrast to *Johnson*, at the punishment phase of Petitioner's June 1996 capital murder trial, (1) disregarding Dr. O'Brien's bite-mark identification testimony, the prosecution introduced overwhelming evidence establishing the heinous, atrocious, and cruel nature of the Petitioner's capital offenses and (2) both the jury and judge were statutorily bound to consider as aggravating the fact the Petitioner committed his multiple capital offenses in the course of a burglary, robbery, and rape.  Petitioner argues for the first time in his pleadings in this court that he has located an unidentified forensic dentist who could have furnished testimony at Petitioner's 1996 capital murder trial that Petitioner

asserts would have refuted Dr. O'Brien's bite-mark identification testimony. At best, Petitioner's new arguments raise an issue as to the credibility or weight to be given to Dr. O'Brien's expert opinion testimony, not its admissibility. As explained above, the state appellate court's finding that Dr. O'Brien was fully qualified under Alabama law to render an opinion on the bite-mark evidence[146] binds this federal habeas court. *Bradshaw v. Richey*, 546 U. S. at 76; *Loggins v. Thomas*, 654 F.3d at 1228; *Hendrix v. Sec'y, Fla. Dep't of Corr.*, 527 F.3d at 1153. The possibility that a different forensic dentist might have been available at the time of Petitioner's 1996 trial to present a contradictory opinion on the bite-mark evidence does not render Dr. O'Brien's trial testimony "materially inaccurate" within the meaning of *Johnson* or inadmissible under state law. More importantly, unlike the subsequently overturned prior conviction that formed the *sole evidentiary basis* supporting one aggravating factor in *Johnson*, Dr. O'Brien's bite-mark testimony was so insignificant the prosecution failed to make any mention of it or any allusion to it during closing punishment-phase jury argument at Petitioner's June 1996 trial.

Petitioner did not object to the admission of Dr. O'Brien's expert opinion testimony regarding the bite-mark evidence. Thus, Petitioner's fifth claim herein is an argument that he was prejudiced when the state trial court failed to exclude Dr.

---

[146] Alabama Court of Criminal Appeals Memorandum issued June 17, 2005, 50 SCR (Tab R-64), at pp. 16-21; 55 SCR (Tab R-73), at pp. 16-21.

O'Brien's bite-mark opinion testimony *sua sponte*. The Supreme Court's harmless error standard announced in *Brecht v. Abrahamson*, 507 U. S. 619 (1993), governs this court's analysis of whether the marginal impact of Dr. O'Brien's opinion testimony on the outcome of the punishment phase of Petitioner's trial warrants federal habeas relief. *See Spivey v. Hand*, 207 F.3d at 1282 (holding *Brecht* harmless error standard applied to a *Johnson v. Mississippi* claim); *Duest v. Singletary*, 997 F.2d 1336, 1338 (11th Cir. 1993) (holding the same), *cert. denied*, 510 U. S. 1133 (1994). Under *Brecht*, habeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U. S. at 637. "Actual prejudice" occurs when constitutional error "has substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U. S. at 647; *Duest v. Singletary*, 997 F.2d at 1338.

This court concludes admission of Dr. O'Brien's expert opinion testimony did not result in "actual prejudice" to Petitioner. Dr. O'Brien's bite-mark testimony reflected what Sylvia Gordon had done or might have done to Petitioner, not what Petitioner did to his victims.[147] Dr. Lauridson's uncontroverted testimony, the other

---

[147] Dr. O'Brien's bite-mark testimony might have furnished Petitioner with mitigating evidence, *i.e.*, an explanation for the viciousness of his assault upon Sylvia Gordon. Dr. O'Brien's bite-mark opinion testimony might have furnished Petitioner's trial counsel with a basis to argue that Petitioner's violent explosion inside the Gordon home on March 11, 1988 was precipitated by a violent assault upon Petitioner by Sylvia Gordon. Petitioner undermined any potential mitigating impact of the bite-mark testimony when he stated to law enforcement officers the bite marks on his arms were the product of a seizure by an unidentified relative. Petitioner's statement containing this assertion was admitted into evidence as State Exhibit 13A [41 SCR R-612] and appears at 34

forensic evidence, and the crime scene photographs established beyond any reasonable doubt the grisly (*i.e.*, heinous, atrocious, and cruel) nature of Petitioner's capital offenses. The jury and sentencing judge were both statutorily bound to consider as aggravating the fact that Petitioner committed multiple intentional murders during the course of a burglary, a robbery, and a rape. The prosecution made no mention of Dr. O'Brien or his bite-mark testimony during closing arguments at the punishment phase of Petitioner's June 1996 trial.

Petitioner's *Johnson* claim fails on the merits for two equally convincing reasons: first, Petitioner has failed to identify any legal authority establishing the state trial court's admission *without objection* of Dr. O'Brien's expert opinion testimony was erroneous under applicable state or federal law; second, this court independently concludes after *de novo* review that admission of Dr. O'Brien's expert opinion testimony on the bite-mark evidence did not have a substantial or injurious effect or influence on the jury's verdict at the punishment phase of Petitioner's June 1996 capital murder trial.

**E. Conclusion**

After *de novo* review, this court concludes Petitioner's fifth claim herein does not warrant federal habeas corpus relief.

---

SCR 3225-30. Petitioner's assertion that the bite marks on his arms resulted from a relative's seizures appears at 34 SCR 3227.

# VII. *MIRANDA* CLAIM

## A.  The Claim

In his second claim for federal habeas relief, Petitioner argues his Fifth and Fourteenth Amendment rights were violated by the trial court's admission of Petitioner's post-arrest statements on March 14, 1988, made after Petitioner told a law enforcement officer that he "couldn't talk about" his offense (Doc. # 5, at pp. 13-15; Doc. # 64, at pp. 3-50).

## B.  State Court Disposition

Petitioner presented the same Fifth and Fourteenth Amendment arguments in his fifth claim in his appellant's brief.[148]  As the state appellate court correctly noted (*Freeman v.* State, 776 So. 2d at 173), Petitioner did not contest the admission of any of his post-arrest statements prior to or during his June 1996 trial.[149]  The state appellate court rejected this claim on the merits as follows:

> The record reveals that Freeman was initially advised of his *Miranda* rights when he was arrested at his apartment on March 12, 1988.  Officer Terry Jett with the Montgomery Police Department testified that after Freeman was taken from the apartment to police headquarters for questioning, he was again advised of his *Miranda* rights before he was questioned.  Jett testified that Freeman acknowledged that he understood those rights, that he signed a waiver to that effect, and that he agreed to talk to the police.  In his March 12

---

[148] 45 SCR (Tab R-38), at pp. 34-37.

[149] Significantly, Petitioner did not object when the prosecution offered State Exhibit 13A, *i.e.*, a transcript of the oral statement Petitioner gave in which he finally admitted he stabbed Mary Gordon.  41 SCR R-612.

statement to Jett, which was also audiotaped, Freeman denied any knowledge of, or participation in, the murders of Mary Gordon and Sylvia Gordon.

The record further reveals that on March 14, 1988, Detective Gary Graves, who at that time was a detective with the Montgomery Police Department and the case agent in charge of the Gordon case, went to the jail to question Freeman and to photograph bite marks on Freeman's arm. Graves testified that he advised Freeman of his *Miranda* rights, and that Freeman signed the rights waiver form stating that he understood his rights and that he agreed to waive those rights and talk to the police. Graves testified that he then asked Freeman what happened on the day of the murders. Graves stated that in response to that question, Freeman told him "he couldn't talk about it." (R.598.) In an effort to clarify Freeman's comment, Graves then said to Freeman, "If you can't talk about it, can you write it for me?" (R. 599.) Graves testified that Freeman said that he would, and he then proceeded to handwrite two statements denying any involvement in the murders in the first statement, but admitting in the second statement to killing both Mary Gordon and Sylvia Gordon.

Freeman maintains that he invoked his right to remain silent when he told Graves "he couldn't talk" about the murders. We do not, as Freeman does, interpret this statement to be a clear and unequivocal invocation of Freeman's right to remain silent.

\*     \*     \*

Once informed of *Miranda* rights, an accused has the burden of indicating in some manner his wish to remain silent. "When a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of clarifying the equivocal request."

Here, Freeman's response to Graves's question was not an unequivocal invocation of his right to remain silent. The response, instead, appears to be Freeman's simply saying that he did not like talking about the brutal murders. Freeman was, however, more than willing to handwrite a statement about the murders. As the State correctly points out in its brief to this court, Freeman's response to police was not an assertion of his right to remain silent, but instead indicated Freeman's desire to conduct the interview the way he wanted it conducted. This is further evidenced, as the State also points out in its brief, by Freeman's refusing to make a videotaped statement, while agreeing to make an audiotaped statement. Jett's and Grave's

testimony at trial clearly indicated that Freeman wanted to answer their questions. In fact, both Jett and Graves testified that Freeman was cooperative throughout all of the questioning, and that he was responsive to all their questions. For these reasons, we conclude that Freeman did not indicate that he wished to remain silent, thus, there was no violation of his *Miranda* rights in this regard.

*Freeman v. State*, 776 So. 2d at 173-75 (citations and quotations omitted).

## C. Clearly Established Federal Law

In *Miranda v. Arizona*, 384 U. S. 436 (1966), the Supreme Court formulated a warning that must be given to suspects before they can be subjected to custodial interrogation. *Berghuis v. Thompkins*, 560 U. S. 370, 380 (2010). The substance of that warning still must be given to suspects today:

He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Berghuis v. Thompkins*, 560 U. S. at 380 (quoting *Miranda v. Arizona*, 384 U. S. at 479).

Police are not required to obtain a formal waiver of *Miranda* rights before questioning a custodial suspect; the *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke his rights before giving any answers or admissions. *Berghuis v. Thompkins*, 560 U. S. at 384-87. Any waiver, express or implied, may be contradicted by an invocation at any time; if the right to counsel or the right to remain

silent is invoked at any point during questioning, further interrogation must cease. *Id.*, 560 U. S. at 387-88.

The Supreme Court has held a suspect's invocation of his Sixth Amendment's right to counsel following administration of *Miranda* warnings must be unambiguous, *i.e.*, "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U. S. 452, 459 (1994) (quoting *McNeil v. Wisconsin*, 501 U. S. 171, 178 (1991)). "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U. S. at 381 (quoting *Davis v. United States*, 512 U. S. 452, 461-62 (1994)). The Supreme Court has applied the same standard to assertions of the Fifth Amendment right to remain silent following administration of *Miranda* warnings. *See Berghuis v. Thompkins*, 560 U. S. at 381 ("There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously."). "If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Id.,* 560 U. S. at 382.

## D. AEDPA Review

In *Berghuis*, the Supreme Court held that a suspect's silence in response to several hours of custodial interrogation did not, standing alone, constitute an unambiguous assertion of his right to remain silent. *Id.*, 560 U. S. at 382. The Eleventh Circuit applies the *Davis* standard requiring unequivocal and unambiguous assertions of both the right to counsel and right to remain silent before custodial interrogations must be terminated. *See Coleman v. Singletary*, 30 F.3d 1420, 1424 (11th Cir. 1994) ("Because this concern applies with equal force to the invocation of the right to remain silent, and because we have previously held that the same rule should apply in both contexts, we hold that the *Davis* rule applies to invocations of the right to remain silent."), *cert. denied*, 514 U .S. 1086 (1995).

The Eleventh Circuit has repeatedly rejected efforts of criminal defendants to assert violations of their Fifth Amendment right to remain silent following ambiguous or equivocal assertions of that right very similar to Petitioner's statement that "he couldn't talk about it," which statement Petitioner made *after* administration of *Miranda* warnings and Petitioner's execution of a formal written waiver of his constitutional rights. *See Owen v. Fla. Dep't of Corr.*, 686 F.3d 1181, 1192-94 (11th Cir. 2012) (holding suspect's statements "I'd rather not talk about it" and "I don't want to talk about it," both made in response to questions about specific, discrete details of the crime, not general questions about the crime itself, and following which

the suspect continued to talk with police, did not constitute unambiguous assertions of the right to remain silent), *cert. denied*, 569 U. S. 960 (2013); *Coleman v. Singletary*, 30 F.3d at 1424-25 (holding equivocal a defendant's statement in response to a question about his public defender: "I don't know. But if he said to stop it I don't want to do what he said not to do"); *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1472 (11th Cir.) (holding equivocal a suspect's statement: "I don't know if I need a lawyer, maybe I should have one, but I don't know if it would do me any good at this point."), *cert. denied*, 506 U. S. 964 (1992).

Petitioner does not allege any specific facts showing his execution of a formal written waiver of his *Miranda* rights on March 14, 1988 for Detective Graves (State Exhibit 8) prior to any questioning by Detective Graves was anything other than voluntary, intelligent, and knowing. Prior to his conversation with Detective Graves on that date, Petitioner had executed a separate formal waiver of his rights (State Exhibit 7) and submitted to having his arm shaved and the bite marks on his arms photographed and examined by Dr. O'Brien and Dr. Lauridson.[150] Detective Graves's questioning of Petitioner on March 14, 1988 took place prior to the Supreme Court's issuance of its opinion in *Davis*. At that point, Eleventh Circuit case law required law enforcement officers confronted with an ambiguous or

---

[150] Testimony of Dr. James Lauridson, 41 SCR R-682-83; Testimony of Dr. Michael O'Brien, 40 SCR R-442-48.

equivocal assertion of the right to remain silent to ask further questions to clarify the request. *See, e.g., United States v. Pena*, 897 F.2d 1075, 1081 (11th Cir. 1990) ("where an individual in custody makes an equivocal invocation of his right to remain silent, further questioning must be restricted to clarifying that request until it in fact is clarified, and no statement taken after the request but before the clarification can clear the *Miranda* hurdle"). This is precisely what Detective Graves did when he asked Petitioner if he were willing to *write* a statement about the events of March 11, 1988.

The government has no duty to cease interrogating a suspect where the suspect's invocation of his *Miranda* rights is equivocal. *See United States v. Dowd*, 451 F.3d 1244, 1250 (11th Cir.) (a suspect's refusal to sign a formal waiver did not require cessation of interrogation), *cert. denied*, 549 U. S. 941 (2006). Viewed in the full context of all the events of March 14, 1988, this court finds the state appellate court concluded in an objectively reasonable manner that Petitioner's statement that "he couldn't talk about it," when asked by Detective Graves to explain "what really happened" was, at best, an ambiguous and equivocal assertion of his right to remain silent, fully justifying Detective Graves's clarifying question.

## E. Conclusion

The Alabama appellate courts' rejection on the merits of Petitioner's Fifth Amendment *Miranda* claim was neither (1) contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and direct appeal proceedings. Petitioner's second claim does not warrant federal habeas corpus relief.

## VIII. DOUBLE JEOPARDY CLAIM

### A.  The Claim

In his first claim for federal habeas corpus relief, Petitioner argues that his June 1996 trial violated Double Jeopardy principles because the state trial court erroneously granted a mistrial during Petitioner's January 1996 trial without finding, and in the absence of, manifest necessity (Doc. # 5, at pp. 10-12; Doc. # 64, at pp. 20-33).

### B.  State Court Disposition

As explained above in Section I.E., following the reversal of Petitioner's initial capital murder conviction by the state appellate court and a remand, Petitioner's first re-trial commenced in January 1996 but ended when the trial court declared a mistrial on January 31, 1996, without any objection from Petitioner. During the hearing held that date, the following exchanges took place:

> BY THE COURT:  All right, this is the State of Alabama versus David Freeman.  We're here on Wednesday morning after having adjourned this past Thursday.

Mr. Howell, you have been under a doctor's care since then, and we have continued this case on a daily basis awaiting a report of your condition, and so we are here today. For the record, if you would, state what your position is about continuing this trial?

BY MR. HOWELL: Judge, I don't feel a hundred percent today, and one of the reasons that I have been very guarded about all of this, I have been in the hospital three times before with this stuff. I'm trying to avoid a trip this time. I don't feel like I could give my -- do my best job today, and -- but I am here, I am at your pleasure. I am still -- some of the symptoms have improved, some haven't. And that's where I am, Judge.

BY THE COURT: Miss Brooks.

BY MS. BROOKS: Your honor, of course the State would prefer to proceed, but we have observed Mr. Howell and he does not appear to feeling [sic] well at all. He is extremely pale, speaking in very low tones, and of course we wish the defendant to have competent and effective counsel. We have no evidence to the contrary, and believe Mr. Howell when he says he doesn't feel well enough to proceed.

BY THE COURT: Mr. Norris, anything you want to add?

BY MR. NORRIS: Judge, I know it's -- my wife is a nurse, and I have talked to her about Allen's condition, and she has indicated to me that it's their practice that with somebody with Allen's diagnosis, to admit them in the hospital, and she was quite surprised that he hadn't, -- that that hadn't been done.

As the Court is aware, this is my first capital case, so Allen has got far more experience, and we need time so Allen could be one hundred percent to assist me and assist David.

BY THE COURT: Have either one of you lawyers consulted with Mr. Freeman about his wishes about this?

BY MR. NORRIS: Yes, sir, I have, and Mr. Freeman has indicated to me that he wants Allen to be one hundred percent, because he knows Allen did a good job for him on the first trial of this matter, and he just wishes for the Court to give it time so Allen can be one hundred percent.

BY THE COURT: All right. Well, based upon my observations and comments that the lawyers -- I think it's going to be difficult, if not impossible, for you to come complete [sic] this case, Mr. Howell, by tomorrow. So the Court reluctantly finds its only position at this time would be to declare a mistrial, to release these jurors, to release these

parties, and re-schedule this matter for trial upon the completion of the recuperation of counsel.

This Court reluctantly does this, because it's been set three times. We're halfway through the trial. We've got witnesses from out of state, out of county, not the least of which is the defendant's right for a speedy trial, and the victim's right to have this case over and satisfied. So, this Court very reluctantly declares a mistrial due to these circumstances, and will re-schedule this matter at the earliest convenience.

I'm going to ask you lawyers if you would please review your calendars as you leave here today, -- when you leave here today, and in conjunction with the court's calendar with the jurors being here, give me three proposals in the immediate future so that week [sic] get this case retried.

BY MS. BROOKS: Judge, Jayne had wisely thought ahead and suggested that, and we have all looked at February 26. I don't know if Mr. Howell has had a chance -- ?

BY THE COURT: He didn't bring his calendar -- well, let me ask the question, do you have your calendar? Are you prepared to find another day to try this case?

BY MR. HOWELL: I don't have my calendar. Jayne had mentioned February 26 to me, so I asked my secretary to look at my calendar. I've got some depositions that week, including one out of state, but that could be changed because we don't have an immediate trial date in that case.

BY THE COURT: Mr. Norris, do you know about that week?

BY MR. NORRIS: Off the top of my head, the only thing I know that I have would be February 28, which is a domestic hearing. It's possible that it could settle, it's possible that it will not. It's a possibility I could get Judge Drinkard to continue that case.

BY THE COURT: Ms. Brooks, what does your calendar reveal?

BY MS. BROOKS: Your Honor, all three State's counsel are available the week of February 26. Mr. McNeil advised me that he has another capital case, another Judge, is not yet set, but there is a hearing tomorrow, and there is a date considered. But if this case would be set first, it would have priority, and there's another date available for that.

BY MR. McNEIL: It is, and I have alerted Judge Greenhaw's office of that fact, Your honor.

BY THE COURT: All right. Folks, we'll set this case for February 26. If you lawyers would please make arrangements to have your conflicts straightened out, let me know as soon as possible if you

are unable to do that. But, hearing nothing from you in the next ten days, I'll assume that you've been able to re-schedule the conflict that you have.

BY MS. BROOKS: One other matter if we could, could we ask of defense counsel if we can enter into the same stipulations, or should we continue to make efforts to get our witnesses here? If they are prepared to answer that?

BY THE COURT: Any reason to think that we would not be able to enter into the same stipulations?

BY MR. HOWELL: No, sir, same stipulations. There's no reason to bring the witnesses down.

BY THE COURT: Same stipulations would be used. Folks, if you will, file your necessary motions to withdraw all the evidence that Mr. Harris has gotten. You can, -- I guess retake possession of the exhibits and stipulations that have been entered and --.

BY MR. HOWELL: Could we just do that verbally.

BY THE COURT: Granted.

BY MS. BROOKS: Yes, sir, State moves to withdraw our evidence.

BY THE COURT: Granted. So that you would be prepared to present this case on the 26th of February.

BY MR. NORRIS: Judge, we move for our exhibits to be withdrawn.

BY THE COURT: Granted. Thank you. Hope you get better, Mr. Howell. I want all the jurors in please, all fourteen jurors. If you would invite them in and ask them to have a seat in the jury box.

17 SCR 216-24.

Thereafter, as explained above in Sections I.F. and I.G., Petitioner unsuccessfully sought mandamus relief from the state appellate courts, as well as federal habeas corpus relief from this court under 28 U.S.C. § 2241, arguing his re-

trial would violate Double Jeopardy principles because there was no manifest necessity for the January 1996 mistrial declaration.[151]

## C. Clearly Established Federal Law

A trial can be discontinued without barring a subsequent one for the same offense when "particular circumstances manifest a necessity" to declare a mistrial.

---

[151] "In criminal prosecutions, as in civil litigation, the issue-preclusion principle means that 'when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 356 (2016) (quoting *Ashe v. Swenson*, 397 U. S. 436, 443 (1970)). "The doctrine of claim preclusion instructs that a final judgment on the merits 'forecloses successive litigation of the very same claim.'" *Bravo-Fernandez v. United States*, 137 S. Ct. at 357 (quoting *New Hampshire v. Maine*, 532 U. S. 742, 748 (2001)). The claim preclusion doctrine serves to avoid multiple suits on identical entitlements or obligations between the same parties. *Bravo-Fernandez*, 137 S. Ct. at 357.

Logic and common sense would mandate application of these same principles to a situation such as this. Petitioner obtained a ruling on the merits from this court on his Double Jeopardy claim in the context of his pretrial 1996 proceeding brought pursuant to 28 U.S.C. § 2241. Petitioner now presents the exact same Double Jeopardy claim in this post-conviction action brought pursuant to 28 U.S.C. § 2254. Under ordinary principles of res judicata, Petitioner would be barred from re-litigating exactly the same Double Jeopardy claim this court rejected on the merits in 1996. Application of such a rule is consistent with the public policies underlying the adoption of the AEDPA in 1996, the same year Petitioner filed his § 2241 proceeding.

Nonetheless, the Supreme Court held in a pair of opinions issued more than three decades before the AEDPA that the doctrine of res judicata has no application in the habeas corpus context. *See Sanders v. United States*, 373 U. S. 1, 7- 15 (1963) (discussing the history of habeas corpus at common law and holding "[c]onventional notions of finality of litigation have no place where life or liberty is at stake and infringement of constitutional rights is alleged."); *Fay v. Noia*, 372 U. S. 391, 423 (1963) (noting "the familiar principle that res judicata is inapplicable in habeas proceedings"). Those opinions were written, however, at a time when the filing of unlimited successive habeas corpus petitions were the norm rather than the exception. Because respondent did not seek summary dismissal of Petitioner's Double Jeopardy claim on res judicata or claim preclusion grounds, it is unnecessary for this court to resolve the question of whether res judicata should bar re-litigation in a post-conviction § 2254 action of the exact same claim previously denied on the merits in a pretrial § 2241 action brought by the same federal habeas petitioner against the same respondent. Nonetheless, the waste of scare federal judicial resources resulting from this court's re-consideration of Petitioner's still-meritless Double Jeopardy claim is not insignificant.

*Blueford v. Arkansas*, 566 U. S. 599, 609 (2012) (quoting *Wade v. Hunter*, 336 U. S. 684, 690 (1959)). Retrial after reversal of a conviction is not the type of governmental oppression targeted by the Double Jeopardy Clause. *Tibbs v. Florida,* 457 U. S. 41 (1982). The prototypical situation in which this rule applies is a trial court's decision to discharge a deadlocked jury. *See Renico v. Lett*, 559 U. S. 766, 773-74 (2010) (trial judges may declare a mistrial whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for doing so (quoting *United States v. Perez*. 9 Wheat. 579, 579-80 (1824)); *Richardson v. United States*, 468 U. S. 317, 324 (1984) ("[W]e have constantly adhered to the rule that a retrial following a 'hung jury' does not violate the Double Jeopardy Clause."). The Supreme Court applies the "manifest necessity" standard when the trial is terminated over the objection of the defendant. *Oregon v. Kennedy*, 458 U. S. 667, 672 (1982).

The Supreme Court has emphasized that a pragmatic approach should be employed to determine whether "manifest necessity" exists for a mistrial:

> Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury. Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declaration over the objection of the defendant.

*Arizona v. Washington*, 434 U. S. 497, 505 (1978). The Supreme Court emphasized in *Arizona v. Washington* that the term "manifest necessity" cannot be applied mechanically or literally; "instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Id.*, 434 U. S. at 506. The Supreme Court has also held "the state trial judge's mistrial declaration is not subject to collateral attack in a federal court simply because he failed to find 'manifest necessity' in those words or to articulate on the record all the factors which informed the deliberate exercise of his discretion." *Id.*, 434 U. S. at 517.

In the case of a mistrial declared at the behest of the defendant, quite different principles come into play; where the defendant elected to terminate the proceeding against him, the "manifest necessity" standard has no place in the application of the Double Jeopardy Clause. *Oregon v. Kennedy*, 456 U. S. at 672; *United States v. Dinitz*, 424 U. S. 600, 607 (1976). Where a defendant successfully seeks to avoid his trial prior to its conclusion by a motion for mistrial, the Double Jeopardy Clause is not offended by a second prosecution. *United States v. Scott*, 437 U. S. 82, 93 (1978).

## D. AEDPA Review

There are no allegations in this cause that the prosecution did anything to provoke or "goad" Petitioner into requesting a mistrial. Nor is this a situation in

which the prosecution actively sought a mistrial over objection from the defense. On the contrary, objective review of the transcript of the January 31, 1996 hearing set forth above reveals that (1) Petitioner's trial counsel made it very clear that Petitioner's lead trial counsel was not in any physical condition to continue with the trial, even after almost a week of continuances, (2) Petitioner and his co-counsel did not wish the trial to proceed in the absence of Petitioner's lead trial counsel, (3) the prosecution was concerned that Petitioner receive effective assistance and agreed that Petitioner's lead defendant counsel did not appear able to proceed with the trial, (4) when the trial judge raised the possibility of a mistrial, no party objected or raised any concern about such a declaration, and (5) on the contrary, the conversations between the trial court and counsel of record which followed the trial judge's declaration of a mistrial reveal all the parties had anticipated such a declaration and had already discussed exactly what to do in case of such an eventuality.

Petitioner's trial counsel may not have explicitly requested a mistrial on January 31, 1996. Nonetheless, Petitioner's trial counsel made it abundantly clear that, despite the trial court having already granted almost a week of daily continuances, (1) the Petitioner and his trial counsel did not want Petitioner's trial to proceed in the absence of Petitioner's lead trial counsel and (2) Petitioner's lead trial counsel would be unavailable to proceed with trial due to health issues for the foreseeable future. Petitioner's trial counsel did not suggest any other alternative,

such as an even lengthier continuance. Under such circumstances, the state appellate court reviewing Petitioner's mandamus petition could reasonably conclude the manifest necessity standard discussed above did not apply. *Oregon v. Kennedy*, 456 U. S. at 672; *United States v. Scott*, 437 U. S. at 93; *United States v. Dinitz*, 424 U. S. at 607.

Likewise, the state mandamus court could have reasonably concluded this mistrial was obtained at the behest of the defense, not the prosecution. Petitioner voiced no objection to the declaration of a mistrial until several weeks after the trial court's declaration. There is no fact-specific allegation of any bad faith by either the prosecutor or trial court nor any allegation the mistrial in question was intended to afford the prosecution a more favorable opportunity to convict the Petitioner. The distinction between mistrials declared by the court *sua sponte* and mistrials granted at the defendant's request or with his consent is wholly consistent with the protections of the Double Jeopardy Clause. *United States v. Dinitz*, 424 U. S. at 608. Petitioner's trial judge could reasonably have believed that granting a mistrial was wholly consistent with the proffer made by Petitioner's trial counsel during the January 31, 1996 hearing. By that point, the trial court had already granted almost a week of daily continuances yet Petitioner's lead trial counsel made it abundantly clear he remained seriously ill and unable to try the Petitioner's case. Petitioner and

his co-counsel were equally clear that they did not wish the trial to continue in the absence of Petitioner's lead trial counsel.

Petitioner has failed to allege any specific facts showing that he was prejudiced in any manner by the January 1996 declaration of a mistrial. Petitioner alleges no facts showing that any beneficial evidence or testimony became unavailable to Petitioner's defense team in the period January 26 to June 18, 1996.

Moreover, the manifest necessity doctrine permits a trial court to declare a mistrial and discharge a jury where, taking all the circumstances into consideration, there is a manifest necessity for the mistrial, or the ends of public justice would otherwise be defeated. *United States v. Therve*, 764 F.3d 1293, 1298 (11th Cir. 2014); *United States v. Davis*, 708 F.3d 1216, 1221 (11th Cir. 2013). Here, Petitioner's state trial judge listened to the presentations of counsel for both parties, mentioned the fact the trial had already been continued for almost a full week, and received no information from any party suggesting any viable alternative to mistrial existed. Significantly, the state trial judge was presented no information suggesting Petitioner's lead defense counsel would be able to return to Petitioner's trial within the immediate future. No party suggested a continuance beyond those already granted would be sufficient to enable the parties to proceed with the trial. Neither before nor after the state trial judge declared a mistrial did any party voice an objection to the declaration of a mistrial. Under such circumstances, the state court

could reasonably have found the existence of manifest necessity for a mistrial. *See United States v. Malekzadeh*, 855 F.2d 1492, 1498 (11th Cir. 1988) (holding manifest necessity for a mistrial existed where (1) defendant expressed dissatisfaction with the performance of his trial counsel, (2) the trial court gave the defendant the options of continuing with his current counsel, proceeding *pro se*, or being retried with a new counsel, (3) the defendant refused to make a choice, (4) the trial court decided the trial would continue without further interruption, and (5) defendant's trial counsel then moved to withdraw), *cert. denied*, 489 U. S. 1029 (1989). A federal habeas court must assume that a state trial court found manifest necessity existed for a mistrial whether or not the record affirmatively reflects such a finding; a state trial court's finding that manifest necessity existed for retrial is not subject to attack simply because the words "manifest necessity" do not appear in the record. *Venson v. State of Ga.*, 74 F.3d 1140, 1146 (11th Cir. 1996) (citing *Arizona v. Washington*, 434 U. S. at 516-17).

Viewed objectively, on January 31, 1996, Petitioner and his trial counsel attempted to paint the state trial court into a corner. Petitioner neither explicitly requested a further continuance nor a mistrial. Yet Petitioner demanded that his retrial not continue in the absence of Petitioner's lead trial counsel while simultaneously asserting that Petitioner's lead trial counsel was medically unable to proceed with the trial at that time and offering no evidence or even speculation as to

138

when said counsel might be able to proceed with Petitioner's retrial. The trial court had already issued almost a week of daily continuances. Petitioner made no timely objection to the trial court's declaration of a mistrial. The state trial court was responsible for supervising a jury that had already heard extensive testimony in a capital murder trial and then been kept waiting for almost a week.[152] Under such circumstances, the state appellate court could have reasonably concluded that (1)

---

[152] The record from Petitioner's interrupted January 25, 1996 retrial appears at 17 SCR 4-216. The jury heard testimony on that date from Deborah Gordon Hosford (the victims' surviving relative), Thomas G. Knox (the evidence technician who photographed and videotaped the crime scene and helped collect physical evidence), William P. Holland (the evidence technician who collected Petitioner's blood-stained clothing at Petitioner's apartment the morning after the murders), Terry Jett (police detective who gave Petitioner Miranda warnings and interrogated Petitioner post-arrest the morning after the murders), Gary Graves (homicide detective who gave Petitioner *Miranda* warnings and interrogated Petitioner on March 14, 1988), and Dr. Michael O'Brien (forensic dentist regarding the bite marks on Petitioner's arms). In addition, the jury heard the prior testimony of Frances Boozer (concerning petitioner's statements to her shortly before the murders) and stipulations regarding the expert testimony of Phyllis Rollan (forensic serologist concerning blood typing of evidence found at the crime scene and the vaginal swab taken from Mary Gordon at autopsy), Lonnie Harden (tool mark examiner regarding the knives found at the crime scene and inside Mary Gordon's vehicle and various clothing items and the defects found in the ribs of Mary and Sylvia Gordon at autopsy), Craig Bailey (trace evidence examiner regarding the hair found inside Petitioner's jeans pocket and bloody footprints found at the crime scene), Rayfield Parks (correctional officer concerning post-arrest photographs taken of Petitioner), and T.R. Shanks (latent fingerprint examiner concerning the match of Petitioner's fingerprints with a latent print found on the top of the door on the driver's side of Mary Gordon's Pontiac after that vehicle was recovered). In addition, the jury also had before it many items of physical evidence and photographs from the crime scene. Thus, Petitioner's jury had been asked to retain a wide variety of evidence in their collective consciousness for almost a week before the trial judge ordered a mistrial in Petitioner's January 1996 retrial. The manifest necessity for a mistrial was evidenced by the fact Petitioner's jury was being asked to mentally retain such a vast amount of evidence with no hope in sight for the continuation of the trial. Petitioner was on trial for capital murder. The state trial judge could reasonably have concluded that asking the Petitioner's jury to render a verdict based on extensive evidence it had heard a week before, with no clue as to when Petitioner's lead trial counsel might be prepared to proceed with the retrial, was objectively unreasonable, oppressive to the jury, as well as grossly unfair to the Petitioner.

manifest necessity was unnecessary to warrant a mistrial or, alternatively, (2) manifest necessity for a mistrial existed.

## E. Conclusion

The state appellate courts' rejection on the merits of Petitioner's Double Jeopardy claim in the course of Petitioner's state mandamus proceedings was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and mandamus proceedings. Petitioner's first claim does not warrant federal habeas corpus relief.

## IX. INEFFECTIVE ASSISTANCE BY TRIAL COUNSEL

## A. Overview of the Claims

In his fourth claim for federal habeas corpus relief, Petitioner argues his trial counsel failed to render effective assistance as required by the Sixth Amendment by (1) failing to question and challenge for cause three identified members of the jury venire, (2) failing to challenge the admission of Dr. O'Brien's forensic odontology testimony, (3) deciding to obtain the deposition of Dr. Guy Renfro, (4) failing to investigate, develop, and present mitigating evidence showing Petitioner has neurological impairments, (5) failing to investigate, develop, and present in an efficacious manner mitigating evidence showing Petitioner has mental health

problems, and (6) failing to introduce mitigating evidence showing Petitioner's adaptability to prison life.

## B. State Court Disposition

Petitioner presented highly conclusory versions of these same ineffective assistance claims, bereft of any fact-specific support, in his Rule 32 proceeding.[153]

---

[153] As the Alabama Court of Criminal Appeals noted in its Memorandum issued June 17, 2005, none of Petitioner's ineffective assistance claims "were pleaded with sufficient specificity to satisfy the requirements in Rule 32.3 and 32.6(b)." 55 SCR (Tab R-73), at p. 15. An additional copy of the Alabama Court of Criminal Appeals' Memorandum appears as an attachment in 54 SCR (Tab R-64).

This court's independent examination of Petitioner's fourth amended Rule 32 petition is consistent with this conclusion. Despite the State's filing of multiple motions to summarily dismiss as conclusory Petitioner's prior Rule 32 petitions, Petitioner's fourth amended Rule 32 petition was equally bereft of any specific facts supporting Petitioner's conclusory ineffective assistance claims. Each of Petitioner's amended Rule 32 petitions added new claims and theories of relief but no additional facts supporting his naked ineffective assistance claims. Copies of Petitioner's fourth amended Rule 32 petition appear at 49 SCR 293-318 and 49 SCR 321-46.

As explained in Section I.J. above, during the June 2003 evidentiary hearing held in Petitioner's Rule 32 proceeding, he presented testimony from two of his former co-counsel at his June 1996 trial and his former state appellate counsel but asked these attorneys almost no questions concerning their reasoning for any of the strategic or tactical decisions about which Petitioner complained in his fourth amended Rule 32 petition. The verbatim transcription from the June 4, 2003 evidentiary hearing in Petitioner's Rule 32 proceeding appears at 51 SCR R-82-115.

In his federal habeas corpus petition, Petitioner presents completely different, somewhat more factually detailed, versions of his ineffective assistance complaints aimed at the performance of his trial counsel. Petitioner's "new" ineffective assistance complaints are more factually specific than the conclusory claims he fairly presented to the state circuit court in his Rule 32 proceeding. Insofar as Petitioner presents this court with new ineffective assistance claims, this court will undertake *de novo* review of those claims consistent with 28 U.S.C. § 2254(b)(2). *See Berghuis v. Thompkins*, 560 U.S. at 390 (holding federal courts can deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to habeas relief if his claim is rejected on *de novo* review); *Conner v. GDCP Warden*, 784 F.3d at 767 & n.16 ("because we conclude that Mr. Conner would not be entitled to habeas relief under *de novo* review, we affirm the District Court's denial of relief under that standard without resolving whether AEDPA deference applies."); *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d at 1291 ("The Supreme Court has made clear that we are entitled to affirm the denial of habeas relief in this manner: 'a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.'"). When, as here, a federal habeas corpus petitioner presents meritless or even frivolous new versions of conclusory

The state trial court rejected all of Petitioner's ineffective assistance claims on the merits, concluding Petitioner had alleged no specific facts and presented no evidence to support any of these conclusory claims.[154]  The Alabama Court of Criminal Appeals affirmed, holding Petitioner's conclusory complaints about the performance of his trial counsel were insufficiently specific to warrant an evidentiary hearing and, alternatively, concluding Petitioner's complaints about the performance of his trial counsel were bereft of any evidentiary support and lacked merit.[155]

## C.  The Clearly Established Constitutional Standard

The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, 558 U. S. 15, 16-17 (2009); *Bobby v. Van Hook*, 558 U. S. 4, 7 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

---

ineffective assistance claims his state habeas court previously rejected on the merits, concerns of judicial economy justify the federal habeas court's consideration and rejection on the merits of the new claims, rather than stay and abatement to permit the petitioner's dilatory and useless return to state court to exhaust state habeas remedies on such meritless claims.

[154] Copies of the circuit court's Final Order Regarding Freeman's Rule 32 Petition, issued June 25, 2003 appear at 55 SCR (Tab R-72), 50 SCR 446-78, and as Appendix I in 54 SCR (Tab R-65). The circuit court's rejection on the merits of all of Petitioner's ineffective assistance claims appears at pp. 14-26 of that document.

[155] 55 SCR (Tab R-73), at pp. 13-25; Exhibit 1 attached to 54 SCR (Tab R-64), at pp. 13-25; Appendix II in 54 SCR (Tab R-65), at pp. 13-25.

would have been different (*Porter v. McCollum*, 558 U. S. 30, 38-40 (2009); *Wong v. Belmontes*, 558 U. S. at 19-20).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U. S. 668, 687 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

To satisfy the first prong of *Strickland*, *i.e.*, establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U. S. 510, 521 (2003); *Williams v. Taylor*, 529 U. S. 362, 390-91 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U. S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See*

*Wiggins v. Smith*, 539 U. S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U. S. at 7; *Strickland v. Washington*, 466 U. S. at 688-89. It is strongly presumed that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U. S. at 690.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith*, 539 U. S. at 534; *Strickland v. Washington*, 466 U. S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland v. Washington*, 466 U. S. at 694.

In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test (such as those complaints the state courts summarily dismissed under the Texas writ-abuse statute or which petitioner failed to fairly present to the

state courts), this Court's review of the un-adjudicated prong is *de novo*. *See Porter v. McCollum*, 558 U. S. at 39 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard*, 545 U. S. 374, 390 (2005) (holding *de novo* review of the prejudice prong of *Strickland* required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith*, 539 U. S. at 534 (holding the same).

A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Ward v. Hall*, 592 F.3d 1144, 1163 (11th Cir.), *cert. denied*, 562 U.S. 1082 (2010); *Mills v. Singletary*, 63 F.3d 999, 1020 (11th Cir. 1995), *cert. denied*, 517 U. S. 1214 (1996); *Wiley v. Wainwright*, 709 F.2d 1412, 1413 (11th Cir. 1983). *See also Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) ("Petitioner continually bears the burden of persuasion on the constitutional issue of competence and further, (adding the prejudice element) on the issue of ineffective assistance of counsel."), *cert. denied*, 531 U. S. 1204 (2001). Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable

professional judgment. *Bell v. Cone*, 535 U. S. 685, 698 (2002); *Strickland v. Washington*, 466 U. S. at 690.

Under the AEDPA's deferential standard of review, claims of ineffective assistance adjudicated on the merits by a state court are entitled to a doubly deferential form of federal habeas review. The AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow,* 134 S. Ct. 10, 16 (2013). Under § 2254(d)(1), "'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *White v. Wheeler,* 136 S. Ct. 456, 460 (2015) (quoting *White v. Woodall,* 134 S. Ct. 1697, 1702 (2014)); *Harrington v. Richter,* 562 U. S. 86, 103 (2011).

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."

*Harrington v. Richter*, 562 U. S. at 101 (citations omitted).

Thus, in evaluating Petitioner's complaints about the performance of his trial counsel which the state courts rejected on the merits in the course of Petitioner's Rule 32 proceeding, the issue before this Court is whether the Alabama Court of Criminal Appeals could reasonably have concluded Petitioner's complaints about his trial counsel's performance failed to satisfy either prong of the *Strickland* analysis. In making this determination, this court must consider the underlying *Strickland* standard.

## D.  Failure to Adequately Voir Dire the Venire & Make Challenges for Cause

### 1.  State Court Disposition

In his initial complaint of ineffective assistance by his trial counsel, Petitioner faults his trial counsels' failures to (1) "conduct voir dire in a manner that would have revealed biases or predispositions harbored by the jurors" and (2) "articulate

meritorious challenges for cause" (Doc. # 5, at pp. 22-26).[156]  In his fourth amended

Rule 32 petition, Petitioner (1) inaccurately alleged that his trial counsel failed to

ask any questions whatsoever to the members of the jury venire, (2) failed to identify

any members of the jury venire whom his trial counsel should have questioned, (3)

failed to identify any questions his trial counsel should have asked members of the

jury venire, and (4) failed to identify any members of the jury venire whom he

believed were subject to a valid challenge for cause (and why).  Petitioner offered

no evidence supporting this claim during the June 2003 evidentiary hearing held in

his Rule 32 proceeding.[157]

---

[156] Petitioner did not address this ineffective assistance claim in his voluminous brief in support of his federal habeas corpus petition.  The circuit court rejected this ineffective assistance complaint on the merits, finding Petitioner "failed to indicate in his fourth amended petition, or at his evidentiary hearing, what questions trial counsel should have asked or what specific veniremembers should have been challenged for cause," and concluding Petitioner failed to satisfy either prong of the *Strickland* standard.  55 SCR (Tab R-72), at p. 14.  The Alabama Court of Criminal Appeals (1) found Petitioner "failed to identify what questions he believes his counsel should have asked prospective jurors that they did not ask, what jurors he believes should have been challenged for cause and why, or which jurors sat on his jury he believes were biased," (2) concluded Petitioner's claim was "nothing more than a conclusory allegation unsupported by any specific facts," and (3) concluded Petitioner failed to satisfy his burden of pleading and denial of this allegation of ineffective assistance was proper.  55 SCR (Tab R-73), at pp. 15-16.

[157] In his brief on appeal to the Alabama Court of Criminal Appeals *for the first time*, Petitioner argued his trial counsel failed to (1) follow up on a juror's expressions of uncertainty as to how exposure to pretrial publicity would affect her, (2) follow up on a juror's statement about service on another jury, (3) failed to follow up on answers indicating the juror's friends or relatives had been victims of crime, and (4) failed to follow up on answers suggesting bias against the insanity defense.  53 SCR (Tab R-60), at p. 22.  Petitioner did not identify exactly what additional questions, if any, his trial counsel should have asked any of these venire members during voir dire examination.  Nor did Petitioner allege any facts showing what information, if any, would have been elicited had his trial counsel asked any of the additional questions Petitioner argued should have been asked these venire members during voir dire examination.  The Alabama Court of Criminal Appeals held that the new facts Petitioner alleged in support of his ineffective assistance

## 2. AEDPA Review of the Claim Asserted in State Habeas Court

Petitioner alleged no specific facts and presented no evidence to the circuit court during his Rule 32 proceeding evidentiary hearing supporting this particular ineffective assistance claim. Under such circumstances, the circuit court's and Alabama Court of Criminal Appeals' conclusions that these complaints failed to satisfy either prong of the *Strickland* standard was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and mandamus proceedings. *See Price v. Allen*, 679 F.3d 1315

---

claims for the first time in his appellate brief were not properly before that court. 55 SCR (Tab R-73), at p. 15 n.8.

During the evidentiary hearing held in Petitioner's Rule 32 proceeding, Petitioner made no sincere effort to question either of his trial co-counsel (attorneys William Abell and John David Norris) concerning the reasons why the defense team either exercised or refrained from exercising any of their peremptory challenges or the reasons, if any, the defense team chose not to urge challenges for cause against any of the venire members who ultimately served on Petitioner's jury. Petitioner's assertion that he was unable to present the testimony of Petitioner's former lead trial counsel during that evidentiary hearing (because the state habeas court refused to pay the travel expenses of Petitioner's former lead trial counsel) is unpersuasive. Petitioner alleged no facts in his Rule 32 proceeding, and alleges no facts in this court, showing his former lead trial counsel was unavailable to testify via telephonic deposition or via conference call during the June 4, 2003 state-court evidentiary hearing. Moreover, Petitioner alleges no facts, much less proffers any evidence, showing Petitioner's former lead trial counsel was unwilling to cooperate with the efforts of Petitioner's state habeas counsel to secure his testimony. Even if Petitioner had proffered such evidence, Petitioner has failed to allege any facts or proffer any evidence showing the means available under applicable New York law in June 2003 to obtain the deposition of a recalcitrant witness were inadequate to permit the taking of Petitioner's former lead trial counsel's deposition. In sum, Petitioner alleges no facts, and proffers no evidence, showing Petitioner's former lead trial counsel was unavailable to testify (either live or via deposition) in June 2003 via telephone or other electronic media.

149

1325 (11th Cir. 2012) (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard), *cert. denied*, 568 U. S. 1212 (2013); *Wilson v. United States*, 962 F.2d 996, 998 (11th Cir. 1992) (holding complaint about trial counsel's failure to object to amount of drugs identified in PSIR conclusory and without merit where defendant failed to allege any facts showing a factual basis existed for a challenge to the drug quantity listed in the PSIR).

### 3. *De Novo* Review of New Complaints

In his federal habeas corpus petition, Petitioner asserts a slightly more detailed but still conclusory ineffective assistance argument, *i.e.*, that his trial counsel failed to (1) "follow up" with venire member 82 when she expressed uncertainty during her voir dire examination about whether she would be affected by pretrial publicity; (2) "ask further questions" of venire member 115 after she gave voir dire answers indicating her friends or relatives had been victims of crime; and (3) ask "further questions" of venire member 133 after he gave an answer during voir dire suggesting he harbored a bias against the insanity defense. Petitioner also argues his trial counsel should have challenged all three of these venire members for cause. Having independently reviewed the entire record from Petitioner's June 1996 capital murder

trial, this court concludes after *de novo* review that these additional assertions of ineffective assistance do not satisfy either prong of the *Strickland* standard.

### a. No Deficient Performance

Petitioner does not allege any facts or proffer any evidence showing exactly what information was available to Petitioner's trial counsel during voir dire about the backgrounds of any of the three venire members Petitioner has now identified. More specifically, Petitioner does not allege any facts or proffer any evidence showing what information was contained in the juror questionnaires each of these venire members filled out prior to individual voir dire.[158]  Nor does Petitioner

---

[158] The juror questionnaires completed by members of a capital murder jury venire furnish the context within which the objective reasonableness of the strategic and tactical decisions made by trial counsel, including decisions such as to which questions to ask during individual voir dire examination and which venire members to challenge for cause, must be evaluated. *Cf. Jasper v. Thaler*, 765 F. Supp. 2d 783, 816 n.62 (W.D. Tex. 2011) (discussing the analytical hurdles to evaluating a *Batson* claim without access to the juror questionnaires completed by the venire members whom the petitioner claimed had been improperly stricken by the prosecution), *aff'd*, 466 F. App'x 429 (5th Cir. 2012), *cert. denied*, 568 U.S. 1069 (2012).  Selection of a capital jury is more art than science.  *Id.*, 765 F. Supp. 2d at 821.  A decision not to urge a challenge for cause against one member of a jury venire may be objectively reasonable when viewed in the light of the entire jury venire's answers to the questionnaires.  Even a venire member against whom a challenge for cause might be viable may be more appealing to the defense team as a potential juror than other members of the venire panel.  Likewise, there may have been strategic reasons why Petitioner's defense team chose not to urge a challenge for cause against a particular member of the jury venire.  Petitioner furnished neither the state habeas court nor this court with copies of any of the relevant juror questionnaires.  Nor does Petitioner allege any facts showing that the actions of his trial counsel were objectively unreasonable in light of the information contained in the jurors' questionnaire answers.

identify with any reasonable degree of specificity exactly what additional questions

his trial counsel allegedly should have asked any of these venire members.[159]

---

[159] The individual voir dire examination of venire member 82 appears in its entirety at 38 SCR R-266-73. This venire member indicated that, while she had seen some news stories about Petitioner's case, she only vaguely recalled them:

    Q.    (By Mr. Howell) And there were some news stories about this case earlier this year. Did you see any of them or hear any of those?

    A.    I vaguely, when I saw the defendant, I vaguely remember that face, but I don't remember anything about the case at all.

    Q.    Would the fact that you have seen anything like that affect your ability to serve on this jury?

    A.    I really don't know. I am not sure. Since I don't know any details, don't remember details or anything about it as of right now, until I was reminded of what was going on.

Voir Dire Examination of Venire Member 82, 38 SCR R-271-72. Petitioner does not identify any "further" or "follow-up" questions about her exposure to pretrial publicity he believes his trial counsel should have directed toward this venire member.

The individual voir dire examination of venire member 115 appears at 38 SCR R-313-19. During questioning by the prosecution this venire member stated as follows:

    Q.    (By Ms. Brooks) You indicated on your questionnaire that several relatives or close friends had been victims of crime.

    A.    Yes.

    Q.    Would that affect you in any way in this case?

    A.    No, it would not.

Voir Dire Examination of Venire Member 115, 38 SCR R-317-18. Petitioner does not identify any "further" or "follow-up" questions about her friends' or relatives' who were crime victims he believes his trial counsel should have directed toward this venire member.

The individual voir dire examination of venire member 133 appears at 38 SCR R-373-79. In response to questions by Petitioner's trial counsel, this venire member testified as follows:

    Q.    (By Mr. Howell) * * * what are your feelings about the insanity defense in criminal cases?

    A.    Explain that.

    Q.    You have probably seen on detective shows and shows about court and lawyers and stuff on TV something about the insanity defense, maybe on news shows. What feelings do you have based on what you know about it right now?

    A.    The insanity?

    Q.    Yes, sir.

    A.    I am not in favor of it. Of course, it all depends. I would have to have evidence to hear why it would be considered insane.

    Q.    If there were evidence that supported it based upon the legal instructions given to you by the Judge, could you vote for not guilty by reason of insanity verdict?

This court's independent review of the voir dire examination of the three venire members in question reveals there were objectively reasonable reasons readily apparent on the face of the record supporting the decisions by Petitioner's trial counsel not to urge a challenge for cause against any of the venire members in question. Venire member 82 testified during her voir dire examination that (1) she was inclined to vote in favor of a sentence of life without parole, (2) she did not have an opinion regarding the insanity defense in criminal trials, and (3) she considered

---

A.    There again, it all depends on all the other evidence. I would have to weigh it.

Q.    Based on the law the Judge gives you concerning that issue, if there was evidence there to support it, could you vote for it?

A.    Possibly.

Q.    Is there something that would cause you not to be able to vote for it?

A.    Probably not, maybe not.

Q.    There were some news reports about this case earlier this year. Did you see or read any of those?

A.    No.

Voir Dire Examination of Venire Member 133, 38 SCR R-377-79. Petitioner does not identify any "further" or "follow-up" voir dire questions he believes his trial counsel should have asked venire member 133 regarding his views on the insanity defense.

Petitioner's argument that he was unable to present additional evidence supporting this particular ineffective assistance claim because the state habeas court refused to fund an investigator to explore potential bias by Petitioner's jurors is unpersuasive. The state habeas court granted Petitioner an evidentiary hearing on Petitioner's ineffective assistance claims. Petitioner's state habeas counsel could have requested subpoenas for the identified members of Petitioner's petit jury and questioned each of those individuals at the evidentiary hearing about their views on a wide variety of matters, with an eye toward showing what additional information (including any potentially disqualifying biases) his trial counsel could have established had Petitioner's trial counsel asked more or different questions of those jurors during their individual voir dire examination. There is nothing in the record indicating Petitioner's state habeas counsel ever sought the issuance of subpoenas for any of Petitioner's jurors or that Petitioner's state habeas counsel ever offered the circuit court anything more than rank speculation and conjecture in support of this highly conclusory ineffective assistance claim.

herself pro-life.[160]   Venire member 115 testified in response to questions by Petitioner's trial counsel that (1) she was not familiar with the law as it related to the insanity defense, (2) a close friend of hers told her that her father had sexually abused her as a child, and (3) her own daughter had been in an emotionally abusive relationship in her early twenties and went through therapy.[161]   In response to questions by the prosecution, venire member 133 admitted that he had been in "a little trouble: with the law as a teenager, specifically charges of burglary and grand larceny, in which he had been adjudicated under the Youthful Offender Act.[162]

The first prong of the *Strickland* standard calls for an objective evaluation of the performance of counsel.  *See Harrington v. Richter*, 562 U. S. at 109 (*Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind"); *Wiggins v. Smith*, 539 U. S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time).   During individual voir dire

---

[160] Voir Dire  Examination of Venire Member 82, 38 SCR R-271.

[161] Voir Dire Examination of Venire Member 115, 38 SCR R-317-18.

[162] Voir Dire Examination of Venire Member 133, 38 SCR R-377.

examination, each of the venire members identified by Petitioner was examined concerning the very topics Petitioner has identified. Petitioner offers this court no clue as to what additional questions he believes should have been asked these venire members. Nor does Petitioner offer any rational explanation as to why he believes his trial counsel should have engaged in additional questioning of these venire members. Nor does Petitioner offer any rational explanation for why he believes such additional questioning might have disclosed the existence of a disqualifying bias on the part of any of these three venire members. Mere speculation that additional questioning (with unidentified questions) might have produced evidence of an unidentified disqualifying bias does not establish the conduct of Petitioner's trial counsel fell below an objective level of reasonableness.

Moreover, there were objectively reasonable strategic reasons why Petitioner's trial counsel might have chosen not to question further or urge challenges for cause against any of the three identified venire members. From her voir dire answers, venire member 82 appeared disposed toward returning a verdict favorable to Petitioner at the punishment phase of trial. Venire member 115 had both a friend who had survived sexual abuse and a close relative who had endured emotional abuse; Petitioner's trial counsel could reasonably have concluded she likely would be empathetic or at least sympathetic toward Petitioner once evidence of his difficult childhood, including the emotional impact of his many re-locations,

was admitted through the testimony of Dr. Renfro and others. Venire member 133, like Petitioner, had been adjudicated as a juvenile on a charge of burglary; Petitioner's trial counsel could reasonably have concluded this venire member would also likely be inclined toward feelings of sympathy or empathy for Petitioner once evidence of Petitioner's juvenile adjudication for burglary was revealed at trial. In sum, Petitioner's trial counsel may have had objectively reasonable strategic reasons not to choose to further question or urge a challenge for cause against any of these venire members. Petitioner has failed to allege any specific facts, or proffer any evidence in the form of affidavits or juror questionnaires, suggesting the failure of his trial counsel to further question or urge challenges for cause against these three venire members was objectively unreasonable.

### b. No Prejudice

In his pleadings in this court this assertion of ineffective assistance amounts to little more than a conclusory allegation that, if his trial counsel had asked unidentified additional questions of these three venire members, unidentified evidence of a disqualifying bias might have been revealed. Petitioner alleges no specific facts, and proffers no evidence, showing a reasonable probability that, but for the failure of his trial counsel to further question any member of his jury venire during voir dire examination or urge challenges for cause against any of the

identified members of Petitioner's jury, the outcome of either phase of Petitioner's June 1996 capital murder trial would have been any different.

As Petitioner's own co-counsel admitted during the evidentiary hearing held in Petitioner's Rule 32 proceeding, the evidence of Petitioner's guilt was overwhelming. The only mental health expert who examined Petitioner following Petitioner's arrest who held the view that Petitioner *might* have experienced a temporary psychotic episode at the time of his offense was Dr. Burkhart. Dr. Renfro, Dr. Dixon, Dr. Bryant, Dr. Mohabbat, and Dr. Nagi all held contrary views. Moreover, Petitioner admitted in his final written statement to law enforcement officers that he intentionally ripped every phone in the Gordon home off the wall to prevent his victims from calling for help. The mental health experts who testified at Petitioner's June 1996 trial acknowledged this admission indicated a possible awareness on Petitioner's part of the wrongfulness of his behavior and a desire not to be caught.[163] Even Dr. Burkhart admitted it was possible Petitioner did not suffer

---

[163] Petitioner's own mental health expert, Dr. Burkhart testified on cross-examination in part that (1) none of the extensive reports on Petitioner's mental health throughout childhood or following Petitioner's arrest indicated Petitioner had ever been diagnosed with a psychotic disorder, (2) no one believed Petitioner lacked the substantial capacity to appreciate the criminality of his conduct, (3) only Dr. Burkhart believed Petitioner lacked substantial capacity to conform his conduct to the law, (4) the mental disease Dr. Burkhart diagnosed in Petitioner was Schizotypal Personality Disorder, (5) a Personality Disorder is not necessarily a mental disease or defect, (6) he did not believe Petitioner was suffering from a major depression at the time of the capital offenses, (7) rather, he believed Petitioner suffered from a "brief reactive psychosis" at the time of the capital offenses, (8) he was unable to tell when this "brief reactive psychosis" began or ended, (9) if Petitioner attempted to avoid detection, it was likely Petitioner perceived what was happening around him, and (10) it was possible Petitioner was not in a brief psychotic episode when he committed his crimes. Testimony of Dr. Barry Burkhart, 42 SCR R-883-900.

Dr. Renfro testified in part during his deposition that (1) he diagnosed Petitioner in the Spring and Summer of 1995 with Borderline Personality Disorder ("BPD") (a condition he testified he was not certain he would consider a "mental disorder"), (2) long term treatment is available for this condition to help Petitioner learn things he had not learned or to change petitioner's maladaptive behavior, (3) Petitioner's records showed a pattern of (a) unstable and intense interpersonal relationships characterized by alternating between extremes of over-idealization and devaluation, (b) impulsiveness, (c) marked shifts from base line mood to depression, irritability, or anxiety, (d) inappropriate intense anger or lack of control of anger, (e) marked and persistent identity disturbance, and (f) frantic efforts to avoid real or imagined abandonment, (4) Petitioner's frequent residential movements during childhood and the instability accompanying them exacerbated Petitioner's problems and caused Petitioner to act out against his care-givers as a way of testing them, (5) Sylvia Gordon's note to Petitioner indicating that she did not want a romantic relationship with him likely triggered a perception of abandonment within Petitioner which, in turn could trigger rapid changes in thoughts, feelings, and actions, (6) he was unwilling to say Petitioner's fear of abandonment could lead to uncontrollable anger, (7) during periods of extreme stress, persons with Borderline Personality Disorder can display psychotic-like symptoms, (8) in his opinion, Petitioner experienced rage and anger when Sylvia Gordon rejected Petitioner but it was not necessarily uncontrollable, (9) a Personality Disorder is defined by a pattern of behaviors that lead to a person consistently getting into trouble or having trouble functioning in society, (10) people have some capacity for change but after a certain age and certain point in life, it is very difficult to change, (11) Petitioner understood that his behavior at the time of his offenses was wrong or criminal, (12) there was no indication Petitioner was unable to conform his behavior to legal standards, (13) he found no evidence of delusional thinking on Petitioner's part, (14) Petitioner engaged in a lot of goal-oriented behavior during his capital offenses indicating an appreciation of the criminal nature of his conduct and a desire to avoid apprehension, (15) Petitioner's crime scene conduct was inconsistent with the behavior of one who lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to legal standards, (16) BPD is not a mental disease or defect, (17) Petitioner was experiencing BPD at the time of his offenses but was aware of what was going on around him and able to make conscious decisions, (18) there was no indication of a mental disorder or illness that prevented Petitioner from appreciating the criminality of his actions or prevented Petitioner from possessing substantial capacity to conform his conduct to the requirements of law, (19) Petitioner said that he recalled stabbing Sylvia and Mary Gordon each once, (20) Petitioner's admission that he cut the phones suggested he was trying to prevent people from using the phones to call out, (21) there was no evidence Petitioner suffered a "brief reactive psychosis" at the time of his capital offenses, (22) some researchers believe a stressful psychological event can trigger amnesia as a form of dissociative disorder, (23) he did not believe Petitioner experienced amnesia regarding his offenses - only that Petitioner claimed to have amnesia.  Testimony of Dr. Guy J. Renfro, 36 SCR 3648-50, 3652-69, 3671-78, 3680-94, 3701-02, 3705, 3708-09, 3730-31, 3735, 3738, 3741-44, 3753-55, 3758-62, 3773, 3783, 3786.

Dr. Dixon testified in part that (1) forensic psychology is different from clinical psychology in that forensic psychologists are trained or reoriented to consider the possibility of secondary gain when interviewing patients and to be alert to the patient providing incorrect or bogus information, (2) Petitioner claimed he loved his girlfriend and was at work when she was murdered, (3) Petitioner's intelligence was just slightly below average, (4) Dr. Bryant found Petitioner suffered

a "brief psychotic episode" or "brief reactive psychosis" at the time of his capital offenses.[164] There is no reasonable probability that, but for the failure of Petitioner's trial counsel to further question any of the identified venire members or challenge any of them for cause, the outcome of the guilt-innocence phase of Petitioner's June 1996 capital trial would have been any different.

Dr. Lauridson's graphic testimony about the heinous, atrocious, and cruel nature of Petitioner's capital murders was as compelling in June 1996 as it had been in August 1989.   The stark brutality of Petitioner's capital offenses, combined with the jury's guilt-innocence phase verdict, meant both the jury and sentencing judge were required at the punishment phase of trial to weigh the fact Petitioner committed two heinous, atrocious, and cruel murders during the course of a robbery, a burglary, and a rape against Petitioner's mitigating evidence of his unstable, socially disconnected childhood and Petitioner's plethora of diagnosed personality disorders. In 1989 and 1996, two different juries heard basically the same evidence and

_____

from no severe mental illness and that no evidence existed to support a mental health defense at trial, (5) Dr. Nagi likewise found no evidence of mental illness or mental impairment at the time of Petitioner's offense, (6) Dr. Mohabbat found no evidence of mental illness at the time of the murders, (7) Petitioner told Dr. Bryant that he talked Mary Gordon into lending him her car and he had no knowledge of the murders, (8) Petitioner told Dr. Mohabbat he had no knowledge of the murders, and (9) none of the psychiatrists who evaluated Petitioner found any evidence that Petitioner lacked substantial capacity to conform his conduct to the law as a result of a mental disease or defect.  Testimony of Dr. Joe W. Dixon, 43 SCR R-1014-16, R-1056, R-1061-73, R-1075-76.

[164] Testimony of Dr. Barry Burkhart, 42 SCR R-899-900.

unanimously convicted Petitioner beyond a reasonable doubt of all six counts of capital murder alleged in his indictment. Those same juries also recommended by identical eleven-to-one margins that the trial judge impose the death penalty. Petitioner alleges no specific facts, and proffers no evidence, showing any of his jurors in June 1996 possessed any disqualifying bias. This court independently concludes after *de novo* review there is no reasonable probability that, but for the failure of Petitioner's trial counsel to question further, or urge challenges for cause against, any of the identified members of Petitioner's jury venire, the outcome of the punishment phase of Petitioner's June 1996 capital murder trial would have been different.

### 4. Conclusions

The state habeas court acted in an objectively reasonable manner when it rejected Petitioner's conclusory assertions of ineffective assistance during jury selection. This court independently concludes that Petitioner's new, but still conclusory, complaints about the performance of his trial counsel during jury selection contained in his fourth claim for federal habeas relief satisfy neither prong of the *Strickland* standard. This aspect of Petitioner's multi-faceted ineffective assistance claim does not warrant federal habeas corpus relief under either an AEDPA or *de novo* standard of review.

### E. Failure to Challenge Prosecution's Forensic Odontology Evidence

#### 1. State Court Disposition

In his second complaint of ineffective assistance by his trial counsel Petitioner argues his trial counsel should have challenged the prosecution's forensic odontology evidence, *i.e.*, Dr. O'Brien's bite mark testimony (Doc. # 5, at pp. 26-31; Doc. # 64, at pp. 97-105). In his fourth amended Rule 32 petition, Petitioner argued without reference to the record or any legal authority that his trial counsel should have (1) objected to the admission of Dr. O'Brien's testimony and (2) presented unidentified evidence showing an alternative source for the bite marks on Petitioner's arms.[165] In the course of rejecting these ineffective assistance complaints on the merits, the circuit court expressly held (1) Petitioner presented no evidence during the evidentiary hearing showing the failure of his trial counsel to object to the admission of Dr. O'Brien's bite-mark testimony was objectively unreasonable, (2) any objection to the admission of Dr. O'Brien's bite-mark testimony would have been meritless, and (3) Petitioner presented no testimony at his evidentiary hearing showing evidence of an alternative source for Petitioner's bite marks was available at the time of Petitioner's trial.[166] In affirming the circuit

---

[165] 49 SCR at 296-98. These two related ineffective assistance claims were designated as claims II.D. and II.E in Petitioner's fourth amended Rule 32 petition,

[166] 50 SCR 461-63; 55 SCR (Tab R-72), at pp. 16-18.

court's rejection of these complaints on the merits, the Alabama Court of Criminal Appeals held (1) Petitioner failed to plead or prove any facts showing he was prejudiced by his trial counsels' failures to object to the admission of Dr. O'Brien's testimony or present testimony showing an alternative source for Petitioner's bite marks, (2) contrary to Petitioner's argument in his fourth amended Rule 32 petition, the predicate for the admission of scientific evidence was not necessary to the admissibility of Dr. O'Brien's testimony under Alabama law and any objection to the admission of Dr. O'Brien's bite-mark testimony on this ground would have been baseless, (3) Dr. O'Brien was fully qualified to render an opinion on bite-mark identification, (4) the evidence of the bite marks on Petitioner's arm "was only a small piece of the State's overwhelming case" and was not a crucial component of the prosecution's proof of capital murder during a burglary nor of the heinous, atrocious, and cruel nature of petitioner's crimes, (5) Petitioner told police in a statement introduced into evidence that he received his bite marks from a relative who experienced a seizure, and (6) Petitioner admitted that he stabbed both Mary and Sylvia Gordon.[167]

---

[167] 54 SCR (Exhibit 1 attached to Tab R-64), at pp. 16-21; 55 SCR (Tab R-73), at pp. 16-21.

## 2. AEDPA Review of the Claim Asserted in State Habeas Court

Petitioner alleged no specific facts and presented no evidence to the circuit court during his Rule 32 proceeding evidentiary hearing supporting this particular ineffective assistance claim. Under such circumstances, the circuit court's and Alabama Court of Criminal Appeals' conclusions that these complaints failed to satisfy either prong of the *Strickland* standard was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and mandamus proceedings. *See Price v. Allen*, 679 F.3d at 1325 (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard); *Wilson v. United States*, 962 F.2d at 998 (holding complaint about trial counsel's failure to object to amount of drugs identified in PSIR conclusory and without merit where defendant failed to allege any facts showing a factual basis existed for a challenge to the drug quantity listed in the PSIR).

Moreover, as explained in Section VI.D., the state appellate court's holding that Dr. O'Brien's bite-mark testimony was admissible under Alabama evidentiary standards binds this federal habeas court. *See Bradshaw v. Richey*, 546 U. S. at 76

("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Loggins v. Thomas*, 654 F.3d at 1228 ("Alabama law is what the Alabama courts hold that it is."); *Hendrix v. Sec'y, Fla. Dep't of Corr.*, 527 F.3d at 1153 (holding state court ruling on issue of recusal under Florida state law bound federal habeas court). Petitioner's trial counsel cannot reasonably be faulted for failing to make a meritless objection to the admission of Dr. O'Brien's bite-mark testimony. The failure of Petitioner's trial counsel to raise such a futile or meritless objection did not constitute deficient performance and did not prejudice Petitioner within the meaning of *Strickland*. *See Hittson v. GDCP Warden*, 759 F.3d 1210, 1262 (11th Cir. 2014) (failure of collateral counsel to raise a meritless claim does not prejudice petitioner), *cert. denied*, 135 S. Ct. 2126 (2015); *Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013) ("It is also crystal clear that there can be no showing of actual prejudice from an appellate attorney's failure to raise a meritless claim."), *cert. denied*, 135 S. Ct. 48 (2014); *Freeman v. Atty. Gen*, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim"), *cert. denied*, 555 U. S. 1110 (2009); *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir.) ("it is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance"), *cert. denied*, 513 U. S. 1022

(1994); *United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) ("a lawyer's failure to preserve a meritless issue plainly cannot prejudice a client").

Additionally, also as explained in Section VI.D. above, neither the failure of Petitioner's trial counsel to object to the admission of Dr. O'Brien's bite-mark testimony nor the failure of Petitioner's trial counsel to present a divergent expert opinion prejudiced Petitioner within the meaning of the *Strickland* standard. The evidence of Petitioner's guilt was overwhelming. The issue before the jury at the guilt-innocence phase of Petitioner's June 1996 trial was Petitioner's mental state at the time of his offenses. There is no reasonable probability Dr. O'Brien's bite mark testimony impacted the jury's evaluation of whether Petitioner suffered from a mental disease or defect that prevented him from conforming his conduct to the requirements of the law.

The jury was aware through the admission of Petitioner's final statement to police that Petitioner contended a relative had bitten him during a seizure. Dr. O'Brien's bite-mark testimony, *i.e.*, that Sylvia Gordon bit Petitioner at some point within days of Petitioner's arrest, also did very little, if anything, to increase the overwhelming evidence showing Petitioner committed a pair of heinous, atrocious, and cruel murders in the course of a robbery, burglary, and rape. Dr. Lauridson's unchallenged trial testimony established the heinous, atrocious, and cruel nature of Petitioner's capital offenses. Petitioner's admissions in his final statement to police

that (1) he was still inside the Gordon home when Mary Gordon returned home to find Petitioner assaulting her daughter, (2) he stabbed Mary Gordon, (3) he then pursued Mary Gordon into her bedroom as she attempted to flee from him, and (4) he cut the wires of, or pulled off the wall, all the phones in the Gordon house to prevent his victims from calling for help furnished more than enough evidence to support the jury's finding of intentional murder committed during a burglary. The unchallenged forensic evidence established Petitioner stabbed or cut Sylvia Gordon more than twenty times, stabbed or cut Mary Gordon more than ten times, and sexually assaulted Mary Gordon. In the face of this other evidence, Dr. O'Brien's bite-mark testimony was barely even relevant to the issues before Petitioner's jury at either phase of his June 1996 capital murder trial. In fact, this court's recitation of the overwhelming evidence establishing both Petitioner's guilt and the heinous, atrocious, and cruel nature of his capital offenses set forth in Section I.A. above makes no mention of Dr. O'Brien's bite-mark testimony.

### 3. *De Novo* Review of New Complaints

In his federal habeas corpus petition and brief in support *for the first time* Petitioner alleges he has now located an unidentified odontology expert who was available at the time of Petitioner's June 1996 capital murder trial and who could have refuted Dr. O'Brien's testimony that the bite marks on Petitioner's arms (1) were of recent origin and (2) matched the teeth of Sylvia Gordon (Doc. # 64, at pp.

100-02). Petitioner does not identify his new expert or proffer an affidavit or other documentation from this unidentified expert supporting his naked assertion that expert odontology opinions different from those expressed by Dr. O'Brien were available at the time of Petitioner's June 1996 trial. For the reasons discussed in Section IX.E.2. above, this court independently concludes there is no reasonable probability that, but for the failures of Petitioner's trial counsel to either (1) challenge the admission of Dr. O'Brien's bite-mark testimony or (2) present controverting expert testimony, the outcome of either phase of Petitioner's June 1996 capital trial would have been different. *See Price v. Allen*, 679 F.3d at 1325 (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard). The same analysis applies to Petitioner's naked assertion that unidentified evidence existed at the time of Petitioner's June 1996 trial to establish that someone other than Sylvia Gordon inflicted the bite marks on Petitioner's arms. Petitioner has presented this court with no specific facts, nor a valid proffer through affidavits or properly authenticated documents, showing that any witness (other than possibly Petitioner himself) was available at the time of Petitioner's June 1996 trial who could have testified Petitioner had been bitten on

the arms by someone other than Sylvia Gordon in the days immediately before Petitioner's capital offenses.[168]

The possibility that Sylvia Gordon might have managed to inflict injuries to Petitioner while Petitioner was murdering her or posing her in a lurid manner beneath a blanket on her bed added nothing of substance to the prosecution's evidence at either phase of trial. Completely refuting the credibility of Dr. O'Brien's expert opinion testimony would have furnished Petitioner virtually zero benefit with regard to the issues before the jury at either phase of trial. With or without the bite-mark testimony, Petitioner's capital offenses were particularly heinous, atrocious, and cruel. With or without Dr. O'Brien's bite-mark testimony, overwhelming evidence established both murders were committed in the course of a robbery, burglary, and rape. In view of Petitioner's denial to police that Sylvia Gordon inflicted his bite marks, the identity of the person who inflicted the wounds on Petitioner's arms was

---

[168] Petitioner alleges no specific facts, and furnishes this court no proffer of evidence, showing he ever informed his trial counsel of the identity of the "relative" Petitioner claimed had bitten him in the days immediately before Petitioner's capital offenses. Likewise, Petitioner alleges no specific facts and proffers nothing establishing that any witness (other than possibly Petitioner himself) was available at the time of Petitioner's June 1996 capital murder trial who could testify that someone other than Sylvia Gordon inflicted the bite marks observed on Petitioner's arms at the time of his arrest. If, in fact, Petitioner were bitten in March 1988 by a relative during a seizure, Petitioner necessarily possessed personal knowledge of the identity of the person who bit him. Yet Petitioner alleges no facts showing that he ever communicated such information to his defense team, either in 1989 or 1996. Moreover, this court has no affidavit or other valid proffer before it establishing that any person other than Petitioner was available at the time of Petitioner's June 1996 capital murder trial to offer testimony identifying anyone other than Sylvia Gordon as the person who inflicted Petitioner's bite marks.

of little-to-no relevance to the question of whether Petitioner suffered from a mental disease or defect at the time of his offense that warranted a verdict of not guilty.

Successfully challenging the efficacy of Dr. O'Brien's opinion testimony, either through a credible controverting expert opinion or a fact witness who could identify an alternate source of the bite marks, would not have diminished the overwhelming evidence of Petitioner's guilt or diminished the strength of the aggravating evidence before the jury at the punishment phase of his June 1996 capital murder trial. It also would have added nothing to the mitigating evidence Petitioner's trial counsel presented through the testimony of Dr. Renfro, Dr. Burkhart, and Yvonne Copeland.

### 4. Conclusions

The state habeas court acted in an objectively reasonable manner when it rejected Petitioner's conclusory assertions of ineffective assistance concerning Dr. O'Brien's bite-mark testimony. This court independently concludes after *de novo* review that Petitioner's new, but still conclusory, complaints about the performance of his trial counsel in connection with Dr. O'Brien's bite-mark testimony contained in his fourth claim for federal habeas relief do not satisfy the prejudice prong of the *Strickland* standard. This aspect of Petitioner's multi-faceted ineffective assistance claim does not warrant federal habeas corpus relief under either an AEDPA or *de novo* standard of review.

## F. Decision to Depose Dr. Renfro

### 1. State Court Disposition

In his third complaint of ineffective assistance by his trial counsel, Petitioner argues that his trial counsels' decision to depose Dr. Guy J. Renfro, who evaluated Petitioner's competence to stand trial in 1995, constituted ineffective assistance because Dr. Renfro's deposition testimony was introduced into evidence at trial by the prosecution and proved harmful to Petitioner's efforts to convince the jury Petitioner was not guilty by reason of mental disease or defect (Doc. #5, at pp. 32-35; Doc. # 64, at pp. 105-17). Dr. Renfro evaluated Petitioner and wrote a report, which he sent to the trial court and counsel for both parties.[169] Petitioner's trial

---

[169] Copies of Dr. Renfro's report appear at 35 SCR 3464-73 and 37 SCR 3802-11. Dr. Renfro's report was marked at trial as State Exhibit 94 and admitted into evidence at the request of the prosecution following cross-examination of Petitioner's mental health expert Dr. Burkhart, who testified concerning the contents of Dr. Renfro's report and voiced disagreement with Dr. Renfro's conclusions. Testimony of Dr. Barry Burkhart, 42 SCR R-880-83. In his report, Dr. Renfro concluded that (1) assessment of Petitioner's cognitive functioning revealed no significant problems, (2) "It is estimated that he is functioning in the average range of intelligence," (3) Petitioner did not exhibit any delusional thinking, (4) Petitioner "is a young man who had a rather chaotic upbringing" which "contributed to his developing a pattern of having difficulty in establishing and maintaining good interpersonal relationships," (5) Petitioner (a) displays a lot of impulsivity, (b) has a history of showing a lot of emotional variability, (c) has a chronic problem in dealing with his anger, and (d) fears abandonment and rejection, (6) "It is likely that he responds quite negatively to any perceived rejection or abandonment by others," (7) Petitioner appears to be emotionally immature, which could be due in part to the fact he has been incarcerated since he was in his late adolescence, (8) Petitioner displays Borderline Personality Disorder, (9) Petitioner possesses the intellectual and psychological skills necessary to understand the charges against him and assist in the preparation of his defense, (10) Petitioner possesses the capacity to disclose to his attorney pertinent facts about the offense, (11) Petitioner appears to have sufficient intellectual capacity to challenge prosecution witnesses if called upon to do so, (12) Petitioner appears to have the intellectual and verbal skills necessary to testify if called upon to do so, (13) it is likely Petitioner "will need to feel in control of situations and may have a tendency to feel rejected if individuals disagree with him, (14) there are no indications that Petitioner suffered from a mental

counsel requested and obtained permission from the state trial court to take Dr. Renfro's deposition when it became evident Dr. Renfro would be unable to appear at Petitioner's June 1996 trial.  In his fourth amended Rule 32 petition, Petitioner argued in conclusory fashion that his trial counsel "deposed Dr. Guy Renfro despite knowledge that his conclusions were harmful to petitioner's defense."[170]  The circuit court concluded: (1) "[t]he record clearly indicates that trial counsel did not, and indeed, could not know what Renfro's exact testimony would be until he was deposed."; (2) Petitioner failed to "cite in his petition or argue at his evidentiary hearing what specific testimony in Renfro's deposition caused him to be prejudiced."; and (3) Petitioner "failed to meet his burden of proving trial counsel's

---

disease or illness at the time of his offenses which would have prevented him from appreciating the consequences of his behavior, (15) Petitioner "did realize that certain aspects of his behavior were wrong and thus necessitated further action to conceal his identity and to attempt to avoid apprehension and detection," (16) "Mr. Freeman stated in his own words that he knew what he was doing was wrong and was attempting to avoid apprehension," (17) Petitioner "was capable of discerning right from wrong and could appreciate the wrongfulness of acts such as that with which he is charged," and (18) Petitioner is competent to stand trial.  35 SCR 3464-73; 37 SCR 3802-11.

[170] The entirety of this assertion of ineffective assistance which appears in Petitioner's fourth amended Rule 32 petition is as follows:

> Trial counsel deposed Dr. Guy Renfro despite knowledge that his conclusions were harmful to petitioner's defense.  As a result of trial counsel's decision to take Dr. Renfro's deposition, the prosecution was supplied with useful evidence against petitioner, which it subsequently introduced at petitioner's trial.  But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different.

49 SCR 298-99; 49 SCR 326-27.  Petitioner did not identify any specific portion or portions of Dr. Renfro's deposition that Petitioner believed to be "harmful" to Petitioner.  Petitioner also failed to introduce any evidence of substance during the evidentiary hearing held in June 2003 regarding the reasoning underlying the decision by his trial counsel to request and obtain the deposition of Dr. Renfro.

taking Renfro's deposition was the result of deficient performance or caused him to be prejudiced as required by *Strickland*."[171]   The Alabama Court of Criminal Appeals concluded (1) Petitioner failed to identify in his petition who Dr. Guy Renfro was, (2) Petitioner failed to plead any facts regarding what conclusions Dr. Renfro had that were harmful to Petitioner or what evidence Dr. Renfro developed that was used by the State, (3) Petitioner failed to "satisfy his burden of pleading with respect to this allegation of ineffective assistance of trial counsel," and (4) the circuit court properly denied this ineffective assistance claim.[172]

## 2. AEDPA Review of Claim Asserted in State Habeas Court & *De Novo* Review of New Complaints

Petitioner offered the state habeas court no fact-specific allegations, nor any evidence, showing the decision to depose Dr. Renfro was objectively unreasonable or prejudicial within the meaning of the *Strickland* standard.   Instead, Petitioner argued in conclusory fashion that his trial counsel knew or should have known unidentified portions of Dr. Renfro's opinions would be unfavorable to the defense's strategy of attempting to obtain a not guilty verdict based on mental disease or defect. Unfortunately for Petitioner, this court has read (1) Dr. Renfro's pretrial report, as

---

[171] 50 SCR 464-65; 54 SCR (Appendix I attached to Tab R-65), at pp. 19-20; 55 SCR (Tab R-72), at pp. 19-20.

[172] 54 SCR (Appendix II attached to Tab R-64), at p. 24; 55 SCR (Tab R-73), at p. 24.

well as (2) the records from Petitioner's June 1996, January 1996, and August 1989 capital murder trials and (3) the voluminous psychological reports prepared throughout Petitioner's many years as a ward of the State of Alabama. In his pleadings in this federal habeas proceeding, Petitioner points to various aspects of Dr. Renfro's report and deposition testimony which he contends were prejudicial to him at both phases of his June 1996 capital murder trial, specifically, Dr. Renfro's rejection of Dr. Burkhart's assertion that Petitioner was unable at the time of his offense to conform his behavior to the requirements of the law.

By the time of Petitioner's June 1996 trial, there was no genuine dispute that Petitioner murdered Mary and Sylvia Gordon in a particularly vicious and brutal manner. The only remaining issue was whether, at the time of his capital offenses, Petitioner suffered from a mental disease or defect that effectively prevented him from either (1) understanding the criminality of his conduct or (2) being capable of conforming his behavior to the requirements of the law. There was no genuine dispute about the first of these two issues. All of the mental health experts who examined Petitioner prior to his June 1996 capital trial, *including Petitioner's own mental health expert Dr. Barry Burkhart*, agreed that Petitioner's personality disorder did *not* prevent Petitioner from appreciating the wrongful or criminal nature

of his murderous conduct.[173]  Contrary to Petitioner's recent assertions, however,

Dr. Renfro's report did *not* expressly address the issue of whether Petitioner's

---

[173] Dr. Burkhart testified on direct examination that (1) he first evaluated Petitioner in November-December 1982, many years before Petitioner's capital offenses, when Petitioner was thirteen, (2) at that time, he concluded Petitioner (a) was depressed and angry and (b) needed both placement in a long-term treatment facility and psychotherapy, (3) he examined petitioner again in June and August 1989, (4) at that time, he diagnosed Petitioner with major depressive disorder and Schizotypal Personality Disorder, *i.e.*, a pervasive pattern of social discomfort and disability in which a person cannot get along with others and is unable to make any attachments to people and may experience brief paranoid psychotic episodes, (4) Borderline Personality Disorder ("BPD"), *i.e.*, Dr. Renfro's diagnosis, is similar to Schizotypal Personality Disorder, (5) Petitioner meets the criteria for both Borderline and Schizotypal Personality Disorders, (6) he did not disagree with Dr. Renfro's diagnosis of BPD, (7) Petitioner's inappropriate anger and violent outburst on March 11, 1988 were likely the products of Petitioner's fear of abandonment, a response consistent with both Schizotypal and Borderline Personality Disorders, (8) Petitioner's condition included severe dissociative symptoms in which he lost cognitive control, *i.e.*, "blanked out," and (9) Petitioner very likely suffered a brief reactive psychosis as a result of the stress of being abandoned or rejected by Sylvia Gordon, in which Petitioner lost touch with reality. Testimony of Dr. Barry Burkhart, 41 SCR R-726-41, R-746-50, R-757-58, R-766-69.

On cross-examination, Dr. Burkhart testified (1) Petitioner's answers to multiple MMPI tests consistently showed the possibility of invalid results, (2) many of the tests he administered to Petitioner were of little utility in determining Petitioner's mental status at the time of his capital offenses, (3) none of the tests he administered to Petitioner or which Petitioner self-administered, showed Petitioner was psychotic on March 11, 1988, (4) Petitioner told him that he had no knowledge of the murders and did not commit them, (5) he disagreed with the diagnoses of Adjustment Disorder and Antisocial Personality Disorder made by (a) the psychiatrists who examined Petitioner in December 1988 and January 1989 for the Lunacy Commission (b) Dr. Grayson, who evaluated Petitioner in May 1984 at the Children's Hospital after Petitioner threatened to jump off the roof of a building, and (c) Dr. Kline, who evaluated Petitioner in September 1978 and warned there was a danger Petitioner would become antisocial later in life, (6) none of the many psychological reports prepared during Petitioner's childhood included a diagnosis of a psychotic disorder, (7) none of the reports prepared on Petitioner included a diagnosis of an inability to appreciate the criminality of Petitioner's conduct, (8) *no one believes Petitioner lacked substantial capacity to appreciate the criminality of his conduct, including Dr. Burkhart*, (9) he believed Petitioner lacked substantial capacity to conform his conduct to the law, (10) a personality disorder is not necessarily a mental disease or defect, (11) while he believes Petitioner suffered a brief reactive psychosis at the time of his capital offense, he cannot determine when Petitioner's "brief reactive psychosis" began or ended, and (12) if Petitioner tried to avoid detection during his offenses, it was possible Petitioner perceived what was happening and did not have a brief psychotic episode when he committed his crimes. *Id.*, 41 SCR 779-83, R-785, R-787, R-95-801; 42 SCR R-802-26, R-829, R-839, R-833, R-843, R-847, R-859-60, R-872, R-878-79, R-883-85, R-887-89, R-893-96, R-899, R-900, R-903.

personality disorder prevented Petitioner from conforming his conduct to the requirements of the law.[174]  Petitioner's trial counsel could reasonably have wished to explore Dr. Renfro's views on that subject in a manner that permitted their admission at trial if favorable to the defense.  Petitioner's trial counsel cannot

---

Dr. Dixon testified that (1) he prepared a summary report reflecting the findings of the three psychiatrists who evaluated Petitioner in December 1988 and January 1989 for the Lunacy Commission, (2) *none of the psychiatrists who evaluated Petitioner at that time found any evidence of mental illness at the time of Petitioner's capital offenses*, (3) none of the reports prepared by any of the mental health professionals who evaluated Petitioner during childhood found any evidence of mental illness, and (4) he found no active mental illness when he examined Petitioner in December 1988 and January 1989.  Testimony of Dr. Joe W. Dixon, 43 SCR R-1021, R-1042, R-1051, R-1055, R-1059-76.

Dr. Renfro testified during his deposition that (1) Sylvia Gordon's note informing Petitioner that she did not want a romantic relationship with him may well have triggered an intense violent reaction consistent with Petitioner's BPD, (2) while fear of abandonment can lead to inappropriate anger in those classified as displaying BPD, he was unwilling to say Petitioner's fear of separation would lead to an uncontrollable change in thinking or behavior, (3) Petitioner's history of impulsiveness, moodiness, episodic depression, angry outbursts, and extreme reactivity to interpersonal stress were all well-documented, (4) some people with BPD may have significant changes to their perceptions of reality when they experience stress-induced psychotic-like symptoms, (5) Petitioner's behavior on March 11, 1988 fit BPD, (6) in his opinion, Petitioner experienced rage and anger on March 11, 1988 but not necessarily uncontrollable rage and anger, (7) *Petitioner understood his behavior was wrong or criminal*, (8) *there was no indication Petitioner was unable to conform his behavior to legal standards*, (9) *Petitioner engaged in a lot of goal-oriented behavior during his crimes, indicating an appreciation of the criminal nature of his conduct and a desire to avoid apprehension*, (10) BPD is not a mental disease or mental illness, (11) Petitioner was aware of what was going on around him and able to make conscious decisions and behave in a certain way, (12) *there was no indication Petitioner suffered from a mental disorder or illness that prevented Petitioner from appreciating the criminality of his actions or prevented him from possessing substantial capacity to conform his conduct to the requirements of law*, (13) Petitioner said he remembered stabbing both Mary and Sylvia Gordon once each, indicated he knew what he did was wrong, and discussed disposing of a knife, (14) Petitioner's admission that he cut the phone lines suggests he was trying to prevent people from using the phones to call out, (15) he found no evidence Petitioner suffered from a brief reactive psychosis at the time of his capital offenses, and (16) he found no indication in Petitioner's records of any diagnosis of psychosis.  Deposition of Dr. Guy J. Renfro, 36 SCR 3667-69, 3672-74, 3678-79, 3682-94, 3714, 3730-31, 3741-44, 3749, 3753-55, 3758-62, 3773.

[174] *See* note 169 above.

175

reasonably be faulted simply because, subsequent to obtaining permission to depose Dr. Renfro, he offered an ultimate opinion disadvantageous to the defense on the conformity issue. Clairvoyance is not a required attribute of effective representation. *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999). After *de novo* review, this court concludes the alleged failure of Petitioner's trial counsel to anticipate Dr. Renfro's ultimate conclusion on the conduct-conformity aspect of Petitioner's mental health defense did not cause the performance of said counsel to fall below an objective level of reasonableness.

Moreover, unlike the many psychological evaluations contained among Petitioner's record, Dr. Renfro's report set forth in a relatively clear and intelligible manner a linkage between (1) the removal of Petitioner from his mother as an infant, and Petitioner's chaotic and unstable childhood and (2) Petitioner's subsequent inability to develop interpersonal relationships.[175] Dr. Renfro's deposition

---

[175] Dr. Renfro's report contained the following clinical assessment of Petitioner's mental condition:

> David Freeman is a young man who had a rather chaotic upbringing. He was removed from his parents care and custody at a very young age. They reportedly were unable to provide adequately for Mr. Freeman. Mr. Freeman was placed in a variety of foster placements and institutional placements throughout his formative years. It would appear that Mr. Freeman's growing up in such placements contributed to his developing a pattern of having difficulty in establishing and maintaining good interpersonal relationships. He tends to show a pattern of instability in his relationships, at times having intensely positive feelings towards individuals and at other times feeling very negatively towards them. He also displays a lot of impulsivity, including engaging in behavior which is either self-damaging or self-defeating. He has a history of showing a lot of emotional variability. He can move from being irritable to being pleasant in a very brief period of time. He also can be intensely depressed or angry for relatively brief periods of

time.  Mr. Freeman also apparently has had a rather chaotic problem in dealing with his anger.  He has displayed aggressive behavior towards staff members at the placements he has been in as well as other residents of the facilities.  He has been sensitized to the point that he fears abandonment and rejection.  It is likely that he responds quite negatively to any perceived rejection or abandonment by others.  This leads him to test individuals with whom he comes in contact with to determine whether they can be trustworthy and counted on or whether they will be someone to let him down.  Mr. Freeman described how he very quickly sizes up or judges an individual to determine whether he will enter into a relationship with them or not.  * * *

35 SCR 3468; 37 SCR 3806.

Dr. Renfro's report also contained the following assessment of Petitioner's mental state at the time of his offense:

The information examined would indicate Mr. Freeman was displaying the personality characteristics of a borderline personality disorder at the time of the alleged offense.  That is, he had difficulty in maintaining relationships.  He was very sensitive to possible feelings of rejection and abandonment.  He was likely to manifest intense anger and could engage in aggressive acting out towards others.  While these characteristics do appear to have played a role in Mr. Freeman's choices and decisions during this time frame, there are no indications that he did suffer from a mental disorder or illness which would have prevented him from appreciating the consequences of his behavior.  Instead, there are indications both in police reports and in Mr. Freeman's own statements which indicate that he did realize that certain aspects of his behavior were wrong and thus necessitated further action to conceal his identity and to attempt to avoid apprehension and detection.  Mr. Freeman does claim amnesia for certain aspects of his behavior on the date of the alleged offense.  That is, at times Mr. Freeman would stated [sic] that he did not recall something and later he would make statements indicating that he did have a memory of this incident.  * * *

35 SCR 3471; 37 SCR 3809.

Dr. Renfro's report also contained the following summary and recommendations:

* * * This review of records and the clinical evaluation of Mr. Freeman found him to be an individual who experienced a rather chaotic upbringing with multiple placements in a variety of institutions.  Mr. Freeman has a long history of difficulty adjusting to these environments.  He appears to have developed a rather well entrenched pattern of responding which includes having difficulty in relationships with others, intense fear of abandonment and rejection, episodes of angry outbursts, and a tendency to engage in impulsive and self-defeating behavior.  The descriptive category which best summarizes this pattern of behavior is borderline personality disorder.

35 SCR 3472; 37 SCR 3810.

Dr. Renfro concluded his report with the following recommendation:

Information was reviewed to assess Mr. Freeman's mental state at the time of the alleged offenses.  The information which was reviewed does indicate rather strongly that Mr. Freeman did have a good appreciation for the criminality of

testimony further fleshed out this linkage in language free from the jargon typical of most mental health professionals' testimony.[176] Thus, even if Dr. Renfro ultimately disagreed with Dr. Burkhart's view that Petitioner lacked the ability to conform his

---

> behavior such as that with which he is charged and also indicates that he had a good understanding of right from wrong. Mr. Freeman has at times asserted that he experienced amnesia for certain points during the day in which the crimes allegedly occur [sic]. However, there were a number of inconsistencies between Mr. Freeman's report of amnesia and his later ability to provide information which had been requested. These sort of inconsistencies are highly suggestive of a voluntary form of memory problem rather than one reflecting true amnesia. It is this examiner's opinion that David Freeman did understand right from wrong and could appreciate the criminality of behavior such as that with which he is charged. - At [sic] the time of the offense. [I]t is recommended that the case should proceed to trial as scheduled.

35 SCR 3473; 37 SCR 3811.

[176] Deposition of Dr. Guy J. Renfro, 36 SCR 3651-60 (discussing the criteria for a diagnosis of Borderline Personality Disorder ("BPD")); *Id.*, 36 SCR 3660-61, 3705 (discussing how Petitioner's frequent movements exacerbated his problems with instability in his self-perception and relationships with others); *Id.*, 36 SCR 3661-63 (explaining that (1) Petitioner frequently acted out as a child to test the resolve of his care givers and to see if adults would abandon him and (2) Petitioner's separation from his mother and family at an early age disrupted Petitioner's ability to form attachments and to bond with other people); *Id.*, 36 SCR 3663-65, 3667-69, 3705 (discussing (1) Dr. Burkhart's personal observations of Petitioner's rapid change from calm to agitated and (2) Petitioner's abandonment issues with Sylvia Gordon); *Id.*, 36 SCR 3671-74, 3778 (explaining that persons with BPD who perceive they are about to be abandoned or separated by someone can experience profound changes in emotion, including intense inappropriate anger); *Id.*, 36 SCR 3676-78 (explaining how persons with BPD (1) go from idealizing a potential caregiver or lover to very quickly devaluing the same person and (2) are prone to sudden and dramatic shifts in their views of others); *Id.*, 36 SCR 3681-86, 3705 (explaining Petitioner's frequent removal from homes set the tone for his feelings of abandonment and rejection and led to him experiencing extreme dysphoria (depression) and extreme reactivity (*i.e.*, feelings of anger, panic, and despair) when experiencing interpersonal stress); *Id.*, 36 SCR 3687-89 (explaining that Petitioner's records show a pattern of angry outbursts as early as age eight, which could lead people to reject him, which, in turn, led to more anger and more rejection); *Id.*, 36 SCR 3689-92, 3783 (explaining that during periods of extreme stress, transient, paranoid ideation or dissociative symptoms may occur, including psychotic-like symptoms, in which some people may have significant changes to their perceptions of reality); *Id.*, 36 SCR 3693-94, 3730 (explaining that Petitioner displayed symptoms of his BPD at the time of his offense, including intense anger and aggressive acting out).

behavior to the law, Dr. Renfro's deposition furnished a wealth of mitigating evidence (suggested in his report), including a plain-language explanation for why Petitioner reacted so violently when Sylvia Gordon gave him a note stating she did not wish to be romantically involved with him. This court independently finds after *de novo* review that it was objectively reasonable for Petitioner's trial counsel to take action to preserve for the jury's consideration the wealth of mitigating testimony furnished by Dr. Renfro during his deposition.

Finally, this court independently concludes after *de novo* review there is no reasonable probability that, but for the decision by Petitioner's trial counsel to obtain Dr. Renfro's deposition, the outcome of either phase of Petitioner's June 1996 capital murder trial would have been different. At the guilt-innocence phase of trial, Dr. Renfro was only one of a small army of mental health professionals who either testified or had their reports presented to the jury, who disagreed with Dr. Burkhart's opinion that Petitioner suffered from a "brief reactive psychosis" at the time of his capital offenses. Even Dr. Burkhart admitted that evidence (which was abundant at Petitioner's trial) showing Petitioner intentionally engaged in behavior designed to either (1) prevent his victims from calling for help or (2) avoid Petitioner's apprehension would tend to undermine a finding that Petitioner was suffering from

a psychotic-like episode at the time of his capital crimes.[177]   Dr. Burkhart also

admitted he was the only mental health professional who had ever diagnosed

Petitioner with a psychosis.[178]   Dr. Renfro's deposition testimony fully supported

Dr. Burkhart's testimony that persons with the types of personality disorders Dr.

Burkhart and Dr. Renfro believed were descriptive of Petitioner's behavior could

suffer extreme dissociative episodes under the influence of extreme stress.[179]   Dr.

Burkhart believed it was likely Petitioner had experienced an episode of brief

reactive psychosis at time of his capital offenses.   Dr. Renfro did not.   This

disagreement did not diminish the clearly mitigating value of Dr. Renfro's

testimony, which offered the jury a plain English explanation for why Petitioner

reacted in such a horrifically violent manner when Sylvia Gordon rejected his

romantic overture.

Dr. Renfro's deposition testimony furnished a wealth of mitigating evidence

beneficial to Petitioner at the punishment phase of trial, added very little to the

---

[177] Testimony of Dr. Barry Burkhart, 42 SCR R-899-900.

[178] *Id.*, 42 SCR 883-85.

[179] Testimony of Dr. Guy J. Renfro, 36 SCR 3663-64 (discussing Dr. Burkhart's first-hand observations of Petitioner's rapid mood changes); *Id.*, 36 SCR 3664-69, 3671-74, 3678-79, 3730 (discussing the reasons why persons with BPD react with profound changes in emotion (including inappropriate anger) to perceived separation, rejection, or loss of external structure); *Id.*, 36 SCR 3687-94 (discussing the psychotic-like symptoms experienced by some persons with BPD in response to interpersonal stress); *Id.*, 36 SCR 3694, 3730 (expressing the opinion Petitioner was displaying BPD characteristics at the time of his capital offenses).

testimony of Dr. Dixon or the findings of the three Lunacy Commission psychiatrists who each concluded Petitioner was not suffering from a mental disease or illness at the time of his capital offenses, and furnished support for much of Dr. Burkhart's testimony about the nature of Petitioner's personality disorder.[180] Given that (1) Dr. Nagi, Dr. Mohabbat, Dr. Dixon, and Dr. Bryant had years before all determined Petitioner had not suffered from any mental disease or illness at the time of his capital offenses, (2) Dr. Burkhart's agreement there was no evidence Petitioner was unable to appreciate the criminality of his capital offenses, (3) the fact Petitioner had never, prior to March 1988, been diagnosed with any type of psychotic disorder, and (4) the substantial evidence showing Petitioner undertook deliberate actions during the course of his capital offenses to prevent his victims from calling for help (*i.e.*, he attacked Mary Gordon without provocation when she returned home and cut the wires or tore from the walls all the telephones in the Gordon house), this court independently concludes after *de novo* review there is no reasonable probability the outcome of either phase of Petitioner's June 1996 capital murder trial would have been different had Petitioner's trial counsel not obtained Dr. Renfro's deposition testimony.

---

[180] Dr. Burkhart testified that he did not disagree with Dr. Renfro's diagnosis of Borderline Personality Disorder (because that diagnosis dove-tailed with his own Schizotypal Personality Disorder diagnosis) but believed his own was the more accurate diagnosis. Testimony of Dr. Barry Burkhart, 41 SCR 737-38; 42 SCR 888.

### 3. Conclusion

This court concludes after independent, *de novo* review that Petitioner's complaints in his federal habeas corpus petition and brief in support about his trial counsels' decision to obtain the deposition testimony of Dr. Guy J. Renfro all fail to satisfy either prong of the *Strickland* standard. Accordingly, the circuit court and Alabama Court of Criminal Appeals' rejections on the merits of Petitioner's stripped-down version of this same ineffective assistance claim during the course of Petitioner's Rule 32 proceeding were neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. This aspect of Petitioner's multi-faceted ineffective assistance claim does not warrant federal habeas corpus relief under either an AEDPA or *de novo* standard of review.

## G. Failure to Investigate, Develop, & Present Mitigating Evidence

### 1. State Court Disposition

In his fourth and fifth assertions of ineffective assistance, Petitioner argues his trial counsel should have (1) obtained the services of a neuropsychologist who could have testified Petitioner suffers from neurological impairments, including organic brain damage, mental retardation, and an inability to control his aggression and cope

with stressors, (2) obtained the services of a social worker and neuropsychologist who could have (a) furnished a social history for Petitioner, (b) testified to the complete lack of nurturing and supportive family contact Petitioner endured throughout his developmental period, and (c) testified about the adverse neurological and developmental effects of same, Petitioner's post-traumatic stress disorder, and other factors reducing Petitioner's moral blameworthiness, and (3) built a more compelling case in mitigation rather than relying upon "an insanity defense that lacked evidentiary support" (Doc. #5, at pp. 35-43; Doc. # 64, at pp. 118-61). In Sections II.G., II.J. and II.K. of his fourth amended Rule 32 petition, Petitioner complained in conclusory fashion that his trial counsel failed to present unidentified mitigating evidence showing Petitioner suffers from unidentified neurological impairments and unidentified evidence "regarding Petitioner's background and his mental health history in a manner which would have allowed the jury to give this evidence mitigating effect during the sentencing phase."[181]

---

[181] Petitioner's wholly conclusory assertions in his fourth amended Rule 32 petition alleging ineffective assistance by his trial counsel vis-a-vis mitigating evidence are as follows:

> G. Trial counsel failed to investigate, develop and present evidence that petitioner suffers from neurological impairments. But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different.

49 SCR 298.

> J. Trial counsel failed to investigate, develop and present available evidence in mitigation of petitioner's punishment. But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different.

> K. Trial counsel failed to present available evidence regarding petitioner's background and his mental health history to the jury in a manner which would have

The circuit court found (1) Petitioner "presented absolutely no evidence at his evidentiary hearing" supporting his complaint of an alleged failure to present evidence of an unidentified neurological impairment, (2) "presented absolutely no evidence at his evidentiary hearing" supporting his complaint about the alleged failure to investigate, develop, and present unidentified mitigating evidence, and (3) "failed to offer any evidence at his evidentiary hearing proving that if trial counsel had presented the evidence of his background and mental health history in a different manner, the outcome of his trial would have been different."[182] The Alabama Court of Criminal Appeals held (1) Petitioner failed to plead sufficient facts in support of his ineffective assistance claims to warrant an evidentiary hearing, much less habeas relief, (2) the new facts Petitioner alleged in his appellant's brief in support of his conclusory ineffective assistance claims in the circuit court would not be considered

_____

allowed the jury to give this evidence mitigating effect during the sentencing phase. But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's trial would have been different.
49 SCR 299.

Petitioner presented no testimony or other evidence during the June 2003 evidentiary hearing held in his Rule 32 proceeding supporting any of these complaints of undeveloped or unpresented mitigating evidence. Nor did Petitioner present any evidence showing any alternative method of presenting Petitioner's mitigating evidence was available in June 1996. In fact, Petitioner presented no evidence whatsoever showing why his trial counsel chose not to retain the assistance of any experts, including a neuropsychologist or social worker. As Respondent correctly points out, Petitioner's fourth amended Rule 32 petition made no complaint about the failure of his trial counsel to retain the services of, or call to testify, any expert. Nor did Petitioner's fourth amended Rule 32 petition offer the state habeas court any clue as to what additional mitigating evidence he believed his trial counsel should have presented.

[182] 50 SCR 464, 466-67; 54 SCR (Appendix I to Tab R-65), at pp. 18-19, 21-22; 55 SCR (Tab R-72), at pp. 18-19, 21-22.

by that appellate court, (3) Petitioner failed to allege the type of neurological impairments he suffered from, the severity of his alleged impairments, or how the alleged impairments were relevant to his trial, and (4) Petitioner's conclusory and vague complaints about unidentified mitigating evidence concerning his "background and mental health history" and the "manner" in which his counsel should have presented same were "wholly insufficient" to satisfy his pleading burden.[183]

### 2. AEDPA Review of the Claim Asserted in State Habeas Court

Petitioner alleged no specific facts and presented no evidence to the circuit court during his Rule 32 proceeding evidentiary hearing supporting these particular ineffective assistance complaints. Moreover, Petitioner failed to allege with any reasonable degree of specificity exactly what new or additional mitigating evidence his trial counsel should have presented during Petitioner's June 1996 capital murder trial. Under such circumstances, the circuit court's and Alabama Court of Criminal Appeals' conclusions that these complaints failed to satisfy either prong of the *Strickland* standard was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable

---

[183] 54 SCR (Exhibit 1 attached to Tab R-64), at pp. 13-15, 23-25; 54 SCR (Appendix II attached to Tab R-65), at pp. 13-15, 23-25; 55 SCR (Tab R-73), at pp. 13-15, 23-25.

determination of the facts in light of the evidence presented in the Petitioner's state trial and mandamus proceedings. *See Price v. Allen*, 679 F.3d at 1325 (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard); *Wilson v. United States*, 962 F.2d at 998 (holding complaint about trial counsel's failure to object to amount of drugs identified in PSIR conclusory and without merit where defendant failed to allege any facts showing a factual basis existed for a challenge to the drug quantity listed in the PSIR).

### 3. *De Novo* Review of New Complaints

In his federal habeas corpus petition, *for the first time*, Petitioner presents new factual allegations supporting his vague and conclusory *Wiggins* complaints about unpresented mitigating evidence that fill more than 28 pages, identifying allegedly "new" evidence of (1) Petitioner's family's alleged history of mental problems, (2) chaos and instability in Petitioner's life from the time of birth, (3) Petitioner's childhood problems with insomnia, nightmares, and alleged delusional thinking, (4) cryptic assertions of physical, emotional, and sexual abuse, (5) Petitioner's academic problems, (6) Petitioner's suicide attempts, and (7) unidentified expert testimony showing how these problems affected Petitioner and reduced his moral blameworthiness (Doc. # 64, at pp. 124-52).

### a. No Deficient Performance

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U.S. at 690-91.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's litigation decisions.

*Strickland v. Washington*, 466 U.S. at 691.

This Court thoroughly examined the entire record from Petitioner's June 1996 capital murder trial, including the extensive documentation regarding Petitioner's background and mental health history contained in State Exhibits 85, 86, 87, 94, 95,

187

96, 97, 98, 99, 100, 101, 102, 103, 105, and 106, all of which were admitted into evidence during Petitioner's final capital murder trial.[184]  Petitioner alleges no specific facts showing that his trial counsel were unaware of any of the information concerning Petitioner's background or mental health history contained in these voluminous records.  Having meticulously reviewed all of the information concerning Petitioner's background and mental health history contained in the foregoing trial exhibits, as well as the June 1996 trial testimony of Dr. Renfro, Dr. Burkhart, and Yvonne Copeland, this court independently finds that, with two exceptions, all of the "new" mitigating evidence Petitioner identifies in his pleadings

---

[184] The trial court admitted all of these voluminous documents into evidence.  42 SCR R-882-83.  Copies of these trial exhibits appear at 34 SCR 3318 through 36 SCR 3632, 37 SCR 3802-11.  The extensive additional documentation addressing Petitioner's background and mental health history that was available to Petitioner's trial counsel prior to Petitioner's June 1996 capital murder trial is voluminous.  These documents include (1) the original sentencing report prepared by the Alabama Board of Pardons and Paroles in September 1989 in connection with Petitioner's original capital murder trial (24 SCR 1242-52), (2) all of the exhibits addressing Petitioner's background, medical history, and mental health history admitted into evidence during Petitioner's original capital murder trial, (3) innumerable pages of additional documents Petitioner's trial counsel furnished to the Lunacy Commission in 1988 or to Dr. Renfro in 1995, (4) correspondence and progress reports prepared by social workers and child-care workers at the various institutions where Petitioner was housed, (5) Petitioner's childhood medical records, academic records, and psychological evaluations, (6) pleadings and court orders filed in conjunction with Petitioner's multiple removals from one state-supervised child-care institution and placement in another state-supervised facility, (7) Dr. Dixon's summary report on the findings of the mental health professionals who evaluated Petitioner in December 1988 and January 1989 for the Lunacy Commission (36 SCR 3621-25), and (8) the detailed records, social history reports, and Petitioner's psychological evaluations generated during Petitioner's Lunacy Commission evaluation in December 1988 and January 1989 (27 SCR 1847 through 28 SCR 2141).  These documents fill almost the entirety of Volumes 24 through 36 of the state court record in this case.

in this court in support of his *Wiggins* claims was either available to Petitioner's trial counsel or actually presented to Petitioner's capital sentencing jury in June 1996.

Petitioner's trial counsel presented an extensive case in mitigation during Petitioner's June 1996 capital murder trial, through the testimony of Dr. Renfro, Dr. Burkhart, and Petitioner's former childcare case-worker Yvonne Price Copeland. Petitioner's capital sentencing jury also had before it extensive documentation concerning petitioner's social history, mental health history, academic history, and history of behavioral problems at a variety of state-sponsored institutions throughout his developmental period. Thus, this is not a case in which defense counsel failed to present extensive available mitigating evidence. On the contrary, Petitioner's trial counsel presented substantial expert witness testimony (through Dr. Burkhart and Dr. Renfro) which (1) described in great detail Petitioner's long history of behavioral problems throughout childhood, (2) suggested mitigating explanations for those problems (*i.e.*, Petitioner's removal from his family at an early age, the State of Alabama's subsequent inability to furnish Petitioner with either a stable living situation or the intensive, activity-based, psychotherapy numerous mental health professionals recommended, and Petitioner's resulting personality disorders), and (3) identified Petitioner's resulting difficulty handling abandonment and rejection in interpersonal relationships as a major contributing factor in his violent capital offenses. Simply put, Petitioner's trial counsel employed the testimony of Ms.

Copeland, Dr. Burkhart, and Dr. Renfro to (1) "humanize" Petitioner and (2) offer a rational explanation for Petitioner's otherwise incomprehensibly violent response to Sylvia Gordon's rejection of his romantic overtures.

The questions before this court are whether, given the information reasonably available to Petitioner's trial counsel at the time of Petitioner's June 1996 trial, Petitioner's trial counsel (1) conducted an objectively reasonable investigation into Petitioner's background and mental health history and (2) presented an objectively reasonable range of the available mitigating evidence. *See Sears v. Upton*, 561 U. S. 945, 953-54 (2010) (the proper focus of an evaluation of trial counsel's performance at the punishment phase of a capital murder trial is on whether counsel fulfilled their obligation to conduct a thorough investigation of the defendant's background; the objective reasonableness of trial counsel's tactical decisions must be viewed in the context of the objective reasonableness of counsel's investigation into the defendant's background). In the context of penalty phase mitigation in capital cases, the Supreme Court has held that it is unreasonable not to investigate further when counsel has information available to him that suggests additional mitigating evidence - such as mental illness or a history of childhood abuse - may be available. *See Porter v. McCollum*, 558 U. S. 30, 39-40 (2009) (trial counsel failed to interview any witnesses or to request any of the defendant's school, medical, or military records and ignored information in a report on the defendant's

competency evaluation suggesting possible mitigating evidence - including evidence of mental illness - could be gleaned from investigation into the defendant's family background and military service); *Wiggins v. Smith*, 539, U. S. 510, 524-26 (2003) (counsel failed to investigate the defendant's background beyond review of summary records from competency evaluation, presentence report, and records from the state foster care system, failed to compile a social history of the defendant, and presented no mitigating evidence concerning the defendant's background); *Williams v. Taylor*, 529 U. S. 362, 395-96 (2000) (counsel failed to conduct even a cursory investigation into the defendant's background which would have shown the defendant's parents had been imprisoned for the criminal neglect of the defendant and his siblings, the defendant had been severely beaten by his father, and had been returned to his parents' custody after they were released from prison).

Petitioner alleges no specific facts, and proffers no new evidence through affidavits or sworn declarations, showing (1) Petitioner ever communicated any information to his defense team prior to June 1996 indicating that he had been sexually abused as a child or he suffered from neurological problems or (2) any other evidence was reasonably available at that time to Petitioner's June 1996 trial counsel which would have alerted Petitioner's trial counsel to the possibility that further investigation into Petitioner's background and mental health history could have produced mitigating evidence of child sexual abuse or a neurological disorder.

A defense attorney preparing for the sentencing phase of a capital trial is not required "to scour the globe on the off chance something will turn up." *Rompilla v. Beard*, 545 U. S. 374, 382-83 (2005); *Everett v. Sec., Fla. Dep't of Corr.*, 779 F.3d 1212, 1250 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 795 (2016). Rather, diligent counsel may draw the line when they have good reason to think that further investigation would be a waste. *Rompilla v. Beard*, 545 U. S. at 383; *Everett v. Sec., Fla. Dep't of Corr.*, 779 F.3d at 1250. The scope of the duty to investigate mitigation evidence is substantially affected by the defendant's actions, statements, and instructions. *Cummings v. Sec'y, Fla. Dep't of Corr.*, 588 F.3d 1331, 1357 (11th Cir. 2009), *cert. denied*, 562 U. S. 872 (2010).

As explained at length in Section III above, in June 1996 Petitioner's trial counsel had access to extensive documentation, including academic records and psychological evaluations created during Petitioner's developmental period, which established Petitioner did not suffer from intellectual disability. Petitioner's trial counsel cannot reasonably be faulted for failing to pursue a line of inquiry that appeared objectively foreclosed by a wealth of expert mental health opinions (all finding Petitioner functioned within or just below the average range of intellectual ability) and numerous standardized IQ test scores, the lowest of which was 85. Dr. Renfro's 1995 report on Petitioner's competence to stand trial agreed with prior psychological evaluations that Petitioner was not intellectually disabled. Under such

circumstances, this court independently concludes after *de novo* review that the failure of Petitioner's trial counsel to pursue investigation into whether Petitioner was intellectually disabled did not cause the performance of Petitioner's June 1996 trial counsel to fall below an objective level of reasonableness.

Likewise, extensive documentation was available in June 1996 to Petitioner's trial counsel establishing that, throughout his developmental period, Petitioner consistently either (1) failed to make any allegation of sexual abuse or (2) denied any sexual contact whatsoever.[185] Petitioner neither alleges any facts nor furnishes

---

[185] More specifically, (1) a pediatric examination of Petitioner by Dr. John A. Saunders in March 1977 when Petitioner was seven years old reported nothing indicative of physical or sexual abuse, *i.e.*, Petitioner was described as a "physically well child" (35 SCR 3512); (2) a September 1, 1978 psychological report by Dr. R.J. Kline reported (a) no presence of a personality disorder but (b) evidence of some undesirable and "potentially problematic personality characteristics," and (c) "[i]f these tendencies are not stopped from developing, he possibly will become antisocial in later life" (31 SCR 2624; 32 SCR 2896, 2906, 2968; 35 SCR 3545); (3) a September 28 & October 12, 1982 psychological evaluation by Dr. Dennis E. Breiter (a) stating *Petitioner basically refused to talk about his past*, (b) recommending activity-oriented psychotherapy, (c) stating Petitioner is unlikely to do well in therapy in which he is simply required to talk, and (d) concluding that "only through therapy is he likely to become less withdrawn, more communicative, and begin to develop reasonable feelings of self-worth" (32 SCR 2978; 36 SCR 3611); (4) a report dated December 9, 1982 prepared by Patty Stratton and Dr. Burkhart (a) reported *Petitioner stated he had never had sexual contact of any kind* (30 SCR 2481, 2492; 31 SCR 2628; 32 SCR 2849, 2971; 35 SCR 3559) and (b) concluded individual therapy would be needed before Petitioner could benefit from group therapy (30 SCR 2483, 2494; 31 SCR 3630; 32 SCR 2851, 2973; 35 SCR 3561); (5) a May 22, 1984 report by Dr. Garry S. Grayson included findings of (a) no characteristic signs of a major depressive episode, (b) "[h]e has been generally well, without serious illness or trauma," and (c) "[t]here is no available hx [sic] of serious psychiatric illness in family members" (24 SCR 1331; 36 SCR 3619); (6) a September 25, 1984 letter from Dr. F. Lopez reported (a) a diagnosis of Conduct Disorder and (b) nothing suggestive of a history of sexual abuse (34 SCR 3321; 35 SCR 3412, 3595); (7) a November 7, 1985 psychological evaluation by William Mea and Dr. Thomas L. Boyle (a) diagnosed Petitioner with Conduct Disorder, (b) recommended Petitioner receive individual psychotherapy to resolve his feelings of being without family and to help him learn the skills needed to enter into relationships where he can gain nurturance from others, but (c) reported nothing suggestive of a history of sexual abuse (33 SCR 3195-97; 34 SCR 3322-24; 35 SCR 3405-07); and (8) a December 23, 1988 social history prepared following Petitioner's interview while

any affidavits, sworn declarations, or other legitimate evidence establishing that he ever advised his trial counsel that he had been a victim of sexual abuse. Thus, Petitioner alleges no facts and presents no evidence establishing it was objectively unreasonable for his June 1996 trial counsel to refrain from investing their limited time and energy in an investigation of potential child sexual abuse inflicted upon Petitioner. On this record, and after independent, *de novo* review, the failure of Petitioner's June 1996 trial counsel to investigate potential child sexual abuse inflicted upon Petitioner did not cause the performance of Petitioner's trial counsel to fall below an objective level of reasonableness. Clairvoyance is not a required attribute of effective representation. *Smith v. Singletary*, 170 F.3d at 1054. Petitioner's June 1996 trial counsel could reasonably have relied upon the absence of any indication of a history of child sexual abuse in Petitioner's voluminous records (and Petitioner's failure to inform them of any such abuse) to direct their investigative efforts in other directions.

Insofar as Petitioner complains that his trial counsel failed to present testimony from Petitioner's family members or others showing that (1) Petitioner's family had a history of mental problems, (2) chaos and instability existed in Petitioner's life from the time of birth, (3) Petitioner had childhood problems with

---

he was undergoing Lunacy Commission evaluation states *Petitioner denied any history of physical or sexual abuse* (28 SCR 2076, 2122).

insomnia, nightmares, and alleged delusional thinking, (4) Petitioner had academic problems, and (5) Petitioner made suicide attempts or gestures, this court's independent review of the voluminous documents submitted in evidence during Petitioner's June 1996 capital murder trial establishes these assertions are factually inaccurate. Careful review of the testimony of Ms. Copeland, Dr. Burkhart, and Dr. Renfro, as well as the many voluminous exhibits admitted into evidence near the conclusion of Dr. Barry Burkhart's testimony, amply demonstrates Petitioner's jury was well aware of (1) the fact Petitioner's family was incapable of providing for Petitioner during his infancy (based in part on bald assertions by social workers that Petitioner's parents were intellectually disabled), (2) the unstable, chaotic, nature of Petitioner's childhood, (3) Petitioner's many mental problems (usually described as "personality disorders"), (4) Petitioner's academic struggles (including the fact he made generally poor grades and was usually one grade level behind his age cohort), and (5) the incident in which Petitioner went to the roof of a building and threatened to jump off and Petitioner's other expressions (and denials) of suicidal ideation to various mental health professionals recorded in Petitioner's psychological evaluations. This court concludes after *de novo* review that it was objectively reasonable for Petitioner's trial counsel to present this mitigating evidence through the testimony of Dr. Renfro, Dr. Burkhart, and Ms. Copeland and the voluminous records introduced into evidence, rather than to attempt to present the same

mitigating evidence in anecdotal form from members of Petitioner's family with whom he had very little contact during his developmental period. In fact, presenting myriad members of Petitioner's family as fact witnesses at the punishment phase of trial (in the manner presented in Petitioner's brief in this court) might very well have undermined the theme of Petitioner's case in mitigating, *i.e.*, that Petitioner had been separated from, and deprived of stable relationships with, his family as a child - which led him to develop Schizotypal or Borderline Personality Disorder.

Finally, Petitioner alleges no specific facts showing it was objectively unreasonable for his June 1996 trial counsel to refrain from obtaining a neuropsychological evaluation of Petitioner prior to trial. Petitioner has not identified any neurological disorder with which he had been diagnosed prior to his June 1996 trial. Petitioner's voluminous psychological and psychiatric records and the testimony of Dr. Burkhart, Dr. Renfro, and Dr. Dixon revealed a variety of mental health diagnoses, including Conduct Disorder, Adjustment Reaction, Adjustment Disorder, Borderline Personality Disorder, Schizotypal Personality Disorder, and Antisocial Personality Disorder. Petitioner offers no specific facts and no evidence showing his trial counsel were aware, or reasonably should have been aware, of any information suggesting that a neurological examination of Petitioner by a neuropsychologist in June 1996 would have produced any new or different mitigating evidence beyond that already available to Petitioner's defense team. "The

defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources." *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992), *cert. denied*, 510 U. S. 829 (1993).

To be effective a lawyer is not required to pursue every path until it bears fruit or until all hope withers. *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d at 649; *Puiatti v. Sec., Fla. Dep't of Corr.*, 732 F.3d 1255, 1280 (11th Cir. 2013), *cert. denied*, 135 S. Ct. 68 (2014). "[C]ounsel is not required to present all mitigating evidence, even if the additional mitigating evidence would not have been incompatible with counsel's strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively." *Tanzi v. Sec., Fla. Dep't of Corr.*, 772 F.3d 644. 659 (11th Cir. 2014) (quoting *Halliburton v. Sec'y for Dep't of Corr.*, 342 F.3d 1233, 1243-44 (11th Cir. 2003), *cert. denied*, 541 U. S. 1087 (2004)), *cert. denied*, 136 S. Ct. 155 (2015). *Accord Debruce v. Commn'r, Ala. Dep't of Corr.*, 758 F.3d 1263, 1299 (11th Cir. 2014) ("Counsel is not required to present every nonfrivolous defense, nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy."), *cert. denied*, 135 S. Ct. 2854 (2015).

Having carefully review the entire record from Petitioner's June 1996 capital murder trial, this court concludes after *de novo* review there was nothing objectively

unreasonable with either (1) the scope of the investigation into potentially mitigating evidence undertaken by Petitioner's trial counsel or (2) the manner with which Petitioner's trial counsel presented their mitigating evidence through the lengthy, detailed, testimony of Dr. Burkhart, Dr. Renfro, and Ms. Copeland (which must be viewed in conjunction with the many detailed exhibits introduced into evidence near the conclusion of Dr. Burkhart's testimony). The failures of Petitioner's trial counsel to investigate potentially mitigating evidence of intellectual disability, neurological disorders (including post-traumatic stress disorder ("PTSD")), and child sexual abuse did not cause the performance of Petitioner's trial counsel to fall below an objective level of reasonableness. An attorney does not render ineffective assistance by failing to discover and develop childhood abuse that his client does not mention to him. *Puiatti v. Sec., Fla. Dep't of Corr.*, 732 F.3d 1255, 1281 (11th Cir. 2013), *cert. denied*, 135 S. Ct. 68 (2014); *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999), *cert. denied*, 530 U. S. 1246 (2000); *Porter v. Singletary*, 14 F.3d 554, 560 (11th Cir. 1994), *cert. denied*, 513 U. S. 1104 (1995).

As Petitioner's own pleadings admit (Doc. # 64, at pp. 141-52) if, in fact, Petitioner was sexually abused in Missouri at age six or seven and later at St. Mary's House in Mobile, evidence of Petitioner's alleged PTSD (resulting from Petitioner's alleged childhood sexual abuse) was missed by scores of mental health professionals and child care workers who evaluated Petitioner in the years following Petitioner's

return to Alabama. Petitioner's trial counsel cannot reasonably be faulted for failing to identify signs of alleged childhood sexual abuse (and associated PTSD) in June 1996 when numerous mental health experts and child-care workers who evaluated Petitioner in the years since Petitioner's return to Alabama had likewise failed to spot the same alleged signs of childhood sexual abuse and PTSD.[186]  In sum, Petitioner has alleged no facts and furnishes no evidence showing it was objectively unreasonable for Petitioner's June 1996 trial counsel to rely upon the conclusions of (1) Dr. Burkhart (*i.e.*, a diagnosis of Schizotypal Personality Disorder), (2) Dr. Renfro (*i.e.*, a diagnosis of Borderline Personality Disorder), (3) the findings of Dr. Dixon and the three psychiatrists who evaluated Petitioner for the Lunacy Commission (*i.e.*, diagnoses of Adjustment Disorder and Antisocial Personality Disorder), and (4) all of the mental health professionals who evaluated Petitioner prior to Petitioner's first capital murder trial (none of whom diagnosed childhood sexual abuse or PTSD), in deciding not to pursue a neuropsychological examination of Petitioner for evidence of childhood sexual abuse or PTSD. These ineffective assistance complaints do not satisfy the deficient performance prong of the *Strickland* standard.

---

[186] Petitioner argues in his brief in support of his habeas corpus petition in this court that a witness called by his June 1996 trial counsel to testify as to Petitioner's good character sexually assaulted Petitioner years before (Doc. # 64, at pp. 157-58). Yet Petitioner alleges no facts showing that he ever informed his trial counsel of this fact or made his trial counsel aware that he had, in fact, been sexually abused by anyone while staying at St. Mary's House in Mobile.

### b. No Prejudice

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes*, 558 U. S. at 20; *Wiggins v. Smith*, 539 U. S. at 534. The *Strickland* standard does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a trial would have been different. *Wong v. Belmontes*, 558 U. S. at 27. The prejudice inquiry under *Strickland* requires evaluating whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U. S. at 694. The likelihood of a different result must be substantial, not just conceivable. *Cullen v. Pinholster*, 563 U. S. 170, 189 (2011); *Harrington v. Richter*, 562 U. S. at 112.

This court finds after *de novo* review there is no reasonable probability that, but for the failure of his June 1996 trial counsel to present still-unidentified mitigating evidence showing Petitioner is intellectually disabled, the outcome of the punishment portion of Petitioner's June 1996 capital murder trial would have been different. For the reasons discussed at length in Section III above, (1) Petitioner is

not intellectually disabled[187] and (2) a veritable cornucopia of evidence was available to the prosecutors at the time of Petitioner's June 1996 trial to refute any effort by Petitioner's trial counsel to prove otherwise.[188]

---

[187] This court concludes after *de novo* review that, even under the latest edition of the American Psychiatric Association's standard, Petitioner does not qualify as intellectually disabled. *See* note 108 above. As the Supreme Court explained in *Hall v. Florida*, "[t]he legal determination of intellectual disability is distinct from a medical diagnosis, but it is informed by the medical community's diagnostic framework." 134 S. Ct. at 2000. The latest (fifth) edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders defines "intellectual disability" as follows:

> Intellectual disability (intellectual developmental disorder) is a disorder with onset during the developmental period that includes both intellectual and adaptive functioning deficits in conceptual, social, and practical domains. The following three criteria must be met:
>
> A.  Deficits in intellectual functions, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience, confirmed by both clinical assessment and individualized, standardized intelligence testing.
>
> B.  Deficits in adaptive functioning that result in failure to meet developmental and socio-cultural standards for personal independence and social responsibility. Without ongoing support, the adaptive deficits limit the functioning in one or more activities of daily life, such as communication, social participation, and independent living, across multiple environments, such as home, school, work, and community.
>
> C.  Onset of intellectual and adaptive deficits during the developmental period.
>
> **Note:** The diagnostic term *intellectual disability* is the equivalent for the ICD-11 diagnosis of *intellectual developmental disorders*. Although the term *intellectual disability* is used throughout this manual, both terms are used in the title to clarify relationships with other classification systems. Moreover a federal statute in the United States (Public Law 111-256, Rosa's Law) replaces the term *mental retardation* with *intellectual disability*, and research journals use the term *intellectual disability*. Thus, *intellectual disability* is the term in common use by medical, educational, and other professions and by the lay public and advocacy groups.

*Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5)*, American Psychiatric Association (2013), at p. 33. The DSM-5 also states "IQ measures are less valid in the lower end of the IQ range." *Id.*

The DSM-5 also provides the following explanation of the diagnostic features of "intellectual disability":

> The essential features of intellectual disability (intellectual developmental disorder) are deficits in general mental abilities (Criterion A) and impairments in everyday

adaptive functioning, in comparison to an individual's age-, gender-, and socioeconomically matched peers (Criterion B). Onset is during the developmental period (Criterion C). The diagnosis of intellectual disability is based on both clinical assessment and standardized testing of intellectual and adaptive functions.

Criterion A refers to intellectual functions that involve reasoning, problem solving, planning, abstract thinking, judgment, learning from instruction and experience, and practical understanding. Critical components include verbal comprehension, working memory, perceptual reasoning, quantitative reasoning, abstract thought, and cognitive efficacy. Intellectual functioning is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence. Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin of measurement error (generally +5 points). On tests with a standard deviation of 15 and a mean of 100, this involves a score of 65-75 (70 $\pm$ 5). Clinical training and judgment are required to interpret test results and assess intellectual performance.

Factors that may affect test scores include practice effects and the "Flynn effect" (i.e., overly high scores due to out-of-date test norms). Invalid scores may result from the use of brief intelligence screening tests or group tests; highly discrepant individual subtest scores may make an overall IQ score invalid. Instruments must be normed for the individual's sociocultural background and native language. Co-occurring disorders that affect communication, language, and/or motor or sensory function may affect test scores. Individual cognitive profiles based on neuropsychological testing are more useful for understanding intellectual abilities than a single IQ score. Such testing may identify areas of relative strengths and weaknesses, an assessment important for academic and vocational planning.

IQ test scores are approximations of conceptual functioning but may be insufficient to assess reasoning in real life situations and mastery of practical tasks. For example, a person with an IQ score above 70 may have such severe adaptive behavior problems in social judgment, social understanding, and other areas of adaptive functioning that the person's actual functioning is comparable to that of individuals with a lower IQ score. Thus, clinical judgment is needed in interpreting the results of IQ tests.

Deficits in adaptive functioning (Criterion B) refers to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical. The *conceptual (academic) domain* involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others. The *social domain* involves awareness of others' thoughts, feelings, and experiences, empathy, interpersonal communication skills; friendship abilities; and social judgment, among others. The *practical domain* involves learning and self-management across life settings, including personal care, job responsibilities,

Insofar as Petitioner now alleges that unidentified experts (*i.e.*, a neuropsychologist and social worker) could have furnished potentially mitigating testimony that might have proven helpful to Petitioner at the punishment phase of his June 1996 capital murder trial, Petitioner fails to identify any such expert or to proffer an affidavit, sworn declaration, or other properly authenticated documentation showing what testimony each such expert could have furnished had

---

money management, recreation, self-management of behavior, and school and work task organization, among others. Intellectual capacity, education, motivation, socialization, personality features, vocational opportunity, cultural experience, and coexisting general medical conditions or mental disorders influence adaptive functioning.

      Adaptive functioning is assessed using both clinical evaluation and individualized, culturally appropriate, psychometrically sound measures. Standardized measures are used with knowledgeable informants (e.g., parent or other family member; teacher; counselor; care provider) and the individual to the extent possible. Additional sources of information include educational, developmental, medical, and mental health evaluations. Scores from standardized measures and interview sources must be interpreted using clinical judgment. When standardized testing is difficult or impossible, because of a variety of factors (e.g., sensory impairment, severe problem behavior), the individual may be diagnosed with unspecified intellectual disability. Adaptive functioning may be difficult to assess in a controlled setting (e.g., prisons, detention centers); if possible, corroborative information reflecting functioning outside those settings should be obtained.

      Criterion B is met when at least one domain of adaptive functioning – conceptual, social, or practical – is sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings at school, at work, at home, or in the community. To meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in Criterion A. Criterion C, onset during the developmental period, refers to recognition that intellectual and adaptive deficits are present during childhood or adolescence.

*DSM-5*, at pp. 37-38.

[188] *See* notes 99-106, 110-11.

they been called at Petitioner's June 1996 capital murder trial. Petitioner also fails to furnish any specific facts or evidence showing these new witnesses were available and willing to testify to those facts at that time. Under such circumstances, Petitioner's conclusory complaints about uncalled social workers or neuropsychologists fail to satisfy the prejudice prong of the *Strickland* standard. *See Price v. Allen*, 679 F.3d at 1325 (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard).

Moreover, as explained above, Petitioner's trial counsel presented extensive mitigating evidence concerning Petitioner's background and mental health history through the testimony of Dr. Renfro, Dr. Burkhart, and Ms. Copeland. Voluminous records from Petitioner's largely institutionalized childhood were also introduced showing a wide range of information concerning Petitioner's chaotic and unstable family life, unstable social history, academic troubles, difficulty complying with the rules in various institutional settings, difficulty getting along with others, tendency toward violence, and various personality disorders. Having independently reviewed the entirety of the testimony and documentary evidence actually presented to Petitioner's sentencing jury in June 1996, this court finds after *de novo* review there is no reasonable probability the outcome of the punishment phase of Petitioner's trial

would have been different had Petitioner's trial counsel presented any of the anecdotal testimony from Petitioner's family members identified for the first time in this court in Petitioner's brief in support of his habeas corpus petition.

Any testimony in June 1996 by Petitioner's family members or others that they suspected Petitioner had been the victim of child sexual abuse would have been subject to potentially devastating cross-examination based upon the failure of those same witnesses to report their suspicions of child abuse to responsible law enforcement authorities or child protective services officers in a timely manner. Moreover, the psychological evaluations and other records admitted into evidence in June 1996 established that, throughout his childhood, Petitioner either failed to report alleged sexual abuse or denied that he had been the subject of child sexual abuse. Those denials continued even after his arrest for capital murder. Petitioner furnishes this court with no affidavits, sworn declarations, or other proper evidence showing that Petitioner or anyone else was *available* at the time of Petitioner's June 1996 capital murder trial and *willing* to testify that they had personal knowledge of facts showing Petitioner had been the victim of child sexual abuse. The fact that individuals may have been willing to make accusations of alleged sexual abuse (or that a more intensive investigation might have disclosed similar allegations) a decade or more *after* Petitioner's June 1996 capital trial does not establish any of these new witnesses identified by Petitioner's federal habeas counsel were willing

to testify under oath, subject to cross-examination and the penalty of perjury, when it truly mattered.

Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a lay witness or an expert witness) satisfy the prejudice prong of *Strickland* only by naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness's proposed testimony, and showing the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010); *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). *See also Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1262 (11th Cir. 2014) (federal habeas petitioner who failed to show an uncalled witness was available to testify at the time of trial failed to satisfy prejudice prong of *Strickland*), *cert. denied*, 135 S. Ct. 1563 (2015).

Petitioner has neither identified, nor furnished an affidavit from, a neuropsychologist or a social worker or any of the new fact witnesses identified in Petitioner's brief in this court who (1) was *available* to testify at the time of Petitioner's June 1996 capital murder trial, (2) was *willing* and able to do so, and (3) could have furnished any testimony at the punishment phase of trial that would have added to the already voluminous mitigating evidence Petitioner's trial counsel actually presented. The evidence before Petitioner's capital sentencing jury and trial

judge established (1) Petitioner's difficult, unstable childhood, (2) Petitioner's resulting personality disorders, and (3) the causal linkage between those personality disorders and Petitioner's inability to respond in a non-violent manner to Sylvia Gordon's rejection of Petitioner's romantic overtures.  Petitioner alleges no facts and presents no evidence showing any of the new fact witnesses now willing to make allegations of childhood sexual abuse (1) were willing to testify to the same matters in June 1996 or (2) ever communicated any of their suspicions about Petitioner's alleged child sexual abuse to Petitioner's trial counsel or responsible law enforcement officials.  Petitioner's own pleadings and brief acknowledge the difficulty Petitioner's federal habeas counsel had getting the new witnesses to admit the new information underlying Petitioner's childhood sexual abuse and PTSD assertions.[189]  "[T]he Sixth Amendment does not require that counsel do what is impossible or unethical." *United States v. Cronic*, 466 U. S. 648, 656 n.19 (1984).

Finally, the evidence supporting the jury's guilty verdict was overwhelming. At the punishment phase of Petitioner's capital murder trial, the jury was thus required, as was the sentencing judge, to consider as aggravating the facts that Petitioner committed multiple intentional murders during the course of a burglary, robbery, and rape.  The evidence showing the heinous, atrocious, and cruel nature of

---

[189] Doc. # 64, at p. 140 ("[T]his information was gathered only after a trained social worker and psychologist reviewed the documents and saw strong indications of possible sexual abuse, and a skilled mitigation specialist conducted the interviews necessary to uncover this information.").

Petitioner's capital murders was likewise overwhelming: Petitioner stabbed or cut

Mary Gordon more than ten times and sexually assaulted her; Petitioner stabbed or

cut Sylvia Gordon more than twenty times and posed her in a lurid manner on her

bed with her blouse and bra pulled back behind her head and her body virtually nude

beneath a blanket. Petitioner admitted to Dr. Renfro that he recalled stabbing each

of his victims once.[190] Petitioner admitted to police that he tore from the walls every

phone within the Gordon home to prevent his victims from calling for help.[191] After

his capital offenses, Petitioner admitted he (1) drove away in Mary Gordon's vehicle

with his bicycle in the trunk, (2) parked a short distance from his apartment, (3) went

inside, (4) washed up, and (5) later went to work.

Petitioner's evidence of intellectual disability is still incredibly weak to the

point of bordering on frivolousness. The jury was well aware of the thrust of most

---

[190] Deposition testimony of Dr. Guy J. Renfro, 36 SCR 3758.

[191] In his final statement to police, Petitioner made the following admissions:
Q.      Did you, did you stab her anymore while she was laying there?
A.      Um, I don't know cause when I came out of her mother's room, I went for the keys and I saw my hand still bleeding so I went to the bathroom.
Q.      All right. When you came back out of the bathroom, where was Sylvia?
A.      She was, ah, by the kitchen.
Q.      Was she bleeding badly?
A.      Ah, probably.
Q.      What happened in the kitchen?
A.      Well, I took all the phones off the wall.
Q.      Did you go around the house and take them all off?
A.      Yeah.
Q.      All right. When you came back where was Sylvia?
A.      Um, I think she was still laying by the kitchen.
34 SCR 3228; 22 SCR 900.

of Petitioner's new anecdotal accounts of Petitioner's childhood offered by Petitioner's family and friends. Petitioner's evidence of childhood sexual abuse is not only cryptic but is refuted by Petitioner's own assertions to mental health professionals throughout his childhood and following his arrest. Petitioner has presented this court with no affidavits, sworn declarations, or other proper evidence showing that any of the new witnesses Petitioner identifies in his brief in support of his habeas petition were available and willing to testify at the time of Petitioner's June 1996 capital murder trial. Even Petitioner does not allege that he was available and willing to testify at his June 1996 capital murder trial about his own alleged childhood sexual abuse. Under such circumstances, there is no reasonable probability that, but for the failure of Petitioner's trial counsel to present any of the "new" mitigating evidence identified in Petitioner's pleadings in this court, the outcome of the punishment phase of Petitioner's June 1996 capital murder trial would have been different.

### 4. Conclusion

This court concludes after independent, *de novo* review that Petitioner's complaints in his federal habeas corpus petition and brief in support about his trial counsels' allegedly inadequate investigation, development, and presentation of mitigating evidence fail to satisfy either prong of the *Strickland* standard. Accordingly, the circuit court and Alabama Court of Criminal Appeals' rejections

on the merits of Petitioner's highly conclusory versions of these same ineffective assistance complaints during the course of Petitioner's Rule 32 proceeding were neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. These aspects of Petitioner's multi-faceted ineffective assistance claim do not warrant federal habeas corpus relief under either an AEDPA or *de novo* standard of review.

## H. Failure to Introduce Evidence of Petitioner's Adaptability to Prison Life

### 1. State Court Disposition

In his final complaint of ineffective assistance by his trial counsel, Petitioner argues that his trial counsel should have (1) introduced unidentified institutional records showing Petitioner's good behavior while in prison and (2) presented risk assessment testimony from a competent expert on institutional adaptability that the State of Alabama's Department of Corrections possessed the ability to manage Petitioner "with little to no risk to other inmates or staff" (Doc. # 5, at pp. 44-46; Doc. # 64, at pp. 161-68). In Section II.L. of his fourth amended Rule 32 petition, Petitioner argued in conclusory fashion that his trial counsel failed to investigate and introduce unidentified "readily-available evidence of petitioner's good behavior in

and adaptability to prison."[192]   The circuit court held (1) Petitioner presented no evidence at his evidentiary hearing concerning this claim and (2) denied relief on the merits.[193]   The Alabama Court of Criminal Appeals held (1) Petitioner failed to allege what evidence he believed his counsel should have presented in this regard, (2) Petitioner made no factual allegations whatsoever regarding his behavior in prison or how he adapted to prison life, (3) Petitioner made only a conclusory allegation of prejudice, and (4) the circuit court properly denied this complaint.[194]

## 2.  AEDPA Review of Complaint Asserted in State Habeas Court

Petitioner alleged no specific facts and presented no evidence to the circuit court during his Rule 32 proceeding evidentiary hearing supporting these particular ineffective assistance complaints.   Moreover, Petitioner failed to allege with any reasonable degree of specificity exactly what new or additional mitigating evidence

---

[192] 49 SCR 299-300.  Petitioner also asserted in an equally conclusory manner as follows: "But for counsel's deficient performance, there exists a reasonable probability that the result of petitioner's sentencing proceeding would have been different."  Petitioner presented no evidence whatsoever during the evidentiary hearing held in his Rule 32 proceeding showing either (1) what evidence of Petitioner's good behavior or adaptability to prison existed as of June 1996, (2) what institutional records addressing these subjects existed as of June 1996, (3) what potentially mitigating testimony on these subjects a risk assessment or institutional adaptability expert could have furnished in June 1996, or (4) the identity of an expert in those areas who was available and willing to furnish such testimony in June 1996.

[193] 50 SCR 467-68; 54 SCR (Appendix 1 attached to Tab R-65), at pp. 22-23; 55 SCR (Tab R-72), at pp. 22-23.

[194] 54 SCR (Exhibit 1 attached to Tab R-64), at p. 25; 54 SCR (Appendix II attached to Tab R-65), at p. 25; 55 SCR (Tab R-73), at p. 25.

his trial counsel should have presented during Petitioner's June 1996 capital murder trial. Under such circumstances, the circuit court's and Alabama Court of Criminal Appeals' conclusions that this complaint failed to satisfy either prong of the *Strickland* standard was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and mandamus proceedings. *See Price v. Allen*, 679 F.3d at 1325 (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard); *Wilson v. United States*, 962 F.2d at 998 (holding complaint about trial counsel's failure to object to amount of drugs identified in PSIR conclusory and without merit where defendant failed to allege any facts showing a factual basis existed for a challenge to the drug quantity listed in the PSIR).

### 3. *De Novo* Review of New Complaint

In his brief in this court in support of this ineffective assistance complaint, *for the first time*, Petitioner alleges that (1) he has located an unidentified "risk assessment expert" who has reviewed unidentified prison records available prior to the 1996 re-trial, unidentified information about Petitioner's capital offenses, and

unspecified information about Petitioner's background, and (2) this unidentified expert has concluded that (a) the facts available in 1996 indicate Petitioner was a "fully manageable inmate," (b) Petitioner's background indicates he is particularly well-suited for adaptation to prison life," (c) Petitioner has been conditioned to "the structure" prison settings provide, and (d) persons with Petitioner's background are "much less likely to be destructive, subversive or otherwise rebellious" than other types of prisoners (Doc. # 64, at pp. 164-65).

### a. No Deficient Performance

In his pleadings and brief in this court, Petitioner still alleges no specific facts (and proffers no evidence) showing either what institutional records or other information regarding Petitioner's allegedly good behavior in prison or adaptability to prison life existed as of June 1996. A convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U. S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U. S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of

said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook*, 558 U. S. at 7; *Strickland v. Washington*, 466 U. S. at 688-89. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington*, 466 U. S. at 690.

Petitioner has failed to allege any facts sufficient to overcome the presumption of reasonableness afforded to the decisions of his trial counsel. Without at least some indication of what prison records existed in June 1996 showing Petitioner's good behavior and how Petitioner had adapted to prison life in the years since his first conviction for capital murder in 1989, Petitioner's conclusory assertions do not satisfy the deficient performance prong of the *Strickland* standard.

### b. No Prejudice

Petitioner's equally conclusory assertions that an unidentified risk assessment expert could have testified that (1) Petitioner was a "fully manageable inmate," (2) Petitioner's background indicates he is particularly well-suited for adaptation to prison life," (3) Petitioner has been conditioned to "the structure" prison settings provide, and (4) persons with Petitioner's background are "much less likely to be destructive, subversive or otherwise rebellious" than other types of prisoners

likewise fails to satisfy the prejudice prong of the *Strickland* standard. *See Price v. Allen*, 679 F.3d at 1325 (holding conclusory assertion that a mental health expert could have testified to a connection between the abuse the defendant suffered as a child and his subsequent actions failed to satisfy prejudice prong of the *Strickland* standard). Federal habeas corpus petitioners asserting claims of ineffective assistance based on counsel's failure to call a witness (either a lay witness or an expert witness) satisfy the prejudice prong of *Strickland* only by naming the witness, *demonstrating the witness was available to testify and would have done so*, setting out the content of the witness's proposed testimony, and showing the testimony would have been favorable to a particular defense. *Woodfox v. Cain*, 609 F.3d at 808; *Day v. Quarterman*, 566 F.3d at 538. *See also Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d at 1262 (federal habeas petitioner who failed to show an uncalled witness was available to testify at the time of trial failed to satisfy prejudice prong of *Strickland*). Petitioner has neither identified, nor furnished an affidavit from his unidentified expert. Nor has Petitioner alleged any specific facts or furnished any evidence showing this unidentified expert was available and willing to testify at the time of Petitioner's June 1996 trial.

The question here is whether there is a reasonable probability that, but for the failure of Petitioner's trial counsel to present this "new" mitigating evidence, the outcome of the punishment phase of Petitioner's capital murder trial would have

been different.  *See Hill v. Lockhart*, 474 U. S. 52, 59 (1985) (in an ineffective assistance inquiry involving the alleged failure of counsel to discover or present exculpatory evidence, the prejudice inquiry will depend in large part on a prediction whether the evidence likely would have changed the outcome of the trial).  This court independently concludes after *de novo* review there is no reasonable probability that, but for the failure of his trial counsel to either (1) present unidentified institutional records or (2) present testimony from an unidentified risk assessment expert in the manner alleged by Petitioner in his pleadings and brief in this court, the outcome of the punishment phase of Petitioner's June 1996 capital murder trial would have been different.  The evidence of Petitioner's guilt was overwhelming, as was the evidence establishing the heinous, atrocious, and cruel nature of Petitioner's multiple capital offenses.  Petitioner's trial counsel presented (1) expert testimony from mental health professionals and a child-care worker and (2) a vast array of documents detailing Petitioner's background and mental health history.  Without some fact-specific allegation showing how Petitioner actually adapted to prison life following his 1989 capital murder conviction, Petitioner's conclusory assertions that an unidentified expert could have testified (based upon unidentified prison records and other, equally unidentified, information) that Petitioner was well-suited for adaptation to prison life and less likely than other inmates to be rebellious and subversive do not satisfy the prejudice prong of the

*Strickland* standard. *See Price v. Allen*, 679 F.3d at 1325-26 (holding conclusory allegations as to what an expert witness and various fact witnesses might have testified had they been presented at trial insufficient to satisfy the prejudice prong of the *Strickland* standard).

### 4. Conclusion

This court concludes after independent, *de novo* review that Petitioner's conclusory complaint in his federal habeas corpus petition and brief in support about his trial counsels' failure to introduce (1) unidentified prison records allegedly showing Petitioner's good behavior in prison and (2) the testimony of an unidentified risk assessment expert concerning Petitioner's adaptability to prison life fails to satisfy either prong of the *Strickland* standard. Accordingly, the circuit court and Alabama Court of Criminal Appeals' rejections on the merits of Petitioner's highly conclusory versions of this same ineffective assistance complaint during the course of Petitioner's Rule 32 proceeding were neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and Rule 32 proceedings. Petitioner's final assertion of ineffective assistance by his trial counsel does not warrant federal habeas corpus relief under either an AEDPA or *de novo* standard of review.

# X. INEFFECTIVE ASSISTANCE BY STATE APPELLATE COUNSEL

## A. The Claim

In his sixth ground for federal habeas relief, Petitioner argues that his state appellate counsel rendered ineffective assistance by failing to challenge the trial court's admission during petitioner's June 1996 trial of the prior testimony of prosecution witness Frances Boozer from Petitioner's first trial (Doc. # 5, at pp. 48-53; Doc. # 64, at pp. 172-85).

## B. State Court Disposition

Francis Boozer testified during Petitioner's 1989 capital murder trial that, days before the murders, Petitioner told her he believed that if he could get rid of Sylvia's mother, he and Sylvia could have a romantic relationship.[195] Petitioner's trial counsel called two witnesses in an attempt to impeach Ms. Boozer: a co-worker of Ms. Boozer (who testified Ms. Boozer had never related Petitioner's statements about his girlfriend to her)[196] and Ms. Boozer's supervisor (who testified Ms. Boozer and Petitioner rarely worked the same shift but did on one occasion a few days before the Gordon murders).[197]

---

[195] Testimony of Francs Boozer, 11 SCR R-1692-1712.

[196] Testimony of Geraldine Dee Lancaster, 11 SCR R-1727-30.

[197] Testimony of Anita Hussey, 11 SCR R-1714-27.

At Petitioner's re-trial in January 1996, after an investigator for the prosecutor's office testified outside the presence of the jury that Ms. Boozer then resided in Florida and suffered from poor health,[198] one prosecutor and one of Petitioner's trial counsel each took the stand to testify regarding their communications vis-a-vis Ms. Boozer's possible testimony,[199] and the parties reached a stipulation in which Ms. Boozer's prior testimony would be read into the record, as would the prior testimony of Ms. Boozer's former co-worker and supervisor.[200] Ms. Boozer's testimony was read into evidence[201] but the trial court declared a mistrial before the defense had an opportunity to read the prior testimony of Ms. Boozer's co-worker and supervisor into the record.

At Petitioner's latest capital murder trial in June 1996, prior to the testimony of the same investigator from the prosecutor's office who had testified in January regarding Ms. Boozer's unavailability to testify, Petitioner's lead trial counsel advised the trial court that he believed the burden was on the prosecution to establish Ms. Boozer's unavailability to testify before her prior testimony could be

---

[198] Testimony of Blake Trammer, 17 SCR 154-58.

[199] Testimony of Teresa Harris, 17 SCR 159-60; Testimony of Allen Howell, 17 SCR 160-63.

[200] 17 SCR 163-67.

[201] 17 SCR 167-82.

admitted.[202]  The prosecutor's investigator then testified outside the presence of the jury that (1) he had contacted Ms. Boozer by telephone, (2) she was living in Florida, and (3) she advised him she was (a) still under a doctor's care due to lung problems that included emphysema and asthma, (b) she was using a ventilator to help her breathe, and (c) she was unable to travel.[203]  On cross-examination, the same witness admitted that (1) he had not independently verified whether Ms. Boozer was telling him the truth about her condition, (2) he had not obtained a statement from her physician about her condition, and (3) he did not even obtain the name of her physician.[204]  Petitioner's trial counsel objected to the prosecution reading Ms. Boozer's prior testimony as follows: "We object to reading her prior testimony.  All we have got is her hearsay as to her unavailability.  We don't have any evidence she is, in fact, unavailable."[205]  The prosecution then argued that anyone who lives out of state is "unavailable."[206]  The trial court overruled Petitioner's objection to the admission of Ms. Boozer's prior testimony.[207]  The prosecution reoffered all of the

---

[202] 41 SCR R-619.

[203] Testimony of Blake Trammer, 41 SCR R-619-21.

[204] *Id.*, 41 SCR 621.

[205] 41 SCR 621.

[206] 41 SCR 621-22.

[207] 41 SCR 622.

testimony from the prior proceeding as to the issue of her availability and the trial court admitted that evidence as well.[208]  After a short recess, Ms. Boozer's prior testimony was read into the record in the jury's presence.  On direct appeal, Petitioner's state appellate counsel did not present any challenge to the admission of Ms. Boozer's prior testimony.

In his eighth claim in his fourth amended Rule 32 petition, Petitioner asserted seven different complaints about the performance of his state appellate counsel; his fifth complaint argued in conclusory terms that his state appellate counsel should have challenged the trial court's admission of the prior testimony of Frances Boozer.[209]  The circuit court (1) held Petitioner "failed to proffer in his petition or at his evidentiary hearing what argument or legal authority appellate counsel could have presented on appeal that would have caused the appellate courts to reverse his

---

[208] *Id.*

[209] Petitioner's complaint about this aspect of his state appellate counsel's performance was as follows:

> E.    The record on appeal reveals that the State was permitted to introduce the prior testimony of an allegedly unavailable witness, Frances Boozer, over the objection of defense counsel.  Had appellate counsel raised and argued this error, there is a reasonable probability that the result of petitioner's direct appeal would have been different.

49 SCR 308.
During the evidentiary hearing held in Petitioner's Rule 32 proceeding, Petitioner's state habeas counsel called Petitioner's former state appellate counsel to testify but asked only one question regarding why Petitioner's former state appellate counsel failed to challenge on appeal the admission of Mrs. Boozer's testimony: "Was there a strategic reason for not raising on appeal the fact that the State was allowed to introduce the prior testimony of an allegedly unavailable witness, Francis [sic] Boozer?"  Testimony of Thomas M. Goggans, 51 SCR R-108.  Attorney Goggans answered "Not that I recall."  *Id.*

convictions or sentence" and (2) denied relief on the merits.[210]  The Alabama Court of Criminal Appeals held (1) Petitioner failed to allege (a) what the substance of Francis Boozer's testimony was, (b) why he believed the testimony was inadmissible, and (c) how the testimony prejudiced him; (2) Petitioner failed to satisfy his burden of pleading with respect to this allegation of ineffective assistance; and (3) the circuit court properly denied this claim.[211]

## C. The Clearly Established Constitutional Standard

The same two-pronged standard for evaluating ineffective assistance claims against trial counsel announced in *Strickland* applies to complaints about the performance of counsel on appeal. *See Smith v. Robbins*, 528 U. S. 259, 285 (2000) (holding a petitioner arguing ineffective assistance by his appellate counsel must establish both (1) his appellate counsel's performance was objectively unreasonable and (2) there is a reasonable probability that, but for appellate counsel's objectively unreasonable conduct, the petitioner would have prevailed on appeal); *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) ("The *Strickland* standard for ineffective assistance of counsel governs claims of ineffective assistance of appellate counsel."), *cert. denied*, 137 S. Ct. 2160 (2017).  Thus, the

---

[210] 50 SCR 476; 54 SCR (Appendix I to Tab R-65), at p. 31; 55 SCR (Tab R-72), at p. 31.

[211] 54 SCR (Exhibit 1 to Tab R-64), at p. 27; 54 SCR (Appendix II to Tab R-65), at p. 27; 55 SCR (Tab R-73), at p. 27.

standard for evaluating the performance of counsel on appeal requires inquiry into (1) whether appellate counsel's performance was deficient, *i.e.*, whether appellate counsel's conduct was objectively unreasonable under then-current legal standards, and (2) whether appellate counsel's allegedly deficient performance "prejudiced" petitioner, *i.e.*, whether there is a reasonable probability that, but for appellate counsel's deficient performance, the outcome of petitioner's appeal would have been different. *Smith v. Robbins*, 528 U. S. at 285; *Hittson v. GDCP Warden*, 759 F.3d 1210, 1262 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 2126 (2015). Appellate counsel who files a merits brief need not and should not raise every non-frivolous claim but, rather, may select from among them in order to maximize the likelihood of success on appeal. *Smith v. Robbins*, 528 U. S. at 288; *Jones v. Barnes*, 463 U. S. 745, 751 (1983). The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail is the hallmark of effective appellate advocacy. *Smith v. Murray*, 477 U. S. 527, 536 (1986); *Jones v. Barnes*, 463 U. S. at 751-52.

Where, as in Petitioner's case, appellate counsel presented, briefed, and argued, albeit unsuccessfully, one or more non-frivolous grounds for relief on appeal and did not seek to withdraw from representation without filing an adequate *Anders* brief, the defendant must satisfy *both* prongs of the *Strickland* test in connection with his claims of ineffective assistance by his appellate counsel. *See Roe v. Flores-Ortega*, 528 U. S. 470, 477, 482 (2000) (holding the dual prongs of *Strickland* apply

to complaints of ineffective appellate counsel and recognizing, in cases involving "attorney error," the defendant must show prejudice); *Smith v. Robbins*, 528 U. S. at 287-89 (holding petitioner who argued his appellate counsel rendered ineffective assistance by failing to file a merits brief must satisfy both prongs of *Strickland*).

## D. AEDPA Review of Complaint Asserted in State Habeas Court

Petitioner offered the state habeas court no clue in his Rule 32 petition as to why he believed the state trial court had erred in admitting the previous testimony of Frances Boozer. The state habeas court could reasonably have concluded Petitioner's conclusory assertion of ineffective assistance by his appellate counsel failed to overcome the presumption of reasonableness afforded the performance of his state appellate counsel and, thereby, failed to satisfy the deficient performance prong of the *Strickland* standard. A convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial (or appellate) counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U. S. at 687-91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith*, 539 U. S. at 523 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the

perspective of said counsel at the time).  The state habeas court could also have reasonably concluded Petitioner's conclusory complaint of ineffective assistance by his state appellate counsel regarding the admission of Mrs. Boozer's prior testimony failed to satisfy the prejudice prong of the *Strickland* standard.  *See Wilson v. United States*, 962 F.2d at 998 (holding complaint about trial counsel's failure to object to amount of drugs identified in PSIR was conclusory and without merit where defendant failed to allege any facts showing a factual basis existed for a challenge to the drug quantity listed in the PSIR).  During his Rule 32 proceeding, Petitioner failed to identify with any reasonable degree of specificity the legal basis he argued established the trial court had erroneously admitted Ms. Boozer's prior testimony.

The circuit court's and Alabama Court of Criminal Appeals' conclusion that Petitioner's conclusory complaint of ineffective performance by his state appellate counsel failed to satisfy the *Strickland* standard was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state trial and mandamus proceedings.

## E.  *De Novo* Review of New Complaints

In his federal habeas corpus petition and brief in support, Petitioner argues his state appellate counsel should have challenged on direct appeal the trial court's

admission of Ms. Boozer's prior testimony on both Confrontation Clause and hearsay grounds, in substantial part, because (1) the Alabama Supreme Court's opinion in *Ex parte Scroggins*, 727 So. 2d 131 (Ala. 1998), and the Alabama Court of Criminal Appeals' opinion in *Flowers v. State*, 700 So. 2d 966 (Ala. Crim. App. 1999), *cert. denied*, 534 U. S. 901 (2001), undermine the validity of the trial court's ruling,[212] (2) the Confrontation Clause and Rule 804 of the Alabama Rules of Evidence proscribe admission of prior testimony unless the prosecution carries a heavy burden to show the witness is unavailable to testify, and (3) the prosecution failed to present adequate evidence showing Ms. Boozer was "unavailable" in June 1996 (Doc. # 5, at pp. 48-53; Doc. # 64, at pp. 172-85).

### 1. No Deficient Performance

Petitioner's state appellate counsel filed Petitioner's brief on direct appeal on or about April 15, 1997.[213] Petitioner's appellate counsel may not reasonably be faulted for failing to anticipate the Alabama Supreme Court's July 1998 holding in *Scroggins* or the Alabama Court of Criminal Appeals' October 1999 holding in *Flowers*. Clairvoyance is not a required attribute of effective representation. *Smith v. Singletary*, 170 F.3d at 1054.

---

[212] Petitioner first presented his argument premised on the holding in *Scroggins* in his appellant's brief when he appealed the circuit court's denial of his Rule 32 petition. 53 SCR (Tab R-60), at pp. 62-65.

[213] 45 SCR (Tab R-39), at p. 69.

Petitioner's trial counsel never argued the admission of Ms. Boozer's prior testimony violated Petitioner's constitutional rights under the Confrontation Clause. Petitioner's trial counsel did argue that the testimony of the prosecution's investigator was itself hearsay and, therefore, insufficient to establish that Ms. Boozer was "unavailable." Nonetheless, Petitioner's state appellate counsel reasonably could have believed the objection raised at trial to the admission of Ms. Boozer's prior testimony was inadequate to preserve for state appellate review either a Confrontation Clause argument or a hearsay complaint.

Likewise, Petitioner's state appellate counsel reasonably could have concluded that any error on the part of the trial court in admitting Ms. Boozer's prior testimony did not rise to the level of an abuse of discretion. Under Alabama law, "the question of the sufficiency of the proof offered to establish the predicate of a witness's unavailability is addressed to the sound discretion of the trial judge . . . ." *Ex parte Scroggins*, 727 So. 2d at 134. The prosecution offered the state trial court basically the same evidence regarding Ms. Boozer's unavailability in January 1996 that it did in June 1996. Petitioner's trial counsel offered the state trial court no evidence in June 1996 rebutting the testimony of the prosecution's investigator suggesting Ms. Boozer's health prevented her from traveling from Florida back to Montgomery, Alabama, to testify. Given the obvious notice to Petitioner and his trial counsel on this subject, and the total failure of Petitioner to challenge the factual

accuracy of the prosecution investigator's June 1996 testimony concerning his telephone conversation with Ms. Boozer, Petitioner's state appellate counsel could reasonably have believed an "abuse of discretion" argument would carry little weight in the state appellate court.[214]

Petitioner's state appellate counsel also could reasonably have believed in April 1997 that the prosecution investigator's uncontroverted, albeit hearsay,

---

[214] During his brief testimony at the evidentiary hearing held in Petitioner's Rule 32 proceeding, attorney Goggans and the State's attorney had the following exchanges:

    Q.    And if there were case law, say, for example, that any case that narration of a videotape is admissible as long as the individual narrating the videotape is present for cross-examination, then you might not raise that issue, because it would not be meritorious; is that right?

    A.    It is kind of a general question, but let me say this. There are areas, for example, photographic evidence, videotape evidence which I might argue strenuously in the trial court, and sometimes you win and sometimes you don't win in the trial court, but the standard of a review on appeal of getting something reversed when the appellate standard is abusive [sic] discretion, something I may have argued strenuously in the trial court might not be appropriate to argue on appeal just because of the appellate review standard.

    Q.    Yes, sir. So, in other words, you look at the record, decide what issues you might want to raise and go from there, depending on if you have done the trial yourself and the appeal? Let me rephrase that for you. If you try the case, do you often do the appeal?

    A.    Yes.

    Q.    And I believe you indicated you may argue something before the court and then decide on appeal if it didn't work in the trial court, it is not going to work in front of the criminal Court or Supreme Court?

    A.    That's correct. It could be that the trial judge was right. It could be that I still think the trial judge was wrong but I am just not going to get it reversed.

    Q.    Yes, sir. And obviously you didn't try this case?

    A.    No, I did not.

    Q.    So you were bound in your appellate brief by the record that had already been made?

    A.    That's correct.

Testimony of Thomas M. Goggans, 51 SCR R-110-12.

testimony that (1) he had contacted Ms. Boozer by telephone, (2) she was living in Florida, and (3) she was too ill to travel was sufficient under Alabama law to permit the trial court to admit her prior testimony under Rule 804(a)(4) of the Alabama Rules of Evidence. "If a witness who has given testimony in the course of a judicial proceeding between the parties litigant, before a competent tribunal, subsequently dies or becomes insane, or after diligent search is not to be found within the jurisdiction of the court, or if that which is equivalent is shown, *that he has left the state permanently, or for such an indefinite time that his return is contingent and uncertain,* it is admissible to prove the substance of the testimony he gave formerly." *Ex parte Scroggins*, 727 So. 2d at 133-34 (emphasis added) (quoting *Williams v. Calloway*, 281 Ala. 249, 251-52, 201 So. 2d 506, 508 (1984)).

Finally, near the conclusion of the hearing held January 31, 1996, during which the trial court declared a mistrial, the parties appeared to stipulate on the record that, at the forthcoming retrial (which eventually took place in June 1996), they would adhere to the same stipulations regarding witnesses they had entered into during the abbreviated January 1996 retrial.[215] Petitioner's state appellate counsel

---

[215] More specifically, after the trial court declared a mistrial and the parties and trial court began discussing possible future dates for a new trial, the following exchanges took place:

> BY MS. BROOKS: On other matter if we could, could we ask of defense counsel if we can enter into the same stipulations, or should we continue to make efforts to get our witnesses here? If they are prepared to answer that?

> BY THE COURT: Any reason to think that we would not be able to enter into the same stipulations?

could reasonably have believed this stipulation applied to the parties' agreement during the January 1996 trial to permit the admission of Ms. Boozer's prior testimony in exchange for the admission of the prior testimony of her former co-worker and former supervisor and, thus, could undermine any appellate argument challenging the admission in June 1996 of Ms. Boozer's prior testimony.

For any of the foregoing reasons, Petitioner's state appellate counsel reasonably could have concluded that including an argument in Petitioner's direct appeal brief challenging the trial court's admission of Ms. Boozer's prior testimony was unlikely to convince the state appellate court to reverse Petitioner's convictions or sentence. After independent, *de novo* review, this court concludes Petitioner's complaint about his state appellate counsel's failure to assert a ground for relief on appeal complaining about the admission of Ms. Boozer's prior testimony does not satisfy the deficient performance prong of the *Strickland* standard.

### 2. No Prejudice

Rule 804(b)(1) of the Alabama Rules of Evidence provides that a witness's testimony in a former trial or action is admissible if the declarant is "unavailable" and the testimony is:

---

BY MR. HOWELL: No, sir, same stipulations. There's no reason to bring the witnesses down.

BY THE COURT: Same stipulations would be used. * * *

17 SCR 222-23

given (A) under oath, (B) before a tribunal or officer having by law the authority to take testimony and legally requiring an opportunity for cross-examination, (C) under circumstances affording the party against whom the witness was offered an opportunity to test his or her credibility by cross-examination, and (D) in litigation in which the issues and parties were substantially the same as in the present cause.

Rule 804(a)(4) of the Alabama Rules of Evidence provides that a witness is "unavailable" when he or she "is unable to be present or to testify at the hearing because of death or then existing physical or mental infirmity."

The Alabama appellate court opinions in *Scroggins* and *Flowers* do not address the facts that were before Petitioner's state trial court in June 1996. In *Scroggins*, the lone witness (a prosecution investigator) who testified regarding the missing witness's unavailability testified (1) he conducted his search for the missing witness primarily by phone, (2) he did not know whether the missing witness had been served with a subpoena by the sheriff's office, (3) he had placed a hold on the missing witness with juvenile authorities but (4) even though the missing witness was arrested and placed in a juvenile facility, the witness had been released before Scroggins' trial. *Ex parte Scroggins*, 727 So. 2d at 134. Thus, there was evidence before the trial court in *Scroggins* suggesting the missing witness in that case had (1) recently been in the State of Alabama and (2) been apprehended and detained, at least briefly prior to trial, by law enforcement authorities, who inexplicably let him go. In *Flowers*, the prosecution "presented no evidence at all concerning its efforts to obtain" the missing witness's presence at trial and proffered no information

regarding the steps, if any, it took to procure the missing witness; instead, the prosecution informed the trial court that the missing witness was in California and "that's the best we can do at this point." *Flowers v. State*, 799 So. 2d at 975.

In contrast, at the time of Petitioner's June 1996 capital trial, it was uncontroverted from the prosecution investigator's testimony (in both January 1996 and June 1996) that Ms. Boozer had been living out of state (in Florida) for some time and was under a physician's care for emphysema and asthma, conditions which required her to use a ventilator and rendered her unable to travel. Neither *Scroggins* nor *Flowers* addresses (1) a situation in which there was testimony an allegedly unavailable witness was definitively located and resided in another jurisdiction or (2) the amount or type of evidence necessary to establish a witness's "then existing physical or mental illness or infirmity" renders him or her "unavailable" for purposes of Rule 804(a)(4) of the Alabama Rules of Evidence.[216]

---

[216] For similar reasons, Petitioner's reliance upon The Eleventh Circuit's holding in *United States v. Acosta*, 769 F.2d 721 (11th Cir. 1985), is unpersuasive. In *Acosta*, the defense sought to admit prior testimony of the defendant's wife (as an alibi witness) because, as explained by defense counsel, "[s]he's got a baby . . . and the baby is not well . . . ." *United States v. Acosta*, 769 F.2d at 722 n.2. The Eleventh Circuit (1) concluded the defendant offered no evidence that he had requested the witness to testify or that she had refused to do so, (2) found there was no medical testimony as to the nature or severity of the child's illness or that the child's health would be jeopardized by the mother's absence, and (3) found there was no pretrial motion for a continuance in order to produce the witness at a later trial. *Id.*, 769 F.2d at 723. The Eleventh Circuit held the trial court had not abused its discretion in determining that the naked statement of the defendant's trial counsel failed to satisfy the standard for establishing Mrs. Acosta was "unavailable" to testify at her husband's trial. *Id.* Thus, *Acosta* reaffirms that the appellate standard of review on the question of a witness's "availability" is abuse of discretion. Moreover, in contrast to *Acosta*, (1) it was Ms. Boozer's own health, not that of another person, that prevented her from traveling and testifying, (2) there was no evidence suggesting Ms. Boozer was related in any manner to the

While the prosecution did make note of Ms. Boozer's testimony in its June 1996 guilt-innocence phase closing argument,[217] there was no genuine doubt at that point about whether Petitioner fatally stabbed Mary and Sylvia Gordon. Dr. Renfro testified without contradiction that Petitioner informed him he remembered stabbing each victim once.[218] The other evidence establishing Petitioner's commission of the fatal stabbings was overwhelming: it included Petitioner's bloody shoe prints at the crime scene,[219] the presence of the victims' blood on Petitioner's clothing found the

---

prosecution, and (3) there was no evidence Ms. Boozer was even present within the State of Alabama in June 1996.

[217] The prosecution twice mentioned Ms. Boozer's testimony during closing argument at the guilt-innocence phase of petitioner's June 1996 capital murder trial:

> The seed of this [sic] heinous, vicious killings was planted not just on March 11. No, it wasn't. It was planted several weeks or days beforehand. How do we know that? We know that from the statements he made to Frances Boozer whose testimony was read to you. When he said, when this defendant said, I would rather see her, Sylvia, dead than anyone have her. When he couldn't come around like he wanted to, when he couldn't be in control like he wanted to, he stabbed the life out of her. That's what this case is about. The case is about the choice this man made. That's why he sits where he sits today.

43 SCR R-1157.

> How else do we know that David Freeman intended this course of conduct, that he intended to do what happened here, to murder these two women? It is like Mr. McNeil has already explained to you, he had a prior conversation with Francis Boozer and told you [sic] that if he couldn't have Sylvia, nobody would. He also told Sylvia in that letter he wrote, I don't want to lose you like all my other girlfriends. And he didn't, did he? He took care of that.

43 SCR R-1169-70.

[218] Deposition testimony of Dr. Guy J. Renfro, 36 SCR 3758.

[219] It was un-contradicted at trial that partial bloody footprints found at the crime scene, including one found on the blouse of Mary Gordon (which was still on her body) matched the Petitioner's shoe. Stipulation regarding testimony of Craig Bailey, 41 SCR R-639-40.

morning after the murders at his apartment,[220] and Petitioner's final statement to the police, in which he admitted that he tore from the walls all the telephones in the Gordon home (presumably to keep his victims from calling for help).[221] It was undisputed that each victim was stabbed or cut multiple times.[222] The evidence, when viewed in the light most favorable to the jury's verdict, established that Petitioner sexually assaulted Mary Gordon *after* he stabbed her the first time.[223] It

---

[220] A forensic serologist testified without contradiction via stipulation that blood consistent with the victims was found (1) on the gearshift of Mary Gordon's vehicle (which was found a short distance from Petitioner's apartment the morning after the murders) and (2) on the Petitioner's blue jeans, underwear, jacket, and shoes found at Petitioner's apartment the morning after the murders. Stipulation regarding the testimony of Phyllis Rollan, 41 SCR 6-632-33.

[221] The audiotape-recorded statement Petitioner gave to police on March 14, 1988 was admitted into evidence as State Exhibit 12 and played in open court. Testimony of Gary Graves, 41 SCR R-611-12. A verbatim transcription of Petitioner's question-and-answer-formatted statement given March 14, 1988 was admitted into evidence as State Exhibit 13A [41 SCR R-612] and appears at 34 SCR 3225-30 and 22 SCR 897-902.

[222] Testimony of Dr. James Lauridson, 41 SCR R-646-82.

[223] A forensic serologist testified without contradiction via stipulation that semen recovered at autopsy from the vaginal swabs of Mary Gordon's body were consistent with Petitioner. Stipulation regarding the testimony of Phyllis Rollan, 41 SCR R-624.

In his final statement to police, admitted into evidence as State exhibit 13A, Petitioner stated as follows:

[Q.]    Okay. You got dizzy for a little while. Then what happened to you, when you can remember what, you know, came back?
[A.]    All right. After I got dizzy, um, the next thing I knew Sylvia was laying on the couch bleeding, um, I had a knife in my hand, my hand was cut, um, her mother was coming in the door, she said ah hi, how are you, and I'm not sure if I said anything or not, ah, she walked in about four feet, looked around at Sylvia and I stabbed Mrs. Gordon in the back.
[Q.]    Did she fall at that time?
[A.]    Yes, she fell, she said, I'm not sure if she said something it sounded like why and then ah she headed for her room and I forced my way in ah, I fell again, well, I fell, and then when I came to she was laying beside me, well not beside beside me, close, close to me, um, she was whizzing, so I got up, I went and got the car keys, then I went to the bathroom and cleaned my hands as best I could, wrapped

234

something around my hand, ah, I cleaned the bathroom up.  When I came out, Sylvia was at the kitchen door.  At that point I ah took all the phones out of, of the wall sockets, and something happened, um, um, I can't quite get it, but I think, I know I went out to the car and put my bike in the trunk, um, I left the car door open, came back, um, the lights was [sic] on so I cut 'em all off.  Um, at that time I felt dizzy again, ah, so I went and got some water, went to the, um, I left their house and ah I drove around a couple of hours.  I, I went, I went by my apartment, I seen [sic] my roommate Henry walking towards the apartment so I kept on going and ah I parked the car somewhere and i fell asleep.  When I woke up my shoes was untied, my bike was gone, my shirt and jacket was off, um, the radio was on, I couldn't find my shirt so I put my jacket back on, then I left, drove around.  I went by Junior Food Store and that lady I was talking about earlier was there that I couldn't get the name of, she was there.  So I got a pack of cigarettes and a Coke.  I stayed there for about ten minutes, then I left.  I drove around for, I don't know how long, um, I think I got lost once.  Um, anyway, I parked the car next door behind some bushes or somewhere back there and I went through the bushes to my apartment.  I got in my apartment.  I sit down on the couch.  I guess I fell asleep or something.  I woke up.  I felt my hand.  It was, you know, like it was, I didn't look down at first.  When I did look down it was all bloody, ah, so I washed it off, I changed my clothes, took a bath, ah, wrapped my hand, ah . . . .

34 SCR 3225-26; 22 SCR 897-98.

Subsequently, in the same statement, Petitioner made the following admissions:

Q.      Okay.  The mother came in, she asked how you were doing.  You didn't say anything and she walked on in to the house and then at that time you stabbed the mother in the back?

A.      Yeah

Q.      All right.  She fell down on the floor?

A.      Yeah.

Q.      All right.  Did you stab her anymore while she was on the floor?

A.      I don't know.

Q.      Okay.  Did you go, did you go back over to Sylvia at that time?

A.      I don't know that either.

Q.      All right.  The next thing you remember is the mother, was, did she get up and walk to her bedroom or did she crawl?

A.      I think she walked to the bedroom.

Q.      Did she ever scream?

A.      I don't know.

Q.      All right.  When she was in her bedroom, did she shut the door?

A.      She tried.  I know she tried cause I got my, my hand in the door and then she slammed the door, and I forced my way in.

34 SCR 3227; 22 SCR 899.

*               *               *

Q.      All right.  When you walked back out was Sylvia still laying on that couch?

A.      No, she was laying beside the chair that's by the ah mantle piece by the fireplace.

was undisputed that some of Mary Gordon's stab wounds were inflicted post-mortem.[224]

More significantly, Ms. Boozer's testimony (that Petitioner told her (1) he loved Sylvia Gordon and wanted to marry her, (2) he believed Mary Gordon was an impediment to his having a romantic relationship with Sylvia, (3) he believed that if he could get rid of Mary Gordon, he would be able to have a romantic relationship with Sylvia, and (4) he would rather see Sylvia dead than let her go) was substantially corroborated by (and cumulative of) the physical evidence at the crime scene (which demonstrated the rage displayed by Petitioner when he was rejected

---

Q. Uh-huh. She was laying on the floor?
A. Yeah.
Q. Was she trying to get in there?
A. In where?
Q. In her mother's room where you were at?
A. I don't know.
Q. Did you, did you stab her anymore while she was laying there?
A. Um, I don't know cause when I came out of her mother's room, I went for the keys and I saw my hand still bleeding so I went to the bathroom.
Q. All right. When you came back out of the bathroom, where was Sylvia?
A. She was, ah, by the kitchen.
Q. Was she bleeding badly?
A. Ah, probably.
Q. What happened in the kitchen?
A. Well, I took all the phones off the wall.
Q. Did you go around the house and take them all off?
A. Yeah.
Q. All right. When you came back where was Sylvia?
A. Um, I think she was still laying by the kitchen.
34 SCR 3228; 22 SCR 900.

[224] Testimony of Dr. James Lauridson, 41 SCR R-658-59.

by Sylvia) and the testimony of Deborah Gordon Hosford.[225]  Mrs. Hosford testified

without contradiction that (1) Mary Gordon was "aggravated" that Petitioner was at

their house so often and (2) when Deborah brought her sister home from school on

the afternoon of March 11, 1988, Sylvia told her that she was going to get rid of

Petitioner that day.[226]  Ms. Boozer's testimony was also consistent with the expert

testimony of Dr. Burkhart and Dr. Renfro, both of whom described Petitioner as

displaying personality disorders in which Petitioner tended to over-idealize the

object of his affection but then rapidly shift to hostility toward the same

individual.[227]  Furthermore, Petitioner's propensity for violent outbursts was well-

documented by the evidence presented during his June 1996 trial, including (1) his

---

[225] Testimony of Frances Diane Boozer, 11 SCR R-1695-97.

[226] Testimony of Deborah Gordon Hosford, 40 SCR R-464-65.

[227] Dr. Burkhart testified (1) Petitioner met the criteria for both Schizotypal Personality Disorder and Borderline Personality Disorder, (2) Borderline Personality Disorder is marked by (a) instability in interpersonal relationships (b) frantic efforts to avoid real or perceived abandonment, (c) inappropriate and violent anger when confronted with abandonment or rejection, and (d) *initial over-idealization of the object of their affection then when the relationship fails, demonization*, and (3) at the time of his capital offenses, Petitioner displayed extreme reactivity to interpersonal stress, including intense anger.  Testimony of Dr. Barry Burkhart, 41 SCR R-736-38, R-742-49, R-754-55.

Dr. Renfro testified Petitioner's Borderline Personality Disorder was characterized by a pattern of unstable and intense interpersonal relationships which alternated between extremes of over-idealization and de-valuation of the object of Petitioner's attention.  Deposition testimony of Dr. Guy J. Renfro, 35 SCR 3652-53.

Ms. Boozer's testimony regarding the statements made to her by Petitioner supported Dr. Burkhart's and Dr. Renfro's opinions that (1) Petitioner over-idealized his relationship with Sylvia Gordon and (2) Petitioner displayed a violent reaction when Sylvia rejected his romantic overture.

custodial and mental health records introduced into evidence in June 1996,[228] (2) the

testimony of Dr. Burkhart,[229] and (3) the testimony of Dr. Renfro.[230]

---

[228] For instance, a social worker's report in March 1977 when Petitioner was seven years old reported (1) Petitioner repeated the first grade, (2) Petitioner kicked his teacher and told him he didn't have to do what he had been told, and (3) Petitioner's school tantrums and disruptive classroom behavior.  35 SCR 3503-11.

A report dated November 1977 by Dr. R.J. Kline (1) diagnosed Petitioner with Adjustment Reaction, (2) stated Petitioner has found that stubbornness and exaggerated behavior "gets him what he wants," and (3) recommended that Petitioner receive individual therapy and those responsible for him "ignore tantrums, use time out and stop running after him." 35 SCR 3606-07.

An evaluation in September 1978 by Dr. R.J. Kline (1) found no indication of a personality disorder but (2) did note evidence of some undesirable and potentially problematic personality characteristics, and (3)  concluded that "[i]f these tendencies are not stopped from developing, he possibly will become antisocial in later life."  35 SCR 3545.

A psychological evaluation in January 1979 by Dr. Dennis E. Breiter (1) noted Petitioner's :long and difficult history which shows frequent moves and placements, (2) noted one placement in which Petitioner was described as having bizarre behavior and a strong tendency toward engaging in aggression, and (3) concludes Petitioner would "certainly go to the extreme to test the limits within any foster family."  35 SCR 3546-47; 36 SCR 3608-09.

A psychological evaluation performed in September and October 1982 by Dr. Dennis E. Breiter stated (1) Petitioner basically refused to talk about his past, (2) "as he grows older there is a high potential for acting out his fears and anxieties," (3) Petitioner "really is in need of psychotherapy" that is activity oriented, and (4) Petitioner is "unlikely to do well in therapy where he is simply required to talk."  35 SCR 3548-50; 36 SCR 3610-12.

A social worker's report prepared in March, 1983, when Petitioner was thirteen discussed (1) Petitioner's temper tantrum-like behavior, destruction of property, and aggression, (2) Petitioner's discharge from St. Mary's House after he hit a child care worker in anger, and (3) Petitioner's admission he needed to work on his temper tantrum-like behavior.  35 SCR 3418-20, 3577-79.

Social worker reports on Petitioner covering the period January 1983 through April 1984 discussed (1) Petitioner's tantrum-like behavior, (2) an incident in which Petitioner threw a radio at a staff member, (3) Petitioner's increased physical aggression, particularly focused on a female resident Petitioner knew from a previous placement, (4) Petitioner's "difficulty in taking responsibility for negative behaviors," and (5) Petitioner's escalating negative behaviors.  35 SCR 3414-17; 35 SCR 3580-88; 36 SCR 3613-16.

A psychological evaluation performed by Dr. Dale Wisely in May, 1984 when Petitioner was fourteen (1) diagnosed Petitioner with "Adjustment disorder with mixed disturbances of emotions and conduct," (2) concluded Petitioner was impulsive and lacking in social skills, self-understanding, and personal insight, and (3) recommended psychotherapy.  35 SCR 3409-11, 3526-28, 3589-91.

Dr. Garry Grayson reported in May 1984 that (1) Petitioner's physical examination was normal and (2) Petitioner had been diagnosed with Adjustment disorder with disturbance of emotion and conduct.  36 SCR 3619.

Dr. Garry Grayson reported in August 1984 that (1) Petitioner reported frustration and mounting anger with the staff at his residential facility and (2) Petitioner's "impulsivity leads to behavior of a kind that bears real jeopardy, particularly to himself but potentially to others." 35 SCR 3570.

A psychiatric evaluation performed in November 1984 when Petitioner was fifteen by Dr. F. Lopez (1) diagnosed Petitioner with "Conduct Disorder, Socialized, Aggressive," (2) noted Petitioner had recently scored a full scale 97 on an IQ test, and (3) also noted a history of oppositional behavior, stealing, physical and verbal abuse, immaturity, temper tantrums, and running away. 35 SCR 3412, 3595.

A release summary prepared by several staff at the Eufaula Adolescent Center, including Dr. Bayard S. Tarpley, on November 1, 1985 (1) reported Petitioner was demanding as well as self-centered in his relationships with others and (2) recounted an incident in August 1985 in which Petitioner "eloped' from that facility with a female resident and broke into a trailer in Barbour County, which led to juvenile proceedings being brought against him for burglary and criminal mischief. 36 SCR 3600-01.

A psychological evaluation performed by William Mea and Dr. Thomas Boyle in November, 1985 when Petitioner was 16 years old diagnosed Petitioner with Conduct Disorder, *i.e.*, the juvenile precursor to Antisocial Personality Disorder. 35 SCR 3405-07.

Dr. Dixon's January 1989 summary report for the Lunacy Commission noted all three psychiatrists who evaluated Petitioner found no evidence of mental illness. 35 SCR 3478-82.

A report prepared in July, 1986 when Petitioner was seventeen (1) reported Petitioner had displayed "consistently antisocial behavior" during his stay at a Bell Road Group Home, (2) noted Petitioner seemed to "derive a sense of satisfaction from being 'labeled' negatively," (3) recounted an incident in which petitioner reacted violently to an attempt by a staff member to search Petitioner and later got into a fight with another resident. 35 SCR 3450-53.

Dr. Renfro's September 1995 report notes Petitioner's (1) chronic problem dealing with his anger, (2) impulsivity, emotional immaturity, and history of emotional variability, (3) fear or abandonment and rejection, (4) difficulty establishing and maintaining good interpersonal relationships, (5) desires "to feel in control" and "to receive attention from others," (6) tendency to engage in angry outbursts and impulsive and self-defeating behavior, and (7) Borderline Personality Disorder. 35 SCR 3464-73.

[229] Dr. Burkhart testified that (1) Petitioner displayed impulsivity, (2) Petitioner showed marked or extreme reactivity to interpersonal stress, (3) Petitioner displayed inappropriate intense anger, including tantrums from an early age, (4) Petitioner assaulted other residents at the Gateway facility, (5) Petitioner's records are full of instances where he was violent, reactive, and refused to follow orders, (6) Petitioner's records show he was violent from age eight, when he was referred for evaluation, (7) Petitioner was removed from a foster home because of his aggressive behavior with a young child, and (8) when angry with persons in authority, Petitioner displayed low impulse control and acted out. Testimony of Dr. Barry Burkhart, 41 SCR R-727, R-747, R-750, R-752, R-754-55; 42 SCR R-847-48, R-850, R-857-58, R-865-66.

[230] Dr. Renfro testified in his deposition that (1) Petitioner had been impulsive throughout his life and this fact was well documented, (2) Petitioner's records show at times he has displayed rapid shifts in emotions, inappropriate intense anger, and extreme reactivity to interpersonal stresses, (3) Petitioner exhibits a depressed or dysphoric mood interrupted by periods of anger,

Petitioner argues the testimony of Ms. Boozer was critical to the issue of "premedication" (Doc. # 64, at pp. 184-85). Contrary to Petitioner's argument in his brief in this court, the issue of "premedication" was not properly before the jury at either phase of Petitioner's June 1996 capital murder trial. The trial court did not instruct the jury at the guilt-innocence phase of trial that it had to consider whether Petitioner's offenses were "premeditated"; rather, the trial court properly instructed the jury it needed to determine whether Petitioner intentionally murdered his victims.[231] The number and nature of the wounds Petitioner inflicted on his victims established beyond any reasonable doubt that his attacks upon each victim were intentional, regardless of whether they were "premeditated." Unlike some jurisdictions, the Alabama capital sentencing statute does not include "premedication" as a statutory aggravating factor.[232] The trial court did not instruct Petitioner's jury at the punishment phase of trial that it could consider

---

panic, or despair, and (4) Petitioner has displayed a history of angry outbursts from age eight. Deposition testimony of Dr. Guy J. Renfro, 36 SCR 3653-55, 3663, 3682-83, 3685-90, 3694, 3702.

[231] 44 SCR R-1214-61, R-1264-66.

[232] *See Burgess v. State*, 827 So. 2d 134, 181-83 (Ala. Crim. App. 1998) (discussing the statutory aggravating factors contained in § 13A-5-49 of Code of Alabama, 1975, and finding a sentencing court's commentary in its sentencing order on the "premeditated" nature of the offense did not constitute consideration of an improper non-statutory aggravating factor), *aff'd Ex parte Burgess*, 827 So. 2d 193 (Ala. 2000), *cert. denied*, 537 U. S. 976 (2002); *Ex parte Clark*, 728 So. 2d 1126, 1141 n.4 (Ala. 1998) (comparing and contrasting Florida's aggravating circumstance for "cold, calculated, and premeditated" murders with the Alabama capital sentencing statute's "heinous, atrocious, or cruel" aggravating circumstance); *Ala. Code* § 13A-5-49 (1975).

"premeditation" when weighing the aggravating factors against the mitigating evidence and making its sentencing recommendation.[233]   Thus, Ms. Boozer's testimony was neither critical nor crucial to any issue properly before the jury at either phase of Petitioner's June 1996 capital murder trial; in fact, her testimony tended to support the expert opinions of Dr. Burkhart and Dr. Renfro, *i.e.*, that Petitioner displayed a personality disorder which left him likely to over-idealize the object of his affection but also likely to rapidly become inappropriately angry (and even violent) when confronted with real or perceived rejection or abandonment.

This court concludes after independent, *de novo* review there is no reasonable probability that, but for the failure of Petitioner's state appellate counsel to include a ground on direct appeal challenging the admission of Ms. Boozer's prior testimony, the outcome of Petitioner's direct appeal would have been different. Even if the state appellate court concluded the circuit court erred when it concluded Ms. Boozer was unavailable to testify within the meaning of Rule 804(a)(4), there is no reasonable probability the state appellate court would have reversed Petitioner's capital murder convictions for that reason.  The allegedly erroneous admission of Ms. Boozer's testimony at Petitioner's June 1996 trial was harmless at best.  The admission of Ms. Boozer's prior testimony added very little to the prosecution's

---

[233] 44 SCR R-1303-23, R-1325-26.

overwhelming evidence showing Petitioner committed a pair of intentional murders during the course of a burglary, robbery, and rape, which murders were both heinous, atrocious, or cruel. In fact. Ms. Boozer's descriptions of Petitioner's romantic obsession with Sylvia Gordon furnished support for the expert opinions describing Petitioner's personality disorders offered by Dr. Burkhart and Dr. Renfro and thereby strengthened Petitioner's case in mitigation.

## F. Conclusion

The state habeas court acted in an objectively reasonable manner when it rejected Petitioner's conclusory assertion that his state appellate counsel rendered ineffective assistance by failing to raise a claim on direct appeal challenging the admission of Ms. Boozer's prior testimony. The state habeas court's rejection on the merits of this complaint about the performance of Petitioner's state appellate counsel was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in Petitioner's state habeas corpus proceeding. Furthermore, this court independently concludes after *de novo* review that Petitioner's new complaints about the failure of his appellate counsel to raise a claim on direct appeal challenging the admission of Ms. Boozer's prior testimony fail to satisfy either prong of the *Strickland* standard. Petitioner's seventh claim in

his federal habeas corpus petition does not warrant federal habeas corpus relief under either an AEDPA or *de novo* standard of review.

## XI. LEAD TRIAL COUNSEL'S ALLEGED CONFLICT OF INTEREST

### A. The Claim

In his third claim for federal habeas corpus relief, Petitioner argues that (1) his lead trial counsel suffered from a debilitating psychological condition (identified by Petitioner as "gender identity crisis" or "gender confusion") throughout the course of Petitioner's trial and (2) because his trial counsel failed to inform Petitioner of this fact, an actual conflict of interest existed between Petitioner and his lead trial counsel which prejudiced Petitioner (Doc. # 5, at pp. 15-19).[234]

### B. State Court Disposition

In his seventh and ninth claims in his fourth amended Rule 32 petition, Petitioner argued in conclusory terms that (1) his trial counsel "labored under the debilitating, judgment-impairing effects of a psychological condition which resulted in the alteration of counsel's gender, and permanently disabled counsel from the practice of law,"[235] and (2) his Sixth Amendment right to the effective assistance of

---

[234] As was also true of Petitioner's *Atkins* claim, Petitioner did not furnish any briefing in support of this claim in his 218-page brief in support of his federal habeas corpus petition, *i.e.*, Doc. # 64.

[235] 49 SCR 304-05. Petitioner alleged no additional facts in support of this conclusory assertion in his fourth amended Rule 32 petition. During the evidentiary hearing held in Petitioner's Rule 32 proceeding, he called his trial co-counsel to testify but asked them no

counsel was "violated as a result of his representation at trial by lead counsel who labored under an actual conflict of interest which adversely affected petitioner's defense."[236]

During the evidentiary hearing held in Petitioner's Rule 32 proceeding, Petitioner's state habeas counsel questioned Petitioner's co-counsel at trial, attorney William Abell, about his work as an associate in the same law firm as Petitioner's lead trial counsel (attorney Howell) and a reverse discrimination civil lawsuit in which attorney Howell had served as trial counsel but never asked any questions about attorney Abell's observations of the quality of attorney Howell's pretrial

---

questions regarding any "gender confusion" or "gender identity crisis" allegedly experienced by Petitioner's lead trial counsel.

[236] 49 SCR 309-10. In support of this conclusory assertion in his fourth amended Rule 32 petition, Petitioner alleged as follows:

> As alleged in Ground VII, *supra*, trial counsel suffered throughout his representation of petitioner from the debilitating, judgment-impairing effects of a psychological condition which subsequently resulted in the alteration of counsel's gender, and permanently disabled counsel from the practice of law. Due to the controversial and potentially embarrassing nature of this information, however, counsel did not reveal his condition, or the effect it had on his judgment and ability to effectively represent petitioner, to either his client or the trial court. By putting his personal interest in maintaining secrecy about his condition ahead of his obligation to reveal the impairments brought about by that condition, counsel deprived petitioner of his right to request that new counsel, free of psychological impairments, be appointed. As a result, petitioner was forced to go forward at trial with lead counsel whose judgment was impaired to such an extent that counsel failed to function in the manner guaranteed by the Sixth Amendment. *See also* ground VII.

49 SCR 309-10. During the evidentiary hearing held in Petitioner's Rule 32 proceeding, he called his trial co-counsel to testify but asked them no questions regarding any "gender confusion" or "gender identity crisis" allegedly experienced by Petitioner's lead trial counsel.

decision-making or the quality of attorney Howell's performance during trial as lead trial counsel for Petitioner.[237]  During the same hearing, Petitioner's state habeas counsel questioned Petitioner other co-counsel at trial, attorney John David Norris, who (1) denied ever receiving any information from attorney Howell regarding the possibility of any gender identity issues attorney Howell might have been suffering and (2) denied any knowledge that attorney Howell had ever discussed with Petitioner any concerns attorney Howell might have had about his ability to discharge his duties of loyalty and diligence to Petitioner.[238]  Neither attorney Abell

---

[237] Attorney Abell's testimony at the evidentiary hearing held in Petitioner's Rule 32 proceeding appears at 51 SCR R-82-94.  Petitioner's state habeas counsel did elicit testimony from attorney Abell explaining that he had been appointed only weeks before the start of Petitioner's June 1996 trial because attorney Howell had experienced ill health that had necessitated postponement of several pretrial hearings.  Testimony of William Abell, 51 SCR R-85. Significantly, Petitioner's state habeas counsel elicited no testimony from attorney Abell regarding any alleged impairment of attorney Howell's judgment or any allegedly impaired decisions made by attorney Howell in connection with Petitioner's June 1996 trial.  Attorney Abell testified that (1) he gave the opening statement for the defense at the guilt-innocence phase of trial when attorney Norris was unable to do so and in attorney Howell's absence, (2) he was fully aware attorney Howell would not be present for opening statements, and (3) he was fully prepared to give, and did give, the defense team's opening statement, outlining Petitioner's history of multiple placements by state officials and arguing the state was to blame for Petitioner's offenses.  *Id.*, 51 SCR R-89-90.  On cross-examination, attorney Abell testified the decision to enter a plea of not guilty by reason of mental disease or defect was made because (1) Petitioner's "not guilty" plea had previously been rejected by the jury and the evidence of Petitioner's guilt was overwhelming and (2) the mental disease or defect plea was intended to hopefully gloss over or eliminate some of the more inflammatory aspects of the case, as irrelevant.  *Id.*, at R-92.  On redirect examination, attorney Abell (1) admitted that by the time he joined Petitioner's defense team, all the key strategic and tactical decisions had already been made by attorney Howell but (2) expressed no opinions suggesting there was anything defective or deficient in those decisions made by attorney Howell.  *Id.*, at R-93-94.

[238] Testimony of John David Norris, 51 SCR R-103-04.  The entirety of attorney Norris's testimony at the evidentiary hearing in Petitioner's Rule 32 proceeding appears at 51 SCR R-94-105.  Attorney Norris did emphasize throughout his testimony that attorney Howell made all of the strategic and tactical decisions for the defense team leading up to Petitioner's June 1996 trial

nor attorney Norris offered any testimony suggesting they believed any of attorney Howell's strategic, tactical, or practical decisions relating to the defense of Petitioner at the June 1996 trial were defective, deficient, or otherwise harmful to Petitioner. Likewise, neither of them offered any testimony suggesting that attorney Howell's personal interests conflicted in any way with Petitioner's legal interests. Neither of these witnesses, nor any other witness at Petitioner's Rule 32 hearing, offered any testimony concerning their personal knowledge of any "gender identity crisis" or "gender confusion" attorney Howell allegedly experienced in June 1996.[239]

The circuit court concluded Petitioner "failed to meet his burden of proving that any possible psychological difficulties, that his lead counsel may have suffered, violated his right to counsel or caused a conflict of interest."[240] The Alabama Court of Criminal Appeals held (1) Petitioner had failed to allege any specific facts

---

but expressed no opinions and stated no facts suggesting that there was anything defective or deficient in those decisions made by attorney Howell.

[239] Petitioner's state habeas counsel did present an affidavit from Petitioner's former lead trial counsel to the circuit court during Petitioner's Rule 32 hearing, but the circuit court sustained the State's objection to consideration of the affidavit and ordered it sealed. 51 SCR R-115-23. Petitioner did not furnish this court with a copy of this affidavit.

[240] 50 SCR 471-72; 54 SCR (Appendix I to Tab R-65), at pp. 26-27; 55 SCR (Tab R-72), at pp. 26-27.

supporting his seventh and ninth claims in his Rule 32 petition and (2) the circuit court properly denied those claims.[241]

## C. Clearly Established Federal Law

The Sixth Amendment right to counsel includes the right to representation that is free from any conflict of interest. *See Wood v. Georgia*, 450 U. S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest."). A conflict of interest exists when defense counsel places himself in a position conducive to divided loyalties. *See Holloway v. Arkansas*, 435 U. S. 475, 481, 490-91 (1978) (holding (1) a lawyer who represents multiple defendants with conflicting interests cannot provide sufficient legal assistance to satisfy the Sixth Amendment's command and (2) a criminal defendant who objects to his

---

[241] 54 SCR (Exhibit 1 to Tab R-64), at pp. 26-27; 54 SCR (Appendix II to Tab R-65), at pp. 26-27; 55 SCR (Tab R-73), at pp. 26-27. More specifically, the Alabama Court of Criminal Appeals' Memorandum issued June 17, 2005 stated as follows:

> Freeman pleaded no facts whatsoever in support of Ground VII of his petition. Contrary to Freeman's apparent belief, merely stating the ground for relief without any supporting facts is not sufficient to satisfy the burden of pleading. Likewise, Freeman's allegation in Ground IX of his petition consists of nothing more than conclusory statements unsupported by any specific facts indicating that counsel suffered from an actual conflict of interest that adversely affected her performance. Therefore, Freeman failed to satisfy his burden of pleading with respect to these allegations of ineffective assistance of trial counsel, and they were properly denied by the circuit court.

54 SCR (Exhibit 1 to Tab R-64), at pp 27; 54 SCR (Appendix II to Tab R-65), at p. 27; 55 SCR (Tab R-73), at p. 27.

representation based on a conflict of interest prior to trial need not demonstrate actual prejudice). *Contrast Cuyler v. Sullivan*, 446 U. S. 335, 348 (1980) ("In order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest affected his lawyer's performance."). The mere possibility of a conflict, absent a showing that the attorney actively represented conflicting interests, is not sufficient. *Cuyler v. Sullivan*, 446 U. S. at 350 ("But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance."). The *Cuyler* standard differs substantially from the *Strickland* standard in that *Cuyler* requires no showing of "prejudice." *See Burger v. Kemp*, 483 U. S. 776, 783 (1987) (prejudice is presumed under the *Cuyler* test "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" (quoting *Strickland v. Washington*, 466 U. S. at 692)).

In *United States v. Cronic*, 466 U. S. 648 (1984), decided the same day as *Strickland*, the Supreme Court held a presumption of prejudice similar to that recognized in *Cuyler v. Sullivan*, 446 U. S. 335, 348 (1980), arises in three narrow circumstances: first, when a criminal defendant is completely denied the assistance of counsel; second, when counsel entirely fails to subject the prosecution's case to meaningful adversarial testing; and finally, where the circumstances are such that

even competent counsel very likely could not render effective assistance. *United States v. Cronic*, 466 U. S. at 659. As examples of the latter two situations, respectively, the Supreme Court cited the denial of effective cross-examination in *Davis v. Alaska*, 415 U. S. 308 (1974) (defendant was denied the opportunity to cross-examine the prosecution's key witness for bias), and the incendiary circumstances surrounding the trial of the so-called "Scottsboro Boys" addressed in *Powell v. Alabama*, 287 U. S. 45 (1932) (no individual attorney was appointed to represent the defendants and trial proceeded after a volunteer attorney from another state appeared on the first day of trial but confessed he had not had an opportunity to prepare for trial). *United States v. Cronic*, 466 U. S. at 659-61. In a footnote, the Supreme Court recognized the continuing efficacy of its earlier holding in *Cuyler*, presuming prejudice where a defendant establishes an actual conflict of interest adversely affected his counsel's performance. *United States v. Cronic*, 466 U. S. at 661 n.31. In *Bell v. Cone*, 535 U. S. 685, 695-96 (2002), the Supreme Court reiterated that the second exception to the requirement of *Strickland* "prejudice" it had envisioned in *Cronic* was limited to situations in which defense counsel *completely* failed to subject the prosecution's case to meaningful adversarial testing. *See Bell v. Cone*, 535 U. S. at 697-98 (holding complaints about trial counsel's waiver of closing argument at the punishment phase of trial and failure to adduce mitigating evidence insufficient to create a presumption of prejudice absent a

showing trial counsel completely failed to challenge the prosecution's case throughout the sentencing proceeding).

## D. AEDPA Review of Claim Asserted in the State Habeas Proceeding

### 1. *Cuyler v. Sullivan* Conflict of Interest Claim

Under the *Cuyler* standard, a federal habeas petitioner asserting a conflict of interest claim must show an actual conflict of interest existed that adversely affected the performance of petitioner's counsel. *Cuyler v. Sullivan*, 446 U. S. at 348; *Downs v. Sec'y, Fla, Dep't of Corr.*, 738 F.3d 240, 265 (11th Cir. 2013), *cert. denied*, 135 S. Ct. 70 (2014);  A conflict of interest claimant cannot prevail unless he can point to specific instances in the record to suggest an actual conflict or impairment of his interests existed.  *See Ferrell v. Hall*, 640 F.3d 1199, 1244 (11th Cir. 2011) (petitioner asserting a conflict of interest claim must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting or failing to elicit evidence helpful to one client but harmful to another; if counsel did not make such a choice, the conflict remained hypothetical (quoting *Smith v. White*, 815 F.2d 1401, 1404 (11th Cir.), *cert. denied*, 484 U. S. 863 (1987)); *Owen v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 913 (11th Cir. 2009) (holding defendant's conflict of interest claim failed where he did not present evidence showing his counsel represented conflicting interests), *cert. denied*, 558 U. S. 1151 (2010).  To show "adverse effect, a defendant

need not show that, but for the conflict of interest, the outcome of the proceeding would have been different; rather, the defendant merely must demonstrate that his attorney's conflict of interest had an effect upon the representation that he received. *See Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d at 265 (testimony of petitioner's former trial counsel that a contingency fee contract between him and the petitioner had no impact on counsel's strategic decisions during trial (including decision not to present any defense witnesses) fully supported state court's rejection on the merits of conflict of interest claim).

Petitioner failed to allege any specific facts and failed to present any evidence during his Rule 32 proceeding showing either (1) his trial counsel actually represented conflicting interests prior to or during Petitioner's June 1996 capital murder trial or (2) Petitioner was adversely affected by an actual conflict of interest. During his Rule 32 proceeding, Petitioner did not identify any adverse act or omission by his lead trial counsel prior to or during Petitioner's June 1996 capital murder trial resulting from his lead trial counsel's representation of any party with an interest adverse to Petitioner. In fact, Petitioner identified no other party or person whom Petitioner claimed his trial counsel was representing at the time of Petitioner's June 1996 trial (or had represented prior to the June 1996) whom Petitioner alleged

possessed an interest adverse to, or conflicting with, Petitioner.[242]   Under such circumstances, the state habeas court's rejection on the merits of Petitioner's *Cuyler* conflict of interest claim was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.

### 2. Inapplicability of *Cronic's* Presumed Prejudice Rule

Conclusory complaints about the performance and strategic decisions of Petitioner's lead trial counsel of the nature asserted by Petitioner in his fourth amended Rule 32 petition do not warrant application of the presumption of prejudice recognized in *Cronic*.  *See Castillo v. Florida, Sec'y of DOC*, 722 F.3d 1281, 1288-92 (11th Cir. 2013) (holding complaints about discreet omissions by trial counsel (including the failure to object to an allegedly unconstitutional error) do not fall within the presumed prejudice rule of *Cronic* because they do not amount to a

---

[242] Attorney Abell did testify during Petitioner's Rule 32 hearing that, at some point in the past, attorney Howell had represented a civil litigant pursuing a reverse discrimination claim against a state agency.  Testimony of William Abell, 51 SCR R-88-89.  However, Petitioner offered the state habeas court no facts or evidence showing (1) attorney Howell's client in that civil proceeding had an interest adverse to, or conflicting with, Petitioner or (2) attorney Howell made any decision in Petitioner's capital murder case as a result of, or that was affected in any manner by, attorney Howell's prior representation of that civil litigant.

complete failure to subject the prosecution's case to meaningful adversarial testing), *cert. denied*, 134 S. Ct. 1927 (2014). The presumption of prejudice recognized in *Cronic* does not apply where the defendant complains of merely shoddy or poor performance by his trial counsel; for a defendant to be entitled to such a presumption, his attorney's failure must be complete. *See Bell v. Cone*, 535 U. S. at 697 (holding the presumption applicable only when counsel entirely failed to subject the prosecution's case to meaningful adversarial testing). At best, Petitioner's pleadings and evidence in his Rule 32 proceeding amounted to complaints that his lead trial counsel suffered from unidentified psychological problems arising from counsel's "gender confusion" or "gender identity crisis" and these problems harmed Petitioner in an unspecified manner.

The circuit court and Alabama Court of Criminal Appeals both had before them the record from Petitioner's June 1996 capital murder trial when those courts rejected Petitioner's implied *Cronic* claim on the merits. Review of the record from Petitioner's June 1996 trial establishes that Petitioner's trial counsel (1) vigorously challenged the prosecution's witnesses through cross-examination, (2) stipulated to the admission of summaries of the testimony of various forensic experts (whose detailed and often graphic testimony during Petitioner's 1989 trial had clearly been disadvantageous to Petitioner), (3) presented Dr. Burkhart's expert opinion testimony suggesting Petitioner suffered from (a) Schizotypal Personality Disorder

and (b) a brief reactive psychotic episode at the time of his capital offenses, (4) presented (a) Ms. Copeland's testimony and Dr. Renfro's detailed analysis of Petitioner's difficult childhood and (b) Dr. Renfro's plain English explanation of how Petitioner's resulting Borderline Personality Disorder left Petitioner particularly susceptible to fits of anger and rage when confronted with real or perceived abandonment or rejection, (5) argued at the guilt-innocence phase of trial that (a) Petitioner had, consistent with Dr. Burkhart's view, been unable to conform his conduct to the requirements of the law at the time of his capital offenses and (b) a verdict of not guilty by reason of mental disease or defect would result in Petitioner going to Taylor-Hardin, a secure mental health facility,[243] and (6) argued at the punishment phase of trial that (a) Petitioner's juvenile record should be ignored because such records are usually sealed, (b) Petitioner's juvenile offenses were minor and nonviolent, (c) Petitioner's extreme emotional disturbance at the time of his offenses should be weighed as mitigating even if the jury had concluded earlier that it did not warrant an acquittal by reason of mental disease or defect, (d) Petitioner's youth should also be considered as a mitigating factor, and (e) condemning Petitioner would not rectify the loss of two other lives.[244]    Viewed

---

[243] Attorney Howell's closing argument at the guilt-innocence phase of Petitioner's June 1996 capital murder trial appears at 43 SCR R-1177-95.

[244] Attorney Howell's closing argument at the punishment phase of Petitioner's June 1996 trial appears at 44 SCR R-1293-96.

objectively, this was the very antithesis of a "complete failure to subject the prosecution's case to meaningful adversarial testing."

The state habeas court's rejection on the merits of Petitioner's *Cronic* conflict of interest claim was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.

## E. *De Novo* Review of New Allegations and Arguments

In his third claim for relief in this federal habeas corpus proceeding, Petitioner argues (1) attorney Howell's gender confusion was "at its height in 1994 and through the end of petitioner's trial," (2) during this time, Howell was dealing with "other personal problems as well, including caring for his wife . . . , and his infant son," (3) the nature of the charges against Petitioner were especially difficult for Howell to confront, (4) Howell's psychological and personal problems interfered with his ability to focus on Petitioner's case, (5) Howell decided to rely solely on an insanity defense despite the fact he lacked persuasive expert testimony to substantiate the claim and he should have known he might have to overcome the testimony of Frances Boozer who recalled Petitioner telling her prior to the crime that he would rather see Sylvia dead than with someone else, (6) Howell deposed Dr. Renfro "with

full knowledge that Renfro's conclusions refuted the defense theory," (7) Howell told the jury during guilt-innocence phase closing argument that a finding of guilt would be the equivalent of "writing the first line or two of David's death certificate," (8) Howell presented virtually no evidence at the punishment phase of trial, and (9) Howell did not reveal to Petitioner his "condition" or the effect it had on his judgment and ability to effectively represent Petitioner (Doc. # 5, at pp. 15-18).

### 1. *Cuyler v. Sullivan* Conflict of Interest Claim

As was true of his *Cuyler* conflict of interest claim in his Rule 32 proceeding, Petitioner's *Cuyler* conflict of interest claim in this court is bereft of any specific facts (or properly proffered evidence) showing that his lead trial counsel either (1) actually represented (or previously represented) a party with an interest adverse to, or conflicting with, Petitioner or (2) took, or failed to take, any identifiable action in connection with Petitioner's June 1996 trial *because* of his simultaneous or previous representation of another party with an interest adverse to, or conflicting with, Petitioner. Instead, stripped of the vituperative and vitriolic invective that permeates Petitioner's pleadings in this court, Petitioner's third claim for federal habeas relief is an argument that his lead trial counsel suffered from mental impairments, which caused said counsel to make ill-advised strategic decisions in connection with Petitioner's June 1996 capital murder trial. Petitioner's assertion that his lead trial counsel suffered from an illness (whether physical or mental in nature is irrelevant)

which allegedly impaired or interfered with his lead trial counsel's judgment does not, standing alone, establish an "actual conflict of interest" within the meaning of *Cuyler*.[245]

*Cuyler* dealt with a conflict of interest in the context of counsel's concurrent representation of multiple defendants. *Cuyler v. Sullivan*, 446 U. S. at 337-38. The Eleventh Circuit has recognized "there is no Supreme Court decision holding that

---

[245] Additionally, Petitioner's use of the terms "gender confusion" and "gender identity crisis" is problematic at best. The DSM-4-TR included a discussion of "gender identity disorder." The DSM-5 now refers to "gender dysphoria," which "focuses on dysphoria as the clinical problem, not identity *per* se." *DSM-5*, at p. 451. The DSM-5's discussion of gender dysphoria appears at pp. 451-59 of that publication. The DSM-5's diagnostic criteria for gender dysphoria in adolescents and adults are as follows:

A.    A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B.    The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

*DSM-5*, at pp. 452-53.

any kind of presumed prejudice rule applies outside the multiple representation context. The *Sullivan* decision itself did not involve any other context." *Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d at 265 (quoting *Schwab v. Crosby*, 451 F.3d 1308, 1327 (11th Cir. 2006), *cert. denied*, 549 U. S. 1169 (2007)). Most other circuits agree. *See, e.g.*, *Earp v. Ornoski*, 431 F.3d 1158, 1184-85 (9th Cir. 2005) (holding dicta in the Supreme Court's opinion in *Mickens v. Taylor*, 535 U. S. 162, 176 (2002), limited the holding in *Cuyler* to joint representation cases), *cert. denied*, 547 U. S. 1159 (2006); *Smith v. Hoffbauer*, 312 F.3d 809, 815-17 (6th Cir. 2002) (holding extension of the rule in *Cuyler* beyond multiple representation cases is not clearly established by Supreme Court precedent as required by the AEDPA), *cert. denied*, 540 U. S. 971 (2003); *Beets v, Scott*, 65 F.3d 1258, 1266-72 (5th Cir. 1995) ("applying *Cuyler* in cases arising from a lawyer's conflict of interest between himself and his client ultimately undermines the uniformity and simplicity of *Strickland*"), *cert. denied*, 517 U. S. 1157 (1996).

Prejudice is presumed only if there is proof of an actual conflict of interest. *Burger v. Kemp*, 483 U. S. at 783. That a criminal defendant finds an aspect of his trial counsel's professional representation or personal life objectionable does not establish an "actual conflict of interest" within the meaning of *Cuyler*. *See, e.g.*, *Jones v. Sec'y, Dep't of Corr.*, 644 F.3d 1206, 1210 (11th Cir.) (lawyer's status as an honorary deputy sheriff posed no conflict of interest or prejudice to defendant),

*cert.* denied, 565 U. S. 1041 (2011); *Owen v. Sec'y for Dep't of Corr.*, 568 F.3d 894, 912-13 (11th Cir. 2009) (neither the fact counsel represented defendant both at trial and direct appeal or that counsel represented defendant on appeal after the defendant filed a bar complaint against counsel rose to the level of an actual conflict of interest under *Cuyler*), *cert. denied*, 558 U. S. 1151 (2010); *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1355-58 (11th Cir.) (counsel's status as a special deputy sheriff so he could carry a firearm did not rise to an actual conflict of interest), *cert. denied*, 546 U. S. 928 (2005).

Moreover, Petitioner's complaints about the performance of his trial counsel do not establish that his lead trial counsel took any action or failed to take any action *because* of an actual conflict of interest. Petitioner's conclusory complaint about his lead trial counsel's decision to present an insanity defense in June 1996 is premised, in part, upon what Petitioner now perceives, with the advantage of twenty/twenty hindsight, to be the weakness of Dr. Burkhart's opinion testimony (that Petitioner's brief reactive psychosis prevented Petitioner from conforming his behavior to the requirements of the law). As Petitioner's co-counsel, attorney Abell, pointed out during his testimony at Petitioner's Rule 32 hearing, the evidence of Petitioner's guilt was overwhelming. Given the overwhelming evidence of Petitioner's guilt and the lack of success of Petitioner's "not guilty" plea in 1989, there was nothing objectively unreasonable with the decision by Petitioner's lead trial counsel to rely

upon Dr. Burkhart to establish the basis for a defense of "not guilty by reason of mental disease or defect." As attorney Abell also pointed out, doing so allowed Petitioner's defense team to ameliorate much of the graphic evidence reflecting the lurid details of Petitioner's capital offenses. Had Petitioner insisted on re-litigating every detail of his guilt, there is no assurance the prosecution would have stipulated to having most of its forensic experts (who testified graphically and at length in 1989 to the grisly details of Petitioner's offenses) testify in June 1996 via dry stipulations read into the record by the prosecutor. Moreover, Dr. Burkhart's testimony did support Petitioner's insanity defense. The fact Dr. Burkhart did not testify that Petitioner was "crazy" at the time of his offense did not render the decision by Petitioner's defense team to assert a mental health defense objectively unreasonable or the product of an actual conflict of interest.

Nor does Petitioner allege any specific facts showing that his trial counsels' decisions to (1) depose Dr. Renfro, (2) emphasize during closing argument the seriousness of the question before the jury at the guilt-innocence phase of trial, or (3) present the bulk of the defense's mitigating evidence during the guilt-innocence phase of trial were the results of any "actual conflict of interest" within the meaning of *Cuyler*. *Ferrell v. Hall*, 640 F.3d at 1244 (petitioner asserting a conflict of interest claim must make a factual showing of inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such

as eliciting or failing to elicit evidence helpful to one client but harmful to another; if counsel did not make such a choice, the conflict remained hypothetical); *Smith v. White*, 815 F.2d at 1404 (holding the same); *Owen v. Sec'y for Dep't of Corr.*, 568 F.3d at 913 (defendant's conflict of interest claim failed where he failed to present evidence showing his counsel represented conflicting interests).

## 2. Inapplicability of *Cronic's* Presumed Prejudice Rule

For the same reasons discussed in Section XI.D.2., Petitioner's new complaints about the performance of his trial counsel do not fall within any of the three narrow situations the Supreme Court discussed in *Cronic*. Petitioner was capably represented throughout his June 1996 trial by three attorneys. Petitioner's defense team did not fail to subject the prosecution's case to meaningful adversarial testing. Nor does Petitioner allege any facts showing his trial counsel were so overwhelmed by circumstances they were unable to furnish effective assistance. Petitioner's complaints about the performance of his trial counsel are little more than arguments that his trial counsel should have come up with a better defensive strategy. Counsel offers no clue as to how his trial counsel could have done so within the context of the overwhelming evidence of (1) Petitioner's guilt[246] and (2) Petitioner's virtually life-long propensity for violence.[247] As the Supreme Court noted in *Cronic*,

---

[246] *See* notes 161, 167, 171, 173, 221, 225.

[247] *See* notes 133, 167, 183, 225-28.

"the Sixth Amendment does not require that counsel do what is impossible or unethical." *United States v. Cronic*, 466 U. S. at 656 n.19.

## F.  Conclusion

The state habeas court's rejection on the merits of Petitioner's conclusory *Cuyler/Cronic* claims during Petitioner's Rule 32 proceeding was neither (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the Petitioner's state habeas corpus proceeding.  After independent, *de novo* review, this court concludes Petitioner's *Cuyler/Cronic* conflict of interest claims, as supplemented by the new facts alleged in Petitioner's pleadings in this court, are without arguable merit.  Petitioner's third ground for relief does not warrant federal habeas corpus relief.

## XII.  Request for Evidentiary Hearing

Petitioner requests an evidentiary hearing.  Insofar as Petitioner's claims in this federal habeas corpus proceeding were disposed of on the merits during the course of Petitioner's direct appeal or Rule 32 proceeding, Petitioner is not entitled to a federal evidentiary hearing to develop new evidence attacking the state appellate or state habeas court's resolution of Petitioner's claims.  Under the AEDPA, the proper place for development of the facts supporting a claim is the state court.  *See*

*Harrington v. Richter*, 562 U. S. 86, 103 (2011) ("Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding."); *Hernandez v. Johnson*, 108 F.3d 554, 558 n.4 (5th Cir.) (holding the AEDPA clearly places the burden on a petitioner to raise and litigate as fully as possible his federal claims in state court), *cert. denied*, 522 U. S. 984 (1997). Furthermore, where a petitioner's claims have been rejected on the merits, further factual development in federal court is effectively precluded by virtue of the Supreme Court's holding in *Cullen v. Pinholster*, 563 U. S. 170  181-82 (2011):

> We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that "resulted in" a decision that was contrary to, or "involved" an unreasonable application of, established law.  This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at that same time *i.e.,* the record before the state court.

Thus, petitioner is not entitled to a federal evidentiary hearing on any of his claims which were rejected on the merits by the state courts, either on direct appeal or during Petitioner's Rule 32 proceeding.

With regard to the new factual allegations and new legal arguments Petitioner failed to fairly present to the state courts, and for which this court has undertaken *de novo* review, Petitioner is likewise not entitled to an evidentiary hearing.  In the

course of conducting *de novo* review, this court has assumed the factual accuracy of all the specific facts alleged by Petitioner in support of his claims for relief, including the factual accuracy of all the new potentially mitigating information Petitioner identified in his pleadings in this court in support of his multi-faceted ineffective assistance claims. As explained at length in Sections IX and X above, even when the truth of all of Petitioner's new factual allegations supporting his ineffective assistance claims is assumed, Petitioner's ineffective assistance claims still do not satisfy the prejudice prong of the *Strickland* standard. Furthermore, as explained above, even assuming the truth of all the new factual allegations Petitioner presents in support of his federal habeas claims, this court concludes after *de novo* review that none of petitioner's claims warrant federal habeas corpus relief. In light of these assumptions, Petitioner is not entitled to an evidentiary hearing in this court. *See Schriro v. Landrigan*, 550 U. S. 465, 474 (2007) ("In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."); *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d 1299, 1318-19 (11th Cir. 2016) ("We emphasize that the burden is on the petitioner in a habeas corpus proceeding to allege sufficient facts to support the grant of an evidentiary hearing and that a federal court will not blindly accept speculative and inconcrete claims as the basis upon which a hearing will be ordered.") (quoting

*Dickson v. Wainwright*, 683 F.2d 348, 351 (11th Cir. 1982)); *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1060 (11th Cir. 2011) (the burden is on the petitioner to establish the need for an evidentiary hearing), *cert. denied*, 565 U. S. 1120 (2012). If a habeas petition does not allege enough specific facts that, if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing. *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d at 1319; *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d at 1060. Where a petitioner fails to allege sufficient facts to satisfy the prejudice prong of *Strickland*, it is unnecessary to hold an evidentiary hearing to resolve disputed facts relating to the allegedly deficient performance of trial counsel. *Bester v. Warden*, 836 F.3d 1331, 1339-40 (11th Cir. 2016), *cert. denied*, 137 S. Ct. 819 (2017). For the reasons discussed at length above, Petitioner has failed to satisfy this standard.

Moreover, Petitioner failed to make a valid proffer of any new evidence in support of his claims for relief. Petitioner did not present this court with any affidavits or properly authenticated documents in support of his claims for federal habeas corpus relief. Petitioner's federal habeas corpus petition and brief in support (in which Petitioner asserts a plethora of new factual allegations) were not executed under penalty of perjury by a person claiming to possess personal knowledge of the facts contained therein; thus they do not satisfy the requirements of a sworn declaration under 28 U.S.C. § 1746. There is no need for an evidentiary hearing in

federal court where a federal habeas petitioner fails to proffer any evidence he would seek to introduce at a hearing. *See Chandler v. McDonough*, 471 F.3d 1360, 1363 (11th Cir. 2006) (holding no evidentiary hearing necessary in federal habeas proceeding where the district court took as true the factual assertions underlying the ineffective assistance claim and the petitioner failed to proffer any additional evidence), *cert. denied*, 550 U.S. 943 (2007). "[I]f a habeas petition does not allege enough specific facts that, if they were true, would warrant relief, the petitioner is not entitled to an evidentiary hearing." *Jones v. Sec'y, Fla. Dep't of Corr.*, 834 F.3d at 1319. "The allegations must be factual and specific; conclusory allegations are simply not enough to warrant a hearing." *Id.* "Moreover, a petitioner seeking an evidentiary hearing must make a 'proffer to the district court of any evidence that he would seek to introduce at a hearing.'" *Id.* "A §2254 petitioner is not entitled to an evidentiary hearing if he fails to 'proffer evidence that, if true, would entitle him to relief.' " *Hamilton v. Sec'y, Fla. Dep't of Corr.*, 793 F.3d 1261, 1266 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1661 (2016). Because Petitioner failed to make a valid proffer of new evidence in support of his claims, he is not entitled to an evidentiary hearing to develop that evidence in this court.

## XIII. Certificate of Appealability

Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a Certificate of

Appealability ("CoA").  *Miller-El v. Johnson*, 537 U. S. 322, 335-36 (2003);  28 U.S.C. §2253(c) (2).  A CoA is granted or denied on an issue-by-issue basis.  *Jones v. Sec'y, Fla. Dep't of Corr.*, 607 F.3d 1346, 1354 (11th Cir.) (no court may issue a CoA unless the applicant has made a substantial showing of the denial of a constitutional right and the CoA itself "shall indicate which specific issue or issues satisfy" that standard), *cert. denied*, 562 U. S. 1012 (2010); 28 U.S.C. §2253(c) (3).

A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right.  *Tennard v. Dretke*, 542 U. S. 274, 282 (2004); *Miller-El v. Johnson*, 537 U. S. at 336; *Slack v. McDaniel*, 529 U. S. 473, 483 (2000); *Barefoot v. Estelle*, 463 U. S. 880, 893 (1983).  To make such a showing, the petitioner need *not* show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further.  *Tennard v. Dretke*, 542 U. S. at 282; *Miller-El v. Johnson*, 537 U. S. at 336.  This court is required to issue or deny a CoA when it enters a final Order such as this one adverse to a federal habeas petitioner.  *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim.  "[W]here a

district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller-El v. Johnson*, 537 U. S. at 338 (quoting *Slack v. McDaniel*, 529 U. S. at 484). In a case in which the petitioner wishes to challenge on appeal this court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this court was correct in its procedural ruling. *See Slack v. McDaniel*, 529 U. S. at 484 (when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

Reasonable minds could not disagree with this court's conclusions that (1) the state habeas court reasonably rejected on the merits all of Petitioner's conclusory complaints about the performance of his trial counsel and state appellate counsel, (2) when reviewed under a *de novo* standard of review, all of Petitioner's new factual allegations supporting his ineffective assistance claims fail to satisfy the prejudice

prong of *Strickland*, (3) the state appellate and state habeas courts reasonably rejected on the merits Petitioner's *Atkins, Cuyler/Cronic, Apprendi/Ring, Miranda,* and Double Jeopardy claims, as well as Petitioner's complaints about the admission of Dr. O'Brien's bite-mark testimony and the prosecutor's closing jury arguments, and (4) Petitioner's new factual allegations and new legal theories asserted in this court in support of his claims do not warrant federal habeas relief under a *de novo* standard of review and do not warrant a federal evidentiary hearing. Petitioner is not entitled to a CoA on any of his claims for federal habeas corpus relief.[248]

## XIV. ORDER

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in Petitioner's original federal habeas corpus petition (Doc. # 5), as supplemented by the new facts alleged in his brief in support (Doc. # 64), is **DENIED.**

2. Petitioner's request for an evidentiary hearing is **DENIED.**

---

[248] The state court record consists of fifty-five volumes averaging approximately two-hundred pages per volume, which lack a uniform, consistent system for numbering pages. This record includes (1) multiple, very poor quality (some almost illegible), photocopies of Petitioner's mental health and institutional records, as well as (2) social worker records relating to Petitioner's family, some of which date back to the 1950's. Key volumes in the state court record are indexed with numbered tabs attached to the right margin of pages which will likely be lost if the record is scanned for transmittal to an appellate court. Without the accompanying numbered tabs, it will be virtually impossible for an appellate court to locate individual documents among the voluminous state court record. For these reasons, in the event of an appeal from this court's Final Judgment, the court will direct the Clerk to seek permission from the Eleventh Circuit to transmit the state court record in its current hard-copy form rather than a scanned version.

3.  All other pending motions are **DISMISSED** AS MOOT.

4.  Petitioner is **DENIED** a Certificate of Appealability on all of his claims.

DONE this 2nd day of July, 2018.

/s/ W. Keith Watkins

CHIEF UNITED STATES DISTRICT JUDGE